IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| THE UNITED STATES OF AMERICA | |
| Plaintiff | CIVIL 94-2080CCC |
| vs. | |
| THE COMMONWEALTH OF PUERTO RICO; | |

The Honorable PEDRO J. ROSSELLO, Governor of the Commonwealth of Puerto Rico, in his official capacity;

THE JUVENILE INSTITUTIONS ADMINISTRATION;

ZORAIDA BUXO, Secretary of the Department of Corrections and Rehabilitation, in her official capacity;

MIGUEL RIVERA, Director, Juvenile Institutions Administration, in his official capacity;

DR. CARMEN FELICIANO VDA. DE MELECIO, Secretary of Health, Department of Health, in her official capacity;

DR. NESTOR GALARZA, Director, Anti-Addiction Services Department, in his official capacity;

VICTOR FAJARDO, Secretary, Department of Education, in his official capacity;

PEDRO PIERLUISI, Secretary, Justice Department of the Commonwealth of Puerto Rico, in his official capacity;

CARMEN RODRIGUEZ, Secretary, Department of Social Services, in her official capacity;

DANIEL VAZQUEZ TORRES, Director Humacao Detention Center, in his official capacity;

EDGARD ORTIZ ALBINO, Director, Mayagüez Industrial School, in his official capacity;

NORMA CRUZ, Director, Ponce Central Training School, in her official capacity;

CIVIL 94-2080CCC                                        2

FRANCISCA APONTE, Director, Ponce
Victoria Street Training Center, in her
official capacity;

PAULITO DIAZ DE GARCIA, Director,
Ponce Detention Center for Girls and
Ponce Industrial School for Girls and
Boys, in her official capacity;

JULIO CUALIO BONET, Director,
Guaynabo Training School, in his official
capacity; and

LYDIA LASALLE, Acting Director, Central
Metropolitan Training School of Bayamón,
in her official capacity;

Defendants

---

### STATEMENT OF REASONS IN SUPPORT OF ORDER ISSUED ON SEPTEMBER 30, 2011 (DOCKET ENTRY 997)

After having considered the Motion Under the Prison Litigation Reform Act to Terminate Particular Prospective Relief Provisions filed by the Commonwealth defendants (docket entry 939), the United States' Opposition (docket entry 942), the Monitor's Expert Reports for the PLRA Hearing (docket entries 951 and 954), and the United States' Motion in Response to Monitor's Report for the PLRA Hearing (docket entry 958), the Court ruled on September 30, 2011 (docket entry 997) and terminated paragraphs 31b, 31c, 31d, 32, 33, 44, 75 and 76 of the Settlement Agreement as prospective relief while deciding to maintain in effect paragraph 31a and paragraphs 48, 81, 87 and 90 as they applied to Guali. We now state the reasons for said ruling.

**Paragraphs 32, 33 and 75 of the Settlement Agreement**

Paragraphs 32, 33 and 75 were terminated in the Order issued on September 30, 2011 (docket entry 997) as the United States consented to their termination as informed in its Motion in Response to Monitor's July 6, 2010 Expert Reports for PLRA Hearing (docket entry 958).

CIVIL 94-2080CCC                                    3

**Paragraph 31 of the Settlement Agreement**

      Paragraph 31 of the Settlement Agreement provides:

    **¶ 31**   ***Existing facilities expected to be occupied by juveniles beyond Fiscal Year 1996-1997 shall conform to applicable federal, state and/or local building codes. Sleeping areas in which juveniles are confined shall conform to 35 square feet per one occupant. Toilets shall be provided at a minimum ratio of one for every 12 juveniles in male facilities and one for every eight juveniles in female facilities. Juveniles will have access to operable wash basins with running water, to operable showers and to potable drinking water.***

      The Commonwealth defendants have submitted a Certification issued by engineer Luis Angel Ortiz-Santiago, Director, AIJ Physical Plant Division, and Rosa Fernández, Administrative Manager, which makes a general statement that "the existing facilities in use for housing youth (Bayamón - Detention and Treatment, Villalba, Humacao and Guayama) do comply with applicable federal, state and/or local building codes. This Certification is dated January 4, 2011. The April 25, 2011 Monitor's PLRA Report states at page 7 that the Monitor's Office conducted a comprehensive building code analysis in 2006 to determine compliance. Mr. Michael DiMascio, an expert code consultant for correctional facilities, was retained to conduct field service. In January of 2011, the Monitor's Office retained engineer Alonghitano to do an updated compliance code study which included a limited scope field audit to determine whether AIJ facilities conformed with federal, state and/or local building codes in providing safety levels under the requirements of the National Fire Protection Association. A four-day field audit of seven AIJ facilities, including the more recent CREANDO program at Camp Santiago, was done on March 14 through 17, 2011. The Monitor reports at pages 8 and 9 different instances of non-compliance with Life Safety Code requirements at seven facilities, to wit: CTS Humacao [inadequate emergency key management, inadequate fire alarm and sprinkler system maintenance, failure to maintain fire safety equipment and systems in continuous operating condition, each living unit had 15 cells with manual locks which exceeded the 10 locks one staff person may safely operate in an emergency situation under the Code]; CTS-Bayamón [inadequate emergency key

CIVIL 94-2080CCC                              4

management, inadequate fire alarm and sprinkler maintenance, failure to maintain fire safety equipment and systems in continuous operating condition]; CREANDO program [dormitories not equipped with fire alarm systems or single station smoke alarms]; CTS-Guayama [absence of fire alarm system maintenance]; CTS-Villalba [sprinkler systems are not maintained in accordance with the Code, emergency keys are not coded to be easily determined by sight and touch, required smoke barriers in dayrooms have Lexan panels that could melt out in a fire allowing the spread of fire and smoke across the barriers]; CTS-Ponce Niñas [sprinkler and fire alarm systems not maintained in accordance with the Code, emergency keys are not coded to be easily determined by sight and touch, failure to maintain fire safety equipment and systems in continuous operating condition]; CD-Bayamón [sprinkler systems currently not installed in accordance with the Code as they have been removed from toilet/shower areas, fire alarm systems not maintained in accordance with the Code, emergency keys not coded to be easily determined by sight and touch, required smoke barriers in dayrooms have Lexan panels that could melt in a fire allowing the spread of fire and smoke across the barriers, failure to maintain fire safety equipment and systems in continuous operating condition].

The violations to the Life Safety Code raised by the Monitor, as outlined above, have not been disputed. The non-compliance with the Life Safety Code requirements were found by the Monitor to be present at all seven facilities in violation of the juvenile detainees' right to confinement in facilities which provide adequate safety conditions.  The Monitor's findings in the April 25, 2011 Report raise serious concerns regarding risk of harm to detained juveniles due to unsafe conditions essentially stemming from violations of the Life Safety Code 1997 Edition of the National Fire Safety Association (NFPA) provisions that guarantee safety from fire hazards.

In addition to the ongoing violations, the Court also finds that the PLRA requirement that the prospective relief extend no further than necessary to correct the violation, be

CIVIL 94-2080CCC                                      5

narrowly drawn and be the least intrusive means to achieve the correction, has been complied with by paragraph 31(a) of the Settlement Agreement. The Code compliance agreed to in paragraph 31(a) is tailored to the applicable federal, state and local building codes and the compliance required does not go beyond the scope of the codes in force.

The Court notes that the reference made by the Monitor in his PLRA Report of April 25, 2011 is to the 1997 edition of the NFPA Life Safety Code. Since the Court finds that paragraph 31(a) must continue, pursuant to 18 U.S.C. 3626(b)(3), and, further notes that the 2012 edition is the current version of the Life Safety Code, the parties shall SHOW CAUSE by NOVEMBER 18, 2011, why paragraph 31(a) should not be modified to require conformity with the current federal, state and/or local building codes.

Paragraph 31(b) is terminated since, as reflected in the Monitor's PLRA Report, there is full compliance with the requirement related to the size of the sleeping area and the United States does not oppose termination.

Paragraph 31(c) (toilet ratio) is terminated. The 31(c) provision establishes a minimum ratio of 1 toilet for every 12 juveniles in male facilities and one for every 8 juveniles in female facilities. At page 11 of the Monitor's PLRA Report, the Monitor finds that "while there were no concerns about the physical availability of toilets, I nevertheless surveyed all the facilities to determine if the toilets were operational." The Monitor also finds at page 12 that "AIJ has been able to maintain the ratio in all my site visits for the past year and furthermore, as all housing units (except at Niñas) also have urinals, this adds additional (sic) sanitary fixtures to the plumbing ratios." This notwithstanding, the Monitor injects the requirement that toilets be operational found in paragraph 41 of the Settlement Agreement since he concludes that it "is related to paragraph 31 because a broken toilet cannot be counted toward the ratio at the time of inspection." PLRA Report, at p. 11. The Court does not have before it a violation to paragraph 41, which requires that toilets be repaired, nor is there a reference in paragraph 31 to "operational" toilets when establishing the minimum

CIVIL 94-2080CCC                                        6

ratios of 1:12 and 1:8.  Since the number of toilets have been found to exceed the ratios required in paragraph 31(c), and the operational requirement is not part of this provision, paragraph 31(c) of the Settlement Agreement is also terminated for there is no ongoing violation of the same.

As to paragraph 31(d) (access to operable wash basins with running water, to operable showers, and to potable drinking water), the Court has examined the Monitor's findings set forth at pages 13 and 14.  The Monitor repeatedly makes reference that AIJ has been in non-compliance with this particular provision because of the unavailability of continuous hot water or limited availability of hot water.  Hot water is not a requirement of 31(d).  Likewise, the Monitor attempts to impose a ratio of operational wash basins and showers which is nowhere  contemplated in paragraph 31(d) either.  What paragraph 31(d) does require, operable wash basins, operable showers, and potable drinking water, has been achieved by defendants , as the Monitor reports that there was access to working wash basins and showers at all locations as well as access to potable drinking water.  For this reason, paragraph 31(d) is terminated.

**Paragraph 38 of the Settlement Agreement**

As we noted in the September 30, 2011 Order (docket entry 997), although paragraph 38 was included by the Commonwealth defendants in its PLRA motion it was not discussed at all in said filing.  Since it was not until August 31, 2011 that the Commonwealth defendants stated their reasons in support of the request for termination (docket entry 985), we will entertain said filing as a separate PLRA motion and rule on it once the Monitor submits his customary PLRA Report.[1]

---

[1] The Court notes that the United States already filed its opposition on September 19, 2011 (docket entry 994).

CIVIL 94-2080CCC                                     7

## Paragraph 44 of the Settlement Agreement

Paragraph 44 of the Settlement Agreement provides:

> **¶ 44   *Defendants agree to provide mattresses constructed of fire retardant materials.***

The Commonwealth defendants have submitted a certification signed on January 4, 2011 by the Fire Prevention and Security Officer of AIJ, Pedro Santiago-Rivera, and its Administrative Manager Rosa Fernández, where the distribution of fire retardant mattresses per facility for a total of 600 such mattresses is included.  The PLRA termination motion (docket entry 939), at page 9, states that this quantity allows for one fire retardant mattress per juvenile and enough to store in the event the juvenile population increases.  It also indicates that "[t]hese mattresses will substitute for the current mattresses used in AIJ facilities which only have a fire retardant covering as opposed to being totally made of fire retardant material as the new ones are."  The Monitor's PLRA Report dated April 25, 2011, at page 19, takes the position that, since the NFPA is the national organization that promulgates the Life Safety Code and also develops testing procedures for labs to ascertain if materials qualify as fire retardant, it follows that the benchmark in determining compliance with paragraph 44 is compliance with the NFPA requirements.  The Monitor affirms that in order for AIJ to comply with paragraph 44 the components of the mattresses must "conform to NFPA Code requirements as determined by certified laboratories" and all existing mattresses at AIJ facilities must have been replaced "with NFPA Code compliance mattresses." Id., at p. 20.  The Monitor also raises that AIJ does not have a system in place to assure that mattresses were maintained in good condition by holding the facilities and the staff responsible for deterioration of the mattresses.

Neither conformity with NFPA requirements as determined by certified laboratories nor  having a system in place to hold the staff responsible for the "maintenance" or "deterioration" of the mattresses is a part of paragraph 44.  We have expressed before that the Settlement Agreement cannot be rewritten by adding criteria or requirements that are

CIVIL 94-2080CCC                                    8

not part of its provisions.  The United States concedes in its Response (docket entry 958) "that defendants have replaced the old mattresses at all facilities, except CREANDO, with new, supposedly fire retardant mattresses."  The term  "supposedly" is coupled to the argument that to demonstrate compliance with paragraph 44 all components of the mattress must meet the laboratory tests required by the NFPA.  The United States then incorrectly concludes that "as the Monitor discovered, the test used to determine whether the newly purchased mattresses were fire retardant did not demonstrate that the mattresses were fire retardant," referring generally to pages 20-22 of the Monitor's April 25, 2011 PLRA Report. What the Monitor states at page 20 is that he met on February 16, 2011 with representatives of the company that sold the mattresses to AIJ and requested certain additional testing reports or a test by a certified laboratory on the ticking, the thread and the plastic material used in the piping.  The Monitor  states that juveniles "have been ripping the piping and thread of several of the new mattresses and in turn could try to set fire to that material .  To date the Monitor's Office has not received these tests results."  Id.  He then concludes that because the Commonwealth and the Monitor's Office has not been provided with these tests, the Monitor cannot inform compliance at the time of his Report with paragraph 44. That is quite different from what the United States reports in the sense that the Monitor discovered that the test did not demonstrate that the mattresses were fire retardant.

    In sum, none of the arguments advanced support the request for continuing paragraph 44 as prospective relief.  The evidence before the Court is that fire retardant mattress have been provided to each juvenile, except at the CREANDO program. Accordingly, paragraph 44 is terminated, subject to defendants submitting proof by NOVEMBER 18, 2011 that each juvenile who participates in the CREANDO program at Camp Santiago in Salinas has been provided a fire retardant mattress.

CIVIL 94-2080CCC                                9

**Paragraph 76 of the Settlement Agreement**

Paragraph 76 of the Settlement Agreement provides:

> **¶ 76** *The terms of this agreement relating to safety, crowding, health, hygiene, food, education, recreation and access to courts shall not be revoked or limited for any juvenile for disciplinary reasons.*

Contrary to the United States' Response of May 4, 2011 (docket entry 958) to the Monitor's April 25, 2011 PLRA Report in which insistence is made that paragraph 76 remains necessary and appropriate, the Monitor's PLRA Report filed on April 25, 2011 recommends that it be terminated.  The reasons for this recommendation are outlined in detail by the Monitor at pages 28 through 31, which he ends with the following: "My opinion, based on my personal observations during numerous site visits, as well as the information reported by me, by my colleague Mr. Gatling and by the Deputy Associate Court Monitors, is that youths are not denied any of the protections of the 1997 Agreements or 1994 Order with respect to safety, crowding, health, hygiene, food, education, recreation and/or access to court for disciplinary reasons."   The Monitor not only refers to compliance for all four quarters of 2012; he also reports that "based on my personal monitoring of this provision since 2003, it has been my consistent position that AIJ policies, training and formal practice were in conformance with the requirements of this provision" and that "there was no available evidence to otherwise suggest that youths were being disciplined by limitations or revocations of their paragraph 76 rights."  At pages 28 and 29 of the April 25, 2011 Monitor's PLRA Report he provides information related to site visits at six AIJ facilities during February 2 to 4, 2011 during which he reviewed every entry in the disciplinary logbook dating back to February 1, **2010** to determine whether sanctions were imposed in conflict with paragraph 76; randomly selected ten disciplinary files and also reviewed the Disciplinary System Checklist used by the disciplinary boards, interviewed ten juveniles at each facility to inquire whether any of their paragraph 76 rights had been revoked for disciplinary purposes or knew of anyone who had, reviewed grievance logs to ascertain whether

CIVIL 94-2080CCC                              10

juveniles have filed grievances as a result of paragraph 76 violations, reviewed logs of 284A filings to ascertain whether youths or staff had initiated abuse violations related to paragraph 76, reviewed the juveniles handbook on advice of paragraph 76 rights and interviewed disciplinary officers on receiving training related to paragraph 76 requirements. The results of the reviews and visits of the Monitor were all negative as to violations of paragraph 76 and positive as to staff training and youths' awareness of rights under paragraph 76.

The so-called "security measures" and "informal security measures" raised by the United States in support of continuing paragraph 76 have been satisfactorily explained by the Monitor at pages 30 and 31 of the April 25, 2011 Monitor's PLRA Report. There being no circumstances that would justify continuing paragraph 76 as prospective relief, the same is terminated.

**Paragraphs 48, 81, 87 and 90 of the Settlement Agreement**

These four paragraphs provide as follows:

¶ 48   *Defendants shall ensure that the facilities have sufficient direct care staff to implement all terms of this agreement. Direct care staff supervise and participate in recreational, leisure and treatment activities with the juveniles. Compliance can be demonstrated in either of two ways.*

"*Paragraph 1: All necessary steps shall be taken immediately to ensure the reasonable safety of youth by providing adequate supervision of youth in all facilities operated by, or on behalf of, the Defendants.*

¶ 81   *Defendants, specifically the Department of Education, shall provide academic and/or vocational education services to all juveniles confined in any facility for two weeks or more, equivalent to the number of hours the juveniles would have received within the public education system. Specifically, this education shall be provided 5 (five) days per week, 6 (six) hours per day. AIJ shall provide adequate instructional materials and space for educational services. Defendants shall employ an adequate number of qualified and experienced teachers to provide these services.*

¶ 87   *If a juvenile has been previously identified as having an educational disability, Defendants shall immediately request that*

CIVIL 94-2080CCC                                    11

> *the appropriate school district provide a copy of the juvenile's individualized education plan (IEP). Defendants shall assess the adequacy of the juveniles' IEP and either implement it as written if it is an adequate plan or, if the IEP is inadequate, rewrite the plan to make it adequate, and then implement the revised IEP.*

> **¶ 90**   *Defendants shall provide appropriate services for juveniles eligible for special education and related services. Defendants shall provide each such juvenile with educational instruction specially designed to meet the unique needs of the juvenile, supported by such services as are necessary to permit the juvenile to benefit from the instruction. Defendants shall coordinate such individualized educational services with regular education programs and activities.*

Finally, we reach paragraphs 48, 81, 87 and 90, as applied to the Guali population, referring generally to juveniles aged 13 or under.  The Court shares the Monitor's position that compliance must be determined system-wide and cannot be fragmented by single or individual facilities.  Since the request as to these specific provisions is that termination be granted as such provisions are applied to the youth population of Guali, as to which defendants have met their requirements, said request for termination is DENIED.  There is no evidence as to system-wide compliance of the direct care staff requirement of paragraph 48, the academic and/or vocational education service requirements of paragraph 81, the paragraph 87 requirements as to IEPs related to juveniles who have been previously identified as having an educational disability, and the special education services required pursuant to paragraph 90 of the Settlement Agreement.

SO ORDERED.

At San Juan, Puerto Rico, on October 19, 2011.

S/CARMEN CONSUELO CEREZO
United States District Judge