**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

**THE UNITED STATES OF AMERICA**

        **Plaintiff,**

        **v.**                  **CIVIL ACTION NO. 94-2080 CC**

**COMMONWEALTH OF PUERTO RICO**

        **Defendant,**
_____

**INFORMATIVE MOTION TO APPROVE MONITOR'S
THIRD QUARTERLY REPORT FOR 2019**

        The Monitor hereby submits her Third Quarterly Report for 2019 covering the period of

July 1 through September 30, 2019 regarding compliance on remaining issues in this case.

**Submitted by:**

**/s/Kim Tandy**
Kim Tandy, Federal Monitor
United States v. Commonwealth of Puerto Rico
SPEHCE, VIG Tower
1225 Avidena Ponce de Leon, Penthouse Floor, Office #7
San Juan, Puerto Rico   00907
kimtandy@justicebydesign.net
317-840-9332

**Certificate of Service**

I HEREBY CERTIFY that this, I electronically filed the foregoing with the Clerk of the Court on December 12, 2019,  using the CM/ECF system, which will simultaneously serve notice of such filing to counsel of record to their registered electronic mail addresses.


Respectfully Submitted,

/s Kim Tandy_____

**Kim Tandy**
Federal Monitor, United States v. Commonwealth of Puerto Rico
SPEHCE, VIG Tower
1225 Avidena Ponce de Leon, Penthouse Floor, Office #7
San Juan, Puerto Rico   00907
kimtandy@justicebydesign.net
317-840-9332

# Commonwealth of Puerto

Civil Action No:  3:94 –cv-02080 (ccc)

## Monitor's Third Quarterly Report

July 1 – September 30, 2019

Kim Tandy, Federal Monitor
USACPR Monitoring, Inc.
kimtandy@justicebydesign.net
317-840-9332

Monitoring Team:
David Bogard, MPA, JD
Javier Burgos, JD
Robert Dugan
Miriam Martinez, PhD
Curtiss Pulitzer, AIA

# EXECUTIVE  SUMMARY

This Third Quarterly Report contains information about the remaining 30 provisions in the Settlement Agreement, original Consent Order, and a 2009 addendum regarding staffing.  Currently, there are 4 provisions which remain in substantial compliance, one of which has met the one year threshold for termination. A motion has been filed to terminate Paragraph 73 regarding behavior modification and treatment plans, and is pending before the Court.  Substantial compliance has also been found again this quarter for Paragraph 72 regarding emergency psychotropic drugs.  Paragraph 93 (Extended School Year for Special Education) and in one of the court sub-sections of Paragraph 86.

The work being done to achieve compliance for the nine (9) remaining sections on education remains promising. Continued improvements in providing special education and related services is anticipated during this coming school year. Education staff, under the direction of Carlos Delgado, should be commended for their continued efforts to improve services and achieve compliance in the remaining areas, many of which are interconnected.

The Monitor also wishes to acknowledge the efforts being made by DCR leadership, FOMB staff, and the Monitor's own staff and consultants to work toward a resolution of the funding and resource issues which are pervasive in this case.  Many hours have been devoted this quarter to determine the necessary resources to bring remaining provisions into compliance, and from where these resources can be taken.  The pressure to close facilities as a cost saving measure, and ultimately the closure of Humacao in January, have led to a dangerously low level of staffing, as well as other safety conditions for both staff and youth in the remaining two facilities.   Three separate interim reports have documented these concerns, as well as concerns regarding compliance with classification, adequate space issues, and the need for facility repairs to maximize space usage.   These concerns have moved the agency backwards in compliance regarding staffing and classification.  It is critical that DCR continue to work with its financial advisors, as well as the FOMB to fully identify resources needed, ensure they are contained within the budget proposal for 2020, and determine where such resources will be taken. DCR should strongly consider a separate program budget for NIJ within the DCR budget, with sufficient resources allocated to achieve compliance.

This report will detail how these the lack of sufficient staff is hampering the ability to maintain a safe and secure environment for youth and staff, and the impact of the Humacao move on the current classification system.  It will also highlight further compliance needs for physical plant, mental health, use of force, isolation and education requirements. A list of all ratings for remaining provisions follows.

| Parag. No. | Compliance Provision | 4th 2018 | 1st 2019 | 2nd 2019 | 3rd 2019 | 4th 2019 |
|---|---|---|---|---|---|---|
| Physical Plant | | | | | | |
| S.A. 31 | Facilities conforming to Building Codes | PC | PC | PC | PC | |

| Policies and Procedures, Training, and Resources | | | | | |
|---|---|---|---|---|---|
| C.O.  43 | Sufficient funding for Implementation of C.O. | PC | PC | PC | PC | |
| S.A. 45 | Agency Policy and Procedure Manual for all operations | PC | PC | PC | PC | |
| S.A. 50 | Training for current and new direct care staff | PC | PC | PC | PC | |
| **Protection from Harm** | | | | | |
| S.A. 48 | Sufficient Direct Care Staff | PC | PC | NC | NC | |
| Jan 2009 Para. 1 | Reasonable Safety of Youth through Adequate Supervision | PC | PC | NC | NC | |
| Parag 2 | Sufficient Staff to Implement Decree and adequate supervision | PC | PC | NC | NC | |
| Parag 3 | Training for social workers if direct care staff | na | na | na | na | |
| Parag 4 | Persons Hired to be Sufficiently Trained before deployed | SC | SC | na | na | |
| Parag 5 | Monthly submission of master roster | PC | PC | PC | PC | |
| S.A. 52 | Classification | PC | PC | NC | NC | |
| S.A. 77 | Use of Force | PC | PC | PC | PC | |
| S. A. 78 | Investigations into Alleged Abuse and Maltreatment of Youth | PC | PC | PC | PC | |
| S.A. 79 | Restrictions on Isolation | PC | PC | PC | PC | |
| S.A. 80 | Protective Custody | PC | PC | PC | PC | |
| Mental Health and Substance Abuse Treatment | | | | | |
| S.A.  59 | Treatment Plans for youth with Substance Abuse problems | PC | PC | PC | PC | |

| | | | | | |
|---|---|---|---|---|---|
| C.O. 29 | Residential Mental Health Treatment Program | PC | PC | PC | PC |
| S.A. 36 | Continuous Psychiatric and Psychological services | PC | PC | PC | PC |
| S.A. 63 | Reducing Risk of Suicide | PC | PC | PC | PC |
| S.A. 72 | Emergency Psychotropic Medication | PC | SC | SC | SC |
| S.A. 73 | Behavior Modification/Treatment | SC | SC | SC | SC |
| **Education and Vocational Services** | | | | | |
| S.A. 81 | Provision of Academic and Voc. Education to All Youth | PC | PC | PC | PC |
| S.A. 86a. | Compliance with IDEA Requirements and Timeframes | PC | PC | PC | PC |
| S.A. 86b. | Screening for youth with Disabilities (Child Find Provisions) | PC | PC | SC | SC |
| S.A. 87 | Obtaining IEPs of  Eligible Youth | PC | PC | PC | PC |
| S.A. 90 | Delivery of Specially Designed Instruction and Related Services | PC | PC | PC | PC |
| S. A. 91 | Qualified educational professionals and voc. Ed | PC | PC | PC | PC |
| S.A. 93 | Year Round Services for youth with IEPS | PC | PC | SC | SC |
| S.A. 94 | Services to youth in isolation or other disciplinary settings | PC | PC | PC | PC |
| S.A. 95 | Modification of IEPs | PC | PC | PC | PC |

## Compliance Ratings, Analysis and Recommendations

The Settlement Agreement requires that the Court retain jurisdiction of remaining claims "until such time as the Commonwealth has fully and faithfully implemented all requirements of the agreement and such full compliance has been maintained for one year."  (S.A. 103).  Each

provision of the Settlement Agreement (S.A.) or Consent Order (C.O.) will have only one compliance rating using the measures described below.  Compliance ratings will be tracked by quarter in order to show which provisions come into and remain in substantial compliance over a one year period, and achieve "full and faithful compliance." The Monitor and Consultants use a three-tiered system in this report defined as follows:

***Substantial Compliance*** shall mean a level of compliance that does not significantly deviate from the components of the provision, provided that any deviation poses no significant risk to detainee health or safety. Substantial Compliance indicates that there are approved relevant policies and procedures which, when implemented, are sufficient to achieve compliance; trained staff responsible for implementation; sufficient staff and resources to implement the required reform; and consistent implementation of the procedures during the majority of the monitoring period.  Substantial compliance also requires that the procedures accomplish the outcome envisioned by the provision.

The substantial compliance rating is given only when the required reforms address all of the issues discussed in the provision and when solid implementation of the reforms has been consistently demonstrated, through reliable data, observations and reports from staff and youth, for a majority of the monitoring period.

***Partial Compliance*** indicates that compliance has been achieved on some of the components of this provision, but significant work remains. It indicates that there are approved relevant policies and procedures which, when implemented, are sufficient to achieve compliance; trained staff responsible for implementation; and sufficient staff and resources to implement the requirements of the provision. Partial compliance indicates that while progress has been made toward implementing the procedures described by policy, performance has been inconsistent throughout the monitoring period and additional modifications are needed to ensure that procedures are sufficiently comprehensive to translate policy into practice, and to accomplish the outcome envisioned by the provision.  Partial compliance is appropriate if policies may need minor revisions for compliance with the Settlement Agreement provided other requirements of this section are applicable.

***Non-compliance*** indicates that most or all of the components of the provision have not yet been met. Examples include provisions where policies still need to be overhauled, the majority of staff may need to be trained, procedures may not have been developed, documentation may not be in place or consistently provided, and there has been no determination that the procedures accomplish the outcome envisioned by the provision.

## PHYSICAL PLANT - Curtiss Pulitzer

| | |
|---|---|
| S.A. 31 Existing facilities expected to be occupied by juveniles beyond Fiscal Year 1996-1997 shall conform to applicable federal, state, and/or local building codes. | |
| Compliance Rating | Partial Compliance |
| Description of Monitoring process during this period of time | The Monitor's office continues to review the documents being developed by NIJ/DCR's consulting architect Javier Valentin relative to compliance with this provision. The findings for compliance for this quarter are based upon the process underway to assess and agree on necessary repairs to comply with the three remaining code areas:  Life Safety, ADA and Building Codes. As reports are finalized in these three areas, compliance will be based upon the substance of these reports and the plan for implementation of the necessary changes.

 A complete draft of the Life Safety Code compliance report was received on September 1st, 2019 and discussed at the Functional Team Meeting noted below.  The time table for the remaining two reports was set and is also noted below.

I made a site visit on September 10, 2019 to see the progress being made relative to the physical plant repairs at Ponce and Villalba. These repairs have been included in Court Orders during 2019 in response to the closure of Humacao as necessary to maximize facility utilization in order to comply with other areas of the Settlement Agreement.

I also had a functional team meeting the day before my site visits with Javier Valentin, Luis Ortiz, Aida Burgos and Luis Cruz. Luis Ortiz briefed me on the physical plant issues at Ponce and Villalba and the proposed approach to devising a way to prevent ligatures from being tied on to room door hinges. We also briefly discussed a plan to move the female juveniles out of Ponce to a privately operated facility in Gurabo and that NIJ/DCR was evaluating the physical plant and fire safety of the 30 bed facility before proceeding forward with the plan.

During our meeting, I shared my comments on the Life Safety Code report that had only been submitted to the monitor the week before my arrival in San Juan.  We discussed future deliverables and he stated at that time that he planned to have the ADA and IBC/PR Building Code compliance reports submitted to NIJ/DCR in early December for their review. Luis Ortiz mentioned that he was being asked to address some of the preliminary findings of Mr. Valentin has pointed out informally and I responded that there is a formal process of documentation that first needs to occur with proper notifications to the monitor's office. Aida Burgos said she would convey that point to Kelvin Merced. I have been requesting a schedule of when these reports would be forthcoming and only received a revised schedule for Mr. Valentin on November 6th. The dates have changed and the final report will not be completed until February, 2020.

 I have also been monitoring the progress being made to comply with suicide prevention  measures (See Para 79) in juvenile rooms, and I continue to monitor fire safety conditions, |

| | |
|---|---|
| | plumbing and air conditioning to insure that all housing units are functional and safe for juveniles to occupy. |
| Findings and Analysis | Mr. Valentin, the architect performing the Code Analysis, last submitted a draft report of the Fire Safety Codes analysis on September 1st, which was reviewed by the Monitor's office and discussed during the functional team meeting. (See discussion below) Future reports will be delivered based on the revised schedule attached.<br><br>During the visit, I found that the Villalba facility was in a very good state of repair. All the mold remediation within the living areas and roof repairs were completed as previously reported and still in good repair. As was reported last quarter, the Gym had a new floor and was in very good condition but there was still a small area of potential water penetration at the far end of the gym where the roof beam and wall meet, that still needed repair. No date has been provided for that repair as it was reported that funds are not available. The air conditioning was in good repair and 23 out of 24 units in living areas were in working order. The air conditioning in the school area was all working. All plumbing and hot water in living areas were in good repair. I tested several of the electronic release of fire doors in the housing units and all were opened by mini-control in under 5 seconds. I reviewed the fire safety officer's life safety inspection reports and fire drill reports and all were in order. I also observed workers installing the new camera system which I was told was nearly completed and was able to see a test of the camera monitoring system in one of the housing units.<br><br>There have been no repairs or painting at Ponce at the time of the site visit, reportedly due to a lack of funds, although the facility did appear in generally good condition. The air conditioning was generally in good repair and 21 out of 24 units in living areas were in working order with one unit operating at half capacity. The air conditioning in the school area was all working. All plumbing and hot water in living areas were in good repair and new shower curtains were installed for privacy in the bathroom areas. I commented that while the shower curtains were appropriate, the ones purchased may conflict with PREA requirements and may inhibit staff monitoring of the bathroom areas.  As was reported last quarter, the Gym had a new floor and was in very good condition but there was still a small area of potential water penetration at the far end of the gym where the roof beam and wall meet, that still needed repair. No date has been provided for that repair as funds are not available. I tested several of the electronic release of fire doors in the housing units and all were opened by mini-control in under 5 seconds. I reviewed the fire safety officer's life safety inspection reports and fire drill reports and all were in order.<br><br>In an earlier meeting with the financial leadership of DCR, we were assured that the repairs at Ponce would be forthcoming and that $800,000 had been allocated for the work needed at that facility.  An additional $100,000 was budgeted to move the recently upgraded emergency generator at Humacao to Villalba. At this time we have heard that very little money has been allocated for any of these capital improvements. |

| What is needed for full compliance? What steps are required and/or recommended? | At the present time, Mr. Valentin is working on the various documents that will be part of the full final report. The Monitor's office received a draft of the second report on NFPA code compliance on September 1st. I shared my comments on the report with Mr. Valentin. According to his original schedule, a draft of the IBC and Puerto Rico building codes compliance report was to be delivered to the Monitor's office for review in late August. The new schedule has that report being sent to the Monitor's office on December 6th at the earliest.<br><br>The primary document which serves as the basis of the building code analysis is the 2009 International Building Code (IBC) cross referenced with Amendments per Division II of the 2011 Puerto Rico Building Code. The codes also incorporate the relevant sections of the NFPA Life Safety Codes. In my meetings with Mr. Valentin and the Functional Team we discussed my edits to the last document received, which Mr. Valentin will incorporate into a Final Draft.<br><br>In addition to the codes compliance report, Mr. Valentin will be documenting the ADA violations at the two existing facilities. That report is due to be received on December 6th as well. The last step will be the report detailing the recommendations as to what capital improvements will be needed to achieve full compliance, and projected costs for each recommend remedy. A revised schedule that was received by the monitor on 11/6/19 is noted below.<br><br>When the magnitude of compliance issues are fleshed out, a prioritization schedule will be developed along with potential timelines for compliance. Violations that affect Life Safety, and cannot be initially mitigated operationally, will have the highest priority for implementation. The financial resources available to DCR will become a key factor affecting a schedule for compliance at this juncture in the process. |
|---|---|
| Priority Next Steps | The current schedule for deliverables are as follows:<br>• Analysis of Life Safety Code Compliance - Draft Received on 9/1/19<br>• 2009 IBC/Puerto Rico Building Code Report- 12/6/19<br>• Analysis of ADA Compliance – 12/6/19<br>• Report Findings and Recommendations  - 1/17/20<br>• Final Report Comments and Revisions by monitor – 2/7/20<br>• Final Report Submittal -  2/17/20 |
| Quality Assurance Measures | The quality assurance measures are for the monitor's office to keep reviewing the documents developed by Mr. Valentin and touring the facilities with Mr. Valentin to view first hand where code and ADA violations may exist. This will occur once any violations are fully defined and documented. In addition, the monitor's office are reviewing the spread sheets being developed by DCR to track facility repair issues including suicide mitigation efforts followed up by tours to determine compliance. |

| Sources of Information upon which | The documentation being developed by Mr. Valentin will be the primary source to determine the levels of compliance with the codes and regulations. The financial resources to rectify violations and achieve compliance will need to involve discussions with the Secretary of DCR as |
|---|---|

| Consultant report and compliance ratings are based. | well as senior officials within DCR and the Commonwealth hierarchy responsible for funding the agency. <br><br> The spread sheets and photographs being submitted periodically by NIJ/DCR will help the monitor's office to track facility repair issues. |
|---|---|

## POLICIES AND PROCEDURES, TRAINING AND RESOURCES – Kim Tandy

| S.A. 43 Until this order is fully implemented, Defendants shall submit to the Legislature of the Commonwealth each fiscal year a report wherein the required sums of money will be established so as to implement this Consent Order. | |
|---|---|
| **Compliance Rating** | **Partial Compliance** |
| Description of Monitoring process during this period of time | During the Third Quarter, the Monitor worked with the Office of the Secretary for DCR, Bluhaus Capital LLC, and staff for the Federal Oversight and Management Board with three primary objectives:<br><br>1) to determine a more accurate, current budget and per diem rate for the remaining two NIJ facilities and related administrative NIJ staff;<br><br>2) to provide information to the FOMB about the status of this case, the obstacles for reaching compliance, and the monitoring process; and<br><br>3) to work with the FOMB on a plan which can ensure that necessary financial and management resources are in place for the DCR to be able to comply with remaining provisions of the Settlement Agreement.<br><br>The Monitor sent a letter to the Executive Director of the FOMB Natalie Jaresko on August 19th informing her of the non-compliance issues discussed with the Parties and the Court at the August 13, 2019 Status Conference, and asked for a meeting. The Monitor discussed the letter with Ulrich Jimenez Lopez, Secretario Auxiliar for the Department of Corrections and Rehabilitation in a brief meeting on August 14th. Mr. Jimenez previously suggested the possibility of the Monitor meeting with Bluhaus Capital consultants, a group which has assisted DCR with its interactions with FOMB. In a subsequent email exchange, Mr. Jimenez introduced the Monitor to Jesus Mendez from Bluhaus.<br><br>The Monitor had two lengthy calls with Mr. Mendez and Lorenzo Blanco Benzini, an Analyst with Bluhaus, regarding revisions in the NIJ budget to more accurately reflect actual costs for operation of the remaining two facilities, as well as other NIJ related expenses for administration. |

| | |
|---|---|
| | On September 14, Secretary Erik Rolon was asked to step down as the Secretary of DCR by the new Governor Wanda Vasquez.  The Governor appointed Eduardo Juanetay as the Interim Secretary, and ultimately his appointment was confirmed. |
| | On September 20th, the Monitor met with Secretary Juanetay and others to discuss her meeting later that day with the Executive Director of the FOMB.  That meeting was held on September 20, 2019 with Natalie Jaresko, Executive Director of FOMB;  Eric Sepulveda, Associate; Ginorly Maldonado, Fiscal Plan and Budget Director; and Sebastian Negron Reichard, Chief of Staff for FOMB.  A letter was sent by Director Jaresko in October and was filed with the Monitor's Third Interim Report Regarding the Closure of Humacao on October 30, 2019. |
| Findings and Analysis |  Department of Corrections and Rehabilitation Secretary Erik Rolon, prior to his departure, sent a letter to the FOMB requesting 1200 additional officers for DCR,  noting that the 300 new officers approved by FOMB for a new training Academy was insufficient given the 14 million cut in personnel in the DCR budget for 2019-2020.  While the Monitor has seen no written response, a news account of the meeting indicates that FOMB may have increased this number from $300 - 500$.  There is no mention in the Secretary's letter that new juvenile officers were included in this number, or how many are included is so.

There is little information in FOMB's reports about DCR's juvenile facilities. The costs associated with the operation of NIJ are inexplicably intertwined in DCR's overall budget. There is no separate budget set-aside for staffing and resources necessary for reaching compliance.  When resources are needed, there exists no clear and consistent process for how such expenditures are approved; as such, NIJ compliance needs compete with every other need within DCR.

The Fiscal Plan presented to the FOMB by the Executive Branch in September of 2018 estimated that NIJ's spends $42 million dollars annually and should be able to reduce this by $19.4 million annually by 2022.  The report noted an extraordinarily high per diem rate of $692.  Asking for more resources given this budget, which serves an average of 115 youth per day, understandably raised many questions.

In reality, the cost of operating the remaining two facilities and related administration in reality less than half of this amount.  Over $20 million dollars in personnel has been attributed to the NIJ budget for staff which do not work in NIJ facilities, and in many cases work in facilities which have been closed or are assigned to adult facilities.  A more realistic estimate of actual spending, as prepared by Bluhaus at the Monitor's request, places the cost of operations for Ponce and Villalba at closer to $19 million, although this does not include federal dollars which flow into NIJ, or accompanying expenses, and Central Office expenses.

DCR has not allocated sufficient funding and resources to bring remaining areas into compliance, nor has it completed a thorough cost analysis of what funds are necessary. |

| | There is no line item in its budget submitted to the FOMB, and ultimately to the legislature, which includes resources for this case, other than the expenses incurred by the Office of the Monitor. |
|---|---|
| | DCR has not costed out nor allocated specific resources for remaining provisions to reach compliance, and no separate budget exists within the DCR budget process to identify these needs. The budget process submitted by the administration has not identified these costs for FOMB.  The merger of NIJ operational costs into the greater DCR budget over the last several years may well have contributed to this issue. |
| | The failure to submit a budget to the legislature to request adequate staffing,  physical plant repairs, necessary placement options to address classification, fully functioning security equipment, and sufficient mental health care is in direct violation of the Settlement Agreement, and has created dangerous and harmful circumstances for youth at Ponce and Villalba facilities. |
| What is needed for full compliance?<br><br>What steps are required and/or recommended? | DCR must ensure that its budget addresses adequate staffing, training, resources and physical plant requirements to fully comply with the provisions of the Consent Order and Settlement Agreement. Whether this can be done within the confines of its current budget or needs additional supplemental funds from FOMB, is for the Commonwealth to determine, and FOMB to approve. |
| | Past history suggests that simply relying on DCR to make these allocations has not been successful to achieve compliance. The costs associated with compliance have not been fully calculated because NIJ management has no authority over its own funding, and DCR has not otherwise identified and allocated the necessary funds.  The Monitor supports the idea that the DCR budget include a separate program budget, including the cost of identified compliance needs for staffing, contracted services for placement of youth in other facilities, and capital and equipment needs. |
| | DCR must first be able to determine accurate expenditures and resources used by NIJ. Second, DCR must be able to project the necessary costs for compliance with remaining provisions in its existing facilities, and/or other contract which may externalize some services.  Third, DCR must work with FOMB to determine where such funds can be taken, or if supplemental amounts are needed. |
| | If the population can be further downsized, with more youth remaining in their own communities, or being returned sooner, the budget projections will likely be different. The Monitor strongly suggests a leadership group be formed to create this vision, and to utilize outside consultants to assist with this. |
| Priority Next Steps | DCR should work with FOMB to separate out a program budget for NIJ which reflects more accurate expenditures, and which removes those staff positions currently assigned to other facilities, including those stationed at closed facilities. |

| | |
|---|---|
| | DCR must continue its effort to work with FOMB staff and the Office of the Monitor to determine the number of necessary staffing positions, and determine how best those positions will be secured within the existing budget.  The Staffing Plan developed by DCR according to the August 26th Agreement must include the necessary details including these projections, timelines, methods of recruitment, efforts to bring back existing trained staff from Humacao or elsewhere, and details regarding recruitment, training and retention of new staff.

DCR must continue to work with the FOMB staff and the Office of the Monitor to cost out other expenses including the work to be completed at Ponce for air conditioners, leaky roofs and mold remediation, code violations under paragraph 31, inoperable or malfunctioning security equipment, additional cameras identified at Ponce and Villalba, and suicide resistant hardware on door hinges for specified rooms.

DCR must identify where within its budget these expenditures will be made, or determine with the FOMB where additional funds can be secured, and provide a timeframe for these funds to be available.

It is encouraging that this issue is finally being addressed at the highest levels within DCR and FOMB to establish a process to resolve issues related to resources.  This continued effort is critical to bring the remaining claims into compliance.  The efforts being made by DCR leadership, FOMB and others should continue as a new fiscal budget process begins for 2020.

A time table should be established by DCR, in conjunction with FOMB and the Office of the Monitor, to fully identify the needed costs to achieve compliance in remaining areas, and to determine how such funds will be allocated within the DCR budget, or otherwise as determined by FOMB. The time table should also determine what is needed to create a separate project budget for NIJ, and how this will be achieved. The Monitor will call for a meeting during the first week in December with DCR and FOMB representatives to solidify this process. |
| Sources of Information upon which Consultant report and compliance ratings | Fiscal Plan for Puerto Rico as submitted to the Fiscal Oversight and Management Board of Puerto Rico, September 7, 2018, found at http://www.aafaf.pr.gov/assets/pr-fiscal-plan-090718.pdf

Letter from Secretary Rolon to FOMB, letters from FOMB

Financial analysis of the NIJ budget prepared for the FOMB by Bluhaus

Restoring Growth and Prosperity, 2019 Fiscal Plan for Puerto Rico (May 9, 2019)

Phone calls and emails with staff and consultants. |

**S.A. 45**  Within one year of the approval of the agreement by the Court, Defendants agree to provide an agency policy and procedure manual governing all operational aspects of the institutions.  Within eighteen months of the approval of this agreement, Defendants shall further insure that the facilities are strictly operated within these policies and procedures and that all staff have been trained accordingly.

| Compliance  Rating | Partial Compliance |
|---|---|
| Description of Monitoring process during this period of time | The Monitor has copies of existing policies and procedures in most of the remaining areas of the Settlement Agreement and Consent Order.  The four remaining policies which must still be approved are for S.A. 43, S.A. 52, and several provisions related to education covered in Policies 20.1 and 20.2. <br><br> The Monitor has sought a signed copy of Policy 20.1 through the Secretary's office.  The Monitor also requested a copy of the second round of revisions made to Policy 20.2 by the Department of Education and NIJ and has yet to receive this. |
| Findings and Analysis | The following policies and procedures have not been finalized and approved through the Office of the Monitor: |

| | S.A. 52 Classification | Not complete | Bob Dugan provided recommendations on July 18, 2018 to bring the existing policies into compliance. Necessary changes must include annual review of the validation of objective methods of classification instruments and processes. A process is underway to work on modifications to the classification policy as one of the Monitor's priority safety issues from the Second Quarter. |
|---|---|---|---|
| | S. A. 79 and 80 Isolation and Protective Custody | Not complete | Policies on TM must be revised after agreement is reached regarding a working definition of what is and what is not isolation. |
| | S. A. 81 General and Vocational Education | Completed not signed | Policy 20.1 has been amended to indicate that youth still enrolled in school and who are in TM/PC status receive a full school day.  This policy has been pending a signature by the Secretary for months. |
| | S.A 86, 91, 94 | Not complete | Changes are needed to Policy 20.2 to ensure procedural safeguards are included consistent with IDEIA.  Other changes have been made, but so far, no resubmission with this section has been provided to the Monitor. |

| | Further discussion about policies and procedures are noted in other sections of this report as relevant in the sections noted above. |
|---|---|
| What is needed for full compliance?<br><br>What steps are required and/or recommended? | Approved policies and procedures should remain a priority in any area where the Monitor's office has not yet approved of changes, and where policies do not adequately reflect the requirements of the Settlement Agreement and/or Consent Order.<br><br>Policy 20.1 as amended requires a signature by the Secretary.  The policy was submitted to the Secretary in July of 2019. Policy 20.2 must be amended to include procedural safeguards required under the IDEIA.  Such amendments have reportedly been made but have not been provided to the Monitor for her review after multiple requests. Both Policies should be approved and signed by the end of 2019.<br><br>Changes to the Classification Policy must be made according to recommendations by Bob Dugan in order to be found in compliance. Outstanding policy issues and a timeframe should be established for completion of any needed changes. A review of the classification policies should be on the agenda for the December 2019 site visit.<br><br>The parties should agree upon a definition of isolation to be included in the policies on transitional measures or elsewhere, and determine what does and does not trigger the provisions of Paragraph 79.  The Monitor requests that this be completed by the end of 2019. |
| Priority Next Steps | Policy 20.1 has been waiting approval by the Secretary's office since July of 2019. Counsel should immediately seek this approval or determine what additional changes need to be made in order for the approval to be granted.<br><br>DCR and/or DOE should forward changes to Policy 20.2 immediate to the Monitor for review of the sections on due process protections and other changes made. Changes should be completed during the Fourth Quarter, if any, and approval by the Secretary sought.<br><br>DCR must address the needed changes to policies as recommended by Bob Dugan relative to classification, and set a time frame for the decisions to be made in December of 2019.<br><br>The Monitor will continue to work with the parties to agree on a definition of isolation relative to paragraph 79, and any changes required in the policies on transitional measures, protective custody, and/or group schedule modifications in order to meet this definition.  Monitoring in 2020 will be done in accordance with how isolation is defined by this process, and whether actions taken comport with this definition. |
| Quality Assurance Measures | NIJ staff, under the leadership of Kelvin Merced, have been working on a set of policies regarding Quality Assurance which are under review by Bob Dugan. |

**S.A. 50.** Defendants shall ensure that current and new facility direct care staff are sufficiently well-trained to implement the terms of this agreement. Each direct care staff, whether current or new, shall receive at least forty (40) hours of training per year by qualified personnel to include, but not be limited to, the following areas: CPR (cardiopulmonary resuscitation); recognition of and interaction with suicidal and/or self-mutilating juveniles; recognition of the symptoms of drug withdrawal; administering medicine; recognizing the side-effects of medications commonly administered at the facility; HIV related issues; use-of-force regulations; strategies to manage juveniles' inappropriate conduct; counseling techniques and communication skills; use of positive reinforcement and praise; and fire prevention and emergency procedures, including the fire evacuation plan, the use of keys, and the use of fire extinguishers.

| Compliance Rating | Partial Compliance |
|---|---|
| Methodology for Monitoring this Quarter | A site visit was conducted during the week of May 13-16, 2019 and a meeting with Aida Burgos, the Director of IDECRH, and Kelvin Merced was held to discuss training compliance and documentation. |
|  | At that time, the Monitor and Compliance staff reaffirmed the required metrics for compliance with paragraph 50.  It was agreed that five areas would be tracked for compliance, and that these provisions should also be part of quality assurance measures: |
|  | 1)  Required topics for training are scheduled and available with such frequency that all staff can attend as required. |
|  | 2)  Training must be completed by qualified trainers with relevant, accurate and helpful materials and content as indicated by pre/post tests and evaluation of training sessions. |
|  | 3)  Training completion by topic will meet targeted goals by topic (as noted below). |
|  | 4)  Ongoing training needs will be assessed on an annual basis or more frequently if appropriate. |
|  | 5)  Necessary revisions to training based on changes in policies and procedures will be made within a targeted time, with full implementation within 12 months. |
|  | It is the intention of the Monitor to move this paragraph into self-monitoring mode for a specific period of time, allowing NIJ to self-report compliance on the agreed upon metrics for compliance.  The annual report covering the period of January 1, 2018 – June 30, 2019 should be the determining factor as to whether the Commonwealth can begin that process.  The content must be based upon the five items listed above and provide sufficient documentation that each of the metrics have been achieved with sufficient back up documentation and analysis where required. |

| | |
|---|---|
| Findings and Analysis regarding compliance. | NIJ Policy 4 on training was approved previously.  On March 11, IDECARH was provided with a support staff who has been able to afford much needed clerical and administrative support. This is an improvement in resources which should greatly benefit ongoing compliance with record keeping and documentation of training activities and participation.<br><br>The Annual Report completed on October 8, 2019 covers the period of January 1, 2018 through June 30, 2019 relative to training activities.  This includes coordination of 1,765 hours of training for 271 officers.  It should be noted that this total does not include 140 officers inactive for training purposes, including those on extended leave (4-6 months), those who abandoned post, or were reassigned to a facility that does not house youth. Of the remaining 271 officers, 127 were assigned to the Ponce Social Treatment Center, 126 to the Villalba Social Treatment Center, and 18 to other facilities within that Department of Corrections and Rehabilitation which do not provide direct services to youth.<br><br>Of the 271 active officers, 89% (242) completed 40 or more hours of training, including 94% (119) of officers at Villalba, 85% (108) of officers at Ponce, and 72% (13) in other facilities.   The percentages of completion by facility and topic are included in the following chart.<br><br>NIJ data indicates that the facilities met or exceeded all benchmarks established for meeting compliance with the exception of Use of Force training at Ponce.  The Monitor did not receive a corrective action plan or verification that such was initiated.<br><br>

| Topic | Ponce | Villalba | Other |
|---|---|---|---|
| Emergency Key Control (only 1 of 270 did not complete) | 100% | 100% | 94% |
| CPR/AED/First Aid (6 hours) | 96% | 96% | 89% |
| Management of Alleged Maltreatment and Institutional Negligence (4 hours) | 97% | 97% | 95% |
| Youth Suicide Prevention (3 hours) | 97% | 97% | 95% |
| Behavior Modification Program (4 hours) | 99% | 96% | 95% |
| Life Security NIJ (6 hours) | 77% | 99% | 100% |
| Rules and Procedures Regarding Use of Force (3 hours)* | 97% | 100% | 100% |
| Youth Rights and Application of Duties (4 hours) | 98% | 94% | 100% |

|

| | |
|---|---|
| | *Note that 74 officers were also trained in the management of chemical restrictions, 39 at Ponce and 35 in Villalba.  Not all officers receive this training, but only those who are trained in the use of chemical restrictions are authorized to use this method.<br><br>Verification of training on recognizing the symptoms of drug withdrawal, administering medication and recognizing the side-effects of medications commonly administered at the facilities was not provided.<br><br>A training calendar was planned and provided in advance for 2020.<br><br>Documentation was not received verifying pre and post test results, evaluations of training, the annual assessment of training needs, and documentation of necessary or recommended changes to the training curricula.<br><br>NIJ has begun to train staff relative to identifying and effectively dealing with youth with trauma exposure.  While not among the required topics within the Settlement Agreement, this is an important training topic which can be a building block for developing a system of trauma informed care. |
| What is needed to reach full and faithful compliance? | **Agreed upon metrics for reaching compliance are as follows:**<br><br>1)  Training sessions in all SA 50 categories must be planned and provided throughout the coming year with sufficient frequency to allow for ready access by participants in the remaining two facilities.  A training calendar must be prepared in advance.<br><br>2)  Training completion by active direct care staff must reach the targeted benchmarks by topic over an 18 month period, and corrective action plans for facilities not achieving those benchmarks must ensure that the remaining staff complete training within 180 days.  This includes:<br><br>&bull;  Training on the use of chemical agents must be completed at the 100% rate, but only for those who are authorized and certified to use OC spray.<br>&bull;  CPR training and certifications must be completed every 2 years at the 90% level for those direct care staff.<br>&bull;  Training on suicide prevention must be completed at the 90% rate for all direct care staff.<br>&bull;  Facility directors must ensure that all other required trainings for this provision meet at least 85% completion rate within the 18 months.<br><br>3)  Pre and post must be used to evaluate participants' increase in knowledge and skills achieved by the training. Staff must pass such tests with a 70% or higher grade<br><br>4)  Evaluation of training modules and delivery must be sought by participants and through QA to ensure trainers are knowledgeable and skilled both in content and delivery to adult learners, materials are understandable and adequately cover the topic, and that content is relevant, current and accurate. |

| | |
|---|---|
| | 5)  Ongoing training needs will be assessed at least on an annual basis or more frequently if needed to determine if modifications are necessary. Written documentation is required to show that such reviews have taken place and what changes if any have been made as a result.<br><br>6)   Necessary revisions to training based on changes in policies and procedures will be made within a targeted time, with full implementation within 12 months.  Written documentation is required to show that such changes have been made and implementation scheduled and completed. It is important that such changes be coordinated with UEMNI and OISC and include recommendations based upon investigation findings and results.<br><br>Appropriate clerical support must continue to assist the IDECAHR director to facilitate report preparation and compliance evidence. |
| Priority Next Steps | Documentation from IDECARH which supports compliance with the above metrics will determine if compliance has been achieved, and the point at which compliance was or will be achieved in order to show full and faithful implementation of this provision over an 18 month period.<br><br>The 18 month report covering the period of January 1, 2018 – June 30, 2019 does not provide detailed information on compliance with all 6 metrics listed above. Documentation was not received verifying pre and post test results or evaluations of training for the first six months of 2019 and the last six months of 2018. The report did not provide information regarding the annual assessment of training needs, and documentation of necessary or recommended changes to the training curricula. This information is needed in order to achieve full compliance.<br><br>If the missing files from 2018 and 2019 relative to training evaluations and pre and post testing can be retrieved, a summarized report can be provided for this metric, but back up files should be provided so they can be spot checked. |
| Basis for findings and recommendations | The findings and recommendations are based upon the annual report submitted, and discussion with the Human Resource Specialist, as well as documentation provided of monthly training.<br><br>Back up files for training evaluations by participants, and pre-post test results for trainings were also received for the first half of 2018.<br><br>Training curriculum regarding trauma exposure and identification was received and reviewed. |

## PROTECTION FROM HARM – STAFFING  (Bob Dugan)

**S.A. 48.** Defendants shall ensure that the facilities have sufficient direct care staff to implement all terms of this agreement. Direct care staff supervise and participate in recreational, leisure and treatment activities with the juveniles. Compliance can be demonstrated in either of two ways.

48.a Method one: Defendants may provide documentation of consistent supervision by not less than one (1) direct care worker to eight (8) juveniles during day and evening shifts and not less than one (1) direct care worker to sixteen (16) juveniles during normal sleeping hours.

*48.b Method Two: Defendants may develop, and submit to the court for approval, an alternate staffing roster for any facility in this case. The roster shall be based on a study that shall specify fixed posts and the assignment necessary to implement the terms of this agreement, taking into consideration the physical configuration and function of spaces, the classification and risk profiles of youths involved, the incident patterns in the settings involved, the routine availability in the settings of other categories of staff, and the overall number of direct care positions necessary to consistently achieve the coverage proposed. Once a plan is approved for a facility, defendants shall document the employment of the necessary overall numbers of direct care staff, and the ongoing deployment of such staff in accordance with the plan."*

*The Commonwealth has the choice to demonstrate compliance according to method 48.a or 48.b. They have informed the Monitor that they do not intend to select method 48.b and that their legal position is that this language should be struck from the Settlement Agreement as superfluous.*

| Compliance Ratings | Non-Compliance |
|---|---|
| Description of Monitoring process during this period of time | S.A. 48 Staff Youth Ratio monitoring compliance is analyzed on a quarterly basis using DCR facility generated weekly staff youth ratio forms as well as the weekly Form DCR -DCR -0144. These forms are submitted to the Monitor's Consultant throughout the reporting quarter. DCR facilities daily shift by shift staffing and youth population for each operational housing module is reported, as well as any 1:1 supervision events, and the volume of staff that are required to work a double shift. The compliance report provides information from Staff Youth Ratio forms that were provided to the Monitor's Consultant for the period June 30, 2019 through September 28, 2019.<br><br>The Monitor's staff conducted site visits on September 17 and 18, 2019 to CDTS Ponce and September 18, 2019 to CDTS Villalba. Observation and documentation of housing module staff youth ratios is conducted on each visit. |
| Findings and Analysis | **Compliance Status:**  For the 2019 third quarter, S.A. 48a is found to be in non-compliance, with these findings:<br><br>• There are not sufficient staff and resources assigned to CDTS Ponce and CDTS Villalba to implement the requirements of the provision.<br>• An extraordinary volume and rate of staff youth ratio events continues to be dangerously dependent on double shifting. |

- The percentage of shifts (40%) covered by staff doing double shifts continues to increase.
- The closure of CD Humacao and transfer of youth to CDTS Ponce and CDTS Villalba had no positive impact in meeting the minimum required staff youth ratios.
- The volume of non-compliant minimum required staff youth ratio events and double shifting are occurring disproportionately on Saturdays and Sundays.
- The volume of serious youth violence, assaults, cutting events and escapes reflects institutional environments that are intermittently chaotic and not safe for youth or staff.
- The volume of reported and unreported incident events that identify or allude to staffing deficiencies, staff presence and performance appears to be increasing.

- For the 2019 third quarter, the Monitor's Consultant finds that non-compliance with meeting the minimum staff youth ratios and the extreme reliance on double shifts, significantly jeopardizes youth safety and protection from harm.

**Analysis:**

DCR submitted a total of 26 facility staff youth ratio forms for the two facilities requiring staff youth ratios, allowing for 100% of the staff youth ratio forms being available for analysis. DCR has consistently provided all requested Staff Youth Ratio forms used for monitoring and reporting.

The chart and table below represent staff youth ratio performance by shift for the period (June 30, 2019 through September 28, 2019).



| | Met Staff Youth Ratio 10:00 - 6:00 Events | Met Staff Youth Ratio 6:00 - 2:00 Events | Met Staff Youth Ratio 2:00- 10:00 Events | Met Staff Youth Ratio Average:    All Shifts |
|---|---|---|---|---|
| CTS Villalba | 100% | 96% | 99% | 98% |
| CTS Ponce | 100% | 95% | 95% | 97% |

The following chart and table below represents the DCR agency Staff Youth Ratio averages by shift for 2018 through September 28, 2019:



**DCR Quarterly Staffing Performance**
**Meeting Staff/Youth Supervision Ratios:**
**2018 and 2019 Through Third Quarter**

| | 6:00am- 2:00pm | 2:00pm- 10:00pm | 10:00pm- 6:00am |
|---|---|---|---|
| 3rd Quarter 2019 | 96% | 97% | 100% |
| 2nd Quarter 2019 | 97% | 99% | 100% |
| 1st Quarter 2019 | 94% | 96% | 100% |
| 4th Quarter 2018 | 96% | 97% | 100% |
| 3rd Quarter 2018 | 99.9% | 99.7% | 100% |
| 2nd Quarter 2018 | 99.4% | 100.0% | 100% |
| 1st Quarter 2018 | 95.0% | 96.0% | 100% |

**Waking Hours Youth Ratio Events:**

CDTS Ponce reported meeting the minimum required staff youth ratio in 95% of the waking hour staffing events, resulting in meeting the staff youth ratio in 1456 of 1388. PUERTAS, housed in one of the housing modules within CDTS Ponce, met the minimum required staff youth ratios for all shifts throughout of the 2019 third quarter reporting period.

CDTS Villalba reported meeting the minimum required staff youth ratio in 98% of the waking hour staffing events, meeting the staff youth ratio in 1430 of 1464.

The DCR 2019 third quarter performance in meeting Staff Youth Ratios is as follows:

- 6:00 am – 2:00 pm shift:  96% of events, a 1% decrease from the second quarter of 2019 (97%)
- 2:00 pm – 10:00 pm shift:  97% of events, a 2% decrease from the second quarter of 2018 (99%)
- 10:00 pm – 6:00 am shift:  100% of events, a 0% increase from the second quarter of 2018 (100%)

Of the 2920 waking hour supervision events (6:00 – 2:00 and 2:00 – 10:00 shifts) 2818 of the events (97%) met the minimum shift staff youth ratio requirements. The DCR 2019 third quarter Staff Youth Ratios compliance performance during waking hours reflects a 1% decrease in staff youth ratio compliance compared to the second quarter reporting period.

**Staff Double Shifts:**

For the 2019 third quarter, 1769 (40%) of the 4396 staff youth ratio events were covered by staff working a double shift. **This is 13% increase of shifts requiring to work a double shift compared to the second quarter 2019 reporting period, an increase in volume of 581 staffing events.** It needs to be noted that this increase in double shifts occurred after the closure of CD Humacao on January 15, 2019.

| DCR Staff Youth Ratio Events and Double Shifts: Third Quarter 2019 | Volume of Staff Youth Ratio Supervision Events | Volume of Shifts Meeting Staff Youth Ratio | Waking Hour Supervision Events | Met Minimum Staff Youth Ratio During Waking Hour Supervision Events | Volume of Shifts Covered by Staff Working a Double Shift | Percentage of Shifts Covered by Staff Working Double Shift | Waking Hour Double Shifts | Percentage of Waking Hour Shifts Covered with Double Shifts |
|---|---|---|---|---|---|---|---|---|
| CTS Ponce | 2184 | 2116 | 1456 | 1388 | 924 | 42% | 605 | 65% |
| CTS Villalba | 2196 | 2162 | 1464 | 1430 | 845 | 38% | 611 | 72% |
| DCR Third Quarter 2019 Staff Youth Ratio: All Shifts | 4380 | 4278 | 2920 | 2818 | 1769 | 40% | 1216 | 69% |

CDTS Ponce increased percentage of shifts covered by staff working a double shift to 42% (924 events), +14% increase from the previous quarter.

CDTS Villalba increased percentage of shifts covered by staff working a double shift to 38% (845 events), +19% increase from the previous quarter.

A closer review identifies staff working double shifts occurred disproportionately on weekends and occurring on the first and second shifts. There was an increase in the volume of non-compliant staff youth ratio events (102), from the second quarter (60), while 53% of the events occurred on weekends.

| DCR Facility Third Quarter 2019 | Volume of Non-Compliant Staffing Ratios | Volume of Non-Compliant Staffing Ratios on Weekends | Percentage of Non-Compliant Staffing Ratios on Weekends | Volume of Double Shifts | Volume of Double Shifts on Weekends | Percentage of Double Shifts on Weekends |
|---|---|---|---|---|---|---|
| CTS Ponce | 68 | 33 | 49% | 924 | 359 | 39% |
| CTS Villalba | 34 | 21 | 62% | 845 | 344 | 41% |
| DCR Totals | 102 | 54 | 53% | 1769 | 703 | 40% |

The table below displays the last four quarters of staffing events, double shift staffing events, percentage of double shift staffing events and total number of operational facilities for the quarter.

| Staff Double Shifts and Staffing Events | Fourth Quarter 2018 | First Quarter 2019 | Second Quarter 2020 | Third Quarter 2020 |
|---|---|---|---|---|
| Volume of Double Shifts | 926 | 812 | 1188 | 1769 |
| Volume of Staffing Events | 5288 | 4343 | 4396 | 4380 |
| Percentage of Double Shift Staffing Events | 18% | 18.7% | 27.0% | 40.4% |
| Number of Facilities | 3 | 2 | 2 | 2 |

Implications of a large volume of double shifting are deterioration in staff productivity, reducing the ability to be actively engaged in the supervision of youth as well as the negative impact to staff morale. The outcome of double shifting for direct care staff can lead to a level of inattentiveness on the part of staff, failure to provide active behavior management, which can negatively impact youth safety and potentially contribute to staff negligence in providing effective, safe and secure supervision of youth. Double shifting often leads to staff calling in sick to avoid being required to double shift after their regularly scheduled shift. All of the aforementioned are outcomes of a significant dependence on double shifts to staff housing modules.

There are no prohibitions nor restrictions in S. A. 48 on the use of double shifts to meet the requirements of minimum required direct care staff youth ratios. Although undesirable from an operational, staff morale and budgetary perspective, it does not impact analysis of whether the minimum required staff youth ratios are being met.

Double shifting is a critical contributing factor that has jeopardized the agency's capacity to provide effective staffing to provide adequate supervision and to assure youth safety and protection from harm.

On the weekly staff youth ratio reports completed by each facility, DCR requires documentation of the volume of double shifts used for each day for each shift. By Policy 9.20, Supervisors IV and III are required to assign officers to housing modules to meet the minimum required staff youth ratio based on the module youth population.

The table below displays the volume of the 2019 weekly absences and double shifts.

| 2019 Weeks | Weekly NIJ DCR Officer Absences | Weekly NIJ DCR Officers Double Shifts |
|---|---|---|
| December 30, 2018 - January 5, 2019 | 331 | 110 |
| January 6 - 12, 2019 | 254 | 61 |
| January 13 - 19, 2019 | 229 | 59 |
| January 20 - 26, 2019 | 177 | 39 |
| January 27 - February 2, 2019 | 253 | 93 |
| February 3- 9, 2019 | 221 | 61 |
| February 10- 16, 2019 | 235 | 34 |
| February 17- 23, 2019 | 214 | 32 |
| February 24 - March 2, 2019 | 212 | 44 |
| March 3 - 9, 2019 | 264 | 60 |
| March 10- 16, 2019 | 336 | 129 |
| March 17-23, 2019 | 218 | 39 |
| March 24- March 30, 2019 | 242 | 46 |
| March 31 -April 6, 2019 | 279 | 93 |
| April 7 - 13, 2019 | 273 | 75 |
| April 14 - 20, 2019 | 285 | 74 |
| April 21 -27, 2019 | 333 | 119 |
| April 28 - May 4, 2019 | 275 | 69 |
| May 5 - 11, 2019 | 238 | 64 |
| May 12 -18, 2019 | 327 | 111 |
| May 19 - 25, 2019 | 303 | 88 |
| May 26 - June 1, 2019 | 275 | 60 |
| June 2 - 8, 2019 | 310 | 86 |
| June 9 - 15, 2019 | 274 | 93 |
| June 16 -22, 2019 | 348 | 129 |
| June 23 - 29, 2019 | 321 | 127 |
| June 30 - July 6, 2019 | 345 | 152 |
| July 7 - 13, 2019 | 333 | 142 |
| July 14 - 20, 2019 | 342 | 139 |
| July 21 -27, 2019 | 328 | 131 |
| July 28 - August 3, 2019 | 291 | 133 |
| August 4 -10, 2019 | 284 | 115 |
| August 11 - 17, 2019 | 327 | 142 |
| August 18 -24, 2019 | 295 | 153 |
| August 25 - 31, 2019 | 299 | 135 |
| September 1 - 7, 2019 | 252 | 107 |
| September 8 -14, 2019 | 239 | 124 |
| September 15 -21, 2019 | 283 | 161 |
| September 22 - 28, 2019 | 299 | 134 |
| | 10944 | 3763 |

As illustrated in the table above the volume of double shifting being used to provide the minimally required staff youth ratio continues to grow at an unsustainable rate.

Compounding the extreme level of double shifting is the vacant positions during the third quarter at both facilities:

- At CDTS Ponce there are six of eight unfilled vacancies for Shift Supervisor positions.
- At CDTS Villalba there are three of eight unfilled vacancies for Shift Supervisor positions.

The volume of unfilled shift supervisor positions, aside from requiring excessive double shifts, creates a supervision void that is unacceptable for any expectation of successful operations, short of crisis management.

The volume of supervisor vacancies and corresponding requirement for a small group of supervisors to do multiple double shifts creates an unrealistic expectation for effective supervision, decision-making and coaching. This situation is compounded in that the two facilities operate on a shift model, which provides intermittent supervisory presence as shift supervisors make their required rounds in housing modules and throughout the facility, assuming that a more serious facility issue has not prevented timely rounds. Officers and supervisors are double shifting at an extraordinary rate, significantly decreasing their capacity to assure youth safety, security and well-being.

**Escape from CDTS Ponce:**  On September 22, 2019, at approximately 4:44 PM two youths, E.R.C. and K.O.C.F. escaped from CDTS Ponce by climbing over the facility interior and exterior security fencing. During the time of the escape, one Officer I (J.O.G.) was assigned by himself to supervise fourteen (14) youth while in the gym and returning from the gym to the housing module 1. Officer 1 (J.O.G.) was working a mandated double shift.

While returning to the housing module 1, three youths shut the security gate. The Officer I did not realize that two youths had escaped until he had returned to the housing module and taken a youth count.

The facility ranking officer in charge during the 2:00 – 10:00 shift was an Officer II.

One of the youth (E.R.C.), while on escape status from CDTS Ponce, was killed on October 1, 2019.

DCR OISC findings for the escape event of September 22, 2019 found there to be negligence on the part of officers, as well the facility perimeter was not secured as required by policy because of Special Operations Unit officers being assigned to supervision of Sumariados youth in module 2.

The escape event on September 22, 2019 is an illustration of the critical life and death outcomes as a result of the dangerous level of understaffing, double shifting and

inadequate supervision occurring at DCR juvenile facilities. The escape and outcomes of the escape is directly related to the errors and omissions that occurred in an understaffed facility and the inability of DCR to provide adequate staffing to the youth that have been placed in their care.

For the 2019 third quarter, DCR has not demonstrated sustainable performance compliance in meeting the minimum required staff youth ratios without a continually increasing and extensive dependence of double shifting. For the third quarter of 2019, DCR has not been able to sustain meeting the minimum required staff youth ratio for 100% of the staffing events, even while remaining operationally dependent on double shifting.

**Staffing Policy and Procedural Compliance and Quality Assurance:**

As of September 16, 2018, DCR successfully implemented agency staffing policy to procedurally require staffing assignment and documentation to prioritize operational compliance with the minimum required staff youth ratios. On November 16, 2018, DCR provided to the Monitor's Consultant a final, Secretary signed and approved Policy 9.20, *"Handling and Distribution of Youth Service Officers Roster".*

The Monitor's Consultant Staff Policy Compliance and Performance Reviews assess for accuracy, reliability and comprehensive reporting required by the DCR Staff Policy and is the primary quality assurance process to determine compliance of S.A. 48a. The design of the Monitor's Consultant Staff Policy Compliance and Performance Reviews consists of a comparative analysis of weekly submitted Staff Youth Ratio workbook documentation and forms DCR-DCR-0144 with the Master Roster, the daily rosters and mini-control logs.

- Form DCR -DCR -0144 is required by Policy 9.20. Form DCR -DCR -0144 is completed by the Supervisor IV and documents Policy 9.20 policy and procedural compliance, posts that are compliant and non-compliant with the requirements of Policy 9.20, as well as the volume of posts that do not meet the minimum required staff youth ratio.
- The facility Master Roster is an agency generated staffing roster, identifying posts, fixed posts, fixed posts identified by need, movable posts and relief personnel. The Master Roster designates one fixed post for each housing modules and additional fix posts identified by need, predicated on the housing module youth population and youth on special status (protective custody, transitional measure, constant supervision, etc.).

- The facility daily shift staff rosters display which staff has been assigned to which modules and corresponding module youth population. Supervisor IV's are required to develop a facility daily shift staff rosters from the Master Roster, adjusting as required for housing module youth populations, approved leave status, call offs, training, trips and special needs.

- Daily youth population list that identifies which youth are in which modules, designation of any youth on Protective Custody, Transitional Measures,

| | |
|---|---|
| | Therapeutic Observation or Constant Watch. Additionally, daily trips and youth assigned to those trips are documented on the daily population list.<br><br>• Mini-control logs are used to provide supplemental documentation of staff housing module assignments and staff and youth movement.<br><br>• Staffing documentation binders are in place at each facility and allow for a review of daily staffing practices, which allows for both DCR and Monitor's Office analysis of policy and procedural compliance. |
| What is needed for full compliance? What steps are required and/or recommended? | DCR needs to assign an adequate volume of officers to CDTS Ponce and CDTS Villalba to ensure the facilities have sufficient direct care staff to implement all terms of this agreement, and reduce unsustainable reliance on double shifting.<br><br>DCR needs to meet procedural compliance not only with S.A. 48, but also their own Policy 9.20. Compliance requires significant improvement in meeting minimum required staff youth ratios with a significant reduction and minimum dependence on double shifting.<br><br>Additionally, procedural compliance with DCR-DCR Policy 9.20 requires meeting minimum required staff youth ratios as well as corrective action when ratios are not met for any given supervision event on any shift. |
| Priority Next Steps | Priority next steps required to find compliance for S.A. 48a are the following:<br>• Recalculate and produce new Master Rosters for facilities based on the CD Humacao closure and staff and youth population redistribution.<br>• Address the requirement for procedural compliance with staffing Policy 9.20, especially in light of facility housing module increased populations, as well as any required 1:1 staff or special population youth supervision events.<br>• Address the inability to provide the necessary staff to maintain youth in the least restrictive placement possible, assuring protection from harm.<br>• Provide the Monitor's Consultant with electronic versions of each facilities active monthly/ cycle Master Roster as well as DCR-DCR 0144 occurring during the third and fourth quarters of 2019.<br>• DCR-DCR needs to implement independent quality assurance assessment of procedural compliance as required by Policy 9.20, generating reports for both internal use and submission to the Monitor's Office.<br>• The Monitor's Consultant has requested that commencing with the fourth quarter of 2019, DCR/DCR provide additional staffing information as to the names of the officers assigned double shifts and the location of the officer's assignment. This additional staffing information will allow for a deeper analysis to the staffing configuration and officer assignment during incident events.<br>• On August 26, 2019 the Parties reached an agreement to address immediate safety issues, including improvement in reporting information to the Monitor and Monitor's Team as well as a plan with specific elements to address |

| | |
|---|---|
| | immediate staffing issues. A staffing report filed with the Court by DCR's counsel had significant information missing. The Monitor filed a responsive pleading on September 18, 2019, that asked for a revised report and additional information. A response from DCR to the agreed staffing report is critical to start to positively impact the staffing crisis at CDTS Ponce and CDTS Villalba.<br><br>The staffing report should include:<br><br>    o   the details regarding the request for approval of officers and supervisors for both facilities, responses to such request, and if approved, how such officers and supervisors will be secured, and the time frame for doing so.<br>    o   If it is necessary for new officers to be recruited and trained, the time frame for recruitment, training and placement should be provided.<br>    o   The plan should also indicate how the Commonwealth will reduce its reliance upon double shifting to meet the minimum required staff/youth ratio, and indicate a recognition that staff youth ratios that exceed the minimum level will be required at times to keep assure youth safety.<br><br>**Monitor's note:  Determining the number of officers necessary to fill posts, including an adequate relief factor, and the necessary supervisors, has been discussed with FOMB representatives as well as with DCR.** |
| Quality Assurance Measures | DCR Staffing Policy 9.20 identifies that retrievable staff youth ratio documentation be maintained at each facility. As described in the previous section, the documentation consists of the following:<br><br>    •   Daily youth population list identify which youth are in which modules, designation of any youth on Protective Custody, Transitional Measures, Therapeutic Observation of Constant Watch. Additionally, daily trips and youth assigned to those trips should also be maintained in the daily population list.<br>    •   The facility staff daily roster, displaying which staff has been assigned to which modules. It is critical that the form allows for clear documentation of officers assigned to each module as well as mini control.<br><br>Staff youth ratio quality assurance compliance analysis consists of a review of the Master Roster, facility Daily Roster, facility mini control logs, and DCR-DCR 0144 daily forms to assess procedural and performance compliance with DCR-DCR Policy 9.20.<br><br>Additionally, review and assessment of DCR-DCR 0144 forms for each day are assessed for accuracy to the Daily Roster and compliance with DCR-DCR Policy 9.20 by the Supervisor IV the day after the events.<br><br>At this time DCR-DCR has not initiated independent analysis of procedural compliance to Policy 9.20. |

| | |
|---|---|
| Sources of Information upon which Consultant report and compliance ratings are based | Weekly facility staff youth ratio workbooks and form DCR-DCR-1044 are provided to the Monitor's Consultant throughout the quarter. Facility staff youth ratio workbook data is analyzed to assess facility and agency compliance in meeting the minimum required staff youth ratio as described in S.A. 48a.  Form DCR-DCR-1044 is analyzed for procedural compliance with staffing policy, 9.20.<br><br>A component of facility site visits is review facility staffing source documentation, Master Rosters, Daily Rosters, mini control analyzed against the weekly facility staff youth ratio workbooks that are provided to the Monitor's Consultant. Review and assessment of DCR-DCR 0144 forms for each facility for each day are assessed for accuracy to the Daily Roster and compliance with DCR-DCR Policy 9.20, by the Supervisor IV the day after the events. |

**January 2009 Stipulation Paragraph 1:** All necessary steps shall be taken immediately to ensure the reasonable safety of youth by providing adequate supervision of youth in all facilities operated by, or on behalf of, the Defendants.

| | |
|---|---|
| **Compliance Ratings** | **Non-Compliance** |
| Description of Monitoring process during this period of time | The Monitor's Consultant reviews and analyzes weekly Staff Youth Ratio forms and form DCR-DCR-0144. Additional documentation that is reviewed is as follows: Master Rosters, Daily Rosters, DCR-DCR 0144 Daily Staffing forms, as well as use of force events, monthly contraband reports, and incident report events. Observation, verification and documentation of housing module staff youth ratios is conducted on each site visit.<br><br>Additionally, 284 referrals to UENMI and OISC investigative reports have been reviewed to assess incidents and investigations that identify youth safety and youth supervision issues. |
| Findings and Analysis | For the third quarter of 2019, DCR is not providing adequate supervision of youth and ensuring reasonable safety.<br><br>**Facility Closure of CD Humacao:** As of January 15, 2019, the CD Humacao facility was closed for youth populations. After the closure of Humacao, 127 staff were reassigned to other DCR facilities. The two remaining juvenile facilities, CDTS Ponce and CDTS Villalba, absorbed the additional youth and classifications without sufficient staff to ensure compliance with S.A. 48.  Double shifting is not a viable solution to provide adequate supervision and youth safety.<br><br>**Master Rosters and Required Staffing:**<br><br>The facility Master Roster is an agency generated staffing roster, identifying posts, fixed posts, fixed posts identified by need, movable posts and relief personnel. The Master Roster designates one fixed post for each housing module and additional fix posts |

identified by need, predicated on the housing module youth population and youth on special status (protective custody, transitional measure, constant supervision, etc.).

The table below illustrates the DCR analysis of the volume of personnel required to fulfill the minimally required staff youth ratio requirements of S.A. 48 at CDTS Ponce and CDTS Villalba. DCR uses a shift relief factor of 1.73 for seven day supervisor and officer posts and a 1.23 shift relief factor for five day posts.

| Master Roster CDTS Ponce SRF Calculations | Master Roster Required Personnel |
|---|---|
| 5 Posts of 7 Days x 1.73 = 8.65 = 9 Supervisors | 9 |
| 67  Posts of 7 Days x 1.73 = 115.91 = 116  O.S.J.I. & II | 116 |
| 1 Post of 5 Days X 1.23 = 1.23 = 1 Supervisor | 1 |
| 23 Posts of 5 Days X 1.23 = 28.29 = 28  O.S.J.I. & II | 28 |
| 144  O.S.J.I. & II + 10 Supervisors | 154 |
| Master Roster CDTS Villalba SRF Calculations | Master Roster Required Personnel |
| 5 Posts of 7 Days x 1.73 = 8.65 = 9 Supervisors | 9 |
| 67  Posts of 7 Days x 1.73 = 115.91 = 116  O.S.J.I. & II | 116 |
| 1 Post of 5 Days X 1.23 = 1.23 = 1 Supervisor | 1 |
| 26 Posts of 5 Days X 1.23 = 31.98 = 32 O.S.J.I. & II | 32 |
| 158 = 148 O.S.J.I. & II + 10 Supervisors | 158 |
| Master Roster Total Personnel Required | 312 |

The next table is a comparative analysis between the volume of positions reported in the *September 2019* **January 2009 Stipulation Paragraph 5 Report** and the personnel requirements of the DCR generated facility Master Rosters:

| Volume of Personnel by Position:   September 2019 | | | |
|---|---|---|---|
| Facility | OSJ I and II | OSJ III and IV | Total |
| CDTS Ponce | 119 | 6 | 125 |
| Master Roster Required Personnel | 144 | 10 | 154 |
| Minimum Additional Personnel to Meet CDTS Ponce Master Roster | 25 | 4 | 29 |
| CDTS Villalba | 122 | 8 | 130 |
| Master Roster Required Personnel | 148 | 10 | 158 |
| Minimum Additional Personnel to Meet CDTS Villalba Master Roster | 26 | 2 | 28 |
| Both Facility Master Roster Required Personnel | 292 | 20 | 312 |
|  | 241 | 14 | 255 |
| Minimum Additional Personnel to Meet NIJ/DCR Master Rosters | 51 | 6 | 57 |

It should be noted that the CDTS Villalba Master Roster does not include required posts to staff the facility video system that was certified as operational as of October 7, 2019. Staff required for this post, consistent with DCR policy, requires the addition of five more personnel.

The Sumariados population have historically been involved in the most violent and disruptive incidents within the juvenile facilities. The minimum required staff youth ratio for this population has not provided adequate supervision to ensure youth safety. Between June 27 and September 10, 2019, one Sumariados youth was assaulted and cut on three separate occasions.

After these events, DCR assigned three officers to the Sumariados module and placed the module population on group time modification, requiring youth to be isolated in their sleeping rooms to assure youth safety.

Staffing rosters are inadequate to provide sufficient number of staff on all shifts without an assignment of additional staff to CDTS Ponce and CDTS Villalba.  Investigations completed during the third quarter indicate incidents occurring while assigned staff are off unit and/or not adequately providing supervision of youth. Facilities and security management cannot adequately maintain their rosters when insufficient staff are available to them, and consequently are forced to rely heavily on double shifting to attempt to meet the minimum required staff youth ratio.

The closure of CD Humacao did not provide the volume of staff to CDTS Ponce nor CDTS Villalba to relieve the agencies inability to consistently meet the minimum required staff youth ratio, nor to provide the adequate supervision to keep youth safe in the least restrictive placement possible, nor to relieve the disproportionate necessity on double shifting to provide youth supervision. The availability and manner that staff are deployed to youth populations, based on housing module youth population volume or by need to assure youth safety, has not met the requirements of this provision.

| | |
|---|---|
| | The remaining charge for DCR, perhaps more complex, is to determine whether Humacao staff that have been reassigned to other DCR facilities could be moved to CDTS Ponce and CDTS Villalba and whether a new training class of recruits must be sought. |
| | Additional staff does not assure adequate supervision of youth nor youth safety if staff is not adequately trained, supervised, coached, mentored and lead to develop a behavior management skill set that emphasizes communication, intervention, active listening skills and an understanding of adolescent and young adult development.  Likewise, supervisory and management staff must be available to model and develop these skills in staff and not only available at times of module disruptions or required rounds. Programming opportunities must be significantly expanded to create an operational environment that keep youth actively engaged in meaningful social, recreational, educational and vocational activities. |
| | The older age of the youth population, many who no longer qualify for educational services, creates a sub-culture of youth whose only purpose is to see who can exert power and intimidation over the other populations. The continual challenge for "leadership" in facilities of a relatively small population must be addressed and remedied.  In order to assure adequate supervision and youth safety, intervention and strategies must be developed to not only curtail the "leader" culture but to end it. |
| | The Monitor and Monitor's Consultant believe that quantitatively meeting the minimum staff youth ratios, in and of itself, is not sufficient to assure youth safety, especially when 40% of shift events are covered with double shifting. There are not sufficient staff and resources assigned to CDTS Ponce and CDTS Villalba to implement the requirements of the provision. |
| What is needed for full compliance? What steps are required and/or recommended? | A review of the DCR Master Rosters for CDTS Ponce and CDTS Villalba reflect that in order to have the volume of staff required to fill identified posts a minimum of sixty-two officers need to be assigned to CDTS Ponce and CDTS Villalba. |
| | Meeting minimum staff youth ratios does not necessarily equate that staffing provides adequate supervision to keep youth safe.  For full compliance, staff youth ratios need to consistently meet the minimum required staff youth ratio, as well as additional staffing that is required by special populations, youth assigned to Transitional Measures, Protective Custody, Sumariados and 1:1 staff youth supervision events. Reliance upon placement of youth in restrictive housing statuses in an effort to provide protection from harm does not provide "adequate supervision" to ensure youth safety. |
| | To assure youth safety, procedural and operational practices need to require direct care staff to engage in active behavior management, youth need to be engaged in robust programming, as well as classification and programming to assure adequate staff supervision to effectively manage and control aggressive youth and youth "leaders". |

| Priority Next Steps | Although there are many priority next steps, the most critical priority next step would be for DCR to reassign a minimum of sixty-two officers to CDTS Ponce and CDTS Villalba to meet the operational requirements of the agency's Master Rosters. |
| --- | --- |
| | The Monitor's Consulting Team continue to request access to incident report information as one of the critical components to assess youth safety. As of the close of the 2019 third quarter this information has started to be provided, although inconsistently and not within the requested guidelines. Based upon the Agreement reached by the Parties and entered with the Court on August 25, 2019, all incident report cover sheets should be submitted to the Office of the Monitor weekly on Mondays, and incidents of a more critical nature, as outlined in that report, must be submitted within 24 hours, or 48 hours in some cases. |
| | Digitizing incident reports has long been discussed so that the Monitoring team can have immediate access to this information, but more importantly, for efficiency, consistency and accountability purposes for DCR.  The Agreement reached between the Parties and filed with the Court on August 26 required a plan by the Commonwealth for digitalizing these reports; such plan has not yet been received. |
| | The Monitor and Consultant are also working to establish measures of safety based upon those criteria contained within Paragraph 78 reporting, and other factors. |
| Quality Assurance Measures | Incident report analysis and quality assurance requires consensus on incident report characteristics and definitional compliance as well as comprehensive reporting. The installation of video systems at CDTS Villalba, while assisting in the assessment of investigations, will also significantly help in assessing youth safety, as well as the dynamics associated with youth incident events and adequate staff supervision to assure youth safety. |

**January 2009 Stipulation Paragraph 2:** All necessary steps shall be taken to provide sufficient direct care staff to implement the Consent Decree and adequately supervise youth, pursuant to Paragraph 48.

The requirement that 50 YSOs be hired each month was terminated by the Court on September 13, 2011 (Docket 991). No new YSOs were hired during the Third Quarter of 2019.

| Compliance Ratings | Non-Compliance |
| --- | --- |
| Description of Monitoring process during this period of time | Monitoring of S.A. 48 January 2009 Stipulation Paragraph 2 occurs through review of the monthly staffing report required by the January 2009 Stipulation Paragraph 5 provided by the DCR Human Resources Development and Training Institute. The report indicated that no new officers were appointed during the quarter. Additional monitoring processes that occurred during this quarter were analysis of facility populations, classification levels, youth assigned to restrictive housing, minimum required staff youth ratios, and agency and facility staff volume and assignments. |

| Findings and Analysis | **Analysis of Sufficient Staffing:**  The closure of CD Humacao did not provide the volume of staff to CDTS Ponce nor CDTS Villalba to relieve the agencies inability to consistently meet the minimum required staff youth ratio, nor to provide the adequate supervision to keep youth safe in the least restrictive placement possible, nor to relieve the disproportionate necessity on double shifting to provide the minimum required staff youth ratio for youth supervision. The availability and manner that staff are deployed to facilities and youth populations, based on housing module youth population volume or by need, has not consistently met the requirements of this provision. |
| :--- | :--- |

**Third Quarter 2019 Contraband Report Review:**

DCR submitted contraband workbooks for both active facilities for each month of the third quarter of 2019.

- CDTS Ponce reported twenty-one contraband events for the quarter.
- CDTS Villalba reported fifteen contraband events for the quarter.

The third quarter contraband reports reported the following:

| Facility | 3rd Quarter 2019: Volume of Reported Contraband Events | 3rd Quarter 2019: Type of Contraband | | |
| :--- | :--- | :--- | :--- | :--- |
| | | Sharps (blades, knives) | Pills/ Drugs | Cell Phones/ Accessories |
| CTS Ponce | 21 | 13 | 7 | 0 |
| CTS Villalba | 15 | 7 | 1 | 2 |

The contraband report did not document the volume of searches that were conducted at each facility, the type of searches that resulted in the discovery of contraband, nor the volume of searches that did not result in the discovery of contraband. The volume of sharps, drugs and medications contraband that were discovered is concerning in light of the history and volume of cutting events at DCR facilities.

As documented in the OISC reports below, staff fail to provide searches.

1. **OISC Report 19-049:** At CDTS Villalba, youth M.R. assaulted by multiple youth requiring hospitalization and 6 stitches to the head, 12 stitches to a wound in his hand, wound to the neck, laceration in frontal area of the neck, and various scratches on his face.  The OISC report identifies that searches were not being conducted to detect contraband.

2. **OISC Report 19-052:** At CDTS Ponce, youth J.K.R.T. admitted to and tested positive to using synthetic cannabis and had done so before August 1 – 15, 2019.
   The OISC report notes s Standard 9.11 regarding detection of smuggling and concerns that staff are not using preventative measures with conducting searches as required by policy.

Staff are challenged to conduct effective searches because of noted staffing deficiencies, facilities do not have operational metal detection equipment, nor comprehensive

practices of strategically searching youth who are known threats to the safety of other youth.

**Staffing, Incident Events and Investigations:**

There were 102 staff youth ratio events during the third quarter that did not meet the minimum required staff youth ratio. In addition to these 102 staff youth ratio events, additional staff supervision events have occurred where staff were not actively engaged in effective behavior management, were unable to keep youth safe, or were violating DCR policy and procedure by abandoning their posts without authorized staff relief.

1.  **Youth C.V.P. :** At CDTS Ponce, on three separate occasions (June 27, September 10 and September 12, 2019) youth C.V.P. was assaulted by other youth and cut with sharp instruments requiring hospitalization and stitches.
    a.  **OISC Report 19-042:** . *"Allowed physical contact between children and the Sumariados module 4.  Engaged in omission of duties by failing to intervene at the time which the young J.N.N had contact with the minor C.V.P. resulting in the latter with a wound on the left side of the proximal face, ear, upper lip that required 18 stitches."*

    Based on the documentation that is available to the Monitor's Consultant, the youth C.V.P. was not placed on protective custody after the June 27 assault and cutting event, nor after the September 10 assault and cutting event. The youth C.V.P. was placed on protective custody status on September 12, 2019, only after three assault/cutting events that had taken place in the prior seventy-seven days.

2.  **Youth C.D.V. :** At CDTS Ponce, on June 30, 2019  Youth **C.D.V** was assaulted with a bar of soap in a sock.
    a.  **OISC Report 19-044:**  The OISC Report noted that there was no officer assigned to Mini 3 module control that day *"which represents negligence and risk for both young people and staff."*

3.  **OISC Report 19-044:** At CDTS Ponce, on July 6, 2019, two youth chose to be "locked up" in their rooms because they were having problems with other youth in the module.  The Supervisor ordered all youth out of their rooms. There was a fight amongst eight youth with three being hurt and one youth hospitalized with open wounds to the face.

4.  **Escape Event:** At CDTS Ponce, on September 22,2019 two youth (K.O.C. F. and E. R. C.) escaped.  This escape event is described and commented on under S.A. 48 a, *Escape from CDTS Ponce.*

5.

Officers properly assigned, posted, supervised and engaged in active behavior management and awareness of behavioral indicators of potential disruptive behavior increases the probability of staff being able to keep youth safe. The DCR youth

| | |
|---|---|
| | population, although smaller in volume, can certainly be characterized as a more sophisticated, violent adolescent population requiring competent staffing, predicated on a volume of staff that does not rely on 40% of shifts being covered by staff doing double shifts. The serious nature of incident events, reported and unreported, certainly indicates that the staffing issue within DCR has risen to a critical point that is not compliant with the provisions of S.A. 48.<br><br>The aforementioned incident events and corresponding staffing deficiencies and extraordinary reliance on double shifting, demonstrates DCR has provided an insufficient number of staff to adequately supervise youth and assure youth safety. Staffing rosters are inadequate to provide sufficient number of staff on all shifts without an increase in assigned staff.  Investigations completed during the third quarter indicate incidents occurring while required staff are off unit and/or not adequately providing supervision of youth. Facilities and security management cannot adequately maintain their rosters when insufficient staff are available to them, or they are forced to rely heavily on double shifting.<br><br> The Monitor and Monitor's Consultant believe that being quantitatively in meeting the minimum staff youth ratios, in and of itself, is not sufficient to assure youth safety, especially in increasing high volume of double shifting. There are not sufficient staff and resources to implement the requirements of the provision.<br><br>This Stipulation is found to be in non-compliance for the third quarter of 2019. |
| What is needed for full compliance? What steps are required and/or recommended? | DCR should take immediate steps to reduce the staffing crisis by identifying the strategies it will use to fill the staffing vacancies, including whether some officers previously at Humacao can be sent to CDTS Ponce and CDTS Villalba, and recruitment and training of new officers.<br><br>For full compliance for this provision, DCR needs to consistently provide and assure availability of direct care staff to be deployed to housing modules based on the minimum required staff youth ratio as well as the specific staff supervision needs of special populations, Transitional Measures, Protective Custody and 1:1 staff youth supervision events to avoid restrictive housing placement to assure youth safety. |
| Priority Next Steps | The Monitor's Team is analyzing how to better assess characteristics of incident reports to accurately assess the volume of events occurring impacting youth safety and adequate staff supervision of youth.<br><br>A priority next step will be to assess DCR IT capacity to provide an electronic incident report module within the electronic record keeping process. In the interim, the Monitor's Consultant has developed an Excel contraband workbook for consideration of implementation by DCR to allow for more efficient analysis of contraband reporting. The contraband report should document the volume of searches that were conducted at each facility, the type of searches that resulted in the discovery of contraband, and the volume of searches that did not result in the discovery of contraband. In incident events |

| | |
|---|---|
| | in which contraband has been discovered a formal analysis of the contraband source should be conducted and shared with officers.<br><br>Additionally, the Monitor and Monitor's Consultant continue to await a staffing report from DCR. Analysis of CDTS Ponce and CDTS Villalba Master Rosters clearly illustrates that there is an inadequate number of staff assigned to these two facilities. The staff that are assigned to CDTS Ponce and CDTS Villalba are required to work an inordinate volume of double shifts resulting in inadequate youth supervision. |
| Quality Assurance Measures | The critical next steps for quality assurance measures is to develop consensus over critical terms of this stipulation. Agreement on the importance of the accuracy and reliability of data, consensus on definitional compliance of terminology, and comprehensive reporting of events and incident event characteristics are essential for effective quality assurance measures. |
| Sources of Information upon which Consultant relied | Reports that were used for analysis of this compliance ratings were: the January 2009 Stipulation Paragraph 5 report for July, August and September 2019; the DCR-DCR submitted contraband reports for July, August and September 2019; incident reports submitted for  July, August and September 2019; as well as UEMNI and OISC reports. |

**January 2009 Stipulation Paragraph 3:** Defendants will include as direct care staff all social workers assigned to its institutions, once such staff receive forty (40) hours of pre- service training, ~~pursuant to Paragraph 49 of the Consent Decree.~~ The same shall also receive annual training as direct care staff, pursuant to Paragraph 50 of the Consent Decree.

| | |
|---|---|
| **Compliance Ratings** | **NA** |

*In approximately 2011, the Commonwealth decided not to employ the categorization of Social Workers as direct care staff as allowed by this provision to enhance coverage. However, the provision remains as a future option. Unless and until the Commonwealth determines that they want to apply this provision, the Monitor's Office will not Monitor the provision. The choice to not implement this provision is not non-compliance, but has been categorized as "NA" not applicable. The ~~struck~~ part of the provision references a provision that has been terminated.*

**January 2009 Stipulation Paragraph 4:** All persons hired to comply with Paragraph 48 shall be sufficiently trained~~, pursuant to Paragraph 49 of the Consent Decree,~~ before being deployed. Defendants shall deploy all duly trained direct care staff, ~~pursuant to Paragraph 49,~~ to juvenile facilities in a timely manner.

*The ~~struck~~ part of the provision references a provision that has been terminated.*

| | |
|---|---|
| **Compliance Ratings** | **NA** |

| Monitoring process during this period of time | There were no new appointments to the agency during the third quarter reporting period, nor has there been any new appointments in the last several years. |
| --- | --- |
| | Upon hiring of any new staff, DCR Policy Chapter 4.1 and 4.2 address the agency's policy and procedure for new employee pre-service training and annual training, as well as certification prior to facility assignment. In light of the approved and implemented policies, but the absence of any new hires during this quarter, this stipulation is found to be non-applicable (NA) for assessment of compliance for this quarter. |

**January 2009 Stipulation Paragraph 5:** On the fifth day of every thirty-day period commensurate with the Order approving this Stipulation, Defendants shall submit a report to the Monitor and the United States providing the following: a. the number of current direct care staff, by position classification, at each facility; b. the number of qualified direct care staff hired during the previous period; c. the number of hired direct care staff in the previous period who were hired ~~and have received pre-service training, pursuant to Paragraph 49~~; and d. the juvenile facilities where the direct care staff who were hired in the previous quarter ~~and have received pre-service training, pursuant to Paragraph 49~~, have been deployed or assigned.

*The ~~struck~~ part of the provision references a provision that has been terminated.*

| Compliance Ratings | Partial Compliance |
| --- | --- |
| Description of Monitoring process | Monitoring of S.A. 48 January 2009 Stipulation Paragraph 5 occurs through review of the monthly staffing report provided by the DCR Human Resources Development and Training Institute. |
| Findings and Analysis | **January 2009 Stipulation Paragraph 5:** |
| | For the 2019 third quarter, January 2009 Stipulation Paragraph 5 is found to be in partial compliance. |
| | **January 2009 Stipulation Paragraph 5:** DCR provided at the July, August and September staffing report required by the stipulation. On September 9, 2019, DCR provided the July and August 2019 reports. On October 11, 2019 DCR provided the September report. |
| | The stipulation language requires that the defendants shall submit a report by the fifth day of the following month. As seen in the receipt dates of the third quarter reports, the reports were not received by the fifth day of the month. |
| | The Monitor's Consultant has identified that the staffing documented in the report should reflect the volume of staff identified in each facility master roster. |
| | The table below summarizes the July, August and September 2019, January 2009 Stipulation Paragraph 5 reports: |

| Month/Year | OSJ I | OSJ II | OSJ III | OSJ IV | Total | Inactive | New Hires: 7-9/2019 | Voluntary Resignation Program |
|---|---|---|---|---|---|---|---|---|
| Jul-19 | 355 | 22 | 15 | 5 | 397 | 47 | 0 | 0 |
| Aug-19 | 355 | 22 | 15 | 5 | 397 | 38 | 0 | 0 |
| Sep-19 | 352 | 22 | 16 | 5 | 395 | 39 | 0 | 0 |

Although the aggregate volume of staff would appear that DCR/DCR has the volume of staff to meet the requirements of S.A. 49, a closer review illustrates that staff have not been deployed in a manner to meet minimum required staff youth ratios nor to effectively reduce the disproportionate reliance on double shifting, nor adequate staffing to assure youth safety.

| Facilities | Month/Year | OSJ I | OSJ II | OSJ III | OSJ IV | Total | Inactive | New Hires: 7-9/2019 | Voluntary Resignation Program | Date Received |
|---|---|---|---|---|---|---|---|---|---|---|
| CD Humacao | Jul-19 | 16 | 0 | 2 | 1 | 19 | 11 | 0 | 0 | |
| CTS Ponce | Jul-19 | 109 | 10 | 2 | 1 | 122 | 12 | 0 | 0 | |
| CTS Villalba | Jul-19 | 118 | 7 | 6 | 2 | 133 | 14 | 0 | 0 | |
| Nivel Central y Otras facilidades DCR | Jul-19 | 112 | 5 | 5 | 1 | 123 | 10 | 0 | 0 | |
| | Jul-19 | 355 | 22 | 15 | 5 | 397 | 47 | 0 | 0 | 9/9/2019 |
| CD Humacao | Aug-19 | 15 | 0 | 1 | 0 | 16 | 9 | 0 | 0 | |
| CTS Ponce | Aug-19 | 109 | 10 | 3 | 1 | 123 | 6 | 0 | 0 | |
| CTS Villalba | Aug-19 | 116 | 7 | 6 | 3 | 132 | 13 | 0 | 0 | |
| Nivel Central y Otras facilidades DCR | Aug-19 | 115 | 5 | 5 | 1 | 126 | 10 | 0 | 0 | |
| | Aug-19 | 355 | 22 | 15 | 5 | 397 | 38 | 0 | 0 | 9/9/2019 |
| CD Humacao | Sep-19 | 14 | 0 | 1 | 0 | 15 | 8 | 0 | 0 | |
| CTS Ponce | Sep-19 | 109 | 10 | 5 | 1 | 125 | 6 | 0 | 0 | |
| CTS Villalba | Sep-19 | 115 | 7 | 5 | 3 | 130 | 15 | 0 | 0 | |
| Nivel Central y Otras facilidades DCR | Sep-19 | 114 | 5 | 5 | 1 | 125 | 10 | 0 | 0 | |
| | Sep-19 | 352 | 22 | 16 | 5 | 395 | 39 | 0 | 0 | 10/11/2019 |

As can be seen in the table above, the closure CD Humacao of a youth population on January 15, 2019, as of September 2019, there still remained 15 officers assigned to CD Humacao. After the closure of Humacao, roughly 129 staff were reassigned to other facilities within DCR. The CDTS Ponce and CDTS Villalba absorbed the additional youth and classifications without sufficient staff to ensure compliance with paragraph 48.  Double shifting is not the solution to an overall inadequate staffing number.

| What is needed for full compliance? | The Monitor's Consultant believes the following actions, metrics and data elements are necessary for DCR to be in compliance with S.A. 48 January 2009 Stipulation Paragraph 5: |
|---|---|

- Assessment and deployment of staffing requirements of the two operational facilities to meet the minimum required staff youth ratio without unreasonable reliance on double shifting, and capacity to provide adequate staffing to keep youth safe in the least restrictive placement possible without dependence on restrictive housing;
- For each month submit a January 2009 Stipulation Paragraph 5 staffing report to the Monitor's Consultant on or about the fifth day of the month;

| | |
|---|---|
| | • The inactive (inactivos) staff identified for each facility should be identified by classification type;<br>• The report should contain the number of qualified direct care staff hired during the previous period (month);<br>• Identify the juvenile facilities where the direct care staff who were hired in the previous quarter have been deployed or assigned.<br>• Provide the Monitor's Consultant with each facility's electronic version of the Master Rosters that is applicable to the monthly S.A. 48 January 2009 Stipulation Paragraph 5 reports.<br>• DCR needs to stipulate that the volume of staff documented in each facility's Master Roster corresponds with the data in the monthly S.A. 48 January 2009 Stipulation Paragraph 5 reports. |
| Priority Next Steps | DCR needs to continue to provide this report on a consistent and timely basis. Additionally, in order to assess the accuracy and reliability of the S.A. 48 January 2009 Stipulation Paragraph 5 report, DCR needs to continue to provide to the Monitor's Consultant an electronic version of each facility's corresponding monthly/cycle Master Rosters CDTS Ponce and CDTS Villalba.<br><br>As the Monitor's Consultant has explained to the Operations Functional Team, the criteria to assess the accuracy of the S.A. 48 January 2009 Stipulation Paragraph 5 report would be that the monthly report documentation be the same volume of staff that is identified in each facilities Master Roster. |
| Quality Assurance Measures | Upon receipt of the monthly facility Master Roster, a comparative analysis will occur with the S.A. 48 January 2009 Stipulation Paragraph 5 report to assess the accuracy and reliability of the report matching the data from the facility Master Rosters.<br><br>Ultimately, the Monitor's Consultant expectation as an effective quality assurance measure that DCR-DCR, upon production of the S.A. 48 January 2009 Stipulation Paragraph 5 report, assure and stipulate that the numbers presented in the report correspond to the volume of staff and corresponding classifications for each facility's Master Roster. If the cycle Master Report and the S.A. 48 January 2009 Stipulation Paragraph 5 report staff numbers do not match, an explanation as to why there is variance in the numbers should be provided.<br><br>As of the production of the 2019 third quarter report, DCR has not stipulated that the volume of staff documented in each facility's Master Roster corresponds with the data in the monthly S.A. 48 January 2009 Stipulation Paragraph 5 report. |

# PROTECTION FROM HARM – CLASSIFICATION (Bob Dugan)

**S.A. 52:**  At both the detention phase and following commitment, Defendants shall establish objective methods to ensure that juveniles are classified and placed in the least restrictive placement possible, consistent with public safety. Defendants shall validate objective methods within one year of their initial use and once a year thereafter and revise, if necessary, according to the findings of the validation process.

| Compliance Ratings | Non-Compliance |
|---|---|
| Description of Monitoring process during this period of time | The Monitor's Consultant conducted site visits on September 17 and 18, 2019 to CDTS Ponce and September 18, 2019 to CDTS Villalba. Observation and documentation of housing module staff youth ratios is conducted on each visit as well as the levels of treatment of youth assigned to housing modules.<br><br>During site visits facility youth population classification and housing assignments were provided for both facilities. Throughout the quarter, and in the previous twenty-nine quarters, DCR has provided detention and committed classification documentation, with corresponding youth facility assignments and assessed levels of treatment. DCR facility and housing assignments have been found to consistently correspond to youth's assessed levels of classification and treatment. |
| Findings and Analysis | DCR has been engaged in an effort to meet the requirements of S. A. 52 since 2013. The following timeline illustrates various milestones of the agency's classification efforts:<br><br>

| Quarters | Activity |
|---|---|
| Fourth Quarter 2013 | Proposals for Classification validation study |
| Fourth Quarter 2014 | Start of Classification validation study |
| First Quarter 2015 | Classification validation study preliminary report |
| Second Quarter 2015 | Classification Manual for training and implementation |
| Fourth Quarter 2016 | DCR Administrative Order CDR -2016-10, for implementation of DCR Classification processes |
| Third Quarter 2019 | Court Filing by  the Office of the Monitor requesting a report within 60 days, detailing current concerns with the classification system, analyzing existing data from DEC from the prior 12 months, and making recommendations for how to address current limitations while ensuring that youth remain in the least restrictive placements, consistent with public safety. |

Since the Fourth Quarter 2014, DCR has experienced a 60% reduction in the volume of facilities and a 69% reduction in youth population: |

Throughout the DCR Classification development process the Monitor's Consultant has continually requested that the agency provide the following core elements to assure policy and procedural compliance with the S.A. 52:

- An approved, agency Secretary signed, trained policy and procedure that addresses the requirements of S. A. 52.
- The policy needs to specifically require an annual validation that assesses the objective methods and efficacy of the classification processes. Revisions to the classification processes should be made based on the annual validation.
- The policy needs to provide for both the detention and committed classification processes an administratively approved override process.

In October 2018, the Monitor's Consultant was asked to provide his professional opinion relative to the closure of CD Humacao. At that time, the Monitor's Consultant addressed his concerns about the impact that the closure of CD Humacao would have on the classification, staffing and youth safety. These issues were further documented in the Monitor's 2018 Fourth Quarter Report:

*Needless to say, the proposed classification distribution leaves DCR with no capacity to manage facility maintenance without further population and classification consolidation. Although there is recognition of the DCR population reduction, the logistics to maintaining the integrity of the existing classification practices will be very challenging.*

*The present DCR Classification practice was implemented in the Spring of 2015 with an Administrative Order. Staff were trained in April of 2015, at which time the agency operated five facilities and an agency youth population of 267. With the reduction in facilities, over a 50% reduction in youth population, and the absence of classification validation studies, the Monitor's Consultant has significant concerns about whether the DCR classification practices are effective in meeting the safety and treatment needs to youth, especially in light of facility closure and consolidation of youth populations.*

As of October 22, 2019, the agency has only produced various draft classification policies, has not produced any annual validations, has not presented any documentation nor identified a mechanism for or implemented any detention nor committed classification overrides, nor made any revisions to the existing classification practices.

As of September 30, 2019, the DCR committed classification housing assignments are illustrated below:



As of September 30, 2019, the DCR detention classification housing assignments are illustrated below:



The following table identifies the diverse classification populations within CDTS Ponce and CDTS Villalba.

| Detention Classification | Committed Classification | Special Populations |
|---|---|---|
| Detention Intake | Evaluation | Puertas (mental health youth) |
| Detention: Low | Level 2 | Mental Health 1:1 Supervision Events |
| Detention: Moderate | Level 3 | Protective Custody |
| Detention: Severe | Level 4 | Transitional Measures |
| Sumariados | Level 5 | Sumariados |
| Girls Detention Population | Girls Committed | Federal Holds |

The table below displays the CDTS Ponce and CDTS Villalba bed capacity and youth populations as documented in each facility's  September Levels of Treatment document.

| CDTS Ponce | Bed Capacity | Youth Population 9/2019 | CDTS Villalba | Bed Capacity | Youth Population 9/2019 |
|---|---|---|---|---|---|
| MODULO - 1 (Sumariados) | 15 | 5 | MODULO-A-1 (Det. M/Int.)) | 15 | 12 |
| MODULO - 2 (Detention Leve) | 15 | 7 | MODULO-A-2 (Nivel IV) | 15 | 12 |
| MODULO - 3 (N-III) | 15 | 8 | MODULO-B-1 (Det. Leve | 15 | 15 |
| MODULO - 4 (N-III) | 15 | 6 | MODULO-B-2 (Nivel IV) | 15 | 11 |
| MODULO - 5 (Det. Niñas) | 15 | 3 | MODULO-C-1 Nivel V) | 15 | 7 |
| MODULO - 6 (Cust. Niñas) | 15 | 7 | MODULO-C-2 (Nivel V) | 15 | 7 |
| MODULO - 7 (N-II ) | 15 | 3 | MODULO-D-1 (CN) | 15 | 3 |
| PUERTAS- 8 | 15 | 4 | MODULO-D-2 (Nivel IV) | 15 | 6 |
| Admissions | 4 | 0 | Admissions | 4 | 0 |
| | | **43** | | | **73** |

With the closure of CD Humacao, DCR does not have the housing module capacity to house all of the detention classification levels in separate housing modules. The diverse categories and classification status of youth allows for no specific housing for severe status detention youth nor any capacity to evacuate a module for emergency or normal physical plant maintenance.

DCR has failed to produce an annual objective validation of the classification instruments for the four years that the classification process has been in practice. The reduction in youth population, facilities requires an urgent analysis of the existing agency resources and youth classification, treatment and safety needs.

| | |
|---|---|
| | For the third quarter of 2019, the Monitor's Consultant has determined that DCR is in non-compliance with S.A. 52. |
| What is needed for full compliance? What steps are required and/or recommended? | The dynamic changes in the reduction of DCR facilities and youth populations, accompanied by the absence of comprehensive planning, and the failure to conduct annual classification validation and revisions, has jeopardized the agency's capacity to provide for the safety and treatment needs of the youth in their care in the least restrictive placements as possible.<br><br>It is imperative that DCR initiate a comprehensive review of the agency's classification, restrictive housing and non-compliant staffing practices. The review and associated revisions to policy and practice should result in a classification process that places youth in the in the least restrictive placement possible, with the minimally required staffing to assure protection from harm, absent restrictive housing practices.<br><br>A review of the classification practices and revisions to the classification validation should be focused on expeditiously developing the required policy, procedures, training and quality assurance processes to meet all of the compliance requirements of, S. A. 48, S. A. 52, as well as the protection from harm and services required by S. A. 79 and S. A. 80.<br><br>The metrics established for compliance of this provision are the following:<br>• A final agency approved classification policy and procedure, inclusive of a process requirement for annual classification methodology validation, findings, and revisions that are necessary.<br>• Production of annual review of validation of classification objective methods, findings and revisions as required.<br>• Continued production of monthly detention and committed classification data.<br>• 100% of detention youth are classified and assigned to appropriate housing modules, unless prior release by the Court.<br>• 100% of committed youth are classified and assigned to appropriate facilities and housing modules, consistent with their assigned classification treatment levels and safety requirements.<br>• Youth are placed in the least restrictive placement possible with staff assigned to assure their safety and protection from harm.<br><br>The DCR Classification Report should address the manner in which these compliance issues will be addressed. |
| Priority Next Steps | The closure of Humacao has also brought new challenges to the remaining two facilities to comply with classification requirements. Space limitations, as well as staffing shortages, work to hamper the ability of staff to separate youth when necessary for safety reasons. There is currently no additional unit at Villalba should a high risk youth be admitted into detention. Girls are grouped together by status regardless of risk levels. Current policies require that DCR "validate objective methods within one year of their initial use and once a year thereafter and revise, if necessary, according to the findings of the validation process." The purpose of the classification system, as indicated in Paragraph 52, is to "ensure that |

juveniles are classified and placed in the least restrictive placement possible, consistent with public safety."

Past compliance reports for classification have identified the need to address by policy and practice language regarding annual reviews and necessary revisions.  While that language must be added for the policy to be reviewed, it is critical to revisit the classification system given the new reality of housing youth in only two facilities.  This is particularly true now that the population has decreased so significantly, and that there is a higher concentration of youth with a history of violence and/or mental health concerns. As a result of the absence of any classification revisions, especially with the reduction to two facilities the volume and diversity of classification and special populations a formal report on the needs of the classification system was agreed to by the parties on August 26, 2019.

**DCR Classification Report:**

The specific language of the filing states*:  Pursuant to Paragraph XVII (j), the Office of the Monitor requested a report within 60 days, with assistance from Bob Dugan, detailing current concerns with the classification system, analyzing existing data from DEC from the prior 12 months, and making recommendations for how to address current limitations while ensuring that youth remain in the least restrictive placements, consistent with public safety.  It is strongly recommended that the process include the input of the facility directors, facility compliance officers, social work supervisors and others with direct working knowledge of the classification system. Recommendations which can bring paragraph 52 into compliance, both in policy and practice, should be concrete, with specific time frames, and address underlying problems occurring with current space limitations.  Please identify who will be responsible to prepare such report, who will be involved in the process, and who will be responsible for its submission.*

On August 15, 2019, the Monitor's Consultant provided a classification issues outline for DCR staff to assist with the task of generating a classification report. On August 16, 2019, the Monitor's Consultant had a conference call to review the submitted classification outline with Kelvin Merced, from the DCR Office of Federal Stipulations, who was designated as the lead staff member for the Classification Report. During site visits on September 17 and 18, the Monitor's Consultant met with DCR facility and Central Office staff to discuss issues that needed to be addressed in the classification report. Addressed during these meetings was the shortcomings in the classification process to allow for the instrument to effectively address the issue of "negative leaders" and those youth who threaten the safety of other youth and staff. This situation has obviously been compounded by staff shortages and the disturbingly high volume of double shifting.

In the absence of safety, treatment cannot occur. Youth and staff fear for safety. Staff have not been able to keep youth safe. Although this is a staff issue, it is also concurrently a classification issue. There is a critical need and opportunity to revise the classification process to assure that facility management has the capacity to classify youth not only based on the assigned level of treatment but concurrently balanced with safety and managing "negative

|  | leaders". The sophisticated youth who is a negative leader, rarely is the youth directly involved with acts of violence and threatening behavior.<br><br>A critical need exists to revise the classification process predicated on the reality of the limited number of facilities, modules and existing youth behavior profiles. The classification report and classification process revisions need to address the new reality of DCR juvenile institutions and youth populations., specifically addressing the ability to classify negative youth leaders in a manner that they are sequestered from youth populations that are able benefit and participate in treatment plans in a safe environment. Developing the policy and practices to prioritize youth safety in order to provide effective treatment, while maintaining the requirements of the consent decree must be addressed with a sense of urgency.<br><br>The Classification Report was due on October 14, 2019, but has not been received in time for this report.  The priority next step is for DCR to produce a Classification Report addressing the issues identified above for discussion during the Fourth Quarter. |
|---|---|
| Quality Assurance Measures | DCR effectively documents the results of both detention and committed classification processes and youth classification, levels of treatment and corresponding housing module assignments. Monthly documentation of detention and committed classification is consistently provided to the Monitor's Consultant.<br><br>DCR must incorporate annual reviews of the validation of the objective methods of the classification instruments, processes and findings, negating the opportunity to systematize quality assurance into the classification processes.<br><br>The CD Humacao facility closure, youth population consolidation, staff resignations and staff reassignments, the volume of transitional measures, protective custody and the corresponding restrictive housing practices requires DCR to assess the effectiveness of existing Classification practices in light of a reduction in housing modules, and how these issues impact youth treatment and protection from harm requirements. |
| Sources of Information upon which Consultant report and compliance ratings are based | Monthly classification documentation for youth who have been classified for detention and committed youth is provided to the Monitor's Consultant. Monthly, DCR provides the Monitor's Consultant facility youth population and classification reports. During site visits, the Monitor's Consultant obtains facility youth population documentation that identifies youth housing module populations and classification levels of treatment.<br><br>Detention classification documentation provided to the Monitor's Consultant monthly, indicates youth have been consistently classified and assigned to a housing module that corresponds to detention classification level.<br><br>For the third quarter of 2019, all the reviewed committed institutional assignments are consistent with the level of treatment scores and level assignments as reported in the |

| | monthly committed classification reports. Youth committed classification levels and institutional housing assignments are reviewed for consistency during site visits. |
|---|---|

## PROTECTION FROM HARM – USE OF FORCE (David Bogard)

| | |
|---|---|
| **S.A. 77.** In no event is physical force justifiable as punishment on any juvenile. The use of physical force by staff, including the use of restraints, shall be limited to instances of justifiable self-defense, protection of self and others, to maintain or regain control of an area of the facility, including the justifiable protection of significant property from damage; and prevention of escapes; and then only when other less severe alternatives are insufficient. A written report is prepared following all uses of force and is submitted to administrative staff for review. When force, including restraint, is used to protect a youth from self, this must be immediately referred to the medical area for medical and mental health evaluation and any necessary treatment. | |
| **Compliance Rating** | **Partial Compliance** |
| Description of Monitoring process during this period of time | The Monitor's staff visited the two facilities on September 17-19, 2019 to review quarter to date use of force incidents and discuss these with institutional management and compliance staff.  At Ponce, incident reports and videos were reviewed for two use of force incidents that had transpired thus far in the quarter (P-19-07-342 and P-19-09-445), and none were reported subsequently. There was one reported use of force at Villalba as of the time of our site visit (V-19-7-253), but no additional ones later in the quarter.  Both of the Ponce incidents were referred via 284 and investigated by OISC.  Off-site, I reviewed translations of the two OISC investigations for use of force at Ponce to determine whether the investigations were thorough, findings reasonable, and comported with the requirements of ¶78. |
| | I also reviewed DCR's weekly spreadsheet reports of use of force incidents and multiple descriptive data elements for same including names of youth involved, locations, types of force employed, injuries sustained by youth, medical services provided, chemical agents use and documentation of amounts, etc. |
| Findings and Analysis | The three reported use of force incidents this quarter were the fewest over the past four quarters.   This quarter's incidents occurred as follows: Villalba (1) and Ponce (2). |

| Facility | Q3 Events: Use of Force | Q2 Events: Use of Force | Q3 Youth Involved | Q2 Youth Involved |
|---|---|---|---|---|
| CTS Ponce | 2 | 6 | 13 | 1 |
| CTS Villalba | 1 | 3 | 1 | 8 |

Chemical agents were only used in one incident this quarter, one in which three youths with weapons attacked and slashed a youth who was being escorted by two officers.

Review of the video of the slashing incident revealed that OC was a reasonable action for the officers to take in light of the substantial threat posed to them and the youth being attacked. These conclusions are in contrast to the concerns raised in Q2 that OC was not being used " in extreme situations and as a last resort where an imminent and significant threat is posed to staff or other youth by the subject, as required by NIJ policy 9.18. " That said, OISC Investigation 19-024 was initiated as a result of inquiries made by the Monitor's Office into a use of OC against a girl at Ponce in the previous quarter (on May 1). The initial investigation did not address an aspect of the incident that appeared to involve OC being used against the girl despite the fact that she was not posing any threat to staff or other youth at the time she was sprayed. A supplemental report was prepared by OISC with the assistance of an agency defensive tactics instructor, and this confirmed the Monitor's concerns that the force violated policy.

Both of the incidents at Ponce this quarter were violent and dangerous incidents in which youth were at substantial risk of harm from attack by other youths. In P-19-07-342, as many as seven youths attacked another youth. My review of the video concluded that staff used reasonable and measured physical restraints to protect the youth being attacked by the other youths. (While staff may have contributed to a dangerous condition by allowing too many youth out of their rooms in the same location during a search and not acting when there was evidence that the group was poised to attack the other, nevertheless, staff intervene appropriately). And in P-19-09-445, staff appropriately resorted to OC to fend off two attacking youth with sharp objects intent on attacking the young man they were escorting. And the third such incident—V-19-7-253—was classified as a *Level 1* incident meaning that no OISC investigation was required or initiated, and only involved minimal force (mechanical restraints) for a very aggressive and out of control youth.

While there remains room for continued improvement, as pointed out in the investigation concerning the girl at Ponce in May (UEMNI 19-024), my review of OISC investigations for use of force reveals that these investigations continue to improve. The reports are typically thorough, following an investigation protocol that is geared to assessing numerous aspects of the incidents being reviewed including the completeness and accuracy of written reports, good summaries of youth and staff interviews, review of medical records and interviews with nurses, most recent training received by each employee involved, as well as thorough findings of relevant facts. OISC is now routinely opining as to whether there is evidence to corroborate allegations of excessive or unnecessary force and whether other policy or training violations occurred.

In most cases, staff who used force themselves, or were witnesses, prepared thorough reports using the check boxes and narrative components of the Incident Report form, with reviews by supervisors as required and Cernimiento reviews by directors, UEMNI liaisons, and compliance staff to determine whether 284 referrals would be made. This general rule, however, has exceptions such as the omissions of staff incident reports or important

| | |
|---|---|
| | facts in incident reports that OISC revealed in one particular incident (*see*, OISC Report 19-020).<br><br>OISC has raised important questions about the efficacy of the current Cernimiento process as a tool for evaluating use of force incidents, including whether to investigate use of force incidents as Level 1 or 2, or at all (*see*, OISC Report 19-020). Management signatories to the Cernimiento report they are signing the form to represent only that they have reviewed it and not that they take the position that the incident was handled correctly, according to policy and training. Given the fact that institutional management is not in a position or expected to conduct a complete investigation of such incidents as would OISC, there is some merit to this as a potential flaw in the Cernimiento screening process.<br><br>As of December 2018, IDECARH issued revised training materials to reflect the August 2018 revised version of policies 9.18 (use of force) and 9.10 (reporting). As stated in the previous QRs, we reviewed the revised training materials and found them to properly track the new policy and appropriately convey to staff the expectations for use of force as required by ¶77 and the policy itself. |
| What is needed for full compliance? | In March 2019 the Monitor's Consultant drafted a QA Use of Force template that he and NIJ can use to review use of force incidents. This draft tool reflects the requirements of ¶77 as clarified by policy 9.18. While OISC has protocols that determine what steps its investigators will take in reviewing an incident, those measures are not directed at reviewing specific aspects of an incident to determine whether there is compliance with ¶77 and Policy 9.18 and use of force training. On September 17, Monitor's staff met with NIJ personnel, including OISC staff, UEMNI liaisons and administrators and facility managers to review the Use of Force Assessment template. OISC staff committed to integrating the elements of the tool in their investigations, while institutional staff will use the checklist beginning in Q4-2019.<br><br>In order for the Monitor to find substantial compliance with ¶77, NIJ must be able to provide evidence in incident reports, videos and OISC investigations of OC routinely being used according to the procedures set forth in Policy 9.18.<br><br>Over the past couple of years we have observed staff routinely exhibiting much patience and use of alternatives to force at Ponce before resorting to physical restraints or chemical agents, but NIJ must provide additional evidence to the Monitor and reinforce to staff that, where feasible and safe, alternatives to force and de-escalation and patience must be used before staff resort to physical, mechanical and chemical restraints<br><br>DCR IDECARH needs to provide updated evidence to the Monitor's Office that all staff have received the required training in the revised Use of Force Policy 9.18 and reporting requirements included in 9.10.<br><br>Complete implementation of the new camera system at Villalba must occur promptly and be used internally and by OISC to evaluate incidents. |

| What steps are recommended? | 1- Determine whether the current Cernimiento form and process will continue as is to determine whether use of force incidents will be subject to 284 referrals. |
| | 2- Complete implementation of the video camera system at Villalba. |
| | 3- OISC should incorporate the use of force checklist into its investigatory template to guide the process to better assess ¶77 and Policies 9.10, 9.18 and use of force training. |

## Protection from Harm:  Investigations of Abuse and Institutional Neglect – Kim Tandy and Javier Burgos

| | |
|---|---|
| S.A. 78.   Defendants shall take prompt administrative action in response to allegations of abuse and mistreatment.  An incident report shall be prepared for each allegation of physical or mental abuse, including juvenile on juvenile assaults, staff on juvenile abuse, and excessive use of force by staff, within 24 hours of the incident.  A copy of each incident report together with the preliminary investigation prepared by the Police Department and/or AIJ shall be forwarded to Defendant Department of Justice, where the allegations shall be investigated and a final report shall be made in 30 days.  In addition, a copy of each incident report alleging physical or mental abuse by staff or excessive use of force by staff together with the preliminary investigation prepared by the Police Department and/or the AIJ, shall be forwarded to the Defendant Department of Social Services. | |

| Compliance Rating | Partial Compliance |
|---|---|
| Description of Monitoring process during this period of time | The Monitor met with the Functional Team regarding Paragraph 78 on August 14, 2019.  The meeting included a discussion the five key points in the Monitor's Memorandum regarding immediate safety issues.   Other topics included the quality of UEMNI and OISC investigations, compliance metrics for paragraph 78, next steps for compliance, and "completing the loop" between investigations/analysis and change at the institutional level. |
| | UEMNI staff shared a quarterly report done by policy regarding characteristics of abuse and neglect investigations completed in the last 3 months, including where the incidents occurred, shift time, by facility, by type and the intervention of the special operations unit. UEMNI also created a report which was sent to the Monitor by request detailing all of the incidents over the past 12 months (July 2018 – June 2019) involving youth who were injured, and the annual report of 284 incidents. |
| | The Monitor also reviewed the table developed by UEMNI listing all OISC and UEMNI investigations of alleged abuse and/or institutional neglect for the third quarter of 2019,  and any corrective or disciplinary actions taken against staff for confirmed mistreatment. |
| | Incidents involving suicidal or self-mutilation were diverted to and reviewed by Dr. Miriam Martinez for review under paragraph 63, as well as investigations by UEMNI and OISC when |

<table>
<tr><td></td><td>

allegations of abuse or neglect are alleged. Level 2 284 reports completed by OISC involving the use of force were reviewed by David Bogard. The Monitor reviewed 21 completed investigations during the third quarter dating back to incidents occurring April 2, 2019 to August 14, 2019.

The Office of the Monitor is working with DCR to ensure that all incident reports are received weekly, or in many cases, within a 24 hour or 48 hour period per the agreement reached on August 26, 2019.  This is necessary to ensure there is backup documentation to the raw data which has previously been reported by DCR relative to paragraph 78 reporting.

</td></tr>
<tr><td>

Findings and Analysis

</td><td>

The approved policies are divided in three sections, and include the analysis of referrals of abuse and/or institutional neglect by UEMNI (Policy No 13.2.1); immediate prevention actions regarding serious allegations (Policy No. 13.2.2); and final determinations on referrals of abuse and/or institutional neglect (Policy 13.2.3).   Review of investigations under this provision are reviewed against these policies.

NIJ routinely provides training to staff on Management of Investigations Regarding Abuse and Institutional Neglect.  The Annual Training Report for the period of January 2018 through June of 2019 verifies that 95% of staff in both facilities received this required training during that period.

The following tables summarize statistics about case management for the past four quarters. The primary source of the information is the case tracking records maintained by NIJ along with other records such as the underlying individual case reports and records reviewed by members of the Monitoring team.

The first table summarizes general information about incidents events. An incident event may generate many incident reports, but this table counts a multiple-report incident as a single event.  Incident reports are not yet digitalized, and there are no detailed reports generated, making corroborate the information in this set of data difficult. Efforts this quarter due to the Agreement of August 26th by the parties has improved the process by providing hard copies of Incident Report Cover sheets to the Office of the Monitor. This process is still being refined, and is intended to be digitalized this year.

Incident Tracking by Quarter involving Harm to Youth

| A. General Measures by quarter | 4th 2018 | 1st 2019 | 2nd 2019 | 3rd 2019 |
|---|---|---|---|---|
| A.1 Average Monday 1st Shift count of youth | 142 | 123 | 119 | 114 |
| A.2 Number of incident events | 45 | 33 | 53 | 34* |
| A.3 Number of youth-to-youth incident events | 11 | 6 | 10 | 12 |
| A.4 Incident events involving use of force by staff | 10 | 3 | 9 | 3 |

</td></tr>
</table>

| | 4th | 1st | 2nd | 3rd |
|---|---|---|---|---|
| A.5 Incident events with suicide act, ideation, or gesture | 4 | 5 | 5 | 14 |
| A.6 Incident events w/ self-mutilation act, ideation, or gesture | 12 | 15 | 18 | 8 |

A total of nineteen (19) Level II 284 referrals were made this quarter.

*The data provided by NIJ indicates 34 incident events. The Office of the Monitor received 36 events during this quarter.

Mental Health Incidents – Including 284 Reports

The subset of incidents involving suicidal acts, ideation, or gestures, or self-mutilation acts, ideation or gestures is found in Table B.  Most of these do not warrant abuse allegations.  If a 284 report is filed, implicating possible abuse by a staff member or other, the case also moves through the investigative stage.

| B. Mental Health Record Information | 4th 2018 | 1st 2019 | 2nd 2019 | 3rd 2018 |
|---|---|---|---|---|
| B.1 Suicidal incidents, ideation or gestures | 7 | 5 | 5 | 14 |
| B.2 Number of individual youth referenced | 7 | 5 | 4 | 14 |
| B.3 Cases involving ideation only | 5 | 3 | 3 | 9 |
| B.4 Cases involving suicide gesture | 0 | 2 | 0 | 1 |
| B.5 Cases involving suicide intention | 2 | 0 | 2 | 4 |
| B.6 Cases w/ ambulatory treatment | 4 | 4 | 3 | 5 |
| B.7 Cases with hospitalization | 3 | 1 | 2 | 9 |
| B.8 Cases leading to death | 0 | 0 | 0 | 0 |
| B.9 Suicide Cases with 284 report filed | 1 | 0 | 0 | 0 |
| B.10 Self-mutilations incidents, ideation or gestures | 17 | 15 | 18 | 8 |
| B.11 Number of individual youth referenced | 14 | 10 | 15 | 8 |

| | | | | |
|---|---|---|---|---|
| B.12 Cases requiring sutures | 0 | 0 | 4 | 3 |
| B.13 Cases requiring hospitalization | 0 | 0 | 0 | 0 |
| B.14 Cases leading to death | 0 | 0 | 0 | 0 |
| B. 16 Self-Mutilation Reports with 284 Referrals | 6 | 5 | 2 | 3 |

The above cases come from mental health records. NIJ has implemented a screening procedure and instrument that diverts the investigation of some incidents from the Paragraph 78 process to a mental health process. Of the 34 (A.2) incident events in most recent quarter, twenty- two (2 ) (B.1 plus B.10) involved suicide and self-mutilation incidents.

During the third quarter, 3 of the eight (8)  incidents involving self-mutilation resulted in a 284 report being filed. None of the fourteen (14) cases involving suicidal gestures or ideation resulted in a 284 case being filed.  For a discussion of these incidents and how they were handled, see Dr. Martinez's analysis for Paragraph 63 in the Mental Health section.

### Responses to Abuse Referrals

The next table summarizes abuse referrals and the initial responses to such referrals.

| C. 284 Incidents by quarter (2018-2019) | 4th | 1st | 2nd | 3rd |
|---|---|---|---|---|
| C.1 284 Incident Events | 24 | 19 | 24 | 20 |
| C.2 Level One Incident Events | 5 | 5 | 4 | 1 |
| C.3 Level Two Incident Events | 19 | 14 | 20 | 19 |
| C.4 Referrals to OISC | 19 | 14 | 20 | 19 |
| C.5 Youth to Youth incidents | 11 | 6 | 10 | 12 |
| C.6 Youth to Youth Injuries | 5 | 3 | 6 | 6 |
| C.7 Youth to Youth with External Care | 5 | 3 | 3 | 5 |
| C.8 Youth to Youth Sexual | 1 | 0 | 0 | 0** |
| C.9 Youth to Youth Sexual  w/injury | 0 | 0 | 0 | 0 |
| C.10 Staff to Youth Incidents | 13 | 13 | 14 | 8 |
| C.11 Staff to Youth Injuries | 7 | 6 | 6 | 1 |
| C.12 Staff to Youth External Care | 0 | 1 | 2 | 3 |
| C.13  Staff to Youth Sexual | 0 | 1 | 1 | 1 |

| | | | | |
|---|---|---|---|---|
| C.14 Staff to Youth Sexual w/injury | 0 | 0 | 0 | 0 |
| C.15 284 Incidents with Admin. Action | 24 | 19 | 24 | 20 |
| C.16 284 Incidents with report by shift end | 24 | 18 | 23 | 19 |
| C.17 Level 1 investigations completed 20 days | 5 | 5 | 4 | 1 |
| C.18 Special Operations interventions | 0 | 1 | 2 | 2 |
| C.19 SOU reports with 284 investigations | 0 | 0 | 1 | 1 |
| C.20  284 with Item 5 completed | 24 | 19 | 24 | 20 |
| C.21 284 with Staffing Compliance | 23 | 17 | 24[1] | 19 |
| C.22 Percent of 284 cases with staffing compliance | 96% | 89% | 100% | 95% |

**Investigation 19-046 involved an allegation of sexual assault by one youth on another in Villalba.  It was classified as physical and verbal aggression in the NIJ data system.

A determination is made at the institutional level as to whether incidents are Level One or Level Two based upon criteria in the Cernimiento de Incidentes de Alegado Maltrato Institutional form.  Level one incidents by definition include verbal abuse and some forms of physical aggression.   Level Two incidents include material exploitation, incidents of a sexual nature, death, various instances of institutional neglect, including youth self-harm, undue restrictions with medication, misuse of mechanical restraint or pepper spray, and excessive use of force.

Level One incidents are investigated locally at the institution. Level Two incidents are investigated by OISC. Referrals to OISC as based on the screening protocol.

A review during the 3rd quarter of 2019 for the calendar year shows that there was one Level 1 report made.  Level I cases followed the same format/guidelines than Level II cases but the facilities' investigators only have 20 working days to finish the investigation.

Initial Case Management Measures Taken

| D. Initial Case Management Measures (2018-19) | 4th | 1st | 2nd | 3rd |
|---|---|---|---|---|
| D.1 284 percent with admin actions | 100% | 100% | 100% | 100% |

| | | | | |
|---|---|---|---|---|
| D.2 284 per cent completed by end of shift | 100% | 95% | 96% | 95% |
| D.3 284  Level 1 Investigation Complete Within 20 days | 100% | 100% | 100% | 100% |

Initial case management data indicates that compliance remains strong regarding the percentage of documentation by the end of the shift, and completion by UEMNI of Level 1 investigations within the prescribed period of time.

### Investigations Referred to OISC

| E. OISC (2018-2019) | 4th | 1st | 2nd | 3rd |
|---|---|---|---|---|
| E.1 Cases Referred from this quarter | 19 | 14 | 20 | 19 |
| E.2 Received by OISC Within 24 hours | 19 | 12 | 17 | 16 |
| E.3 Completed by OISC Within 30 workdays | 19 | 12 | 18 | 9 |
| E.4 Complete during the next quarter, but within 30 days | 0 | 0 | 0 | 0 |
| E.5 Cases Not Completed by OISC Within 30 days. | 0 | 2 | 2 | 10 |
| E.6 Percent of OISC cases completed within 30 days | *100%* | *86%* | 85% | 47% |
| E.7 Completed Cases Returned for Further investigation | 0 | 0 | 2 | 1 |
| E.8 Percent of cases returned for further investigation | 0% | 0% | 10% | 10% |
| E.9 Further Investigation Completed | 0 | 0 | 0 | 0 |
| E.10 Cases this quarter incomplete, including further investigation | 0 | 0 | 2 | 10 |
| E.11 Percent of cases from this quarter not yet completed | 0% | 0% | 10% | 53% |

The following table summarizes the decisions and actions taken in cases that do not involve criminal charges.

| F. Administrative Determinations for 284 Cases (2018-2019) | 4th | 1st | 2nd | 3rd |
|---|---|---|---|---|
| F.1 Cases with youth discipline referrals | 43 | 21 | 31 | 38 |
| F.2 Cases with youth discipline actions | 36 | 12 | 19 | 31 |
| F.3 Cases with youth no discipline actions | 2 | 9 | 7 | 7 |
| F.4 Cases Staff/youth with determinations | 18 | 9 | 12 | 24 |
| F.5 Cases recommending personnel actions | 10 | 3 | 6 | 12 |

Of the 38 youth cases referred for disciplinary action (F.1) with referrals as a 284 cases, 31 disciplinary actions were imposed; no discipline was imposed in 7 cases.  This represents a substantial increase from the last two quarters.

Of the 24 cases involving staff/youth incidents, personnel actions were recommended in 12 cases, also a significant increase over the last 2 quarters.

A summary of actions taken by the legal department should be provided at the end of the fiscal year as part of the annual report.  It would be helpful to indicate whether such decisions were overturned on appeal or through any other process.  The summary should also provide information on the nature and extent of disciplinary actions involving youth.

Prosecutorial Determinations for 284 Cases

| G. Prosecutorial Determinations for 284 Cases (2018-2019) | 4th | 1st | 2nd | 3rd |
|---|---|---|---|---|
| G.1 Cases received by PRDOJ | 0 | 1 | 2 | 1 |
| G.2 Cases with decision  not to prosecute | 0 | 1 | 2 | 1 |
| G.3 Cases with referral for prosecution | 0 | 0 | 0 | 0 |
| G.4 Cases pending determinations | 0 | 1 | 0 | 2 |

NIJ's quarterly statistical report indicate that unlike other quarters, less than half of the case investigations were completed within the 30 day completion time.  OISC staff were being used to carry out roughly 1000 investigations of Candidates for Correctional Cadet, to complete the Academies of Correctional Officers of the DCR that will address the lack of custodial staff in both institutions, adults and minors.  OISC indicated that this work should be completed during the week of November 17-23, 2019, and that they will engage in an aggressive schedule to complete the remaining investigations.

The Monitor would like to note, however, that some investigations may be of a more complex or sensitive nature and may require more than 30 days to complete; such explanations should be conveyed to the Monitor.

A review of the twenty one (21) OISC reports received for the quarter indicates the investigations were typically very thorough, assessing numerous aspects of the incidents being reviewed including the completeness and accuracy of written reports, good summaries of youth and staff interviews, review of medical records and interviews with nurses, most recent training received by each employee involved, as well as thorough findings of relevant facts.  Findings as to whether the allegations were validated and other policy or training violations occurred are increasingly detailed.  Although it is the Legal Division that ultimately determines the efficacy of charges and, if appropriate any corrective actions, OISC staff are now making recommendations as to whether there is sufficient evidence to corroborate the allegations or any other concerns that arise during the investigation.  Reports are also now identifying specific policy violations, by policy number, that may have occurred.  Investigations are reviewed by supervisors to ensure investigators are following protocol.

Two Level 1 investigations were reviewed by Javier Burgos for the quarter, although one occurred during the last quarter (19-041 and 19-051).  In the first case, there were discrepancies between the conclusions and the corrective measures taken.  The conclusions indicated there was not enough evidence against the alleged aggressors, but they were sanctioned through the disciplinary system.  This is the result of a youth alleging he was assaulted three times on different dates in the module.

In the second case (19-051, a youth alleging he was assaulted and threatened with a sharp object by other youths in the module on different dates.  UEMNI referred it directly to DCR Legal Division for further actions;  it appears this should have been  Level II classification.

There appears some confusion at the facility level as to what should be reported as an incident and who should make that report.  A recent example involved several youth at Villalba who tested positive for the narcotic drug buprenorphine.  Unlike a similar incident at Ponce, where an incident report as well as a 284 referral was made, the Villalba incident was only noted in the online system documenting the testing and results, and no incident report or 284 referral was made.  UEMNI staff are addressing this discrepancy as they do not otherwise know when such incidents occur.

A similar concern has been raised by OISC investigators, as discussed earlier by David Bogard, in reference to use of force reports and the efficacy of the current Cernimiento process as a tool for evaluating these, including whether to investigate use of force incidents as Level 1 or 2, or at all (see, OISC Report 19-020). As noted in the analysis of Paragraph 77 compliance, management signatories to the Cernimiento report suggest they have reviewed it, and not that the incident was handled correctly, according to policy and training.  Changes to this procedure are being discussed in relation to the use of force reports. A similar review should be conducted in relation to when and who must file an incident report, and the level of review to determine if the incident is a Level 1 or Level 2 investigation, or does not require any additional

| | |
|---|---|
| | investigation, and to ensure that the two facilities are consistent in their interpretation and handling of incidents and 284 referrals.<br><br>An investigation completed this quarter regarding allegations of sexual assault youth-on-youth raises questions about the protocol for addressing these situations. (OISC 19-046)  The Monitor sought information from OISC about whether investigators are trained specifically to conduct sexual assault investigations  - separate and apart from merely being trained on PREA requirements – and whether the medical and mental health professionals who are engaged to provide evaluations are trained in conducting forensic medical exams as required by PREA. Questions also remain about the collection of evidence, the interviews done of the alleged victim(s), and whether UEMNI has reviewed the incident to "prevent or recommend changes in policy or practices to prevent and detect sexual assault" as required by Policy 13.2.1.<br><br>OISC reports have raised important issues during this quarter regarding the need to ensure that youth are registered before and after movement, and that searches are done consistently and thoroughly for noted contraband.  OISC investigators noted in several reports the lack of staff, the failure of staff to adequately supervise youth, and incidents of harm which may have otherwise been prevented.  The absence of cameras at Villalba has continued to be noted. |
| What is needed for full compliance?<br><br>What steps are required and/or recommended? | Effective treatment cannot take place absent an environment where youth and staff are safe. Paragraph 78 is a critical aspect of protecting youth from harm while incarcerated in NIJ facilities**.**  The process is designed ensure that allegations of harm are immediately reported, investigated at both the facility level and through OISC, and that appropriate actions are taken for discipline against youth and/or employees involving such misconduct.  Of equal importance, however, is that the process should identify policies which may need to be changed, additional training which may need to occur, and/or other measures which should be taken in response to incidents which have been investigated.  In that sense, Policy 13.2.1 has as part of its purpose, "to prevent and minimize the occurrence of situations involving abuse or institutional neglect."<br><br> The Monitor and her team have continued to be impressed by the quality of investigations being performed by UEMNI and OISC, including thorough, timely reports which increasingly conclude with findings which indicate conduct which appears to violate policy, and weigh evidence to support or disprove allegations and other reported circumstances.  But timely and thorough investigations are not enough to find substantial compliance without consideration to whether policies and practices meet the underlying purpose of Paragraph 78.  In this regard, there remains work to be done.<br><br>Compliance measures require:<br><br>1) Timely reporting by NIJ of all incident reports (cover sheets) as detailed in other aspects of this report, to the Office of the Monitor. This ensures the Monitor that incidents are appropriately reported for investigation, or otherwise identified for review and possible 284 referrals. All incident reports are to be submitted weekly, but those of a more serious nature |

identified elsewhere must be submitted within 24 hours, or 48 hours, consistent with the Agreement between the Parties filed on August 26, 2019.

2) Submission of UEMNI referrals and OISC completed investigations should be done at least monthly, or sooner if requested. Translation and review of these reports can be time consuming, but the content is extremely important and reflective of institutional climate, youth population challenges and leadership issues, as well as the response to such.

3)  OISC investigations should continue to evaluate compliance with procedural requirements regarding the handling of incidents, and equally important,  contain sufficient detail with regard to violations of policy, credibility of facts and evidence supporting or disavowing allegations, and other relevant conclusions reached by the investigators.  Processes must be in place within facilities and NIJ leadership to then utilize these findings to make needed changes. Reports are required to be completed within 30 days of referral; while some reports may by necessity require additional time, the rate of timely completion during this quarter was exceptionally low.

4)  Consistent with the purpose of Paragraph 78, and Policy 13.2.1, measures must be in place to prevent and minimize the occurrence of situations involving abuse or institutional neglect. At a minimum, reporting on this should include:

        a)  Quarterly statistical reports of incidents involving allegations of abuse or institutional neglect, with analysis of possible patterns, trends, and other observations which can help prevent further incidents;

        b)  Evidence of meetings which document meetings with management and others to discuss cases of alleged abuse, status and outcomes of investigations, evaluation of patterns of recurrence, compliance with the terms, and discussions of alternatives for the prevention of incidents. Summaries of these meetings and decision regarding policies, training needs, and other appropriate action steps should be documented and submitted.

        c) Evidence of training for staff trainers and other direct service staff on the handling of referrals of alleged abuse and institutional neglect in coordination with IDECARH.

        d)  Maintenance of a log of actions taken against employees including the particulars of the actions by the employee, and actions taken against the employee, whether administrative or criminal.  Given that the purpose is to consider recidivism of actions constituting abuse or neglect, an analysis of such information should be done at least quarterly, or more often if warranted.  A copy of this log should be made available to the Monitor on a quarterly basis, along with any analysis done or actions taken as a result.

        e)  In the case of sexual abuse investigations, UEMN must review incidents to "recommend changes in policy or practices to prevent and detect sexual assault" as required by Policy 13.2.  Such reviews should ensure that adequate PREA protocols are in place and being used.

| Priority Next Steps Toward Compliance | Staff must have a clear understanding of what should be reported as an incident, who must report, and the process for determining whether incidents should be reported as a Level 1 or Level 2 284 report requiring investigation at the facility level, or by OISC. The Monitor and her staff have requested a copy of Policy 9.10 regarding reporting of incidents. Changes needed to ensure that there is greater oversight as to how these decisions get made should be discussed during the Fourth Quarter and solidified.

Incident cover sheets must be provided weekly, with those incidents of a serious nature provided to the Office of the Monitor within 24 hours. The Office of the Monitor, through Bob Dugan, will continue to track these incidents relative to safety issues, and to determine appropriate referrals for investigations of Level 1 and Level 2 investigations.

Digitizing incident reports for efficiency, consistency and accountability purposes should be completed, in consultation with Bob Dugan, so that a systemized method of obtaining data regarding incidents, by facility, can be collected and analyzed.

Provide the Monitor with evidence of the last 3 meetings where discussions were held regarding the status and content of investigations, trends identified, and decisions made as a result.

Provide the Monitor with the last year years of data detailing employee conduct and actions taken by the agency, along with analysis of recidivism or other trends completed as required by policy.

UEMNI should examine the sexual assault incidents which have been alleged, determine if PREA protections are in place, and if any changes in policy and practice should be made. Reference to prior correspondence from the Monitor as to forensic evaluations, training and other matters should be addressed. |
|---|---|
| Quality Assurance | The Monitor has not reviewed proposed QA measures in this area. |

## Protection from Harm – Isolation and Protective Custody (David Bogard)

| Compliance Rating | Partial Compliance |
|---|---|
| | **S.A. 79.** Juveniles shall be placed in isolation only when the juvenile poses a serious and immediate physical danger to himself or others and only after less restrictive methods of restraint have failed. Isolation cells shall be suicide resistant. Isolation may be imposed only with the approval of the facility director or acting facility director. Any juvenile placed in isolation shall be afforded living conditions approximating those available to the general juvenile population. Except as provided in ¶ 91 of this agreement, juveniles in isolation shall be visually checked by staff at least every fifteen (15) minutes and the exact time of the check must be recorded each time. Juveniles in isolation shall be seen by a masters level social worker |

| | |
|---|---|
| | within three (3) hours of being placed in isolation. Juveniles in isolation shall be seen by a psychologist within eight (8) hours of being placed in isolation and every twenty-four (24) hours thereafter to assess the further need of isolation. Juveniles in isolation shall be seen by his/her case manager as soon as possible and at least once every twenty-four (24) hours thereafter. A log shall be kept which contains daily entries on each juvenile in isolation, including the date and time of placement in isolation, who authorized the isolation, the name of the person(s) visiting the juvenile, the frequency of the checks by all staff, the juvenile's behavior at the time of the check, the person authorizing the release from isolation, and the time and date of the release. Juveniles shall be released from isolation as soon as the juvenile no longer poses a serious and immediate danger to himself or others. |
| | **S.A. 80.** The terms of this agreement relating to safety, crowding, health, hygiene, food, education, recreation and access to courts shall not be revoked or limited for any juvenile in protective custody. |
| Description of Monitoring process during this period of time | Because of the substantial overlap and interplay between these two provisions, these two provisions will be addressed together in this 3rd quarter compliance report.<br><br>The Monitoring Team's 2019 Third Quarter site visits occurred September 17-19, 2019.<br><br>On the day of the September 18, 2019 Q3 site visit to Ponce, there were three youths on PC status and none on TM status.  Monitor's staff interviewed one youth on PC status, CVP, (who had been the victim of two recent slashing incidents on September 9 and 10).  There were no youths on TM or PC status when the Team visited Villalba on September 19.<br><br>During the quarter, significant attention was directed to identify instances of facility imposed restrictions on regular module schedules and group activities pursuant to Policy 9.17 *Group Time Modification*.  The policy identifies the types of dangerous group behaviors or other critical circumstances that can prompt imposition of this policy and what activities can be curtailed. And it includes forms that must be completed to justify and document the events preceding and during the Group Time Modification.  The policy also expressly prohibits use of this process as a form of group disciplinary sanctions. But how this policy is implemented still raises questions, including whether or not it may trigger the provisions of Paragraph 79.<br><br>At Ponce, there is documentation that two such events occurred pursuant to Policy 9.17, in Q-3 (there was another in April 2019 in Q2). The first such event in Q3 was at Ponce and lasted for four days (July 8-12) and was activated due to a fight that included all of the youth assigned to Module III.  The second and more recent event was activated from September 12-24 after a large scale fight, including a knife wound in the module housing Sumariados.<br><br>Ponce compliance staff provided documentation to show that activities and services did continue on a modified schedule, and that 15 minute room checks were made and documented when youth were confined to their rooms. The limitations on group dayroom and activity time were set forth in a written justification and group behavior management plan prepared by the Co-Director, consistent with the requirements of a form/attachment to Policy |

9.17.  At Villalba, facility directors report that there have been no official activations of Policy 9.17, despite multiple youth having complained to Monitor's staff about group and individual lockdowns.  The Monitoring team is currently attempting to determine whether, as reported by the facility co-director, any complaints by youth that Monitor's staff fielded about individual lockdowns were actually punishments of individual youths, meted out by the disciplinary board, where youth have to remain in their rooms after dinner for a fixed number of days as set forth in the Disciplinary Policy, or as part of a module group modification.

Consistent with the Monitor's commitment to shift review of individual case data to NIJ, with oversight by the Monitoring team,  during this quarter there were significant enhancements made to the process of collecting information about initial admission and services received by youth entering TM or PC status and their conditions and services once so placed. The "P79/80 Checklist" is completed by NIJ compliance staff at or near the time that the youth is admitted to the special status, while the "Weekly 79/80 Audit" is completed on each youth for the week that he was on the status.

The weekly Audit for each youth focuses on the five ¶79/80 post placement criteria that are most critical and/or have proven most difficult for NIJ to comply with, including: (1) the youth was seen by a psychologist every 24 hours after initial placement in the status, (2) the youth is seen by a case worker at least once every 24 hours, (3) if eligible, the youth receives 50 minutes of education class time per subject, five days a week, and (4) the youth receives one hour of recreation daily. (5) In addition, although there is substantial evidence of compliance with the requirement that youth are observed and supervised every 15 minutes when in their rooms, the critical nature of this requirement led to its inclusion on the weekly audit.

The "P79/80 Checklist" includes most of the 79/80 criteria that are evaluated for compliance regarding placement and release decisions, initial meetings with psychologists and case workers, as well as the access to services issues set forth in ¶80.

Monitor's staff have worked extensively to design the documentation process and to provide technical assistance to NIJ staff as this modified and enhanced process has been put into place over the past few months.

The replacement of air vent grilles with suicide resistant versions on the lower levels of the housing units at Ponce and Villalba has been completed.  DCR staff has also arrived at what seems to be a viable plan to retrofit new door hinges that will meet the ¶79 suicide resistant requirements for any youth held in isolation.

During his site visit to Ponce in September, the Monitor's Physical Plant Consultant Curtiss Pulitzer viewed a test sample in one juvenile room of the cover plate made from galvanized tubing which is 2" x 3" x 20' x 1/8" being custom fabricated  and welded to the inner door frames of the juvenile rooms. The cover plate has cut outs for the three hinges to allow the doors to be opened and closed. After viewing the test sample, the Consultant expressed some

concerns about the cut outs ability to restrict a ligature from being squeezed into a narrow gap above the hinge. NIJ said they would refine future applications to eliminate the tiny gaps. This should meet the ¶79 suicide resistant requirements for any youth held in isolation. (see picture below) He was also told there was enough material on hand to make this retrofit in the Puertas housing unit plus two more units. But it was reported that there is no additional funding at this time to retrofit all rooms at Ponce and Villalba.



The replacement of air vent grilles with suicide resistant versions on the lower levels of the housing units at Ponce and Villalba has been completed as reported in the last quarterly report. During the site visit this quarter, the Monitor's Physical Plan Consultant expressed a concern that in some rooms there were still gaps at the edges of the new vent grills that might allow a juvenile to thread in a ligature. He suggested that by applying security caulking at the edges of the vent grill it will prevent this from happening. In addition, this would prevent juveniles from sliding paper through these same gaps which impedes air conditioning air flow into the rooms.

| | |
|---|---|
| Findings and Analysis | The number of TM placements remained at none at Villalba for the second consecutive quarter, while the number of youth on TM placements at Ponce decreased from 2 to none. PC placements at Ponce remained stable this Q3 as compared to Q2 (7 versus 8). |

| Facility | Q3 Events: Protective Custody | Q2 Events: Protective Custody | Q3 Events: Transitional Measures | Q2 Events: Transitional Measures |
|---|---|---|---|---|
| CTS Ponce | 7 | 8 | 0 | 2 |
| CTS Villalba | 0 | 1 | 0 | 0 |

There continues to be extensive documentation available concerning the requirements of these two provisions. And while there were 7 Ponce youth on PC status during Q3, there were only 4 *placements* during the quarter that would have been eligible for consideration via the checklists and subsequent weekly audits. In fact, one of the four youth was released from custody to a prison facility (CVP) in July before any weekly audits were implemented.

At the very end of Q3, NIJ initiated completion of P79/80 checklists and weekly audits, including ratings of each component of ¶79 and ¶80 and identification of data sources so that Monitor's staff can audit the audits on each of the youth admitted to PC status this quarter. Based on a small total number of youth assigned as PC or TM this quarter, and the fact that the new data approach with NIJ staff taking the lead only began at the very end of the Quarter, there are a few ¶79 and ¶80 compliance conclusions that can *tentatively* be reached:

- Lack of alternative housing options for Sumariados is a significant impediment to identification or implementation of non-isolation options for that population (e.g., CVP and JNN);
- Each case's checklist graded as non-compliant for item 3 related to the still ongoing process of finalizing (via new hinges) the suicide resistance of rooms to be used for youth in isolation;
- Youth on judicial ordered PC placements were (appropriately) rated as N/A on several criteria over which the institution has no control such as the original PC placement and the lifting of that status;
- While youth are generally seen by a case worker as required, that staff is not always at a master's level although there is evidence of masters level staff reviewing files;
- All items reviewed on the weekly audits were rated as compliance including 15 minute monitoring and documentation thereof, youth seen by a psychologist within 24 hours of placement, seen by a case worker at least once every 24 hours, and one hour of daily recreation (the one youth eligible for education- ECV- did attend for five days 50 minutes per subject);
- Minor non-compliances for sub-provisions such as no recreation one day due to inclement weather or the masters level social worker being out of town should not be viewed as indicative of non-compliance for that particular sub-provision rating or the overall provision's rating.
- Good progress has been made in offering full day educational programming for youth in PC or TM status, as discussed in paragraph 94.

|  | The results of the checklists and weekly audits thus far are promising based on the efforts by NIJ to adopt the new processes.  That said, there will be significantly more data from which to evaluate compliance during the Q4 and Monitor's staff will also be on-site in December to audit results provided by NIJ staff. |
|---|---|
| What is needed for full compliance? | While not each and every of the 20 criteria set forth in ¶79 as well as the eight criteria specifically required in ¶80 in the case of PC youth needs to be satisfied for substantial compliance to be rated, the majority must be rated positively consistently and with minor deviations.<br><br>Monitor's staff will audit the results of checklists and weekly audits as they are submitted and while on-site with source documents available.<br><br>A shared definition of isolation is a requirement for ultimately determining what actions constitute isolation events.<br><br>Housing units where isolation might be occurring need to have door hinges retrofitted.<br><br>Incidents which trigger youth being in room confinement for discipline or as part of a group schedule modification must be reported to the Office of the Monitor. |
| Priority Next Steps | 1.  Obtain agreement on a definition of "isolation;"<br>2.   Development of revised policies driving TM and PC including  rethinking of TM versus PC criteria such that youth who are vulnerable to assault would typically be considered PC and clarify that for those youth on PC status that are *not* separated in a form of isolation, only the ¶80 requirements will apply.<br>3. Ensure that all module lockdowns are accomplished formally as per Policy 9.17;<br>4. Revise Policy 9.17 *Group Time Modification;*<br>5. Create and define alternatives to isolation that can insure the safety of youths on TM and PC statuses. Alternatives could include specialized and designated housing modules in each facility for TM or PC or expanded use of staff one-on-one escorts, although each of these measures is currently unlikely due to insufficient numbers of staff and limited housing options since Humacao was closed.<br>6.  DCR is to start retrofitting doors in Puertas at Ponce and in at least two other housing units or for selective doors in one or both juvenile facilities based on discussions relating to locations of where juvenile isolation might be occurring. |

## MENTAL HEALTH – Dr. Miriam Martinez

**S.A. 59.** Defendants, specifically the Department of Health (ASSMCA), shall provide an individualized treatment and rehabilitation plan, including services provided by AIJ psychiatrists, psychologists, and social workers, for each juvenile with a substance abuse problem.

| Compliance Rating | Partial Compliance |
|---|---|
| Description of Monitoring process during this period of time | During the third quarter the Mental Health Consultant performed remote chart reviews and completed site visits in September of 2019 to Ponce and Villalba.  The visit to Villalba was purposely conducted on a weekend day in order to learn more about the services and programming during the weekends.  The Mental Health Consultant also reviewed documentation regarding emergency psychotropic medication, suicidal ideation/intent/gesture and self-mutilation reports, documentation of administration of the MAYSI 2 and reports of youth in transitional measures or protective custody.  The Mental Health Consultant also met with the staff at the facilities, staff of PCPS (contracted to provide mental health services) and met with two district attorneys at their request regarding the JR case previously reported.<br><br>During the site visits, the Mental Health Consultant interviewed staff regarding youth that were of concern and interviewed six youth in Ponce and six youth in Villalba.  DCR leadership was alerted to concerns that needed immediate attention (fear that a youth had a concealed weapon) and the need for the psychiatrist to have all information available (i.e. from the Department of Evaluation and Classification [the DEC) to help manage high risk youth.<br><br>The Mental Health Consultant requested technical assistance be available during site visit to trouble shoot inability to remote access scanned documents such as the MAYSI II.  Unfortunately, this was not possible and the Mental Health Consultant continues to be unable to access such documents. |
| Findings and Analysis | PCPS has hired two new psychologists and one substance abuse counselor which together bring more experience to the treatment of mental health and substance use disorders than previous staff that had been hired by PCPS.  Credentials were reviewed by the Mental Health Consultant for all new staff.  PCPS provided a detailed response in writing to the Mental Health Consultant regarding the 2nd quarter report.  In this response, PCPS indicated that they are in compliance with policies and procedures for the delivery of mental health services and that they have restarted their weekly group therapy interventions plan.<br><br>PCPS indicates that they are trying to find another child psychiatrist to add to the staffing.  The Mental Health Consultant continues to encourage PCPS to do so in order to augment the services that the current lone psychiatrist can provide. |

| | |
|---|---|
| | Mental health care is provided for youth expressing suicidal ideation or intent in that PCPS is able to advocate and have the youth admitted to a psychiatric hospital for evaluation and stabilization.<br><br>The individual plans, however, require more work to get to specific treatment goals for each youth in relation to their presenting problems. The latter is somewhat stymied by the fact that the information at entry from the DEC is not provided to the treatment team (PCPS leadership, the psychiatrist, the psychologist). |
| What is needed for full compliance?<br>What steps are required and/or recommended? | For full compliance:<br>1. There needs to be a stable and consistent work force that delivers mental health services per the plan of care and per the suggested delivery of services for PUERTAS. While new mental health staff has been added, the turnover in staffing has been a consistent issue with the contracted provider, PCPS.  At minimum one year of an experienced, trained, stable work force is needed.<br>2. As mentioned in the previous report, the youth's treatment plans should reflect the individual needs of the youth.  While PCPS maintains that the services provided are adequate and consistent with policies and procedures, a thoughtful and meaningful treatment plan with agreed upon and consistent diagnosis with expected treatment services is needed.<br>3. Youth need to know their diagnosis, medications treatment plan, schedule of delivery of mental health services – including substance abuse.  While overall youth interviewed are able to state that their mental health care helps them, they cannot state what the expected frequency is, and it appears to be no group therapy treatment.<br>4. Group therapy needs to be consistently provided vs. just didactics/educational groups – especially for the youth in PUERTAS.<br>5. Youth who have received mental health services and are considered "stable" should continue to work weekly with mental health providers and substance abuse counselors in individual and group sessions on issues related to prevention of substance abuse, anger management, social skills, conduct disorder, development of empathy and on behavioral problems within their units that lead to conflicts, violence, bullying and fear.<br>6. Every provider of mental health services should have their own log in and password.  Documenting in the record under another provider's credentials is highly irregular and never recommended. This has been brought to the attention of NIJ and PCPS previously. PCPS is working on this to ensure all (even psychiatrist that fills in on a temporary basis) is properly on-boarded with their own log in and password.  This ensures the integrity of the electronic medical record. |

| | |
|---|---|
| Priority Next Steps | Retain mental health work force with qualified and experienced mental health professionals.<br><br>Increase psychiatric coverage by hiring another psychiatrist and bringing the total number to 1.5 FTE as has been recommended.<br><br>Ensure that via internal quality improvement monitoring that groups and other individualized care is actually being delivered on a day to day basis especially with those most vulnerable and at risk within the PUERTAS unit. Evidence of group therapy should be provided to the Mental Health Consultant quarterly with information on:<br>      Psychotherapy group focus (PTSD, Substance use, Anxiety, Depression)<br>        Attendance<br>        Frequency<br><br>Information from the DEC needs to be electronically accessible to PCPS treatment providers. Further, for high risk cases (those that have had psychiatric hospitalizations, suicidal intent/gestures) there should be a case conference with the psychiatrist to fully grasp and integrate all relevant information into a safety plan and plan of care. |
| Quality Assurance Measures | The Mental Health Consultant is encouraged by the detailed report submitted by PCPS regarding the 2nd quarter report.  This report included reviews of the cases flagged by the Mental Health Consultant who were high risk.  The report, however, was in reaction to the filed report and not received as proactive.  The Mental Health Consultant has consistently requested the establishment of a Quality Improvement Team and this has yet to be realized. |
| Sources of Information upon which Consultant report and compliance ratings are based. | Sources of information that the Mental Health Consultant relied on were site visits to Ponce/PUERTAS & Villalba interviews with youth and staff, review of medical records, and a review of all reports submitted to the Mental Health Consultant and the Consultant, as well as mental health staffing reports. |

**C.O. 29:** Defendants shall establish an adequate residential mental health treatment program which provides services in accordance with accepted professional standards for juveniles confined in the facilities in this case who are attempting to commit suicide and/or who are inflicting harm upon themselves and/or any other juvenile in need of such services as determined by the juvenile's interdisciplinary mental health team, which includes a qualified psychiatrist. This residential treatment program will house up to forty-eight (48) juveniles from Commonwealth facilities. The residential treatment program will be established in an area that meets professional standards regarding safe physical areas for suicidal and/or self-mutilating juveniles.

| Compliance Rating | Partial Compliance |
|---|---|
| Description of Monitoring process during this period of time | The Mental Health Consultant conducted a site visit to PONCE PUERTAS in September of 2019 and interviewed the four youth in that unit.  Discussions were held with the PCPS psychologist supervisor, the psychologist and the psychiatrist.  Chart reviews of youth in PUERTAS were also conducted during this 3rd quarter and questions and concerns were sent to NIJ and PCPS leadership to be addressed. |
| Findings and Analysis | The four youth housed in PUERTAS have serious psychiatric symptomatology that requires consistent assessment and treatment.  This includes suicidal gestures, history of major depression and suicidal gestures and self-mutilation.

One 14 year old youth is of particular concern for his suicidal ideation and gestures.  The case was discussed with the treatment team and request was made on site for the information from the DEC to be forwarded electronically to the Mental Health Consultant and to the psychiatrist.  To date, despite multiple requests, this has not been forthcoming.

Another youth reported anxiety over fear of being cut and reported that he thought another youth in PUERTAS had a concealed weapon to do so. This was reported to NIJ leadership by the Mental Health Consultant. This youth also reported that he wanted to discuss his trauma (he has alleged that he was raped while in Villalba) more with the mental health providers.

The third youth was expected to have left PUERTAS and at this time appears to be disruptive to the group. Staff are aware and are taking steps to discharge.  He has reported stopping his medications in order to get ready to leave the facility.  His behavior is often dysregulated and poses concern regarding impulsivity and ability to manage anxiety.  Psychiatrist is aware.

The fourth youth is an 18 year-old with a history of psychiatric hospitalization who is in for the first time.  He reported that he pleaded guilty to charges as he was told if he didn't, he risked being in the adult system.  He is claiming that the other people in the car older than he got a deal, pointed the finger at him and he was left to either plead guilty or risk going into the adult system.

All four reported receiving behavioral modification incentives and one reported he was not at the moment due to his being disrespectful to staff. |

| | |
|---|---|
| | One youth in PUERTAS had a swollen wrist/arm that was immediately apparent to the Mental Health Consultant.  The Mental Health Consultant requested medical information and was told that the youth would be taken care of.  Of note, as of late October, the youth still had a swollen wrist/arm and it was unclear if or why the medical care was not delivered.<br><br>Javier Burgos and the Mental Health Consultant were shown evidence of suicide proof door hinges.<br><br>There is capacity for more youth to be served within PUERTAS.  Youth that are in detention status are deemed ineligible for PUERTAS.  PCPS is working toward making sure that those youth in detention with serious psychiatric needs are given the intensive services necessary.  Furthermore, the Mental Health Consultant informed PCPS that low cognitive functioning could not be a rule out for admittance into PUERTAS.  During the third quarter visit a psychologist informed the Mental Health Consultant that a youth was not referred initially due to his low cognitive functioning.  This youth is currently in PUERTAS, policies and procedures were reviewed with PCPS supervisor who was clear that cognitive delay was not an exclusionary criteria.  PCPS mental health supervisor is ensuring that all psychologists are informed of this and understand criteria and process for referring to PUERTAS.<br><br>Finally, an adequate residential mental health treatment program in accordance with professional standards had not been established. Consistent programing, therapeutic groups, individualized treatment plans all need to be in place in order to be in compliance with this provision. This has all been covered in previous reports with outlines as to the expectations of what a day program would consist of. |
| What is needed for full compliance?<br>What steps are required and/or recommended? | To be in full compliance:<br>1. As previously reported, the priority is to provide a safe, distinct and consistent specialized program for those most at psychiatric risk.  This feedback with detailed suggestions/technical assistance has been developed by the Mental Health Consultant and delivered on multiple occasions, in person and via emails.<br>2. The psychiatric coverage should be permanently increased overall so that there is coverage even when the one psychiatrist is off for the day, sick or on vacation. The Mental Health Consultant recognizes the difficulty in hiring a Child and Adolescent Psychiatrist and encourages PCPS to continue to make these efforts. |
| Priority Next Steps | Director of PUERTAS meet with PCPS leadership and mental health staff to design the specialized program detailing the therapeutic groups and activities that make up the residential program. |

| | |
|---|---|
| | Train all new staff on policies and procedures for admittance into PUERTAS. Make sure mental health staff understand that anyone can make a referral to PUERTAS directly for consideration and that this does not need the approval of PCPS nor the psychiatrist.<br><br>Ensure that mental health staff have access to the MAYSI II, to information from the DEC regarding psychiatric, family and educational history to adequately plan for youth's treatment. |
| Quality Assurance Measures | There are no quality assurance measures in place although DCR had stated that this was underway. |

**C.O. 36.** Within 120 days of the filing of this Consent Order, Defendant Juvenile Institutions Administration shall provide continuous psychiatric and psychology service to juveniles in need of such services in the facilities in this case either by employing or contracting with sufficient numbers of adequately trained psychologists or psychiatrists, or by contracting with private entities for provision of such services. The continuous psychiatric and psychological services to juveniles in need of such services shall include at a minimum, a thorough psychiatric evaluation, necessary diagnostic tests before the prescription of behavior-modifying medications, blood-level monitoring if behavior-modifying medications are prescribed, therapy, counselling, treatments plans and necessary follow-up care.

| Compliance Rating | Partial Compliance |
|---|---|
| Description of monitoring process during this period of time | During this quarter the Mental Health Consultant performed remote chart reviews and completed site visits in September of 2019 to Ponce and Villalba. |
| Findings and Analysis | A chart review of all youth who expressed suicidal ideation or intent, including gesture revealed 14 incidents this quarter compared to 5 in the first quarter and 5 in the second quarter. This represents a more than doubling of these serious incidents.  Of the 14 incidents, 13 were seen by a psychiatrist within 24 hours (this includes if the youth was psychiatrically evaluated for hospitalization or was hospitalized).  Nine were psychiatrically hospitalized.   In comparison, there was only 1 instance of a psychiatric hospitalization in the first quarter and only 2 instances in the second quarter (same youth 2X).   Of the 14 incidents this 3rd quarter, several youth had multiple incidents of suicidal ideation/gestures:  one youth had 4 incidents, another had 3 and another had 2 incidents.<br><br>This represents a significant increase over the last two quarters in acuity and incidents of suicidal ideation/intent and gestures.  The Mental Health Consultant is concerned that the increased reports by youth of  incidents of lock downs, some  for 23/1 , use of pepper spray, incidents of serious face cutting by youth on youth violence and lack of adequate staffing is connected to this significant rise in suicidal ideation/intent and gestures.  Many of the minors report cutting or suicidal ideation due to frustration of being on lock down. There were multiple youth who reported being placed on lock down |

|  | over a few weeks as "punishment" for something that had occurred involving the security officers.  There is significant literature on the correlation between isolation during incarceration and suicidal ideation/intent/gestures. This information has been shared by the Mental Health Consultant with NIJ and mental health leadership.<br><br>The Mental Health Consultant heard from multiple youth that they had concerns over their personal safety and preferred to stay in protective custody or self-imposed room confinement than to risk being in unsafe situation.<br><br>An analysis of the PCPS hours contracted for mental health vs. the hours delivered indicates that for the third quarter, 3000 hours were contracted and the mental health staff (which includes psychologist, psychiatrist and substance abuse counselors and occupational therapist) delivered 3100.75 hours or 100.75 more hours of services than were contracted for.  The psychiatrist was contracted for 360 hours for the third quarter and delivered 400.25 or 40.25 more hours of psychiatric care than he was contracted for. Given the acuity of the youth as reported above, the addition of the psychiatric time is highly recommended and necessary not only to assess and stabilize youth, but to also case conference and treatment plan high risk cases.  Several of these high risk youth have been (or are being) transferred into the adult system and adequate planning is also needed in these situations to manage acute psychiatric symptoms. |
|---|---|
| What is needed for full compliance?<br>What steps are required and/or recommended? | To be in full compliance:<br><br>1. Psychiatrist time should be increased to fully cover all aspects of treatment planning and care.<br><br>2. Cohesive team work with all disciplines can help the team better address depressive symptomology that could lead to suicidal ideation or intent – especially based on history.<br><br>3. In addition, the mental health staff should continuously offer individual and group psychotherapy services (at least once a week) to youth who have had serious emotional problems, have exhibited violent and manipulative behaviors, serious history of polysubstance use, and who consistently have problems "cohabitating" with others. While the treatment plan often states a minimum of mental health service 1X per month, more frequent (i.e. weekly) group and individual care can help build youth's coping skills, trust with staff and can contribute to the de-escalation of conflicts before they erupt into violence either with other youth or with staff. See also comment above regarding the need for individualized treatment plans. |

|  | 4. NIJ leadership need to further examine and eliminate practices outside of transitional measures and protective custody which are being used to keep youth in their rooms for extended periods, particularly when used or disciplinary or punitive reasons.. NIJ leadership needs to understand and address the fear youth have of violence due to youth cutting on youth.   Staffing issues also need to be addressed.  Youth remanded to the care of DCR should not have to fear for their lives.  They are entitled to feel safe, free of harm and able to trust that the security staff will avert any violence towards them. |
|---|---|
| Priority Next Steps | PCPS and DCR leadership should evaluate the increase in suicidal incidents and address accordingly based on recommendations. |
| Quality Assurance Measures | See above. |

**S.A. 63.** For each juvenile who expresses suicidal or self- mutilating ideation or intent while incarcerated, staff shall immediately inform a member of the health care staff. Health care staff shall immediately complete a mental health screening to include suicide or self-mutilation ideation for the juvenile. For each juvenile for whom the screening indicates active suicidal or self-mutilating intent, a psychiatrist shall immediately examine the juvenile. The juvenile, if ever isolated, shall be under constant watch. Defendants shall develop written policies and procedures to reduce the risk of suicidal behavior by providing screening for all juveniles at all points of entry or re-entry to AIJ's facilities and/or programs and by providing mechanisms for the assessment, monitoring, intervention and referral of juveniles who have been identified as representing a potential risk of severe harm to themselves. Treatment will be provided consistent with accepted professional standards.

| Compliance  Rating | Partial Compliance |
|---|---|
| Description of Monitoring process during this period of time | The Mental Health Consultant reviewed reports that were submitted by DCR of youth that were reported to have suicidal ideation, suicidal intent and/or self-mutilation for the entire quarter.  The Mental Health Consultant reviewed the electronic medical records to find evidence of compliance with S.A. 63, including providing treatment consistent with professional standards. |
| Findings and Analysis | Chart reviews this quarter continue to reveal inconsistent or incomplete nurse suicide evaluations upon entry or immediately following a transfer. The SI screen was not consistently present for all 14 incidents of suicidal ideation/intent/gesture this quarter.

Of the 14 incidents, 13 were seen by a psychiatrist within 24 hours and 9 were psychiatrically hospitalized (this includes if the youth was psychiatrically evaluated for hospitalization or was hospitalized). |

| | There were 7 incidents of self-mutilation this quarter.  Of those, 4 were seen by a psychiatrist within a 24-hour period.  Some of the instances occurred in the evening and the evaluations had to wait for the next day for a mental health staff to see the minor.  Documentation could improve to show the steps taken by the health staff to ensure that the youth has been evaluated for SI, who if anyone they consulted with on the mental health staff and the plan to have someone come asap to evaluate the youth. |
|---|---|
| What is needed for full compliance? What steps are required and/or recommended? | To be in full compliance: <br><br> 1. As mentioned above, all information collected by the DEC should be easily accessible to the mental health treatment team electronically for treatment planning purposes. <br><br> 2. Nursing notes regarding suicidal ideation assessment should be more fully noted (not just check marks) with a clear plan in the bottom note section as to next steps. <br><br> 3. Increase psychiatric coverage. <br><br> 4. Increase mental health interventions targeted at healthy coping mechanisms, tolerance of anxiety, ability to communicate conflict. (see also CA 36 comments on what is needed for full compliance). <br><br> 5. Treatment team meetings should involve representation from security staff supervisor or other staff in position of leadership to address issues related to youth who allegedly cut due to boredom, or who report to the Mental Health Consultant that they cut to disrupt a shift of officer they have a conflict with, or under threat by another youth to "cut yourself or be cut." |
| Priority Next Steps | Please see above and Consultant's Note from Second Quarterly Report. |
| Quality Assurance Measures | As reported in previous quarterly report, It is highly recommended that DCR have PCPS perform their own quality assurance measures to ensure compliance with S.A. 63. <br><br> PCPS provided the Mental Health Consultant with a response to the second quarterly report which included detailed chart reviews. It is recommended that these reviews happen proactively vs. reactively. |

**S.A. 72**. All juveniles receiving emergency psychotropic medication shall be seen at least once during each of the next three shifts by a nurse and within twenty-four (24) hours by a physician to reassess their mental status and medication side effects. Nurses and doctors shall document their findings regarding adverse side effects in the juvenile's medical record. If the juvenile's condition is deteriorating, a psychiatrist shall be immediately notified.

| Compliance Rating | Substantial Compliance |
|---|---|
| Description of Monitoring process during this period of time | The Mental Health Consultant has requested and reviewed documentation regarding the use of psychotropic medication for this third quarter of 2019. |
| Findings and Analysis | During this quarter, there were seven instances of use of emergency psychotropic medication involving 6 youth.  In five instances, Haldol, 1 mg, po, STAT was administered.  Five of the six youth were hospitalized following the administration.  The one minor which was given emergency psychotropic medication on 8/10 and 8/14 was seen by psychiatrist on 8/10 and orders were given on 8/14 with daily notes from the nurses and with the psychiatrist following up on 8/17.<br><br>These reports of use of psychotropic medication are in sharp contrast to previous years of no reports of use of psychotropic medication.  This use could be due to the higher acuity, and/or the lack of full psychiatric coverage. |
| What is needed for full compliance?<br>What steps are required and/or recommended? | To be in full compliance:<br><br>1. There are policies and procedures in place for the use of psychotropic medications which have been reviewed and approved by the Mental Health Consultant.<br><br>2. Compliance and documentation will continue to be monitored. |
| Priority Next Steps | A period of assessment of at least one year in substantial compliance will be required. |
| Quality Assurance Measures | See above. |

**S.A. 73.** Defendants, specifically AIJ, shall design a program that promotes behavior modification by emphasizing positive reinforcement techniques. Defendants, specifically AIJ, shall provide all juveniles with an individualized treatment plan identifying each juvenile's problems, including medical needs, and establishing individual therapeutic goals for the juvenile and providing for group and/or individual

| | |
|---|---|
| counseling addressing the problems identified. Defendants, specifically AIJ, shall implement all individualized treatment plans. | |
| **Compliance  Rating** | **Substantial Compliance** |
| Description of Monitoring process during this period of time | The Mental Health Consultant has reviewed written evidence of the curriculum, staff training, receipt of incentives by the youth and interviewed youth during the site visits and consistently received information that incentives are being provided.  During the site visit in September, youth reported receiving incentives unless they had a withholding of the incentive due to a behavior such as cursing at an officer.<br><br>**Consultant's Note:  The Commonwealth filed a Motion to Terminate this provision during the second quarter, which remains pending.** |
| Findings and Analysis | Please review previous reports where the Mental Health Consultant indicated the review of plans of care within electronic medical records.  The records have consistently indicated a plan for behavior modification for youth in treatment facilities.  Policies and procedures were provided, reviewed, discussed and approved.  A request for training materials was made, delivered, reviewed and approved.  In addition, the Mental Health Consultant has interviewed youth each quarter that she has been on site.  The Mental Health Consultant requested proof of incentives being delivered and received written documentation of youth signing off on incentives they were given.  The Mental Health Consultant will continue to work with behavior modification staff so that low or no cost incentives can be used more with youth (more time on phone with family, outdoor time, jobs outdoors, etc., a special trip or walk, etc.)<br><br>While youth may protest that incentives are withheld, the treatment plans and review of documentation consistently supports that youth are receiving behavior modification services. |
| What is needed for full compliance?<br>What steps are required and/or recommended? | To be in full compliance:<br><br>As previously reported, policies and procedures for behavior modification have been reviewed and approved by the Mental Health Consultant.<br><br> The Mental Health Consultant continues to suggest the use of low or no cost incentives. |
| Priority Next Steps | The Mental Health Consultant will continue to review records and will perform another site visit next quarter to review continued compliance with this provision unless terminated. |

| Quality Assurance Measures | See above. |
|---|---|
| Sources of Information upon which Consultant report and compliance ratings are based | Review of documentation has been adequate and indicates compliance with the policies and procedures and with the individual plans of care. |

## SPECIAL EDUCATION AND VOCATIONAL TRAINING –Kim Tandy

| Section XIII:  Educational and Vocational Services – General Population |
|---|
| S.A. 81  Defendants, specifically the Department of Education, shall provide academic and/or vocational education services to all juveniles confined in any facility for two weeks or more, equivalent to the number of hours the juvenile would have received within the public education system.  Specifically, this education shall be provided 5 (five) days per week, 6 (six) hours per day, 10 (ten) months per year.  AIJ shall provide adequate instructional materials and space for educational services.  Defendants shall employ an adequate number of qualified and experienced teachers to provide these services. |

| Compliance  Rating | **Partial Compliance** |
|---|---|
| Methodology for Monitoring this Quarter | The Monitor met with Carlos Delgado and other staff on August 12, and also visited Ponce and Villalba that week.  The visit included facility tours, including classroom areas which were newly created on units or elsewhere as a result of Humacao closure and additional space needs. The 2019-2020 school year was ready to begin.

Information received and reviewed this quarter for the time period July - September, as well as on-site verification  includes:

1) An analysis of classroom space and resources for the provision of education, including for transitional measures and protective custody youth, as needed

2) List of school employee vacancies for the beginning of the school year.

3)  Monthly personnel attendance by support staff, teachers, and special education teachers, with documentation of teacher absences and "security situations" which disrupt school services for August and September.

4) List of all student receiving vocational education, including special education students

5)  Verification of the provision of educational services within 5 days of arrival for eligible youth.

6)  Verification of school records for those youth in transitional measures or protective custody.

7)  Tracking Form for Initial and Re-evaluation Process. |

| | |
|---|---|
| | The Monitor received revisions to Policies 20.1 and 20.2 from NIJ and DE in March, and returned comments.  Revisions have been completed to Policy 20.1 but to date these have not been received as signed. Final revisions to Policy 20.2 have not been received. The Memorandum of Understanding between NIJ and PRDE regarding the delivery of education services is in need of revision.<br><br>A Functional Team meeting was held August 12 included continued discussion of the impact of Humacao closure, policies and procedures revisions, and training records, paragraph 86 issues relative to evaluations and re-evaluations, provision of specially designed instruction and related services, procedural safeguards, and paragraphs 79, 80 and 94 related to educational services for youth in TM and PC.<br><br>The Monitor also reviewed the education records and classrooms for youth in TM or PC status.  An analysis of the 3 youth receiving educational services can be found in the Findings and Analysis under Paragraph 94. |
| Findings and Analysis | The current structure for education services in NIJ facilities splits responsibilities between the Puerto Rico Department of Education, which provides special education teachers, Title I, and vocational education staff, and the Department of Corrections and Rehabilitation, which provides academic and library staff.  The language in S.A. 81 requires the Department of Education to provide these services.  As such, compliance regarding educational and vocational education for youth confined 2 weeks or more, five days per week, 10 months per year, is the responsibility of the Department of Education. The requirement of providing qualified teachers logically also falls on the Department of Education based upon this responsibility.  NIJ is required to provide adequate educational materials and space for instruction.<br><br>The current Memorandum of Understanding must be modified to reflect these responsibilities between the two entities and to redefine the relationship as DOE assumes full responsibility for the delivery of educational services.  Previously, PRDE indicated that it would assume full financial responsibility for all services by July 1, 2019. The Monitor has been informed that this was not included in the PRDE budget and will not occur for the 2019-2020 school year.<br><br>Policy 20.1 Educational and Recreational Services provides for regular and vocational services to youth in detention and in social treatment centers. The revised policies received by the Monitor in May of 2019 contain the recommended changes with the exception of providing full school days to youth in TM or PC status but they are not yet signed. The new policies reflect improvement and show commitment and continued effort to provide high quality educational services for youth.<br><br>Monitored Provisions:<br><br>**1)  Provision of academic and/or vocational education for youth confined 2 weeks or more 5 days per week, 6 hours per day, 10 months per year.** |

This provision ensures that all youth who are eligible for educational services receive such services within a two week period, and that full school days are provided over the 10 month school calendar.

Documentation received at the beginning of the school year verifies that NIJ uses the PRDE school calendar. Monthly monitoring of attendance for education staff is documented on a daily basis, for administrative support, teachers, and special education teachers, as well as for students. Monthly reports have been received for the quarter.

Rates are affected by teacher absences and "security situations." Security situations are discussed in more detail in paragraph 94. NIJ has been asked to report when youth are removed from school for security or other reasons and do not receive educational services. Teacher attendance rates are listed as 82% or above for August and September. Two dates noted on the "school exclusion" chart because of youth registration are not accurately listed as such on the Monthly Education Services Report for September.

A review of enrollment information for educational services for the Third Quarter of 2019 indicates youth enrollment in vocational services at 100% for both facilities. These classes include bakery, cabinet making, administrative work, and barbering.

**2) AIJ shall provide adequate instructional materials and space for educational services**

Both facilities have multiple classrooms for students engaged in regular and special education as well as vocational services. Classrooms seem adequate for students to have small classes based upon subject, and in some cases, grade levels (i.e. elementary level students). The facilities have vocational education rooms which were inviting, seemingly well stocked, and were engaging students.

The closure of Humacao has created significant challenges to ensuring adequate classroom space with the addition detention youth in both of the other facilities, and an increase in the number of youth in TM/PC measures. A review of the schedule provided by NIJ indicates that each classification of youth is scheduled for a full school day, and the required teacher planning time is incorporated into the schedule. One exception appears to be the sumariados where the schedule indicates they are receiving two fifty (50) minute classes. Some of these youth have graduated, but for those who are in that unit, and not receiving services through a TM or PC status, the schedule does not reflect six 5 hour classes.

**3) Defendants shall employ an adequate number of qualified and experienced teachers to provide these services.**

The Monitor reviewed a list of instructional staff and their certifications and subject matter expertise for each of the three facilities the beginning of the school year, and will

| | |
|---|---|
| | continue to review any staffing vacancies. During the August visit, only two vacancies were noted – a math teacher at Villalba and a Science teacher at Ponce.

NIJ Policy 4.1 requires the Training Division to coordinate and implement a master plan of training for staff development, including orientation and pre-service training of a minimum of 24 hours for treatment staff who are new.  By definition, treatment staff includes teachers, social workers, counselors, and school principals.

Training records, while partially received, must reflect that all new educational staff receive 24 hours of training by NIJ.  In addition, Policy 4.1 requires that staff training needs be assessed in operational areas (including education and social work), and that such areas, in conjunction with the Division of Training, design training according to need.  While not included in Policy 20.1, the Department of Education also requires annual training for its special education instructors, usually for one week prior to the beginning of the school year.

Teacher attendance should be at 90% or higher, and a system of substitute teachers should be in place so that youth do not lose school days due to these absences. Youth who receive special education services are entitled to this service at the level indicated in each IEP. If special teachers are absent and the services are not provided, youth are entitled to make up that amount of time. |
| What is needed for full compliance?

What steps are required and/or recommended? | The Department of Education is responsible per the Settlement Agreement for the delivery of all educational services, as well as providing sufficient qualified teachers. After committing to that Monitor's office that this would be done for assume this for the 2019-2020 school year, the Monitor was informed by counsel for NIJ at the May meeting the funds were not budgeted by PRDE and they would not be providing full funding for 2019-2020.

This policies and practices must ensure that youth in protective custody or transitional measures who are eligible for education services are offered the required 6 hours per day, five days per week, 10 months of the year. A revised version of Policy 20.1 was provided to the Monitor in May which meets this requirement.  A signed copy has not yet been received in order to find this aspect in full compliance.

Well qualified staff should include verification not only of certifications, but also of training for new educational staff, and training required by the Department of Education and coordinated between the Division of Training and NIJ educational services. Additionally, a staff training needs assessment for education staff should be produced, as well as a training plan for the 2019-20 school year based upon that assessment.

Training records of education staff (including ancillary staff) should be documented and provided as evidence of training requirements.

Facilities for classrooms and administrative staff for the education programs must be functional, without leaking roofs, moldy ceilings or walls, and with air conditioning units |

|  | that are working. While work at Villalba has been substantially completed, the Monitor needs verification that such work at Ponce is completed as it pertains to classrooms and other education areas. |
|--|--|
|  | Monthly attendance by essential educational staff should remain at 90% or higher in each facility. Ideally, classes should not be disrupted or cancelled as a result of teacher absence. A system for substitute teachers could help to accommodate these situations. |
| Priority Next Steps | NIJ and PRDE must provide a signed copy of Policy 20.1 requiring full school services for youth in PC and TM status. |
|  | Regular and special education teachers who can provide full school day services for youth in TM and PC must be in place for the 2019-2020 school year. |
|  | Security situations should be fully examined so as not to adversely impact the availability of educational programming. Documentation of security situations must be communicated to education administrators.  NIJ must meet the required number of school days based upon Puerto Rica's relevant laws. |
|  | Verification of training from the 2019-2020 school year should be provided as well a training schedule and verification of this year's training for teachers on institutional policies and procedures. |
| Quality Assurance Measures | The Monitor is encouraged by the documentation that is kept and provided relative to many of the provisions of this paragraph. |
|  | Efforts at quality assurance must also come from the DOE relative to the delivery of service, and/or must be incorporated into the Memorandum of Understanding. |
|  | The Monitor agreed to review the proposed QA provisions by June 1, but did not receive a copy upon request. |
| Sources of Information upon which Consultant report and compliance ratings are based. | Meetings at Villalba and Ponce facilities with Carlos Delgado to view available classrooms, teacher rosters and attendance, list of students, attendance logs, and documentation regarding intake of new students. |
|  | Examination of school calendar |
|  | Review of applicable policies |
|  | Examination of other documents as listed above |

S.A. 86  Defendants, specifically the Department of Education, shall abide by all mandatory requirements and time frames set forth under the Individuals with Disabilities Education Act, 20 USC §§ 1401 et seq. Defendants shall screen juveniles for physical and learning disabilities. The screening shall include questions about whether the juvenile has been previously identified by the public school system as having an educational disability,

previous educational history, and a sufficient medical review to determine whether certain educational disabilities are present, such as hearing impairments, including deafness, speech or language impairments, visual impairments, including blindness, mental retardation, or serious emotional disturbances adversely affecting educational performance.

| Compliance Rating | Partial Compliance |
|---|---|
| Description of Monitoring process during this period of time | The Monitor met with Carlos Delgado and other education staff on Ponce on August 14 and Villalba on August 15th.  The visit included facility tours, including classroom areas which were newly created on units or elsewhere for additional space. |
| | File reviews in MIPE were completed on 10 youth during the second quarter, including a review of IEP content, evaluations, and procedural timeframes.  While MIPE provides a good source of information, there are limitations to its use which should be acknowledged.  In most of the cases reviewed, documentation on past evaluations were unavailable.  Procedural safeguards such as parent notifications, distribution of parental rights, and parent participation are more difficult to determine.  Enrollment information for the youth if at Ponce or Villalba often did not match records received from NIJ. Progress reports are not entered.  Even with these limitations, the process provided a good source of verification to review the quality and thoroughness of the evaluation and IEP processes, and were used for compliance ratings along with interviews and on-site information reviewed. |
| | Records reviewed for the third quarter included: |
| | 1) List of all student receiving vocational education, including special education students 2)  Verification of the provision of educational services within 5 days of arrival for eligible youth. |
| | 3)  Verification of school records for those youth in transitional measures or protective custody. |
| | 4)  Tracking Form for Initial and Re-evaluation Process |
| | Because file reviews were not completed for the third quarter, this report relies in part on second quarter findings, as well as documentation received above for the third quarter.  Case reviews will be conducted during the Fourth Quarter including a review of youth files. |
| Findings and Analysis | This section provides a general requirement that compliance with the IDEIA is necessary in order to meet compliance requirements of this section. For purposes of complying with the IDEIA, this provision has been broken down into 4 sections as noted below: |
| | **1) Mandatory requirements of the Individuals with Disabilities Education Act** |
| |     **a)  Child Find** |

PRDE is responsible for ensuring that Child Find provisions to locate and identify youth who may be eligible for special education are met, but must work collaboratively with NIJ instructional staff to ensure that adequate mechanisms are in place to identify when youth are appropriate for referrals.

Youth are screened at detention using an education questionnaire to determine prior educational placements, previous involvement in special education, and academic achievement.  Diagnostic testing is completed within five school days and school records are requested and obtained. Physical disabilities are noted, including visual problems, speech problems, use of medication, hearing problems, and orthopedic problems. Recommendations for testing are made including for hearing impairment, psychological, occupational therapy neurological examination, psychiatric, visual, health and/or a Woodcock Munoz.

Documentation received from NIJ education staff indicates that 100% of new youth admitted on detention status, and who were held for a minimum of 5 days, were evaluated based upon the process noted above, including basic testing across the five subject areas. This includes 22 new admissions in August and 22 new admissions in September. Of this number, eight (8) youth did not complete testing, but they left before five days. One youth did not complete testing because he was a high school graduate.  This screening and evaluation process, completed on all youth, is an excellent way in which Child Find requirements can be met.

Education staff also document when youth in regular education services are experiencing difficulties and may need specially designed instruction.  Department of Education and NIJ have produced several examples in past years of youth identified for evaluation based upon suspected disabilities. This question was not specifically raised this quarter.  These are detailed in prior reports.

While the screening is an important tool being used to comply with Child Find requirements, it likewise is important for regular education students as well.

Given the documentation consistently received to date, the Monitor finds this part of Paragraph 86 in substantial compliance.

### b) Evaluation of youth with suspected disabilities

PRDE has an obligation to ensure that youth with suspected disabilities, and those in need of re-evaluation, receive thorough multi-faceted evaluations which stretch across areas of concern as well as the identification of student strengths.  This include three year re-evaluation processes as well.

The Monitor received a report during the Second Quarter generated by MIPE which provided the names and registration numbers of 11 youth whose 3 year re-evaluation time had expired.  There was no indication that one of those 11 had been in an NIJ facility and so presumable sent in error.  Of the remaining 10 youth, a review of files obtained through the MIPE system showed that such evaluations were in fact overdue,

and sometimes substantially overdue.  The time that the youth spent in the NIJ facility was also considered in cases where re-evaluations were not timely completed.

The tracking for youth evaluations and IEP revisions was reviewed for the month of September for both Ponce and Villalba.  There were 10 youth at Ponce receiving special education.  All of the youth had IEPs which appear to be current.  Only one youth did not, but a COMPU meeting was scheduled on 10/19/19 to revise it.  At Villalba, 17 youth were receiving special education services during the month of September, and of this number 4 IEPs were not current.  One has been revised as of 10/21/19, and three youth were referred to be re-evaluated.

The Monitor learned during the Third Quarter that NIJ has received funding to hire two school psychologists through Title I funds. This is very encouraging, especially since they can be used to improve the evaluation process, as well as assist with IEP development and training of staff. It reflects a strong commitment on the part of education staff to problem solve areas which have been deficient, but over which they have had limited control.  During the 4th Quarter, the Monitor will meet with these psychologists and include them in the case reviews.

This section of Paragraph 86 remains in partial compliance.

### c) Provision of specially designed instruction and related services

During the Second Quarter, the Monitor also reviewed the 10 files noted above to examine certain aspects of the youth's Individual Education Plan (IEP), including eligibility, levels of performance, IEP goals, progress notes and the provision of specially designed instruction, accommodations and related services. It should be noted that while MIPE information does not always appear to be complete, youth in correctional settings often arrive with spotty educational experiences, gaps in enrollment, multiple placements and missing records.  To the extent that staff do not enter complete information, however, this should be improved.  It may also be that information contained in the youth's hard copy file may fill some gaps, but the chances of that information following the youth once in the community seems less likely if it is not entered into the MIPE system. A more extensive discussion of this section can be found in the Second Quarter Repot.

An evaluation process which is well designed, inclusive as to all areas of concern, and orchestrated properly, is critical to the development of an IEP.  It should address deficits in content areas, and establish goals and objectives which are individualized, measurable, and able to be tracked.  In some cases, evaluations are dated, and IEPs are developed without the benefit of that information.

This provisions remains in partial compliance and should be a high priority for improvement in the 2019-2020 school year.  Additional training for education staff is highly recommended.

| | |
|---|---|
| | **d) Procedural safeguards**<br><br>Policy 20.2 must be amended to ensure that procedural safeguards required by IDEA are included. A policy draft of Policy 20.2 was returned in February of 2019 with instructions to include a section regarding the procedural safeguards in IDEIA.<br><br>File reviews through MIPE seemingly do not designate a "parent" for purposes of enforcing education rights. There is no indication that NIJ/PRDE has a system for providing surrogate parents, although a draft of the new policies will include such.<br><br>Procedural rights must also ensure that parents (as designated) are provided adequate opportunities to participate in and challenge decisions made regarding the identification, evaluation, eligibility determination, and IEP services for their child. A more thorough review of such practices will be examined during the 2019-2020 school year.  File notations regarding parental participation in MIPE for the filed examined were cursory and boilerplate overall.<br><br>Strong parental participation in educational services for youth in special education can have a dramatic and positive effect on the youth's success.  Maximizing ways to engage parents is often difficult in correctional settings.  The Monitor looks forward to better understanding the ways in which educational staff have and will continue to engage parents.<br><br>This section of Paragraph 86 is in partial compliance. |
| What is needed for compliance to be achieved? | NIJ and PRDE submitted substantially improved and updated policies consistent with requirements of the S.A as well as IDEA.  One section which should be included, however, concerns procedural safeguards of youth and parents. Notes and suggestions were returned to NIJ/PRDE regarding the inclusion of this area in March.<br><br>Initial evaluations and re-evaluations must be completed in a timely manner, and in accordance with the provisions of IDEA. Under 34 CFR §300.305(a)(1), the IEP Team and other qualified professionals, as appropriate, as part of an initial evaluation and as part of any reevaluation under 34 CFR Part 300, must: "Review existing evaluation data on the child, including—(i) Evaluations and information provided by the parents of the child; (ii) Current classroom-based, local, or State assessments, and classroom-based observations; and (iii) Observations by teachers and related services providers." Referrals into the MIPE system by social workers without convening a COMPU meeting are inadequate to comply with the requirements of IDEA.<br><br>IEPs must include an individualized determination of disability, special considerations, including behavioral plans when appropriate, and a range of placement options, including the availability of resource rooms and a self-contained classroom if necessary. A one size fits all plan for youth is not acceptable.<br><br>The procedures for identifying the "parent" for purposes of IDEA, and the use of surrogates when necessary, must be examined.  While it may be possible that an NIJ |

| | |
|---|---|
| | social worker may stand in for a parent, this must be a parental designation and not one made by NIJ or PRDE. Policies and practices must also ensure other procedural safeguards for the participation of parents as well as youth. |
| Priority Next Steps | Changes to Policy 20.2 should be submitted to the Monitor now.  Once that has been received and approved by the Monitor, more specific metrics for Procedural Safeguards will be developed and monitored. There should be no undue delays in completing this final set of policies and having them approved by the appropriate entities.<br><br>Continue substantial compliance on Child Find requirements, including initial screenings done on youth within 5 days of intake.  Provide information about the number of youth identified through this process, if any.<br><br>PRDE must ensure that COMPU meetings are conducted prior to the request for an evaluation or re-evaluation, and that such meetings comply with the requirements of the regulations under IDEA as to purpose, timing and outcomes.  The tracking form established by NIJ must be accurately completed, and should trigger the timeframes for completion of a new evaluation or re-evaluation accurately. This should be cross-checked with the MIPE system.  That form should also be fully completed to note the dates that a new IEP will be required as part of an annual review.<br><br>PRDE must ensure that there are proper procedures for identification of "parents" and that such individuals meet the definition within IDEA, or are designated by such person, and that surrogate parents are also available as needed. Other policies and practices regarding the participation of parents based upon IDEIA procedural safeguards will be discussed and reviewed during this coming school year.<br><br>PRDE should increase oversight of special education teachers to ensure that youth are properly identified, that IEPs and the services provided as a result, are individualized as to student need, including the type of placement available to the youth.  Adequate resources must be in place to provide a greater level of service to youth depending upon their needs.<br><br>The Monitor strongly encouraged use of the two new psychologists to assist in the evaluation process, training  and development of IEPs, particularly for those students with behavioral challenges. |
| Quality Assurance Measures | The monitor has not yet reviewed draft quality assurance plans but has requested a copy. |
| Sources of Information relied upon | Interviews with NIJ and PRDE staff<br><br>Documentation review of policies and procedures<br><br>Interviews with youth who are receiving special education services |

| | Review of documentation regarding student schedules, attendance of staff and youth, disability categories and time spent in special education by facility |
|---|---|
| | Tour of facilities and classrooms |

| **S.A. 87**. If a juvenile has been previously identified as having an educational disability, Defendants shall immediately request that the appropriate school district provide a copy of the juvenile's individualized education plan ("IEP"). Defendants shall assess the adequacy of the juvenile's IEP and either implement it as written if it is an adequate plan or, if the IEP is inadequate, rewrite the plan to make it adequate, and then implement the revised IEP. | |
|---|---|
| **Compliance Rating** | **Partial Compliance** |
| Description of Monitoring process during this period of time | The monitor previously reviewed the procedures and forms for requesting documentation on youth from prior school districts when admitted to detention.  This includes the youth's cumulative file through SIS and the special education file through MIPE.<br><br>While no file reviews were completed during the third quarter, the youth tracking documents for September suggest that youth identified 5 youth who needed to either be referred for a re-evaluation, or were in need of an updated IEP. |
| Findings and Analysis | Appropriate policies are in place to require that records of the youth's IEP are obtained immediately from the appropriate district. Records must be requested within 10 business days after the screening is done and the youth has indicated he or she has an IEP.  The youth is enrolled in school within 72 hours.  Documentation about starting dates was reviewed and consistently showed youth begin their classes within a couple of days.   This part of Paragraph 87 appears to be compliant.<br><br>Two systems have been put in place electronically for securing regular and special education records of students.  The Department of Education has been operating MIPE (My Education Portal) since 2012.   Students eligible for special education are registered in this system, and any district, including the schools within NIJ facilities, can pull these records on a student they receive within their school.  Access is available immediately.  Some students, however, may have files that are "inactive" due to disruption in the youth's education.  In these cases, education staff indicated that they send a request manually for a copy of the records.  A copy of the form was noted which documents this request in the youth's file. In three cases this quarter, the Monitor noted that there was not an active IEP on file through MIPE, and in all 3, education staff initiated a re-evaluation to determine present levels of performance in order to create a new IEP with current information. |

|  | The Student Information System (SIS) similarly provides student information on all youth registered for school in Puerto Rico, and interplays with MIPE.  NIJ facilities are now on line and can obtain this information immediately when it is available in the system.<br><br>The requirements of this provision as to obtaining records appears to be in compliance. IEPs are not always available through MIPE if the youth is "inactive" in the system. The Monitor will continue to examine whether IEPs are determined to be adequate when received, and/or whether changes are made.  The Monitor will want to ensure that IEP's are not being revised to meet the resources available at NIJ rather than the individuals needs which have been previously identified for the student.  Similarly, disability categories must be aligned with the youth's identified needs and areas of deficit. The rest of this section remains in partial compliance. |
|---|---|
| What is needed for full compliance?<br><br>What steps are required and/or recommended? | All special education files should contain a records of annual IEP reviews, and other reviews of the IEP done during the year as needed.  A system of reviewing IEPs must align with a 12 month calendar year, or more often. |
| Priority Next Steps | Ensure that the appropriate COMPU meetings are held to review the youth's IEP goals and progress, present levels of performance, and any needed changes to the IEP's goals, measurable objectives, accommodations and placement.<br><br>PRDE must establish greater oversight over the supervision of special education staff and the quality of IEPs and placement decisions. |
| Quality Assurance Measures | Education QA tools have not been reviewed by the Monitor but have been requested so they can be reviewed. |
| Sources of Information upon which Consultant report and compliance ratings are based | Review of screening and evaluation materials completed while youth are detained<br><br>Review of documentation used to request and follow up on records<br><br>Discussions with PRDE and NIJ education staff<br><br>Review of monthly documentation tracking special education deadlines for evaluations and IEP reviews. |

**S.A. 90**. Defendants shall provide appropriate services for juveniles eligible for special education and related services. Defendants shall provide each such juvenile with educational instruction specially designed to meet the unique needs of the juvenile, supported by such services as are necessary to permit the juvenile to benefit from the instruction. Defendants shall coordinate such individualized educational services with regular education programs and activities.

| Compliance Rating | Partial Compliance |
|---|---|
| Description of Monitoring process during this period of time | See above generally.<br><br>While the use of MIPE is helpful to evaluate many aspects of student files, MIPE files are not always complete, and the system does not contain information relative to the ongoing progress that is being made by the youth in achieving IEP goals. This progress data, along with other notations, is critical to determine if the services offered adequately permit the youth to benefit from the instruction. |
| Next Steps | PRDE and NIJ education staff must ensure that services are individualized based upon the identified disabilities, and that related services are also provided if necessary to properly implement the IEP.<br><br>The Monitor will conduct manual file reviews with staff to examine progress data on IEPS during the 4th quarter monitoring visit. |

**S.A. 91.** Qualified professionals shall develop and implement an IEP reasonably calculated to provide educational benefits for every juvenile identified as having a disability. When appropriate, the IEP shall include a vocational component.

| Compliance Rating | Partial compliance |
|---|---|
| Description of Monitoring process during this period of time | The Monitor reviewed the qualifications, including records of certifications, for special education staff at the beginning of the 2018-2019 school year. The Monitor received a copy of the 2019-2020 staff list for both facilities. A request was made for the credentials, including certifications of any new staff for this school year. This is no School Director for Villalba yet hired. There are 23 education staff at Ponce, and 20 at Villalba.<br><br>A review of all youth schedules for regular and special education students was completed, including vocational education classes. |
| Findings and Analysis | Staff responsible for the development of IEPs are the special education instructors, who are training in working with students with disabilities and the creation of IEPs. An adequate number of special education staff are employed in the two facilities, with the exception of providing coverage to youth in PC and TM status. Resources appear adequate to provide IEP services to youth. DOE should provide information regarding training provided to special education teachers employed at NIJ facilities regarding IEP development and implementation.<br><br>The Monitor has found substantial compliance with the section of Paragraph 91 relative to qualified staff. |

|  | A review of the special education student schedules in both facilities indicates that all special education students were enrolled in vocational classes.  Likewise, this portion of Paragraph 91 is compliant.<br><br>The extent to which IEPs are developed and implemented to allow youth to achieve academic benefit is monitored through Paragraph 86. |
| --- | --- |
| What is needed for full compliance?<br><br>What steps are required and/or recommended? | The monitor believes that the policies and procedures, training, staff and resources are available to ensure that this provision is in compliance. A system of documentation has been created which is thorough and which appears to follow the requirements under IDEA for the creation and implementation of IEPs.<br><br>The provision of vocational education is incorporated into policy and, while not mandatory in all cases, has been an integral part of providing more robust educational services for youth in NIJ and is offered consistently.<br><br>IEPs must be designed based upon the individual needs of the youth.  Such determinations as made as part of the Paragraph 86 compliance ratings. It is important to note the relationship between well designed evaluations which include all areas of concerns, proper identification of youth disabilities and levels of performance, and the individualization of a plan which can meet the specific needs of those youth, including the level of service afforded, special aids and supports, accommodations, and related services.  Paragraph 86 ties those provisions together through file reviews, youth and teacher interviews, and observations. |
| Priority Next Steps | Ongoing monitoring over the next year will ensure that all provisions in place are being implemented fully and faithfully. |
| Quality Assurance Measures | The Monitor has not reviewed proposed QA measures. |
| Sources of Information upon which Consultant report and compliance ratings are based | All youth schedules including the provision of vocational instruction<br><br>Review of Policies and procedures<br><br>Review of system of documentation maintained in student files<br><br>Student interviews |

**S.A. 93** Services provided pursuant to IEPs shall be provided year round.  Defendants shall ensure that juveniles with educational disabilities receive a full day of instruction five (5) days a week.

| **Compliance  Rating** | **Substantial Compliance** |
| --- | --- |
| Description of Monitoring process | The Monitor met with Carlos Delgado about the provision of extended school year services during her May 12 – 15 monitoring visit.   The process of identifying, approving |

| | |
|---|---|
| during this period of time | and providing services to youth who may require extended school year services (ESS) began during the last part of 2018, with approval by the Department of Education of several youth who were deemed eligible. |
| | In order to ascertain compliance with this provision, the Monitor obtained and reviewed documentation of the criteria for determining which youth are eligible for extended school year, information submitted to PR Department of Education to ascertain eligibility, a list of the eligible youth approved for services, proof that such services were provided and the dates provided, and verification of the extended contract for qualified teacher(s) to provide the services. |
| | No additional monitoring was done during the Third Quarter for this provision as there are no triggering events where compliance can be measured.  During the Fourth Quarter, the Monitor will request documentation to determine possible eligibility which will be submitted at year end to the Department of Education. |
| Findings and Analysis | Year round school services to special education students must be provided to students who "prior to the corresponding evaluations, require this service in order to avoid falling back in their academic skills and performance." (See policy 20.2 Section V) |
| | During the first quarter, the Monitor learned that for the first time NIJ had submitted data to the PR Department of Education to qualify a number of students for extended school year.  Data from September through December of 2018 was analyzed for grades, IEP progress, and student needs according to a formula established by the PRDE. |
| | Documentation was received that three youth at Ponce and five youth at Villalba qualified for extended school services (ESS) for five hours per day.  All IEPs were modified to reflect the youth's eligibility for this service. |
| | Documentation reviewed on site showed that that these youth received the services from a qualified special education teacher for the designated time during the month of June.  Only one youth did not receive much of the service provided, and this was by choice. |
| | The Monitor finds this provision to be in Substantial Compliance and acknowledges the good work staff did in providing this extra serviced needed for some students. During the Fourth Quarter, the Monitor will review documentation to ensure that you who are eligible have been identified for 2020 extended school services, and that such information has been submitted to the Department of Education. |
| What is needed for full compliance?<br><br>What steps are required and/or recommended? | Policies are already in place which address the need for Extended School Services. |
| | Continued documentation for the 2019-2020 school year should include determining eligibility for youth for 2020 summer services, timely submission to PRDE, and the provision of ESS services with proper verification by a qualified teacher. |

| Priority Next Steps | Continue the process begun during the 2018-2019 school year to identify, qualify, modify IEPS, and provide extended school year services for the coming year. |
|---|---|
| Quality Assurance Measures | Quality assurance measures should be established to ensure that such provisions are made in a timely manner, and that youth who are eligible received the service with a qualified teacher. |
| Sources of Information upon which Consultant report and compliance ratings are based | Documentation of files to examine whether IEPs of eligible youth were modified to include ESS. (The MIPE IEPs did not reflect all of the changes, but they were reviewed in hard copy format to verify)<br><br>Review of documentation provided designating the youth approved for ESS, review of schedule, and documentation that youth received the services.  A copy of the revised teacher contract for the needed dates was also reviewed on site. |

**S.A. 94.** Juveniles shall not be excluded from services to be provided pursuant to IEPs based on a propensity for violence or self-inflicted harm or based on vulnerability. Juveniles in isolation or other disciplinary settings have a right to special education. If required for institutional security, services provided pursuant to IEPs may be provided in settings other than a classroom.

| Compliance Rating | Partial Compliance |
|---|---|
| Description of Monitoring process during this period of time | The Monitor has reviewed and approved the final version of Policy 20.1 which requires NIJ to provide 6 fifty (50) minute classes daily to youth in transitional measures or protective custody unless they have already graduated.  A request that this be signed has been made to the Secretary's office.<br><br>The Monitor received documentation of education services regarding 3 youth who were in transitional measures or protective custody.<br><br>NIJ maintains a tracking for to document times when youth may be excluded from school as a result of administrative actions taken, incidents, or the unavailability of security staff within the school.  These incidents are reviewed by the Monitor quarterly.<br><br>The Monitor also toured the school facilities in both institutions to determine the availability of alternative school settings for the provision of educational services for those youth in TM or PC status, or who otherwise need separation. |
| Findings and Analysis | There are three sections to Paragraph 94 which must be monitored:<br><br>1)  Whether youth who have an IEP are excluded from services based upon a propensity for violence or self-inflected harm or based on vulnerability.<br><br>2)  Whether youth in "isolation or other disciplinary settings" are provided the right to special education services; and |

3)  Whether educational services provided pursuant to an IEP occurring in settings outside of the classroom are required for institutional security.

**Services to Youth in TM or PC Status**:

NIJ turned a corner during the second quarter in reaching compliance on this issue by changing Policy 20.1 to require educational services be provided to all youth in Transitional Measures or Protective Custody who have not already graduated.  The requirement is for 6 fifty (50) minute classes, the same afforded other students.  Compliance with this new policy positively impacts several provisions of the Consent Decree, including the educational requirements of Paragraphs 79 and 80, Paragraph 81, and Paragraph 86.  This policy must be signed by the Secretary.

Verification of school services provided is made through examination of each youth's education schedule, and examination of daily attendance records, signed by each teacher, and by the student.  For those dates when the youth did not receive a full school day, accompanying explanatory notes are examined.

Ten (10) PC and/or TM placements were low during the third quarter.  Three youth files were receives as described below. The three cases are consolidated here for convenience. The other 2 youth are entitled to this service pursuant to Paragraph 80 and/or 81)

1)  Youth A was in transitional measure and/or protective custody from the beginning of the school year on August 19th through September 4.  The student receives special education services. Of the 13 days where services were to be provided, on 8 of these dates, the youth received most of the services.  No teacher was available for science classes during that time, however.  On five days days, the youth mostly refused services throughout the day, although services appear to have been offered.

2)  Youth B is a youth in protective custody from the beginning of the school year through September 12.  He was in the 8th grade and a special education student.  Of the 14 days he was in this status, he received full school services only 1 days. On 3 other days, he receives between 1-3 classes.  The other day are noted as "refused services," "security situation," or "registry."  It is also noted that a science teacher was not available for the last week of the schedule

3)  Youth C is a Sumariado who has been in TM or PC for several months. He was in that status from the beginning of the school year on September 13 – September 23. Of the 7 dates eligible for school services, he received school services on three days for only 3 fifty (50) minutes each.  The other dates and times are marked "ruta"  which is not included in the codes or otherwise explained.

Efforts are being made to ensure that youth in transitional measures or protective custody are being provided full school services.  The Monitor recognizes that this is complicated by many factors. Continued work to ensure that adequate security is provided so that youth can receive services is necessary.  Staff should continue to

explore why some youth are refusing services and what incentives might be provided to encourage stronger participation.

No information was provided for one youth who was a special education student and in protective custody through September 9th.
.

**School exclusion for Other Youth**

A tracking form was developed and is being used to document when school services are not available as a result of register, incidents such as fights, lack of available security or other reasons not the fault of youth.  Four incidents were noted in September where all school services were cancelled for all or part of the day.  In two incidents, registration was being provided in the modules, and in two other instances, classes were cancelled as a result of tropical storm Karen.

 School exclusion as a result of security issues should be noted on this form.  In some instances, the youth in TM or PC status did not receive services as a result of a "security situation."  These are not defined.

For youth on group modified schedules, documentation should be provided if the schedule interferes with youth getting a full school day.

**Classroom and Education Staff**

In order to properly implement the new policy, NIJ must have sufficient educational staff to serve these youth, and the physical resources needed to conduct classes in a safe environment.  At Ponce, there are 2 rooms which have been set up for TM or PC youth which were operational - one in room by small recreation court, the other in Unit D. Two classrooms were also set up on unit for youth in detention to help with space issues in the regular classrooms. The units all have cells behind the control room, some of which are in the process of being converted for use for additional classrooms.  One is outside the PUERTAS Unit and has a cage around it with a lock.  One is set up for barbershop services which are brought in as needed for youth who receive this vocational service.

One new additional teacher was received last year during the final quarter to assist with youth in TM or PC status.  The staffing list does not designate whether that teacher remains in service. This will be verified during the 4th quarter.

| | |
|---|---|
| What is needed for full compliance?<br><br>What steps are required and/or recommended? | Compliance with the new policy will require that NIJ consistently provide full school days of 6 fifty minute classes in accordance with individual schedules for youth who are in TM and PC and who have not graduated from high school.<br><br>Coordination with security staff is essential to limit the disruption to the school schedule as best possible, and to ensure that youth receive the required services.  Continues |

| | documentation and analysis of days where youth do not receive services do to other reason is critical.<br><br>The use of alternative classrooms is a positive move, but should ensure that they include necessary personnel and resources to approximate as best possible the regular school setting |
|---|---|
| Priority Next Steps | Continue to track when youth are excluded from school due to violence or vulnerabilities, and ensure that appropriate security measures are in place which limit these instances.<br><br>Continue to use the tracking mechanism to ensure that if youth are removed from school as a result of behavior, self-harm or vulnerability, documentation is provided to indicate why such removal was necessary.<br><br>Documentation should be developed to indicate when alternative school settings are used and to justify the need for these alternative settings based upon institutional security issues<br><br>Ensure that each facility has at least two areas set up to provide alternative settings for youth in TM/PC measures, and that adequate teaching staff are available to ensure services for a full school day, and that such services are offered. |
| Quality Assurance Measures | No QA has been reviewed for this provision but the Monitor.  The Monitor expressed willingness to review a draft of QA Measures but has not received these. |
| Sources of Information upon which Consultant relied | Review of policies and procedures relative to education<br><br>Discussion with education staff<br><br>Review of tracking form regarding removals due to security or other instances.<br><br>Review of education records of three (3) youth in TM and PC status. |

| **S.A. 95.** When an IEP is ineffective, Defendants shall timely modify the IEP. | |
|---|---|
| **Compliance Rating** | **Partial Compliance** |
| Description of Monitoring process | See above for discussion of this section.  Fourth quarter monitoring efforts will include on-site file reviews and discussion of cases to determine whether this provision is compliant. |
| Findings and Analysis | See discussion above. |

| What is needed for full compliance?<br><br>What steps are required and/or recommended? | There are a number of indicators that a youth's IEP Is inappropriate or ineffective. Student goals and objective may be vague and unmeasurable.  The IEP may be inadequate to address identified deficits in the student's multi-faceted evaluation. Needed accommodations may be missing, or related services may not be included when necessary.  The needs of the youth may simply change based upon any variety of circumstances.<br><br>Good data must be kept on student goal achievement, and should reflect student progress for meeting IEP goals, and receiving academic benefit from instruction provided.  Student files reviewed indicated that reviews are completed every 10 weeks on students, and information on progress is sent to parents.  This practice, when done consistently, provides the youth and parents with good benchmarks for the year, but should also provide indicators for when IEPs may need to be modified.<br><br>Supervision of IEPs and data collection should provide indicators of whether such progress is being achieved with each student.  PRDE must have a system of providing oversight of special education teachers to monitor their development of IEPs, as well as progress and benchmarks achieved.<br><br>Full compliance with this provision is met when Paragraph 86 reaches full compliance |
|---|---|