## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

**THE UNITED STATES OF AMERICA**

      **Plaintiff,**

      **v.**                  **CIVIL ACTION NO. 94-2080 (GAG)**

**COMMONWEALTH OF PUERTO RICO**

      **Defendant,**
_____

## INFORMATIVE MOTION TO APPROVE MONITOR'S
## FOURTH QUARTERLY REPORT FOR 2019

    The Monitor hereby submits her Fourth Quarterly Report for 2019 covering the period of

October 1, 2019 – December 31, 2019 regarding compliance on the remaining issues in this case.

**Submitted by:**

**/s/Kim Tandy**
Kim Tandy, Federal Monitor
United States v. Commonwealth of Puerto Rico
SPEHCE, VIG Tower
1225 Avidena Ponce de Leon, Penthouse Floor, Office #7
San Juan, Puerto Rico   00907
kimtandy@justicebydesign.net
317-840-9332

**Certificate of Service**

I HEREBY CERTIFY that this, I electronically filed the foregoing with the Clerk of the Court on March 9, 2020 using the CM/ECF system, which will simultaneously serve notice of such filing to counsel of record to their registered electronic mail addresses.


Respectfully Submitted,
/s Kim Tandy_____
**Kim Tandy**
Federal Monitor, United States v. Commonwealth of Puerto Rico
SPEHCE, VIG Tower
1225 Avidena Ponce de Leon, Penthouse Floor, Office #7
San Juan, Puerto Rico   00907
kimtandy@justicebydesign.net
317-840-9332

# Commonwealth of Puerto

Civil Action No:  3:94 –cv-02080 (GAG)

## Monitor's Fourth Quarterly Report

## October 1 – December 31, 2019

Kim Tandy, Federal Monitor
USACPR Monitoring, Inc.
kimtandy@justicebydesign.net
317-840-9332

Monitoring Team:
David Bogard, MPA, JD
Javier Burgos, JD
Robert Dugan
Miriam Martinez, PhD
Curtiss Pulitzer, AIA

## EXECUTIVE SUMMARY

This report covers the October – December of 2019, a year which has been marked by the closure of Humacao, and challenged by budget, staffing and space limitations, as well as end of the year earthquakes. Through these challenges, NIJ staff have remained positive, and continued to work diligently with the Monitor and her team to achieve compliance with remaining areas of the Settlement Agreement.

At the end of 2019, a new Judge assumed responsibility for the oversight of this case, replacing Judge Carmen Cerezo, whose judicial oversight over 25 years saw innumerable improvements, facility closures, and the termination of much of the Settlement Agreement. Now under the supervision of Judge Gustavo Gelpi, Chief District Judge for the District Court in Puerto Rico, the Monitor and her team will continue to provide technical assistance, guidance and monitoring to assist the Commonwealth in their efforts to bring the remainder of the case into compliance.

Several challenges are evident in this Fourth Quarterly Report, and moving into 2020:

First, the Commonwealth's financial status in bankruptcy places the Department of Corrections and Rehabilitation's (DCR) budget under the scrutiny of the Fiscal Oversight and Management Board (FOMB). DCR has been operating with a deficit this fiscal year, which has a significant and direct correlation to non-compliance issues in this case. The Court has ordered DCR to separate out funds for juvenile facilities within its budget, and to protect funds for this purpose only. It is critical that the NIJ budget incorporate sufficient funds to make necessary equipment and capital improvements, as well as increasing the level of staffing.

Second, a plan for stabilizing staffing must remain the highest priority. DCR reported to the FOMB in December of 2019 that is intended to move 31 staff back into the two remaining facilities, and hold a new training academy early in 2020 to add 50 additional new officers. That plan must come to fruition in order to alleviate the current staffing crisis. Staffing shortages have contributed to multiple incidents of youth and staff harm, kept youth from attending scheduled educational programs and other activities, and led to alarmingly high incidents of double and sometimes triple shifts by officers.

Third, increased focus on youth (and staff) safety is critical. NIJ must address its staffing needs, but must also better assess other safety and security issues which have resulted in multiple youth being cut or otherwise assaulted, self-harming, or having access to drugs and other harmful contraband. Continued focus on providing a strong system of mental health is critical to this effort. The Monitoring team is working with NIJ to establish improved reporting of incidents, and establishing safety indicators which will be tracked and measured. Auditing security mechanisms is important to ensure equipment, policies, procedures and practices are adequate, and to identify areas where improvement is necessary.

Finally, NIJ needs to build internal capacity moving forward, including increased access to information technology, identifying and grooming staff to assume leadership positions, having increase control over its budget, and strengthening quality assurance systems. Compliance has historically been disrupted during elections years; determining ways to minimize this disruption before it occurs would be beneficial.

This report also highlights some of the year's successes, including five provisions which have reached substantial compliance status in the last year. These include two provisions involving the delivery of mental health services, and three provisions involving education, with other education provisions making continued progress. Consistency in leadership in both fields have helped to bring about these

positive changes.  Positive improvements have been made as well to reduce excessive use of force, limit isolation practices, and improve investigations of institutional abuse and neglect.  Staff training has been consistently good, and improvements continue to be made regarding necessary documentation and other accountability measures in that area. The move toward separating the NIJ budget, and the requirement of a protected budget to allow for compliance requirements, can ensure that compliance is not hampered by a lack of resources.  The Monitoring team looks forward to these areas continuing to progress in 2020.

The Monitor appreciates the efforts of her team, counsel for both parties, and the many NIJ staff with whom we work daily who strive to improve the lives of children in NIJ facilities.

A summary of compliance ratings for the remaining sections is found below.

| Parag. No. | Compliance Provision | 1st 2019 | 2nd 2019 | 3rd 2019 | 4th 2019 |
|---|---|---|---|---|---|
| Physical Plant | | | | | |
| S.A. 31 | Facilities conforming to Building Codes | PC | PC | PC | PC |
| C.O.  43 | Sufficient funding for Implementation of C.O. | PC | PC | PC | PC |
| S.A. 45 | Agency Policy and Procedure Manual for all operations | PC | PC | PC | PC |
| S.A. 50 | Training for current and new direct care staff | PC | PC | PC | PC |
| S.A. 48 | Sufficient Direct Care Staff | PC | NC | NC | NC |
| Jan 2009 Para. 1 | Reasonable Safety of Youth through Adequate Supervision | PC | NC | NC | NC |
| Parag 2 | Sufficient Staff to Implement Decree and adequate supervision | PC | NC | NC | NC |
| Parag 3 | Training for social workers if direct care staff | na | na | na | na |
| Parag 4 | Persons Hired to be Sufficiently Trained before deployed | SC | na | na | na |
| Parag 5 | Monthly submission of master roster | PC | PC | PC | PC |

| S.A. 52 | Classification | PC | NC | NC | PC |
|---------|----------------|-----|-----|-----|-----|
| S.A. 77 | Use of Force | PC | PC | PC | PC |
| S. A. 78 | Investigations into Alleged Abuse and Maltreatment of Youth | PC | PC | PC | PC |
| S.A. 79 | Restrictions on Isolation | PC | PC | PC | PC |
| S.A. 80 | Protective Custody | PC | PC | PC | PC |
| S.A. 59 | Treatment Plans for youth with Substance Abuse problems | PC | PC | PC | PC |
| C.O. 29 | Residential Mental Health Treatment Program | PC | PC | PC | PC |
| S.A. 36 | Continuous Psychiatric and Psychological services | PC | PC | PC | PC |
| S.A. 63 | Reducing Risk of Suicide | PC | PC | PC | PC |
| S.A. 72 | Emergency Psychotropic Medication | SC | SC | SC | SC |
| S.A. 73 | Behavior Modification/Treatment | SC | SC | SC | PC |
| S.A. 81 | Provision of Academic and Voc. Education to All Youth | PC | PC | PC | PC |
| S.A. 86a. | Compliance with IDEA Requirements and Timeframes | PC | PC | PC | PC |
| S.A. 86b. | Screening for youth with Disabilities (Child Find Provisions) | PC | SC | SC | SC |
| S.A. 87 | Obtaining IEPs of  Eligible Youth | PC | PC | PC | PC |
| S.A. 90 | Delivery of Specially Designed Instruction and Related Services | PC | PC | PC | PC |
| S. A. 91 | Qualified educational professionals and voc. Ed | PC | PC | PC | SC |
| S.A. 93 | Year Round Services for youth with IEPS | PC | SC | SC | SC |

| S.A. 94 | Services to youth in isolation or other disciplinary settings | PC | PC | PC | PC |
| S.A. 95 | Modification of IEPs | PC | PC | PC | PC |

## Compliance Ratings, Analysis and Recommendations

The Settlement Agreement requires that the Court retain jurisdiction of remaining claims "until such time as the Commonwealth has fully and faithfully implemented all requirements of the agreement and such full compliance has been maintained for one year." (S.A. 103).  The Monitor and Consultants use a three-tiered system in this report defined as follows:

**Substantial Compliance** shall mean a level of compliance that does not significantly deviate from the components of the provision, provided that any deviation poses no significant risk to detainee health or safety. Substantial Compliance indicates that there are approved relevant policies and procedures which, when implemented, are sufficient to achieve compliance; trained staff responsible for implementation; sufficient staff and resources to implement the required reform; and consistent implementation of the procedures during the majority of the monitoring period.  Substantial compliance also requires that the procedures accomplish the outcome envisioned by the provision.

The substantial compliance rating is given only when the required reforms address all of the issues discussed in the provision and when solid implementation of the reforms has been consistently demonstrated, through reliable data, observations and reports from staff and youth, for a majority of the monitoring period.

**Partial Compliance** indicates that compliance has been achieved on some of the components of this provision, but significant work remains. It indicates that there are approved relevant policies and procedures which, when implemented, are sufficient to achieve compliance; trained staff responsible for implementation; and sufficient staff and resources to implement the requirements of the provision. Partial compliance indicates that while progress has been made toward implementing the procedures described by policy, performance has been inconsistent throughout the monitoring period and additional modifications are needed to ensure that procedures are sufficiently comprehensive to translate policy into practice, and to accomplish the outcome envisioned by the provision.  Partial compliance is appropriate if policies may need minor revisions for compliance with the Settlement Agreement provided other requirements of this section are applicable.

**Non-compliance** indicates that most or all of the components of the provision have not yet been met. Examples include provisions where policies still need to be overhauled, the majority of staff may need to be trained, procedures may not have been developed, documentation may not be in place or consistently provided, and there has been no determination that the procedures accomplish the outcome envisioned by the provision.

## PHYSICAL PLANT - Curtiss Pulitzer

| S.A. 31 Existing facilities expected to be occupied by juveniles beyond Fiscal Year 1996-1997 shall conform to applicable federal, state, and/or local building codes. | |
| --- | --- |
| **Compliance  Rating** | **Partial Compliance** |
| Description of Monitoring process during this period of time | The Monitor's office continues to review the documents being developed by NIJ/DCR's consulting architect Javier Valentin relative to compliance with this provision. A complete draft of the 2010 ADA STANDARDS FOR ACCESSIBLE DESIGN compliance was received on January 20th, 2020. This report will be reviewed during the first quarter of 2020. A Fourth Quarter on-site visit was not made by the Consultant.<br><br>The Monitor's Consultant made his last site visit in September, 2019 to see the progress being made relative to the physical plant repairs at Ponce and Villalba and to conduct a Functional Team meeting with the relevant staff.  This was reported on in the Third Quarterly Report, and those findings are summarized below. |
| Findings and Analysis | Mr. Valentin, the architect performing the Code Analysis, last submitted a draft report of the Fire Safety Codes analysis on September 1st, which was reviewed by the Monitor's office and discussed during the functional team meeting in September. As there was no new report to review the team discussed Mr. Valentin's progress. Subsequent to our meeting Mr. Valentin reported that he had prepared a preliminary capital budget based on the NFPA findings and the ADA evaluation. He went on to state that the repair costs were primarily ADA related because of the bathroom work that needed to be done to provide ADA accessibility, lack of braille signage in all the facilities and the sidewalks leading out of exit doors which need to be constructed and/or repaired. The Consultant has requested to see these cost estimates but nothing has been received to date.<br><br>An inspection during the third quarter found that overall Villalba was in a very good state of repair. All the mold remediation within the living areas and roof repairs were completed and still in good repair. The Gym had a new floor and was in very good condition but there was still a small area of potential water penetration at the far end of the gym where the roof beam and wall meet, that still needed repair. No date has been provided for that repair as it was reported that funds are not available to do this. The air conditioning was in good repair and 23 out of 24 units in living areas were in working order. The air conditioning in the school area was all working. All plumbing and hot water in living areas were in good repair. The Consultant tested several of the electronic release of fire doors in the housing units and all were opened by mini-control in under 5 seconds. He reviewed the fire safety officer's life safety inspection reports and fire drill reports and all were in order. He was also told that workers were still finalizing the installation of the new camera system. |

There have been no repairs or painting at Ponce at the time of the site visit due to a reported lack of funds, although the facility did appear in generally good condition. The Consultant was shown the first room that was retrofitted with the door/hinge cover plate sample to prevent suicides from occurring by a juvenile potentially attaching a ligature to the hinges in juvenile room doors.  The air conditioning was generally in good repair and 21 out of 24 units in living areas were in working order with one unit operating at half capacity. The air conditioning in the school area was all working. All plumbing and hot water in living areas were in good repair and new shower curtains were installed for privacy in the bathroom areas. The Consultant noted that while the shower curtains were appropriate, the ones purchased may conflict with PREA requirements and may inhibit staff monitoring of the bathroom areas.

The gym at Ponce had a new floor and was in very good condition but there was still a small area of potential water penetration at the far end of the gym where the roof beam and wall meet, that still needed repair. No date has been provided for that repair. The Consultant tested several of the electronic release of fire doors in the housing units and all were opened by mini-control in under 5 seconds. He also reviewed the fire safety officer's life safety inspection reports and fire drill reports and all were in order.

The Consultant conducted a functional team meeting the day before the site visits with Javier Valentin, Luis Ortiz, Aida Burgos. During our meeting, he shared concerns that he had not received the ADA or the report on compliance with the International Building Code (IBC) and 2011 Puerto Rico Building Code. He discussed future deliverables and he stated at that time that he planned to have the ADA and IBC/PR Building Code compliance reports submitted to NIJ/DCR in early December for their review. Luis Ortiz mentioned that he was being asked to address some of the preliminary findings of Mr. Valentin has pointed out informally.  There is a formal process of documentation that first needs to occur with proper notifications to the Monitor's office. The Consultant requested a schedule of when these reports would be forthcoming and received a revised schedule in early November (see attached). The reports to be delivered in December were not sent as scheduled.

The Monitor's Consultant has also been monitoring the progress being made to comply with suicide prevention measures (See below and Para 79) in juvenile rooms, and continues to monitor fire safety conditions, plumbing and air conditioning to insure that all housing units are functional and safe for juveniles to occupy.

There has been positive movement in creating a solution in preventing suicides from occurring by a juvenile potentially attaching a ligature to the hinges in juvenile room doors. Rooms in the Puertas housing module were in the process of being retrofitted. This should meet the ¶79 suicide resistant requirements for any youth held in isolation. The Consultant was also told there was enough material on hand to make this retrofit in the Puertas housing unit plus two more units. It was reported that that there is no additional funding at this time to retrofit all the remaining rooms at Ponce and Villalba.

| | |
|---|---|
| | The replacement of air vent grilles with suicide resistant versions on the lower levels of the housing units at Ponce and Villalba has been completed as reported in the last quarterly report. During the site visit this quarter, the Monitor's Consultant once more expressed a concern that in some rooms there were still gaps at the edges of the new vent grills that might allow a juvenile to thread in a ligature. The Monitor's Consultant was told that the DCR brigades were starting to apply security caulking at the edges of the vent grills to prevent this from happening. In addition, this would prevent juveniles from sliding paper through these same gaps which impedes air conditioning air flow into the rooms. |
| What is needed for full compliance? What steps are required and/or recommended? | DCR must complete the remaining three reports satisfactorily to the Monitor's Consultant, along with cost estimates, and a schedule for completion which includes who will complete the work. The reports include a review facility compliance relative to the IBC and Puerto Rico Building Codes, the Americans with Disability Act, and the NFPA Life Safety Codes. |
| | DCR is currently under an Order from the Court to separate out NIJ's budget and designate the funds so that they cannot be used for other purposes.  Capital expenses and other repairs for compliance in these 3 areas must be included for 2020-2021 in order for work to be completed during the next fiscal year. |
| | Repairs identified last February, and reported to the Court, must be completed at Ponce. DCR must allocate the appropriate funding to get these completed. |
| | At the present time, Mr. Valentin is working on the IBC/Puerto Rico Building code report that will be part of the full final report. The Monitor's office received a draft of the second report on NFPA code compliance on September 1st. The Consultant shared his comments on the report with Mr. Valentin. According to his original schedule, a draft of the IBC and Puerto Rico building codes compliance report was to be delivered to the Monitor's office for review in late August. The November schedule had that report being sent to the Monitor's office on December 6th but it was not received during the Fourth Quarter for review. |
| | The primary document which serves as the basis of the building code analysis is the 2009 International Building Code (IBC) cross referenced with Amendments per Division II of the 2011 Puerto Rico Building Code. The codes also incorporate the relevant sections of the NFPA Life Safety Codes. In the Consultant's meetings with Mr. Valentin and the Functional Team we discussed edits to the last document received, which Mr. Valentin will incorporate into a Final Draft. |
| | In addition to the codes compliance report, Mr. Valentin has documented ADA compliance and violations at the two existing facilities in his latest report. The last step |

| | |
|---|---|
| | will be the report detailing with the recommendations as to what capital improvements will be needed to achieve full compliance with paragraph 31, and projected costs for each recommend remedy. As stated above a revised schedule was received by the Monitor's Consultant on 11/6/19 and was contained in the Third Quarterly Report, however those target dates are no longer valid and an updated schedule has been requested.<br><br>When the magnitude of compliance issues are fleshed out, a prioritization schedule will be developed along with potential timelines for compliance. Violations that affect Life Safety, and cannot be initially mitigated operationally, will have the highest priority for implementation. The financial resources available to DCR will become a key factor affecting a schedule for compliance at this juncture in the process. |
| Priority Next Steps | The Monitor and Consultant realize and appreciate that the earthquakes which have occurred in Puerto Rico in December, and carried on into January, have placed additional constraints on DCR staff to ensure that facilities are safe. This included engineering inspections of the juvenile facilities, as well as several adult facilities in the area.<br><br>Completion of the Life Safety report should be done immediately and submitted to the Consultant. Cost estimates for required changes must be provided in order for the NIJ designated budget to incorporate sufficient funding to make the needed repairs.<br><br>The Monitor's Consultant will review the ADA compliance report received in the first quarter of 2020 and schedule a review meeting with Mr. Valentin and DCR staff in the first quarter of 2020 so that it can be completed, and changes or repairs costed out and incorporated into the budget.<br><br>Complete the Final Draft of the  IBC/Puerto Rico Building Code Report during the first quarter of 2020  and subsequent reports on Findings and Recommendations  in the second quarter of 2020, with cost estimates incorporated into a separate designated budget for NIJ.<br><br>DCR is to continue retrofitting the door hinges in Ponce and in Villalba.  A schedule for work completion, and inclusion of estimated costs for completion must be included in NIJ's program budget for 2020-2021.<br><br>DCR must anticipate making  the needed repairs and changes, and having sufficient funding allocated to do so, during the 2020-2021 fiscal year, in order to complete the remaining requirements of this paragraph during that time.<br><br>The caulking of the air vent grills should be finished by the end of February 2020. |

| Quality Assurance Measures | The quality assurance measures are for the monitor's office to keep reviewing the documents developed by Mr. Valentin and touring the facilities with Mr. Valentin to view first hand where code and ADA violations may exist. This will occur once any violations are fully defined and documented. In addition, the Monitor's office are reviewing the spread sheets being developed by DCR to track facility repair issues including suicide mitigation efforts followed up by tours to determine compliance.. |
|---|---|
| Source of Information upon which Consultant report and compliance ratings are based | The documentation being developed by Mr. Valentin will be the primary source to determine the levels of compliance with the codes and regulations. The financial resources to rectify violations and achieve compliance will need to involve discussions with the Secretary of DCR as well as senior officials within DCR and the Commonwealth hierarchy responsible for funding the agency.<br>The spread sheets and photographs being submitted periodically by NIJ/DCR will help the Monitor's office to track facility repair issues. |

## POLICIES AND PROCEDURES, TRAINING AND RESOURCES – Kim Tandy

| S.A. 43 Until this order is fully implemented, Defendants shall submit to the Legislature of the Commonwealth each fiscal year a report wherein the required sums of money will be established so as to implement this Consent Order. | |
|---|---|
| **Compliance  Rating** | **Partial Compliance** |
| Description of Monitoring process during this period of time | During the Fourth Quarter, the Monitor worked with the Office of the Secretary for DCR, and staff for the Federal Oversight and Management Board with three primary objectives:<br><br>1) Reach agreement upon an appropriate number of staff for the remaining NIJ facilities, including adequate relief factor ratios, the number of active staff, the number of remaining positions which must be filed, and how those positions will be filed in a timely manner.<br><br>2) Provide information to the FOMB about the status of this case, the obstacles for reaching compliance, and the monitoring process; and<br><br>3) Create a workable plan to ensure that necessary financial and management resources are in place for the DCR to be able to comply with remaining provisions of the Settlement Agreement.<br><br>The Monitor met with FOMB staff assigned to DCR matters on December 3 to review the staffing projections they determined necessary.  It should be noted that FOMB staff also had several conversations with Bob Dugan, and with DCR leadership, to arrive at these projections this quarter. |

| | |
|---|---|
| | The Monitor also met with Secretary Eduardo Juanatay and relevant DCR staff regarding the agency's plan for meeting staffing requirements, as well as how it will address other fiscal needs for compliance.  Among the recommendations made by FOMB and the Monitor is the need to separate out the NIJ budget from DCR's overall budget, and ensure there are sufficient funds for compliance needs. |
| | The Monitor provided information to FOMB for a December 19th public hearing to better educate the FOMB Board about the needs of NIJ relative to reaching compliance in this case, including the need for a separate juvenile training academy. The Monitor reviewed the relevant parts of the December 19th hearing and accompanying written and oral presentation by the DCR. |
| Analysis and Findings | The costs associated with the operation of NIJ are inexplicably intertwined in DCR's overall budget. There is no separate budget set-aside for staffing and resources necessary for reaching compliance.  When resources are needed, NIJ compliance needs compete with every other need within DCR. |
| | Separating the NIJ budget from the overall DCR budget should be pursued, and has support from FOMB, the Monitor and the DCR Secretary.  DCR has indicated that this might not be technically possible for the upcoming year based upon OMB requirements, but that it is committed to an internal process to make this separation as best possible. An Order entered on December 19th by Judge Gelpi has mandated that the parties discuss a plan prior to the January 16th Status Conference for an adequately protected budget for this case, and "one in which funds are designated toward the present consent decree and not used toward any other purposes." (See Order, Doc. 1436) |
| | In addition to needed staffing resources, cost estimates for necessary building code violations should be completed to comply with Paragraph 31, as well as other repairs needed for full facility utilization, modification of door hinges to make them suicide resistant pursuant to Paragraph 79, and upgraded or new security equipment to improve safety and security of youth and staff, particularly in the detention of dangerous contraband.  Should DCR determine that contracting out for the placement of some youth is necessary, the cost of this contract should likewise be included in a separate budget. |
| | During the December 19 public hearing, counsel Arlene Perez presented the following numbers to reach an adequate inmate-staff ratio and necessary facility repairs and improvements:<br><br>• 81 new staff positions<br>  DCR intends to hire and train 50 Juvenile Officers for an estimated cost of 1.2 MM<br>  31 juvenile officer transfers<br>• 0.7 MM in repairs in different stages of completion at Villalba (completed) and Ponce (in progress) |

| | |
|---|---|
| | • Total of 1.5 MM in capital improvements to both facilities in CapEx Program<br>• Approximately $3.9 MM between recurring and non-recurring expenses needs to be assigned toward upgrade<br><br>More detail is needed to determine the nature of these expenditures and whether they address issues raised throughout this report to address compliance. |
| What is needed for full compliance?<br><br>What steps are required and/or recommended? | DCR must ensure that its budget addresses adequate staffing, training, resources and physical plant requirements to fully comply with the provisions of the Consent Order and Settlement Agreement. Whether this can be done within the confines of its current budget or needs additional supplemental funds from FOMB, is for the Commonwealth to determine, and FOMB to approve.<br><br>DCR must first be able to determine accurate expenditures and resources used by NIJ. Second, DCR must be able to project the necessary costs for compliance with remaining provisions in its existing facilities, and/or other contract which may externalize some services.  Third, DCR must work with FOMB to determine where such funds can be taken, or if supplemental amounts are needed.  Separating out the NIJ budget to ensure funds for compliance are readily available as necessary to reach compliance has been a recommendation of the Monitor.<br><br>If the population can be further downsized, with more youth remaining in their own communities, or being returned sooner, the budget projections will likely be different. The Monitor strongly suggests a leadership group be formed to create this vision, and to utilize outside consultants to assist with this. |
| Priority Next Steps | In order to comply with the Court's December 16, 2019 Order, DCR must work with to separate out a program budget for NIJ.   Since this budget cannot be used for other purposes, it is important that it reflect accurate expenditures, and remove positions currently assigned to other facilities, including those stationed at closed facilities, adult facilities, or elsewhere within DCR. The budget must also contain funds for capital expenditures to comply with Paragraph 31 and complete necessary work on Ponce.<br><br>DCR must continue its effort to work with FOMB staff and the Office of the Monitor to determine how the additional necessary staffing positions and other identified costs will be secured within the existing budget.<br><br>It is encouraging that this issue is finally being addressed at the highest levels within DCR and FOMB to establish a process to resolve issues related to resources.  This continued effort is critical to bring the remaining claims into compliance.  The efforts being made by DCR leadership, FOMB and others should continue as a new fiscal budget process begins for 2020. |
| Sources of Information upon | Department of Corrections and Rehabilitation ("DCR") and Correctional Health Program ("CHP"), Presentation to the Fiscal Oversight and Management Board (Dec. 19, 2019) |

| which Consultant report and compliance ratings | Meeting and calls with FOMB staff<br><br>Meeting with DCR staff |
|---|---|

| **S.A. 45**  Within one year of the approval of the agreement by the Court, Defendants agree to provide an agency policy and procedure manual governing all operational aspects of the institutions.  Within eighteen months of the approval of this agreement, Defendants shall further insure that the facilities are strictly operated within these policies and procedures and that all staff have been trained accordingly. | |

| **Compliance  Rating** | **Partial Compliance** |
|---|---|
| Description of Monitoring process during this period of time | The Monitor has copies of existing policies and procedures in most of the remaining areas of the Settlement Agreement and Consent Order.  The four remaining policies which must still be approved are for S.A. 43, S.A. 52, and several provisions related to education covered in Policies 20.1 and 20.2.<br><br>During her meeting with Education staff, the Monitor again asked for a signed copy of Policy 20.1 through the Secretary's office.  The Monitor also requested and received a copy of the second round of revisions made to Policy 20.2 by the Department of Education and NIJ. |
| Findings and Analysis | The following policies and procedures have not been finalized and approved through the Office of the Monitor: |

| S.A. 52 Classification | Not complete | Bob Dugan provided recommendations on July 18, 2018 to bring the existing policies into compliance. Necessary changes must include annual review of the validation of objective methods of classification instruments and processes.  Good progress has been made during the 4th quarter, but a final copy must be signed. |
|---|---|---|
| S. A. 79 Isolation | Not complete | Policies 17.19 and 17.20 must be revised after agreement is reached regarding a working definition of what is and what is not isolation. |
| S. A. 81 General and Vocational Education | Completed not signed | Policy 20.1 has been amended to indicate that youth still enrolled in school and who are in TM/PC status receive a full school day.  This policy has been pending a signature by the Secretary for since the summer months. |
| S.A 86, 91, 94 | Not complete | A second draft of Policy 20.2 was provided to the Monitor for review in December of 2019 |

| | | and returned with comments. It has not been signed. |
|---|---|---|
| | Further discussion about policies and procedures are noted in other sections of this report as relevant in the sections noted above. | |

| What is needed for full compliance?<br><br>What steps are required and/or recommended? | Approved policies and procedures should remain a priority in any area where the Monitor's office has not yet approved of changes, and where policies do not adequately reflect the requirements of the Settlement Agreement and/or Consent Order.<br><br>Policy 20.1 as amended requires a signature by the Secretary.  The policy was submitted to the Secretary in July of 2019. Policy 20.2 must be amended to include procedural safeguards required under the IDEIA.<br><br>Changes to the Classification Policy must be made according to recommendations by Bob Dugan in order to be found in compliance. Outstanding policy issues and a timeframe should be established for completion of any needed changes.<br><br>The parties should agree upon a definition of isolation to be included in the policies on transitional measures or elsewhere, and determine what does and does not trigger the provisions of Paragraph 79.  The Monitor requests that this be completed by the end of 2019. |
|---|---|
| Priority Next Steps | Policy 20.1 has been waiting approval by the Secretary's office since July of 2019. Counsel should immediately seek this approval or determine what additional changes need to be made in order for the approval to be granted.<br><br>DCR and/or DOE should forward changes to Policy 20.2 immediate to the Monitor for review of the sections on due process protections and other changes made. Changes should be completed during the Fourth Quarter, if any, and approval by the Secretary sought.<br><br>DCR must address the needed changes to policies as recommended by Bob Dugan relative to classification.<br><br>The Monitor will continue to work with the parties to agree on a definition of isolation relative to paragraph 79, and any changes required in the policies on transitional measures, protective custody, and/or group schedule modifications in order to meet this definition.  Monitoring in 2020 will be done in accordance with how isolation is defined by this process, and whether actions taken comport with this definition. |
| Quality Assurance Measures | NIJ staff, under the leadership of Kelvin Merced, have been working on a set of policies regarding Quality Assurance which are under review by Bob Dugan. |

**S.A. 50.** Defendants shall ensure that current and new facility direct care staff are sufficiently well-trained to implement the terms of this agreement. Each direct care staff, whether current or new, shall receive at least forty (40) hours of training per year by qualified personnel to include, but not be limited to, the following areas: CPR (cardiopulmonary resuscitation); recognition of and interaction with suicidal and/or self-mutilating juveniles; recognition of the symptoms of drug withdrawal; administering medicine; recognizing the side-effects of medications commonly administered at the facility; HIV related issues; use-of-force regulations; strategies to manage juveniles' inappropriate conduct; counseling techniques and communication skills; use of positive reinforcement and praise; and fire prevention and emergency procedures, including the fire evacuation plan, the use of keys, and the use of fire extinguishers.

| Compliance Rating | Partial Compliance |
|---|---|
| Methodology for Monitoring this Quarter | A site visit was conducted during the week of December 3-6, 2019 and a meeting with Aida Burgos, Human Resource Director, and Kelvin Merced was held to discuss training compliance and documentation during this time. The Monitor learned at that time that Aida Burgos, Human Resource Director, has been now assigned to work on training for all of DCR.  It was also learned that Kelvin Merced has been assigned to also oversee the new training academies for DCR for adults. |

During the December 6th meeting, the Monitor and Compliance staff reaffirmed the required metrics for compliance with paragraph 50.  It was agreed that five areas would be tracked for compliance, and that these provisions should also be part of quality assurance measures:

1)  Required topics for training are scheduled and available with such frequency that all staff can attend as required.

2)  Training must be completed by qualified trainers with relevant, accurate and helpful materials and content as indicated by pre/post tests and evaluation of training sessions.

3)  Training completion by topic will meet targeted goals by topic (as noted below).

4)  Ongoing training needs will be assessed on an annual basis or more frequently if appropriate.

5)  Necessary revisions to training based on changes in policies and procedures will be made within a targeted time, with full implementation within 12 months.

The last annual report with data for compliance covered the period of January 1, 2018 – June 30, 2019.  The content must be based upon the five items listed above and provide sufficient documentation that each of the metrics have been achieved with sufficient back up documentation and analysis where required.

| | |
|---|---|
| | The Monitor received a copy of the training schedule for 2019-2020 and has reviewed the training dates scheduled for October – December. |
| Findings and Analysis regarding compliance. | NIJ Policy 4 on training was approved previously.  On March 11, IDECARH was provided with a support staff who has been able to afford much needed clerical and administrative support. However, resources have created compliance issues previously, and the assignment of Aida Burgos to broader training responsibilities within DCR is worrisome. |

The last Annual Report completed on October 8, 2019 covers the period of January 1, 2018 through June 30, 2019 relative to training activities. During that time, NIJ data indicates that the facilities met or exceeded all benchmarks established for meeting compliance with the exception of Use of Force training at Ponce.  The Monitor did not receive a corrective action plan or verification that such was initiated.

| Topic | Ponce | Villalba | Other |
|---|---|---|---|
| Emergency Key Control (only 1 of 270 did not complete) | 100% | 100% | 94% |
| CPR/AED/First Aid (6 hours) | 96% | 96% | 89% |
| Management of Alleged Maltreatment and Institutional Negligence (4 hours) | 97% | 97% | 95% |
| Youth Suicide Prevention (3 hours) | 97% | 97% | 95% |
| Behavior Modification Program (4 hours) | 99% | 96% | 95% |
| Life Security NIJ (6 hours) | 77% | 99% | 100% |
| Rules and Procedures Regarding Use of Force (3 hours)* | 97% | 100% | 100% |
| Youth Rights and Application of Duties (4 hours) | 98% | 94% | 100% |

Back up documentation was received verifying pre and post test results and the evaluations of training for portions of that 18 month period during the fourth quarter, including January – December of 2018. Documentation was also received for 2018 for all scheduled trainings, the number of individuals certified, and any cancellations noted. (This included numerous cancellations necessary as a result of the storms during the last quarter of 2018).  The next six month report, documenting the last 6 months of 2018 and all of 2019, should be received during the first quarter of 2020.

Training scheduled during the Fourth Quarter of 2019 included:

| Topic | # sessions scheduled |
|---|---|
| Emergency Key Control and Life Safety (6) | 7 |
| CPR/AED/First Aid (6 hours) | 0 |
| Management of Alleged Maltreatment and Institutional Negligence (4 hours) | 6 |
| Youth Suicide Prevention (3 hours) | 6 |
| Behavior Modification Program (4 hours) | 6 |
| Life Security NIJ (6 hours) | 6 |
| Rules and Procedures Regarding Use of Force (3 hours)* Chemical Restraints, Mechanical Restraints, and Grip and Control Techniques | 5-7 sessions of each |
| Prison Rape Elimination Act (PREA) | 6 |
| Validation of Youth Rights (4 hours) | 6 |
| Writing of incident reports (6 hours) | 7 |
| Use of Transitional Measures and Protective Custody | 6 |

It was helpful to see that training was provided this quarter in areas such as PREA, writing incident reports, and use of transitional measures and protective custody. These are areas where issues have arisen in OISC reports, or areas where the Monitor has raised questions about procedures, such as incident reporting. Information on whether changes in policies have occurred in any of these areas which were included in the training are important for the Office of the Monitor to know.

The Monitor has not received an annual assessment of training needs, and documentation of necessary or recommended changes to the training curricula.

NIJ has begun to train staff relative to identifying and effectively dealing with youth with trauma exposure. While not among the required topics within the Settlement Agreement, this is an important training topic which can be a building block for developing a system of trauma informed care.

| What is needed to reach full and | **Agreed upon metrics for reaching compliance are as follows:** |

| faithful compliance? | 1)  Training sessions in all SA 50 categories must be planned and provided throughout the coming year with sufficient frequency to allow for ready access by participants in the remaining two facilities.  A training calendar must be prepared in advance. |
|---|---|
| | 2)  Training completion by active direct care staff must reach the targeted benchmarks by topic over an 18 month period, and corrective action plans for facilities not achieving those benchmarks must ensure that the remaining staff complete training within 180 days.  This includes: |
| | <ul><li>Training on the use of chemical agents must be completed at the 100% rate, but only for those who are authorized and certified to use OC spray.</li><li>CPR training and certifications must be completed every 2 years at the 90% level for those direct care staff.</li><li>Training on suicide prevention must be completed at the 90% rate for all direct care staff.</li><li>Facility directors must ensure that all other required trainings for this provision meet at least 85% completion rate within the 18 months.</li></ul> |
| | 3) Pre and post must be used to evaluate participants' increase in knowledge and skills achieved by the training. Staff must pass such tests with a 70% or higher grade |
| | 4)  Evaluation of training modules and delivery must be sought by participants and through QA to ensure trainers are knowledgeable and skilled both in content and delivery to adult learners, materials are understandable and adequately cover the topic, and that content is relevant, current and accurate. |
| | 5)  Ongoing training needs will be assessed at least on an annual basis or more frequently if needed to determine if modifications are necessary. Written documentation is required to show that such reviews have taken place and what changes if any have been made as a result. |
| | 6)   Necessary revisions to training based on changes in policies and procedures will be made within a targeted time, with full implementation within 12 months.  Written documentation is required to show that such changes have been made and implementation scheduled and completed. It is important that such changes be coordinated with UEMNI and OISC and include recommendations based upon investigation findings and results. |
| | Appropriate staffing support must be in place to the Director of Human Resources and IDECAHR to facilitate report preparation and compliance evidence.  The Monitor is concerned that the expansion of the Director's responsibilities to include training for all of DCR will stretch thin the current staffing configuration. |
| Priority Next Steps | Documentation from IDECARH which supports compliance with the above metrics will determine if compliance has been achieved, and the point at which compliance was or |

| | |
|---|---|
| | will be achieved in order to show full and faithful implementation of this provision over an 18 month period. |
| | The 18 month report covering the period of July 2018 – December of 2019 should be provided during the first quarter of 2020.  It should include detailed information on compliance with all 6 metrics listed above. |
| | IDECARH must provide backup documentation for 2019 regarding training records, evaluations, and pre/post testing. |
| Basis for findings and recommendations | The findings and recommendations are based upon the annual report submitted, and discussion with the Human Resource Specialist, as well as documentation provided of monthly training. |
| | Back up files for training evaluations by participants, and pre-post test results for trainings were also received for all of 2018. |
| | Training curriculum regarding trauma exposure and identification was received and reviewed. |

## PROTECTION FROM HARM – STAFFING  (Bob Dugan)

**S.A. 48.** Defendants shall ensure that the facilities have sufficient direct care staff to implement all terms of this agreement. Direct care staff supervise and participate in recreational, leisure and treatment activities with the juveniles. Compliance can be demonstrated in either of two ways.

48.a Method one: Defendants may provide documentation of consistent supervision by not less than one (1) direct care worker to eight (8) juveniles during day and evening shifts and not less than one (1) direct care worker to sixteen (16) juveniles during normal sleeping hours.

*48.b Method Two: Defendants may develop, and submit to the court for approval, an alternate staffing roster for any facility in this case. The roster shall be based on a study that shall specify fixed posts and the assignment necessary to implement the terms of this agreement, taking into consideration the physical configuration and function of spaces, the classification and risk profiles of youths involved, the incident patterns in the settings involved, the routine availability in the settings of other categories of staff, and the overall number of direct care positions necessary to consistently achieve the coverage proposed. Once a plan is approved for a facility, defendants shall document the employment of the necessary overall numbers of direct care staff, and the ongoing deployment of such staff in accordance with the plan."*

*The Commonwealth has the choice to demonstrate compliance according to method 48.a or 48.b. They have informed the Monitor that they do not intend to select method 48.b and that their legal position is that this language should be struck from the Settlement Agreement as superfluous.*

| **Compliance Ratings** | Non-Compliance |
|---|---|

| | |
|---|---|
| Description of Monitoring process during this period of time | S.A. 48 Staff Youth Ratio monitoring compliance is analyzed on a quarterly basis using DCR facility generated weekly staff youth ratio forms as well as the weekly Form DCR -DCR -0144. These forms are submitted to the Monitor's Consultant throughout the reporting quarter. DCR facilities daily shift by shift staffing and youth population for each operational housing module is reported, as well as any 1:1 supervision events, and the volume of staff that are required to work a double shift. Commencing with the fourth quarter, DCR provided specific information of the names of staff who were working double shifts, the shift and location. The compliance report provides information from Staff Youth Ratio forms that were provided to the Monitor's Consultant for the period September 29, 2019 through December 28, 2019.<br><br>The Monitor's staff conducted site visits on December 10, 2019 to CDTS Ponce and December 11, 2019 to CDTS Villalba. Observation and documentation of housing module staff youth ratios is conducted on each visit. |
| Findings and Analysis | **Compliance Status:**  For the 2019 fourth quarter, S.A. 48a is found to be in non-compliance, with these findings:<br><br>• There are not sufficient staff and resources assigned to CDTS Ponce and CDTS Villalba to implement the requirements of the provision.<br>• An extraordinary volume and rate of staff youth ratio events continues to be dangerously dependent on double shifting.<br>• The percentage of shifts (41%) covered by staff doing double shifts continues to increase.<br>• The closure of CD Humacao and transfer of youth to CDTS Ponce and CDTS Villalba had no positive impact in meeting the minimum required staff youth ratios, absent double shifting.<br>• The volume of non-compliant minimum required staff youth ratio events and double shifting are occurring disproportionately on Saturdays and Sundays and on the 2:00 PM – 10:00P PM shifts.<br>• The volume of serious youth violence, assaults, cutting events reflects institutional environments that are intermittently chaotic and not safe for youth or staff.<br>• For the 2019 fourth quarter, the Monitor's Consultant finds non-compliance with meeting the minimum staff youth ratios and the extraordinary reliance on double shifts, significantly jeopardizes youth safety and protection from harm.<br><br>**Analysis:**<br><br>DCR submitted a total of 26 facility staff youth ratio forms for the two facilities requiring staff youth ratios, allowing for 100% of the staff youth ratio forms being available for analysis. DCR has consistently provided all requested Staff Youth Ratio forms used for monitoring and reporting.<br><br>The chart and table below represent staff youth ratio performance by shift for the period (September 29, 2019 through December 28, 2019). |



| | CTS Ponce | CTS Villalba |
|---|---|---|
| Met Staff Youth Ratio Average:    All Shifts | 99% | 91% |
| Met Staff Youth Ratio 2:00- 10:00 Events | 100% | 94% |
| Met Staff Youth Ratio 6:00 - 2:00 Events | 99% | 87% |
| Met Staff Youth Ratio 10:00 - 6:00 Events | 100% | 100% |

The following chart and table below represents the DCR agency Staff Youth Ratio averages by shift for 2018 through December 28, 2019:



| | 6:00am- 2:00pm | 2:00pm- 10:00pm | 10:00pm- 6:00am |
|---|---|---|---|
| 4th Quarter 2019 | 93% | 97% | 100% |
| 3rd Quarter 2019 | 96% | 97% | 100% |
| 2nd Quarter 2019 | 97% | 99% | 100% |
| 1st Quarter 2019 | 94% | 96% | 100% |
| 4th Quarter 2018 | 96% | 97% | 100% |
| 3rd Quarter 2018 | 99.9% | 99.7% | 100% |
| 2nd Quarter 2018 | 99.4% | 100.0% | 100% |
| 1st Quarter 2018 | 95.0% | 96.0% | 100% |

**Waking Hours Youth Ratio Events:**

CDTS Ponce reported meeting the minimum required staff youth ratio in 99% of the waking hour staffing events, resulting in meeting the staff youth ratio in 1452 of 1461.

PUERTAS, housed in one of the housing modules within CDTS Ponce, met the minimum required staff youth ratios for all shifts throughout of the 2019 fourth quarter reporting period.

CDTS Villalba reported meeting the minimum required staff youth ratio in 91% of the waking hour staffing events, meeting the staff youth ratio in 1329 of 1467 events. This is a reduction of 7%, 104 events less, than the third quarter, 98%.

The DCR 2019 fourth quarter performance in meeting Staff Youth Ratios is as follows:

- 6:00 am – 2:00 pm shift:  93% of events, a 3% decrease from the third quarter of 2019 (96%)
- 2:00 pm – 10:00 pm shift:  97% of events, a 0% change from the third quarter of 2019 (97%)
- 10:00 pm – 6:00 am shift:  100% of events, a 0% change from the third quarter of 2019 (100%)

Of the 2928 waking hour supervision events (6:00 – 2:00 and 2:00 – 10:00 shifts) 2781 of the events (95%) met the minimum shift staff youth ratio requirements. The DCR 2019 fourth quarter Staff Youth Ratios compliance performance during waking hours reflects a 2% decrease in staff youth ratio compliance compared to the third quarter reporting period.

**Staff Double Shifts:**

For the 2019 fourth quarter, 1813 (41%) of the 4390 staff youth ratio events were covered by staff working a double shift**.** This is 1% increase of shifts requiring staff to work a double shift compared to the third quarter 2019 reporting period, an increase of 44 additional staffing events.

| DCR Staff Youth Ratio Events and Double Shifts: Fourth Quarter 2019 | Volume of Staff Youth Ratio Supervision Events | Volume of Shifts Meeting Staff Youth Ratio | Waking Hour Supervision Events | Met Minimum Staff Youth Ratio During Waking Hour Supervision Events | Volume of Shifts Covered by Staff Working a Double Shift | Percentage of Shifts Covered by Staff Working Double Shift | Waking Hour Double Shifts | Percentage of Waking Hour Shifts Covered with Double Shifts |
|---|---|---|---|---|---|---|---|---|
| CTS Ponce | 2190 | 2181 | 1461 | 1452 | 876 | 40% | 632 | 72% |
| CTS Villalba | 2200 | 2062 | 1467 | 1329 | 937 | 43% | 639 | 68% |
| DCR Fourth Quarter 2019 Staff Youth Ratio: All Shifts | 4390 | 4243 | 2928 | 2781 | 1813 | 41% | 1271 | 70% |

CDTS Ponce decreased percentage of shifts covered by staff working a double shift to 40% (876 events),  -2% decrease from the previous quarter.

CDTS Villalba increased percentage of shifts covered by staff working a double shift to 43% (937 events),  +5% increase from the previous quarter.

A closer review identifies staff working double shifts occurred disproportionately on weekends and occurring on the first and second shifts.  Although there was a decrease in the volume of non-compliant staff youth ratio events (67), from the third quarter

(102), 46% of the events occurred on weekends. Additionally, overall 46% of the double shifts occurred on the 2:00 PM 10:00 PM shifts.

| DCR Facility Fourth Quarter 2019 | Volume of Non-Compliant Staffing Ratios | Volume of Non-Compliant Staffing Ratios on Weekends | Percentage of Non- Compliant Staffing Ratios on Weekends | Volume of Double Shifts | Volume of Double Shifts on Weekends | Percentage of Double Shifts on Weekends |
|---|---|---|---|---|---|---|
| CTS Ponce | 9 | 6 | 67% | 876 | 368 | 42% |
| CTS Villalba | 138 | 61 | 44% | 937 | 402 | 43% |
| DCR Totals | 147 | 67 | 46% | 1813 | 770 | 42% |

The table below displays the last four quarters of staffing events, double shift staffing events, percentage of double shift staffing events and total number of operational facilities for the quarter.

| Staff Double Shifts and Staffing Events | First Quarter 2019 | Second Quarter 2019 | Third Quarter 2019 | Fourth Quarter 2019 |
|---|---|---|---|---|
| Volume of Double Shifts | 812 | 1188 | 1769 | 1813 |
| Volume of Staffing Events | 4343 | 4396 | 4380 | 4390 |
| Percentage of Double Shift Staffing Events | 18.7% | 27.0% | 40.4% | 41.3% |
| Number of Facilities | 2 | 2 | 2 | 2 |

The 1813 volume of double shift events represents that largest volume of double shifts in a single quarter over the last three years.

Implications of a large volume of double shifting are deterioration in staff productivity, reducing the ability for staff to be actively engaged in the supervision, as well as having a negative impact on staff morale and well-being. The outcome of double shifting can lead to fatigued direct care staff, a level of inattentiveness on the part of staff that may result in a failure to provide active behavior management. The failure to provide active behavior management can negatively impact youth safety and potentially contribute to staff negligence in providing effective, safe and secure supervision of youth. Double shifting often leads to staff calling in sick to avoid being required to double shift after their regularly scheduled shift. All of the aforementioned are outcomes of a significant dependence on double shifts to provide minimum staff youth ratios.

There are no prohibitions nor restrictions in S. A. 48 on the use of double shifts to meet the requirements of minimum required direct care staff youth ratios. Although undesirable from an operational, staff morale, effective behavior management and budgetary perspective, it does not impact analysis of whether the minimum required staff youth ratios are being met. Extraordinary reliance on double shifting reflects that DCR is significantly understaffed to meet the requirements of S. A. 48.

Double shifting is a critical contributing factor that has jeopardized the agency's capacity to provide effective staffing to provide adequate supervision and to assure youth safety and protection from harm.

On the weekly staff youth ratio reports completed by each facility, DCR requires documentation of the volume of double shifts used for each day for each shift. By Policy 9.20, Supervisors IV and III are required to assign officers to housing modules to meet the minimum required staff youth ratio based on the module youth population.

During the 2019 fourth quarter, at the request of the Monitor's Consultant, DCR provided information about which staff were assigned to double shifts for each shift and each day and the location of the double shift assignment.



CDTS Ponce:
Volume of Staff and Volume of Double Shifts
Fourth Quarter 2019

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CDTS Ponce: Number of Staff Double Shifting | 1 | 2 | 3 | 6 | 3 | 3 | 3 | 6 | 3 | 8 | 2 | 5 | 4 | 5 | 11 | 4 | 9 | 10 | 13 | 6 |
| Volume of Double Shifts in 4th Quarter 2019 | 23 | 22 | 19 | 17 | 16 | 15 | 14 | 13 | 12 | 11 | 10 | 9 | 8 | 7 | 6 | 5 | 4 | 3 | 2 | 1 |

■ Volume of Double Shifts in 4th Quarter 2019   ■ CDTS Ponce: Number of Staff Double Shifting

For the fourth quarter of 2019, CDTS Ponce had a total of 876 double shifts, provided by 107 staff. The double shift profile range was as follows: one staff worked 23 double shifts; 11 staff worked 6 double shifts; 6 staff worked 1 double shift.



For the fourth quarter of 2019, CDTS Villalba had a total of 937 double shifts, provided by 110 staff. The double shift profile range was as follows: two staff worked 21 double shifts; 13 staff worked 6 double shifts; 10 staff worked 1 double shift.

As illustrated in the table above the volume of double shifting being used to provide the minimally required staff youth ratio continues to grow at an unsustainable rate, jeopardizing youth safety, staff capacity to provide effective behavior management and staff well-being.

Compounding the extreme level of double shifting is the vacant positions during the fourth quarter at both facilities:

- At CDTS Ponce there are eight of ten filled Shift Supervisor positions, with two Supervisor IV vacancies.
- At CDTS Villalba there are eight of ten filled Shift Supervisor positions, with two Supervisor IV vacancies.

The volume of unfilled shift supervisor positions, aside from requiring excessive double shifts, creates a supervision void that is unacceptable for any expectation of successful operations, short of crisis management.

The volume of supervisor vacancies and corresponding requirement for supervisors to do multiple double shifts creates an unrealistic expectation for effective supervision, decision-making and coaching. This situation is compounded in that the two facilities operate on a shift model, which provides intermittent supervisory presence as shift supervisors make their required rounds in housing modules and throughout the facility, assuming that a more serious facility issue has not prevented timely rounds. Officers and

|  | supervisors are double shifting at an extraordinary rate, significantly decreasing their capacity to assure youth safety, security and well-being.

For the 2019 fourth quarter, DCR has not demonstrated sustainable performance compliance in meeting the minimum required staff youth ratios without a continually increasing and extensive dependence of double shifting. For the fourth quarter of 2019, DCR has not been able to sustain meeting the minimum required staff youth ratio for 100% of the staffing events, even while remaining operationally dependent on double shifting at a rate of 41%.

**DCR Presentation to the Fiscal Oversight and Management Board:**

As of December 19, 2019, DCR made a presentation to the Fiscal Oversight and Management Board (FOMB) outlining the DCR adult and juvenile program budget, programming and staffing issues. Specifically, for the DCR juvenile facilities, DCR identified that they needed the following (from Slide 21 of DCR FOMB presentation):

   – 81 new staff positions
       • DCR intends to hire and train 50 Juvenile Officers for an estimated cost of $1.2 MM
       • 31 Juvenile Officer transfers

At the time of the development of the fourth quarter report, DCR was not able to identify when a juvenile training academy would begin nor a manner in which DCR would affect transfer of 31 juvenile officers from other DCR programs. No date has been provided for the transfer of 31 juvenile officers.

The Monitor and Monitor's Consultant has discussed with FOMB representatives and DCR, the number of necessary supervisors and officers necessary to fill posts, including an adequate relief factor.  That number, 81, coincides with the representations made by DCR to the FOMB during its December 19th public hearing. |
|---|---|
| What is needed for full compliance? What steps are required and/or recommended? | DCR needs to assign an adequate volume of officers to CDTS Ponce and CDTS Villalba to ensure the facilities have sufficient direct care staff to implement all terms of this agreement, and reduce unsustainable reliance on double shifting.

DCR needs to meet procedural compliance not only with S.A. 48, but also their own Policy 9.20. Compliance requires significant improvement in meeting minimum required staff youth ratios with a significant reduction and minimum dependence on double shifting.

Additionally, procedural compliance with DCR-DCR Policy 9.20 requires meeting minimum required staff youth ratios as well as corrective action when ratios are not met for any given supervision event on any shift. |
| Priority Next Steps | Priority next steps required to find compliance for S.A. 48a are the following:
    • Address the requirement for procedural compliance with staffing Policy 9.20, as well as any required 1:1 staff or special population youth supervision events. |

|  | • Address the inability to provide the necessary staff to maintain youth in the least restrictive placement possible, assuring protection from harm. |
|---|---|
|  | • Provide the Monitor's Consultant with electronic versions of each facilities active monthly/ cycle Master Roster. |
|  | • DCR needs to implement independent quality assurance assessment of procedural compliance as required by Policy 9.20, generating reports for both internal use and submission to the Monitor's Office. |
|  | • On August 26, 2019 the Parties reached an agreement, filed with the Court, to address immediate safety issues, including improvement in reporting information to the Monitor and Monitor's Team as well as a plan with specific elements to address immediate staffing issues. With crucial timeframes having passed without compliance to the terms, the Parties are now meeting to update that Agreement and submit it to the Monitor and to the Court. |
|  | • At the close of the fourth quarter, the Monitor continued to work with DCR to identify the necessary steps to resolve the staffing crisis with the deployment of additional officers to both facilities. A detailed, executable plan is necessary that addresses the following issues: |
|  |     o the details regarding the request for approval of officers and supervisors for both facilities, responses to such request, and if approved, how such officers and supervisors will be secured, trained and deployed, and the time frame for doing so. |
|  |     o If it is necessary for new officers to be recruited and trained, the time frame for recruitment, training and placement should be provided. |
|  |     o The plan should also indicate how the Commonwealth will reduce its reliance upon double shifting to meet the minimum required staff/youth ratio, and indicate a recognition that staff youth ratios that exceed the minimum level will be required at times to keep assure youth safety. |
| Quality Assurance Measures | DCR Staffing Policy 9.20 identifies that retrievable staff youth ratio documentation be maintained at each facility. The documentation consists of the following: |
|  | • Daily youth population list identify which youth are in which modules, designation of any youth on Protective Custody, Transitional Measures, Therapeutic Observation of Constant Watch. Additionally, daily trips and youth assigned to those trips should also be maintained in the daily population list. |
|  | • The facility staff daily roster, displaying which staff has been assigned to which modules. It is critical that the form allows for clear documentation of officers assigned to each module as well as mini control. |
|  | Staff youth ratio quality assurance compliance analysis consists of a review of the Master Roster, facility Daily Roster, facility mini control logs, and DCR-DCR 0144 daily forms to assess procedural and performance compliance with DCR-DCR Policy 9.20. |
|  | Additionally, review and assessment of DCR-DCR 0144 forms for each day are assessed for accuracy to the Daily Roster and compliance with DCR-DCR Policy 9.20 by the Supervisor IV the day after the events. |

| | |
|---|---|
| | At this time DCR-DCR has not initiated independent analysis of procedural compliance to Policy 9.20. |
| Sources of Information upon which Consultant report and compliance ratings are based | Weekly facility staff youth ratio workbooks and form DCR-DCR-1044 are provided to the Monitor's Consultant throughout the quarter. Facility staff youth ratio workbook data is analyzed to assess facility and agency compliance in meeting the minimum required staff youth ratio as described in S.A. 48a.  Form DCR-DCR-1044 is analyzed for procedural compliance with staffing policy, 9.20.<br><br>A component of facility site visits is review facility staffing source documentation, Master Rosters, Daily Rosters, mini control analyzed against the weekly facility staff youth ratio workbooks that are provided to the Monitor's Consultant. Review and assessment of DCR-DCR 0144 forms for each facility for each day are assessed for accuracy to the Daily Roster and compliance with DCR-DCR Policy 9.20, by the Supervisor IV the day after the events. |

**January 2009 Stipulation Paragraph 1:** All necessary steps shall be taken immediately to ensure the reasonable safety of youth by providing adequate supervision of youth in all facilities operated by, or on behalf of, the Defendants.

| Compliance Ratings | Non-Compliance |
|---|---|
| Description of Monitoring process during this period of time | The Monitor's Consultant reviews and analyzes weekly Staff Youth Ratio forms and form DCR-DCR-0144. Additional documentation that is reviewed is as follows: Master Rosters, Daily Rosters, DCR-DCR 0144 Daily Staffing forms, as well as use of force events, monthly contraband reports, and incident report events. Observation, verification and documentation of housing module staff youth ratios is conducted on each site visit.<br><br>Additionally, 284 referrals to UENMI and OISC investigative reports have been reviewed to assess incidents and investigations that identify youth safety, youth supervision and contraband issues. |
| Findings and Analysis | For the fourth quarter of 2019, DCR is not providing adequate supervision of youth nor ensuring reasonable safety.<br><br>**Facility Closure of CD Humacao:** As of January 15, 2019, the CD Humacao facility was closed for youth populations. After the closure of Humacao, 127 staff were reassigned to other DCR facilities. The two remaining juvenile facilities, CDTS Ponce and CDTS Villalba, absorbed the CDTS Ponce youth and classifications without sufficient staff to ensure compliance with S.A. 48.  Double shifting is not a viable solution to provide adequate supervision and youth safety.<br><br>**Master Rosters and Required Staffing:**<br><br>The facility Master Roster is an agency generated staffing roster, identifying posts, fixed posts, fixed posts identified by need, movable posts and relief personnel. The Master |

Roster designates one fixed post for each housing module and additional fix posts identified by need, predicated on the housing module youth population and youth on special status (protective custody, transitional measure, constant supervision, etc.).

The table below illustrates the DCR analysis of the volume of personnel required to fulfill the minimally required staff youth ratio requirements of S.A. 48 at CDTS Ponce and CDTS Villalba. DCR uses a shift relief factor of 1.73 for seven day supervisor and officer posts and a 1.23 shift relief factor for five day posts.

| Master Roster CDTS Ponce SRF Calculations | Master Roster Required Personnel |
|---|---|
| 5 Posts of 7 Days x 1.73 = 8.65 = 9 Supervisors | 9 |
| 67 Posts of 7 Days x 1.73 = 115.91 = 116 O.S.J.I. & II | 116 |
| 1 Post of 5 Days X 1.23 = 1.23 = 1 Supervisor | 1 |
| 23 Posts of 5 Days X 1.23 = 28.29 = 28 O.S.J.I. & II | 28 |
| 144 O.S.J.I. & II + 10 Supervisors | **154** |
| Master Roster CDTS Villalba SRF Calculations | Master Roster Required Personnel |
| 5 Posts of 7 Days x 1.73 = 8.65 = 9 Supervisors | 9 |
| 67 Posts of 7 Days x 1.73 = 115.91 = 116 O.S.J.I. & II | 116 |
| 1 Post of 5 Days X 1.23 = 1.23 = 1 Supervisor | 1 |
| 26 Posts of 5 Days X 1.23 = 31.98 = 32 O.S.J.I. & II | 32 |
| 158 = 148 O.S.J.I. & II + 10 Supervisors | **158** |
| **Master Roster Total Personnel Required** | **312** |

**Monitor's Note:  The Parties have been working through the analysis what a full roster should include with a revised SRF.  Based upon calculations made by the FOMB and discussed with the Monitor and DCR officials, this number was calculated at 318 FTEs, and there was a gap of 81 staff needed.  These numbers are not yet reflected in the staffing documents being provided to the Monitor's Consultant on a weekly basis. The SRF has been adjusted to comply with DCR's policies SRF is calculated with this formula: 364 days a year – 104 weekend days – 30 days of vacation – 18 sick leave – 5 training days = 207 workable days.  SRF = 364 days to be covered/207 workable days = 176**

The next table is a comparative analysis between the volume of positions reported in the *December 2019 January 2009 Stipulation Paragraph 5 Report* and the personnel requirements of the DCR generated facility Master Rosters*:*

| Volume of Personnel by Position: | December 2019 | | |
|---|---|---|---|
| **Facility** | **OSJ I and II** | **OSJ III and IV** | **Total** |
| **CDTS Ponce** | 122 | 8 | 130 |
| **Master Roster Required Personnel** | 144 | 10 | 154 |
| Minimum Additional Personnel to Meet CDTS Ponce Master Roster | **22** | **2** | **24** |
| **CDTS Villalba** | 121 | 8 | 129 |
| **Master Roster Required Personnel** | 148 | 10 | 158 |
| Minimum Additional Personnel to Meet CDTS Villalba Master Roster | **27** | **2** | **29** |
| **Both Facility Master Roster Required Personnel** | **292** | **20** | **312** |
| | 243 | 16 | 259 |
| **Minimum Additional Personnel to Meet NIJ/DCR Master Rosters** | **49** | **4** | **53** |

It should be noted that the CDTS Villalba Master Roster does not include required posts to staff the facility video system that was certified as operational as of October 7, 2019. Staff required for this post, consistent with DCR policy, requires the addition of five more personnel.

The Sumariados population has historically been involved in the most violent and disruptive incidents within the juvenile facilities. Historically, the minimum required staff youth ratio for this population has not provided adequate supervision to ensure youth safety. DCR needs to staff the Sumariados population based on the volume of staff needed to ensure a safe and secure environment, absent management of youth with applying long term restrictive room status.

Staffing rosters are inadequate to provide sufficient number of staff on all shifts without an assignment of additional staff to CDTS Ponce and CDTS Villalba.  Investigations completed during the fourth quarter indicate incidents occurring while assigned staff are off unit and/or not adequately providing supervision of youth. Facilities and security management cannot adequately maintain their rosters when insufficient staff are available to them, and consequently are forced to rely heavily on double shifting to attempt to meet the minimum required staff youth ratio. The availability and manner that staff are deployed to youth populations, based on housing module youth population volume or by need to assure youth safety, has not met the requirements of this provision.

The remaining charge for DCR, perhaps more complex, is to determine whether Humacao staff that have been reassigned to other DCR facilities could be moved to CDTS Ponce and CDTS Villalba and whether a new training class of recruits can be authorized and approved.  DCR made efforts to transfer staff back to juvenile institutions in December 2019, but after negotiations with the union, rescinded the transfer orders.

| | |
|---|---|
| | Additional staff does not assure adequate supervision of youth nor youth safety if staff is not adequately trained, supervised, coached, mentored to develop a behavior management skill set that emphasizes communication, intervention, active listening skills and an understanding of adolescent and young adult development.  Likewise, supervisory and management staff must be available to model and develop these skills in staff and not only available at times of module disruptions or required rounds. Programming opportunities must be significantly expanded to create an operational environment that keep youth actively engaged in meaningful social, recreational, educational and vocational activities. |
| | The older age of the youth population, many who no longer qualify for educational services, creates a sub-culture of youth whose only purpose is to see who can exert power and intimidation over the other populations. The continual challenge for "leadership" in facilities of a relatively small population must be addressed and remedied. The continual maneuvering for leadership amongst youth has led to a culture of power and revenge. In order to assure adequate supervision and youth safety, intervention and strategies must be developed to not only curtail the "leader" culture but to end it.  The direct by-product of the negative leadership culture is the volume of cutting events occurring in both facilities. |
| | The Monitor and Monitor's Consultant believe that quantitatively meeting the minimum staff youth ratios, in and of itself, is not sufficient to assure youth safety, especially when 41% of shift events are covered with double shifting. There are not sufficient staff and resources assigned to CDTS Ponce and CDTS Villalba to implement the requirements of the provision. |
| What is needed for full compliance? What steps are required and/or recommended? | A review of the DCR presentation to FOMB reflect that in order to have the volume of staff required to fill identified posts a minimum of eighty-one officers need to be assigned to CDTS Ponce and CDTS Villalba. The discrepancy between DCR staff numbers in the facility Master Rosters and the FOMB proposed staff numbers and shift relief factors must be resolved immediately. |
| | Meeting minimum staff youth ratios does not necessarily equate that staffing provides adequate supervision to keep youth safe.  For full compliance, staff youth ratios need to consistently meet the minimum required staff youth ratio, as well as additional staffing that is required by special populations, youth assigned to Transitional Measures, Protective Custody, Sumariados and 1:1 staff youth supervision events. Reliance upon placement of youth in restrictive housing statuses in an effort to provide protection from harm does not provide "adequate supervision" to ensure youth safety. |
| | To assure youth safety, procedural and operational practices need to require direct care staff to engage in active behavior management, youth need to be engaged in robust programming, as well as classification and programming to assure adequate staff supervision to effectively manage and control aggressive youth and youth "leaders". |

| Priority Next Steps | Although there are many priority next steps, the most critical priority next step, as stated in their FOMB presentation of December 19, 2019, would be for DCR to reassign a minimum of thirty-one officers to CDTS Ponce and CDTS Villalba to meet the operational requirements of the agency's Master Rosters. At this time, it is unclear as to the manner and timeframe that DCR can successfully fulfill this initiative.<br><br>The Monitor's Consulting Team continue to request access to incident report information as one of the critical components to assess youth safety. This information has started to be provided, although inconsistently and not within the requested guidelines. Based upon the Agreement reached by the Parties and entered with the Court on August 25, 2019, all incident report cover sheets should be submitted to the Office of the Monitor weekly on Mondays, and incidents of a more critical nature, as outlined in that report, must be submitted within 24 hours, or 48 hours in some cases.<br><br>Digitizing incident reports has long been discussed so that the Monitoring team can have immediate access to this information, but more importantly, for efficiency, consistency and accountability purposes for DCR.  The Agreement reached between the Parties and filed with the Court on August 26 required a plan by the Commonwealth for digitalizing these reports; such plan has not yet been received. The Monitor's Consultant has extensive experience in development of incident report application development and has offered to assist DCR in this process.  The Parties are working to modify the August agreement with new timeframes and requirements.<br><br>The Monitor and Consultant are also working to establish measures of safety based upon those criteria contained within Paragraph 78 reporting, and other factors. |
| --- | --- |
| Quality Assurance Measures | Incident report analysis and quality assurance requires consensus on incident report characteristics, definitional compliance as well as comprehensive reporting. The installation of video systems at CDTS Villalba, while assisting in the assessment of investigations, should help in assessing youth safety, youth incident events dynamics and staffing. Unfortunately, video was not available for review of two serious assault cutting events at CDTS Villalba on November 29 and December 4, 2019. The video system was not staffed locally at the facility and inoperable recording was not recognized until a subpoena for the video was requested by law enforcement. |

**January 2009 Stipulation Paragraph 2:** All necessary steps shall be taken to provide sufficient direct care staff to implement the Consent Decree and adequately supervise youth, pursuant to Paragraph 48.

The requirement that 50 YSOs be hired each month was terminated by the Court on September 13, 2011 (Docket 991). No new YSOs were hired during the Fourth Quarter of 2019.

| Compliance Ratings | Non-Compliance |
| --- | --- |
| Description of Monitoring process | Monitoring of S.A. 48 January 2009 Stipulation Paragraph 2 occurs through review of the monthly staffing report required by the January 2009 Stipulation Paragraph 5 provided |

| during this period of time | by the DCR Human Resources Development and Training Institute. The report indicated that no new officers were appointed during the quarter. Additional monitoring processes that occurred during this quarter were analysis of facility populations, classification levels, youth assigned to restrictive housing, minimum required staff youth ratios, and agency and facility staff volume and assignments. |
|---|---|
| Findings and Analysis | **Analysis of Sufficient Staffing:**  The closure of CD Humacao did not result in the transfer of staff to CDTS Ponce nor CDTS Villalba.  The failure to transfer staff has resulted in inability to consistently meet the minimum required staff youth ratio, nor to provide the adequate supervision to keep youth safe in the least restrictive placement possible, nor to relieve the disproportionate necessity on double shifting to provide the minimum required staff youth ratio. The availability and manner that staff are deployed to facilities and youth populations, based on housing module youth population volume or by need, has not consistently met the requirements of this provision.<br><br>**Fourth Quarter 2019 Contraband Report Review:**<br><br>DCR submitted contraband workbooks for both active facilities for each month of the fourth quarter of 2019. CDTS Ponce reported seven contraband events for the quarter. CDTS Villalba reported ten contraband events for the quarter.<br><br>The fourth quarter contraband reports documented the following:<br><br>_table below_<br><br>The contraband report did not document the volume of searches that were conducted at each facility, the type of searches that resulted in the discovery of contraband, nor the volume of searches that did not result in the discovery of contraband. The volume of sharps, drugs and medications contraband that were discovered is concerning in light of the history and volume of cutting events at DCR facilities.<br><br>Numerous OISC investigations have identified inconsistent search procedures.<br><br>**OISC 19-067 Investigation:**  On November 13, 2019 at CDTS Ponce an incident occurred where a youth required stitches after trying to place an object in his penis. Although the OISC investigation found no negligence on the part of security or civilian personnel, they made the following finding:  _"As you can see, there are only two records in module B-1, which indicates that very few searches, which to not allow for detecting hazards or sharp objects so that young people can cause significant damage."_<br><br>Although, the contraband reports only documented three contraband events reporting drugs or pills, there has been digital record alerts about positive toxicology reports. Unfortunately, positive toxicology results are not documented with completion of an incident report. Consequently, the Monitor and Monitor Consultants attempt to identify these events through review of digital record alerts. |

| Facility | 4th Quarter 2019: Volume of Reported | 4th Quarter 2019: Type of Contraband | | |
|---|---|---|---|---|
| | | Sharps (blades, knives) | Pills/ Drugs | Cell Phones/ Accessories |
| CTS Ponce | 7 | 4 | 1 | 0 |
| CTS Villalba | 10 | 4 | 2 | 0 |

The fourth quarter digital record alerts document the following two events:

- On 10/6/2019, six youth at CDTS Villalba tested positive for a highly regulated narcotic drug buprenorphine.
- On 11/14/19, two youth at CDTS Villalba tested positive for buprenorphine.
- On 12/12/2019, two youth at CDTS Villalba tested positive for fentanyl.
- On 12/20/2019, one youth at CDTS Villalba tested positive for fentanyl.

Staff are challenged to conduct effective searches because of noted staffing deficiencies, facilities do not have operational metal detection equipment nor search hardware technology, nor comprehensive practices of strategically searching youth who are known threats to the safety of other youth or themselves.

**Staffing, Incident Events and Investigations:**

There were 147 staff youth ratio events during the fourth quarter that did not meet the minimum required staff youth ratio. In addition to these 147 staff youth ratio events, additional staff supervision events have occurred where staff were not actively engaged in effective behavior management, were unable to keep youth safe, or were violating DCR policy and procedure by abandoning their posts without authorized staff relief or replacement.

1. **Youth #5198:** On November 6, 2019 at CDTS Villalba, youth #5198 was assaulted and cut by two youth on Module A-1. There were ten youth assigned to the module and two officers. At the time of the assault, one of the two officers, was not on the module. The officer not on the module had been directed by the supervisor to provide relief to other officers in other modules.
   a. The staff youth ratio at the time of the assault cutting event was 1:10.
   b. Both officers worked double shifts on November 6, 2019.

2. **Youth #3439:** On November 29, 2019, at CDTS Villalba, youth #3439 assaulted and cut by two youth on Module C-1.
   a. The November contraband report identifies that a sharp was recovered from the each of the two youth who assaulted and cut youth #3439 by officers. The contraband was recorded as evidence #0184573 and #01845714.
   b. The officer assigned to the module on the day and time of the assault and cutting event, had worked a double shift on the prior day, November 28, 2019.

3. **Youth #4885:** On December 4, 2019, at CDTS Villalba, youth #4885 was assaulted and cut by four youth on Module C-2.
   a. The December contraband report identifies that a sharp was recovered from the ground floor bathroom of Module C-2. The contraband was recorded as evidence #0184575.

|  |  |
|---|---|
|  | b.   The officer assigned to the Module C-2 on the day and time of the assault and cutting event, was working a double shift on December 4, 2019.<br><br>4.   **Youth #5328:**  On December 9, 2019, at CDTS Ponce, youth #5328 was assaulted and cut by four youth on Module 3, Sumariados.<br>   a.   OISC Investigation 19-071 disclosed youth #5328 caused an open wound on his left forearm requiring 12 stitches.<br>   b.   Youth was in protective custody at the time of the self-cutting incident.<br>   c.   The officer assigned to provide protective custody supervision had two protective custody youth assigned to him and had double shifted that morning.<br>   d.   On the day of this event, December 9, 2019, 9 officers were required to double shift.<br><br>Officers properly rested, assigned, supervised and engaged in active behavior management and awareness of behavioral indicators of potential disruptive behavior increase the probability of staff being able to keep youth safe. The DCR youth population, although smaller in volume, can certainly be characterized as a more sophisticated, violent adolescent population. Effective youth supervision requires competent staffing, predicated on a volume of staff that does not rely on 41% of shifts being covered by staff doing double shifts. The serious nature of incident events, reported and unreported, certainly indicates that the staffing issue within DCR has risen to a critical point that is not compliant with the provisions of S.A. 48.<br><br>The aforementioned incident events and corresponding staffing deficiencies and extraordinary reliance on double shifting, demonstrates DCR has provided an insufficient number of staff to adequately supervise youth and assure youth safety. Staffing rosters are inadequate to provide sufficient number of staff on all shifts without an increase in assigned staff.  Investigations and report analysis completed during the fourth quarter indicate incidents occurring while required staff are off unit, working double shifts, and/or not adequately providing supervision of youth. Facilities and security management cannot adequately maintain their rosters when insufficient staff are available to them, or they are forced to rely heavily on double shifting.<br><br>The Monitor and Monitor's Consultant believe that approaching quantitative compliance with minimum staff youth ratios, in and of itself, is not sufficient to assure youth safety, especially with reliance on extraordinary volume of double shifting.<br><br>There are not sufficient staff and resources to implement the requirements of the provision.  This Stipulation is found to be in non-compliance for the fourth quarter of 2019. |
| What is needed for full compliance? | DCR should take immediate steps to reduce the staffing crisis by identifying the strategies it will use to fill the staffing vacancies, including whether some officers |

| What steps are required and/or recommended? | previously at other DCR adult facilities or Central Office can be transferred to CDTS Ponce and CDTS Villalba, and well as the recruitment and training of new officers. At the time of the production of the fourth quarter report, DCR was not able to produce a staff plan with timeframes.<br><br>For full compliance for this provision, DCR needs to consistently provide and assure the availability of direct care staff, absent an extraordinary reliance on double shifting, to be deployed to housing modules based on the minimum required staff youth ratio, as well as the specific staff supervision needs of special populations, Transitional Measures, Protective Custody and 1:1 staff youth supervision events to avoid restrictive housing placement to assure youth safety. |
|---|---|
| Priority Next Steps | The Monitor's Team is analyzing how to better assess characteristics of incident reports to accurately assess the volume of events occurring impacting youth safety and adequate staff supervision of youth.<br><br>A priority next step will be to assess DCR IT capacity to provide an electronic incident report module within the electronic record keeping process. The incident report module should not be mere replication of the hard copy incident report cover sheet, but a robust reporting application that not only provides for documentation of incident events, but supports incident event analysis for procedural compliance, development of targeted training efforts, as well as incident event reduction strategies to assure youth safety.  In the interim, the Monitor's Consultant has received incident report cover sheets to assess youth incident report characteristics, UEMNI referrals and OISC investigations.<br><br>Future contraband reports should document the volume of searches that were conducted at each facility, the type of searches that resulted in the discovery of contraband, and the volume of searches that did not result in the discovery of contraband. Contraband events should be documented with incident reports. In incident events in which contraband has been discovered a formal analysis of the contraband source should be conducted and shared with officers.<br><br>The Monitor and Monitor's Consultant continue to await an executable staffing plan from DCR that fills the staff vacancies DCR identified in the December 19, 2019, FOMB presentation. DCR has not been able to obtain authorization for recruitment of a fifty officer training academy, nor identified an executable plan for transfer of thirty-one officers from other DCR adult programs. |
| Quality Assurance Measures | The critical next steps for quality assurance measures is to develop consensus over critical terms of this stipulation. Agreement on the importance of the accuracy and reliability of data, consensus on definitional compliance of terminology, and comprehensive reporting of events and incident event characteristics are essential for effective quality assurance measures. |
| Sources of Information upon | Reports that were used for analysis of this compliance ratings were: the January 2009 Stipulation Paragraph 5 report for October, November and December 2019; DCR |

| which Consultant report and compliance is based | submitted contraband reports for October, November and December 2019;  incident report cover sheets submitted for October, November and December 2019;  UEMNI and OISC reports; observation and youth interviews from the December 10 and 11, 2019 site visits. |
|---|---|

**January 2009 Stipulation Paragraph 3:** Defendants will include as direct care staff all social workers assigned to its institutions, once such staff receive forty (40) hours of pre- service training, ~~pursuant to Paragraph 49 of the Consent Decree.~~ The same shall also receive annual training as direct care staff, pursuant to Paragraph 50 of the Consent Decree.

| Compliance Ratings | **NA** |
|---|---|

*In approximately 2011, the Commonwealth decided not to employ the categorization of Social Workers as direct care staff as allowed by this provision to enhance coverage. However, the provision remains as a future option. Unless and until the Commonwealth determines that they want to apply this provision, the Monitor's Office will not Monitor the provision. The choice to not implement this provision is not non-compliance but has been categorized as "NA" not applicable. The ~~struck~~ part of the provision references a provision that has been terminated.*

**January 2009 Stipulation Paragraph 4:** All persons hired to comply with Paragraph 48 shall be sufficiently trained~~, pursuant to Paragraph 49 of the Consent Decree,~~ before being deployed. Defendants shall deploy all duly trained direct care staff, ~~pursuant to Paragraph 49,~~ to juvenile facilities in a timely manner.

*The ~~struck~~ part of the provision references a provision that has been terminated.*

| Compliance Ratings | **NA** |
|---|---|
| Monitoring process during this period of time | There were no new appointments to the agency during the fourth quarter reporting period, nor has there been any new appointments in the last several years.<br><br>Upon hiring of any new staff, DCR Policy Chapter 4.1 and 4.2 address the agency's policy and procedure for new employee pre-service training and annual training, as well as certification prior to facility assignment. In light of the approved and implemented policies, but the absence of any new hires during this quarter, this stipulation is found to be non-applicable (NA) for assessment of compliance for this quarter. |

**January 2009 Stipulation Paragraph 5:** On the fifth day of every thirty-day period commensurate with the Order approving this Stipulation, Defendants shall submit a report to the Monitor and the United States providing the following: a. the number of current direct care staff, by position classification, at each facility; b. the number of qualified direct care staff hired during the previous period; c. the number of hired direct care staff in the previous period who were hired ~~and have received pre-service training, pursuant to Paragraph 49;~~

and d. the juvenile facilities where the direct care staff who were hired in the previous quarter ~~and have received pre-service training, pursuant to Paragraph 49~~, have been deployed or assigned.

*The ~~struck~~ part of the provision references a provision that has been terminated.*

| Compliance Ratings | Partial Compliance |
|---|---|
| Description of Monitoring process | Monitoring of S.A. 48 January 2009 Stipulation Paragraph 5 occurs through review of the monthly staffing report provided by the DCR Human Resources Development and Training Institute. |
| Findings and Analysis | **January 2009 Stipulation Paragraph 5:**<br><br>For the 2019 fourth quarter, January 2009 Stipulation Paragraph 5 is found to be in partial compliance.<br><br>**January 2009 Stipulation Paragraph 5:** DCR provided at the October, November and December staffing report required by the stipulation. On November 12, 2019, DCR provided the October 2019 report. On December 16, 2019 DCR provided the November report. On January 26, 2020, DCR provided the December report.<br><br>The stipulation language requires that the defendants shall submit a report by the fifth day of the following month. As seen in the receipt dates of the fourth quarter reports, the reports were not received by the fifth day of the month.<br><br>The Monitor's Consultant has identified that the staffing documented in the report should reflect the volume of staff identified in each facility master roster.<br><br>The table below summarizes the October, November and December 2019, January 2009 Stipulation Paragraph 5 reports: |

| Month/Year | OSJ I | OSJ II | OSJ III | OSJ IV | Total | Inactive | New Hires: 7-9/2019 | Voluntary Resignation Program | Date Received |
|---|---|---|---|---|---|---|---|---|---|
| Oct-19 | 352 | 22 | 15 | 5 | 394 | 44 | 0 | 0 | 11/12/2019 |
| Nov-19 | 344 | 22 | 15 | 5 | 386 | 42 | 0 | 0 | 12/16/2019 |
| Dec-19 | 342 | 22 | 15 | 5 | 384 | 41 | 0 | 0 | 1/26/2020 |

Although the reported volume of staff would appear that DCR has the volume of staff to meet the requirements of S.A. 48, a closer review illustrates that staff have not been deployed in a manner to meet minimum required staff youth ratios, nor to effectively reduce the disproportionate reliance on double shifting, nor adequate staffing to assure youth safety. One hundred and twenty-three juvenile officers are deployed to other DCR facilities or programs.

| Facilities | Month/Year | OSJ I | OSJ II | OSJ III | OSJ IV | Total | Inactive | New Hires: 7-9/2019 | Voluntary Resignation Program | Date Received |
|---|---|---|---|---|---|---|---|---|---|---|
| CD Humacao | Oct-19 | 14 | 0 | 1 | 0 | 15 | 7 | 0 | 0 | |
| CTS Ponce | Oct-19 | 109 | 10 | 5 | 2 | 126 | 10 | 0 | 0 | |
| CTS Villalba | Oct-19 | 115 | 7 | 5 | 3 | 130 | 15 | 0 | 0 | |
| Nivel Centeral y Otras facilidades DCR | Oct-19 | 114 | 5 | 4 | 0 | 123 | 12 | 0 | 0 | |
| | Oct-19 | 352 | 22 | 15 | 5 | 394 | 44 | 0 | 0 | 11/12/2019 |
| CD Humacao | Nov-19 | 14 | | 1 | | 15 | 7 | 0 | 0 | |
| CTS Ponce | Nov-19 | 107 | 9 | 5 | 2 | 123 | 11 | 0 | 0 | |
| CTS Villalba | Nov-19 | 113 | 7 | 5 | 3 | 128 | 12 | 0 | 0 | |
| Nivel Centeral y Otras facilidades DCR | Nov-19 | 110 | 6 | 4 | 0 | 120 | 12 | 0 | 0 | |
| | Nov-19 | 344 | 22 | 15 | 5 | 386 | 42 | 0 | 0 | 12/16/2019 |
| CD Humacao | Dec-19 | 2 | 0 | 0 | 0 | 2 | 1 | 0 | 0 | |
| CTS Ponce | Dec-19 | 110 | 12 | 6 | 2 | 130 | 14 | 0 | 0 | |
| CTS Villalba | Dec-19 | 114 | 7 | 5 | 3 | 129 | 18 | 0 | 0 | |
| Nivel Centeral y Otras facilidades DCR | Dec-19 | 116 | 3 | 4 | 0 | 123 | 8 | 0 | 0 | |
| | Dec-19 | 342 | 22 | 15 | 5 | 384 | 41 | 0 | 0 | 1/26/2020 |

Although CD Humacao closed serving a youth population on January 15, 2019, as of December 2019, there still remained 2 officers assigned, a reduction of 13 officers from October 2019. During the fourth quarter, CDTS Ponce appear to have a net gain of 4 officers and CDTS Villalba appear to have a net loss of 1 officer. Overall, DCR juvenile facilities had a net loss of 10 officers, excluding those officers assigned to other Central Office and other DCR adult facilities.

The reduction in officers in the fourth quarter continues to contribute to the extraordinary volume of double shifting necessary to attempt to meet S. A. 48 staff youth ratio requirements. Double shifting is not the solution to inadequate staffing number.

| What is needed for full compliance? | The Monitor's Consultant believes the following actions, metrics and data elements are necessary for DCR compliance with S.A. 48 January 2009 Stipulation Paragraph 5:<br><br>• Assessment of staffing requirements and deployment of officers to the two operational facilities to meet the minimum required staff youth ratio without unreasonable reliance on double shifting.<br>• The capacity to provide adequate staffing to keep youth safe, in the least restrictive placement possible, without dependence on restrictive housing;<br>• For each month submit a January 2009 Stipulation Paragraph 5 staffing report to the Monitor's Consultant on or about the fifth day of the month;<br>• In the January 2009 Stipulation Paragraph 5 staffing report, the inactive (inactivos) staff identified for each facility should be identified by personnel classification type;<br>• The report should contain the number of qualified direct care staff hired during the previous period (month);<br>• Identify the juvenile facilities where the direct care staff who were hired in the previous quarter have been deployed or assigned. |
|---|---|

| | |
|---|---|
| | • Provide the Monitor's Consultant with each facility's electronic version of the Master Rosters that is applicable to the monthly S.A. 48 January 2009 Stipulation Paragraph 5 reports.<br>  ○ The Monitor's Consultant has not received electronic versions of the facilities Master Rosters since July 10, 2019.<br>• DCR needs to stipulate that the volume of staff documented in each facility's Master Roster corresponds with the data in the monthly S.A. 48 January 2009 Stipulation Paragraph 5 reports. |
| Priority Next Steps | DCR needs to provide this report on a consistent, timely basis. In order to assess the accuracy and reliability of the S.A. 48 January 2009 Stipulation Paragraph 5 report, DCR needs to provide to the Monitor's Consultant an electronic version of each facility's corresponding forty-two day cycle Master Rosters for CDTS Ponce and CDTS Villalba.<br><br>As the Monitor's Consultant has explained to the Operations Functional Team, the criteria to assess the accuracy of the S.A. 48 January 2009 Stipulation Paragraph 5 report would be that the monthly report documentation be the same volume of staff that is identified in each facility Master Roster.<br><br>DCR is currently under an Order by this Court (Doc. 1436) entered on 12/19/19 to work on a plan to adequately protect the budget for this case, and designate funds to be used only for the present consent decree and not used for other purposes. As such, they must separate out staff who have been reassigned within DCR and do not serve any function within NIJ when preparing their Master Rosters. |
| Quality Assurance Measures | Upon receipt of the monthly facility Master Roster, a comparative analysis occurs with the S.A. 48 January 2009 Stipulation Paragraph 5 report to assess the accuracy and reliability of the report matching the data from the facility Master Rosters.<br><br>Ultimately, the Monitor's Consultant expectation for an effective quality assurance measure is that upon production of the S.A. 48 January 2009 Stipulation Paragraph 5 report, DCR stipulates that the numbers presented in the report correspond to the volume of staff and corresponding classifications for each facility Master Roster. If the cycle Master Report and the S.A. 48 January 2009 Stipulation Paragraph 5 report staff numbers do not match, an explanation as to why there is variance in the numbers should be provided.<br><br>As of the production of the 2019 fourth quarter report, DCR has not stipulated that the volume of staff documented in each facility's Master Roster corresponds with the data in the monthly S.A. 48 January 2009 Stipulation Paragraph 5 report. |

# PROTECTION FROM HARM – CLASSIFICATION (Bob Dugan)

**S.A. 52:** At both the detention phase and following commitment, Defendants shall establish objective methods to ensure that juveniles are classified and placed in the least restrictive placement possible, consistent with public safety. Defendants shall validate objective methods within one year of their initial use and once a year thereafter and revise, if necessary, according to the findings of the validation process.

| Compliance Ratings | Partial-Compliance |
|---|---|
| Description of Monitoring process during this period of time | The Monitor's Consultant conducted site visits on December 10, 2019 to CDTS Ponce and December 11, 2019 to CDTS Villalba. Observation and documentation of housing module staff youth ratios is conducted on each visit as well as the levels of treatment of youth assigned to housing modules.<br><br>During site visits facility youth population classification and housing assignments were provided for both facilities. Throughout the quarter, and in the previous thirty quarters, DCR has provided detention and committed classification documentation, with corresponding youth facility assignments and assessed levels of treatment. DCR facility and housing assignments have been found to consistently correspond to youth's assessed levels of classification and treatment. |
| Findings and Analysis | DCR has been engaged in an effort to meet the requirements of S. A. 52 since 2013. The following timeline illustrates various milestones of the agency's classification efforts:<br><br>{{TABLE}} |

| Quarters | Activity |
|---|---|
| Fourth Quarter 2013 | Proposals for Classification validation study |
| Fourth Quarter 2014 | Start of Classification validation study |
| First Quarter 2015 | Classification validation study preliminary report |
| Second Quarter 2015 | Classification Manual for training and implementation |
| Fourth Quarter 2016 | DCR Administrative Order CDR -2016-10, for implementation of DCR Classification processes |
| Third Quarter 2019 | Court Filing by  the Office of the Monitor requesting a report within 60 days, detailing current concerns with the classification system, analyzing existing data from DEC from the prior 12 months, and making recommendations for how to address current limitations while ensuring that youth remain in the least restrictive placements, consistent with public safety. |
| Fourth Quarter 2019 | DCR provided annual validation study for FY 2018-2019. DCR provided revised draft classification Policies 6.1 and 6.2.<br>DCR provides a draft report on the Classification processes. |

Since 2014, DCR has experienced a 60% reduction in the volume of facilities and a 73% reduction in youth population (FOMB Presentation, 12/19/2019, Slide 21).

In October 2018, the Monitor's Consultant was asked to provide his professional opinion relative to the potential closure of CD Humacao. At that time, the Monitor's Consultant addressed his concerns about the impact that the closure of CD Humacao would have on the classification, staffing and youth safety. These issues were further documented in the Monitor's 2018 Fourth Quarter Report:

> *Needless to say, the proposed classification distribution leaves DCR with no capacity to manage facility maintenance without further population and classification consolidation. Although there is recognition of the DCR population reduction, the logistics to maintaining the integrity of the existing classification practices will be very challenging.*

> *The present DCR Classification practice was implemented in the Spring of 2015 with an Administrative Order. Staff were trained in April of 2015, at which time the agency operated five facilities and an agency youth population of 267. With the reduction in facilities, over a 50% reduction in youth population, and the absence of classification validation studies, the Monitor's Consultant has significant concerns about whether the DCR classification practices are effective in meeting the safety and treatment needs to youth, especially in light of facility closure and consolidation of youth populations.*

Throughout the DCR Classification development process the Monitor's Consultant has continually requested that the agency provide the following core elements to assure policy and procedural compliance with the S.A. 52:

- An approved, agency Secretary signed policy and procedure with implementation predicated upon a training curriculum and training schedule, that addresses the requirements of S. A. 52.
- The policy needs to specifically require an annual validation that assesses the objective methods and efficacy of the classification processes. Revisions to the classification processes should be made based on the findings of the annual validation.
- The policy needs to provide an administratively approved override process for both the detention and committed classification processes.

**Classification Policies:**

As of close of the fourth quarter 2019, the agency has produced the following revised draft classification policies:

- Policy 6.1:  This revised draft policy establishes the procedures for classification to levels of treatment of youth who are committed to NIJ-DCR.

- The revised draft policy addresses that the committed classification instrument (I.C.C.) is administered by personnel trained by the DCR Institute of Development and Training of Human Resources (IDECARH).
- The revised draft policy provides for a process of overriding the I.C.C. based on specific criteria.
- The revised draft policy includes processes to identify a "negative leader" and assessing an additional point in the ICD scoring process.
- The revised draft policy stipulates that the classification instruments are validated within one year and then annually, with revisions to the classification process in accordance with the validation findings.

- Policy 6.2: This revised draft policy establishes procedures for a comprehensive multidisciplinary assessment, that in conjunction with the custody classification tool, (I.C.C.) allows for development the youths Individualized Family Service Plan (P.I.S.). The P. I. S. provides the structure for treatment services to be provided at the institutional level, that are designed to achieve changes in committed youth allowing for positive reintegration into the community.

On 12/21/2019, the Monitor's Consultant reviewed and commented on the draft Policies 6.1 and 6.2 drafts and asked for revised policies based on his review. Upon final draft policy reviews, the polices require a Secretary's authorization signature, an implementation date, and a training curriculum and training schedule to coincide with the implementation date in a manner that assures staff are trained prior to policy and procedure implementation.

DCR has additional draft classification policies that are being revised based on the Monitor's Consultant prior reviews and comments. It is hoped that DCR will provide additional revised classification polices for review in the first quarter of 2020.

**Annual Classification Validation Reports:**

DCR has produced draft annual classification reviews for 2016-2017 and 2017-2018. The Monitor's Consultant had reviewed and made recommendations on both of the draft annual classification reviews. The Monitor's Consultant indicated that the draft annual reviews did not meet his expectation of what the provision requires, since the reviews were little more than a statistical representation of annual classification administration. The annual reports did not stipulate as to whether the annual reviews validated the custody and detention classification instruments, and if there were any findings that required necessary revisions to classification policies and procedures. Additionally, the Monitor's Consultant recommended that annual classification validation consist of an assessment of procedural compliance to applicable policies, identify training provided, annual youth classification population profiles, specific validation findings and statement relative to any necessary revisions.

On December 19, 2019 DCR provided the Monitor's Consultant with a 2018-2019 Annual Classification Review. The content of the 2018-2019 Annual Classification Review was a significant improvement from the prior annual reviews. The 2018-2019 Annual Classification Review identified the following major issues:

- The I.C.C. was administered to 48 youth. Although no youth were assessed in the evaluation module as qualifying for PUERTAS placement, eleven youth were placed in PUERTAS during the reporting period from the committed youth population.
- Youth were placed consistent with agency policy.
- The Division of Evaluation and Classification (DEC) had a reduction in workforce from 7 to 5, but were able to meet workload requirements.
- Provided comments on the closure of CD Humacao and the corresponding relocation of the evaluation module (ME) to CDTS Villalba.
- Discussed the introduction of video conferencing between DEC and CDTS Villalba for classification work of youth in the evaluation module.
- Provided a youth population profile for 2018-2019.
- Provided an analysis of the reduction in the population of committed youth.
- There were no override cases during the reporting period.

- The I.C.D. (detention classification instrument) was administered to 251 youth, with 4 override cases.
  - Identification of the reduction of detention beds.
  - Identified the absence of a designated housing module for detention youth assessed as "intensive".
    - Two youth were classified as intensive in 2018-2019.
  - Identified the loss of trained CD Humacao staff who had administered the I.C.D.
  - The 2018-2019 Annual Classification Review provided the following translated statement in regard to the findings:

    *The classification tool in Custody (ICC), after its third consecutive year of implementation maintains that it is a functional and viable instrument to measure what it intends to, objective, consistent and reliable. On the basis of what is presented in this report concludes that the classification tool in custody used by the Department of Correction and Rehabilitation (DCR) meets the criteria for the requirement of the federal # 52 stipulation and does not require a new validation to the present.*

    - Consequently, no revisions were made to I.C.D. or the I.C.C. as a result of the 2018-2019 Annual Classification Review.

**DCR Classification Report:**

On August 26, 2019, the Parties reached an agreement to address critical classification issues, in light of the limited facility housing options, volume of youth that had been in restrictive housing status of protective custody and transitional measures, as well as facility violence. The specific language of the filing stated:

*Pursuant to Paragraph XVII (j), the Office of the Monitor requested a report within 60 days, with assistance from Bob Dugan, detailing current concerns with the classification system, analyzing existing data from DEC from the prior 12 months, and*

*making recommendations for how to address current limitations while ensuring that youth remain in the least restrictive placements, consistent with public safety.  It is strongly recommended that the process include the input of the facility directors, facility compliance officers, social work supervisors and others with direct working knowledge of the classification system. Recommendations which can bring paragraph 52 into compliance, both in policy and practice, should be concrete, with specific time frames, and address underlying problems occurring with current space limitations. Please identify who will be responsible to prepare such report, who will be involved in the process, and who will be responsible for its submission.*

On August 15, 2019, the Monitor's Consultant provided a classification issues outline for DCR staff to assist with the task of generating a classification report. On August 16, 2019, the Monitor's Consultant had a conference call to review the submitted classification outline with Kelvin Merced, from the DCR Office of Federal Stipulations, who was designated as the lead staff member for the Classification Report. During site visits on September 17 and 18, the Monitor's Consultant met with DCR facility and Central Office staff to discuss issues that needed to be addressed in the classification report. Addressed during these meetings was the shortcomings in the classification process to allow for the instrument to effectively address the issue of "negative leaders" and those youth who threaten the safety of other youth and staff. This situation has obviously been compounded by staff shortages and the disturbingly high volume of double shifting. The Monitor's Consultant recommended to DCR staff that consideration should be given to blending specific levels of treatment housing module assignments to allow for more flexibility in creating safe, homogenous milieus that can cohabitate and still meet treatment goals.

On October 30, 2019, DCR provided the Office of the Monitor with the draft DCR Classification Process Review. On December 10, 2019, the Monitor's Consultant met with the DCR team that was responsible for the development of the draft Classification Process Review report.

**Results of Classification Study Draft:**  The following summary is a review of the draft Classification Process Review report:

- The DCR team thought the exercise was worthwhile.
- The main issue is the absence of space.
- The volume of detention admissions and length of stay is limiting options to maneuver populations.
- There was a recognized delay in the administration of the detention classification instrument (ICD) to new detention intakes. This issue will be addressed by training more social work staff on how to administer the ICD.
- The committed classification instrument is doing what it is supposed to do and as described in the 2018-2019 annual validation report, no changes are necessary.

- Management of negative leaders is an institutional issue, a function of the two facilities and is not an issue to be addressed through the classification instruments.
- In speaking with the CDTS Villalba facility director on September 18, 2019, he indicated there were no problems with the classification instruments, but rather the facility issues that they were experiencing were a result of not having enough staff.

**Fourth Quarter Classification Profiles:**

As of December 31, 2019, the DCR committed classification housing assignments are illustrated below:



| | CTS Ponce: Level 2 | CTS Ponce: Level 3 | CTS Villalba: Level 4 | CTS Villalba: Level 5 | PUERTAS: | Classification in process, pending institutional assignment | Total Institutional Assignments |
|---|---|---|---|---|---|---|---|
| 2019 Fourth Quarter Totals | 2 | 7 | 5 | 2 | 1 | 13 | 17 |
| 2019 Third Quarter Totals | 0 | 3 | 6 | 2 | 2 | 10 | 13 |
| 2019 Second Quarter Totals | 1 | 4 | 4 | 2 | 0 | 16 | 11 |
| 2019 First Quarter Totals | 0 | 2 | 10 | 3 | 0 | 14 | 15 |

As of December 31, 2019, the DCR detention classification housing assignments are illustrated below:



**NIJ Detention Classification**
**2019 Quarterly Admission Classification**

| | Volume of Admissions | Leve/ Low | Moderado/ Moderate | Intensivo/ Intensive | Egreso/ Released | Custodia/ Custody | Court Releases | NA |
|---|---|---|---|---|---|---|---|---|
| 1st Quarter 2019 Totals | 62 | 51 | 10 | 0 | 0 | 1 | 0 | 0 |
| 2nd Quarter 2019 Totals | 66 | 32 | 31 | 1 | 0 | 0 | 0 | 2 |
| 3rd Quarter 2019 Totals | 62 | 47 | 8 | 0 | 3 | 0 | 4 | 0 |
| 4th Quarter 2019 Totals | 47 | 28 | 16 | 0 | 0 | 0 | 0 | 3 |

■ 1st Quarter 2019 Totals   ■ 2nd Quarter 2019 Totals   ■ 3rd Quarter 2019 Totals   ■ 4th Quarter 2019 Totals

**Fourth Quarter Maximazations, Fleximazations and Overrides:**

Maximazations, Fleximazations and Overrides are the terms used to describe the processes for a facility to request that a youth's level of treatment be raised, a Maximazation, or lowered, a Fleximazation. The facility is required to formally request to the Division of Evaluation and Classification (DEC) for review, approval or denial of the change in level of treatment.

For the fourth quarter of 2019, there were three requests for Fleximazations, which were approved and one request for a Maximazation, which was approved.

During meetings on December 10, 2019, the Monitor's Consultant recommended that the processes for petitioning for a Maximazations and Fleximazations be reviewed with facility treatment teams to promote the Fleximazations as a motivational opportunity for youth treatment progress.

**Fourth Quarter Overrides:**

For the fourth quarter of 2019, there appeared to be no overrides to detention nor committed classifications.

At this time youth who are being held as federal holds have been classified as moderate by the detention classification instrument. The Monitor's Consultant has identified this population to DCR as a group that would appear to be candidates for automatic consideration of an override, in light of the sophisticated behavioral youth profile, the seriousness of alleged offenses and possible sentencing sanctions being faced.

The following table identifies the diverse classification populations within CDTS Ponce and CDTS Villalba.

| Detention Classification | Committed Classification | Special Populations |
|---|---|---|
| Detention Intake | Evaluation | Puertas (mental health youth) |
| Detention: Low | Level 2 | Mental Health 1:1 Supervision Events |
| Detention: Moderate | Level 3 | Protective Custody |
| Detention: Severe | Level 4 | Transitional Measures |
| Sumariados | Level 5 | Sumariados |
| Girls Detention Population | Girls Committed | Federal Holds |

Youth in Special Population categories, although not managed as such specifically by DCR, are youth populations that require specialized services, programming and staff supervision, to assure youth are placed in the least restrictive placement possible.

The table below displays the CDTS Ponce and CDTS Villalba bed capacity and youth populations as documented in each facility's December 2019 Levels of Treatment document.

| CDTS Ponce | Bed Capacity | Youth Population 12/2019 | CDTS Villalba | Bed Capacity | Youth Population 12/2019 |
|---|---|---|---|---|---|
| MODULO - 1 (Leve) | 15 | 5 | MODULO-A-1 (Det. M/Int.) | 15 | 7 |
| MODULO - 2 (Sumariados) | 15 | 5 | MODULO-A-2 (Nivel IV) | 15 | 4 |
| MODULO - 3 (N-III) | 15 | 8 | MODULO-B-1 (Det. Leve) | 15 | 6 |
| MODULO - 4 (N-III) | 15 | 9 | MODULO-B-2 (Nivel IV) | 15 | 14 |
| MODULO - 5 (Det. Niñas) | 15 | NA | MODULO-C-1 Nivel IV) | 15 | 5 |
| MODULO - 6 (Cust. Niñas) | 15 | NA | MODULO-C-2 (Nivel V) | 15 | 7 |
| MODULO - 7 (N-II ) | 15 | 4 | MODULO-D-1 (CN) | 15 | 2 |
| PUERTAS- 8 | 15 | 4 | MODULO-D-2 (Nivel IV) | 15 | 5 |
| Admissions | 4 | 0 | Admissions | 4 | 0 |
| Total | | 35 | | | 50 |

DCR does not have the housing module capacity to place all of the detention classification levels in separate housing modules, upon a youth be classified as severe. The diverse categories and classification status of youth allows for no specific housing for severe status

| | detention youth nor any capacity to evacuate a module for emergency, nor normal physical plant maintenance. |
| --- | --- |
| | Throughout the third and fourth quarter, DCR indicated the housing module limitations would be resolved with the transfer of the girl's detention and committed populations to a private facility. Various dates were presented for the transfers to occur. At this time, there is no finalized contract or specific date which has been identified for the movement of girls or other special populations. At this time there appears to be no relief nor strategies offered by DCR to resolve the limited housing module options. |
| | In light of submittal of the content of the 2018-2019 Annual Classification Review, the status of the fourth quarter classification draft policies, and the Classification Study Draft, for the fourth quarter of 2019, the Monitor's Consultant has determined that DCR is in partial compliance with S.A. 52. |
| What is needed for full compliance? What steps are required and/or recommended? | The dynamic changes caused by the reduction of youth populations  and DCR facilities, ongoing shortages of staff resulting in extraordinary double shifts, accompanied by the absence of comprehensive planning, has jeopardized the agency's capacity to provide for the safety and treatment needs of the youth in their care in the least restrictive placements possible. |
| | Although DCR has provided a draft of the Classification Process Review, it is the opinion of the Monitor's Consultant that the agency has not seized the opportunity to adjust classification requirements and practices in response to the present physical plant housing limitations. It was the hope of the Monitor and Monitor's Consultant that the 2019 Classification Process Review would provide a process to address needed revisions to classification policy and procedures to reflect the reality of the diverse youth population categories, youth who are at risk and existing housing limitations. |
| | In 2020, DCR needs to address the reality of the limited space, the staffing crisis and limited housing options. Relief to limited housing options by private placement of the female population has not materialized. |
| | A legitimate dialogue addressing classification, risk assessment issues and facility space limitations has been negated by DCR contention that issues of youth safety is only a result of the staffing crisis and has no correlation to the classification processes. The classification instruments must not be exclusive to treatment levels, but also provide for a balanced risk assessment and be responsive to the reality of limited housing modules. DCR representatives contend that this is not a classification issue to be addressed by DEC, but an institutional behavior management issue. The Monitor's Consultant believes that DCR needs to undertake a holistic review of classification policies in conjunction with behavior management, programming and housing limitations. This effort should address whether classification level housing segregation may be modified and yet maintain the integrity of the treatment processes. In the absence of safety, treatment cannot occur. |

| | |
|---|---|
| | Problem solving dialogue should addresses creating youth milieus predicated on risk assessment for safety, as well as treatment needs. The volume of assault cutting events during the third and fourth quarter, creates a culture of revenge and fear that jeopardizes the safety of all youth and staff.<br><br>Additionally, classification process should be considered for determination of the possibility of alternate programming placements, especially in light of ongoing youth population reductions.<br><br>The metrics established for compliance of this provision are the following:<br>• Final agency approved classification policies and procedures, implementation dates predicated upon training curriculums and training schedules are necessary for full compliance.<br>• Classification policies need to be inclusive of a process requirement for annual classification methodology validation, findings, and revisions that are necessary.<br>• Production of the 2019-2020 annual classification validation review of objective methods, findings and revisions as required, predicated on a dynamic assessment of the existing and forecasted youth population, as well as the limitations of two or less facilities, and alternate placement options.<br>• Continued production of monthly detention and committed classification data.<br>• 100% of detention youth are classified and assigned to appropriate housing modules, unless prior release by the Court.<br>• 100% of committed youth are classified and assigned to appropriate facilities and housing modules, consistent with their assigned classification treatment levels and safety requirements.<br>• Youth are placed in the least restrictive placement possible with staff assigned to assure their safety and protection from harm, in the least restrictive placement possible. |
| Priority Next Steps | Current policies require that DCR "validate objective methods within one year of their initial use and once a year thereafter and revise, if necessary, according to the findings of the validation process." The purpose of the classification system, as indicated in Paragraph 52, is to "ensure that juveniles are classified and placed in the least restrictive placement possible, consistent with public safety."<br><br>It is critical to continue a review of the classification system given the reality of housing youth in only two facilities.  This is particularly true with a decreasing youth population resulting in a higher concentration of youth with a history of violence and/or mental health concerns. The volume and diversity of classification along with special populations calls for an agency wide interdisciplinary review of classification level of treatment segregated housing practices. This effort should provide the opportunity to consider processes for facility management to have the capacity to create homogenous youth housing module milieus, not limited to assigned levels of treatment, but balanced with youth safety and managing "negative leaders". The |

| | |
|---|---|
| | sophisticated youth who is a negative leader, rarely is the youth directly involved with acts of violence and threatening behavior.<br><br>DCR has a history of blending youth with various levels of treatment that appears not to have jeopardized the integrity of treatment goals. DCR needs to continue to review and revise classification levels of treatment housing practices to assure compliance with all of the components of S. A. 52, as well as addressing the risk and treatment needs, and housing module limitations. Successfully managing the youth leader culture within each housing module and each facility is a priority to provide youth protection from harm and assure that youth are placed in the least restrictive placement possible. |
| Quality Assurance Measures | DCR effectively documents the results of both detention and committed classification processes and youth classification, levels of treatment and corresponding housing module assignments. Additionally, for the fourth quarter, DCR has produced documentation in regard to overrides, Maximazations and Fleximazations. Monthly documentation of detention and committed classification is consistently provided to the Monitor's Consultant.<br><br>DCR must continue incorporate annual reviews of the validation of the objective methods of the classification instruments, processes and findings, facilitating the opportunity to systematize quality assurance into the classification processes.<br><br>The 2019-2020 Annual Classification Validation Report needs to address the effectiveness of existing classification practices in light of a reduction in housing modules and how these issues impact youth treatment and protection from harm requirements in the least restrictive placement possible. The classification levels of treatment assessment and requirements must be dynamic and responsive to effective institutional placement and treatment. |
| Sources of Information upon which Consultant report and compliance ratings are based | Monthly classification documentation for youth who have been classified for detention and committed youth is provided to the Monitor's Consultant. Monthly, DCR provides the Monitor's Consultant facility youth population and classification reports. During site visits, the Monitor's Consultant obtains facility youth population documentation that identifies youth housing module populations and classification levels of treatment.<br><br>Detention classification documentation provided to the Monitor's Consultant monthly, indicates youth have been consistently classified and assigned to a housing module that corresponds to detention classification level.<br><br>For the fourth quarter of 2019, all the reviewed committed institutional assignments are consistent with the level of treatment scores and level assignments as reported in the monthly committed classification reports. Youth committed classification levels and institutional housing assignments are reviewed for procedural accuracy during site visits. |

## PROTECTION FROM HARM – USE OF FORCE (David Bogard)

**S.A. 77.** In no event is physical force justifiable as punishment on any juvenile. The use of physical force by staff, including the use of restraints, shall be limited to instances of justifiable self-defense, protection of self and others, to maintain or regain control of an area of the facility, including the justifiable protection of significant property from damage; and prevention of escapes; and then only when other less severe alternatives are insufficient. A written report is prepared following all uses of force and is submitted to administrative staff for review. When force, including restraint, is used to protect a youth from self, this must be immediately referred to the medical area for medical and mental health evaluation and any necessary treatment.

| Compliance  Rating | Partial Compliance |
|---|---|
| Description of Monitoring process during this period of time | Monitor's Use of Force Consultant and staff visited the two facilities on December 10-11, 2019 to review quarter to date use of force incidents and discuss same with institutional management and compliance staff.  At Ponce, incident reports and videos were reviewed for four use of force incidents that had transpired by that point in the quarter[1] (a fifth occurred and was reported the day following our site visit)[2].  There were no reported uses of force at Villalba in the quarter.   Each of the Ponce incidents were screened via Cernimiento and by Compliance staff using the new Use of Force Checklist form and none were referred via 284 and investigated by OISC.<br><br>The site visit at Villalba also included an extensive discussion and review of the status of implementing a new CCTV (video) system at that facility.  (See discussion of ¶ 78 for more details).  As has been the case for some time at Ponce, the addition of CCTV coverage at Villalba will prove to be a significant asset relative to reviewing use of force and other incidents.<br><br>The Monitor's Consultant  also reviewed DCR's weekly spreadsheet reports of use of force incidents and multiple descriptive data elements for same including names of youth involved, locations, types of force employed, injuries sustained by youth, medical services provided, chemical agents use and documentation of amounts, etc. |
| Findings and Analysis | The five reported use of force incidents this quarter were equal to the average for the previous three quarters (mean=5.3).   This quarter's incidents reflected an increase in the number of incidents but a significant reduction in the number of youth involved or subject to force as compared to the previous quarter. |

| Facility | Q4-19 Events: Use of Force | Q3-19 Events: Use of Force | Q4-19 Youth Involved | Q3-19 Youth Involved |
|---|---|---|---|---|

---

[1] *See* P-19-10-515; P-19-10-524; P-19-10-525; P-19-10-553

[2] *See* P-19-11-553 on 11/24/19

| | | | | |
|---|---|---|---|---|
| CTS Ponce | 5 | 2 | 6 | 13 |
| CTS Villalba | 0 | 1 | 0 | 1 |

For the first time in 2019, chemical agents were not used in any incidents this quarter. This fact is in contrast to the concerns repeatedly raised in previous quarters that OC was not being used only " in extreme situations and as a last resort where an imminent and significant threat is posed to staff or other youth by the subject, as required by DCR policy 9.18. " [3]

Of the five use of force incidents, four occurred in or adjacent to Module 8 (Ponce Puertas). Evaluation of the appropriateness of the force employed was hampered by the fact that there was no video coverage for two incidents and the force occurred in a blind spot within a module dayroom in a third incident.  Without the availability of video for these three incidents, assessments needed to be made based on my review of incident reports and supplemental documentation such as nursing notes, Cernimiento forms, and Use of Force Checklists completed by compliance officers at the facility.

Staff who used force themselves, or were witnesses, prepared reports using the check boxes and narrative components of the Incident Report form, with reviews by supervisors as required and Cernimiento reviews by directors, UEMNI liaisons, and compliance staff to determine whether 284 referrals would be made.

As of this quarter, compliance and UEMNI Liaison/Compliance staff began using a QA Use of Force Checklist to review use of force incidents and OISC staff committed to integrating the elements of the tool in their investigations, although there were no use of force investigations for events this quarter.  This tool reflects the requirements of ¶77 as clarified by policy 9.18.  While OISC has protocols that determine what steps its investigators will take in reviewing an incident, those measures are not directed specifically at assessing compliance with ¶77 and Policy 9.18 and use of force training; OISC investigations should comment on whether there were any violations of these policies, others, or training.

While the Use of Force Checklist is a helpful tool to guide the review of incidents by compliance staff,  review of the completed forms that correspond to each of the reported incidents reveals that some adjustments are required to enhance their utility.

Although not pursuant to a policy or formal process, the Monitor's Consultant was pleased to see that Ponce management and compliance staff have initiated a practice of meeting as a group to review each use of force incident to determine whether follow-up

---

[3] There was one use of chemical agents by UOE at Ponce on September 9, in **Q3**.  That incident was investigated by OISC in #19-056 and the investigation was completed in Q4. No finding was made relative to the appropriateness of OC, although it appeared to have been necessary and appropriate give the fact that three youth were attacking a fourth with sharp objects. *See also*, Incident P19-09.

|  | is necessary, whether the force was used properly as per training and policy, and to review incident reports. [4]<br><br>As of December 2018, IDECARH issued revised training materials to reflect the August 2018 revised version of policies 9.18 (use of force) and 9.10 (reporting).  As stated in the previous QRs, a review  of the revised training materials by the Monitor's use of Force Consultant determined them to properly track the new policy and appropriately convey to staff the expectations for use of force as required by ¶77 and the associated policies. |
|---|---|
| What is needed for full compliance? | In order for the Monitor's Consultant to find substantial compliance with ¶77, DCR must be able to provide evidence in incident reports, videos and OISC investigations of OC routinely being used according to the procedures set forth in Policy 9.18. The absence of OC usage in the five uses of force this quarter is a positive step in that direction.<br><br>Over the past couple of years we have observed staff routinely exhibiting much patience and use of alternatives to force before resorting to physical restraints or chemical agents, but DCR must provide additional evidence to the Monitor and reinforce to staff that, where feasible and safe, alternatives to force and de-escalation must be used before staff resort to physical, mechanical and chemical restraints. |
| What  steps are recommended? | 1. Implement the video camera system at Villalba and insure that blind spots are minimized<br>2. Enhance the Ponce CCTV system to provide coverage of dayroom walls, the sallyports outside the dayrooms, and the mini-exercise yards.<br>3. OISC should more directly include in investigations assessments of compliance with ¶77 and Policies 9.10, 9.18 and use of force training.<br>4. Both facilities should routinely conduct after-incident case reviews to evaluate use of force incidents.<br>5. Continue efforts and associated documentation to de-escalate potential confrontations and use of force, including limited use of OC as per policy 9.18<br>6. DCR IDECARH needs to provide updated evidence to the Monitor's Office that all staff have received the required training in the revised Use of Force Policy 9.18 and reporting requirements included in 9.10. Also, IDECARH needs to provide the Monitor with any updates to the use of force training since 2018.<br>7. Provide the Monitor with any Policies 9.10, 9.18 that have been promulgated since 2018 for review and approval. |

---

[4] In the case of one incident P-19-12-571, the weekly reporting to the Monitor incorrectly noted that the two youth who were combatants in Puertas were injured due to the staff's physical restraints.  The  staff merely held the youth to separate them and the injuries were caused by the underlying confrontation by the two youth.  This seemed to be confirmed by our review of medical notes. No video was available, which made this review that much more critical.

| Sources relied upon by Consultant for report and Compliance Ratings | DCR's weekly spreadsheet reports of use of force incident<br>Incident videos available at Ponce<br>IDECARH revised training materials reflecting the August 2018 revised policies 9.18 (use of force) and 9.10 (reporting).<br>DCR incident reports<br>OISC investigation report # 19-056  for a Q 3-19 use of force<br>January 20, 2020 DCR UEMNI statistical report |
|---|---|

## Protection from Harm:  Investigations of Abuse and Institutional Neglect – Kim Tandy, Javier Burgos and David Bogard

| S.A. 78.   Defendants shall take prompt administrative action in response to allegations of abuse and mistreatment.  An incident report shall be prepared for each allegation of physical or mental abuse, including juvenile on juvenile assaults, staff on juvenile abuse, and excessive use of force by staff, within 24 hours of the incident.  A copy of each incident report together with the preliminary investigation prepared by the Police Department and/or AIJ shall be forwarded to Defendant Department of Justice, where the allegations shall be investigated and a final report shall be made in 30 days.  In addition, a copy of each incident report alleging physical or mental abuse by staff or excessive use of force by staff together with the preliminary investigation prepared by the Police Department and/or the AIJ, shall be forwarded to the Defendant Department of Social Services. |
|---|

| Compliance Rating | Partial Compliance |
|---|---|
| Description of Monitoring process during this period of time | The Monitor met with the Functional Team regarding Paragraph 78 on December 6, 2019. It included members of OISC, UEMNI, Puerto Rico DOJ and police.<br><br>The Monitor also reviewed the table developed by UEMNI listing all OISC and UEMNI investigations of alleged abuse and/or institutional neglect for the Fourth Quarter of 2019, and any corrective or disciplinary actions taken against staff for confirmed mistreatment.<br><br>A total of fifteen (15) OISC investigations were received, reviewed and analyzed during the Fourth Quarter occurring between August 14, 2019 and November 13, 2019.<br><br>The Office of the Monitor is working with DCR to ensure that all incident reports are received weekly, or in many cases, within a 24 hour or 48 hour period per the agreement reached on August 26, 2019.  This is necessary to ensure there is backup documentation to the raw data which has previously been reported by DCR relative to paragraph 78 reporting.<br><br>The Office of the Monitor is also tracking alerts and other information on the online system to ensure that incidents are properly reported according to policy, and that these alerts are appropriately documented as incidents, and ultimately 284 referrals where appropriate. A spreadsheet has been created by Bob Dugan to track this information and compare it as backup documentation for quarterly statistical reports. |

**Findings and Analysis**

The approved policies are divided in three sections, and include the analysis of referrals of abuse and/or institutional neglect by UEMNI (Policy No 13.2.1); immediate prevention actions regarding serious allegations (Policy No. 13.2.2); and final determinations on referrals of abuse and/or institutional neglect (Policy 13.2.3). Investigations under this provision are reviewed against these policies as well as others based upon the implication of staff actions taken.

NIJ routinely provides training to staff on Management of Investigations Regarding Abuse and Institutional Neglect. The Annual Training Report for the period of January 2018 through June of 2019 verifies that 95% of staff in both facilities received this required training during that period. Data for the last six months of 2019 will not be received until the next six month report, due in

The following tables summarize statistics about case management for the past four quarters. The primary source of the information is the case tracking records maintained by NIJ along with other records such as the underlying individual case reports and records reviewed by members of the Monitoring team. The Monitor cannot confirm the total number of incidents because her office currently does not receive all incident reports, and in some cases, incidents are not reported as such. For example:

- On 10/6/19, 6 youth at Villalba tested positive for a highly regulated narcotic drug buprenorphine. There is no incident report which has been provided, and no 284 report received.
- 11/26/29 - Youth taken to hospital for suspected razors hidden internally. No incident report provided.
- On 12/12/19, two youth tested positive for Fentanyl and one for Cannabis, but no incident report was provided. UEMNI did file a 284 report.

The incident report cover sheet contains a comprehensive list of items which should be documented and reported. It appears this is not being done consistently, particularly with youth cutting events and positive drug testing.

The first table summarizes general information about incidents events which have been reported by NIJ for the quarter. An incident event may generate many incident reports, but this table counts a multiple-report incident as a single event. Efforts this quarter due to the Agreement of August 26th by the parties has improved the process by providing hard copies of Incident Report Cover sheets to the Office of the Monitor. This process is still being refined, and is intended to be digitalized in 2020.

Incident Tracking by Quarter involving Harm to Youth

| A. General Measures by quarter | 1st 2019 | 2nd 2019 | 3rd 2019 | 4th 2019 |
|---|---|---|---|---|
| A.1 Average Monday 1st Shift count of youth | 123 | 119 | 114 | 109 |

| | | | | |
|---|---|---|---|---|
| A.2 Number of incident events | 33 | 53 | 34 | 26 |
| A.3 Number of youth-to-youth incident events | 6 | 10 | 12 | 8 |
| A.4 Incident events involving use of force by staff | 3 | 9 | 3 | 5 |
| A.5 Incident events with suicide act, ideation, or gesture | 5 | 5 | 14 | 11 |
| A.6 Incident events w/ self-mutilation act, ideation, or gesture | 15 | 18 | 8 | 5 |

A total of eleven (11) Level II 284 referrals were made this quarter.

Mental Health Incidents – Including 284 Reports

The subset of incidents involving suicidal acts, ideation, or gestures, or self-mutilation acts, ideation or gestures is found in Table B.  Most of these do not warrant abuse allegations.  If a 284 report is filed, implicating possible abuse by a staff member or other, the case also moves through the investigative stage.

| B. Mental Health Record Information | 1st 2019 | 2nd 2019 | 3rd 2019 | 4th 2019 |
|---|---|---|---|---|
| B.1 Suicidal incidents, ideation or gestures | 5 | 5 | 14 | 11 |
| B.2 Number of individual youth referenced | 5 | 4 | 14 | 11 |
| B.3 Cases involving ideation only | 3 | 3 | 9 | 3 |
| B.4 Cases involving suicide gesture | 2 | 0 | 1 | 5 |
| B.5 Cases involving suicide intention | 0 | 2 | 4 | 3 |
| B.6 Cases w/ ambulatory treatment | 4 | 3 | 5 | 7 |
| B.7 Cases with hospitalization | 1 | 2 | 9 | 4 |
| B.8 Cases leading to death | 0 | 0 | 0 | 0 |
| B.9 Suicide Cases with 284 report filed | 0 | 0 | 0 | 4 |
| B.10 Self-mutilations incidents, ideation or gestures | 15 | 18 | 8 | 5 |

| | | | | |
|---|---|---|---|---|
| B.11 Number of individual youth referenced | 10 | 15 | 8 | 5 |
| B.12 Cases requiring sutures | 0 | 4 | 3 | 2 |
| B.13 Cases requiring hospitalization | 0 | 0 | 0 | 3 |
| B.14 Cases leading to death | 0 | 0 | 0 | 0 |
| B. 16 Self-Mutilation Reports with 284 Referrals | 5 | 2 | 3 | 1 |

The above cases come from mental health records. NIJ has implemented a screening procedure and instrument that diverts the investigation of some incidents from the Paragraph 78 process to a mental health process. Of the 26 (A.2) incident events reported by NIJ in fourth quarter, sixteen (16) (B.1 plus B.10) involved suicide and self-mutilation incidents.

During the fourth quarter, only one of the five (5) incidents involving self-mutilation resulted in a 284 report being filed. Four (4) of the eleven (11) cases involving suicidal gestures or ideation resulted in a 284 case being filed.  For a discussion of these incidents and how they were handled, see Dr. Martinez's analysis for Paragraph 63 in the Mental Health section.

Responses to Abuse Referrals

The next table summarizes abuse referrals and the initial responses to such referrals.

| C. 284 Incidents by quarter (2019) | 1st | 2nd | 3rd | 4th |
|---|---|---|---|---|
| C.1 284 Incident Events | 19 | 24 | 20 | 11 |
| C.2 Level One Incident Events | 5 | 4 | 1 | 1 |
| C.3 Level Two Incident Events | 14 | 20 | 19 | 10 |
| C.4 Referrals to OISC | 14 | 20 | 19 | 10 |
| C.5 Youth to Youth incidents | 6 | 10 | 12 | 8 |
| C.6 Youth to Youth Injuries | 3 | 6 | 6 | 2 |
| C.7 Youth to Youth with External Care | 3 | 3 | 5 | 4 |
| C.8 Youth to Youth Sexual | 0 | 0 | 0** | 0 |
| C.9 Youth to Youth Sexual  w/injury | 0 | 0 | 0 | 0 |
| C.10 Staff to Youth Incidents | 13 | 14 | 8 | 3 |

| | | | | |
|---|---|---|---|---|
| C.11 Staff to Youth Injuries | 6 | 6 | 1 | 0 |
| C.12 Staff to Youth External Care | 1 | 2 | 3 | 0 |
| C.13  Staff to Youth Sexual | 1 | 1 | 1 | 0 |
| C.14 Staff to Youth Sexual w/injury | 0 | 0 | 0 | 0 |
| C.15 284 Incidents with Admin. Action | 19 | 24 | 20 | 11 |
| C.16 284 Incidents with report by shift end | 18 | 23 | 19 | 11 |
| C.17 Level 1 investigations completed 20 days | 5 | 4 | 1 | 0 |
| C.18 Special Operations interventions | 1 | 2 | 2 | 0 |
| C.19 SOU reports with 284 investigations | 0 | 1 | 1 | 0 |
| C.20  284 with Item 5 completed | 19 | 24 | 20 | 11 |
| C.21 284 with Staffing Compliance | 17 | 24[5] | 19 | 11 |
| C.22 Percent of 284 cases with staffing compliance | 89% | 100% | 95% | 100% |

** One sexual assault allegation was received and is noted although it was incorrectly identified in the data.

A determination is made at the institutional level as to whether incidents are Level One or Level Two based upon criteria in the Cernimiento de Incidentes de Alegado Maltrato Institutional form.  Level one incidents by definition include verbal abuse and some forms of physical aggression.  Level Two incidents include material exploitation, incidents of a sexual nature, death, various instances of institutional neglect, including youth self-harm, undue restrictions with medication, misuse of mechanical restraint or pepper spray, and excessive use of force.

Level One incidents are investigated locally at the institution. Level Two incidents are investigated by OISC. Referrals to OISC as based on the screening protocol.

A review during the 4th quarter of 2019 for the calendar year shows that there was one Level 1 report made.  Level I cases followed the same format/guidelines than Level II cases but the facilities' investigators only have 20 working days to finish the investigation.

Initial Case Management Measures Taken

| D. Initial Case Management Measures (2018-19) | 1st | 2nd | 3rd | 4th |
|---|---|---|---|---|
| D.1 284 percent with admin actions | 100% | 100% | 100% | 100% |
| D.2 284 per cent completed by end of shift | 95% | 96% | 95% | 100% |
| D.3 284  Level 1 Investigation Complete Within 20 days | 100% | 100% | 100% | 0% |

Initial case management data indicates that compliance remains strong regarding the percentage of documentation by the end of the shift, and completion by UEMNI of Level 1 investigations within the prescribed period of time.

Investigations Referred to OISC

| E. OISC (2018-2019) | 1st | 2nd | 3rd | 4th |
|---|---|---|---|---|
| E.1 Cases Referred from this quarter | 14 | 20 | 19 | 10 |
| E.2 Received by OISC Within 24 hours | 12 | 17 | 16 | 10 |
| E.3 Completed by OISC Within 30 workdays | 12 | 18 | 9 | 1 |
| E.4 Complete during the next quarter, but within 30 days | 0 | 0 | 0 | 2 |
| E.5 Cases Not Completed by OISC Within 30 days. | 2 | 2 | 10 | 9 |
| E.6 Percent of OISC cases completed within 30 days | *86%* | 85% | 47% | 10% |
| E.7 Completed Cases Returned for Further investigation | 0 | 2 | 1 | 0 |
| E.8 Percent of cases returned for further investigation | 0% | 10% | 10% | 0% |
| E.9 Further Investigation Completed | 0 | 0 | 0 | 0 |
| E.10 Cases this quarter incomplete, including further investigation | 0 | 2 | 10 | 9 |
| E.11 Percent of cases from this quarter not yet completed | 0% | 10% | 53% | 90% |

The following table summarizes the decisions and actions taken in cases that do not involve criminal charges.

| F. Administrative Determinations for 284 Cases (2018-2019) | 1st | 2nd | 3rd | 4th |
|---|---|---|---|---|
| F.1 Cases with youth discipline referrals | 21 | 31 | 38 | 16 |
| F.2 Cases with youth discipline actions | 12 | 19 | 31 | 10 |
| F.3 Cases with youth no discipline actions | 9 | 7 | 7 | 6 |
| F.4 Cases Staff/youth with determinations | 9 | 12 | 24 | 17 |
| F.5 Cases recommending personnel actions | 3 | 6 | 12 | 9 |

Of the 16 youth cases referred for disciplinary action (F.1) with referrals as a 284 cases, 10 disciplinary actions were imposed; no discipline was imposed in 6 cases.  This represents a substantial decrease from the last two quarters.

Of the 17 cases involving staff/youth incidents, personnel actions were recommended in 9 cases, also a significant decrease over the last 2 quarters.

A summary of actions taken by the legal department is provided at the end of the fiscal year as part of the annual report.  It would be helpful to indicate whether such decisions were overturned on appeal or through any other process.  The summary should also provide information on the nature and extent of disciplinary actions involving youth.

Prosecutorial Determinations for 284 Cases

| G. Prosecutorial Determinations for 284 Cases (2018-2019) | 1st | 2nd | 3rd | 4th |
|---|---|---|---|---|
| G.1 Cases received by PRDOJ | 1 | 2 | 1 | 0 |
| G.2 Cases with decision  not to prosecute | 1 | 2 | 1 | 0 |
| G.3 Cases with referral for prosecution | 0 | 0 | 0 | 0 |
| G.4 Cases pending determinations | 1 | 0 | 2 | 2 |

NIJ's quarterly statistical report indicate that unlike other quarters, most of the case investigations were not completed within the 30 day completion time.  OISC staff were being

used to carry out investigations of candidates for the adult training academy. OISC indicated has been engaged in an aggressive schedule to complete the remaining investigations.

The Monitor would like to note, however, that some investigations may be of a more complex or sensitive nature and may require more than 30 days to complete; such explanations should be conveyed to the Monitor.

A review of the fifteen (15) OISC reports received for the quarter indicates the investigations were typically very thorough, assessing numerous aspects of the incidents being reviewed including the completeness and accuracy of written reports, good summaries of youth and staff interviews, review of medical records and interviews with nurses, most recent training received by each employee involved, as well as thorough findings of relevant facts. Findings as to whether the allegations were validated and other policy or training violations occurred are increasingly detailed. Although it is the Legal Division that ultimately determines the efficacy of charges and, if appropriate any corrective actions, OISC staff are now making recommendations as to whether there is sufficient evidence to corroborate the allegations or any other concerns that arise during the investigation. Reports are also now identifying specific policy violations, by policy number, that may have occurred. Investigations are reviewed by supervisors to ensure investigators are following protocol.

During the Functional Team meeting in December, continued discussion of sexual assault investigations was held. The meeting was joined by an Assistant District Attorney and Sexual Crimes Coordinator for the Police Department to discuss forensic interviews of sexual assault victims. An investigation completed during the third quarter regarding allegations of sexual assault youth-on-youth raises questions about the protocol for addressing these situations. (OISC 19-046). The Assistant District Attorney clarified that hospitals in PR receive sexual assault training from the Department of Health and are able to conduct forensic sexual assault evaluations for youth in NIJ. They have available training for staff in responding to such incidents, as well as for ongoing treatment and care. She recommended that NIJ provide a wish list for training on sexual assault identification, response and investigations. She also indicated that she would ensure that criminal charges regarding the case above would be given top priority.

OISC reports have raised important issues during this quarter regarding the need to ensure that youth are searched before and after movement, and that searches are done consistently and thoroughly for noted contraband. OISC investigators noted in several reports the lack of staff, the failure of staff to adequately supervise youth, and incidents of harm which may have otherwise been prevented. OISC provided strong language about the incidents where young men are getting access to sharp objects and cutting themselves to embed items into their penis, causing physical damage and risking infection. (The Monitor notes that such incidents have been reported on numerous occasions, and are not always referred as a 284 or even as an incident report)

Perhaps the most disturbing OISC report (Case #19-061) involved the investigation into two youth who escaped from Ponce, one of whom was killed in the community within days after. It was noted that several staff member were working double shifts, and even triple shifts, and

| | |
|---|---|
| | that staff were not monitoring cameras as the time of the incident.  A UOE memo was in place requiring these special operations officers to provide security for youth in Unit 2 (sumariadoes) while also maintaining their regular duties, including guarding the perimeter.   OISC investigators utilized Agent Edgardo Alverez Burgos, training instructor for DCR, to evaluate the circumstances leading up to the escape. They were best described by Agent Alerez as "no coordination, no communication, and no common sense." As a result there were delays in reporting the missing youth, delays in the search of the exterior perimeter which allowed the youth to escape from the grounds. The OISC report noted violations of Policy 9.2 regarding perimeter area searches, Policy 9.4 regarding physical counts of youth, and Policy 9.19 regarding UOE responsibilities.  Although not the focus on the OISC investigation, staffing shortages are at the root of this problem once again, and pulled UOE staff from normal duties in order to provide added security to a high risk unit in Ponce.  UOE cannot adequately provide supervision of a unit while at the same time be responsible for the perimeter security. |
| What is needed for full compliance?

What steps are required and/or recommended? | Paragraph 78 is a critical aspect of protecting youth from harm while incarcerated in NIJ facilities**.**   The process is designed ensure that allegations of harm are immediately reported, investigated at both the facility level and through OISC, and that appropriate actions are taken for discipline against youth and/or employees involving such misconduct.  Of equal importance, however, is that the process should identify policies which may need to be changed, additional training which may need to occur, and/or other measures which should be taken in response to incidents which have been investigated.  In that sense, Policy 13.2.1 has as part of its purpose, "to prevent and minimize the occurrence of situations involving abuse or institutional neglect."

NIJ must ensure compliance with Policy 9.10 regarding consistent reporting of incidents as noted on the Incident Report Cover Sheet.  As DCR moves toward digitization of its incident reports, a review of the policy and cover sheet format should be done to ensure it captures data necessary to generate effective management reporting.

 The Monitor and her team have continued to be impressed by the quality of investigations being performed by UEMNI and OISC, including thorough, timely reports which increasingly conclude with findings which indicate conduct which appears to violate policy, and weigh evidence to support or disprove allegations and other reported circumstances.  But timely and thorough investigations are not enough to find substantial compliance without consideration to whether policies and practices meet the underlying purpose of Paragraph 78.  In this regard, there remains work to be done.

Compliance measures require:

1) Timely reporting by NIJ of all incident reports (cover sheets) as detailed in other aspects of this report, to the Office of the Monitor. This ensures the Monitor that incidents are appropriately reported for investigation, or otherwise identified for review and possible 284 referrals. All incident reports are to be submitted weekly, but those of a more serious nature identified elsewhere must be submitted within 24 hours, or 48 hours, consistent with the |

Agreement between the Parties filed on August 26, 2019, and any further Agreement and Order from the Court.

2) Submission of UEMNI referrals and OISC completed investigations should be done at least monthly, or sooner if requested. Translation and review of these reports can be time consuming, but the content is extremely important and reflective of institutional climate, youth population challenges and leadership issues, as well as the response to such.

3) OISC investigations should continue to evaluate compliance with procedural requirements regarding the handling of incidents, and equally important,  contain sufficient detail with regard to violations of policy, credibility of facts and evidence supporting or disavowing allegations, and other relevant conclusions reached by the investigators.  Processes must be in place within facilities and NIJ leadership to then utilize these findings to make needed changes. Reports should be completed within 30 days of referral; while some reports may require additional time, the rate of timely completion during this quarter and last quarter was exceptionally low.

4)  Consistent with the purpose of Paragraph 78, and Policy 13.2.1, measures must be in place to prevent and minimize the occurrence of situations involving abuse or institutional neglect. At a minimum, reporting on this should include:

a)  Quarterly statistical reports of incidents involving allegations of abuse or institutional neglect, with analysis of possible patterns, trends, and other observations which can help prevent further incidents;

b)  Evidence of meetings which document meetings with management and others to discuss cases of alleged abuse, status and outcomes of investigations, evaluation of patterns of recurrence, compliance with the terms, and discussions of alternatives for the prevention of incidents. Summaries of these meetings and decision regarding policies, training needs, and other appropriate action steps should be documented and submitted.

c) Evidence of training for staff trainers and other direct service staff on the handling of referrals of alleged abuse and institutional neglect in coordination with IDECARH.

d)  Maintenance of a log of actions taken against employees including the particulars of the actions by the employee, and actions taken against the employee, whether administrative or criminal.  Given that the purpose is to consider recidivism of actions constituting abuse or neglect, an analysis of such information should be done at least quarterly, or more often if warranted.  A copy of this log should be made available to the Monitor on a quarterly basis, along with any analysis done or actions taken as a result.

e)  In the case of sexual abuse investigations, UEMN must review incidents to "recommend changes in policy or practices to prevent and detect sexual assault" as required by Policy 13.2.  Such reviews should ensure that adequate PREA protocols are in place and being used.

| Priority Next Steps Toward Compliance | Staff must have a clear understanding of what should be reported as an incident, who must report, and the process for determining whether incidents should be reported as a Level 1 or Level 2 284 report requiring investigation at the facility level, or by OISC. |
|---|---|
| | Incident cover sheets must be provided weekly, with those incidents of a serious nature provided to the Office of the Monitor within 24 hours.  The Office of the Monitor, through Bob Dugan, will continue to track these incidents relative to safety issues, and to determine appropriate referrals for investigations of Level 1 and Level 2 investigations. |
| | Digitizing incident reports for efficiency, consistency and accountability purposes should be completed, in consultation with Bob Dugan, so that a systemized method of obtaining data regarding incidents, by facility, can be collected and analyzed. |
| | Provide the Monitor with evidence of the last 3 meetings where discussions were held regarding the status and content of investigations, trends identified, and decisions made as a result. |
| | Provide the Monitor with the last year years of data detailing employee conduct and actions taken by the agency, along with analysis of recidivism or other trends completed as required by policy. |
| | UEMNI should examine the sexual assault incidents which have been alleged, determine if PREA protections are in place, and if any changes in policy and practice should be made. Reference to prior correspondence from the Monitor as to forensic evaluations, training and other matters should be addressed. |
| Quality Assurance | The Monitor has not reviewed proposed QA measures in this area. |

## Protection from Harm – Isolation and Protective Custody (David Bogard)

| | **S.A. 79.** Juveniles shall be placed in isolation only when the juvenile poses a serious and immediate physical danger to himself or others and only after less restrictive methods of restraint have failed. Isolation cells shall be suicide resistant. Isolation may be imposed only with the approval of the facility director or acting facility director. Any juvenile placed in isolation shall be afforded living conditions approximating those available to the general juvenile population. Except as provided in ¶ 91 of this agreement, juveniles in isolation shall be visually checked by staff at least every fifteen (15) minutes and the exact time of the check must be recorded each time. Juveniles in isolation shall be seen by a masters level social worker within three (3) hours of being placed in isolation. Juveniles in isolation shall be seen by a psychologist within eight (8) hours of being placed in isolation and every twenty-four (24) hours |
|---|---|

|  | thereafter to assess the further need of isolation. Juveniles in isolation shall be seen by his/her case manager as soon as possible and at least once every twenty-four (24) hours thereafter. A log shall be kept which contains daily entries on each juvenile in isolation, including the date and time of placement in isolation, who authorized the isolation, the name of the person(s) visiting the juvenile, the frequency of the checks by all staff, the juvenile's behavior at the time of the check, the person authorizing the release from isolation, and the time and date of the release. Juveniles shall be released from isolation as soon as the juvenile no longer poses a serious and immediate danger to himself or others. |
|---|---|
| Compliance Rating | **Partial Compliance** |
|  | **S.A. 80.** The terms of this agreement relating to safety, crowding, health, hygiene, food, education, recreation and access to courts shall not be revoked or limited for any juvenile in protective custody. |
| Compliance Rating | **Partial Compliance** |
| Description of Monitoring process during this period of time | The process for Monitoring isolation under ¶ 79 has historically included a review of the placement of youth in either Protective Custody (PC under Policy 17.19), or Transitional Measures (TM Policy 17.20) for compliance with the protections and precautions enumerated in that paragraph and in the associated policies . Other forms of restricted room confinement, including self-confinement, group schedule modification, or "cool off" periods, may be considered as isolation as well;  as such, the Monitor has determined that the Parties must come to an agreement as to the scope of what actions are included in this provision as "isolation" and which then invoke the underlying constitutional concern reflected in this provision.

Of the four (4) cases examined this quarter, two (2) were held in Protective Custody, and one in both Transitional Measures and then in Protective Custody. Each of these cases is analyzed under ¶ 79 since these youth are primarily confined in their rooms as a result of these statuses. Because of the substantial overlap and interplay between these two provisions, the Monitor's Consultant has elected to address them together in this 4rd quarter compliance report.[6]

The Monitoring Team's 2019 Fourth Quarter site visits to monitor this provision occurred December 10-11, 2019.  On the day of the December 10, 2019 site visit to Ponce, there were two youths on PC status (CDV and ECV) while there was one on TM status at Villalba (LLM). These youths were confined to their rooms for most hours of the day due to their TM or PC status and the facilities' determination that this was necessary to protect them or others from |

---

[6] The Monitor acknowledges the DOJ's objection to this approach expressed in commenting on the 3rd Quarterly Report but maintains that the two provisions can be separated when the measures for substantial compliance are satisfied.

harm.  Monitor's staff interviewed two youths who were primarily confined to their rooms during waking hours.

A significant development and component of our monitoring this quarter is the review of DCR's internal quality assurance activities for ¶ 79 and ¶ 80.  Compliance staff have been using the Checklist to evaluate ¶ 79 and ¶ 80 initial placements of youth in restricted rooms due to TM or PC status, and also applying the criteria included on the Weekly Audit forms that measure compliance with key aspects of ¶79/¶80 on an ongoing, weekly basis after placement. And Monitor's staff have been reviewing the checklists and weekly audits to review the data being generated by DCR compliance staff in order to assess the degree to which ¶79 and P80 criteria are being satisfied.

While on-site at Ponce, Monitors met with compliance staff who are charged with internal quality assurance for room restriction due to TM/PC status.  The meeting was to review how the facilities are complying with the ¶ 79 requirements as they relate to the criteria for initial placement in restrictive housing  (Checklist) and the weekly requirements (Weekly Audits).  ¶80 protective custody criteria are integrated into the initial checklist and weekly audit forms.  Prior to arriving on site and meeting with compliance staff, we reviewed the checklists and Weekly Audits completed to date.

During the quarter, efforts continue to identify instances of facility imposed restrictions on regular module schedules and group activities pursuant to Policy 9.17 *Group Time Modification*. The policy provides a management tool that allows flexibility in the event of special events such as group disturbances, mass searches, investigations, group violence, escapes and other similar circumstances that necessitate special security precautions.  The policy identifies critical circumstances that can prompt imposition of this policy and what activities can be curtailed. And it includes forms that must be completed to justify and document the events preceding and during the Group Time Modification.  The Monitor continues to identify instances of this policy being used, what services and out of room activity is provided, and whether use of this tool constitutes "isolation" for ¶ 79 purposes, once the term is defined and clarified.

Monitoring staff attempted to assess the status of suicide resistance enhancement measures being taken in all rooms in both facilities.  These efforts included inspecting rooms to advise DCR as to what would be necessary and assessing rooms that were in the process of being retrofitted.

| | |
|---|---|
| Findings and Analysis | Despite the significant number of serious incidents, particularly involving Sumariados, the combined number of four[7] PC and TM events was far lower than last quarter[8] and lower than the quarterly average of 13 that was experienced in the preceding three quarters of 2019. |

[7] One youth (LLM), was initially on TM status and then was placed on PC, both at Villalba. This accounts for two events.

[8] The average headcount dropped by 4% from the 3rd to 4th quarter, which would not account for any changes.

| Facility | Q4 Events: Protective Custody | Q3 Events: Protective Custody | Q4 Events: Transitional Measures | Q3 Events: Transitional Measures |
|---|---|---|---|---|
| CTS Ponce | 2 | 7 | 0 | 0 |
| CTS Villalba | 1 | 0 | 1 | 0 |

The weekly Audit for each youth focuses on the five ¶79/80 post placement criteria that are most critical and/or have proven most difficult for DCR to comply with, including: (1) the youth was seen by a psychologist every 24 hours after initial placement in the status, (2) the youth is seen by a case worker at least once every 24 hours, (3) if eligible, the youth receives 50 minutes of education class time per subject, five days a week, and (4) the youth receives one hour of recreation daily and (5) youth are observed every 15 minutes when in their rooms.

Our review of the checklists and weekly audits has revealed substantial progress in documentation of services and corrective actions as well as documented compliance relative to the majority of requirements of ¶79 and ¶80.   All data is now consistently sourced, whether it emanates from the hours of observation forms, the services forms, or academic records. Corrective measures taken due to missed requirements are specific and well-documented, e.g., when 15-minute rounds are being delayed by a particular shift, there are meetings with supervisors or facility directors convened to identify the underlying problems or staff responsible.  When there is variance regarding a sub-provision, it generally is a one-time exception, or a de minimis variance (e.g., the youth received 48 minutes of recreation one day and not 60). Social workers are seeing the youths six days a week, and while the provision requires it be seven, on Sundays the psychologist sees them while he or she is already required to be on-site as per the contract (a very reasonable and efficient mitigation measure).  And ¶79 requirements for seeing social workers and psychologist every 24 hours are being consistently met as are daily recreation and the education requirement (for youth who do not have 12 years of education).  Other instances of missed services, while infrequent, have been explained and documented, e.g., youth declined to receive a service; no recreation due to inclement weather; no school due to a holiday or teachers' conference.

Missed, delayed or non-documented 15 minute rounds have been identified as the most consistent non-compliance issue through the Weekly Audit process. Officers are partially compliant with this requirement—within a single shift the officers will make some rounds on-time and not others. There is ample evidence presented concerning corrective measures being taken with line staff, supervisors and facility directors to resolve the problems with rounds, including determining whether it is primarily a documentation problem or an actual issue of delayed or missed rounds.

The second persistent non-compliance area identified on each Checklist is the need for suicide resistant rooms for youth in isolation. Although youth rooms were already suicide resistant, it was decided that the level of resistance could be *enhanced* by: (1) cleaning and caulking vents in all rooms and (2) retrofitting the room doors to minimize access to the interior door hinges that could be used as a ligature, and (3) caulking around the sprinkler heads. The replacement

of air vent grilles with suicide resistant versions on the lower levels of the housing units at Ponce and Villalba has been completed,[9] although the Monitor's Consultant expressed a concern that in some rooms there were still gaps at the edges of the new vent grills that might allow a juvenile to thread in a ligature and as such, DCR has been applying security calk around the edges of the air vent grills which has been completed at both facilities. With respect to the effort of retrofitting room door hinges with a cover plate to prevent ligatures from being placed around the door hinges, none of the doors have been retrofitted at Villalba and only 15 rooms in Ponce/Puertas have been retrofitted.[10] Analysis of the viability of caulking around sprinkler heads continues.[11]

Aside from the issues of rounds and suicide resistance enhancements for the rooms, the information gleaned from the weekly audits has been extremely positive and generally well documented.

We received documentation from compliance staff [12]that only one Group Schedule Modification event occurred this quarter—in November at Ponce.  This event was due to violence, including use of sharp weapons attributed to the actions of some Sumariados in Module 2. Pursuant to Policy 9.17 the event occurred on November 24, the status was activated for two youth on November 26, and the modification was terminated by the facility director on December 18. While the original intent of Policy 9.17 was to modify youths' schedules to essentially serve as a "time out" for groups of youth as necessary to calm or investigate a dangerous situation, or separate, for a short time, one group of youths from another that appears to have transitioned to them being confined in their rooms for most waking hours without even the benefit of disciplinary due process or the protections conferred by ¶79 (other than 15 minute rounds and review by a psychologist).  This status will be addressed with the identification of a definition of isolation.

DCR maintains that in cases of modification of Group Schedule, based on a schedule of services, youth are offered all services such as education, recreation, food, and access to courts, phone calls, physical health, mental health and social work, among others. [13] Monitor's staff are still endeavoring to determine whether this is the actual case and for how long individual youth are confined to their rooms. This analysis is occurring in the first quarter of 2020 and will include review of log books in which DCR should be documenting such incidents and the services and activities provided to affected youth.

---

[9] Source: DCR email to Monitor dated 1/17/19.

[10] In light of the mental health profile of youth housed in Puertas, DCR decided to begin the door hinge project there.

[11] Source: January 29 email from DCR Life Safety Officer Pedro Santiago to monitor's staff.

[12] Source: January 28, 2020 response to inquiry to compliance staff by Deputy Monitor.

[13] Source: ibid

| What is needed for full compliance? | While not each and every of the 20 criteria set forth in ¶79 as well as the eight criteria specifically required in ¶80 in the case of PC youth needs to be satisfied for substantial compliance to be rated, the majority must be rated positively consistently and with only occasional or intermittent or minor deviations;  these  do "not significantly deviate from the components of the provision, provided that any deviation poses no significant risk to detainee health or safety."<br><br>Monitor Approved policies for TM (17.19) and PC (17.20) and 9.17<br><br>Monitor's staff will audit the results of checklists and weekly audits as they are submitted and while on-site with source documents available.<br><br>A shared definition of isolation is a requirement for ultimately determining what actions constitute isolation events that invoke ¶79 protections. |
| Priority Next Steps | 1. Create a new policy and procedure governing isolation and restrictive room status<br>2. Obtain agreement on a definition of "isolation;"<br>3. Review and revise policies 17.19 (PC), 17.20 (TM) and 9.17 (group Time Modification) as necessary to reflect and coincide with the new policy defining isolation.<br>4. Ensure that all group lockdowns are accomplished formally and documented as per Policy 9.17;<br>5. DCR must promptly and consistently notify the Monitor's staff when a Group Time Modification is instituted and provide documentation of the circumstances and restrictions per 9.17. |
| Sources of Information upon which Consultant relied | Weekly reports of TM and PC events<br>Checklists upon placement and removal from TM and PC<br>Weekly audits of ¶79/80 services and protections |

# MENTAL HEALTH – Dr. Miriam Martinez

**S.A. 59.** Defendants, specifically the Department of Health (ASSMCA), shall provide an individualized treatment and rehabilitation plan, including services provided by AIJ psychiatrists, psychologists, and social workers, for each juvenile with a substance abuse problem.

| Compliance  Rating | Partial Compliance |
| --- | --- |
| Description of Monitoring process during this period of time | During the fourth quarter the Mental Health Consultant performed remote chart reviews and completed site visits in December of 2019 to Ponce and Villalba.  During this site visit, the Mental Health Consultant together with the Monitor also visited a community based residential site in Gurabo, Puerto Rico run by the Good Morning Foundation of Puerto Rico.  This |

| | |
|---|---|
| | community based residential site is being considered for the placement of the NIJ girls.<br><br>The Mental Health Consultant also reviewed documentation regarding emergency psychotropic medication, suicidal ideation/intent/gesture and self-mutilation reports, documentation of administration of the MAYSI 2 and reports of youth in transitional measures or protective custody.  During the site visit, the Mental Health Consultant followed up on unresolved issues related to accessibility of records within the EMR that were noted in the last quarter report.  The Mental Health Consultant met with NIJ IT staff, staff of the Department of Evaluation and Classification (DEC) as well as PCPS leadership to address issues related to accessibility of records for the mental health staff as well as the Mental Health Monitor.<br><br>During the site visits, the Mental Health Consultant interviewed mental health staff that were new to her (2)  and interviewed mental health staff regarding youth that were of concern.  The Mental Health Consultant interviewed ten youth in Ponce and seven youth in Villalba.  Several of the interviews in Ponce were conducted with the PCPS psychiatrist present to clarify symptoms and treatment planning. |
| Findings and Analysis | Professional Consulting Psychoeducational Services (PCPS) is contracted by the Department of Correction and Rehabilitation to provide mental health staff to provide psychiatric, psychological and substance use services to youth within NIJ.  The PCPS  mental health staff are able to place the youth when needed into psychiatric hospitalization for stabilization and safety reasons.  This is an improvement over years past when the NIJ Mental Health staff had a very difficult time finding psychiatric beds that would accept the youth who were in psychiatric crisis.  The PCPS leadership has been responsive in providing information as requested regarding staffing or high-risk youth.  The psychiatrist and psychologists seem to be working closely and collaboratively to manage the mental health needs of the youth.<br><br>The PCPS leadership indicate that they are trying to find another child/adolescent psychiatrist to add to the staffing. In the meantime, when the current child/adolescent psychiatrist is on vacation/away, PCPS fills in these services with a back-up child psychiatrist that previously worked within NIJ.   The Mental Health Consultant continues to recommend that PCPS hire another child/adolescent psychiatrist in order to augment and back up the services that the current psychiatrist can provide.<br><br>Following up on the issue highlighted in the 3rd quarter report regarding all mental health staff having their own log in and secure password to the EMR, the PCPS psychologist has assured the Mental Health Consultant that all permanent staff do have their own secure passwords and log in.  The |

psychiatrist that fills in will obtain secure password and log in when he/she is filling in.

Of great concern is that there has been an alarming increase in the number of youth that are testing positive (some repeatedly) for illegal substances, including fentanyl.  Youth interviewed allude to some of these substances being brought in through anal cavities following passes to the community.

The Mental Health Consultant found that despite the medical staff placing orders for 3 youth for medical labs, MRIs or neurologist appointment, these were delayed or not being carried out hindering further diagnostic information and treatment planning.  The youth needing these evaluations were of serious concern. Two are from PUERTAS.  One experienced weight loss so severe the Mental Health Consultant almost failed to recognize him from the third quarter when she interviewed him.

As noted in the previous quarterly report, the individual plans need to be more individualized for each youth with specific treatment goals and objectives for each youth in relation to their presenting problems.

The Department of Evaluation and Classification (DEC) within the Department of Correction and Rehabilitation has a team of staff dedicated to evaluating and classifying the youth as they enter into detention.  The DEC have staff that specialize in gathering the forensic information as well as the family, social and educational history, health, substance use and mental health service use.  The DEC staff are able to obtain information from the educational system, the Child Protection/child abuse system, and community mental health to develop a clear picture of youth history and current needs.  The DEC team creates a preliminary and temporary treatment plan based on information gathered.  A permanent treatment plan is developed once there is a case disposition and court order (sentencing), and the youth is remanded to treatment within in NIJ.

The information from DEC is crucial to the treatment planning process.  Despite the Mental Health Consultant's advocacy during the 3rd quarter site visit and in subsequent emails and phone calls that the DEC information be present and immediately accessible.  This was not completed until the Mental Health Consultant went in person during the 4th quarter site visit to the IT Department and was able to trouble shoot in real time to provide access to the PCPS mental health treatment team, including the psychiatrist.  PCPS manages very seriously at risk youth, some who become suicidal upon entry, some who have experience or have psychosis upon entry, and some who have significant cognitive delays.  A PCPS psychologist attends some or all of the DEC meetings currently, however, the information should be accessible to all on the PCPS team – especially the psychiatrist.

| | |
|---|---|
| | Treatment planning would be further enhanced if the psychiatrist is included in DEC case discussions – especially for the most psychiatrically concerning given that the DEC receives and analyzes this information.<br><br>Diet and exercise are important aspects that can influence mood.  One youth in Ponce complained of a "dessert" being served as the snack in the evening which was too sugary (a diabetic patient). We are aware that a lack of staffing limits the amount of out of room/module time that youth can have, however, it is extremely important that the youth confined to their rooms in protective custody or transitional measures receive time out of their rooms for their mental well-being.  The Mental Health Consultant has repeatedly written of the dangers in suicidal ideation, gestures and intent for youth confined – whether it is as a result of an incident (a temporary lock down) or self-imposed (a youth in PC refusing to leave PC for fear of their own safety).<br><br>NIJ leadership at both sites confirmed high stress and difficulties due to a lack of staffing.  Although we were informed by NIJ leadership that some security officers were going to be re-assigned to the NIJ facilities, by the end of our site visit, it was unclear if or when this would come to fruition. Delivery of mental health services is at times delayed or hampered due to the lack of security staffing to escort youth that need to be seen to needed mental health appointments.  The hours that delivery of mental health services can occur are typically after school and therefore there are less hours to see all of the youth. PCPS staff assured the Mental Health Consultant that the mental health staff stay on site until youth that need to be seen, are in fact seen. |
| What is needed for full compliance?<br>What steps are required and/or recommended? | For full compliance:<br>1. NIJ must maintain a stable and consistent work force that delivers mental health services per the plan of care and per the suggested delivery of services for PUERTAS. A term of at least 1.5 years with the current mental health treatment team would indicate some stability has been maintained in the PCPS mental health treatment team.<br>2. The youth's treatment plans should reflect the individual needs of each youth.  PCPS' accessibility to the DEC information should further help tailor the treatment plans more closely to the individual needs of the youth.<br>3. Orders placed by medical staff should be executed as quickly as possible – especially for the high-risk youth and when these medical orders are needed to clarify diagnosis and treatment plan.<br>4. Group therapy needs to be consistently provided vs. just didactics/educational groups – especially for the youth in PUERTAS.<br>5. The mental health team will need to increase substance use interventions, both individual and group. |

|  | 6. Security personnel supervisors and the mental health leadership should work together to strategize the best times of day to have youth escorted to receive mental health services.<br>7. All youth should be in environments free of substance use. The majority of youth have co-morbid substance use diagnosis and struggle with abstaining from illicit drug use. The last couple of months have seen an increase in synthetic marijuana, fentanyl, and norbuprenorphine which raises serious concerns as to the care youth are receiving in this environment and what measures are being taken to identify the responsible sources(s). |
|---|---|
| Priority Next Steps | 1. Increase psychiatric coverage by hiring another psychiatrist. With the drop in the census, it is now recommended that two psychiatrists be hired for a total of 1.25 FTE (instead of the 1.5 FTE that was being suggested in previous reports).<br>2. Use information from the DEC (past psychiatric history, history of suicidal ideation/intent/gesture, history of substance use, cognitive ability, family history, trauma) , to further tailor individual treatment plans and to improve programing – especially in PUERTAS.<br>3. Call more case conferences with the DEC team to further clarify treatment planning needs for complex cases<br>4. Increase substance use individual and group interventions (prevention and treatment) – especially for those found to have positive drug test results. |
| Quality Assurance Measures | The Mental Health Consultant has consistently requested the establishment of a Quality Improvement Team and this has yet to be realized. |
| Sources of Information upon which Consultant report and compliance ratings are based. | Sources of information that the Mental Health Consultant relied on were site visits to Ponce/PUERTAS & Villalba, interviews with youth and staff, review of medical records, and a review of all reports submitted to the Mental Health Consultant and the Monitor, as well as mental health staffing reports. |

**C.O. 29:** Defendants shall establish an adequate residential mental health treatment program which provides services in accordance with accepted professional standards for juveniles confined in the facilities in this case who are attempting to commit suicide and/or who are inflicting harm upon themselves and/or any other juvenile in need of such services as determined by the juvenile's interdisciplinary mental health team, which includes a qualified psychiatrist. This residential treatment program will house up to forty-eight (48) juveniles from Commonwealth facilities. The residential treatment program will be established in an area that meets professional standards regarding safe physical areas for suicidal and/or self-mutilating juveniles.

| Compliance  Rating | Partial Compliance |
|---|---|

| | |
|---|---|
| Description of Monitoring process during this period of time | The Mental Health Consultant conducted a site visit to PONCE PUERTAS in December of 2019 and interviewed the four youth in that unit.  Discussions were held with the PCPS psychologist supervisor, the psychologist and the psychiatrist.  Chart reviews of youth in PUERTAS were also conducted during this 4th quarter and questions and concerns were sent to NIJ and PCPS leadership to be addressed. Prior to the site visit a detailed description of PUERTAS program was requested.  It was not received at the time of the site visit and still has not been received as of the writing of this report despite repeated email requests and phone calls.  A list of staff assigned to PUERTAS was provided, however, this is not a description of a program as has been described, outlined and requested by the Mental Health Consultant.  While the Mental Health Consultant recognizes that mental health staff turnover makes it difficult to have continuity of care for the youth, a new staff person can be oriented to an existing program and thereby provide some stability and consistency in mental health treatment for the youth. |
| Findings and Analysis | The four youth that are housed in PUERTAS have collectively had 15 incidents of suicidal ideation, gestures or suicide attempts and 7 instances of self-mutilation over the past 4 quarters.  Youth are reporting self-mutilation at times due to boredom ("better to go to nursing just to get out of the room/module") or in order to disrupt a security officer's shift. These are serious high-risk youth that require constant assessment and a consistent treatment program.

One youth was not clear that speaking with their attorney is a right and that they do not have to choose between speaking with their attorney or speaking with their family member for their one five-minute phone call of the week.

An adequate residential mental health treatment program in accordance with professional standards had not been established. Consistent programing, therapeutic groups, individualized treatment plans all need to be in place in order to be in compliance with this provision. PUERTAS lacks a cohesive and consistent program that addresses the individual needs of the cohort while also delivering therapeutic groups based on the overall needs for treatment and rehabilitation.  Youth interviewed cannot name specific groups that they participate in that address, for example, substance use.  The youth can name "lectures"  didactics or make reference to a movie about drug  use prevention. Treatment would be a group specifically and consistently held to treat substance use, for anger management, or a group for expressive arts to facilitate trauma work or medication management.  Transition groups that focus on job seeking skills, plans for leaving NIJ for those getting close to leaving, etc.   Youth are particularly at risk the last couple of months before they finish their sentence and they either self-sabotage or self-isolate/request protective custody for fear of being provoked or attacked.  The Mental Health Consultant has covered aspects of expectations for a day program in both in person and in multiple emails. |

| | |
|---|---|
| | The Mental Health Consultant had to physically be present with the IT Team and the leadership of the DEC and PCPS in order to fix the issue electronically so that information regarding all youth relevant to treatment planning can be available to the PCPS treatment team and to the Mental Health Monitor who were unable to access DEC information remotely. |
| What is needed for full compliance?<br>What steps are required and/or recommended? | To be in full compliance,<br>1. As previously reported, the priority is to provide a safe, distinct and consistent specialized program for those most at psychiatric risk. This feedback with detailed suggestions/technical assistance has been developed by the Mental Health Consultant and delivered on multiple occasions, in person and via emails.<br>2. The psychiatric coverage should be increased overall so that there is coverage even when the one psychiatrist is off for the day, sick or on vacation. The Mental Health Consultant recognizes the difficulty in hiring a Child and Adolescent Psychiatrist and encourages PCPS to continue to make these efforts.<br>3. Behavioral modification interventions should increase for those youth who are self-mutilating, self-mutilating due to "boredom" and for youth who are repeatedly found to have a positive (illegal substance) drug screen. |
| Priority Next Steps | Director of PUERTAS meet with PCPS leadership and mental health staff to design the specialized program detailing the therapeutic groups and activities that make up the residential program.<br><br>Ensure that mental health staff have access to the MAYSI II, to information from the DEC regarding psychiatric, family and educational history to adequately plan for youth's treatment.<br><br>Increase substance use and prevention services<br><br>Educate youth so that they know their rights with respect to phone calls to attorneys and family. |
| Quality Assurance Measures | There are no quality assurance measures in place although DCR had stated that this was underway. |
| **C.O. 36.** Within 120 days of the filing of this Consent Order, Defendant Juvenile Institutions Administration shall provide continuous psychiatric and psychology service to juveniles in need of such services in the facilities in this case either by employing or contracting with sufficient numbers of adequately trained psychologists or psychiatrists, or by contracting with private entities for provision of such services. The continuous psychiatric and psychological services to juveniles in need of such services shall include at a minimum, a thorough psychiatric evaluation, necessary diagnostic tests before the prescription of | |

behavior-modifying medications, blood-level monitoring if behavior-modifying medications are prescribed, therapy, counselling, treatments plans and necessary follow-up care.

| Compliance Rating | Partial Compliance |
| --- | --- |
| Description of Monitoring process during this period of time | During this quarter the Mental Health Consultant performed remote chart reviews and completed site visits in December of 2019 to Ponce and Villalba. An analysis of mental health staff hours contracted vs. mental health hours worked were conducted. |
| Findings and Analysis | A chart review of all youth who expressed suicidal ideation or intent, including gesture revealed 11 incidents this quarter.  Of the 11 incidents, 9 were seen by a psychiatrist within 24 hours (this includes if the youth was psychiatrically evaluated for hospitalization or was hospitalized).  Five were psychiatrically hospitalized.

The Mental Health Consultant is concerned that there has been a significant increase in suicidal ideation, gestures and suicide attempts the last two quarters of the year.  The first two quarters there were 10 in total, the last two quarters there were 25 incidents – more than double the amount in the first half of 2019.

Furthermore, there have been several incidents of serious violent attacks involving cutting of the face and body leaving youth feeling unprotected, anxious and desperate to self-isolate or to defend themselves.  One cutting incident left a youth requiring over 40 stiches to the face and head leaving him permanently disfigured.  In one instance the alleged aggressor had less than 4 months to leave NIJ to complete his sentence.  It leaves one to wonder what type of intervention could have prevented such an act that has such complete dire consequences for both the aggressor and the victim.

As mentioned above, there needs to be an improvement in programming and activities overall for youth – for those youth who have completed high school and for those that have not as well as for those youth in protective custody and transitional measures.  For youth in protective custody or transitional measures, there needs to be an increase in the number of hours the youth are able to spend outside of their rooms and engaged in structured activities.  The Mental Health Consultant appreciates the difficulty in creating more activities and commends the NIJ staff for doing what they can under the circumstances such as recent reported activities in Villalba - Library club, a Spelling B, activities with the University, more telephone time and a Thanksgiving celebration.  At Ponce, at least one of the security staff supervisors has arranged for more field trips including an outing with the entire PUERTAS youth plus two more that went smoothly.  More of these activities are encouraged.  In additional, behavior modification stafsf need to |

| | |
|---|---|
| | work diligently and consistently on reinforcing behaviors related to the prevention of youth violence, youth aggression toward staff, and use of illegal substances. |
| | An analysis of the PCPS hours contracted for mental health vs. the hours delivered indicates that for the fourth quarter, 2952 hours were contracted and the mental health staff (which includes psychologist, psychiatrist and substance abuse counselors and occupational therapist) delivered 3043.75 hours or 91.75 hours of service more than were contracted for.  The psychiatrist time was contracted for 360 hours for the third quarter and delivered 350.75 or 9.25 less hours of psychiatric care than contracted for. |
| | Given the acuity of the youth as reported above, not only it is necessary for the current psychiatrist to fulfill the contracted hours, the addition of psychiatric time is necessary to assess and stabilize youth, to follow up on lab and other test results, and to case conference and treatment plan high risk cases.   The Mental Health Consultant recognizes that sick or vacation time may preclude the psychiatrist from fulfilling contracted hours, however, it is incumbent upon PCPS to have back up and to increase the psychiatric time with another provider. |
| What is needed for full compliance?<br>What steps are required and/or recommended? | 1. As mentioned above and in prior reports, the psychiatrist time should be increased to fully cover all aspects of treatment planning and care.<br>2. Cohesive team work with all disciplines can help the team better address depressive symptomology that could lead to suicidal ideation or intent – especially based on history.<br>3. In addition, the mental health staff should continuously offer individual and group psychotherapy services (at least once a week) to youth who have had serious emotional problems, have exhibited violent and manipulative behaviors, serious history of polysubstance use,  and who consistently have problems "cohabitating" with others. While the treatment plan often states a minimum of mental health service 1X per month, more frequent (i.e. weekly) group and individual care can help build youth's coping skills, trust with staff and can contribute to the de-escalation of conflicts before they erupt into violence either with other youth or with staff. See also comment above regarding the need for individualized treatment plans.<br>4. NIJ leadership need to further examine and eliminate practices outside of transitional measures and protective custody which are being used to keep youth in their rooms for extended periods, particularly when used or disciplinary or punitive reasons..  NIJ leadership needs to understand and address the fear youth have of violence due to youth cutting on youth.   Youth remanded to the care of DCR should not have to fear for their lives.  They are entitled to feel safe, free of harm and able to trust that the security staff will avert any violence towards them. |

| Priority Next Steps | PCPS and DCR leadership should evaluate the increase in suicidal incidents and address accordingly based on recommendations. |
| Quality Assurance Measures | See above. |

**S.A. 63.** For each juvenile who expresses suicidal or self- mutilating ideation or intent while incarcerated, staff shall immediately inform a member of the health care staff. Health care staff shall immediately complete a mental health screening to include suicide or self-mutilation ideation for the juvenile. For each juvenile for whom the screening indicates active suicidal or self-mutilating intent, a psychiatrist shall immediately examine the juvenile. The juvenile, if ever isolated, shall be under constant watch. Defendants shall develop written policies and procedures to reduce the risk of suicidal behavior by providing screening for all juveniles at all points of entry or re-entry to AIJ's facilities and/or programs and by providing mechanisms for the assessment, monitoring, intervention and referral of juveniles who have been identified as representing a potential risk of severe harm to themselves. Treatment will be provided consistent with accepted professional standards.

| Compliance Rating | Partial Compliance |
| Description of Monitoring process during this period of time | The Mental Health Consultant reviewed reports that were submitted by DCR of youth that were reported to have suicidal ideation, suicidal intent and/or self-mutilation for the entire quarter.  The Mental Health Consultant reviewed the electronic medical records to find evidence of compliance with S.A. 63, including providing treatment consistent with professional standards. |
| Findings and Analysis | With respect to screening at points of entry, re-entry, the Mental Health Consultant has found consistency in the mental health staff providing this service.

The mental health staff are taking each incident of suicidal gestures or attempts very seriously and have been successful in getting the youth psychiatrically hospitalized.  In the moments when the youth have returned and are still unstable (psychotic and or suicidal) and not safe, the mental health team has done an excellent job of ensuring the youth return to psychiatric hospitalization for stabilization.

The psychologists report a very good and close working relationship with the psychiatrist whom they feel they can call anytime there is a crisis and that the psychiatrist is responsive/available via phone if not present at the site. The PCPS supervising psychologist is also available to the mental health staff for crisis management and consultation.  She has provided timely responses to the Mental Health Monitor's questions and concerns.

With respect to health care staff (i.e. nurses) completing suicide evaluations, the Mental Health Consultant found that the SI screen was not consistently |

| | |
|---|---|
| | present for all 11 incidents of suicidal ideation/intent/gesture this quarter nor for the instances of self-mutilation.  Of the 16 combined suicidal ideation/gesture/intent and self-mutilation, nurses completed 14 evaluations for suicide.<br><br>Of the 11 incidents of suicidal ideation/gesture/intent, 9 were seen by a psychiatrist (either the NIJ psychiatrist or a psychiatrist at the ER/psychiatric hospital) within 24 hours.  Five youth were psychiatrically hospitalized this quarter.  Five youth had incidents of self-mutilation.  Of those, 4 were seen by the psychiatrist within a 24-hour period.<br><br>Findings indicate that NIJ is failing to provide either an immediate suicide evaluation by a health care (i.e. nurse) provider for any youth who self-mutilates or expresses suicidal ideation/intent/gesture and is falling short of also providing a psychiatric evaluation within 24 hours of an incident per this provision. |
| What is needed for full compliance?<br>What steps are required and/or recommended? | Nursing SI assessments need to be consistently completed and the notes regarding suicidal ideation assessment should be more fully noted (not just check marks) with a clear plan in the bottom note section as to next steps.<br><br>Psychiatric evaluations especially of youth who have suicidal ideation/intent or gesture should occur within a 24-hour period per this provision.  In addition, it is recommended that those individuals who have been attacked violently (assaulted, sexually abused, cut) should also receive a psychiatric evaluation. |
| Priority Next Steps | Increasing psychiatric hours may help bridge the gap between the incidents and the availability of a psychiatrist within 24 hours.<br><br>Nurses need to be reminded to complete SI evaluations for all youth who express suicidal ideation/gesture/intent or who self-mutilate. |
| Quality Assurance Measures | As reported in previous quarterly report, It is highly recommended that DCR have PCPS perform their own quality assurance measures to ensure compliance with S.A. 63. |

| | |
|---|---|
| **S.A. 72**. All juveniles receiving emergency psychotropic medication shall be seen at least once during each of the next three shifts by a nurse and within twenty-four (24) hours by a physician to reassess their mental status and medication side effects. Nurses and doctors shall document their findings regarding adverse side effects in the juvenile's medical record. If the juvenile's condition is deteriorating, a psychiatrist shall be immediately notified. | |
| **Compliance  Rating** | **Substantial Compliance** |

| | |
|---|---|
| Description of Monitoring process during this period of time | The Mental Health Consultant analyzed data provided by NIJ for the use of emergency psychotropic medication by month, by site for 2019. There were 15 uses of emergency psychotropic medication in 2019 reported, all in Ponce.  Of note, there were no instances of intramuscular (IM) use of Haldol.  There were 5 uses of Haldol, PO STAT (2 were in August same person].  One use was for irritability, another for depression.   Of the three incidents in September, one youth was psychotic, one had threatened suicide, and the third had attempted suicide.   The Mental Health Consultant discussed the use of emergency psychotropic medication with the psychiatrist during her site visit. Noted were the uses for psychotic or suicidal youth while in transport to psychiatric hospitalization. |
| Findings and Analysis | Higher acuity – especially of psychotic symptoms and suicidal gestures - were reasons given by the psychiatrist for the use of emergency psychotropic medications.  The DCR NIJ policies and procedures 12.2.2B for the emergency use of psychotropic medications is limited to the intramuscular use of Haldol.  The Mental Health Monitor requested a full review by DCR and PCPS to understand the documentation of emergency use of medication to be only in Ponce and to understand why we are seeing the use of STAT medication reported under "emergency use of psychotropic medication" in these last few months vs. months prior or even last year.  The Mental Health Monitor has requested that the team review possible need for training of staff regarding de-escalation techniques. |
| What is needed for full compliance? What steps are required and/or recommended? | There are policies and procedures in place for the use of psychotropic medications which have been reviewed and approved by the Mental Health Consultant. Interpretation of emergency use of medication has been monitored with respect to IM use of Haldol.  Mental Health Consultant will review findings of the treatment team to determine if the medications given were true "emergency use" or if they were orders for adjustments in regular medications youth were already taking. Compliance and documentation will continue to be monitored. |
| Priority Next Steps | A period of assessment of at least one year from this report will continue due to the reporting increase and the need to clarify with DCR what they also consider to be emergency use of psychotropic medication. |
| Quality Assurance Measures | See above. |

**S.A. 73.** Defendants, specifically AIJ, shall design a program that promotes behavior modification by emphasizing positive reinforcement techniques. Defendants, specifically AIJ, shall provide all juveniles with an individualized treatment plan identifying each juvenile's problems, including medical needs, and establishing individual therapeutic goals for the juvenile and providing for group and/or individual counseling addressing the problems identified. Defendants, specifically AIJ, shall implement all individualized treatment plans.

| Compliance  Rating | Partial Compliance |
|---|---|
| Description of Monitoring process during this period of time | The Mental Health Consultant has reviewed written evidence of the Behavioral Modification curriculum, staff training, receipt of incentives by the youth and interviewed youth during the site visits and has received documentation that some incentives are being provided.  During the site visit in December youth were interviewed and also asked about behavioral modification incentives.<br><br>The Mental Health Consultant previous finding of compliance was with respect to the behavior modification program and implementation.  The Mental Health Consultant continued to monitor all aspects of this provision including  the provision that all juveniles receive  a full and detailed individualized treatment plan and its implementation. . |
| Findings and Analysis | During the fourth quarter, In both Ponce and Villalba, most youth interviewed could name a behavioral modification incentive that they were given. These were mainly candy or a play station type of incentive.<br><br>Youth continue to complain about needing more activities.  Some blame boredom for their cutting/self-mutilating behavior.  There has been an alarming amount of increase in suicidal ideation and gestures as well as violent incidences of cutting and assaults.  There has been a recent increase and in the amount of illegal drugs found in the toxicology screens of youth.<br><br>At Ponce, with new security staff on board, some activities such as the outing mentioned above are seen as behavioral incentives.  In Villalba, the Director is taking initiative to find more activities outside of the institution for the youth to do – or in bringing in more activities. These are no or low-cost activities and the Mental Health Consultant recognizes the efforts and creativity of the Villalba Director and of the Security Staff Supervisor in Ponce.  More of these activities consistently applied across both sites are needed.<br><br>At this time, the Mental Health Consultant finds that the Behavior Modification program is lacking in consistent implementation and effectiveness as evidenced in the aforementioned incidences of violent behavior, positive toxicology reports, increases in suicidal behavior. Further, a Behavior Modification leadership presence is needed at both sites (Ponce and Villalba) to ensure consistent implementation, to communicate directly with youth, for observation, planning and supervision of behavioral modification staff.  In addition, the full development and implementation of the individual treatment plans requires further attention and has not been found in compliance by the Mental Health Consultant. |

| What is needed for full compliance? What steps are required and/or recommended? | Further development of a consistently applied behavioral modification program with on-going self-monitoring, evaluation, and individualization to meet the needs of the youth. |
|---|---|
| | Use of low or no cost incentives. This includes time outside of room, art supplies and games for use in rooms and modules, special (healthy) snacks, and increasing the phone calls to families which is so important for reunification purposes. |
| | Self-monitoring, evaluation of effectiveness and individualization of full treatment plans to meet the needs of the youth. |
| Priority Next Steps | The Mental Health Consultant continuously reviews records fully to look for compliance with individualized treatment planning and implementation for all youth. |
| Quality Assurance Measures | See above. |
| Sources of Information upon which Consultant report and compliance ratings are based | Site visits, interviews with staff, youth. Chart reviews. Data analysis. |

## SPECIAL EDUCATION AND VOCATIONAL TRAINING –Kim Tandy

| Section XIII:  Educational and Vocational Services – General Population |
|---|
| S.A. 81  Defendants, specifically the Department of Education, shall provide academic and/or vocational education services to all juveniles confined in any facility for two weeks or more, equivalent to the number of hours the juvenile would have received within the public education system.  Specifically, this education shall be provided 5 (five) days per week, 6 (six) hours per day, 10 (ten) months per year.  AIJ shall provide adequate instructional materials and space for educational services.  Defendants shall employ an adequate number of qualified and experienced teachers to provide these services. |

| Compliance  Rating | Partial Compliance |
|---|---|
| Methodology for Monitoring this Quarter | The Monitor met with Carlos Delgado and other staff during the week of December, and visited both Ponce and Villalba facilities that week.  The visit included facility tours, including classroom areas which were newly created on units or otherwise outside of the regular school area for security purposes. |
| | Information received and reviewed this quarter for the time period October – December,  as well as on-site verification  includes: |

| | |
|---|---|
| | 1) An analysis of classroom space and resources for the provision of education, including for transitional measures and protective custody youth, as needed.

2) Monthly personnel attendance by support staff, teachers, and special education teachers, with documentation of teacher absences and "security situations" which disrupt school services for October - December.

3) List of all student receiving vocational education, including special education students

4) Verification of the provision of educational services within 5 days of arrival for eligible youth.

5) Verification of school records for those youth in transitional measures or protective custody.

6) Tracking Form for Initial and Re-evaluation Process.

NIJ did not provide documentation as requested for the month of December, in spite of several email requests.

The Monitor received revisions to Policy 20.2 from NIJ and DE during her visit, and returned comments. Revisions have been completed to Policy 20.1 but to date these have not been received as signed. Final revisions to Policy 20.2 have not been made and signed. The Memorandum of Understanding between NIJ and PRDE regarding the delivery of education services has not been revised.

The Monitor also reviewed the education records and classrooms for youth in TM or PC status. An analysis of youth receiving educational services during October through December is discussed in Paragraph 94. |
| Findings and Analysis | The current structure for education services in NIJ facilities splits responsibilities between the Puerto Rico Department of Education, which provides special education teachers, Title I, and vocational education staff, and the Department of Corrections and Rehabilitation, which provides academic and library staff. The language in S.A. 81 requires the Department of Education to provide these services. As such, compliance regarding educational and vocational education for youth confined 2 weeks or more, five days per week, 10 months per year, is the responsibility of the Department of Education. The requirement of providing qualified teachers logically also falls on the Department of Education based upon this responsibility. NIJ is required to provide adequate educational materials and space for instruction.

The current Memorandum of Understanding must be modified to reflect these responsibilities between the two entities and to redefine the relationship as DOE assumes full responsibility for the delivery of educational services. Previously, PRDE indicated that it would assume full financial responsibility during the 2019-2020 school year. During this trip, NIJ and DE representatives noted that this change should take effect during the 2020-2021 school year. |

Policy 20.1 Educational and Recreational Services provides for regular and vocational services to youth in detention and in social treatment centers. The revised policies received by the Monitor in May of 2019 contain the recommended changes with the exception of providing full school days to youth in TM or PC status but they are not yet signed. The new policies reflect improvement and show commitment and continued effort to provide high quality educational services for youth.  Several requests have been made to receive a signed copy of this policy.

Monitored Provisions:

**1)  Provision of academic and/or vocational education for youth confined 2 weeks or more 5 days per week, 6 hours per day, 10 months per year.**

This provision ensures that all youth who are eligible for educational services receive such services within a two week period, and that full school days are provided over the 10 month school calendar.

Documentation received at the beginning of the school year verifies that NIJ uses the PRDE school calendar. Monthly monitoring of attendance for education staff is documented on a daily basis, for administrative support, teachers, and special education teachers, as well as for students.  Monthly reports have been received this quarter for October through December.

Rates are affected by teacher absences and "security situations." Security situations are discussed in more detail in paragraph 94.  NIJ has been asked to report when youth are removed from school for security or other reasons and do not receive educational services.

Teacher attendance rates for Villalba are listed at 82- 98% for October, 87 – 92% for November, and 70-100% for December.  At Ponce, attendance ranged between 86 – 100% for teacher and student attendance. This does not necessarily mean youth did not receive school services that day, but does connote absences by regular teaching staff.

A review of enrollment information for educational services for the Fourth Quarter of 2019 indicates youth enrollment in vocational services at 100% for both facilities.  These classes include bakery, cabinet making, administrative work, and barbering.  Both facilities provide vocational classes to youth who have already graduated.

**2)  AIJ shall provide adequate instructional materials and space for educational services**

Both facilities have multiple classrooms for students engaged in regular and special education as well as vocational services.  Classrooms seem adequate for students to have small classes based upon subject, and in some cases, grade levels (i.e. elementary level students).  The facilities have vocational education rooms which were inviting, seemingly well stocked, and were engaging students.

| | A review of the schedule provided by NIJ indicates that each classification of youth is scheduled for a full school day, and the required teacher planning time is incorporated into the schedule. |
| | **3)  Defendants shall employ an adequate number of qualified and experienced teachers to provide these services.** |
| | The Monitor reviewed a list of instructional staff and their certifications and subject matter expertise for each of the three facilities the beginning of the school year, and will continue to review any staffing vacancies. |
| | NIJ Policy 4.1 requires the Training Division to coordinate and implement a master plan of training for staff development, including orientation and pre-service training of a minimum of 24 hours for treatment staff who are new.  By definition, treatment staff includes teachers, social workers, counselors, and school principals. |
| | Training records, while partially received, must reflect that all new educational staff receive 24 hours of training by NIJ.  In addition, Policy 4.1 requires that staff training needs be assessed in operational areas (including education and social work), and that such areas, in conjunction with the Division of Training, design training according to need.  While not included in Policy 20.1, the Department of Education also requires annual training for its special education instructors, usually for one week prior to the beginning of the school year. |
| | Teacher attendance should be at 90% or higher, and a system of substitute teachers should be in place, or other arrangements should be made so that youth do not lose school days due to these absences.  Youth who receive special education services are entitled to this service at the level indicated in each IEP. If special teachers are absent and the services are not provided, youth are entitled to make up that amount of time. |
| What is needed for full compliance?<br><br>What steps are required and/or recommended? | The Department of Education is responsible per the Settlement Agreement for the delivery of all educational services, as well as providing sufficient qualified teachers.<br><br>This policies and practices must ensure that youth in protective custody or transitional measures who are eligible for education services are offered the required 6 hours per day, five days per week, 10 months of the year. A revised version of Policy 20.1 was provided to the Monitor in May which meets this requirement.  A signed copy has not yet been received in order to find this aspect in full compliance.<br><br>Well qualified staff should include verification not only of certifications, but also of training for new educational staff, and training required by the Department of Education and coordinated between the Division of Training and NIJ educational services. Additionally, a staff training needs assessment for education staff should be produced, as well as a training plan for the 2019-20 school year based upon that assessment. |

| | Training records of education staff (including ancillary staff) should be documented and provided as evidence of training requirements. |
|---|---|
| | Facilities for classrooms and administrative staff for the education programs must be functional, without leaking roofs, moldy ceilings or walls, and with air conditioning units that are working. While work at Villalba has been substantially completed, the Monitor needs verification that such work at Ponce is completed as it pertains to classrooms and other education areas. |
| | Monthly attendance by essential educational staff should remain at 90% or higher in each facility. Ideally, classes should not be disrupted or cancelled as a result of teacher absence. A system for substitute teachers could help to accommodate these situations. |
| Priority Next Steps | NIJ and PRDE must provide a signed copy of Policy 20.1 requiring full school services for youth in PC and TM status.  Finalization of Policy 20.2 should be a priority, including a signature by the Secretary. |
| | Regular and special education teachers who can provide full school day services for youth in TM and PC must be in place for the 2019-2020 school year. |
| | Security situations should be fully examined so as not to adversely impact the availability of educational programming. Documentation of security situations must be communicated to education administrators. |
| | Verification of training from the 2019-2020 school year should be provided as well a training schedule and verification of this year's training for teachers on institutional policies and procedures. |
| Quality Assurance Measures | The Monitor is encouraged by the documentation kept and provided relative to many of the provisions of this paragraph. |
| | Efforts at quality assurance must also come from the DOE relative to the delivery of service, and/or must be incorporated into the Memorandum of Understanding. |
| | The Monitor agreed to review the proposed QA provisions by June 1, but did not receive a copy upon request. |
| Sources of Information upon which Consultant report and compliance ratings are based. | Meetings at Villalba and Ponce facilities with Carlos Delgado to view available classrooms, teacher rosters and attendance, list of students, attendance logs, and documentation regarding intake of new students. |
| | Review of applicable policies |
| | Examination of other documents as listed above |

S.A. 86  Defendants, specifically the Department of Education, shall abide by all mandatory requirements and time frames set forth under the Individuals with Disabilities Education Act, 20 USC §§ 1401 et seq. Defendants shall screen juveniles for physical and learning disabilities. The screening shall include questions about whether the juvenile has been previously identified by the public school system as having an educational disability, previous educational history, and a sufficient medical review to determine whether certain educational disabilities are present, such as hearing impairments, including deafness, speech or language impairments, visual impairments, including blindness, mental retardation, or serious emotional disturbances adversely affecting educational performance.

| Compliance  Rating | Partial Compliance |
|---|---|
| Description of Monitoring process during this period of time | The Monitor met with Carlos Delgado and other education staff on Ponce during the first week in December.  The visit included facility tours, including classroom areas which were newly created on units or elsewhere for additional space.<br><br>The Monitor completed case reviews on 8 youth during her visit, meeting with Carlos Delgado and the Special Education coordinators at each facility. Teachers completed a compliance checklist in advance for each youth, which was reviewed during the visit. The Monitor verified the compliance information provided against documentation in each youth's file, including information relative to IEP development, dates, and participation, parent notification and involvement, evaluation information, and transfer of rights to students.  During the case reviews, the special education teacher(s) answered questions prepared in advance by the Monitor, with specific focus related to the evaluation process, IEP development and implementation.  This included:<br><br>• Areas of concern noted for which the youth was evaluated,  whether these addressed all areas of concern, and whether these changed over time<br>• Whether evaluation results were tied to current levels of performance to create the IEP, the need for related services, and placement determinations<br>• Evidence of the youth's goals being made and whether they allow the youth to achieve academic progress, and whether such goals are specific and measureable<br>• If youth is not progressing, changes to IEP, related services or placement<br>• Parental involvement and transfer of rights to the youth at 18<br><br>This information has been analyzed and is discussed below.<br><br>Additional records reviewed for the Fourth Quarter included:<br><br>1) List of all student receiving vocational education, including special education students<br>2) Verification of the provision of educational services within 5 days of arrival for eligible youth.<br><br>3)  Verification of school records for those youth in transitional measures or protective custody. |

| | |
|---|---|
| | 4)  Tracking Form for Initial and Re-evaluation Process |
| Findings and Analysis | This section provides a general requirement that compliance with the IDEIA is necessary in order to meet compliance requirements of this section. For purposes of complying with the IDEIA, this provision has been broken down into 4 sections as noted below:<br><br>**1) Mandatory requirements of the Individuals with Disabilities Education Act**<br><br>   **a)  Child Find**<br><br>PRDE is responsible for ensuring that Child Find provisions to locate and identify youth who may be eligible for special education are met, but must work collaboratively with NIJ instructional staff to ensure that adequate mechanisms are in place to identify when youth are appropriate for referrals.<br><br>Youth are screened at detention using an education questionnaire to determine prior educational placements, previous involvement in special education, and academic achievement.  Diagnostic testing is completed within five school days and school records are requested and obtained. Physical disabilities are noted, including visual problems, speech problems, use of medication, hearing problems, and orthopedic problems. Recommendations for testing are made including for hearing impairment, psychological, occupational therapy neurological examination, psychiatric, visual, health and/or a Woodcock Munoz.<br><br>Documentation received from NIJ education staff indicates that 100% of new youth admitted on detention status, and who were held for a minimum of 5 days, were evaluated based upon the process noted above, including basic testing across the five subject areas. This includes 17 new admissions in October, 14 new admissions in November, and 10 new admissions in December. Of this number, five (5) youth did not complete testing, but they left before five days. Four (4) youth did not complete testing because they were already high school graduates.  In three instances, testing was not complete within the 5 day period required, but completed within a day or so later.   This screening and evaluation process, completed on all youth, is an excellent way in which Child Find requirements can be met.<br><br>While the screening is an important tool being used to comply with Child Find requirements, it likewise is important for regular education students as well.<br><br>Education staff also identify youth who may be in need of special education and related services in other ways.  Data on youth progress is reviewed every 10 weeks, and teachers may document at that time the need for a youth to be evaluated. Youth who are not able to keep up with school work, who exhibit behaviors which impede their learning, or who are receiving failing grades are also examples of red flags which may suggest that additional interventions are necessary, including an evaluation for educational disabilities.  NIJ has produced lists in prior years of youth who have been |

identified and evaluated for specially designed instruction.  The Monitor will request a similar list at the end of this school year.

Given the documentation consistently received to date, the Monitor finds this part of Paragraph 86 remains in substantial compliance.

### b) Evaluation of youth with suspected disabilities

PRDE has an obligation to ensure that youth with suspected disabilities, and those in need of re-evaluation, receive thorough multi-faceted evaluations which stretch across areas of concern as well as the identification of student strengths.  This include three year re-evaluation processes as well.

MIPE sends quarterly computer generated updates to the Monitor indicating which youth have had completed evaluations, which are about to be completed, and in which cases triennial evaluation dates have been expired. The Monitor confirms these using the online MIPE system for more information about the timelines.  At the end of the quarter, MIPE's printout showed that seven (7) triennial evaluations were overdue. An online review indicates that at least 5 of the 7 youth were in either Ponce or Villalba during the quarter, either in detention or in treatment status.

Many of the youth who come into NIJ facilities have been out of school, or have had inconsistent educational experiences.  It is not uncommon for IEPs to be out of date, and evaluation times to have lapsed.  It is important that education staff identify when triennial evaluations are due, and work to obtain these in a timely fashion.  A question has arisen as to whether the youth remains enrolled in their local community school while the youth is detained, and whether NIJ's school program has authority and/or responsibility to ensure these evaluations are done. The Department of Education must determine ensure that the evaluations are conducted in a timely manner regardless, and must work through whatever barriers to achieving these that the youth's status in detention may pose.  That status does not obviate the requirement of a triennial evaluation, or initial evaluation, once the youth arrives in detention.

During case reviews, education staff could generally identify areas of concern noted in the evaluations, including behavioral issues identified as well as academic areas of strength or weakness. How these levels of performance were transferred into IEP goals, related services, and accommodations, as identified by the evaluation process, varied as to thoroughness.  Where academic weaknesses were noted in an evaluation, goals were generally specific, measurable and appropriately tracked.  For two youth with identified behavior problems that significantly impact learning, behavior supports and strategies did not carry over effectively into the IEP's goals and related services.

The Monitor is working to get evaluations translated to English to more fully review content.

The Monitor learned during the Third Quarter that NIJ was to receive funding to hire two school psychologists through Title I funds. A federal hold has been placed on this

funding, however, so the psychologists have to date not been hired.  Carlos Delgado has been discussing with PCPS, the Mental Health Service provider, an arrangement by which their psychologists could assist with evaluations.

This section of Paragraph 86 remains in partial compliance.

### c) Provision of specially designed instruction and related services

Case reviews completed also examined aspects of the youths' Individual Education Plan (IEP), including eligibility, levels of performance, IEP goals, progress notes and the provision of specially designed instruction, accommodations and related services. (MIPE reviews are not as comprehensive as information is not always entered or complete)

An evaluation process which is well designed, inclusive as to all areas of concern, and orchestrated properly, is critical to the development of an IEP.  It should address deficits in content areas, and establish goals and objectives which are individualized, measurable, and able to be tracked.  The Monitor found in general that IEP goals were specific, measurable and tied to specific academic deficits in the evaluations. Improvement was seen in this area.

Education staff can improve the development of behavior goals and strategies to improve behaviors which are impeding learning or otherwise disruptive to the educational setting. Two students in particular had significant behaviors which were either disruptive to the classroom, or otherwise hampered the learning process.  In one case, education staff discussed the need for self-containing the student to provide education in a one on one setting.  The Monitor discussed the use of Functional Behavioral Assessments (FBA) as a method to better identify behavior interventions and support. FBAs should result in goals to teach replacement behaviors, along with a Behavior Intervention Plan (BIP) with strategies to modify the curriculum, environment, activities to prevent the challenging behaviors.  These plans should also include positive reinforcements and supports for youth once they are engaging in the new skills.

Placements described in the IEPs are generally the same for all youth, and provide assistance in Spanish and Math five days a week for an hour each. Of the cases reviewed, there was a wide array of differences in learning styles, needs and progress being made; as such, the amount of specially designed services provided, and the settings in which they are provided should be more varied and individualized.

Progress notes are kept on each youth, and a review of progress is done every 10 weeks, including notification of parents.  Changes to the IEPS are generally not made unless the youth's 10 week progress reviews are consistently showing low marks.

Related services are often included, and usually refer to services provided for mental health, such as "psychological services 2 times per week."  This is provided by PCPS, as part of the overall treatment the youth is receiving in the facility.

Related services are defined within IDEA are those supportive services required to assist a child with a disability to benefit from special education, and as such, must be tied to implementation of the IEP.  They may include "transportation, and such developmental, corrective, and other supportive services (including speech-language pathology and audiology services, interpreting services, psychological services, physical and occupational therapy, recreation, including therapeutic recreation, social work services, school nurse services designed to enable a child with a disability to receive a free appropriate public education as described in the individualized education program of the child, counseling services, including rehabilitation counseling, orientation and mobility services, and medical services, except that such medical services shall be for diagnostic and evaluation purposes only)…….." (20 U.S.C. Section 1401(26))

This provisions remains in partial compliance and should be a high priority for improvement over the next year.  Additional training for education staff is highly recommended.

**d) Procedural safeguards**

Policy 20.2 must be amended to ensure that procedural safeguards required by IDEA are included. A policy draft of Policy 20.2 was returned in February of 2019 with instructions to include a section regarding the procedural safeguards in IDEIA.

File reviews through MIPE seemingly do not designate a "parent" for purposes of enforcing education rights. There is no indication that NIJ/PRDE has a system for providing surrogate parents, although a draft of the new policies will include such.

Procedural rights must also ensure that parents (as designated) are provided adequate opportunities to participate in and challenge decisions made regarding the identification, evaluation, eligibility determination, and IEP services for their child.

Strong parental participation in educational services for youth in special education can have a dramatic and positive effect on the youth's success.  Maximizing ways to engage parents is often difficult in correctional settings.  The Monitor looks forward to better understanding the ways in which educational staff have and will continue to engage parents.

This section of Paragraph 86 is in partial compliance.

| | |
|---|---|
| What is needed for compliance to be achieved? | NIJ and PRDE submitted substantially improved and updated policies consistent with requirements of the S.A as well as IDEA.  Policy 20.2 must be finalized and signed for this section to be in compliance.<br><br>Initial evaluations and re-evaluations must be completed in a timely manner, and in accordance with the provisions of IDEA. Under 34 CFR §300.305(a)(1), the IEP Team and other qualified professionals, as appropriate, as part of an initial evaluation and as part of any reevaluation under 34 CFR Part 300, must: "Review existing evaluation data on the child, including—(i) Evaluations and information provided by the parents of the |

| | |
|---|---|
| | child; (ii) Current classroom-based, local, or State assessments, and classroom-based observations; and (iii) Observations by teachers and related services providers."<br><br>For youth who are in detention status, and who had a re-evaluation which is overdue or an initial evaluation which has not been completed,  this process must be worked out with the local district to ensure the evaluation gets completed.  Because some youth remain in detention for extended periods, the evaluation process cannot be delayed until the youth returns to their local community.<br><br>IEPs must include an individualized determination of disability, special considerations, including behavioral plans when appropriate, and a range of placement options, including the availability of resource rooms and a self-contained classroom if necessary. Staff should be trained on the use of Functional Behavioral Assessments and the Development of Behavioral Intervention Plans for those youth with significant behavioral and emotional problems which impede learning, and/or disrupt the classroom setting.<br><br>The use of surrogates when necessary, must be examined.  While it may be possible that an NIJ social worker may stand in for a parent, this must be a parental designation and not one made by NIJ or PRDE. Policies and practices must also ensure other procedural safeguards for the participation of parents as well as youth. |
| Priority Next Steps | Changes to Policy 20.2 should be submitted to the Monitor now.  Once that has been received and approved by the Monitor, more specific metrics for Procedural Safeguards will be developed and monitored. There should be no undue delays in completing this final set of policies and having them approved by the appropriate entities.<br><br>Continue substantial compliance on Child Find requirements, including initial screenings done on youth within 5 days of intake.  Provide information about the number of youth identified through this process, if any.<br><br>PRDE must ensure that COMPU meetings are conducted prior to the request for an evaluation or re-evaluation, and that such meetings comply with the requirements of the regulations under IDEA as to purpose, timing and outcomes.  The tracking form established by NIJ must be accurately completed, and should trigger the timeframes for completion of a new evaluation or re-evaluation accurately. This should be cross-checked with the MIPE system.<br><br>PRDE must clarify the authority and responsibilities between local school districts and NIJ facilities regarding evaluations and re-evaluations. Evaluations are still the responsibility of the Department of Education and must be completed irrespective of whether the youth is in a community school or NIJ facility.<br><br>PRDE must ensure that there are proper procedures for identification of "parents" and that such individuals meet the definition within IDEA, or are designated by such person, and that surrogate parents are also available as needed. |

| | |
|---|---|
| | PRDE should increase oversight of special education teachers to ensure that youth are properly identified, that IEPs and the services provided as a result, are individualized as to student need, including the type of placement available to the youth.  Adequate resources must be in place to provide a greater level of service to youth depending upon their needs.<br><br>The Monitor strongly encouraged use of PCPS psychologists to assist in the evaluation process, training and development of IEPs, particularly for those students with behavioral challenges. |
| Quality Assurance Measures | The monitor has not yet reviewed draft quality assurance plans but has requested a copy. |
| Sources of Information relied upon | Interviews with NIJ and PRDE staff<br>Documentation review of policies and procedures<br>Case reviews and verification of file content on MIPE<br>Review of documentation regarding student schedules, attendance of staff and youth, disability categories and time spent in special education by facility<br>Tour of facilities and classrooms |

**S.A. 87**. If a juvenile has been previously identified as having an educational disability, Defendants shall immediately request that the appropriate school district provide a copy of the juvenile's individualized education plan ("IEP"). Defendants shall assess the adequacy of the juvenile's IEP and either implement it as written if it is an adequate plan or, if the IEP is inadequate, rewrite the plan to make it adequate, and then implement the revised IEP.

| | |
|---|---|
| **Compliance Rating** | **Partial Compliance** |
| Description of Monitoring process during this period of time | The monitor previously reviewed the procedures and forms for requesting documentation on youth from prior school districts when admitted to detention.  This includes the youth's cumulative file through SIS and the special education file through MIPE.<br><br>Case reviews completed in the Fourth Quarter provided information on the adequacy of IEPs and when changes are made if inadequate. |
| Findings and Analysis | Appropriate policies are in place to require that records of the youth's IEP are obtained immediately from the appropriate district. Records must be requested within 10 business days after the screening is done and the youth has indicated he or she has an IEP.  The youth is enrolled in school within 72 hours.  Documentation about starting dates was reviewed and consistently showed youth begin their classes within a couple of days.   This part of Paragraph 87 appears to be compliant.<br><br>Two systems have been put in place electronically for securing regular and special education records of students.  The Department of Education has been operating MIPE (My Education Portal) since 2012.   Students eligible for special education are registered |

| | in this system, and any district, including the schools within NIJ facilities, can pull these records on a student they receive within their school.  Access is available immediately.  Some students, however, may have files that are "inactive" due to disruption in the youth's education.  In these cases, education staff indicated that they send a request manually for a copy of the records.  A copy of the form was noted which documents this request in the youth's file.  In several cases this quarter, it appears that youth were admitted to detention with an outdated IEP, and that a new IEP was created once the youth was in the facility. |
|---|---|
| | The Student Information System (SIS) similarly provides student information on all youth registered for school in Puerto Rico, and interplays with MIPE.  NIJ facilities are now on line and can obtain this information immediately when it is available in the system. |
| | The requirements of this provision as to obtaining records appears to be in compliance.  IEPs are not always available through MIPE if the youth is "inactive" in the system. The The rest of this section remains in partial compliance. |
| What is needed for full compliance?  What steps are required and/or recommended? | All special education files should contain a records of annual IEP reviews, and other reviews of the IEP done during the year as needed.  A system of reviewing IEPs must align with a 12 month calendar year, or more often.  Youth with an outdated IEP upon arrival must have a COMPU meeting to develop a new IEP based upon the latest evaluation, and when that is out of date, a referral for a new evaluation must be promptly made. |
| Priority Next Steps | Ensure that the appropriate COMPU meetings are held to review the youth's IEP goals and progress, present levels of performance, and any needed changes to the IEP's goals, measurable objectives, accommodations and placement.  Clarify with Department of Education the responsibility and authority for re-evaluation when youth are detained and community schools still hold the youth's enrollment status. |
| Quality Assurance Measures | Education QA tools have not been reviewed by the Monitor but have been requested so they can be reviewed. |
| Sources of Information upon | Review of screening and evaluation materials completed while youth are detained Review of documentation used to request and follow up on records Discussions with PRDE and NIJ education staff Review of monthly documentation tracking special education deadlines for evaluations and IEP reviews. |

**S.A. 90.** Defendants shall provide appropriate services for juveniles eligible for special education and related services. Defendants shall provide each such juvenile with educational instruction specially designed to meet the unique needs of the juvenile, supported by such services as are necessary to permit the juvenile to benefit

from the instruction. Defendants shall coordinate such individualized educational services with regular education programs and activities.

| Compliance Rating | Partial Compliance |
|---|---|
| Description of Monitoring process | See above generally Paragraph 86 for a discussion of the provision of specially designed instruction and the Case Reviews conducted during the Fourth Quarter. |

**S.A. 91.** Qualified professionals shall develop and implement an IEP reasonably calculated to provide educational benefits for every juvenile identified as having a disability. When appropriate, the IEP shall include a vocational component.

| Compliance Rating | Substantial compliance |
|---|---|
| Description of Monitoring process during this period of time | The Monitor reviewed the qualifications, including records of certifications, for special education staff at the beginning of the 2018-2019 school year.  The Monitor received a copy of the 2019-2020 staff list for both facilities.  A request was made for the credentials, including certifications of any new staff for this school year.<br><br>A review of all youth schedules for regular and special education students was completed, including vocational education classes. |
| Findings and Analysis | Staff responsible for the development of IEPs are the special education instructors, who are training in working with students with disabilities and the creation of IEPs.  An adequate number of special education staff are employed in the two facilities, with the exception of providing coverage to youth in PC and TM status.  Resources appear adequate to provide IEP services to youth. DOE should provide information regarding training provided to special education teachers employed at NIJ facilities regarding IEP development and implementation.<br><br>A review of the special education student schedules in both facilities for the Fourth Quarter indicates that all special education students were enrolled in vocational classes. Likewise, this portion of Paragraph 91 is compliant.<br><br>The extent to which IEPs are developed and implemented to allow youth to achieve academic benefit is monitored through Paragraph 86. |
| What is needed for full compliance?<br><br>What steps are required and/or recommended? | The monitor believes that the policies and procedures, training, staff and resources are available to ensure that this provision is in compliance. A system of documentation has been created which is thorough and which appears to follow the requirements under IDEA for the creation and implementation of IEPs. |

| | |
|---|---|
| | The provision of vocational education is incorporated into policy and, while not mandatory in all cases, has been an integral part of providing more robust educational services for youth in NIJ and is offered consistently. |
| | IEPs must be designed based upon the individual needs of the youth.  Such determinations as made as part of the Paragraph 86 compliance ratings. It is important to note the relationship between well designed evaluations which include all areas of concerns, proper identification of youth disabilities and levels of performance, and the individualization of a plan which can meet the specific needs of those youth, including the level of service afforded, special aids and supports, accommodations, and related services.  Paragraph 86 ties those provisions together through file reviews, youth and teacher interviews, and observations. |
| Priority Next Steps | Ongoing monitoring over the next year will ensure that all provisions in place are being implemented fully and faithfully. |
| Quality Assurance Measures | The Monitor has not reviewed proposed QA measures. |
| Sources of Information | All youth schedules including the provision of vocational instruction<br>Review of Policies and procedures<br>Review of system of documentation maintained in student files<br>Student interviews |

**S.A. 93** Services provided pursuant to IEPs shall be provided year round.  Defendants shall ensure that juveniles with educational disabilities receive a full day of instruction five (5) days a week.

| | |
|---|---|
| **Compliance  Rating** | **Substantial Compliance** |
| Description of Monitoring process during this period of time | The Monitor met with Carlos Delgado about the provision of extended school year services during her December monitoring visit.   The process of identifying, approving and providing services to youth who may require extended school year services (ESS) begins early in the calendar, and requires the approval by the Department of Education of youth who are deemed eligible. In January of 2020, NIJ will provide a list to the Monitor of those youth they believe eligible for extended school year services in the summer.  Data was being reviewed during the month of December. |
| Findings and Analysis | Year round school services to special education students must be provided to students who "prior to the corresponding evaluations, require this service in order to avoid falling back in their academic skills and performance." (See policy 20.2 Section V) |
| | During the 2018-19 school year, NIJ submitted data to the PR Department of Education to qualify a number of students for extended school year.  Data from September through December of 2018 was analyzed for grades, IEP progress, and student needs according to a formula established by the PRDE.  Documentation was received that |

|  | three youth at Ponce and five youth at Villalba qualified for extended school services (ESS) for five hours per day.  All IEPs were modified to reflect the youth's eligibility for this service.

Documentation reviewed on site showed that that these youth received the services from a qualified special education teacher for the designated time during the month of June.  Only one youth did not receive much of the service provided, and this was by choice.

The Monitor finds this provision to be in Substantial Compliance and acknowledges the good work staff did in providing this extra serviced needed for some students. During the Fourth Quarter, the Monitor confirmed the same process is in place for youth who are eligible for extended school services in the summer of 2020, and that such information has been submitted to the Department of Education. |
|---|---|
| What is needed for full compliance? | Policies are already in place which address the need for Extended School Services.

Continued documentation for the 2019-2020 school year should include determining eligibility for youth for 2020 summer services, timely submission to PRDE, and the provision of ESS services with proper verification by a qualified teacher. |
| Priority Next Steps | Provide the Monitor with information submitted to the Department of Education regarding eligible students for ESS in the summer of 2020, with documentation about how eligibility was determined. |
| Quality Assurance Measures | Quality assurance measures should be established to ensure that such provisions are made in a timely manner, and that youth who are eligible received the service with a qualified teacher. |
| Sources of Information |  Verbal confirmation with Carlos Delgado regarding the process for data collection and submission of information to the Department of Education for qualified students. |

**S.A. 94.** Juveniles shall not be excluded from services to be provided pursuant to IEPs based on a propensity for violence or self-inflicted harm or based on vulnerability. Juveniles in isolation or other disciplinary settings have a right to special education. If required for institutional security, services provided pursuant to IEPs may be provided in settings other than a classroom.

| **Compliance Rating** | **Partial Compliance** |
|---|---|
| Description of Monitoring process during this period of time | The Monitor has reviewed and approved the final version of Policy 20.1 which requires NIJ to provide 6 fifty (50) minute classes daily to youth in transitional measures or protective custody unless they have already graduated.  A request that this be signed has been made to the Secretary's office. |

| | |
|---|---|
| | The Monitor received documentation of education services regarding 2 youth in transitional measures and/or protective custody. |
| | NIJ maintains a tracking for to document times when youth may be excluded from school as a result of administrative actions taken, incidents, or the unavailability of security staff within the school.  These incidents were reviewed by the Monitor for the Fourth Quarter. |
| | The Monitor also toured the school facilities in both institutions to determine the availability of alternative school settings for the provision of educational services for those youth in TM or PC status, or who otherwise need separation. |
| Findings and Analysis | There are three sections to Paragraph 94 which must be monitored: |
| | 1)  Whether youth who have an IEP are excluded from services based upon a propensity for violence or self-inflected harm or based on vulnerability. |
| | 2)  Whether youth in "isolation or other disciplinary settings" are provided the right to special education services; and |
| | 3)  Whether educational services provided pursuant to an IEP occurring in settings outside of the classroom are required for institutional security. |
| | **Services to Youth in TM or PC Status**: |
| | NIJ revised Policy 20.1 to require full day educational services be provided to youth in Transitional Measures or Protective Custody who have not already graduated.  The requirement is for 6 fifty (50) minute classes, the same afforded other students.  Compliance with this new policy positively impacts several provisions of the Consent Decree, including the educational requirements of Paragraphs 79 and 80, Paragraph 81, and Paragraph 86.  This policy must still be signed by the Secretary. |
| | Verification of school services is made through examination of each youth's education schedule, and examination of daily attendance records, signed by each teacher, and by the student.  For those dates when the youth did not receive a full school day, accompanying explanatory notes are examined. |
| | Placement in Transitional Measures and/or Protective Custody for the quarter was low, with only 3 youth in this status, and only 2 youth who were eligible for school services. |
| | The Monitor reviewed educational services provided to one youth who has been in Protective Custody for the entire quarter.  Only November and December data was provided for review. A review of the daily schedule notes times and dates each class was provided, with signatures by the teacher providing the service. For November and December, this youth received six 50 minute classes, and had special education services delivered daily for roughly 50 minutes, although some days this was longer.  Of the 28 scheduled days for those 2 months, the youth missed vocational education on five (5) days due to the absence of the teacher, and one day due to "security issues." Overall, |

the schedule seems to be working well and services brought to this youth are individualized to meet his circumstances. An interview with this youth suggests that he is motivated by school, and would benefit from additional reading or other materials which can alleviate his boredom in PC status.

The second youth was in TM status starting on 12/6/19.  School break began after 12/20/19, so there were 10 days of service which should have been provided. Records were received but incomplete, and showed the youth received educational programming for only 4 days, one of which was only for one class.  There were no explanatory notes provided as to why other days may have been missed.

**School exclusion for Other Youth**

A tracking form is used to document when school services are not available as a result of register, incidents such as fights, lack of available security or other reasons not the fault of youth.  During the Fourth Quarter, information received suggests that school was cancelled all day for some or all units on 11 days during the quarter.  The following breakdown suggests that lack of officers is the primary reason this is occurring.

| Date | Facility | Time | Groups | Reason(s) |
|------|----------|------|--------|-----------|
| 10/7/19 | Ponce | 8-3:00 | Sumariados | No officers |
| 10/16/19 | Villalba | 8-3:00 | C2 and C1 | No officers |
| 10/17/19 | Ponce | 8 – 3:00 | Sumariados | No officers |
| 10/17/10 | Villalba | 8 – 3:00 | C2 and C1 | No officers |
| 10/18/19 | Villalba | 8 – 3:00 | C2 and C1 | No officers |
| 11/7/19 | Ponce | 8 – 3:00 | PUERTAS | Security situation |
| 11/13/19 | Ponce | 8- 3:00 | Sumariados | No officers |
| 11/14/19 | Ponce | 8 – 3:00 | Sumariados | No officers |
| 11/14/19 | Villalba | 8 – 3:00 | All | No officers |
| 12/2/19 | Villalba | 8 – 3:00 | All | No officers |
| 12/11/19 | Villalba | 8 – 3:00 | All | Searches |

NIJ must be have sufficient staff to enable officers to provide security in the school setting. The school program is available on a daily basis and scheduled to serve all youth.

For youth on group modified schedules, documentation should be provided if the schedule interferes with youth getting a full school day.

|  | **Classroom and Education Staff** |
|---|---|
|  | In order to properly implement the new policy, NIJ must have sufficient educational staff to serve these youth, and the physical resources needed to conduct classes in a safe environment.  At Ponce, there are 2 rooms which have been set up for TM or PC youth which were operational - one in room by small recreation court, the other in Unit D. Two classrooms were also set up on unit for youth in detention to help with space issues in the regular classrooms. The units all have cells behind the control room, some of which are in the process of being converted for use for additional classrooms.  One is outside the PUERTAS Unit and has a cage around it with a lock.  Similar areas have been created at Villalba. |
|  | Teaching staff were available were available and noted in the youth's file reviewed for November and December. |
| What is needed for full compliance?<br><br>What steps are required and/or recommended? | Compliance with the new policy will require that NIJ consistently provide full school days of 6 fifty minute classes in accordance with individual schedules for youth who are in TM and PC and who have not graduated from high school.<br><br>Coordination with security staff is essential to limit the disruption to the school schedule as best possible, and to ensure that youth receive the required services.  Continues documentation and analysis of days where youth do not receive services due to other reason is critical.<br><br>The continued use of alternative classrooms is a positive move. NIJ should continue to ensure the necessary personnel and resources to approximate as best possible the regular school setting.<br><br>Time documentation of youth receiving education in TM and PC status, as well as any changes with implementation of Group Schedule Modification which interfere with educational programming. |
| Priority Next Steps | Work with security staff to minimize cancellations of school due to lack of officers.<br><br>Ensure that all records are sent to the Monitor's office within 15 days after the close of the month relative to youth in TM or PC status. |
| Quality Assurance Measures | No QA has been reviewed for this provision but the Monitor. |
| Sources of Information upon which Consultant relied | Review of policies and procedures relative to education<br>Discussion with education staff<br>Review of tracking form regarding removals due to security or other instances.<br>Review of education records of one youth in TM and PC status. |

| **S.A. 95.** When an IEP is ineffective, Defendants shall timely modify the IEP. | |
|---|---|
| **Compliance Rating** | **Partial Compliance** |
| Description of Monitoring process | See above for discussion of this section.  Fourth quarter monitoring efforts included on-site file reviews and discussion of cases to determine whether this provision is compliant. |
| Findings and Analysis | See discussion above. |
| What is needed for full compliance? What steps are required and/or recommended? | Good data must be kept on student goal achievement, and should reflect student progress for meeting IEP goals, and receiving academic benefit from instruction provided.  Student files reviewed indicated that reviews are completed every 10 weeks on students, and information on progress is sent to parents.  This practice, when done consistently, provides the youth and parents with good benchmarks for the year, but should also provide indicators for when IEPs may need to be modified. Supervision of IEPs and data collection should provide indicators of whether such progress is being achieved with each student.  PRDE must have a system of providing oversight of special education teachers to monitor their development of IEPs, as well as progress and benchmarks achieved. Full compliance with this provision is met when Paragraph 86 reaches full compliance. |