# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

**THE UNITED STATES OF AMERICA**

        **Plaintiff,**

        **v.**                         **CIVIL ACTION NO. 94-2080 (GAG)**

**COMMONWEALTH OF PUERTO RICO**

        **Defendant,**
_____

## INFORMATIVE MOTION TO APPROVE MONITOR'S
## FIRST QUARTERLY REPORT FOR 2020

        The Monitor hereby submits her First Quarterly Report for 2020 covering the period of

January 1 - March 31, 2020 regarding compliance on the remaining issues in this case. This

report is submitted after review and comment by the Parties.

**Submitted by:**

**/s/Kim Tandy**
Kim Tandy, Federal Monitor
United States v. Commonwealth of Puerto Rico
SPEHCE, VIG Tower
1225 Avidena Ponce de Leon, Penthouse Floor, Office #7
San Juan, Puerto Rico   00907
kimtandy@justicebydesign.net
317-840-9332

**Certificate of Service**

I HEREBY CERTIFY that this, I electronically filed the foregoing with the Clerk of the Court on June 8, 2020 using the CM/ECF system, which will simultaneously serve notice of such filing to counsel of record to their registered electronic mail addresses.

Respectfully Submitted,

/s Kim Tandy_____

**Kim Tandy**
Federal Monitor, United States v. Commonwealth of Puerto Rico
SPEHCE, VIG Tower
1225 Avidena Ponce de Leon, Penthouse Floor, Office #7
San Juan, Puerto Rico   00907
kimtandy@justicebydesign.net
317-840-9332

# Commonwealth of Puerto

Civil Action No:  3:94 –cv-02080 (GAG)

## Monitor's First Quarterly Report

January 1 – March 31, 2020

Kim Tandy, Federal Monitor
USACPR Monitoring, Inc.
kimtandy@justicebydesign.net
317-840-9332

Monitoring Team:
David Bogard, MPA, JD
Javier Burgos, JD
Robert Dugan
Miriam Martinez, PhD
Curtiss Pulitzer, AIA

# EXECUTIVE  SUMMARY

This report covers the period of January 1 through March 31, 2020.  The quarter began with the island experiencing a series of earthquakes.  It ended being stricken with the pandemic caused by COVID-19. In spite of the many demands placed on the Department of Corrections and Rehabilitation (DCR) this quarter, the Monitor wishes to commend the staff of the facilities and others in Central office for their diligence in working with me and my team as best possible to avoid setbacks in this case.

In spite of these challenges, there has been much activity this quarter.  The Department for Corrections and Rehabilitation worked to separate out a program budget for NIJ which will be protected, used only for NIJ purposes, and which provides for a training academy and new officers, as well as funding for other compliance matters. The Parties have worked together to reach new agreements regarding safety and security issues, including staffing, refined isolation policies, and improvements in incident reporting. The Governor has appointed a personal representative in this case.  The Court scheduled an onsite visit to both CDT Ponce and CDT Villalba to see firsthand how the facilities were operating, and to speak with youth and staff.  And finally, as COVID-19 took hold throughout the country, and in Puerto Rico, DCR necessarily developed protocols designed for prepare, prevent, and manage the spread of the virus in its facilities.  This too has led to changes in how monitoring can be done moving forward, as stay at home orders impacted many NIJ staff and ultimately, certain operations within the facilities.

Although earthquakes in early January caused temporary delays, monitoring for much of the quarter was able to be completed as normal.  On March 15, Governor Wanda Vasquez imposed a strict curfew, and a stay at home order other than for essential employees.[1] Quarterly visits by the Monitoring team were mostly completed the two weeks prior to that Order. Document production after that time was impacted in some areas of compliance, and is noted as such accordingly by paragraph.

This report continues to place a high priority on the shortage of officers in CDT Ponce and Villalba, and the need to hold a new training academy in the new fiscal year.  Security and safety issues are also critical as evidenced by several alarming incidents which occurred this quarter involving youth injuries. Mental health services are particularly important given the trauma exposure of this population generally, and in particular, in light of the traumatic events of the quarter.

At the end of the first quarter, it became apparent that monitoring will need to be adapted moving forward.  Much will change in the coming months due to the pandemic.  Protocols will need to be in place internally within DCR for educating, preventing, and responding to the virus.  Monitoring will change, as health and safety necessarily become the agency's number one priority.

The Monitor appreciates the efforts of her team, counsel for both parties, and the many NIJ staff with whom we work to improve the lives of children in NIJ facilities.

A summary of compliance ratings for the remaining sections is found below.

---

[1] See,
https://www.elnuevodia.com/noticias/locales/nota/wandavazquezdecretatoquedequedaparatodopuertoricoparacontenerelcoronavirus-2552934/ (Accessed on 4/21/20)

| Parag. No. | Compliance Provision | 2nd 2019 | 3rd 2019 | 4th 2019 | 1st 2020 |
|---|---|---|---|---|---|
| Physical Plant | | | | | |
| S.A. 31 | Facilities conforming to Building Codes | PC | PC | PC | PC |
| C.O.  43 | Sufficient funding for Implementation of C.O. | PC | PC | PC | PC |
| S.A. 45 | Agency Policy and Procedure Manual for all operations | PC | PC | PC | PC |
| S.A. 50 | Training for current and new direct care staff | PC | PC | PC | PC |
| S.A. 48 | Sufficient Direct Care Staff | NC | NC | NC | NC |
| Jan 2009 Para. 1 | Reasonable Safety of Youth through Adequate Supervision | NC | NC | NC | NC |
| Parag 2 | Sufficient Staff to Implement Decree and adequate supervision | NC | NC | NC | NC |
| Parag 3 | Training for social workers if direct care staff | na | na | na | na |
| Parag 4 | Persons Hired to be Sufficiently Trained before deployed | na | na | na | na |
| Parag 5 | Submission of monthly staffing report | PC | PC | PC | NC |
| S.A. 52 | Classification | NC | NC | PC | PC |
| S.A. 77 | Use of Force | PC | PC | PC | PC |
| S. A. 78 | Investigations into Alleged Abuse and Maltreatment of Youth | PC | PC | PC | PC |
| S.A. 79 | Restrictions on Isolation | PC | PC | PC | PC |
| S.A. 80 | Protective Custody | PC | PC | PC | PC |
| S.A.  59 | Treatment Plans for youth with Substance Abuse problems | PC | PC | PC | PC |

| | | | | | |
|---|---|---|---|---|---|
| C.O. 29 | Residential Mental Health Treatment Program | PC | PC | PC | PC |
| S.A. 36 | Continuous Psychiatric and Psychological services | PC | PC | PC | PC |
| S.A. 63 | Reducing Risk of Suicide | PC | PC | PC | PC |
| S.A. 72 | Emergency Psychotropic Medication | SC | SC | SC | PC |
| S.A. 73 | Behavior Modification/Treatment | SC | SC | SC | PC |
| S.A. 81 | Provision of Academic and Voc. Education to All Youth | PC | PC | PC | PC |
| S.A. 86a. | Compliance with IDEA Requirements and Timeframes | PC | PC | PC | PC |
| S.A. 86b. | Screening for youth with Disabilities (Child Find Provisions) | SC | SC | SC | SC |
| S.A. 87 | Obtaining IEPs of  Eligible Youth | PC | PC | PC | PC |
| S.A. 90 | Delivery of Specially Designed Instruction and Related Services | PC | PC | PC | PC |
| S. A. 91 | Qualified educational professionals and voc. Ed | PC | PC | SC | SC |
| S.A. 93 | Year Round Services for youth with IEPS | SC | SC | SC | SC |
| S.A. 94 | Services to youth in isolation or other disciplinary settings | PC | PC | PC | PC |
| S.A. 95 | Modification of IEPs | PC | PC | PC | PC |

## Compliance Ratings, Analysis and Recommendations

The Settlement Agreement requires that the Court retain jurisdiction of remaining claims "until such time as the Commonwealth has fully and faithfully implemented all requirements of the agreement and such full compliance has been maintained for one year." (S.A. 103). The Monitor and Consultants use a three-tiered system in this report defined as follows:

***Substantial Compliance*** shall mean a level of compliance that does not significantly deviate from the components of the provision, provided that any deviation poses no significant risk to detainee health or safety. Substantial Compliance indicates that there are approved relevant policies and procedures which, when implemented, are sufficient to achieve compliance; trained staff responsible for implementation; sufficient staff and resources to implement the required reform; and consistent implementation of the procedures during the majority of the monitoring period.  Substantial compliance also requires that the procedures accomplish the outcome envisioned by the provision.

The substantial compliance rating is given only when the required reforms address all of the issues discussed in the provision and when solid implementation of the reforms has been consistently demonstrated, through reliable data, observations and reports from staff and youth, for a majority of the monitoring period.

***Partial Compliance*** indicates that compliance has been achieved on some of the components of this provision, but significant work remains. It indicates that there are approved relevant policies and procedures which, when implemented, are sufficient to achieve compliance; trained staff responsible for implementation; and sufficient staff and resources to implement the requirements of the provision. Partial compliance indicates that while progress has been made toward implementing the procedures described by policy, performance has been inconsistent throughout the monitoring period and additional modifications are needed to ensure that procedures are sufficiently comprehensive to translate policy into practice, and to accomplish the outcome envisioned by the provision.  Partial compliance is appropriate if policies may need minor revisions for compliance with the Settlement Agreement provided other requirements of this section are applicable.

***Non-compliance*** indicates that most or all of the components of the provision have not yet been met. Examples include provisions where policies still need to be overhauled, the majority of staff may need to be trained, procedures may not have been developed, documentation may not be in place or consistently provided, and there has been no determination that the procedures accomplish the outcome envisioned by the provision.

## PHYSICAL PLANT - Curtiss Pulitzer

| S.A. 31 Existing facilities expected to be occupied by juveniles beyond Fiscal Year 1996-1997 shall conform to applicable federal, state, and/or local building codes. | |
|---|---|
| Compliance  Rating | Partial Compliance |
| Description of Monitoring process during this period of time | The Monitor's office reviewed draft documents developed by NIJ/DCR's consulting architect Javier Valentin relative to compliance with this provision. Mr. Valentin, the architect performing the Code Analysis, submitted a draft report this quarter on compliance with the Americans with Disability Act (ADA). The report was submitted to the Monitor's Consultant on February 7th.  DCR previously submitted a draft of the Life Safety Code analysis which was reviewed by the Monitor's Consultant in September and is being finalized. |

| | |
|---|---|
| | A second draft report on building codes (INTERNATIONAL BUILDING CODE 2009 and PUERTO RICO BUILDING CODE 2011) violations, which is the third report due, was submitted by Arlene Perez to the Monitor's Consultant on March 13th.<br><br>The Monitor's Consultant made his last site visit in September, 2019 to see the progress being made relative to the physical plant repairs at Ponce and Villalba and to conduct a Functional Team meeting with the relevant staff.  A First Quarter on-site visit was not made by the Consultant due to the earthquakes in January and then the Covid-19 epidemic. |
| Findings and Analysis | The Monitor's Consultant planned a trip to Puerto Rico on March 16th to review the ADA and codes report with Mr. Valentin as well as Luis Ortiz during a scheduled in person Functional Team meeting on the 17th. That weekend, the Commonwealth declared a state of emergency as did the Consultant's local community in New Jersey so the trip to Puerto Rico was canceled. The Monitor's Consultant is planning to schedule virtual review meetings with Mr. Valentin and Luis Ortiz during the second quarter.<br><br>Mr. Valentin reported that he prepared a preliminary capital budget working with DCR based on the non-compliance findings as they related to all three reports.  He stated that the repair costs were primarily ADA related because of the bathroom work that needed to be done to provide ADA accessibility, lack of braille signage in all the facilities and the sidewalks leading out of exit doors which need to be constructed and/or repaired. The Monitor's office was informed that $373,707.09 had been allocated to Ponce and $340,448.29 for Villalba for these repairs and these funds were allocated in the current 20-21 FY budget for DCR. The Consultant received a breakdown of these figures on April 6th with some explanation of where the work would be performed. The Consultant has requested further clarification form Mr. Valentin tying capital allocations to specific non-compliance references in the three documents. Mr. Valentin stated he would develop that revised list.  As the capital allocation already been preliminarily approved, no additional changes could be made for this coming year.<br><br>In addition, the Monitor's Consultant received a breakdown of allocated capital expenditures in the amount of $779,960 for the upcoming fiscal year for Ponce and Villalba, including funds in addition those listed above. The Consultant spoke with Luis Cruz, the head of DCR's FMO division about this dollar amount and capital allocation breakdown and expressed concern that insufficient funds may have been budgeted and that additional funding will still be needed.<br><br>The Monitor's Consultant has also been monitoring the progress being made to comply with suicide prevention measures (See discussion for Para 79) in juvenile rooms, and continues to review fire safety conditions, plumbing and air conditioning through conversations and e-mails from NIJ./DCR  to confirm  that all housing units are functional and safe for juveniles to occupy.<br><br>As reported in the last quarterly report, there has been some positive movement in creating a solution in preventing suicides from occurring by a juvenile attaching a |

|  | ligature to the hinges in juvenile room doors. We understand that all the rooms in the Puertas housing module in Ponce have been retrofitted as have three rooms in Modules 1, 2 and 3 in Ponce. The remaining modules in Ponce need to be completed. There has been no work performed in Villalba, where it is proposed that three rooms in each living unit be retrofitted. This should meet the ¶79 suicide resistant requirements for any youth held in isolation. It was reported that that there is no additional funding at this time to retrofit all the remaining rooms at Ponce and Villalba.<br><br>The replacement of air vent grilles with suicide resistant versions on the lower levels of the housing units at Ponce and Villalba has been completed as reported in the last quarterly report. The Monitor's Consultant was told that the DCR brigades have started to apply security caulking at the edges of the vent grills to prevent the possibility of a ligature from being threaded through the edge of the grill. Application of the security caulking should prevent this from happening. In addition, this would prevent juveniles from sliding paper through these same gaps which impedes air conditioning air flow into the rooms. |
|---|---|
| What is needed for full compliance? What steps are required and/or recommended? | The Monitor's Consultant must review his comments on the two new reports with Mr. Valentin.  He must then compile the edits to all three reports relative to facility compliance with the IBC and Puerto Rico Building Codes, the Americans with Disability Act, and the NFPA Life Safety Code, based on all the comments from the Monitor's Consultant. The preliminary cost estimates to achieve compliance have now been included in the 2020-2021 budget but will need further review by the Monitor's office. A schedule for completion needs to be developed by NIJ including the time frames for design/ engineering and construction and who will be performing the work.<br><br>Repairs budgeted at Ponce and Villalba must be completed and a schedule for completion developed by NIJ.<br><br>When the Monitor's Consultant better understands the magnitude of compliance issues, a prioritization schedule should be developed along with potential timelines for compliance. Violations that affect Life Safety, and cannot be initially mitigated operationally, should have the highest priority for implementation.<br><br>While the Monitor's Consultant is pleased that funds have been budgeted to commence compliance with this provision, it will take time to fully understand the scope of work being proposed and determine if there are additional capital allocations that may be necessary. On-site visits to understand better the proposed capital projects will be necessary as will continued on-site inspections to review the progress of the work. |
| Priority Next Steps | The Monitor's Consultant realizes and appreciate that the earthquakes which have occurred in Puerto Rico into early in this quarter coupled with the Covid -19 crisis have placed additional constraints on DCR staff to ensure that facilities are safe. |

| | |
|---|---|
| | The Monitor's Consultant will review the two most recent reports on ADA compliance and Building Codes and schedule virtual review meetings with Mr. Valentin and DCR staff in the second quarter of 2020 so that the reports can be completed.<br><br>DCR is to hopefully continue retrofitting the door hinges in Ponce and in Villalba.  A schedule for work completion, and inclusion of estimated costs for completion must be developed.<br><br>DCR must make the needed repairs in the upcoming fiscal year when it commences in July, and have sufficient funding allocated to make additional repairs in the next 2021-2022 fiscal year, in order to complete the remaining requirements of this paragraph during that time.<br><br>The caulking of the air vent grills should be finished by the brigades this quarter.<br><br>Due to the Covid-19 crisis, the Monitor's Consultant will continue to meet virtually with DCR and their consultant Mr. Valentin. The Consultant will also rely on self-reporting by DCR on existing physical plant issues that affect the health and safety of juveniles. It is hoped that an on-site visit may be possible next quarter as it will be nearly impossible to verify the accuracy of the capital expenditure allocations without being on-site at the two facilities. If possible, the Consultant may be able to do visual inspections by video transmission. |
| Quality Assurance Measures | The quality assurance measures are for the monitor's office to keep reviewing the documents developed by Mr. Valentin and hopefully touring the facilities with Mr. Valentin to view first hand where code and ADA violations may exist and repairs are to be made. The Monitor's office will keep reviewing the documents being developed by DCR to track facility repair issues including suicide mitigation efforts followed up hopefully by tours to determine compliance. |

| | |
|---|---|
| Sources of Information upon which Consultant report and compliance ratings are based. | The documentation being developed by Mr. Valentin will be the primary source to determine the levels of compliance with the codes and regulations. The financial resources to rectify violations and to achieve full compliance will need to involve continued discussions with key personnel at DCR and FOMB as well as senior officials within the Commonwealth hierarchy responsible for funding the agency.<br><br>The spread sheets and photographs being submitted periodically by NIJ/DCR will help the Monitor's office to track facility repair issues. |

## POLICIES AND PROCEDURES, TRAINING AND RESOURCES – Kim Tandy

| S.A. 43 Until this order is fully implemented, Defendants shall submit to the Legislature of the Commonwealth each fiscal year a report wherein the required sums of money will be established so as to implement this Consent Order. | |
| --- | --- |
| **Compliance  Rating** | **Partial Compliance** |
| Description of Monitoring process during this period of time | On December 19, 2019 Judge Gelpi ordered the Parties to discuss a plan prior to the January 16th Status Conference for an adequately protected budget for this case, and "one in which funds are designated toward the present consent decree and not used toward any other purposes." (See Order, Doc. 1436) This was reinforced by the Court during the Status Conference on January 16th, 2020.<br><br>The Parties met prior to the hearing on January 16 to discuss the process which would be involved in DCR having a separate program budget for juvenile facilities. After the hearing, the Court ordered the Parties to file a joint motion as to the budget for the program by 3/1/20.  On February 7th, the Monitor and DOJ received a draft of the budget which was also submitted to Fiscal Oversight and Management Board (FOMB). The Monitor submitted a list of questions to DCR to reconcile concerns regarding separation of the budget.  The Parties moved to extend the process until March 13th, the date of the Status Hearing, which was granted.<br><br>The Monitor and FOMB worked jointly to create a list of questions/ concerns regarding the proposed separate budget and provided this list to DCR on March 2 to be discussed at an in-person meeting on March 9th with FOMB and DCR finance staff.  The major issues concern staffing costs, CAPEX and repairs.<br><br>The Monitor met with Francisco Pares Alicia, Secretary of the Treasury and the Governor's personal representative assigned to the case, and Secretary Eduardo Juanatay on March 9 regarding the agency's plan for meeting staffing requirements, as well as how it will address other fiscal needs for compliance.<br><br>The Parties were given an extension of time until April 10th to file a Joint Motion agreeing to a budget which complied with the Court's orders.  The Monitor had several calls with DCR, Bluhaus, and FOMB to assist in working through questions and concerns. |
| Analysis and Findings | DCR is required by the Settlement Agreement to "submit to the Legislature of the Commonwealth each fiscal year a report wherein the required sums of money will be established so as to implement this Consent Order."  The Court has ordered DCR to have an adequately protected budget for this case, with designated funds which cannot otherwise be used toward other purposes. The current budget proposal has NIJ as a separate program within DCR so that funds will be assigned for exclusively use for juvenile facilities.  DCR has indicated that this might not be technically possible for the upcoming year based upon OMB requirements, but that it is committed to an internal |

| | |
|---|---|
| | process to make this separation as best possible, and to establish a separate accounting of expenses.<br><br>The budget for NIJ includes 316 security personnel within the two remaining facilities, and 129 civil staff, including social workers, educators, special operations, and others. The budget also includes positions from Central Office and five community offices which work with youth referred by the Courts.  Over $700,000 has been includes for capital expenditures needed to comply with paragraph 31.<br><br>DCR is working to answer any remaining questions about efficiencies with FOMB prior to the Court's deadline of April 10th.<br><br>FOMB must certify the Fiscal Plan for 2021 and issue a notice of violation for correction to the Governor is necessary.  After a period provided for corrections, FOMB will submit a compliant budget to the Governor and legislature, which submits any changes back to FOMB.  By June 30th, the Oversight Board must certify the Budget. |
| What is needed for full compliance?<br><br>What steps are required and/or recommended? | DCR must ensure that its budget addresses adequate staffing, training, resources and physical plant requirements to fully comply with the provisions of the Consent Order and Settlement Agreement.<br><br>The budget must be separated out within the DCR budget as a program, and have a system of accountability to ensure that funds are spent only for NIJ purposes and not used otherwise.<br><br>DCR must respond to questions raised by the Monitor and FOMB about spending categories including staffing, capital expenditures, and repair and replacement issues, as well as separation of the PCPS contract between adults and youth.<br><br>If the population can be further downsized, with more youth remaining in their own communities, or being returned sooner, the budget projections will likely be different. The Monitor strongly suggests a leadership group be formed to create this vision, and to utilize outside consultants to assist with this. |
| Priority Next Steps | In order to comply with the Court's December 16, 2019 Order, DCR must work with FOMB and the Office of Management and Budget to complete a separated budget for NIJ.  Since this budget cannot be used for other purposes, it is important that it reflect accurate expenditures, and remove positions currently assigned to other facilities, including those stationed at closed facilities, adult facilities, or elsewhere within DCR. The budget must also contain funds for capital expenditures to comply with Paragraph 31 and to complete necessary work at CDT Ponce.<br><br>NIJ spending must be tracked and accounted for separately and apart from the total DCR budget throughout the fiscal year. |

| Sources of Information upon which Consultant report and compliance ratings | Department of Corrections and Rehabilitation ("DCR") and Correctional Health Program ("CHP"), Presentation to the Fiscal Oversight and Management Board (Dec. 19, 2019) |
|---|---|
| | Meeting and calls with FOMB staff |
| | Meeting with DCR staff |
| | Draft budget reports with backup documentation |

**S.A. 45**  Within one year of the approval of the agreement by the Court, Defendants agree to provide an agency policy and procedure manual governing all operational aspects of the institutions.  Within eighteen months of the approval of this agreement, Defendants shall further insure that the facilities are strictly operated within these policies and procedures and that all staff have been trained accordingly.

| Compliance  Rating | **Partial Compliance** |
|---|---|
| Description of Monitoring process during this period of time | The Monitor has copies of existing policies and procedures in most of the remaining areas of the Settlement Agreement and Consent Order.  The four remaining policies which must still be approved are for S.A. 43, S.A. 52, and several provisions related to education covered in Policies 20.1 and 20.2. |
| | During her meeting with Education staff in March, the Monitor again asked for a signed copy of Policy 20.1 through the Secretary's office.  The Monitor also requested and received a copy of the second round of revisions made to Policy 20.2 by the Department of Education and NIJ. |

| Findings and Analysis | The following policies and procedures have not been finalized and approved through the Office of the Monitor: | | |
|---|---|---|---|
| | S.A. 52 Classification | Not complete | Changes to Policies 6.1 and 6.2 have been made and were reviewed by the Consultant in December.  Those changes must be reviewed by DCR and approved. |
| | S. A. 79 Isolation | Not complete | Policies must be revised after agreement is reached regarding a working definition of what is and what is not isolation. |
| | S. A. 81 General and Vocational Education | Completed not signed | Policy 20.1 has been amended to indicate that youth still enrolled in school and who are in TM/PC status receive a full school day.  This policy has been pending a signature by the Secretary for since the summer months. |
| | S.A 86, 91, 94 | Completed not signed | A second draft of Policy 20.2 was provided to the Monitor for review in December of 2019 |

|  |  |  | and returned with comments. It has not been signed. |
|--|--|--|----------------------------------------------------|

Further discussion about policies and procedures are noted in other sections of this report as relevant in the sections noted above.

| What is needed for full compliance?

What steps are required and/or recommended? | Approved policies and procedures should remain a priority in any area where the Monitor's office has not yet approved of changes, and where policies do not adequately reflect the requirements of the Settlement Agreement and/or Consent Order.

Policy 20.1 as amended requires a signature by the Secretary.  The policy was submitted to the Secretary in July of 2019. Policy 20.2 must be amended to include procedural safeguards required under the IDEIA.

On 12/21/2019, the Monitor's Consultant reviewed and commented on the draft Policies 6.1 and 6.2 drafts and asked for revised policies based on his review. Upon final draft policy reviews, the polices require a Secretary's authorization signature, an implementation date, and a training curriculum and training schedule to coincide with the implementation date in a manner that assures staff are trained prior to policy and procedure implementation.

DCR has additional draft classification policies that are being revised based on the Monitor's Consultant prior reviews and comments. It is hoped that DCR will provide additional revised classification polices for review in the second quarter of 2020.

The parties agreed upon a definition of isolation to be included in the policies on transitional measures or elsewhere.  Revisions must be made to Paragraph 79 and other policies which are implicated.  Draft policies by Order should be completed and submitted to the Monitor during the second quarter. |
|--|--|

| Priority Next Steps | Policy 20.1 has been waiting approval by the Secretary's office since July of 2019. Counsel should immediately seek this approval or determine what additional changes need to be made in order for the approval to be granted.

DCR and/or DOE should forward changes to Policy 20.2 immediate to the Monitor for review of the sections on due process protections and other changes made. Changes should be completed during the Fourth Quarter, if any, and approval by the Secretary sought.

DCR must address the needed changes to policies as recommended by Bob Dugan relative to classification.

The Parties have agreed on a definition of isolation relative to paragraph 79. Required changes to policy must be submitted to the Monitor within 60 days of the April 9th 2020 Order.  Monitoring in 2020 will be done in accordance with how isolation is defined by this process, and whether actions taken comport with this definition. |
|--|--|

| Quality Assurance Measures | NIJ staff, under the leadership of Kelvin Merced, have been working on a set of policies regarding Quality Assurance which are under review by Bob Dugan. |
|---|---|

**S.A. 50.** Defendants shall ensure that current and new facility direct care staff are sufficiently well-trained to implement the terms of this agreement. Each direct care staff, whether current or new, shall receive at least forty (40) hours of training per year by qualified personnel to include, but not be limited to, the following areas: CPR (cardiopulmonary resuscitation); recognition of and interaction with suicidal and/or self-mutilating juveniles; recognition of the symptoms of drug withdrawal; administering medicine; recognizing the side-effects of medications commonly administered at the facility; HIV related issues; use-of-force regulations; strategies to manage juveniles' inappropriate conduct; counseling techniques and communication skills; use of positive reinforcement and praise; and fire prevention and emergency procedures, including the fire evacuation plan, the use of keys, and the use of fire extinguishers.

| Compliance Rating | Partial Compliance |
|---|---|
| Methodology for Monitoring this Quarter | A site visit was conducted during the week of March 10 - 13 and a meeting with Aida Burgos, Human Resource Director, and Kelvin Merced was held to discuss training compliance and documentation during this time. The Monitor confirmed that again this quarter Aida Burgos, Human Resource Technician, was assigned to work on training for all of DCR.  It was also learned that Kelvin Merced has been assigned to also oversee the new training academies for DCR for adults.  The time for both to work on NIJ compliance issues has been limited in the first quarter.<br><br>During the March meeting, the Monitor and Compliance staff reaffirmed the required metrics for compliance with paragraph 50. |
| Findings and Analysis regarding compliance. | NIJ Policy 4 on training was approved previously.<br><br>While staffing for training has often been minimal, the recent assignment of Aida Burgos to broader training responsibilities within DCR is worrisome and has caused setbacks in training compliance.  This quarter has also seen setbacks in training as a result of the earthquakes as well as COVID-19.<br><br>The last annual report received covers the period of January 1, 2018 through June 30, 2019 relative to training activities. During that time, NIJ data indicates that the facilities met or exceeded all benchmarks established for meeting compliance with the exception of Use of Force training at Ponce.  The Monitor did not receive a corrective action plan or verification that such was initiated.<br><br>The annual report covering July 1, 2018 – December, 2019 was not completed during this quarter and is overdue.<br><br>A list of training provided during the First Quarter was provided, along with the number of participants. Fourteen training sessions scheduled January 13 – 23 were cancelled as a result of the earthquakes.  All sessions scheduled on or after March 16 were cancelled as |

| | |
|---|---|
| | a result of the Coronavirus.  Training sessions scheduled between January 27 – March 13 were able to proceed as planned with a few exceptions.<br><br>The Monitor has not received an annual assessment of training needs, and documentation of necessary or recommended changes to the training curricula. |
| What is needed to reach full and faithful compliance? | **Agreed upon metrics for reaching compliance are as follows:**<br><br>1)  Training sessions in all SA 50 categories must be planned and provided throughout the coming year with sufficient frequency to allow for ready access by participants in the remaining two facilities.  A training calendar must be prepared in advance.<br><br>2)  Training completion by active direct care staff must reach the targeted benchmarks by topic over an 18 month period, and corrective action plans for facilities not achieving those benchmarks must ensure that the remaining staff complete training within 180 days.  This includes:<br><br>• Training on the use of chemical agents must be completed at the 100% rate, but only for those who are authorized and certified to use OC spray.<br>• CPR training and certifications must be completed every 2 years at the 90% level for those direct care staff.<br>• Training on suicide prevention must be completed at the 90% rate for all direct care staff.<br>• Facility directors must ensure that all other required trainings for this provision meet at least 85% completion rate within the 18 months.<br><br>3) Pre and post must be used to evaluate participants' increase in knowledge and skills achieved by the training. Staff must pass such tests with a 70% or higher grade<br><br>4)  Evaluation of training modules and delivery must be sought by participants and through QA to ensure trainers are knowledgeable and skilled both in content and delivery to adult learners, materials are understandable and adequately cover the topic, and that content is relevant, current and accurate.<br><br>5)  Ongoing training needs will be assessed at least on an annual basis or more frequently if needed to determine if modifications are necessary. Written documentation is required to show that such reviews have taken place and what changes if any have been made as a result.<br><br>6)   Necessary revisions to training based on changes in policies and procedures will be made within a targeted time, with full implementation within 12 months.  Written documentation is required to show that such changes have been made and implementation scheduled and completed. It is important that such changes be coordinated with UEMNI and OISC and include recommendations based upon investigation findings and results.<br><br>Appropriate staffing support must be in place to the Director of Human Resources and IDECAHR to facilitate report preparation and compliance evidence.  The Monitor is |

| | |
|---|---|
| | concerned that the expansion of the Director's responsibilities to include training for all of DCR has stretched thin the current staffing configuration. |
| Priority Next Steps | The second quarter goal for IDECARH is to complete the18 month report covering the period of July 2018 – December of 2019.   It should include detailed information on compliance with all 6 metrics listed above.

IDECARH must provide backup documentation for 2019 regarding training records, evaluations, and pre/post testing.

NIJ must comply with the April 9th (Doc. 1477) Order to provide a written plan to the Monitor and DOJ that describes the timing for recruitment and training of new officers, along with proposed dates for the training academy and estimated start dates.  The plan must describe the impact for officer recruitment, training and placement in facilities. |
| Basis for findings and recommendations. | The findings and recommendations are based upon the meetings with the Human Resource Technician, as well as documentation provided of monthly training. |

## PROTECTION FROM HARM – STAFFING  (Bob Dugan)

**S.A. 48.** Defendants shall ensure that the facilities have sufficient direct care staff to implement all terms of this agreement. Direct care staff supervise and participate in recreational, leisure and treatment activities with the juveniles. Compliance can be demonstrated in either of two ways.

48.a Method one: Defendants may provide documentation of consistent supervision by not less than one (1) direct care worker to eight (8) juveniles during day and evening shifts and not less than one (1) direct care worker to sixteen (16) juveniles during normal sleeping hours.

*48.b Method Two: Defendants may develop, and submit to the court for approval, an alternate staffing roster for any facility in this case. The roster shall be based on a study that shall specify fixed posts and the assignment necessary to implement the terms of this agreement, taking into consideration the physical configuration and function of spaces, the classification and risk profiles of youths involved, the incident patterns in the settings involved, the routine availability in the settings of other categories of staff, and the overall number of direct care positions necessary to consistently achieve the coverage proposed. Once a plan is approved for a facility, defendants shall document the employment of the necessary overall numbers of direct care staff, and the ongoing deployment of such staff in accordance with the plan."*

*The Commonwealth has the choice to demonstrate compliance according to method 48.a or 48.b. They have informed the Monitor that they do not intend to select method 48.b and that their legal position is that this language should be struck from the Settlement Agreement as superfluous.*

| Compliance Ratings | Non-Compliance |
|---|---|
| | |

| | |
|---|---|
| Description of Monitoring process during this period of time | S.A. 48 Staff Youth Ratio monitoring compliance is analyzed on a quarterly basis using DCR facility generated weekly staff youth ratio forms as well as the weekly Form DCR -DCR - 0144. These forms are submitted to the Monitor's Consultant throughout the reporting quarter. DCR facilities daily shift by shift staffing and youth population for each operational housing module is reported, as well as any 1:1 supervision events, and the volume of staff that are required to work a double shift. Commencing with the fourth quarter of 2019, DCR provided specific information of the names of staff who were working double shifts, the shift and location. The compliance report provides information from Staff Youth Ratio forms that were provided to the Monitor's Consultant for the period December 29, 2019 through March 28, 2020.

The Monitor's staff conducted site visits on March 3, 2020 to CDTS Ponce and March 4, 2020 to CDTS Villalba. Observation and documentation of housing module staff youth ratios is conducted on each visit. |
| Findings and Analysis | **Compliance Status:**  For the 2020 first quarter, S.A. 48a is found to be in non-compliance, with these findings:

- There are not sufficient staff and resources assigned to CDTS Ponce and CDTS Villalba to implement the requirements of the provision.
- 1324 (31%) of staff youth ratio events were filled by staff working double shifts.
- The percentage of shifts (31%) covered by staff doing double shifts has reduced by 10% since the 2019 fourth quarter. This appears to be as a direct result of suspension of education and off module programming as a result of the Covid-19 quarantine protocols.
- The closure of CD Humacao and transfer of youth to CDTS Ponce and CDTS Villalba had no positive impact in meeting the minimum required staff youth ratios, absent double shifting.
- The volume of non-compliant minimum required staff youth ratio events and double shifting are occurring disproportionately on Saturdays and Sundays (40%) and on the 2:00 PM – 10:00P PM shifts (43%).
- The volume of serious youth violence, assaults, cutting events reflects institutional environments that are intermittently chaotic and not safe for youth or staff.
- For the 2020 first quarter, the Monitor's Consultant continues to find non-compliance with meeting the minimum staff youth ratios and the reliance on double shifts, significantly jeopardizes youth safety and protection from harm.

**Analysis:**

DCR submitted a total of 26 facility staff youth ratio forms for the two facilities requiring staff youth ratios, allowing for 100% of the staff youth ratio forms being available for analysis. DCR has consistently provided all requested Staff Youth Ratio forms used for monitoring and reporting. |

The chart and table below represent staff youth ratio performance by shift for the period (December 29, 2019 through March 28, 2020).



| | Met Staff Youth Ratio 10:00 - 6:00 Events | Met Staff Youth Ratio 6:00 - 2:00 Events | Met Staff Youth Ratio 2:00- 10:00 Events | Met Staff Youth Ratio Average:    All Shifts |
|---|---|---|---|---|
| CTS Villalba | 100% | 96% | 94% | 97% |
| CDTS Ponce | 100% | 99% | 99% | 100% |

The following chart and table below represents the DCR agency Staff Youth Ratio averages by shift for 2019 through March 28, 2020:



| | 6:00am- 2:00pm | 2:00pm- 10:00pm | 10:00pm- 6:00am |
|---|---|---|---|
| 1st Quarter 2020 | 98% | 97% | 100% |
| 4th Quarter 2019 | 93% | 97% | 100% |
| 3rd Quarter 2019 | 96% | 97% | 100% |
| 2nd Quarter 2019 | 97% | 99% | 100% |
| 1st Quarter 2019 | 94% | 96% | 100% |

**Waking Hours Youth Ratio Events:**

CDTS Ponce reported meeting the minimum required staff youth ratio in 99% of the waking hour staffing events, resulting in meeting the staff youth ratio in 1353 of 1363 events. This is a reduction of 98 waking hour staffing events from the 2019 fourth quarter reporting period.

PUERTAS, housed in one of the housing modules within CDTS Ponce, met the minimum required staff youth ratios for all shifts throughout of the 2020 first quarter reporting period. During the 2020 first quarter reporting period, CDTS Ponce had sixty-nine waking hour staff to youth 1:1 events.

CDTS Villalba reported meeting the minimum required staff youth ratio in 95% of the waking hour staffing events, meeting the staff youth ratio in 1412 of 1482 events. This is an increase of 4%, 15 more events, than the 2019 fourth quarter reporting period, 91%. Also during the 2020 first quarter reporting period, CDTS Villalba had three waking hour staff to youth 1:1 events.

The DCR 2019 first quarter performance in meeting Staff Youth Ratios is as follows:

- 6:00 am – 2:00 pm shift:  98% of events, a 5% increase from the fourth quarter of 2019 (93%)

- 2:00 pm – 10:00 pm shift:  97% of events, a 0% change from the fourth quarter of 2019 (97%)

- 10:00 pm – 6:00 am shift:  100% of events, a 0% change from the fourth quarter of 2019 (100%)

Of the 2845 waking hour supervision events (6:00 – 2:00 and 2:00 – 10:00 shifts) 2765) of the events  (97%) met the minimum shift staff youth ratio requirements. The DCR 2020 first quarter Staff Youth Ratios compliance performance during waking hours reflects a 2% increase in staff youth ratio compliance compared to the 2019 fourth quarter reporting period.

The 2020 first quarter waking hour staff youth ratio compliance increase is attributable to the following issues:

- A reduction of 83 waking hour supervision events.
- The last day of education for youth in the first quarter was March 13, 2020.
- DCR protocols for Covid-19 quarantine were initiated on March 16, 2020.
  - DCR protocols for Covid-19 quarantine require that all youth be restricted to their assigned housing modules and suspension of all off module programming and events.
- The Covid-19 quarantine requirements cause for a reduction in the need for officers providing supervision of youth while receiving programming off of their assigned modules.

**Staff Double Shifts:**

For the 2020 first quarter, 1324 (31%) of the 4265 staff youth ratio events were covered by staff working a double shift**.** This is 10% decrease of shifts requiring staff to work a double shift compared to the fourth quarter 2019 reporting period (1813), a decrease of 489 double shift staffing events, but also a reduction of 125 staffing events from the 2019 fourth quarter.

| DCR Staff Youth Ratio Events and Double Shifts: First Quarter 2020 | Volume of Staff Youth Ratio Supervision Events | Volume of Shifts Meeting Staff Youth Ratio | Waking Hour Supervision Events | Staff Youth Ratio During Waking Hour Supervision Events | Volume of Shifts Covered by Staff Working a Double Shift | Percentage of Shifts Covered by Staff Working Double Shift | Waking Hour Double Shifts | Percentage of Waking Hour Shifts Covered with Double Shifts |
|---|---|---|---|---|---|---|---|---|
| CDTS Ponce | 2045 | 2035 | 1363 | 1353 | 637 | 31% | 404 | 63% |
| CDTS Villalba | 2220 | 2149 | 1482 | 1412 | 687 | 31% | 505 | 74% |
| DCR First Quarter 2020 Staff Youth Ratio: All Shifts | 4265 | 4184 | 2845 | 2765 | 1324 | 31% | 909 | 69% |

CDTS Ponce, with a decrease of 145 staff youth supervision events from the 2019 fourth quarter to the first quarter, had a decreased percentage of shifts covered by staff working a double shift to 31% (637 events),  a 9% decrease from the previous quarter.

CDTS Villalba with an increase of 20 staff youth supervision events from the 2019 foruth quarter to the 2020 first quarter had a decreased percentage of shifts covered by staff working a double shift to 31% (687 events),  a 12% decrease from the previous quarter.

A closer review identifies staff working double shifts occurred disproportionately on weekends and occurring on the first and second shifts.  Although there was a decrease in the volume of staffing events (-125) and non-compliant staff youth ratio events (-66), from the 2019 fourth quarter, 40% of the events occurred on weekends. Additionally, 43% of the double shifts occurred on the 2:00 PM 10:00 PM shifts.

The volume of double shifts occurring on weekends and on the second shift coincides to periods of time that have a significant reduction in the presence of administrative staff, supervisory staff and programming opportunities.

| DCR Facility First Quarter 2020 | Volume of Non-Compliant Staffing Ratios | Volume of Non-Compliant Staffing Ratios on Weekends | Percentage of Non-Compliant Staffing Ratios on Weekends | Volume of Double Shifts | Volume of Double Shifts on Weekends | Percentage of Double Shifts on Weekends |
|---|---|---|---|---|---|---|
| CTS Ponce | 10 | 3 | 30% | 637 | 256 | 40% |
| CTS Villalba | 71 | 32 | 45% | 687 | 284 | 41% |
| DCR Totals | 81 | 35 | 43% | 1324 | 540 | 41% |

The table below displays the last five quarters of staffing events, double shift staffing events, percentage of double shift staffing events and total number of operational facilities for the quarter.

| Staff Double Shifts and Staffing Events | First Quarter 2019 | Second Quarter 2019 | Third Quarter 2019 | Fourth Quarter 2019 | First Quarter 2020 |
|---|---|---|---|---|---|
| Volume of Double Shifts | 812 | 1188 | 1769 | 1813 | 1324 |
| Volume of Staffing Events | 4343 | 4396 | 4380 | 4390 | 4265 |
| Percentage of Double Shift Staffing Events | 18.7% | 27.0% | 40.4% | 41.3% | 31.0% |
| Number of Facilities | 2 | 2 | 2 | 2 | 2 |

Implications of a large volume of double shifting are deterioration in staff productivity, reducing the ability for staff to be actively engaged in youth observation and supervision, as well as having a negative impact on staff morale and well-being. The outcome of double shifting can lead to fatigued direct care staff, a level of inattentiveness on the part of staff that may result in a failure to provide active behavior management. The failure to provide active behavior management can negatively impact youth safety and potentially contribute to staff negligence in providing effective, safe and secure supervision of youth. Double shifting often leads to staff calling in sick to avoid being required to double shift after their regularly scheduled shift. All of the aforementioned are outcomes of a significant dependence on double shifts to provide minimum staff youth ratios.

There are no prohibitions nor restrictions in S. A. 48 on the use of double shifts to meet the requirements of minimum required direct care staff youth ratios. Although undesirable from an operational, staff morale, effective behavior management and budgetary perspective, it does not impact analysis of whether the minimum required staff youth ratios are being met. It should be noted that DCR's reliance on double shifting to meet minimum staff youth ratios reflects that DCR is significantly understaffed to meet the requirements of S. A. 48.

The first quarter reduction in double shifting must be balanced against the recognition of the Covid-19 quarantine requirements have created an aberrant institutional environment with segregation of youth populations and suspension of youth population facility movement. Double shifting is a critical contributing factor that has jeopardized the agency's capacity to provide effective staffing to provide adequate supervision and to assure youth safety and protection from harm.

On the weekly staff youth ratio reports completed by each facility, DCR requires documentation of the volume of double shifts used for each day for each shift. By Policy 9.20, Supervisors IV and III are required to assign officers to housing modules to meet the minimum required staff youth ratio based on the module youth population.

During the 2020 first quarter, at the request of the Monitor's Consultant, DCR continued to provide information about which staff were assigned to double shifts for each shift, each day and the location of the double shift assignment.

| Volume of Double Shifts | Number of Staff Double Shifting | Volume of Double Shifts | Number of Staff Double Shifting |
|---|---|---|---|
| 27 | 1 | 21 | 1 |
| 21 | 1 | 18 | 1 |
| 19 | 2 | 16 | 1 |
| 17 | 1 | 14 | 3 |
| 16 | 1 | 13 | 4 |
| 15 | 1 | 12 | 5 |
| 14 | 1 | 11 | 8 |
| 13 | 1 | 10 | 8 |
| 12 | 2 | 9 | 5 |
| 11 | 1 | 8 | 6 |
| 10 | 4 | 7 | 7 |
| 9 | 8 | 6 | 8 |
| 8 | 8 | 5 | 7 |
| 7 | 9 | 4 | 10 |
| 6 | 4 | 3 | 6 |
| 5 | 7 | 2 | 7 |
| 4 | 20 | 1 | 7 |
| 3 | 27 | | |
| 2 | 33 | | |
| 1 | 39 | | |

For the first quarter of 2020, CDTS Ponce had a total of 637 double shifts provided by 171 different named staff. The double shift profile range was as follows: one staff worked 27 double shifts; 33 staff worked 2 double shifts; 39 staff worked 1 double shift.

For the first quarter of 2020, CDTS Villalba had a total of 687 double shifts provided by 99 different named staff. The double shift profile range was as follows: one staff worked 21 double shifts; 8 staff worked 11 double shifts; 5 staff worked 9 double shifts; 10 staff worked 4 double shifts.

As illustrated in the tables above, the volume of double shifting being used to provide the minimally required staff youth ratio, although reduced in the first quarter in light of facility Covid-19 quarantine restrictions, continues at an unsustainable rate, jeopardizing youth safety, staff capacity to provide effective behavior management, and staff well-being.

Compounding the level of double shifting is the vacant positions during the first quarter at both facilities:

- At CDTS Ponce there are eight of ten filled Shift Supervisor positions, with two Supervisor IV vacancies.

|  | • At CDTS Villalba there are eight of ten filled Shift Supervisor positions, with two Supervisor IV vacancies.<br><br>The volume of unfilled shift supervisor positions, aside from requiring excessive supervisor double shifts, creates a supervision void that is unacceptable for any expectation of successful operations, short of crisis management.<br><br>The volume of supervisor vacancies and corresponding requirement for supervisors to do multiple double shifts creates an unrealistic expectation for effective supervision, decision-making and coaching. This situation is compounded in that the two facilities operate on a shift model, which provides intermittent supervisory presence as shift supervisors make their required rounds in housing modules and throughout the facility, assuming that a more serious facility issue has not prevented timely rounds. Officers and supervisors are double shifting at an extraordinary rate, significantly decreasing their capacity to assure youth safety, security and well-being.<br><br>For the 2020 first quarter, DCR has not demonstrated sustainable performance compliance in meeting the minimum required staff youth ratios without a continual dependence of double shifting. For the first quarter of 2020, DCR has not been able to sustain meeting the minimum required staff youth ratio for 100% of the staffing events, even while remaining operationally dependent on double shifting at a rate of 31%. |
|---|---|
| What is needed for full compliance?<br><br>What steps are required and/or recommended? | DCR needs to assign an adequate volume of officers to CDTS Ponce and CDTS Villalba to ensure the facilities have sufficient direct care staff to implement all terms of this agreement, and reduce unsustainable reliance on double shifting.  DCR needs to meet procedural compliance not only with S.A. 48, but also their own Policy 9.20.<br><br>On April 9, 2020 a Joint Motion was filed with the United States District Court for the District of Puerto Rico which identifies that compliance issues regarding staffing are not easily addressed within the current DCR budget. DCR has been ordered to separate out a program budget for NIJ operations for the 2020-2021 fiscal year. The budget, which must be certified by the Fiscal Oversight and Management Board (FOMB) and approved by the legislature, includes 318 officers and supervisory positions within the two NIJ facilities, 67 of which are new positions to be recruited and trained.<br><br>Additionally, the Joint Motion requires DCR to address its critical staffing issues and reduce its reliance on double shifting to meet the minimum staff/youth ratio. DCR is required to submit a plan to the Monitor and United States Department of Justice (DOJ)<br><br>by June 30, 2020. Procedural compliance with DCR Policy 9.20 requires meeting minimum required staff youth ratios as well as corrective action when ratios are not met for any given supervision event on any shift. |
| Priority Next Steps | Priority next steps required to find compliance for S.A. 48a are the following: |

| | |
|---|---|
| | <ul><li>By the end of the 2020 second quarter, June 30, 2020, DCR needs to submit a plan to the to the Monitor and United States Department of Justice (DOJ) that meets the requirements of the April 9, 2020 Joint Motion.</li><li>Address the requirement for procedural compliance with staffing Policy 9.20, as well as any required 1:1 staff or special population youth supervision events.</li><li>Address the inability to provide the necessary staff to maintain youth in the least restrictive placement possible, assuring protection from harm.</li><li>Provide the Monitor's Consultant with electronic versions of each facilities active monthly/ 42 day cycle Master Roster, assuring the Master Roster is an accurate representation of all posts and assigned personnel.</li><li>DCR needs to implement independent quality assurance assessment of procedural compliance as required by Policy 9.20, generating reports for both internal use and submission to the Monitor's Office.</li><li>On April 9, 2019 the Parties reached an agreement, filed with the Court, to address immediate safety issues, including improvement in reporting information to the Monitor and Monitor's Team as well as a plan with specific elements to address immediate staffing issues.</li><li>At the close of the 2020 first quarter, the Monitor continued to work with DCR to identify the necessary steps to resolve the staffing crisis with the deployment of additional officers to both facilities. A detailed, executable plan is necessary that addresses the following issues:<ul><li>The details regarding the request for approval of officers and supervisors for both facilities, responses to such request, and if approved, how such officers and supervisors will be secured, trained and deployed, and the time frame for doing so.</li><li>If it is necessary for new officers to be recruited and trained, the time frame for recruitment, training and placement must be provided.</li><li>The plan should also indicate how the Commonwealth will reduce its reliance upon double shifting to meet the minimum required staff/youth ratio, and indicate a recognition that staff youth ratios that exceed the minimum level will be required at times to keep assure youth safety.</li></ul></li></ul> |
| Quality Assurance Measures | DCR Staffing Policy 9.20 identifies that retrievable staff youth ratio documentation be maintained at each facility. The documentation consists of the following:<br><br><ul><li>Daily youth population list identify which youth are in which modules, designation of any youth on Protective Custody, Transitional Measures, Therapeutic Observation of Constant Watch. Additionally, daily trips and youth assigned to those trips should also be maintained in the daily population list.</li><li>The facility staff daily roster, displaying which staff has been assigned to which modules. It is critical that the form allows for clear documentation of officers assigned to each module as well as mini control.</li></ul> |

| | Staff youth ratio quality assurance compliance analysis consists of a review of the Master Roster, facility Daily Roster, facility mini control logs, and DCR 0144 daily forms to assess procedural and performance compliance with -DCR Policy 9.20. |
|---|---|
| | Additionally, review and assessment of DCR 0144 forms for each day are assessed for accuracy to the Daily Roster and compliance with DCR-DCR Policy 9.20 by the Supervisor IV the day after the events. |
| | At this time DCR has not initiated independent analysis of procedural compliance to Policy 9.20. |
| Sources of Information upon which Consultant report and compliance ratings are based | Weekly facility staff youth ratio workbooks and form DCR-1044 are provided to the Monitor's Consultant throughout the quarter. Facility staff youth ratio workbook data is analyzed to assess facility and agency compliance in meeting the minimum required staff youth ratio as described in S.A. 48a.  Form DCR-1044 is analyzed for procedural compliance with staffing policy, 9.20. |
| | A component of facility site visits is review of facility staffing source documentation, Master Rosters, Daily Rosters, mini control logs analyzed against the weekly facility staff youth ratio workbooks that are provided to the Monitor's Consultant. Review and assessment of DCR-DCR-0144 forms for each facility for each day are assessed for accuracy to the Daily Roster and compliance with DCR Policy 9.20, by the Supervisor IV the day after the events. |

| **January 2009 Stipulation Paragraph 1:** All necessary steps shall be taken immediately to ensure the reasonable safety of youth by providing adequate supervision of youth in all facilities operated by, or on behalf of, the Defendants. | |
|---|---|
| **Compliance Ratings** | **Non-Compliance** |
| Description of Monitoring process during this period of time | The Monitor's Consultant reviews and analyzes weekly Staff Youth Ratio forms and form DCR-0144. Additional documentation that is reviewed is as follows: Master Rosters, Daily Rosters, DCR-DCR 0144 Daily Staffing forms, as well as use of force events, monthly contraband reports, and incident report events. Observation, verification and documentation of housing module staff youth ratios is conducted on each site visit. |
| | Additionally, 284 referrals to UENMI and OISC investigative reports have been reviewed to assess incidents and investigations that identify youth safety, youth supervision and contraband issues. |
| Findings and Analysis | For the first quarter of 2020, DCR is not providing adequate supervision of youth nor ensuring reasonable safety. |
| | **Facility Closure of CD Humacao:** As of January 15, 2019, the CD Humacao facility was closed for youth populations. After the closure of Humacao, 127 staff were reassigned to |

other DCR facilities. The two remaining juvenile facilities, CDTS Ponce and CDTS Villalba, absorbed the CDTS Ponce youth and classifications without sufficient staff to ensure compliance with S.A. 48.  Double shifting is not a viable solution to provide adequate supervision and youth safety.

**Master Rosters and Required Staffing:**

The facility Master Roster is an agency generated staffing roster, identifying posts, fixed posts, fixed posts identified by need, movable posts and relief personnel. The Master Roster designates one fixed post for each housing module and additional fix posts identified by need, predicated on the housing module youth population and youth on special status (protective custody, transitional measure, constant supervision, etc.).

On April 1, 2020, DCR submitted to the Monitor's Consultant CDTS Ponce and CDTS Villalba

Master Rosters for the period of March 25, 2020 through May 5, 2020. The most recent Master Rosters continue to use the DCR shift relief factors that have been used by the Agency for multiple years.  With the submitted Master Rosters, DCR continues to use a shift relief factors of 1.73 for seven day supervisor and officer posts and a 1.23 shift relief factor for five day posts.

The table below illustrates the March 25, 2020 through May 5, 2020DCR Master Rosters staffing at CDTS Ponce and CDTS Villalba.

| | Master Roster Required Personnel |
|---|---|
| **DCR Master Roster CDTS Ponce SRF Calculations** | |
| 5 PUESTOS DE 7 DÍAS X 1.73 = 8.65 (9 SUPERVISORES) | 9 |
| 67 PUESTOS DE 7 DIAS X 1.73 = 115.91 = 116 O.S.J.I. & II | 116 |
| 1 PUESTOS DE 5 DÍAS X 1.23 = 1.23 (1 SUP) | 1 |
| 23 PUESTOS DE 5 DÍAS X 1.23 = 28.29 = 28 O.S.J.I. & II | 28 |
| 144  O.S.J.I. & II + 10 SUPERVISORES | **154** |
| | **Master Roster Required Personnel** |
| **DCR Master Roster CDTS Villalba SRF Calculations** | |
| 5 Puestos de 7 días x 1.73 = 8.65 = 9 Supervisores | 9 |
| 67 Puestos de 7 días x 1.73 = 115.91 -116  O.S.J.I. | 116 |
| 1 PUESTOS DE 5 DÍAS X 1.23 = 1.23 (1 SUPERVISOR) | 1 |
| 26 PUESTOS DE 5 DÍAS X 1.23 = 31.98  (32 O.S.J.I.) | 32 |
| 162 (152 O.S.J.I. & II + 10 SUPERVISORES) | **162** |
| *Master Roster Total Personnel* | **316** |

**Monitor's Note:  The Parties have agreed upon an analysis what a full roster should include with a revised SRF.  Based upon calculations made by the FOMB and discussed with the Monitor and DCR officials, this number was calculated at 318 FTEs. These**

| | |
|---|---|
| | **numbers are not yet reflected in the staffing documents being provided to the Monitor's Consultant on a weekly basis, nor in the forty-two day Master Rosters.** |
| | It should be noted that the CDTS Villalba Master Roster does not include required posts to staff the facility video system that was certified as operational as of October 7, 2019. Staff required for this post, consistent with DCR policy, requires the addition of five more personnel. |
| | The Sumariados population has historically been involved in the most violent and disruptive incidents within the juvenile facilities. The minimum required staff youth ratio for this population at times does not provide adequate supervision to ensure youth safety. Dependent on the composition and milieu of Sumariados population DCR needs to assess the staff youth ratio based on the volume of staff needed to ensure a safe and secure environment, absent management of youth with applying long term restrictive room status. |
| | Staffing rosters are inadequate to provide sufficient number of staff on all shifts without an assignment of additional staff to CDTS Ponce and CDTS Villalba. Facilities and security management cannot adequately maintain their rosters when insufficient staff are available to them, and consequently are forced to rely heavily on double shifting to attempt to meet the minimum required staff youth ratio. The availability and manner that staff are deployed to youth populations, based on housing module youth population volume or by need to assure youth safety, has not met the requirements of this provision. |
| | Additional staff does not assure adequate supervision of youth nor youth safety if staff is not adequately trained, supervised, coached, mentored to develop a behavior management skill set that emphasizes communication, intervention, active listening skills and an understanding of adolescent and young adult development.  Likewise, supervisory and management staff must be available to model and develop these skills in staff and not only available at times of module disruptions or required rounds. Programming opportunities must be significantly expanded to create an operational environment that keep youth actively engaged in meaningful social, recreational, educational and vocational activities. |
| | The Monitor and Monitor's Consultant believe that quantitatively meeting the minimum staff youth ratios, in and of itself, is not sufficient to assure youth safety, especially when 31% of shift events are covered with double shifting. There are not sufficient staff and resources assigned to CDTS Ponce and CDTS Villalba to implement the requirements of the provision. |
| What is needed for full compliance?<br><br>What steps are required and/or recommended? | The April 9, 2020 Joint Motion stipulates 318 officers need to be assigned to CDTS Ponce and CDTS Villalba, 67 of which are new positions to be recruited and trained. The variance between DCR staff numbers in the facility Master Rosters and the Joint Motion required staff volume, and assigned staff posts and revised shift relief factors must be resolved immediately. |

| | |
|---|---|
| | Meeting minimum staff youth ratios does not necessarily equate that staffing provides adequate supervision to keep youth safe.  For full compliance, staff youth ratios need to consistently meet the minimum required staff youth ratio, as well as additional staffing that is required by special populations, youth assigned to Transitional Measures, Protective Custody, Sumariados and 1:1 staff youth supervision events. Reliance upon placement of youth in restrictive housing statuses in an effort to provide protection from harm does not provide "adequate supervision" to ensure youth safety.<br><br>To assure youth safety, procedural and operational practices need to require direct care staff to engage in active behavior management, youth need to be engaged in robust programming, as well as classification and programming to assure adequate staff supervision to effectively manage and control aggressive youth and youth "leaders". |
| Priority Next Steps | Although there are many priority next steps, the most critical priority next step, as agreed upon in the April 9, 2020 Joint Motion would be for DCR to provide a plan to meet the staffing requirements to the Monitor and DOJ by June 30, 2020.<br><br>The Monitor's Consulting Team continue to request access to incident report information as one of the critical components to assess youth safety. This information has started to be provided, although inconsistently and not within the requested guidelines. Based upon the Joint Motion filed on April 9, 2020, all incident report cover sheets should be submitted to the Office of the Monitor weekly on Mondays, and incidents of a more critical nature, as outlined in that report, must be submitted within 24 hours, or 48 hours in some cases.<br><br>Digitizing incident reports has long been discussed so that the Monitoring team can have immediate access to this information, but more importantly, for efficiency, consistency and accountability purposes for DCR.  The Joint Motion reached between the Parties and filed with the Court on April 9, 2020, requires a plan by the Commonwealth for digitalizing these reports; such plan has not yet been received, although some progress has been made in creating a digitized incident report cover sheet. The Monitor's Consultant has extensive experience in development of incident report application development and has offered to assist DCR in this process.<br><br>The Joint Motion requires that DCR report to DOJ and the Monitor by June 30, 2020 with completion of digitalization of incident reports; an explanation of the digitalized system for entering incident report cover sheets, including the design of application content, quality controls and security requirements. The incident report system implementation must include time frames and individuals responsible for field testing, workload requirements, necessary changes in policy, development and implementation of training and quality assurance measures. Additionally, DCR is to designate a Project Manager who will responsible for implementation and integration of the changes into the DCR operations. |

|  | The Monitor and Consultant continue working to establish measures of safety based upon those criteria contained within Paragraph 78 reporting, and other factors. |
| --- | --- |
| Quality Assurance Measures | Incident report analysis and quality assurance requires consensus on incident report characteristics, definitional compliance as well as comprehensive reporting. The installation of video systems at CDTS Villalba, while assisting in the assessment of investigations, should help in assessing youth safety, youth incident events dynamics and staffing. The CDTS Villalba video system continues to not be staffed locally at the facility. Failure to staff and establish procedures for identification and review of any event of violence and use of force, with preservation of relative video, jeopardizes accurate incident reporting and comprehensive investigations. Absent immediate policy, procedure, training and quality assurance reviews, jeopardizes the confidence in the accuracy, reliability and comprehensive reporting of events that impact youth protection from harm. |

**January 2009 Stipulation Paragraph 2:** All necessary steps shall be taken to provide sufficient direct care staff to implement the Consent Decree and adequately supervise youth, pursuant to Paragraph 48.

The requirement that 50 YSOs be hired each month was terminated by the Court on September 13, 2011 (Docket 991). No new YSOs were hired during the First Quarter of 2020.

| Compliance Ratings | Non-Compliance |
| --- | --- |
| Description of Monitoring process during this period of time | Monitoring of S.A. 48 January 2009 Stipulation Paragraph 2 occurs through review of the monthly staffing report required by the January 2009 Stipulation Paragraph 5 provided by the DCR Human Resources Development and Training Institute. No reports were provided for January, February or March 2020, although DCR has stated that no new officers were appointed during the quarter. Additional monitoring processes that occurred during this quarter were analysis of facility populations, classification levels, youth assigned to restrictive housing, minimum required staff youth ratios, and agency and facility staff volume and assignments. |
| Findings and Analysis | **Analysis of Sufficient Staffing:**  The closure of CD Humacao did not result in the transfer of staff to CDTS Ponce nor CDTS Villalba.  The failure to transfer staff has resulted in inability to consistently meet the minimum required staff youth ratio, nor to provide the adequate supervision to keep youth safe in the least restrictive placement possible, nor to relieve the disproportionate necessity on double shifting to provide the minimum required staff youth ratio. The availability and manner that staff are deployed to facilities and youth populations, based on housing module youth population volume or by need, has not consistently met the requirements of this provision.<br><br>**First Quarter 2020 Contraband Report Review:** |

DCR submitted contraband workbooks for both active facilities for each month of the first quarter of 2020.

CDTS Ponce reported seven contraband events for the first quarter. CDTS Ponce reported no contraband for February 2020 and only three contraband events for March 2020. CDTS Villalba reported seventeen contraband events for the first quarter.

The first quarter of 2020 contraband reports documented the following:

| Facility | 1st Quarter 2020: Volume of Reported Contraband Events | 1st Quarter 2020: Type of Contraband | | |
|---|---|---|---|---|
| | | Sharps (blades, knives, sharp metal) | Pills/ Drugs | Cell Phones/ Accessories |
| CTS Ponce | 7 | 4 | 0 | 0 |
| CTS Villalba | 17 | 7 | 0 | 0 |

The contraband report did not document the volume of searches that were conducted at each facility, the type of searches that resulted in the discovery of contraband, nor the volume of searches that did not result in the discovery of contraband. The volume of sharps, drugs and medications contraband that were discovered is concerning in light of the history and volume of cutting events at DCR facilities. Numerous OISC investigations have identified inconsistent search procedures.

**UEMNI Referrals and OISC Investigations:**

**UEMNI 20-019:** On March 12/2020, at CDTS Ponce, at approximately 6:17 PM, Youth # 5328 was seriously assaulted and cut by eight youth around mini control between Module 7 and Module 8. The assault resulted in cuts to the face, ear and back resulting in a total of 68 stitches.

- After the assault event, an emergency search of Module 7 resulted in the discovery of a sharp piece of medal on the ground floor bathroom.

**OISC 19-069 Investigation:** On December 9, 2019 at CDTS Ponce at approximately 2:45 PM, Youth #5328 caused an open wound with a razor to his left forearm that required twelve stitches.

- At the time of the event the youth was in protective custody status.
- There were two youth ( Youth #5328 and Youth #5627) on protective custody status on the module, on the date and time of the event.
- The officer assigned to the youths' module on the 2:00 PM -10:PM shift was working a double shift on the assigned shift.
  - The assigned officer was working his third double shift between the dates from December 2 through December 9, 2019.
- On this date, nine officers were working double shifts.
- The OISC report identified the razor was found in the bathroom on the ground floor on the left hand side. The report did not address how the razor entered into the module.

**OISC 20-002 Investigation:**

Although, the contraband reports documented zero contraband events reporting drugs or pills, there has been digital record alerts about positive toxicology reports. Unfortunately, positive toxicology results are not documented with completion of an incident report. Consequently, the Monitor and Monitor Consultants attempt to identify these events through review of digital record alerts, UEMNI and OISC reports.

The OISC investigation and conclusions for OISC 20-002 investigation raised concerns that search reports and seizure of contraband details were different that confiscated items described in records and makes no reference of any controlled substances being confiscated.

Staff are challenged to conduct effective searches because of noted staffing deficiencies, facilities do not have operational metal detection equipment nor search hardware technology, nor comprehensive practices of strategically searching youth who are known threats to the safety of other youth or themselves.

**Staffing, Incident Events and Investigations:**

There were 81 staff youth ratio events during the first quarter that did not meet the minimum required staff youth ratio. In addition to these 81 staff youth ratio events, additional staff supervision events have occurred where staff were not actively engaged in effective behavior management, were unable to keep youth safe.  The following four are examples of such events:

1. **Youth #3668:**  On  January 4, 2020 at CDTS Ponce, at approximately 4:50 PM outside of Module 3, Youth #3668, was assaulted by being punched in the face by another youth.
   - Youth #3668 was assaulted by the other youth because he was upset about him being a "leader".
   - The location of the assault event was outside of the module and did not allow for video coverage.

2. **Youth #4651:**  On  January 27, 2020 at CDTS Ponce, at approximately 8:00 PM a Youth #4651, who was assigned to the PUERTAS module, was assaulted by another youth.
   - The incident report cover sheet did not indicate that there was any use of physical force.
   - On March 3, 2020, the Monitor's Consultants during a facility site visit, requested to review the video of the assault event. The video review revealed that officers did engage in the use of physical force, that was appropriate and measured.
   - CDTS Ponce were informed of the Monitor's Consultants findings and revised incident report cover sheets and use of force reporting data.

3.  **Youth #4885:**  On January 16, 2020 at CDTS Villalba, at approximately 7:08 PM a Youth #4885, who was assigned to be on Protective Custody was assaulted by three other youth.

    - The officer assigned to provide supervision to Module D-2 was working a double shift on January 16, 2020.
    - On March 4, 2020, the Monitor's Consultants during a facility site visit, requested to review the video of the assault event. The video of the assault event was not available for review since it had been longer than thirty days and the video is deleted and overwritten if it is not identified and saved to the video server.

4.  **Youth #5328:**  On March 12, 2020 at CDTS Ponce, at approximately 6:17 PM, Youth #5328 was seriously assaulted and cut by eight youth around Mini Control between Module 7 and Module 8. The assault resulted in cuts to the face above the left eyebrow that required 24 stitches, 8 stitches in the ear and 38 stitches in the back.

    - There are no video cameras that provide coverage to these types of locations in either facility.
    - After the assault event, an emergency search of Module 7 resulted in the discovery of a sharp piece of medal on the ground floor bathroom.
    - Youth #5328 had previously been on Protective Custody from July 12, 2019 through February 5, 2020, a total of 208 days.

Within the last seven months, between September 2019 and March 2020, there have been three assault cutting events to youth (Youth #3468; Youth #4885; and Youth #5328) who were on protective custody at the time of the event or had previously been on protective custody and taken off of protective custody and then cut again in another event.

The older age of the youth population, many who no longer qualify for educational services, creates a sub-culture of youth whose only purpose is to see who can exert power and intimidation over the other populations. The continual challenge for "leadership" in facilities, with a relatively small population, must be addressed and remedied.

Based on the Monitor's Consultant operational experiences, multiple years of incident report analysis, and on-site observations, it is his opinion that the continual maneuvering for leadership amongst youth has led to a culture of power and revenge. In order to assure adequate supervision and youth safety, intervention and strategies must be developed to not only curtail the "leader" culture but to end it.  The direct by-product of the negative leadership culture is the volume of assault and cutting events occurring in both facilities.

Officers properly rested, assigned, supervised and engaged in active behavior management and awareness of behavioral indicators of potential disruptive behavior increase the probability of staff being able to keep youth safe. The DCR youth population, although smaller in volume, can certainly be characterized as a more sophisticated,

| | |
|---|---|
| | violent adolescent population. Effective youth supervision requires competent staffing, predicated on a volume of staff that does not rely on 31% of shifts being covered by staff doing double shifts. The serious nature of incident events, reported and unreported, certainly indicates that the staffing issue within DCR continues at a critical point that is not compliant with the provisions of S.A. 48.<br><br>The aforementioned incident events and corresponding staffing deficiencies and reliance on double shifting, demonstrates DCR has provided an insufficient number of staff to adequately supervise youth and assure youth safety. Staffing rosters are inadequate to provide sufficient number of staff on all shifts without an increase in assigned staff.  Investigations and report analysis completed during the fourth quarter indicate incidents occurring while required staff are off unit, working double shifts, and/or not adequately providing supervision of youth. Facilities and security management cannot adequately maintain their rosters when insufficient staff are available to them, or they are forced to rely heavily on double shifting.<br><br>The Monitor and Monitor's Consultant believe that approaching quantitative compliance with minimum staff youth ratios, in and of itself, is not sufficient to assure youth safety, especially with reliance on extraordinary volume of double shifting.<br><br>There are not sufficient staff and resources to implement the requirements of the provision.  This Stipulation is found to be in non-compliance for the first quarter of 2020. |
| What is needed for full compliance?<br><br>What steps are required and/or recommended? | DCR should take immediate steps to reduce the staffing crisis by identifying the strategies it will use to fill the staffing vacancies by faithfully and comprehensively complying with the staff plan reporting requirements of the April 9, 2020 Joint Motion.<br><br>For full compliance for this provision, DCR needs to consistently provide and assure the availability of direct care staff, absent an extraordinary reliance on double shifting, to be deployed to housing modules based on the minimum required staff youth ratio, as well as the specific staff supervision needs of special populations: Transitional Measures; Protective Custody; and 1:1 staff youth supervision events. Staffing volume should be provided to assure youth safety absent sole dependence on restrictive housing placements. |
| Priority Next Steps | The Monitor's Team is analyzing how to better assess characteristics of incident reports to accurately assess the volume of events occurring impacting youth safety and adequate staff supervision of youth.<br><br>A priority next step will be to fulfill the requirements of the April 9, 2020 Joint Motion to "Improve System of Incident Reporting".  The incident report module should not be mere replication of the hard copy incident report cover sheet, but a robust reporting application that not only provides for documentation of incident events, but supports incident event analysis for procedural compliance, development of targeted training efforts, as well as incident event reduction strategies to assure youth safety. |

| | In the interim, the Monitor's Consultant must receive all incident report cover sheets to assess youth incident report characteristics, UEMNI referrals and OISC investigations. |
|---|---|
| | Future contraband reports should document the volume of searches that were conducted at each facility, the type of searches that resulted in the discovery of contraband, and the volume of searches that did not result in the discovery of contraband. Contraband events should be documented with incident reports. In incident events in which contraband has been discovered a formal analysis of the contraband source should be conducted and shared with officers. |
| | The Monitor and Monitor's Consultant anticipate an executable staffing plan from DCR that fulfills the requirements of the April 9, 2020 Joint Motion. |
| Quality Assurance Measures | The critical next steps for quality assurance measures is to develop consensus over critical terms of this stipulation. Agreement on the importance of the accuracy and reliability of data, consensus on definitional compliance of terminology, and comprehensive reporting of events and incident event characteristics are essential for effective quality assurance measures. |
| | Recommendations have been made to DCR that all incident events of violence and use of force should require by policy that quality assurance video reviews be conducted, assuring that incident report characteristics and narratives are accurate representation of incident events. Additionally, all incident events of violence and use of force video documentation be identified and saved to the video server to prevent critical video events from being deleted. |
| Sources of Information upon which Consultant report and compliance is based | Reports that were used for analysis of this compliance ratings were: January and March CDTS Ponce and CDTS Villalba Master Rosters; DCR submitted contraband reports January, February and March 2020;  37 incident report cover sheets submitted for January, February and March 2020;  UEMNI and OISC reports; observation and youth interviews from the March 3 and March 4, 2020 site visits. |

**January 2009 Stipulation Paragraph 3:** Defendants will include as direct care staff all social workers assigned to its institutions, once such staff receive forty (40) hours of pre- service training, ~~pursuant to Paragraph 49 of the Consent Decree.~~ The same shall also receive annual training as direct care staff, pursuant to Paragraph 50 of the Consent Decree.

| **Compliance Ratings** | **NA** |
|---|---|

*In approximately 2011, the Commonwealth decided not to employ the categorization of Social Workers as direct care staff as allowed by this provision to enhance coverage. However, the provision remains as a future option. Unless and until the Commonwealth determines that they want to apply this provision, the Monitor's Office will not Monitor the provision. The choice to not implement this provision is not non-compliance but has*

*been categorized as "NA" not applicable. The ~~struck~~ part of the provision references a provision that has been terminated.*

**January 2009 Stipulation Paragraph 4:** All persons hired to comply with Paragraph 48 shall be sufficiently trained~~, pursuant to Paragraph 49 of the Consent Decree,~~ before being deployed. Defendants shall deploy all duly trained direct care staff, ~~pursuant to Paragraph 49,~~ to juvenile facilities in a timely manner.

*The ~~struck~~ part of the provision references a provision that has been terminated.*

| Compliance Ratings | NA |
|---|---|
| Monitoring process during this period of time | There were no new appointments to the agency during the fourth quarter reporting period, nor has there been any new appointments in the last several years. Upon hiring of any new staff, DCR Policy Chapter 4.1 and 4.2 address the agency's policy and procedure for new employee pre-service training and annual training, as well as certification prior to facility assignment. In light of the approved and implemented policies, but the absence of any new hires during this quarter, this stipulation is found to be non-applicable (NA) for assessment of compliance for this quarter. |

**January 2009 Stipulation Paragraph 5:** On the fifth day of every thirty-day period commensurate with the Order approving this Stipulation, Defendants shall submit a report to the Monitor and the United States providing the following: a. the number of current direct care staff, by position classification, at each facility; b. the number of qualified direct care staff hired during the previous period; c. the number of hired direct care staff in the previous period who were hired ~~and have received pre-service training, pursuant to Paragraph 49;~~ and d. the juvenile facilities where the direct care staff who were hired in the previous quarter ~~and have received pre-service training, pursuant to Paragraph 49,~~ have been deployed or assigned.

*The ~~struck~~ part of the provision references a provision that has been terminated.*

| Compliance Ratings | Non Compliance |
|---|---|
| Description of Monitoring process | Monitoring of S.A. 48 January 2009 Stipulation Paragraph 5 occurs through review of the monthly staffing report provided by the DCR Human Resources Development and Training Institute. |
| Findings and Analysis | **January 2009 Stipulation Paragraph 5:** For the 2020 first quarter, January 2009 Stipulation Paragraph 5 is found to be in non-compliance. **January 2009 Stipulation Paragraph 5:** DCR has not provided January, February nor March 2020 staffing report required by the stipulation. The DCR Human Resources Development and Training Institute staff member who has historically provided the report had been |

assigned to DCR Training Academy and then had been on furlough since the start of the Covid-19 quarantine. The stipulation language requires that the defendants shall submit a report by the fifth day of the following month. As seen in the receipt dates of the first quarter reports, no reports were not received by the fifth day of the month.

The table below summarizes the January, February nor March 2020, January 2009 Stipulation Paragraph 5 reports:

| Month/Year | OSJ I | OSJ II | OSJ III | OSJ IV | Total | Inactive | New Hires: 2020 | Voluntary Resignation Program | Date Received |
|---|---|---|---|---|---|---|---|---|---|
| Jan-20 | NA | NA | NA | NA | NA | NA | NA | NA | NA |
| Feb-20 | NA | NA | NA | NA | NA | NA | NA | NA | NA |
| Mar-20 | NA | NA | NA | NA | NA | NA | NA | NA | NA |

Historically, in prior quarterly reporting periods, the reported volume of staff would indicate that DCR has the volume of staff to meet the requirements of S.A. 48, but a closer review illustrates that staff have not been deployed in a manner to meet minimum required staff youth ratios, nor to effectively reduce the disproportionate reliance on double shifting, nor adequate staffing to assure youth safety. In the 2019 fourth quarter, one hundred and twenty-three juvenile officers are deployed to other DCR facilities or programs.

As reflected in the table below, there was no January 2009 Stipulation Paragraph 5 reporting data provided in the 2020 first quarter.

| Facilities | Month/Year | OSJ I | OSJ II | OSJ III | OSJ IV | Total | Inactive | New Hires: 2020 | Voluntary Resignation Program | Date Received |
|---|---|---|---|---|---|---|---|---|---|---|
| CD Humacao | Jan-20 | NA | NA | NA | NA | 0 | NA | NA | NA | NA |
| CTS Ponce | Jan-20 | NA | NA | NA | NA | 0 | NA | NA | NA | NA |
| CTS Villalba | Jan-20 | NA | NA | NA | NA | 0 | NA | NA | NA | NA |
| Nivel Centeral y Otras facilidades DCR | Jan-20 | | | | | 0 | | 0 | 0 | |
| | Jan-20 | NA | NA | NA | NA | NA | NA | NA | NA | NA |
| CD Humacao | Feb-20 | NA | NA | NA | NA | NA | NA | NA | NA | NA |
| CTS Ponce | Feb-20 | NA | NA | NA | NA | NA | NA | NA | NA | NA |
| CTS Villalba | Feb-20 | NA | NA | NA | NA | NA | NA | NA | NA | NA |
| Nivel Centeral y Otras facilidades DCR | Feb-20 | NA | NA | NA | NA | NA | NA | NA | NA | NA |
| | Feb-20 | NA | NA | NA | NA | NA | NA | NA | NA | NA |
| CD Humacao | Mar-20 | NA | NA | NA | NA | 0 | NA | NA | NA | NA |
| CTS Ponce | Mar-20 | NA | NA | NA | NA | 0 | NA | NA | NA | NA |
| CTS Villalba | Mar-20 | NA | NA | NA | NA | 0 | NA | NA | NA | NA |
| Nivel Centeral y Otras facilidades DCR | Mar-20 | NA | NA | NA | NA | 0 | NA | NA | NA | NA |
| | Mar-20 | NA | NA | NA | NA | NA | NA | NA | NA | NA |

| What is needed for full compliance? | DCR must fulfill their responsibility to provide monitoring data that is required to assess compliance. During environmental or other work stoppage events such as Covid-19 quarantine, DCR needs to assure that critical monitoring data is able to be produced.<br><br>Additionally, the Monitor's Consultant believes the following actions, metrics and data elements are necessary for DCR compliance with S.A. 48 January 2009 Stipulation Paragraph 5:<br><br>• Assessment of staffing requirements and deployment of officers to the two operational facilities to meet the minimum required staff youth ratio without unreasonable reliance on double shifting.<br>• The capacity to provide adequate staffing to keep youth safe, in the least restrictive placement possible, without dependence on restrictive housing.<br>• For each month submit a January 2009 Stipulation Paragraph 5 staffing report to the Monitor's Consultant and the US Department of Justice on or about the fifth day of the month.<br>• In the January 2009 Stipulation Paragraph 5 staffing report, the inactive (inactivos) staff identified for each facility should be identified by personnel classification type.<br>• The report should contain the number of qualified direct care staff hired during the previous period (month).<br>• Identify the juvenile facilities where the direct care staff who were hired in the previous quarter have been deployed or assigned.<br>• Provide the Monitor's Consultant with each facility's electronic version of the Master Rosters that is applicable to the monthly S.A. 48 January 2009 Stipulation Paragraph 5 reports.<br> ○ The Monitor's Consultant did receive electronic versions of the facilities Master Rosters for the forty-two day roster cycle of March 25 through May 5, 2020.<br>• DCR needs to stipulate that the volume of staff documented in each facility's Master Roster corresponds with the data in the monthly S.A. 48 January 2009 Stipulation Paragraph 5 reports. |
|---|---|
| Priority Next Steps | DCR needs to provide this report on a consistent, timely basis. In order to assess the accuracy and reliability of the S.A. 48 January 2009 Stipulation Paragraph 5 report, DCR needs to provide to the Monitor's Consultant an electronic version of each facility's corresponding forty-two day cycle Master Rosters for CDTS Ponce and CDTS Villalba and stipulate that the volume of staff documented in each facility's Master Roster corresponds with the data in the monthly S.A. 48 January 2009 Stipulation Paragraph 5 reports.<br><br>As the Monitor's Consultant has explained to the Operations Functional Team in numerous occasions, the criteria to assess the accuracy of the S.A. 48 January 2009 Stipulation Paragraph 5 report would be that the monthly report documentation be the same volume of staff that is identified in each facility Master Roster.<br><br>DCR is currently under an Order by this Court (Doc. 1436) entered on 12/19/19 to work on a plan to adequately protect the budget for this case, and designate funds to be used only for |

| | |
|---|---|
| | the present consent decree and not used for other purposes. As such, they must separate out staff who have been reassigned within DCR and do not serve any function within NIJ when preparing their Master Rosters. |
| Quality Assurance Measures | Upon receipt of the monthly facility Master Roster, a comparative analysis occurs with the S.A. 48 January 2009 Stipulation Paragraph 5 report to assess the accuracy and reliability of the report matching the data from the facility Master Rosters.<br><br>Ultimately, the Monitor's Consultant expectation for an effective quality assurance measure is that upon production of the S.A. 48 January 2009 Stipulation Paragraph 5 report, DCR stipulates that the numbers presented in the report correspond to the volume of staff and corresponding classifications for each facility Master Roster. If the cycle Master Report and the S.A. 48 January 2009 Stipulation Paragraph 5 report staff numbers do not match, an explanation as to why there is variance in the numbers should be provided.<br><br>As of the production of the 2020 first quarter report, DCR has not stipulated that the volume of staff documented in each facility's Master Roster corresponds with the data in the monthly S.A. 48 January 2009 Stipulation Paragraph 5 reports. |

## PROTECTION FROM HARM – CLASSIFICATION (Bob Dugan)

| **S.A. 52:** At both the detention phase and following commitment, Defendants shall establish objective methods to ensure that juveniles are classified and placed in the least restrictive placement possible, consistent with public safety. Defendants shall validate objective methods within one year of their initial use and once a year thereafter and revise, if necessary, according to the findings of the validation process. |
|---|

| Compliance Ratings | Partial-Compliance |
|---|---|
| Description of Monitoring process during this period of time | The Monitor's Consultant conducted site visits on March 3, 2020 to CDTS Ponce and March 4, 2020 to CDTS Villalba. Observation and documentation of housing module staff youth ratios is conducted on each visit as well as the levels of treatment of youth assigned to housing modules.<br><br>During site visits facility youth population classification and housing assignments were provided for both facilities. Throughout the quarter, and in the previous thirty-one quarters, DCR has provided detention and committed classification documentation, with corresponding youth facility assignments and assessed levels of treatment. DCR facility and housing assignments have been found to consistently correspond to youth's assessed levels of classification and treatment. |

| Findings and Analysis | DCR has been engaged in an effort to meet the requirements of S. A. 52 since 2013. The following timeline illustrates various milestones of the agency's classification efforts: |
|---|---|

| Quarters | Activity |
|---|---|
| Fourth Quarter 2013 | Proposals for Classification validation study |
| Fourth Quarter 2014 | Start of Classification validation study |
| First Quarter 2015 | Classification validation study preliminary report |
| Second Quarter 2015 | Classification Manual for training and implementation |
| Fourth Quarter 2016 | DCR Administrative Order CDR -2016-10, for implementation of DCR Classification processes |
| Third Quarter 2019 | Court Filing by the Office of the Monitor requesting a report within 60 days, detailing current concerns with the classification system, analyzing existing data from DEC from the prior 12 months, and making recommendations for how to address current limitations while ensuring that youth remain in the least restrictive placements, consistent with public safety. |
| Fourth Quarter 2019 | DCR provided annual validation study for FY 2018-2019. DCR provided revised draft classification Policies 6.1 and 6.2. DCR provides a draft report on the Classification processes. |

Since 2014, DCR has experienced a 60% reduction in the volume of facilities and a 73% reduction in youth population (FOMB Presentation, 12/19/2019, Slide 21).

**Classification Policies:**

As of close of the fourth quarter 2019, the agency has produced the following revised draft classification policies:

- Policy 6.1:  This revised draft policy establishes the procedures for classification to levels of treatment of youth who are committed to NIJ-DCR.
    - The revised draft policy addresses that the committed classification instrument (I.C.C.) is administered by personnel trained by the DCR Institute of Development and Training of Human Resources (IDECARH).
    - The revised draft policy provides for a process of overriding the I.C.C. based on specific criteria.
    - The revised draft policy includes processes to identify a "negative leader" and assessing an additional point in the ICD scoring process.
    - The revised draft policy stipulates that the classification instruments are validated within one year and then annually, with revisions to the classification process in accordance with the validation findings.
- Policy 6.2: This revised draft policy establishes procedures for a comprehensive multidisciplinary assessment, that in conjunction with the custody classification tool,

(I.C.C.) allows for development the youths Individualized Family Service Plan (P.I.S.). The P. I. S. provides the structure for treatment services to be provided at the institutional level that are designed to achieve changes in committed youth allowing for positive reintegration into the community. Draft Policy 6.2 is being reviewed by the Monitor's Mental Health Consultant. Upon her review, comments and recommendations will be provided to DCR.

On 12/21/2019, the Monitor's Consultant reviewed and commented on the draft Policies 6.1 and 6.2 drafts and asked for revised policies based on his review. Upon final draft policy reviews, the polices require a Secretary's authorization signature, an implementation date, and a training curriculum and training schedule to coincide with the implementation date in a manner that assures staff are trained prior to policy and procedure implementation.

DCR has additional draft classification policies that are being revised based on the Monitor's Consultant prior reviews and comments. It is hoped that DCR will provide additional revised classification polices for review in the second quarter of 2020.

**Annual Classification Validation Reports:**

On December 19, 2019 DCR provided the Monitor's Consultant with a 2018-2019 Annual Classification Review. The content of the 2018-2019 Annual Classification Review was a significant improvement from the prior annual reviews. The 2018-2019 Annual Classification Review identified the following major issues:

- o The I.C.C. was administered to 48 youth. Although no youth were assessed in the evaluation module as qualifying for PUERTAS placement, eleven youth were placed in PUERTAS during the reporting period from the committed youth population.
- o Youth were placed consistent with agency policy.
- o The Division of Evaluation and Classification (DEC) had a reduction in workforce from 7 to 5, but were able to meet workload requirements.
- o Provided comments on the closure of CD Humacao and the corresponding relocation of the evaluation module (ME) to CDTS Villalba.
- o Discussed the introduction of video conferencing between DEC and CDTS Villalba for classification work of youth in the evaluation module.
- o Provided a youth population profile for 2018-2019.
- o Provided an analysis of the reduction in the population of committed youth.
- o There were no override cases during the reporting period.
- The I.C.D. (detention classification instrument) was administered to 251 youth, with 4 override cases.
  - o Identification of the reduction of detention beds.
  - o Identified the absence of a designated housing module for detention youth assessed as "intensive".
    - ▪ Two youth were classified as intensive in 2018-2019.
  - o Identified the loss of trained CD Humacao staff who had administered the I.C.D.

- The 2018-2019 Annual Classification Review provided the following translated statement in regard to the findings:

  *The classification tool in Custody (ICC), after its third consecutive year of implementation maintains that it is a functional and viable instrument to measure what it intends to, objective, consistent and reliable. On the basis of what is presented in this report concludes that the classification tool in custody used by the Department of Correction and Rehabilitation (DCR) meets the criteria for the requirement of the federal # 52 stipulation and does not require a new validation to the present.*

  - Consequently, no revisions were made to I.C.D. or the I.C.C. as a result of the 2018-2019 Annual Classification Review.

**DCR Classification Report:**

On August 26, 2019, the Parties reached an agreement to address critical classification issues, in light of the limited facility housing options, volume of youth that had been in restrictive housing status of protective custody and transitional measures, as well as facility violence. The specific language of the filing stated*:*

*Pursuant to Paragraph XVII (j), the Office of the Monitor requested a report within 60 days, with assistance from Bob Dugan, detailing current concerns with the classification system, analyzing existing data from DEC from the prior 12 months, and making recommendations for how to address current limitations while ensuring that youth remain in the least restrictive placements, consistent with public safety.  It is strongly recommended that the process include the input of the facility directors, facility compliance officers, social work supervisors and others with direct working knowledge of the classification system. Recommendations which can bring paragraph 52 into compliance, both in policy and practice, should be concrete, with specific time frames, and address underlying problems occurring with current space limitations. Please identify who will be responsible to prepare such report, who will be involved in the process, and who will be responsible for its submission.*

On August 15, 2019, the Monitor's Consultant provided a classification issues outline for DCR staff to assist with the task of generating a classification report. On August 16, 2019, the Monitor's Consultant had a conference call to review the submitted classification outline with Kelvin Merced, from the DCR Office of Federal Stipulations, who was designated as the lead staff member for the Classification Report. During site visits on September 17 and 18, the Monitor's Consultant met with DCR facility and Central Office staff to discuss issues that needed to be addressed in the classification report. Addressed during these meetings was the shortcomings in the classification process to allow for the instrument to effectively address the issue of "negative leaders" and those youth who threaten the safety of other youth and staff. This situation has obviously been compounded by staff shortages and the disturbingly high volume of double shifting. The Monitor's Consultant recommended to DCR staff that consideration should be given to blending specific levels of treatment housing module

assignments to allow for more flexibility in creating safe, homogenous milieus that can cohabitate and still meet treatment goals.

On October 30, 2019, DCR provided the Office of the Monitor with the draft DCR Classification Process Review. On December 10, 2019, the Monitor's Consultant met with the DCR team that was responsible for the development of the draft Classification Process Review report. There has been no further action or response from DCR in the 2020 first quarter on the draft classification report.

**Results of Classification Study Draft:**  The following summary is a review of the draft Classification Process Review report:

- The DCR team thought the exercise was worthwhile.
- The main issue is the absence of space.
- The volume of detention admissions and length of stay is limiting options to maneuver populations.
- There was a recognized delay in the administration of the detention classification instrument (ICD) to new detention intakes. This issue will be addressed by training more social work staff on how to administer the ICD.
- The committed classification instrument is doing what it is supposed to do and as described in the 2018-2019 annual validation report, no changes are necessary.
- Management of negative leaders is an institutional issue, a function of the two facilities and is not an issue to be addressed through the classification instruments.
- In speaking with the CDTS Villalba facility director on September 18, 2019, he indicated there were no problems with the classification instruments, but rather the facility issues that they were experiencing were a result of not having enough staff.

There has been no further action or response from DCR in the 2020 first quarter on the draft classification report.

**First Quarter Classification Profiles:**

As of March 31, 2020, the DCR first quarter committed classification housing assignments are illustrated below:



| | CTS Ponce: Level 2 | CTS Ponce: Level 3 | CTS Villalba: Level 4 | CTS Villalba: Level 5 | PUERTAS: | Classification in process, pending institutional assignment | Total Institutional Assignments |
|---|---|---|---|---|---|---|---|
| 2020 First Quarter Totals | 0 | 2 | 0 | 0 | 0 | 8 | 2 |
| Mar-20 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Feb-20 | 0 | 1 | 0 | 0 | 0 | 5 | 1 |
| Jan-20 | 0 | 1 | 0 | 0 | 0 | 3 | 1 |

The DCR 2019 and first quarter 2020 committed classification housing assignments are illustrated below:



| | CTS Ponce: Level 2 | CTS Ponce: Level 3 | CTS Villalba: Level 4 | CTS Villalba: Level 5 | PUERTAS: | Total Institutional Assignments |
|---|---|---|---|---|---|---|
| 2020 First Quarter Totals | 0 | 3 | 0 | 0 | 0 | 3 |
| 2019 Fourth Quarter Totals | 2 | 7 | 5 | 2 | 1 | 17 |
| 2019 Third Quarter Totals | 0 | 3 | 6 | 2 | 2 | 13 |
| 2019 Second Quarter Totals | 1 | 4 | 4 | 2 | 0 | 11 |
| 2019 First Quarter Totals | 0 | 2 | 10 | 3 | 0 | 15 |

As of March 31, 2020, the DCR detention classification housing assignments are illustrated below:



| | 1st Quarter 2019 Totals | 2nd Quarter 2019 Totals | 3rd Quarter 2019 Totals | 4th Quarter 2019 Totals | 1st Quarter 2020 Totals |
|---|---|---|---|---|---|
| ■ Volume of Admissions | 62 | 66 | 62 | 47 | 54 |
| ■ Leve/ Low | 51 | 32 | 47 | 28 | 26 |
| ■ Moderado/ Moderate | 10 | 31 | 8 | 16 | 28 |
| ■ Intensivo/ Intensive | 0 | 1 | 0 | 0 | 0 |
| ■ Egreso/ Released | 0 | 0 | 3 | 0 | 0 |
| ■ Custodia/ Custody | 1 | 0 | 0 | 0 | 0 |
| ■ Sumariado | 0 | 0 | 0 | 0 | 0 |
| ■ Court Releases | 0 | 0 | 4 | 0 | 0 |
| ■ NA | 0 | 2 | 0 | 3 | 0 |

**First Quarter Maximazations, Fleximazations and Overrides:**

Maximazations, Fleximazations and Overrides are the terms used to describe the processes for a facility to request that a youth's level of treatment be raised, a Maximazation, or lowered, a Fleximazation. The facility is required to formally request to the Division of Evaluation and Classification (DEC) for review, approval or denial of the change in level of treatment.

For the first quarter of 2020, there were two requests for Fleximazations to the community, which were both approved.

Overrides are a change in detention level classification, either to a lower of higher classification. For the first quarter of 2020, there was three Override requests, which were all approved: one override to severe classification; one override from moderate to low classification; and one override from low to moderate.

At this time youth who are being held as federal holds have been classified as moderate by the detention classification instrument. The Monitor's Consultant has identified to DCR federal as a population group that would appear to be candidates for automatic consideration of an override, in light of the sophisticated behavioral youth profile, the seriousness of alleged offenses and possible sentencing sanctions being faced.

The following table identifies the diverse classification populations within CDTS Ponce and CDTS Villalba.

| Detention Classification | Committed Classification | Special Populations |
|---|---|---|
| Detention Intake | Evaluation | Puertas (mental health youth) |
| Detention: Low | Level 2 | Mental Health 1:1 Supervision Events |
| Detention: Moderate | Level 3 | Protective Custody |
| Detention: Severe | Level 4 | Transitional Measures |
| Sumariados | Level 5 | Sumariados |
| Girls Detention Population | Girls Committed | Federal Holds |

Youth in Special Population categories, although not managed as such specifically by DCR, are youth populations that require specialized services, programming and staff supervision, to assure youth are placed in the least restrictive placement possible.

The table below displays the CDTS Ponce and CDTS Villalba bed capacity and youth populations as documented in each facility's Staff Youth Ratio weekly report document.

| CDTS Ponce | Bed Capacity | Youth Population 3/31/2020 | CDTS Villalba | Bed Capacity | Youth Population 3/31/2020 |
|---|---|---|---|---|---|
| MODULO - 1 (Detetnion Leve) | 15 | 0 | MODULO-A-1 (Det. Mod.) | 15 | 13 |
| MODULO - 2 (Sumariados) | 15 | 6 | MODULO-A-2 (Nivel IV) | 15 | 7 |
| MODULO - 3 (N-II) | 15 | 4 | MODULO-B-1 (Det. Low) | 15 | 11 |
| MODULO - 4 (N-III) | 15 | 9 | MODULO-B-2 (Nivel IV) | 15 | 13 |
| MODULO - 5 (Det. Niñas) | 15 | 2 | MODULO-C-1 (Det. Severe) | 15 | 2 |
| MODULO - 6 (Cust. Niñas) | 15 | 4 | MODULO-C-2 (Nivel V) | 15 | 5 |
| MODULO - 7 (N-II ) | 15 | 7 | MODULO-D-1 (Evaluation: ME) | 15 | 11 |
| PUERTAS- 8 | 15 | 2 | MODULO-D-2 (Nivel V) | 15 | 5 |
| Admissions | 4 | 4 | Admissions: (Det. Low) | 4 | 0 |
| Total | | 38 | | | 67 |

| | |
|---|---|
| | As of March 16, 2020, with the initiation of DCR Covid-19 quarantine protocols, new admissions to the facilities were required to be on fourteen and twenty-one day quarantines. In order to meet the DCR quarantine requirements, new admissions to the facilities, either from the community, hospitals or from another facility required quarantine placements.<br><br>In light of the limited housing capacity of CDTS Ponce and CDTS Villalba, the facility admissions and the infirmary medical room are being used for quarantine of youth. As will be noted in the table above, both facilities were housing four youth in the facility admissions area.<br><br>The diverse categories and classification status of youth allows for no specific housing for special status youth, absent use of Admissions or Infirmary, nor any capacity to evacuate a module for emergency, nor normal physical plant maintenance.<br><br>Throughout the third and fourth quarter, DCR indicated the housing module limitations would be resolved with the transfer of the girl's detention and committed populations to a private facility. Various dates were presented for the transfers to occur. At this time, there is no finalized contract or specific date which has been identified for the movement of girls or other special populations. At this time there appears to be no relief nor strategies offered by DCR to resolve the limited housing module options.<br><br>In light of submittal of the content of the 2018-2019 Annual Classification Review, the status of the first quarter classification draft policies, and the Classification Study Draft, for the first quarter of 2020, the Monitor's Consultant has determined that DCR is in partial compliance with S.A. 52. |
| What is needed for full compliance?<br><br>What steps are required and/or recommended? | The dynamic changes caused by the reduction of youth populations  and DCR facilities, ongoing shortages of staff resulting in an overreliance on double shifts, accompanied by the absence of comprehensive planning, has jeopardized the agency's capacity to provide for the safety and treatment needs of the youth in their care in the least restrictive placements possible.<br><br>Although DCR has provided a draft of the Classification Process Review, it is the opinion of the Monitor's Consultant that the agency has not seized the opportunity to adjust classification requirements and practices in response to the present physical plant housing limitations. It was the hope of the Monitor and Monitor's Consultant that the 2019 Classification Process Review would provide a process to address needed revisions to classification policy and procedures to reflect the reality of the diverse youth population categories, youth who are at risk and existing housing limitations.<br><br>In 2020, DCR needs to address the reality of the limited space, the staffing crisis and limited housing options. Relief to limited housing options by private placement of the female population has not materialized. |

| | |
|---|---|
| | A legitimate dialogue addressing classification, risk assessment issues and facility space limitations compromised has been negated by DCR contention that issues of youth safety is only a result of the staffing crisis and has no correlation to the classification processes. The classification instruments must not be exclusive to treatment levels, but also provide for a balanced risk assessment and be responsive to the reality of limited housing modules. DCR representatives contend that this is not a classification issue to be addressed by DEC, but an institutional behavior management issue. The Monitor's Consultant believes that DCR needs to undertake a holistic review of classification policies in conjunction with behavior management, programming and housing limitations. This effort should address whether classification level housing segregation may be modified and yet maintain the integrity of the treatment processes. In the absence of safety, treatment cannot occur.<br><br>Problem solving dialogue should addresses creating youth milieus predicated on risk assessment for safety, as well as treatment needs. The volume of assault cutting events during the third and fourth quarter, creates a culture of revenge and fear that jeopardizes the safety of all youth and staff.<br><br>Additionally, classification process should be considered for determination of the possibility of alternate programming placements, especially in light of ongoing youth population reductions.<br><br>The metrics established for compliance of this provision are the following:<br><br>• Final agency approved classification policies and procedures, implementation dates predicated upon training curriculums and training schedules are necessary for full compliance.<br>• Classification policies need to be inclusive of a process requirement for annual classification methodology validation, findings, and revisions that are necessary.<br>• Production of the 2019-2020 annual classification validation review of objective methods, findings and revisions as required, predicated on a dynamic assessment of the existing and forecasted youth population, as well as the limitations of two or less facilities, and alternate placement options.<br>• Continued production of monthly detention and committed classification data, with resolution of missing classification data as a result of the Covid-19 furloughs.<br>• 100% of detention youth are classified and assigned to appropriate housing modules, unless prior release by the Court.<br>• 100% of committed youth are classified and assigned to appropriate facilities and housing modules, consistent with their assigned classification treatment levels and safety requirements.<br>• Youth are placed in the least restrictive placement possible with staff assigned to assure their safety and protection from harm, in the least restrictive placement possible. |
| Priority Next Steps | Current policies require that DCR "validate objective methods within one year of their initial use and once a year thereafter and revise, if necessary, according to the findings of the validation process." The purpose of the classification system, as indicated in Paragraph 52, is |

| | |
|---|---|
| | to "ensure that juveniles are classified and placed in the least restrictive placement possible, consistent with public safety." |
| | It is critical to continue a review of the classification system given the reality of housing youth in only two facilities.  This is particularly true with a decreasing youth population resulting in a higher concentration of youth with a history of violence and/or mental health concerns. The volume and diversity of classification along with special populations calls for an agency wide interdisciplinary review of classification level of treatment segregated housing practices. This effort should provide the opportunity to consider processes for facility management to have the capacity to create homogenous youth housing module milieus, not limited to assigned levels of treatment, but balanced with youth safety and managing "negative leaders". The sophisticated youth who is a negative leader, rarely is the youth directly involved with acts of violence and threatening behavior. |
| | DCR has a history of blending youth with various levels of treatment that appears not to have jeopardized the integrity of treatment goals. DCR needs to continue to review and revise classification levels of treatment housing practices to assure compliance with all of the components of S. A. 52, as well as addressing the risk and treatment needs, and housing module limitations. Successfully managing the youth leader culture within each housing module and each facility is a priority to provide youth protection from harm and assure that youth are placed in the least restrictive placement possible. |
| Quality Assurance Measures | DCR effectively documents the results of both detention and committed classification processes and youth classification, levels of treatment and corresponding housing module assignments. Additionally, for the first quarter, DCR has produced documentation in regard to overrides, Maximazations and Fleximazations. Historically, monthly documentation of detention and committed classification is consistently provided to the Monitor's Consultant. |
| | DCR must continue incorporate annual reviews of the validation of the objective methods of the classification instruments, processes and findings, facilitating the opportunity to systematize quality assurance into the classification processes. |
| | The 2019-2020 Annual Classification Validation Report needs to address the effectiveness of existing classification practices in light of a reduction in housing modules and how these issues impact youth treatment and protection from harm requirements in the least restrictive placement possible. The classification levels of treatment assessment and requirements must be dynamic and responsive to effective institutional placement and treatment. |
| Sources of Information upon which Consultant report and compliance | Monthly classification documentation for youth who have been classified for detention and committed youth is provided to the Monitor's Consultant. Monthly, DCR provides the Monitor's Consultant facility youth population and classification reports. During site visits, the Monitor's Consultant obtains facility youth population documentation that identifies youth housing module populations and classification levels of treatment. |

| ratings are based | Detention classification documentation provided to the Monitor's Consultant monthly, indicates youth have been consistently classified and assigned to a housing module that corresponds to detention classification level.

For the first quarter of 2020, all the reviewed committed institutional assignments are consistent with the level of treatment scores and level assignments as reported in the monthly committed classification reports. Youth committed classification levels and institutional housing assignments are reviewed for procedural accuracy during site visits. |
|---|---|

## PROTECTION FROM HARM – USE OF FORCE (David Bogard)

**S.A. 77.** In no event is physical force justifiable as punishment on any juvenile. The use of physical force by staff, including the use of restraints, shall be limited to instances of justifiable self-defense, protection of self and others, to maintain or regain control of an area of the facility, including the justifiable protection of significant property from damage; and prevention of escapes; and then only when other less severe alternatives are insufficient. A written report is prepared following all uses of force and is submitted to administrative staff for review. When force, including restraint, is used to protect a youth from self, this must be immediately referred to the medical area for medical and mental health evaluation and any necessary treatment.

| Compliance Rating | Partial Compliance |
|---|---|
| Description of Monitoring process during this period of time | Monitor's Use of Force Consultant and staff visited the two facilities on March 3-4, 2020 to review quarter to date use of force incidents and discuss same with institutional management and compliance staff.  At Ponce, incident reports and videos were reviewed for four use of force incidents that had transpired by that point in the quarter.

For the first time, the site visit at Villalba also included a video review of two incidents available as a result of the new CCTV (video) system at that facility.

In identifying use of force cases to review on-site, the Monitor's consultant drew upon the incidents reported by DCR on its weekly ¶48 reports .We also selected several other incidents from the incident cover sheets submitted by each site that had not been reported as use of force incidents but which seemed likely to have included force based on the violent nature of the incidents. In fact, the video review of the three incidents selected at Ponce as *potential* uses of force (despite not being reported as such), revealed that force had, in fact, been used. See below for additional discussion of this reporting problem. |
| Findings and Analysis | The ten use of force incidents this quarter was the highest figure in eight previous quarters. This quarter's incidents primarily reflected an increase in the volume of use of force incidents at Villalba, but also displayed a very significant increase in the number of youth involved in force incidents at CTS Ponce as compared to the previous quarter (although 13 youth in two incidents accounted for the majority of youth involved). |

| Facility | Q4-19 Events: Use of Force | Q4-19 Youth Involved | Q4-19 Physical Restraints | Q4-19 OC | Q1-20 Events: Use of Force | Q1-20 Youth Involved | Q1-20 Physical Restraints | Q4-20 OC |
|---|---|---|---|---|---|---|---|---|
| CTS Ponce | 9 | 6 | 9 | 0 | 6 | 19 | 22 | 0 |
| CTS Villalba | 0 | 0 | 0 | 0 | 4 | 7 | 16 | 0 |
| Total | 9 | 6 | 9 | 0 | 10 | 26 | 38 | 0 |

Notably, for the second consecutive quarter, chemical agents were not deployed. This very positive trend is reflective of DCR policy 9.18 that permits OC to be used only, "in extreme situations and as a last resort where an imminent and significant threat is posed to staff or other youth by the subject." While the OC figure is indeed encouraging, at the same time there was a substantial increase in the use of physical restraints, which increased from 9 to 38 and registered as more than double the amount of any quarter in two years.

There was one self-harm incident at Villalba on March 27 when there may have been an element of force employed to protect the youth from himself. We do not have the incident report and the cover sheet does not provide any support for force having been used, although it does state the youth went to the hospital. This incident was to be reviewed on video at the time of our site visit in the second quarter but the Covide-19 restrictions have delayed that.

Critically important is the fact that in the six incident videos we reviewed that included uses of force, staff acted professionally, displayed patience, and made concerted efforts to de-escalate, despite the violent actions of one or several youth in each incident. We observed multiple officers place themselves in physical jeopardy as they intervened to protect youths from harm. And of the four use of force incidents or allegations that were investigated by OISC (two of which were incidents that we observed on video), none resulted in confirmed findings of excessive or unnecessary force.

It was, however, inexplicable that three separate incidents in which force was certainly used at Ponce, could go unreported as uses of force on incident cover sheets, incident reports, use of force checklists and, as a result, on ¶48 weekly reports. These three unreported use of force incidents equalled the three that were correctly reported at Ponce. And while we identified three potential unreported use of force incidents at Villalba in addition to the two that were reported, none of the three were later determined by UEMNI to actually have included force. We cannot say with certainty whether these instances of unreporting are anomalies; this concern will be closely evaluated in the second quarter, although lack of access to videos due to travel restrictions may make it more difficult to fully assess the accuracy of incidents being categorized as uses of force. The process of reporting force begins with the incident reports prepared by officers, which are then reviewed by and signed off by supervisors, facility managers and compliance staff and then the use of force

| | |
|---|---|
| | information is included in Incident Report cover sheets, use of force checklists, weekly ¶48 staffing spreadsheets; DCR failed to explain how these three reporting failures occurred.<br><br>DCR's failure to consistently, accurately, and comprehensively report use of force events is highly problematic and calls for a level of enhanced staff awareness and attention to what types of incidents need to be documented as uses of force on various reporting mechanisms that we have established to date. Once these reporting anomalies were identified and brought to the attention of DCR personnel, they submitted revisions to the inaccurate use of force reporting sources that had been submitted to us for this quarter's data.  In response to our stated concerns, DCR leadership began to institute measures to remedy such reporting anomalies, although that process was not completed as of the date of this Report.<br><br>Although the video review of the events displayed staff compliance with use of force policy, procedure and training, DCR has not implemented video review policy, procedure or practices to assess as to whether their existing documentation practices provide for comprehensive and accurate reporting of use of force events.<br><br>Another crucial element of the force reporting scheme is the CCTV system that is in the final stages of implementation at Villalba and continues to be fully operational at Ponce.  The DCR video system is set up to overwrite video files after thirty days. The implication of this video storage management timeline is that if video events (whether use of force or other incident types) are not identified for capture and retention prior to the thirty day overwrite timeframe, the video events will likely be lost. In fact, one of the violent (although not use of force) events that we sought to view at Villalba was no longer recoverable. |
| What is needed for full compliance? | In order for the Monitor's Consultant to find substantial compliance with ¶77, DCR must be able to provide accurate and reliable evidence in incident reports, videos and OISC investigations of force routinely being used according to the procedures set forth in Policy 9.18 and DCR training.  Completion of the CCTV system at Villalba, including assignment of staff on the master roster for video monitoring and providing enhanced views of certain areas for which there is currently inadequate coverage, will enhance the utility of the new system. The personnel necessary to manage the Villalba CCTV system have not yet been assigned due, we are told by DCR, to budget issues.  As of the preparation of this report, however, there continues to be technical problems with Villalba's system and absence of personnel is not the factor delaying full implementation.<br><br>Over the past couple of years we have observed staff routinely exhibiting much patience and use of alternatives to force before resorting to physical restraints or chemical agents, but DCR must continue to provide additional evidence to the Monitor and reinforce to staff that, where feasible and safe, alternatives to force and de-escalation must be used before staff resort to physical, mechanical and chemical restraints. |
| What steps are recommended? | 1.  Ensure all use of force events are consistently and accurately documented in incident reports, incident report cover sheets, use of force checklists, P48 weekly reports and promptly reported to the Monitor accordingly; |

|  | 2. Complete implementation of the video camera system at Villalba, including resolving technical problems and providing necessary master roster personnel to provide on-site capacity to save and view incidents; |
|  | 3. Address the current problem of video files being overwritten after 30 days by, at a minimum, establishing protocols for identifying significant use of force and other violent incidents and preserving them prior to their 30-day overwrites; |
|  | 4. Expand camera coverage at Ponce and Villalba to view infirmary areas, mini-controls/sallyports and admissions and living unit dayroom glass walls; |
|  | 5. OISC should more directly include in investigations assessments of compliance with ¶77 and Policies 9.10, 9.18 and use of force training; |
|  | 6. Both facilities should routinely conduct after-incident case reviews to evaluate use of force incidents; |
|  | 7. DCR IDECARH needs to provide updated evidence to the Monitor's Office that all staff have received the required training in the revised Use of Force Policy 9.18 and reporting requirements included in 9.10. Also, IDECARH needs to provide the Monitor with any updates to the use of force training since 2018. |
| Sources relied upon by Consultant for report and Compliance Ratings | DCR's ¶ 48 weekly spreadsheet reports of use of force incidents<br><br>Review of Ponce and Villalba Incident videos<br><br>IDECARH revised training materials reflecting the August 2018 revised policies 9.18 (use of force) and 9.10 (reporting).<br><br>DCR incident reports and cover sheets<br><br>Use of Force checklists prepare for each applicable incident<br><br>OISC investigation reports |

## Protection from Harm:  Investigations of Abuse and Institutional Neglect – Kim Tandy, Javier Burgos and David Bogard

S.A. 78.  Defendants shall take prompt administrative action in response to allegations of abuse and mistreatment.  An incident report shall be prepared for each allegation of physical or mental abuse, including juvenile on juvenile assaults, staff on juvenile abuse, and excessive use of force by staff, within 24 hours of the incident.  A copy of each incident report together with the preliminary investigation prepared by the Police Department and/or AIJ shall be forwarded to Defendant Department of Justice, where the allegations shall be investigated and a final report shall be made in 30 days.  In addition, a copy of each incident report alleging physical or mental abuse by staff or excessive use of force by staff together with the preliminary investigation prepared by the Police Department and/or the AIJ, shall be forwarded to the Defendant Department of Social Services.

| Compliance Rating | Partial Compliance |
|---|---|
| Description of Monitoring process during this period of time | The Monitor met with the Functional Team regarding Paragraph 78 on March 10th, 2020. It included members of OISC, UEMNI, Puerto Rico DOJ and police.<br><br>Unlike in other quarters, the Monitor was unable to review quarterly data prepared by UEMNI regarding incidents, referrals and investigations for the first quarter.  Work by UEMNI was delayed as a result of earthquakes early in the quarter, and the onset of COVID-19.  Data which appear in this section, where available, has been generated from sources identified in each section.<br><br>A total of nine (9) OISC investigations were received, reviewed and analyzed during the First Quarter, down from fifteen (15) in the prior quarter.  OISC staff have also been hampered in their investigations as a result of damage done to their offices in Ponce, and the onset of COVID-19 which restricted access to the facilities and to their offices.<br><br>The Office of the Monitor is working with DCR to ensure that all incident reports are received weekly, or in many cases, within a 24 hour or 48 hour period per the agreement reached on August 26, 2019.  This is necessary to ensure there is backup documentation to the raw data which has previously been reported by DCR relative to paragraph 78 reporting.<br><br>The Office of the Monitor is also tracking alerts and other information on the online system to ensure that incidents are properly reported according to policy, and that these alerts are appropriately documented as incidents, and ultimately 284 referrals where appropriate. A spreadsheet has been created by Bob Dugan to track this information and compare it as backup documentation for quarterly statistical reports. Some of the data below is taken from this source, as noted. |
| Findings and Analysis | The approved policies are divided in three sections, and include the analysis of referrals of abuse and/or institutional neglect by UEMNI (Policy No 13.2.1); immediate prevention actions regarding serious allegations (Policy No. 13.2.2); and final determinations on referrals of abuse and/or institutional neglect (Policy 13.2.3).   Investigations under this provision are reviewed against these policies as well as others based upon the implication of staff actions taken.<br><br>Information about training on these policies during the first quarter was not provided.<br><br>The following tables summarize statistics about case management for the past four quarters. The primary source of the information is the case tracking records maintained by NIJ along with other records such as the underlying individual case reports and records reviewed by members of the Monitoring team. The Monitor cannot confirm the total number of as accurate because her office currently does not receive all incident reports, and in some cases, incidents are not reported as such.  The numbers listed below are based upon only the information which has appropriate backup documentation. |

The incident report cover sheet contains a comprehensive list of items which should be documented and reported.  It appears this is not being done consistently, as in the case of youth who test positive for illegal substances, or youth who have cut themselves. For example:

On 1/28/20, an alert notes that a youth smuggled in a controlled substance, although did not have a positive toxicology screen.

On 2/5/20, 2/9/20, and 2/19/20 three different youth tested positive for cannabis, noted as an alert, but no incident reports were completed. (One youth was noted as having come in from detention)

On 2/21/20 there is an alert of a youth reclassified as extreme as a result of various incidents, including destruction of a television.  No incident reports noted regarding destruction of property by this youth.

The Parties have worked on an agreement to strengthen the reporting and documentation of incidents, and to build into the online system a more consistent and accurate method of reporting which can be easily accessed as needed.

The first table summarizes general information about incidents events which have been reported by NIJ for the quarter. An incident event may generate many incident reports, but this table counts a multiple-report incident as a single event.  Sequential numbering of events for the first quarter indicates that at least 114 incidents took place.  Only 36 of these incidents (32.5%) were provided to the Monitor.

Incident Tracking by Quarter involving Harm to Youth

| A. General Measures by quarter | 2nd 2019 | 3rd 2019 | 4th 2019 | 1st 2020 |
|---|---|---|---|---|
| A.1 Average Monday 1st Shift count of youth | 119 | 114 | 109 | 103 |
| A.2 Number of incident events | 53 | 34 | 26 | 36* |
| A.3 Number of youth-to-youth incident events | 10 | 12 | 8 | 11* |
| A.4 Incident events involving use of force by staff | 9 | 3 | 5 | 10 |
| A.5 Incident events with suicide act, ideation, or gesture | 5 | 14 | 11 | 11 |
| A.6 Incident events w/ self-mutilation act, ideation, or gesture | 18 | 8 | 5 | 9 |

*NIJ reported 34 incident events and 9 youth on youth incidents.  A review of incident reports provided to Bob Dugan indicates that these numbers are 36 and 11, respectively.

A total of nineteen (19) 284 referrals were made this quarter, of which 16 were categorized as Level II.

Mental Health Incidents – Including 284 Reports

The subset of incidents involving suicidal acts, ideation, or gestures, or self-mutilation acts, ideation or gestures is found in Table B.  Most of these do not warrant abuse allegations.  If a 284 report is filed, implicating possible abuse by a staff member or other, the case also moves through the investigative stage.

| B. Mental Health Record Information | 2nd 2019 | 3rd 2019 | 4th 2019 | 1st 2020 |
|---|---|---|---|---|
| B.1 Suicidal incidents, ideation or gestures | 5 | 14 | 11 | 11 |
| B.2 Number of individual youth referenced | 4 | 14 | 11 | 8 |
| B.3 Cases involving ideation only | 3 | 9 | 3 | 5 |
| B.4 Cases involving suicide gesture | 0 | 1 | 5 | 6 |
| B.5 Cases involving suicide intention | 2 | 4 | 3 | 1 |
| B.6 Cases w/ ambulatory treatment | 3 | 5 | 7 | 5 |
| B.7 Cases with hospitalization | 2 | 9 | 4 | 6 |
| B.8 Cases leading to death | 0 | 0 | 0 | 0 |
| B.9 Suicide Cases with 284 report filed | 0 | 0 | 4 | 1* |
| B.10 Self-mutilations incidents, ideation or gestures | 18 | 8 | 5 | 9 |
| B.11 Number of individual youth referenced | 15 | 8 | 5 | 9 |
| B.12 Cases requiring sutures | 4 | 3 | 2 | 1 |
| B.13 Cases requiring hospitalization | 0 | 0 | 3 | 3 |
| B.14 Cases leading to death | 0 | 0 | 0 | 0 |
| B. 16 Self-Mutilation Reports with 284 Referrals | 2 | 3 | 1 | 3* |

The above cases come from mental health records. NIJ has implemented a screening procedure and instrument that diverts the investigation of some incidents from the Paragraph 78 process to a mental health process. Of the 36 (A.2) incident events reported by NIJ in first quarter, eleven (11) involved suicide and self-mutilation incidents.  However, as the chart notes, an additional 9 incidents occurred which were not included in incident reports.

It is difficult to accurately determine how many of these incidents resulted in a 284 referral and whether NIJ's numbers here are accurate.  Cases are sometimes listed as "allegations of neglect" when a 284 referral is made rather than the underlying issue, such as cutting or suicidal behavior.  This should be done consistently when the revisions are made to the incident report cover sheet, and ultimately, the online reporting system.

For a discussion of these incidents and how they were handled, see Dr. Martinez's analysis for Paragraph 63 in the Mental Health section.

### Responses to Abuse Referrals

The next table summarizes abuse referrals and the initial responses to such referrals.

| C. 284 Incidents by quarter (2019) | 2nd | 3rd | 4th | 1st |
|---|---|---|---|---|
| C.1 284 Incident Events | 24 | 20 | 11 | 19 |
| C.2 Level One Incident Events | 4 | 1 | 1 | 3 |
| C.3 Level Two Incident Events | 20 | 19 | 10 | 16 |
| C.4 Referrals to OISC | 20 | 19 | 10 | 16 |
| C.5 Youth to Youth incidents | 10 | 12 | 8 | 11 |
| C.6 Youth to Youth Injuries | 6 | 6 | 2 | 5 |
| C.7 Youth to Youth with External Care | 3 | 5 | 4 | 2 |
| C.8 Youth to Youth Sexual | 0 | 0** | 0 | 1 |
| C.9 Youth to Youth Sexual  w/injury | 0 | 0 | 0 | 0 |
| C.10 Staff to Youth Incidents | 14 | 8 | 3 | 4 |
| C.11 Staff to Youth Injuries | 6 | 1 | 0 | 0 |
| C.12 Staff to Youth External Care | 2 | 3 | 0 | 0 |
| C.13  Staff to Youth Sexual | 1 | 1 | 0 | 0 |
| C.14 Staff to Youth Sexual w/injury | 0 | 0 | 0 | 0 |

| | | | | |
|---|---|---|---|---|
| C.15 284 Incidents with Admin. Action | 24 | 20 | 11 | 19 |
| C.16 284 Incidents with report by shift end | 23 | 19 | 11 | 18 |
| C.17 Level 1 investigations completed 20 days | 4 | 1 | 0 | 3 |
| C.18 Special Operations interventions | 2 | 2 | 0 | 0 |
| C.19 SOU reports with 284 investigations | 1 | 1 | 0 | 0 |
| C.20  284 with Item 5 completed | 24 | 20 | 11 | 19 |
| C.21 284 with Staffing Compliance | 24 | 19 | 11 | 19 |
| C.22 Percent of 284 cases with staffing compliance | 100% | 95% | 100% | 100% |

** One sexual assault allegation was received and is noted although it was incorrectly identified in the data.

A determination is made at the institutional level as to whether incidents are Level One or Level Two based upon criteria in the Cernimiento de Incidentes de Alegado Maltrato Institutional form.  Level one incidents by definition include verbal abuse and some forms of physical aggression.   Level Two incidents include material exploitation, incidents of a sexual nature, death, various instances of institutional neglect, including youth self-harm, undue restrictions with medication, misuse of mechanical restraint or pepper spray, and excessive use of force.

Level One incidents are investigated locally at the institution. Level Two incidents are investigated by OISC. Referrals to OISC as based on the screening protocol.

A review during the 1st quarter information for 2020 shows three (e) Level 1 reports made. Level I cases followed the same format/guidelines than Level II cases but the facilities' investigators only have 20 working days to finish the investigation.

Initial Case Management Measures Taken

**No information was provided for this quarter for Chart D.**

| D. Initial Case Management Measures (2018-19) | 2nd | 3rd | 4th | 1st |
|---|---|---|---|---|
| D.1 284 percent with admin actions | 100% | 100% | 100% | 100% |
| D.2 284 per cent completed by end of shift | 96% | 95% | 100% | 95% |
| D.3 284  Level 1 Investigation Complete Within 20 days | 100% | 100% | 0% | 100% |

.

Investigations Referred to OISC

| E. OISC (2018-2019) | 2nd | 3rd | 4th | 1st |
|---|---|---|---|---|
| E.1 Cases Referred from this quarter | 20 | 19 | 10 | 16 |
| E.2 Received by OISC Within 24 hours | 17 | 16 | 10 | 15 |
| E.3 Completed by OISC Within 30 workdays | 18 | 9 | 1 | 3 |
| E.4 Complete during the next quarter, but within 30 days | 0 | 0 | 2 | 3 |
| E.5 Cases Not Completed by OISC Within 30 days. | 2 | 10 | 9 | 10 |
| E.6 Percent of OISC cases completed within 30 days | 85% | 47% | 10% | 37% |
| E.7 Completed Cases Returned for Further investigation | 2 | 1 | 0 | 0 |
| E.8 Percent of cases returned for further investigation | 10% | 10% | 0% | 0% |
| E.9 Further Investigation Completed | 0 | 0 | 0 | 0 |
| E.10 Cases this quarter incomplete, including further investigation | 2 | 10 | 9 | 10* |
| E.11 Percent of cases from this quarter not yet completed | 10% | 53% | 90% | 84% |

*In additional to cases which have not been completed for this quarter, six cases from the prior quarter have not been completed and provided to the Monitor. This includes 19-065, 19-066, 19-068, 19-072 and 1974.

NIJ's quarterly statistical report indicate that for the second quarter in a row, a majority of investigations were not completed within the 30 day completion time. OISC staff were used to carry out investigations of candidates for the adult training academy during the last two quarters of 2019. In the first quarter of 2020, staff were hampered by damage to the Ponce offices, as well as stay at home orders during March from the COVID-19 pandemic.

Administrative Determinations

The following table summarizes the decisions and actions taken in cases that do not involve criminal charges.

| F. Administrative Determinations for 284 Cases (2018-2019) | 2nd | 3rd | 4th | 1st |
|---|---|---|---|---|
| F.1 Cases with youth discipline referrals | 31 | 38 | 16 | 25 |
| F.2 Cases with youth discipline actions | 19 | 31 | 10 | 22 |
| F.3 Cases with youth no discipline actions | 7 | 7 | 6 | 3 |
| F.4 Cases Staff/youth with determinations | 12 | 24 | 17 | UnAv |
| F.5 Cases recommending personnel actions | 6 | 12 | 9 | UnAv |

A summary of actions taken by the legal department is provided at the end of the fiscal year as part of the annual report. It would be helpful to indicate whether such decisions were overturned on appeal or through any other process. The summary should also provide information on the nature and extent of disciplinary actions involving youth.

Prosecutorial Determinations for 284 Cases

| G. Prosecutorial Determinations for 284 Cases (2018-2019) | 2nd | 3rd | 4th | 1st |
|---|---|---|---|---|
| G.1 Cases received by PRDOJ | 2 | 1 | 0 | 0 |
| G.2 Cases with decision  not to prosecute | 2 | 1 | 0 | 0 |
| G.3 Cases with referral for prosecution | 0 | 0 | 0 | 0 |
| G.4 Cases pending determinations | 0 | 2 | 2 | 2 |

A review of the nine (9) OISC reports received for the quarter indicates the investigations were typically thorough, assessing numerous aspects of the incidents being reviewed including the completeness and accuracy of written reports, good summaries of youth and staff interviews, review of medical records and interviews with nurses, most recent training received by each employee involved, as well as thorough findings of relevant facts. Findings as to whether the allegations were validated and other policy or training violations occurred are increasingly detailed. Although it is the Legal Division that ultimately determines the efficacy of charges and, if appropriate any corrective actions, OISC staff make recommendations as to whether there is sufficient evidence to corroborate the allegations or any other concerns that arise during the investigation. Reports are also now identifying specific policy violations, by policy number, that may have occurred. Investigations are reviewed by supervisors to ensure investigators are following protocol.

OISC reports have identified several important issues during this quarter as a result of their latest investigations of possible abuse and/or neglect within the institutions. Two trends in

particular stood out this quarter:  1) youth attacking other youth with sharp objects; and 2) the use of controlled substances by youth.  OISC properly noted that the absence of routine searched in the youth institutions allows such illicit materials to enter the facilities on a consistent basis, used by youth to harm others, or harm themselves.  Searches that are done are made more reactively the preventatively.

For example:

1)  An incident in Villalba occurring in late November involved an attack against a youth returning from recreation by several other youth, causing wounds to his face and hands. The youth had 8 stitches in his head, 17 points on his cheek, 13 points on his shoulder, 5 points in his arm, and 3 points on his finger.  Wounds to the head and shoulder were deep.  The incident points to conflicts between youth "leadership" issues, essentially gang type activity, and possible failure to communicate movements properly, as well as contraband issues. A search of the unit found a razor blade in the bathroom.

2)  An incident occurred in December involving a youth in protective custody whereby he was able to make cuts to his arm with a razor which required 12 stitches. He allegedly kept the razor in his rectal area for protection.

OISC has worked for more than a year to find ways to stop smuggling of dangerous contraband into the facilities.  OISC has also expressed concern that youth are testing positive for illicit drugs, including fentanyl. Similar incidents in the adult facilities have resulted in a number of overdose deaths.

OISC's critical investigative function has been hampered over the last several months because of being used for other purposes within DCR, and as a result of earthquakes and COVID-19 this quarter.  While the latter of these could not be avoided, DCR must ensure that it is allocating appropriate resources to allow OISC to carry out its functions in relation to this case.

There is little follow up within NIJ after these investigations are completed.  The Monitor has requested examples of how OISC concerns are addressed by management, and the steps being taken to rectify trends identified through these reports.  Information which suggests additional training is needed as a result of UEMNI and OISC reports is not being provided to IDECARH. During the Functional Team meeting, it was suggested that an internal procedure be established within the agency to provide this information. The Monitor remains concerned that information from OISC investigations which implicates problems with policy and practice is not shared with key managerial staff.

| | |
|---|---|
| What is needed for full compliance? | Paragraph 78 is a critical aspect of protecting youth from harm while incarcerated in NIJ facilities.  The process is designed ensure that allegations of harm are immediately reported, investigated at both the facility level and through OISC, and that appropriate actions are taken for discipline against youth and/or employees involving such misconduct.  Of equal importance, however, is that the process should identify policies which may need to be changed, additional training which may need to occur, and/or other measures which should |

| | |
|---|---|
| What steps are required and/or recommended? | be taken in response to incidents which have been investigated.  In that sense, Policy 13.2.1 has as part of its purpose, "to prevent and minimize the occurrence of situations involving abuse or institutional neglect."<br><br>NIJ must ensure compliance with Policy 9.10 regarding consistent reporting of incidents as noted on the Incident Report Cover Sheet.  As DCR moves toward digitization of its incident reports, a review of the policy and cover sheet format should be done to ensure it captures data necessary to generate effective management reporting.<br><br>The Monitor and her team have continued to be impressed by the quality of investigations being performed by UEMNI and OISC, including thorough, timely reports which increasingly conclude with findings which indicate conduct which appears to violate policy, and weigh evidence to support or disprove allegations and other reported circumstances.  But timely and thorough investigations are not enough to find substantial compliance without consideration to whether policies and practices meet the underlying purpose of Paragraph 78.  In this regard, there remains work to be done.<br><br>Compliance measures require:<br><br>1) Timely reporting by NIJ of all incident reports (cover sheets) as detailed in other aspects of this report, to the Office of the Monitor. This ensures the Monitor that incidents are appropriately reported for investigation, or otherwise identified for review and possible 284 referrals. All incident reports are to be submitted weekly, but those of a more serious nature identified elsewhere must be submitted within 24 hours, or 48 hours, consistent with the Agreement between the Parties filed on August 26, 2019, and any further Agreement and Order from the Court.<br><br>2) Submission of completed OISC investigations should be done at least monthly, or sooner if requested. Translation and review of these reports can be time consuming, but the content is extremely important and reflective of institutional climate, youth population challenges and leadership issues, as well as the response to such.<br><br>3)  OISC investigations should continue to evaluate compliance with procedural requirements regarding the handling of incidents, and equally important,  contain sufficient detail with regard to violations of policy, credibility of facts and evidence supporting or disavowing allegations, and other relevant conclusions reached by the investigators.  Processes must be in place within facilities and NIJ leadership to then utilize these findings to make needed changes. Reports should be completed within 30 days of referral; while some reports may require additional time, the rate of timely completion during this quarter and last quarter was exceptionally low. This needs to be a priority.<br><br>4)  Consistent with the purpose of Paragraph 78, and Policy 13.2.1, measures must be in place to prevent and minimize the occurrence of situations involving abuse or institutional neglect. At a minimum, reporting on this should include: |

| | |
|---|---|
| | a)  Quarterly statistical reports of incidents involving allegations of abuse or institutional neglect, with analysis of possible patterns, trends, and other observations which can help prevent further incidents;

b)  Evidence of meetings which document meetings with management and others to discuss cases of alleged abuse, status and outcomes of investigations, evaluation of patterns of recurrence, compliance with the terms, and discussions of alternatives for the prevention of incidents. Summaries of these meetings and decision regarding policies, training needs, and other appropriate action steps should be documented and submitted.

c)  Evidence of training for staff trainers and other direct service staff on the reporting of incident, and handling of referrals of alleged abuse and institutional neglect in coordination with IDECARH.

d)  Maintenance of a log of actions taken against employees including the particulars of the actions by the employee, and actions taken against the employee, whether administrative or criminal.  Given that the purpose is to consider recidivism of actions constituting abuse or neglect, an analysis of such information should be done at least quarterly, or more often if warranted.  A copy of this log should be made available to the Monitor on a quarterly basis, along with any analysis done or actions taken as a result.

e)  In the case of sexual abuse investigations, UEMN must review incidents to "recommend changes in policy or practices to prevent and detect sexual assault" as required by Policy 13.2.  Such reviews should ensure that adequate PREA protocols are in place and being used. |
| Priority Next Steps Toward Compliance | Staff must have a clear understanding of what should be reported as an incident, who must report, and the process for determining whether incidents should be reported as a Level 1 or Level 2 284 report requiring investigation at the facility level, or by OISC.  There are still multiple incidents not reported to the Monitor's office, and some events not reported as incidents at all.

Incident cover sheets must be provided weekly, with those incidents of a serious nature provided to the Office of the Monitor within 24 hours.  The Office of the Monitor, through Bob Dugan, will continue to track these incidents relative to safety issues, and to determine appropriate referrals for investigations of Level 1 and Level 2 investigations.

Digitizing incident reports for efficiency, consistency and accountability purposes should be completed, in consultation with Bob Dugan, so that a sytemized method of obtaining data regarding incidents, by facility, can be collected and analyzed.

Documentation of discussions held regarding the status and content of investigations, trends identified, and decisions made as a result. |

| | |
|---|---|
| | Provide the Monitor with the last year years of data detailing employee conduct and actions taken by the agency, along with analysis of recidivism or other trends completed as required by policy.<br><br>Per policy, UEMNI must examine the sexual assault incidents which have been alleged, determine if PREA protections are in place, and if any changes in policy and practice should be made. Reference to prior correspondence from the Monitor as to forensic evaluations, training and other matters should be addressed. |
| Quality Assurance | The Monitor has not reviewed proposed QA measures in this area. |

## Protection from Harm – Isolation and Protective Custody (David Bogard)

| | |
|---|---|
| | **S.A. 79.** Juveniles shall be placed in isolation only when the juvenile poses a serious and immediate physical danger to himself or others and only after less restrictive methods of restraint have failed. Isolation cells shall be suicide resistant. Isolation may be imposed only with the approval of the facility director or acting facility director. Any juvenile placed in isolation shall be afforded living conditions approximating those available to the general juvenile population. Except as provided in ¶ 91 of this agreement, juveniles in isolation shall be visually checked by staff at least every fifteen (15) minutes and the exact time of the check must be recorded each time. Juveniles in isolation shall be seen by a masters level social worker within three (3) hours of being placed in isolation. Juveniles in isolation shall be seen by a psychologist within eight (8) hours of being placed in isolation and every twenty-four (24) hours thereafter to assess the further need of isolation. Juveniles in isolation shall be seen by his/her case manager as soon as possible and at least once every twenty-four (24) hours thereafter. A log shall be kept which contains daily entries on each juvenile in isolation, including the date and time of placement in isolation, who authorized the isolation, the name of the person(s) visiting the juvenile, the frequency of the checks by all staff, the juvenile's behavior at the time of the check, the person authorizing the release from isolation, and the time and date of the release. Juveniles shall be released from isolation as soon as the juvenile no longer poses a serious and immediate danger to himself or others. |
| **Compliance Rating** | **Partial Compliance** |
| | **S.A. 80.** The terms of this agreement relating to safety, crowding, health, hygiene, food, education, recreation and access to courts shall not be revoked or limited for any juvenile in protective custody. |
| **Compliance Rating** | **Partial Compliance** |

| | |
|---|---|
| Description of Monitoring process during this period of time | The process for Monitoring isolation under ¶ 79 has historically included a review of the placement of youth in either Protective Custody (PC under Policy 17.19), or Transitional Measures (TM Policy 17.20) for compliance with the protections and precautions enumerated in that paragraph and in the associated policies . While other forms of restricted room confinement, including self-confinement, group schedule modification, or "cool off" periods, might have been considered as isolation as well, in the absence of an agreed upon definition of "isolation" the focus of monitoring has been on the reality that the vast majority of youth placed on TM and PC have been separated from general population and largely restricted to their rooms for their safety or the safety of other youths.<br><br>Accordingly, the Monitor has previously determined that the Parties must come to an agreement as to the scope of what actions are included in this ¶ 79 as "isolation" and which then invoke the underlying constitutional concern reflected in this provision. The parties have reached an agreement as to the parameters of isolation, which will form the basis for analysis of this provision in *future quarters* once reporting and monitoring protocols reflecting the new definition have been developed and tested.<br><br>Of the five (5) events examined this quarter, four (4) were a function of Protective Custody, and one(1) due to Transitional Measures. Of the four PC cases, one youth accounted for two of the placements (ECV). Each of these cases is analyzed herein under ¶ 79 since these youth are primarily confined in their rooms as a result of these statuses.<br><br>The Monitoring Team's 2020 First Quarter site visits to monitor this provision occurred March 3-4, 2020. However, no youths were in Transitional Measures or Protective Custody at either facility at the time of our visits and, consequently, no interviews were done of any youth on those statuses. The number of youth on TM or PC remains extremely low through this quarter with only one or two on either status during the second half of the quarter.<br><br>A significant component of our monitoring this quarter is the independent review of DCR's internal quality assurance activities for ¶ 79 and ¶ 80. Early in the quarter, compliance staff and social workers used the Checklists and weekly audits to evaluate ¶ 79 and ¶ 80 initial placements of youth in restricted rooms and also applying the criteria included on the Weekly Audit forms that measure compliance with key aspects of ¶79/¶80 on an ongoing, weekly basis after placement. However, once employee furloughs due to the Covid-19 pandemic went into effect on March 13, DCR social work staff who were working with compliance personnel in the process of evaluating and documenting compliance were no longer available for these tasks. No evaluations were performed after mid-February and since a month or more passed from the week in question and the time that the audits and checklists were completed (in large part because of earthquake-related staff availability problems), this means that there were no weeks evaluated after early February and none after late February-March. As such, Monitor's staff did not have the full range of data to review ¶ 79 and ¶80 compliance for several youth. Monitoring staff attempted to assess the status of suicide resistance enhancement measures being taken in all rooms in both facilities. These efforts included inspecting rooms to advise DCR as to what would be necessary and assessing rooms that were in the process of being retrofitted. |

| Findings and Analysis | The combined number of five PC and TM events throughout the quarter remains low and is virtually the same as the figure for the preceding quarter. And as a reference point, it compares most strikingly to the same quarter in 2019 when there were *23* such placements. |
|---|---|

| Facility | Q4 Events: Protective Custody | Q1 Events: Protective Custody | Q4 Events: Transitional Measures | Q1 Events: Transitional Measures |
|---|---|---|---|---|
| CTS Ponce | 2 | 3 | 0 | 1 |
| CTS Villalba | 1 | 1 | 1 | 0 |

The weekly Audit for each youth focuses on the five ¶79/80 post- placement criteria that are most critical and/or have proven most difficult for DCR to comply with, including: (1) the youth was seen by a psychologist every 24 hours after initial placement in the status, (2) the youth is seen by a case worker at least once every 24 hours, (3) if eligible, the youth receives 50 minutes of education class time per subject, five days a week, (4) the youth receives one hour of recreation daily and (5) youth are observed every 15 minutes when in their rooms.

The previous quarter's review of the checklists and weekly audits revealed that DCR made substantial progress in documentation of services and corrective actions as well as documented compliance relative to the majority of the numerous requirements of ¶79 and ¶80.   However, as noted above, there was a precipitous decrease in information provided for each youth, which is attributable to the fact that social work staff who would typically be assigned to work with compliance staff to evaluate the checklists and weekly audits were furloughed due to the Corona virus.

While some gaps in documentation were noted, and times when there were no youths on TM or PC status, positive documentation continued through the quarter relative to youth routinely seeing their case workers and psychologists on all days.  And while there are instances of abbreviated or missed education or recreation sessions, the discrepancies noted were not significant or part of a pattern.  By far the most persistent identified concern is missed, delayed or non-documented 15 minute rounds. Officers are partially compliant with this requirement— within a single shift the officers will make some rounds on-time and not others. In response to this persistent problem, there continues to be evidence of repeated corrective measures being taken by facility directors with line staff and supervisors to address and attempt to resolve the problems with rounds.

The second persistent non-compliance area identified on each Checklist is the retrofit of suicide resistant rooms for youth in isolation. DCR did not provide any documentation concerning the status of these modifications. Although youth rooms are already suicide resistant, it was decided that the level of resistance could be *enhanced* by: (1) cleaning and caulking vents in all rooms and (2) retrofitting the room doors to minimize access to the interior door hinges that could be used as a ligature, and (3) caulking around the sprinkler heads. As of the end of the previous quarter, the replacement of air vent grilles with suicide resistant versions on the lower

<table>
<tr><td></td><td>levels of the housing units at Ponce and Villalba were completed.[2] The Monitor's Consultant expressed a concern that in some rooms there were still gaps at the edges of the new vent grills that might allow a juvenile to thread in a ligature. To address this, DCR has been applying security calk around the edges of the air vent grills which has been completed at both facilities. With respect to the effort of retrofitting room door hinges with a cover plate to prevent ligatures from being placed around the door hinges, none of the doors have been retrofitted at Villalba and only 15 rooms in Ponce/Puertas have been retrofitted.[3] Analysis of the viability of caulking around sprinkler heads continues.[4]

Aside from the two issues of rounds and suicide resistance enhancements for the rooms, information from the weekly audits is extremely positive and indicative of compliance with the more than 20 components of ¶79 and ¶80.

We received documentation from compliance staff that only one Group Schedule Modification event occurred this quarter—in February at Ponce.  This four-day restriction was a response to violence directed against officers by six youths. Unfortunately, the current documentation of these events is limited to just a one page form, "Registro de Modificacion de Horario Grupal," that includes only a one sentence description of the event and does not address any specifics concerning the limitations in terms of time youths are confined to their rooms or, for that matter, what the actual modifications of schedule are imposed.  That said, the parties have agreed, by an April 10, 2020 Joint Motion, that group schedule modification will *not* be deemed to fall within the requirements of ¶79 should that status be defined as "a temporary status in response to a group event that is used to help deescalate a crisis." Group disturbances, mass searches, investigations, group violence, escapes and other critical incidents are the ones that this status was originally conceived to address.</td></tr>
<tr><td>What is needed for full compliance?</td><td>While not each and every of the 20 criteria set forth in ¶79 as well as the eight criteria specifically required in ¶80 in the case of PC youth needs to be satisfied for substantial compliance to be rated, the majority must be rated positively consistently and with only occasional or intermittent or minor deviations, which do "not significantly deviate from the components of the provision, provided that any deviation poses no significant risk to detainee health or safety," as noted in the substantial compliance definition. Implementation of policies, practices and monitoring of the new isolation definition and associated policies must be achieved.</td></tr>
<tr><td>Priority Next Steps</td><td>1- Determine a process for reinstating the weekly audits and checklists within the parameters of the furloughs
2- Review and revise policies 17.19 (PC), 17.20 (TM) and 9.17 (Group Schedule Modification) as necessary to reflect and coincide with the new policy defining isolation.</td></tr>
</table>

[2] Source: DCR email to Monitor dated 1/17/19.

[3] In light of the mental health profile of youth housed in Puertas, DCR decided to begin the door hinge project there.

[4] Source: January 29, 2020 email from DCR Life Safety Officer Pedro Santiago to monitor's staff.

|  | 3- Train staff in changes to policies implementing the isolation definition.<br>4- Complete retrofits to a number of rooms in each module to enhance suicide prevention features in rooms used for isolation. |
|---|---|
| Sources of Information | Checklists upon placement and removal from TM and PC<br>Weekly audits of ¶79/80 services and protections |

## MENTAL HEALTH – Dr. Miriam Martinez

| **S.A. 59.** Defendants, specifically the Department of Health (ASSMCA), shall provide an individualized treatment and rehabilitation plan, including services provided by AIJ psychiatrists, psychologists, and social workers, for each juvenile with a substance abuse problem. | |
|---|---|
| Compliance  Rating | Partial Compliance |
| Description of Monitoring process during this period of time | During the first quarter the Mental Health Consultant performed remote chart reviews and completed site visits in March.  During the site visit the Mental Health Consultant participated in a meeting on March 10th regarding Special Educational Assessments with Professional Consulting Psychoeducational Services (PCPS), the Monitor, and NIJ Education Leadership.  On March 10th the Mental Health Consultant also met with PCPS leadership to discuss fourth quarter findings and current concerns.  PCPS is contracted by the Department of Correction and Rehabilitation to provide mental health staff to provide psychiatric, psychological and substance use services to youth within NIJ.  During the site visit, the Mental Health Consultant asked the mental health staff questions related to youth and programing.<br><br>The Mental Health Consultant visited Ponce on March 11th interviewing 8 youth.  On March 12th, she visited Villalba, interviewing 11 youth.  She held a Functional Team Meeting with NIJ leadership, security supervisor and mental health staff leadership on the 13th of March.<br><br>During the site visit, the Mental Health Consultant followed up on self-mutilation incidents related to youth inserting "pearls" in penises and questions regarding toxicology reports regarding positive drug screens of serous drugs such as buprenorphine and fentanyl.<br><br>During this first quarter, the Mental Health Consultant also reviewed documentation regarding emergency psychotropic medication, suicidal ideation/intent/gesture and self-mutilation reports, documentation of administration of the MAYSI 2 and reports of youth in transitional measures or protective custody.  She sent multiple requests for clarification and responses to concerns following chart reviews and was also able to speak to leadership via telephone to follow up on concerns. |

| | The mental health monitor requested and received data for all positive toxicology reports (for illicit drugs) from August of 2019 through Jan 4, 2020. |
|---|---|
| Findings and Analysis | NIJ leadership and PCPS are responsive and willing to work together for the benefit and well-being of youth.  There comes across a genuine concern for a high standard of care and a commitment to deliver such care.  NIJ leadership and PCPS respond to phone calls for information and are available to case conference as needed. The Mental Health Monitor voiced concerns during the functional team meeting of a few members not responding to email queries and these were openly discussed with them present and resolved.  The person responsible for IT is very supportive and available to problem solve should the Mental Health Consultant have any issue accessing the system.  This is crucial for timely and consistent monitoring and is very much appreciated.

Charts reviewed indicate that overall there are plans in place for the youth. These plans, however are not always consistently completed nor implemented.   For example several charts reviewed indicated that either the family therapeutic interventions were missing or that the behavioral modification section was not complete.  Individualized Plans of Care are only as good as when they are able to be fully implemented.  The Mental Health Consultant is looking for evidence that a plan is in place, as well as the quality of the plan and that it is implemented.

Concerns about incomplete plans were emailed to the NIJ staff person responsible for Mental Health.  Many, if not most of these young men will return to live with their families. One five-minute phone call a week is not enough to establish rapport and build the healthy relationship needed for a successful reunification.  Some of the families cannot travel the distance to visit due to economic hardship. Increasing phone calls is something the Mental Health Consultant has requested for quite some time. [Note: due to COVID 19 and the inability of the youth to have family visits, we were informed that the phone calls have increased to twice a week.]

With respect to Behavior Modification in Individualized Plans, the Mental Health Consultant has communicated with the Director of Behavior Modification that coming before a committee is not an intervention and that a full program should be in place.  The majority of the youth interviewed could name incentives they received, such as candy, but several could not explain why one week they received them and the other they did not.  They wondered if maybe the candy had run out versus directly tying incentives to their behavior.  Some youth were able to explain that group incentives are not given when a member of the group does not conform or "behave well." Behavior Modification systems are best implemented when youth are engaged, understand the direct link between their behavior and rewards and when the youth understand how to advance in rewards within a system.  The youth consistently stated they had to behave, do their chores, and not get a report from security staff.  Point and level systems have been discussed in the |

past with the Director of Behavior Modification.  One youth interviewed in Ponce PUERTAS mentioned a system in place that had levels and corresponding privileges associated with those levels (compromise, honors, and VIP were the three levels).  Unfortunately, he and only two others interviewed were vague and could not provide details about the program.  Two mental health staff in Ponce were not able to identify or validate what this behavioral modification program was.

With respect to Mental Health services being provided according to the plans, the Mental Health Consultant discussed with the PCPS leadership the need to adjust up the interventions proactively vs. reactively for youth in detention who present with a serious psychiatric history.  Analysis indicated that overall youth in mental health crisis are being psychiatrically stabilized in hospitals when needed.  To the credit of the PCPS staff, even when a hospital has not had room or refused an admission, the PCPS staff have continued to advocate for the well-being of the youth.

With respect to Substance Use treatment, only a few youth interviewed were able to state that they can and have discussed the origins of substance use, the substance use in their families, how substance use is tied to their trauma and familial histories.  These were few and far between as has been noted in previous site visits. Most of the youth report receiving education about substance use and the dangers of using drugs.  They report finding this helpful, however, this is not considered standard substance use treatment.

Data on all positive drug screens were reviewed for the period of time from August of 2019 through January 4, 2020.  A total of 26 positive drug screens were noted, with five of these taken from youth on admission (ingreso) or shortly after admission when the drugs could possibly still show up on a toxicology test. Three of the five youth that were screened on admission or shortly after admission, screened positive only for cannabis. On the other hand, 14 youth in detention or treatment (cumplimiento) had a total of 17 incidences of positive toxicology results, the majority with benzodiazepines and fentanyl (only 2 incidences of the 17 were for cannabis only).  Two of the 17 instances were positive toxicology reports following a return from a pass and a return from a psychiatric hospitalization.  A few of the fentanyl positive instances (3 out of 7 all with the same person)  were thought to be false positives according to communication with NIJ leadership and PCPS regarding the data provided.   None the less, the ability of youth to obtain and ingest harmful and/or illegal substances while in NIJ custody is alarming, and must be addressed.

With respect to Health Needs and Individualized plans, chart reviews indicate aggressive follow-up is needed when the physicians order tests (MRIs, CT scans or routine lab results).  The Mental Health Consultant has intervened in the past to make sure these important tests are completed and record reviews

<table>
<tr><td></td><td>

indicate that "test results are pending" for months from the time that they were ordered or completed.

Data regarding piercings were requested by the Mental Health Consultant due to multiple reports of self-mutilation that had to do with penile piercings, not incidents typically reported, i.e. cutting for reasons of anxiety, stress relief, boredom.  Data provided by the health staff in both Ponce and Villalba indicate that about half of the male population have piercings - objects ("pearls") inserted in their penises.  These objects are described as whittled down (from a domino for example) into shapes (i.e. heart, superman, square, or triangle) or a diamond, and inserted by creating a slash in the penis and inserting the object.  Data requested and provided to the Mental Health Consultant in early March indicated that out of 104 youth, 50 youth or 48% had such a piercing.  Of note, analysis of data showed that only 4 youth in detention (zero of 7 youth in detention in Ponce and 4 of 22 youth in Villalba) or only 18% percent of youth in detention had a piercing.  Data suggest a significant increase from 18% in detention to 48% in treatment have a piercing.  During the site visit the youth indicated that days prior to the site visit the nurses provided education on the health risks of such insertions.  One youth interviewed asked the Mental Health Consultant if he could have his pearl removed.  It should be noted again that there have been multiple reports referrals for investigations filed over the last year regarding this practice, which raises questions both about the ability of youth to secure and use contraband, as well as a lack of supervision (time to shape, slash and insert).  These issues and concerns were raised by the Mental Health Consultant with NIJ leadership during the March 13th Functional Team Meeting.

 All youth interviewed knew that they could ask for medical attention when needed and that they could ask to speak to a mental health staff person if needed.  When asked what to do if it is the middle of the night and they are depressed the youth consistently could state how they could get help.
</td></tr>
<tr><td>

What is needed for full compliance?
What steps are required and/or recommended?
</td><td>

For full compliance:
NIJ must maintain a stable and consistent work force that delivers mental health services per the plan of care.  A term of at least 1.5 years with the current mental health treatment team would indicate some stability has been maintained in the PCPS mental health treatment team.

The youth's treatment plans should reflect the individual needs of each youth.  The youth's plans should be completed fully and implemented.  The Mental Health Consultant recognizes that security staffing issues may hinder the transport of youth to their mental health appointments, however, the youth need to consistently receive their services per the plan of care and the stipulations of this case.
</td></tr>
</table>

|  | Medical orders placed by psychiatric and medical staff should be executed as quickly as possible – especially for the high-risk youth and when these orders are needed to clarify diagnosis and treatment plan.<br><br>The Mental Health Consultant suggested to NIJ leadership that the data be collected regularly and analyzed for patterns, investigations as to where the drugs are coming from, and plans of action.  For example, is there a cluster in one facility or one module?  Are there more positive tests when youth return from outings, from the hospital or passes?  The Mental Health Consultant emphasized the dangers of such drugs as fentanyl with the potential for overdose.  Education and prevention is needed for youth, however, more importantly, there is a need for substance use treatment. The need for actual substance use treatment was discussed with PCPS who acknowledged the need to move away from didactics and education to more actual substance use treatment. |
|---|---|
| Priority Next Steps | Continue to monitor plan development and implementation. The Mental Health Consultant will continue to maintain close communication with PCPS staff regarding delivery of services and especially the need to have lab results/test results returned in a timely manner. |
| Quality Assurance Measures | The Mental Health Consultant has consistently requested the establishment of a Quality Improvement Team and this has yet to be realized.  The responsibility of the development and implementation of a quality improvement plan with respect to mental health does not rest with PCPS solely.  A treatment plan is inclusive of other areas besides mental health such as health, education, social work and family.  The Director of Mental Health for NIJ together with PCPS can work toward monitoring the indicators that the Mental Health Consultant refers to within her reports.  Chart reviews of those with suicidal ideation can be completed for 15% of the youth with particular attention to adherence to best practices and the policies and procedures in place.  Quality checks on whether or not assessments (MAYSI 2) was completed in a timely way or whether protocols were followed when use of emergency psychotropic medication were used are examples of self-monitoring and reporting that NIJ leadership can and should undertake.  NIJ leadership could also address the data of substance use and the insertion of pearls with a quality improvement plan that is developed with a multidisciplinary group and monitored with reporting going to the Mental Health Consultant.  The Mental Health Consultant stands ready to work with and encourages NIJ and PCPS leadership to move forward with a quality improvement plan. |
| Sources of Information upon which Consultant report and compliance ratings are based. | Sources of information that the Mental Health Consultant relied on were site visits to Ponce/PUERTAS & Villalba, interviews with youth and staff, review of medical records, and a review of all reports submitted to the Mental Health Consultant and the Monitor, as well as mental health staffing reports. |

**C.O. 29:** Defendants shall establish an adequate residential mental health treatment program which provides services in accordance with accepted professional standards for juveniles confined in the facilities in this case who are attempting to commit suicide and/or who are inflicting harm upon themselves and/or any other juvenile in need of such services as determined by the juvenile's interdisciplinary mental health team, which includes a qualified psychiatrist. This residential treatment program will house up to forty-eight (48) juveniles from Commonwealth facilities. The residential treatment program will be established in an area that meets professional standards regarding safe physical areas for suicidal and/or self-mutilating juveniles.

| Compliance  Rating | Partial Compliance |
|---|---|
| Description of Monitoring process during this period of time | The Mental Health Consultant conducted a site visit to PONCE PUERTAS in March of 2020 and interviewed the three youth in that unit.<br><br>Discussions were held with the Director of PUERTAS, the PCPS psychologist supervisor, the psychologist and the psychiatrist.  Phone conferences were held with NIJ leadership regarding expectations for a PUERTAS program.  The Mental Health Consultant provided technical assistance with respect to the expectations for a PUERTAS program, both verbally and in writing.<br>Reviews of PUERTAS proposed programming completed and feedback provided to NIJ leadership both verbally and in person during first quarter site visit.<br><br>Chart reviews of youth in PUERTAS were also conducted during this first quarter and questions and concerns were sent to NIJ and PCPS leadership to be addressed. |
| Findings and Analysis | Reviews of NIJ submitted plans for a PUERTAS program continued to be determined inadequate.   Late in the quarter a plan provided by NIJ for a PUERTAS program proved to be more of schedules for staff providing services vs an actual program being implemented.<br><br>Feedback was provided in writing and verbally during the site visit.  Another written notification of expectations was provided but as stated above, this plan will be difficult to implement given COVID 19 and the small number (two) of youth in PUERTAS which hampers the ability to do true group therapeutic work.<br><br>For the first quarter of the 19 incidents of suicidal ideation/gesture/intent or self-mutilation, 14 incidents or 74% were of youth in PUERTAS.  Some youth continue to report self-mutilating due to "boredom" and/or just to get out of module.<br><br>Consistent programing, therapeutic groups, individualized treatment plans all need to be in place in order to be in compliance with this provision. The Mental Health Consultant has covered aspects of expectations for a day program in both in person and in multiple emails. |

| | |
|---|---|
| | The Mental Health Consultant recognizes that youth in detention areas are sometimes as psychiatrically acute as those in PUERTAS.  While they do not qualify to be moved to PUERTAS while in detention, it has been noted that mental health staff see youth in psychiatric crisis sometimes daily or twice daily to stabilize them. |
| What is needed for full compliance? What steps are required and/or recommended? | The priority is to provide a safe, distinct and consistent specialized program for those youth most at psychiatric risk and placed in the PUERTAS program.

Mental health interventions should increase for those youth who have difficulty with affect regulation and are self-mutilating as a way of coping with anxiety or due to depression.  In addition, consistent and fuller programming combined with the mental health and behavioral modification interventions could help further address self-mutilating due to "boredom" and for youth who are repeatedly found to have a positive (illegal substance) drug screen.

NIJ should take full advantage of the PUERTAS unit, screen and enter all youth who fit criteria. |
| Priority Next Steps | NIJ leadership has recently provided a plan for a PUERTAS program. COVID 19 prevents consistent implementation.  Further, there are only two youth in PUERTAS and therefore "group" activities may be limited when one participant is sick or refuses to otherwise participate.

Continue to consistently evaluate the youth for placement into PUERTAS. |
| Quality Assurance Measures | There are no quality assurance measures in place although DCR had stated that this was underway. |

**C.O. 36.** Within 120 days of the filing of this Consent Order, Defendant Juvenile Institutions Administration shall provide continuous psychiatric and psychology service to juveniles in need of such services in the facilities in this case either by employing or contracting with sufficient numbers of adequately trained psychologists or psychiatrists, or by contracting with private entities for provision of such services. The continuous psychiatric and psychological services to juveniles in need of such services shall include at a minimum, a thorough psychiatric evaluation, necessary diagnostic tests before the prescription of behavior-modifying medications, blood-level monitoring if behavior-modifying medications are prescribed, therapy, counselling, treatments plans and necessary follow-up care.

| | |
|---|---|
| **Compliance  Rating** | **Partial Compliance** |
| Description of Monitoring process during this period of time | During this quarter the Mental Health Consultant performed remote chart reviews and completed site visits in March of 2020 to Ponce and Villalba.   The Mental Health Consultant completed an analysis of mental health staff hours contracted vs. mental health hours worked. |
| Findings and Analysis | An analysis of the PCPS hours contracted for mental health vs. the hours delivered indicates that for the first quarter, 2952 hours were contracted and the mental health staff (which includes psychologist, psychiatrist and substance abuse counselors and occupational therapist) delivered 3189.5 |

| | |
|---|---|
| | hours or 237.5 hours of service more than were contracted for.  The psychiatrist time was contracted for 360 hours for the first quarter and delivered 380.75 or 20.75 more hours of psychiatric care than contracted for.<br><br>In total there were nine unique youth with 19 incidences of suicidal ideation/intent/gesture or self-mutilation. Five unique youth were in the area of detention.  The mental health team, at times has provided almost daily services for youth in crisis in detention.<br><br>Chart reviews indicate that the psychiatrist performs a comprehensive evaluation prior to administering psychiatric medications.   Charts reviewed indicated that youth who are receiving psychiatric medications also receive mental health services.<br><br>Chart reviews indicated that when diagnostic tests were ordered by psychiatrist, there were long (sometimes months) delay in the results being returned to the psychiatrist.  Timely blood level monitoring and other diagnostic tests are crucial and medically necessary for some of the psychotropic medications being prescribed. |
| What is needed for full compliance?<br>What steps are required and/or recommended? | Youth in detention need to be provided treatment according to their psychiatric history and not only reliant on what the youth states is his mood or state of mind at entry.  The Mental Health Monitor recommends providing more intensive services up front, proactively.  This was discussed with PCPS leadership during our meetings in March.<br><br>Diagnostic tests ordered by the psychiatrist or the medical physician need to be completed expeditiously and the results returned as soon as they are completed. Weeks or months wait time is simply unacceptable and not up to the standard of care for psychiatric practice. The Mental Health Consultant recommends a review of this process and an improvement plan or steps by end of next quarter.<br><br>Given the acuity of the youth as reported above, not only it is necessary for the current psychiatrist to fulfill the contracted hours, the addition of psychiatric time is necessary to assess and stabilize youth, to follow up on lab and other test results, and to case conference and treatment plan high risk cases.<br><br>While the treatment plan often states a minimum of mental health service 1X per month, more frequent (i.e. weekly) group and individual care can help build youth's coping skills, especially for those youth who self-mutilate and/or have suicidal thoughts.   Trust with staff can contribute to the de-escalation of conflicts before they erupt into violence either with other youth or with security staff. Connections with the institutions leadership (i.e. Directors) through frequent visits and chats/check-ins, talks and activities with security and other staff, including social work and the head of mental health services |

| | |
|---|---|
| | are all important in building trusting bonds especially for youth who fear for their lives due to violence and retaliation/manipulation from other youth. Leadership incorporating restorative justice practices can also help build community and de-escalate conflicts.<br><br>See also comment above regarding the need for individualized treatment plans. |
| Priority Next Steps | Youth in detention need to be provided treatment according to their psychiatric history and not only reliant on what the youth states is his mood or state of mind at entry. |
| Quality Assurance Measures | See above. |

| | |
|---|---|
| **S.A. 63.** For each juvenile who expresses suicidal or self- mutilating ideation or intent while incarcerated, staff shall immediately inform a member of the health care staff. Health care staff shall immediately complete a mental health screening to include suicide or self-mutilation ideation for the juvenile. For each juvenile for whom the screening indicates active suicidal or self-mutilating intent, a psychiatrist shall immediately examine the juvenile. The juvenile, if ever isolated, shall be under constant watch. Defendants shall develop written policies and procedures to reduce the risk of suicidal behavior by providing screening for all juveniles at all points of entry or re-entry to AIJ's facilities and/or programs and by providing mechanisms for the assessment, monitoring, intervention and referral of juveniles who have been identified as representing a potential risk of severe harm to themselves. Treatment will be provided consistent with accepted professional standards. | |

| Compliance Rating | Partial Compliance |
|---|---|
| Description of Monitoring process during this period of time | The Mental Health Consultant reviewed reports that were submitted by DCR of youth that were reported to have suicidal ideation, suicidal intent and/or self-mutilation for the entire quarter.  The Mental Health Consultant reviewed the electronic medical records to find evidence of compliance with S.A. 63, including providing treatment consistent with professional standards.<br><br>The Mental Health Consultant discussed high risk youth with PCPS leadership and the psychiatrist during the site visit and during multiple phone conferences. |
| Findings and Analysis | There were 19 incidences reported of youth that had suicidal ideation/gesture or intent and/or self-mutilation.  The 19 incidences represent 9 unique youth with one having 7 incidences and another having 5. Chart review of all who were reported to have expressed suicidal ideation or intent, including gesture revealed 11 incidents.  Of the 11 incidents, 10 were seen by a psychiatrist within a 24-hour period (this includes if the youth was psychiatrically evaluated for hospitalization or were hospitalized).  In 8 of the |

| | incidents, the youth were psychiatrically hospitalized. There were nine incidents of self-mutilation with two incidents requiring psychiatric hospitalization (one youth both expressed suicidal ideation and self-mutilated).  Of the nine incidents of self-mutilation, all nine were seen by a psychiatrist within a 24-hour period. |
|---|---|
| | Further analysis indicates almost ¾ of the incidences were youth in PUERTAS indicating that they are appropriately placed and high risk.  In addition, of the 9 unique youth more than half were in the area of detention.  See also comments in C.O. 36 above regarding these youth and the need for more intensive services up front to hopefully prevent decompensation and psychiatric crisis. |
| | Health Care staff must immediately complete a screening for suicide or self-mutilation.  These were completed in only 11 of 19 incidences.  One of the 19 was only partially completed.  It is imperative that these screens are fully completed so that information could be shared with the treatment team that is managing the crisis. |
| | The mental health team is continuing to manage youth into psychiatric hospitalization when needed and to consistently evaluate the youth once they return from the hospital. |
| | Findings indicate that NIJ is failing to provide an immediate suicide evaluation by a health care (i.e. nurse) provider for any youth who self-mutilates or expresses suicidal ideation/intent/gesture. |
| What is needed for full compliance? What steps are required and/or recommended? | Suicide and self-mutilation assessments need to be consistently completed and the notes regarding suicidal ideation assessment should be more fully noted (not just check marks) with a clear plan in the bottom note section as to next steps.<br><br>This was discussed at functional team meeting toward the end of the site visit. |
| Priority Next Steps | Medical staff (i.e. nurses) need to complete suicidal and self-mutilation screening for all youth who express suicidal ideation/gesture/intent or who self-mutilate. |
| Quality Assurance Measures | As reported in previous quarterly report, It is highly recommended that DCR have PCPS perform their own quality assurance measures to ensure compliance with S.A. 63. |

**S.A. 72**. All juveniles receiving emergency psychotropic medication shall be seen at least once during each of the next three shifts by a nurse and within twenty-four (24) hours by a physician to reassess their mental status and medication side effects. Nurses and doctors shall document their findings regarding

adverse side effects in the juvenile's medical record. If the juvenile's condition is deteriorating, a psychiatrist shall be immediately notified.

| Compliance Rating | Partial Compliance |
|---|---|
| Description of Monitoring process during this period of time | The Mental Health Consultant analyzed data provided by NIJ for the use of emergency psychotropic medication by month, by site for the first quarter of 2020.  The Mental Health Consultant discussed the use of emergency psychotropic medication with the psychiatrist during her site visit.  She also discussed the use and concerns regarding lack of adequate medical staff documentation per policies and procedures with NIJ leadership during the functional team meeting on March 13th. During this meeting both the Standards below and the policies and procedures were discussed.<br><br>The Mental Health Consultant reviewed and references: Standards for Mental Health Services in Correctional Facilities, 2015, MH -1-02, regarding the emergency use of psychotropic medication.  She also reviewed and references the NIJ policies and procedures for the emergency use of psychotropic medication, Norma 12.2.2B, Section F: Aplicacion de Medicatmentos Psicotropicos  de Emergencia: Protocolo Para El Manejo De Medicacion Para La Utilizacion de Haloperidol Inyectable. |
| Findings and Analysis | There were 3 incidences of intramuscular (IM) use of psychotropic medication. All three were with the same youth in the month of February.<br><br>Chart reviews indicate that there was a consistent lack of documentation of the use of manual restraint prior to the use of IM psychotropic medication.  Further, there was a lack of documentation by medical staff reassessing the mental status and/or medication side effects and/or adverse side effects.<br><br>Per the Mental Health Consultant's recommendation last quarter and as was discussed during the site visit functional team meeting on March 13th, training was provided to the nurses on March 27th regarding the intramuscular use of emergency psychiatric medication and documentation of such. |
| What is needed for full compliance?<br>What steps are required and/or recommended? | There are policies and procedures in place for the use of psychotropic medications which have been reviewed and approved by the Mental Health Consultant. These need to be consistently adhered to. |
| Priority Next Steps | The Mental Health Consultant will continue to monitor closely. |

| Quality Assurance Measures | See above. |
|---|---|

**S.A. 73.** Defendants, specifically AIJ, shall design a program that promotes behavior modification by emphasizing positive reinforcement techniques. Defendants, specifically AIJ, shall provide all juveniles with an individualized treatment plan identifying each juvenile's problems, including medical needs, and establishing individual therapeutic goals for the juvenile and providing for group and/or individual counseling addressing the problems identified. Defendants, specifically AIJ, shall implement all individualized treatment plans.

| Compliance  Rating | Partial Compliance |
|---|---|
| Description of Monitoring process during this period of time | The Mental Health Consultant has reviewed written evidence of the Behavioral Modification curriculum, staff training, receipt of incentives by the youth and interviewed youth during the site visits and has received documentation that some incentives are being provided.<br><br>During the site visit in March, 19 youth were interviewed and 18 were also asked about behavioral modification incentives. One was not asked as he had just arrived. |
| Findings and Analysis | During the first quarter, in both Ponce and Villalba, most youth interviewed could name a behavioral modification incentive that they were given. These were mainly candy or a play station type of group incentive.<br><br>Of the 19 youth interviewed, only one of them stated that there was a step program in Behavior Modification. The steps were stated to be Compromise, Honors and VIP.  The youth that named these steps indicated that they were explained to him only a few days prior to the Mental Health Consultant's arrival.  Only one or two other youth (out of two sites visited) and no staff were vaguely familiar with these steps. The Director of the Behavior Modification program did not address concerns indicated in the fourth quarter nor was a step program such as Compromise, Honors and VIP explained to the Mental health Consultant during the site visit.<br><br>The Director at Villalba continues to find ways to provide incentives and activities for the youth.  The youth praised his leadership as they consistently describe him as tough but caring and fair.  Some youth when asked about activities mentioned the Book Club in Villalba and described books they liked to or wanted to read.<br><br>Low cost/no cost  incentives such as two phone calls a week were not found to be implmented per the Mental Health Consultant's recommendations over the last several of quarters.<br><br>As per last quarter, the Mental Health Consultant finds that the Behavior Modification program is lacking in consistent implementation and |

| | |
|---|---|
| | effectiveness as evidenced in the incidences of violent behavior and positive toxicology reports. Further, a Behavior Modification leadership presence is reported to still be lacking across both sites to ensure consistent implementation, to communicate directly with youth, for observation, planning and supervision of behavioral modification staff. In addition, the full development and implementation of the individual treatment plans requires further attention and has not been found in compliance by the Mental Health Consultant. |
| What is needed for full compliance? What steps are required and/or recommended? | Further development of a consistently applied behavioral modification program with on-going self-monitoring, evaluation, and individualization to meet the needs of the youth. Use of low or no cost incentives.  This includes time outside of room, art supplies and games for use in rooms and modules, special (healthy) snacks, and increasing the phone calls to families which is so important for reunification purposes. |
| Priority Next Steps | Further development of a consistently applied behavioral modification program with on-going self-monitoring, evaluation, and individualization to meet the needs of the youth. |
| Quality Assurance Measures | See above. |
| Sources of Information upon which Consultant report and compliance ratings are based | Site visits, interviews with staff, youth. Chart reviews. Data analysis. |

## SPECIAL EDUCATION AND VOCATIONAL TRAINING –Kim Tandy

| | |
|---|---|
| S.A. 81 Educational and Vocational Services – General Population Defendants, specifically the Department of Education, shall provide academic and/or vocational education services to all juveniles confined in any facility for two weeks or more, equivalent to the number of hours the juvenile would have received within the public education system.  Specifically, this education shall be provided 5 (five) days per week, 6 (six) hours per day, 10 (ten) months per year.  AIJ shall provide adequate instructional materials and space for educational services.  Defendants shall employ an adequate number of qualified and experienced teachers to provide these services. | |
| Compliance Rating | Partial Compliance |
| Methodology for Monitoring this Quarter | The Monitor met with Carlos Delgado and other staff on March 10, and visited the facility in Ponce on March 11.  The visit included a facility tour, including classrooms on units or otherwise outside of the regular school area for security purposes. While not able to visit |

<table>
<tr><td></td><td>

Villalba due to events related to the budget on the scheduled day, Dr. Martinez interviewed a three youth in detention in Villalba regarding educational services.

A functional team meeting was held on March 10th with DCR, PRDE and representatives of PCPS.

Information received and reviewed this quarter for the time period January 1- March 31, 2020 as well as on-site verification  includes:

1) An analysis of classroom space and resources for the provision of education, including for transitional measures and protective custody youth, as needed.

2)  Monthly personnel attendance by support staff, teachers, and special education teachers, with documentation of teacher absences and "security situations" which disrupt school services for monitoring period.

3) List of all student receiving vocational education, including special education students

4)  Verification of the provision of educational services within 5 days of arrival for eligible youth.

5)  Verification of school records for those youth in transitional measures or protective custody.

6)  Tracking Form for Initial and Re-evaluation Process.

The Monitor received revisions to Policy 20.2 from NIJ and DE during her visit, and returned comments.  Revisions have been completed to Policy 20.1 but to date these have not been received as signed. Final revisions to Policy 20.2 have not been made and signed.

The Monitor also reviewed the education records for youth in TM or PC status.  An analysis of youth receiving educational services during January 1 – March 31, 2020 is discussed in Paragraph 94.

A new Collaborative Agreement between DCR and PRDE regarding responsibilities for educational programming was signed in December, 2019. The Monitor obtained and reviewed a copy of this document.

</td></tr>
<tr><td>

Findings and Analysis

</td><td>

The current structure for education services in NIJ facilities splits responsibilities between the Puerto Rico Department of Education, which provides special education teachers, Title I, and vocational education staff, and the Department of Corrections and Rehabilitation, which provides academic and library staff.   The language in S.A. 81 requires the Department of Education to provide these services.  As such, compliance regarding educational and vocational education for youth confined 2 weeks or more, five days per week, 10 months per year, is the responsibility of the Department of Education. The requirement of providing qualified teachers logically also falls on the Department of

</td></tr>
</table>

Education based upon this responsibility.  NIJ is required to provide adequate educational materials and space for instruction.

A Collaborative Agreement was signed in December of 2019 between the Department of Corrections and Rehabilitation and the Puerto Rico Department of Education regarding the operation of the school program for NIJ facilities.  This Agreement places the regular education programming under the jurisdiction of the Adult Program of the Department of Education, led by the Auxiliary Secretariat of Alternative Education. The agreement stipulates that matters related to educational aspects of institutions and correctional facilities go directly to the Department of Education, and that DCR will have "no inherent participation, or decision making power in the educational aspects of the Correctional Schools Program." Teaching staff will be Department of Education employees and have the same benefits as other teachers in the community.  Funds allocated by the DCR to cover these positions during the 2019-2020 academic year will be reimbursed by the Department of Education, and the Department of Education will cover the allocation of such funds in its budget for 2020-2021 and beyond.  The Agreement also specifies that DCR shall coordinate with the Department of education regarding security issues.

The Monitor has previously recommended that DCR revise its Memorandum of Agreement with the Department of Education.  It seems particularly important to do so now that this broader agreement has been reached regarding the Department of Education's responsibility.  It will also mean that the Department of Education will need to take a more active role in compliance matters.

Policy 20.1 Educational and Recreational Services provides for regular and vocational services to youth in detention and in social treatment centers. The revised policies received by the Monitor in May of 2019 contain the recommended changes but they are not yet signed. The new policies reflect improvement and show commitment and continued effort to provide high quality educational services for youth.  Several requests have been made to receive a signed copy of this policy.

Monitored Provisions:

**1) Provision of academic and/or vocational education for youth confined 2 weeks or more 5 days per week, 6 hours per day, 10 months per year.**

This provision ensures that all youth who are eligible for educational services receive such services within a two week period, and that full school days are provided over the 10 month school calendar.

Documentation received at the beginning of the school year verifies that NIJ uses the PRDE school calendar. Monthly monitoring of attendance for education staff is documented on a daily basis, for administrative support, teachers, and special education teachers, as well as for students.  Youth did not begin school services this quarter until January 21 as a result of earthquakes on the island in early January.  Monthly reports have been received this

quarter for January through March 16th, when the shutdown began due to Coronavirus. No school was held during the last two weeks in March.

Rates are affected by teacher absences and "security situations." Security situations are discussed in more detail in paragraph 94.  NIJ has been asked to report when youth are removed from school for security or other reasons and do not receive educational services.

Staff attendance rates in the facilities from January 21 – March 13th overall were good, with 86 and 81% in January, 90 and 92% in February and 87 and 89% in March.  Staff absences do not necessary mean that youth did not receive education services.  Youth attendance rates were as follows:

| Villalba | Youth in custody | Youth Det. | Spec. Ed. Serv. | Ponce | Youth in custody boys | Youth det. boys | Youth in custody girls | Youth det. girls | Spec. Ed. |
|---|---|---|---|---|---|---|---|---|---|
| January | 83% | 100% | 100% | | 91% | 100% | 100% | NA | 100% |
| February | 75% | 83% | 86% | | 89% | 100% | 100% | NA | 100% |
| March | 80% | 85% | 94% | | 89% | 100% | 100% | 90% | 100% |

Security situations were noted on five days in Villalba which interfered with school for all of part of the youth, and on one day in Ponce.

A review of enrollment information for educational services for the First Quarter of 2020 indicates youth enrollment in vocational services at 100% for both facilities.  These classes include bakery, cabinet making, administrative work, and barbering.  Both facilities schedule vocational classes to youth who have already graduated for a three hour block of time daily.

**2)  AIJ shall provide adequate instructional materials and space for educational services**

Both facilities have multiple classrooms for students engaged in regular and special education as well as vocational services.  Classrooms seem adequate for students to have small classes based upon subject, and in some cases, grade levels (i.e. elementary level students).  The facilities have vocational education rooms which were inviting, seemingly well stocked, and were engaging students.

A review of the schedule provided by NIJ indicates that each classification of youth is scheduled for a full school day, and the required teacher planning time is incorporated into the schedule.

**3)   Defendants shall employ an adequate number of qualified and experienced teachers to provide these services.**

<table>
<tr>
<td></td>
<td>The Monitor reviewed a list of instructional staff and their certifications and subject matter expertise for each of the three facilities the beginning of the school year, and will continue to review any staffing vacancies.

NIJ Policy 4.1 requires the Training Division to coordinate and implement a master plan of training for staff development, including orientation and pre-service training of a minimum of 24 hours for treatment staff who are new.  By definition, treatment staff includes teachers, social workers, counselors, and school principals.

Training records must reflect that all new educational staff receive 24 hours of training by NIJ.  In addition, Policy 4.1 requires that staff training needs be assessed in operational areas (including education and social work), and that such areas, in conjunction with the Division of Training, design training according to need.  While not included in Policy 20.1, the Department of Education also requires annual training for its special education instructors, usually for one week prior to the beginning of the school year. This is required of all special education teachers and not just those within NIJ.

Teacher attendance should ideally be at 90% or higher, with substitute staffing in place so that youth do not lose school days due to these absences.  Youth who receive special education services are entitled to this service at the level indicated in each IEP. If special teachers are absent and the services are not provided, youth are entitled to make up that amount of time.</td>
</tr>
<tr>
<td>What is needed for full compliance?

What steps are required and/or recommended?</td>
<td>The Department of Education is responsible per the Settlement Agreement for the delivery of all educational services, as well as providing sufficient qualified teachers.

 A revised version of Policy 20.1 was provided to the Monitor in May of 2019 which meets this requirement.  A signed copy has not yet been received in order to find this aspect in full compliance.

Well qualified staff should include verification not only of certifications, but also of training for new educational staff, and training required by the Department of Education and coordinated between the Division of Training and NIJ educational services. Additionally, a staff training needs assessment for education staff should be produced, as well as a training plan for the 2019-20 school year based upon that assessment.

Training records of education staff (including ancillary staff) should be documented and provided as evidence of training requirements.

Facilities for classrooms and administrative staff for the education programs must be functional, without leaking roofs, moldy ceilings or walls, and with air conditioning units that are working. While work at Villalba has been substantially completed, the Monitor needs verification that such work at Ponce is completed as it pertains to classrooms and other education areas.</td>
</tr>
</table>

| | |
|---|---|
| | Monthly attendance by essential educational staff should remain at 90% or higher in each facility. Ideally, classes should not be disrupted or cancelled as a result of teacher absence. |
| Priority Next Steps | The Department of Education must play a stronger role in compliance monitoring, and ensuring that the appropriate documentation is received.  A memorandum of agreement which more closely described the working relationship between DCR and PRDE should be created.  During the next quarter, the Monitor will meet with PRDE staff to further discussion their responsibilities, and the collaboration between the two agencies.<br><br>NIJ and PRDE must provide a signed copy of Policy 20.1.  Finalization of Policy 20.2 should be a priority, including a signature by the Secretary.<br><br>Security situations should be fully examined so as not to adversely impact the availability of educational programming. Documentation of security situations must be communicated to education administrators.<br><br>Verification of training from the 2019-2020 school year should be provided as well a training schedule and verification of this year's training for teachers on institutional policies and procedures. |
| Quality Assurance Measures | The Monitor is encouraged by the documentation kept and provided relative to many of the provisions of this paragraph.<br><br>Efforts at quality assurance must also come from the DOE relative to the delivery of service, and/or must be incorporated into the Memorandum of Understanding.  . |
| Sources of Information upon which Consultant report and compliance ratings are based. | Meeting at Ponce with Carlos Delgado to view available classrooms, teacher rosters and attendance, list of students, attendance logs, and documentation regarding intake of new students.<br><br>Review of applicable policies<br><br>Collaborative Agreement between Department of Education and the Department of Corrections and Rehabilitation signed in December of 2019 |

S.A. 86  Defendants, specifically the Department of Education, shall abide by all mandatory requirements and time frames set forth under the Individuals with Disabilities Education Act, 20 USC §§ 1401 et seq. Defendants shall screen juveniles for physical and learning disabilities. The screening shall include questions about whether the juvenile has been previously identified by the public school system as having an educational disability, previous educational history, and a sufficient medical review to determine whether certain educational disabilities are present, such as hearing impairments, including deafness, speech or language impairments, visual impairments, including blindness, mental retardation, or serious emotional disturbances adversely affecting educational performance.

| Compliance Rating | Partial Compliance |
|---|---|
| Description of Monitoring process during this period of time | The Monitor met with Carlos Delgado and other education staff in Ponce on March 11th, 2020.  The visit included a facility tour, including classroom areas which were newly created on units or elsewhere for additional space.  A Functional Team meeting was held with representatives of the PRDE, DCR and PCPS, DCR's contractor for mental health services.

The Functional Team discussed findings from the Fourth Quarterly report, and identified possible roles for PCPS to assist with compliance in areas already covered in their contract with DCR.  This includes multi-faceted evaluations and re-evaluations for special education students, consultation with IEP teams, and training.

Additional records reviewed for the Fourth Quarter included:

1) List of all student receiving vocational education, including special education students

2) Verification of the provision of educational services within 5 days of arrival for eligible youth.

3)  Verification of school records for those youth in transitional measures or protective custody.

4)  Tracking Form for Initial and Re-evaluation Process |
| Findings and Analysis | This section provides a general requirement that compliance with the IDEIA is necessary in order to meet compliance requirements of this section. For purposes of complying with the IDEIA, this provision has been broken down into 4 sections as noted below:

**1) Mandatory requirements of the Individuals with Disabilities Education Act**

   **a)  Child Find**

PRDE is responsible for ensuring that Child Find provisions to locate and identify youth who may be eligible for special education are met, but must work collaboratively with NIJ instructional staff to ensure that adequate mechanisms are in place to identify when youth are appropriate for referrals.

Youth are screened at detention using an education questionnaire to determine prior educational placements, previous involvement in special education, and academic achievement.  Diagnostic testing is completed within five school days and school records are requested and obtained. Physical disabilities are noted, including visual problems, speech problems, use of medication, hearing problems, and orthopedic problems. Recommendations for testing are made including for hearing impairment, psychological, occupational therapy neurological examination, psychiatric, visual, health and/or a Woodcock Munoz. |

Documentation received from NIJ education staff indicates that 100% of new youth admitted on detention status, and who were held for a minimum of 5 days, were evaluated based upon the process noted above, including basic testing across the five subject areas. This includes 14 new admissions in January, 22 new admissions in February, and 11 new admissions in March. Two youth did not complete testing, but they left before five days. Six (6) youth did not complete testing because they were already high school graduates.  This screening and evaluation process, completed on all youth, is an excellent way in which Child Find requirements can be met.

While the screening is an important tool being used to comply with Child Find requirements, it likewise is important for regular education students as well.  Additional information has been requested but not received from the Department of Education relative to the number of students during this school year and last who have been identified through Child Find measures.  Department of Education representatives described other means by which they provide public notice in shopping areas and elsewhere to notify parents about special education services.  Parental activities are also sponsored as a way of helping parents to understand the rights they have as well as their children. A total of nine (9) youth were reported to have been identified as needing special education services this school year.  Three were evaluated and founds to be in need of specialized instruction.  The other 6 are in the process of evaluation.

Given the documentation consistently received to date, the Monitor finds this part of Paragraph 86 remains in substantial compliance.

### b) Evaluation of youth with suspected disabilities

PRDE has an obligation to ensure that youth with suspected disabilities, and those in need of re-evaluation, receive thorough multi-faceted evaluations which stretch across areas of concern as well as the identification of student strengths.  This include three year re-evaluation processes as well.

MIPE sends quarterly computer generated updates to the Monitor indicating which youth have  completed evaluations, which are about to be completed, and in which cases triennial evaluation dates have expired. The Monitor confirms these using the online MIPE system for more information about the timelines.  At the end of the quarter, MIPE's printout showed that three (3) triennial evaluations were overdue.  Two (2) other triennial evaluations were overdue but being completed.

Many of the youth who come into NIJ facilities have been out of school, or have had inconsistent educational experiences.  It is not uncommon for IEPs to be out of date, and evaluation times to have lapsed.  It is important that education staff identify when triennial evaluations are due, and work to obtain these in a timely fashion.  A question has arisen as to whether the youth remains enrolled in their local community school while the youth is detained, and whether NIJ's school program has authority and/or responsibility to ensure these evaluations are done. The Department of Education must determine ensure that the evaluations are conducted in a timely manner regardless, and

must work through whatever barriers to achieving these that the youth's status in detention may pose. That status does not obviate the requirement of a triennial evaluation, or initial evaluation, once the youth arrives in detention.

The prior plan to build two psychologists into the Title 1 funding was not possible as there were more limitations than initially thought, and a federal hold has been placed on this funding. DCR has made arrangements with PCPS to conduct some of the evaluations. This work is included in the PCPS contract, however, money spent for that purpose means there is less funding for mental health services. Representatives from PCPS at the Functional Team meeting indicated that they are currently completing three evaluations which have been overdue, and have contracted with school psychologist qualified to complete these. PRDE will be sending out requests for contracts for professionals interested in doing evaluations for youth with special needs. They will include PCPS on that list as it is the responsibility of PRDE to pay for these to be completed. In a separate email with the Monitor, PSPC indicated it is interested in pursuing this.

This section of Paragraph 86 remains in partial compliance.

### c) Provision of specially designed instruction and related services

Case reviews completed during the 4th quarter of 2019 examined aspects of the youths' Individual Education Plan (IEP), including eligibility, levels of performance, IEP goals, progress notes and the provision of specially designed instruction, accommodations and related services. Case reviews were not conducted during this quarter. Major findings from the 4th quarter include:

- The Monitor found in general that IEP goals were specific, measurable and tied to specific academic deficits in the evaluations. Improvement was seen in this area.
- Education staff can improve the development of behavior goals and strategies to improve behaviors which are impeding learning or otherwise disruptive to the educational setting.
- The Monitor discussed the need to use Functional Behavioral Assessments (FBA) as a method to better identify behavior interventions and support. FBAs should result in goals to teach replacement behaviors, along with a Behavior Intervention Plan (BIP) with strategies to modify the curriculum, environment, activities to prevent the challenging behaviors. These plans should also include positive reinforcements and supports for youth once they are engaging in the new skills.
- Placements described in the IEPs are generally the same for all youth, and provide assistance in Spanish and Math five days a week for an hour each. Given the youth reviewed, the amount of specially designed services provided, and the settings in which they are provided should be more varied and individualized.

| | |
|---|---|
| | • Progress notes are kept on each youth, and a review of progress is done every 10 weeks, including notification of parents.  Changes to the IEPS are generally not made unless the youth's 10 week progress reviews are consistently showing low marks. |
| | • Related services are often included, and usually refer to services provided for mental health, such as "psychological services 2 times per week."  This is provided by PCPS, as part of the overall treatment the youth is receiving in the facility. |
| | This provisions remains in partial compliance and should be a high priority for improvement over the next year.  Additional training for education staff is highly recommended, particularly in individualizing service needs, and creating behavioral supports as part of the IEP. |
| | **d)  Procedural safeguards** |
| | Policy 20.2 must be amended to ensure that procedural safeguards required by IDEA are included. A policy draft of Policy 20.2 was returned in February of 2019 with instructions to include a section regarding the procedural safeguards in IDEIA. |
| | File reviews through MIPE seemingly do not designate a "parent" for purposes of enforcing education rights. There is no indication that NIJ/PRDE has a system for providing surrogate parents, although a draft of the new policies will include such. |
| | Procedural rights must also ensure that parents (as designated) are provided adequate opportunities to participate in and challenge decisions made regarding the identification, evaluation, eligibility determination, and IEP services for their child. |
| | Strong parental participation in educational services for youth in special education can have a dramatic and positive effect on the youth's success.  Maximizing ways to engage parents is often difficult in correctional settings.  The Monitor looks forward to better understanding the ways in which educational staff have and will continue to engage parents. |
| | This section of Paragraph 86 is in partial compliance. |
| What is needed for compliance to be achieved? | NIJ and PRDE submitted substantially improved and updated policies consistent with requirements of the S.A as well as IDEA.  Policy 20.2 must be finalized and signed for this section to be in compliance. |
| | Initial evaluations and re-evaluations must be completed in a timely manner, and in accordance with the provisions of IDEA. Under 34 CFR §300.305(a)(1), the IEP Team and other qualified professionals, as appropriate, as part of an initial evaluation and as part of any reevaluation under 34 CFR Part 300, must: "Review existing evaluation data on the child, including—(i) Evaluations and information provided by the parents of the |

| | |
|---|---|
| | child; (ii) Current classroom-based, local, or State assessments, and classroom-based observations; and (iii) Observations by teachers and related services providers." |
| | For youth who are in detention status, and who had a re-evaluation which is overdue or an initial evaluation which has not been completed, this process must be worked out with the local district to ensure the evaluation gets completed. Because some youth remain in detention for extended periods, the evaluation process cannot be delayed until the youth returns to their local community. |
| | IEPs must include an individualized determination of disability, special considerations, including behavioral plans when appropriate, and a range of placement options, including the availability of resource rooms and a self-contained classroom if necessary. Staff should be trained on the use of Functional Behavioral Assessments and the Development of Behavioral Intervention Plans for those youth with significant behavioral and emotional problems which impede learning, and/or disrupt the classroom setting. |
| | The use of surrogates when necessary, must be examined. While it may be possible that an NIJ social worker may stand in for a parent, this must be a parental designation and not one made by NIJ or PRDE. Policies and practices must also ensure other procedural safeguards for the participation of parents as well as youth. |
| Priority Next Steps | Policy 20.2 must be finalized and signed by the Secretary. |
| | Continue substantial compliance on Child Find requirements, including initial screenings done on youth within 5 days of intake. Provide information about the number of youth identified through this process, if any. |
| | PRDE must ensure that COMPU meetings are conducted prior to the request for an evaluation or re-evaluation, and that such meetings comply with the requirements of the regulations under IDEA as to purpose, timing and outcomes. The tracking form established by NIJ must be accurately completed, and should trigger the timeframes for completion of a new evaluation or re-evaluation accurately. This should be cross-checked with the MIPE system. |
| | Evaluations and re-evaluations are the responsibility of the Department of Education and must be completed irrespective of whether the youth is in a community school or NIJ facility. |
| | PRDE must ensure that there are proper procedures for identification of "parents" and that such individuals meet the definition within IDEA, or are designated by such person, and that surrogate parents are also available as needed. Metrics for Procedural Safeguards will be developed and monitored. |
| | PRDE should increase oversight of special education teachers to ensure that youth are properly identified, that IEPs and the services provided as a result, are individualized as to student need, including the type of placement available to the youth. Adequate |

| | |
|---|---|
| | resources must be in place to provide a greater level of service to youth depending upon their needs.<br><br>The Monitor encourages the use of PCPS to assist in the evaluation process, training and development of IEPs, particularly for those students with behavioral challenges. If interested, PCPS can apply for a service agreement with PRDE for these functions when requests for proposals become available again in the spring. |
| Quality Assurance Measures | The monitor has not yet reviewed draft quality assurance. |
| Sources of Information relied upon | Interviews with NIJ and PRDE staff<br>Documentation review of policies and procedures<br>Review of documentation regarding student schedules, attendance of staff and youth, disability categories and time spent in special education by facility<br>Tour of facilities and classrooms at Ponce<br>Phone calls and emails |

**S.A. 87**. If a juvenile has been previously identified as having an educational disability, Defendants shall immediately request that the appropriate school district provide a copy of the juvenile's individualized education plan ("IEP"). Defendants shall assess the adequacy of the juvenile's IEP and either implement it as written if it is an adequate plan or, if the IEP is inadequate, rewrite the plan to make it adequate, and then implement the revised IEP.

| Compliance Rating | **Partial Compliance** |
|---|---|
| Description of Monitoring process during this period of time | The monitor previously reviewed the procedures and forms for requesting documentation on youth from prior school districts when admitted to detention. This includes the youth's cumulative file through SIS and the special education file through MIPE.<br><br>Case reviews completed in the Fourth Quarter provided information on the adequacy of IEPs and when changes are made if inadequate. |
| Findings and Analysis | Appropriate policies are in place to require that records of the youth's IEP are obtained immediately from the appropriate district. Records must be requested within 10 business days after the screening is done and the youth has indicated he or she has an IEP. The youth is enrolled in school within 72 hours. Documentation about starting dates was reviewed and consistently showed youth begin their classes within a couple of days. This part of Paragraph 87 appears to be compliant.<br><br>Two systems have been put in place electronically for securing regular and special education records of students. The Department of Education has been operating MIPE (My Education Portal) since 2012. Students eligible for special education are registered in this system, and any district, including the schools within NIJ facilities, can pull these records on a student they receive within their school. Access is available immediately. |

|  | Some students, however, may have files that are "inactive" due to disruption in the youth's education.  In these cases, education staff indicated that they send a request manually for a copy of the records.  A copy of the form was noted which documents this request in the youth's file.  In several cases this quarter, it appears that youth were admitted to detention with an outdated IEP, and that a new IEP was created once the youth was in the facility.<br><br>The Student Information System (SIS) similarly provides student information on all youth registered for school in Puerto Rico, and interplays with MIPE.  NIJ facilities are now on line and can obtain this information immediately when it is available in the system.<br><br>The requirements of this provision as to obtaining records appears to be in compliance.  IEPs are not always available through MIPE if the youth is "inactive" in the system. The rest of this section remains in partial compliance. |
|---|---|
| What is needed for full compliance?<br><br>What steps are required and/or recommended? | All special education files should contain a records of annual IEP reviews, and other reviews of the IEP done during the year as needed.  A system of reviewing IEPs must align with a 12 month calendar year, or more often if needed.<br><br>Youth with an outdated IEP upon arrival must have a COMPU meeting to develop a new IEP based upon the latest evaluation, and when that is out of date, a referral for a new evaluation must be promptly made. |
| Priority Next Steps | Ensure that the appropriate COMPU meetings are held to review the youth's IEP goals and progress, present levels of performance, and any needed changes to the IEP's goals, measurable objectives, accommodations and placement.<br><br>Clarify with Department of Education the responsibility and authority for re-evaluation when youth are detained and community schools still hold the youth's enrollment status. |
| Quality Assurance Measures | Education QA tools have not been reviewed by the Monitor but have been requested so they can be reviewed. |
| Sources of Information upon | Review of screening and evaluation materials completed while youth are detained<br>Review of documentation used to request and follow up on records<br>Discussions with PRDE and NIJ education staff<br>Review of monthly documentation tracking special education deadlines for evaluations and IEP reviews. |

**S.A. 90**. Defendants shall provide appropriate services for juveniles eligible for special education and related services. Defendants shall provide each such juvenile with educational instruction specially designed to meet the unique needs of the juvenile, supported by such services as are necessary to permit the juvenile to benefit from the instruction. Defendants shall coordinate such individualized educational services with regular education programs and activities.

| Compliance Rating | Partial Compliance |
|---|---|
| Description of Monitoring process | See above generally Paragraph 86 for a discussion of the provision of specially designed instruction and the Case Reviews conducted during the Fourth Quarter. |

**S.A. 91.** Qualified professionals shall develop and implement an IEP reasonably calculated to provide educational benefits for every juvenile identified as having a disability. When appropriate, the IEP shall include a vocational component.

| Compliance Rating | Substantial compliance |
|---|---|
| Description of Monitoring process during this period of time | The Monitor reviewed the qualifications, including records of certifications, for special education staff at the beginning of the 2018-2019 school year.  The Monitor received a copy of the 2019-2020 staff list for both facilities.  A request was made for the credentials, including certifications of any new staff for this school year.

A review of all youth schedules for regular and special education students was completed, including vocational education classes. |
| Findings and Analysis | Staff responsible for the development of IEPs are the special education instructors, who are training in working with students with disabilities and the creation of IEPs.  An adequate number of special education staff are employed in the two facilities, with the exception of providing coverage to youth in PC and TM status.  Resources appear adequate to provide IEP services to youth. DOE should provide information regarding training provided to special education teachers employed at NIJ facilities regarding IEP development and implementation.

A review of the special education student schedules in both facilities for the First Quarter indicates that all special education students were enrolled in vocational classes. Likewise, this portion of Paragraph 91 is compliant.

The extent to which IEPs are developed and implemented to allow youth to achieve academic benefit is monitored through Paragraph 86. |
| What is needed for full compliance?

What steps are required and/or recommended? | The monitor believes that the policies and procedures, training, staff and resources are available to ensure that this provision is in compliance. A system of documentation has been created which is thorough and which appears to follow the requirements under IDEA for the creation and implementation of IEPs.

The provision of vocational education is incorporated into policy and, while not mandatory in all cases, has been an integral part of providing more robust educational services for youth in NIJ and is offered consistently.

IEPs must be designed based upon the individual needs of the youth.  Such determinations as made as part of the Paragraph 86 compliance ratings. It is important to note the relationship between well designed evaluations which include all areas of |

| | concerns, proper identification of youth disabilities and levels of performance, and the individualization of a plan which can meet the specific needs of those youth, including the level of service afforded, special aids and supports, accommodations, and related services.  Paragraph 86 ties those provisions together through file reviews, youth and teacher interviews, and observations. |
|---|---|
| Priority Next Steps | Ongoing monitoring over the next year will ensure that all provisions in place are being implemented fully and faithfully. |
| Quality Assurance Measures | The Monitor has not reviewed proposed QA measures. |
| Sources of Information | All youth schedules including the provision of vocational instruction<br>Review of Policies and procedures |

**S.A. 93** Services provided pursuant to IEPs shall be provided year round.  Defendants shall ensure that juveniles with educational disabilities receive a full day of instruction five (5) days a week.

| Compliance  Rating | Substantial Compliance |
|---|---|
| Description of Monitoring process during this period of time | The Monitor met with Carlos Delgado about the provision of extended school year services during her March monitoring visit.   The process of identifying, approving and providing services to youth who may require extended school year services (ESS) begins early in the calendar, and requires the approval by the Department of Education of youth who are deemed eligible.<br><br>Data concerning youth eligible for extended school year services in 2020 was received during the first quarter. |
| Findings and Analysis | Year round school services to special education students must be provided to students who "prior to the corresponding evaluations, require this service in order to avoid falling back in their academic skills and performance." (See policy 20.2 Section V)<br><br>During the 2018-19 school year, NIJ submitted data to the PR Department of Education to qualify a number of students for extended school year.  Data from September through December of 2018 was analyzed for grades, IEP progress, and student needs according to a formula established by the PRDE.  Documentation was received that three youth at Ponce and five youth at Villalba qualified for extended school services (ESS) for five hours per day.  All IEPs were modified to reflect the youth's eligibility for this service.  Documentation reviewed on site showed that that these youth received the services from a qualified special education teacher for the designated time during the month of June.  Only one youth did not receive much of the service provided, and this was by choice. |

| | Education staff provided information to the Monitor for the 2019 – 2020 school year which includes 8 youth in Villalba and 7 youth in Ponce who are eligible for extended school services. Youth who are eligible will receive 5 hours per day of instruction during the summer schedule. Two special education teachers in each facility have been approved to work with this program over the summer. |
|---|---|
| | The Monitor finds this provision to be in Substantial Compliance and acknowledges the good work staff did in providing this extra serviced needed for some students. |
| What is needed for full compliance? | Policies are already in place which address the need for Extended School Services. |
| | An annual review of youth eligible for ESS should be made in the fall and submitted to the PRDE for consideration. Qualified teachers must be retained each year to provide ESS to eligible students. |
| Priority Next Steps | The program for ESS should be conducted through the summer months in accordance with Department of Education guidelines. |
| Quality Assurance Measures | Quality assurance measures should be established to ensure that such provisions are made in a timely manner, and that youth who are eligible received the service with a qualified teacher. |
| Sources of Information | Documentation as submitted to PRDE concerning students eligible for ESS, and teachers available and designated for this service. |

**S.A. 94.** Juveniles shall not be excluded from services to be provided pursuant to IEPs based on a propensity for violence or self-inflicted harm or based on vulnerability. Juveniles in isolation or other disciplinary settings have a right to special education. If required for institutional security, services provided pursuant to IEPs may be provided in settings other than a classroom.

| Compliance Rating | Partial Compliance |
|---|---|
| Description of Monitoring process during this period of time | The Monitor has reviewed and approved the final version of Policy 20.1 which requires NIJ to provide 6 fifty (50) minute classes daily to youth in transitional measures or protective custody unless they have already graduated. A request that this be signed has been made to the Secretary's office. |
| | The Monitor received and reviewed documentation of education services regarding 2 youth in transitional measures and/or protective custody. |
| | NIJ maintains a tracking for to document times when youth may be excluded from school as a result of administrative actions taken, incidents, or the unavailability of security staff within the school. These incidents were reviewed by the Monitor for the First Quarter. |

| | |
|---|---|
| Findings and Analysis | There are three sections to Paragraph 94 which must be monitored:<br><br>1)  Whether youth who have an IEP are excluded from services based upon a propensity for violence or self-inflected harm or based on vulnerability.<br><br>2)  Whether youth in "isolation or other disciplinary settings" are provided the right to special education services; and<br><br>3)  Whether educational services provided pursuant to an IEP occurring in settings outside of the classroom are required for institutional security.<br><br>**Services to Youth in TM or PC Status**:<br><br>NIJ revised Policy 20.1 to require full day educational services be provided to youth in Transitional Measures or Protective Custody who have not already graduated.  The requirement is for 6 fifty (50) minute classes, the same afforded other students. Compliance with this new policy positively impacts several provisions of the Consent Decree, including the educational requirements of Paragraphs 79 and 80, Paragraph 81, and Paragraph 86.  This policy must still be signed by the Secretary.<br><br>Verification of school services is made through examination of each youth's education schedule, and examination of daily attendance records, signed by each teacher, and by the student.  For those dates when the youth did not receive a full school day, accompanying explanatory notes are examined.<br><br>Placement in Transitional Measures and/or Protective Custody for the quarter was low, with only 2 youth eligible for school services.<br><br>The Monitor reviewed educational services provided to one youth who was in Transitional measures during much of December and January, but for only 3 days during which school was in session. A review of the daily schedule notes times and dates each class was provided, with signatures by the teacher providing the service. Full school days with 6 classes were held for this youth on the first and third days. On the second day, 3 classes were held.<br><br>The second youth was in PC status starting and should have had classes from January 21 – February 5, after which the shutdown as a result of coronavirus began.  During that time, 2 ½ days are noted off for staff training, between January 21 and January 31. During the remaining dates in January, school was provided every day for 6 fifty minute periods.  This youth completed his GED during that time.<br><br>**School exclusion for other youth**<br><br>A tracking form is used to document when school services are not available as a result of register, incidents such as fights, lack of available security or other reasons not the fault of youth.  During the First Quarter, information received suggests that school was cancelled all day for some or all units on 10 days during the quarter.  The following |

breakdown suggests that lack of officers and security issues are the primary reason this is occurring.

| Date | Facility | Time | Groups | Reason(s) |
|---|---|---|---|---|
| 1/16/20 | Ponce | 8-3:00 | Sumariados | Fight |
| 2/3/20 | Ponce | 8:00 – 3:00 | Sumariados | Youth rejected services |
| 2/7/2020 | Villalba | 8 – 12:00 | Level 4 & % | No officers |
| 2/14/20 | Villalba | 8:00 – 3 | Detention | Security situation |
| 2/20/20 | Villalba | 8:00 – 3 | Special ed | No officers |
| 2/21/20 | Villllaba | 8:00 – 3 | Detention | No officers |
| 2/26/20 | Villalba | 8:00 – 3 | Level 4 & 5 | No officers |
| 2/27/20 | Villalba | 8:00 – 3 | Detention | Security Situation |
| 3/11/20 | Ponce | 8:00 – 3 | Level 2, 3 and girls | Physical plan issues |
| 3/13/20 | Ponce | 8:00 – 3 | Level 2, 3, and girls | Security issues and searches |

NIJ must be have sufficient staff to enable officers to provide security in the school setting. The school program is available on a daily basis and scheduled to serve all youth.

For youth on group modified schedules, documentation should be provided if the schedule interferes with youth getting a full school day.  A process for better tracking group modified schedules is being developed to make it easier to determine if any of the incidents above were the result of a modified schedule.

**Classroom and Education Staff for TM**

In order to properly implement the new policy, NIJ must have sufficient educational staff to serve these youth, and the physical resources needed to conduct classes in a safe environment.  At Ponce, there are 2 rooms which have been set up for TM or PC youth which were operational - one in room by small recreation court, the other in Unit D. Two classrooms were also set up on unit for youth in detention to help with space issues in the regular classrooms. The units all have cells behind the control room, some of which are in the process of being converted for use for additional classrooms.  One is outside the PUERTAS Unit and has a cage around it with a lock.  Similar areas have been

| | |
|---|---|
| | created at Villalba. This should be sufficient given the low number of youth on TM or PC status. |
| What is needed for full compliance?<br><br>What steps are required and/or recommended? | Compliance with the new policy will require that NIJ consistently provide full school days of 6 fifty minute classes in accordance with individual schedules for youth who are in TM and PC and who have not graduated from high school.  There has been a concerted effort made to schedule each of these youth for services, and to have education staff available.  This has been working well for the most part for the last 3 quarters since the policy was changed.<br><br>Coordination with security staff is essential to limit the disruption to the school schedule as best possible, and to ensure that youth receive the required services.  Continued documentation and analysis of days where youth do not receive services due to other reason is critical.<br><br>The continued use of alternative classrooms is a positive move. NIJ should continue to ensure the necessary personnel and resources to approximate as best possible the regular school setting.<br><br>Time documentation of youth receiving education in TM and PC status, as well as any changes with implementation of Group Schedule Modification which interfere with educational programming. |
| Priority Next Steps | Work with security staff to minimize cancellations of school due to lack of officers. |
| Quality Assurance Measures | No QA has been reviewed for this provision but the Monitor. |
| Sources of Information upon which Consultant relied | Review of policies and procedures relative to education<br>Discussion with education staff<br>Review of tracking form regarding removals due to security or other instances.<br>Review of education records of one youth in TM and PC status. |
| **S.A. 95.** When an IEP is ineffective, Defendants shall timely modify the IEP. | |
| **Compliance Rating** | **Partial Compliance** |
| Description of Monitoring process | See above for discussion of this section.  Fourth quarter monitoring efforts included on-site file reviews and discussion of cases to determine whether this provision is compliant.   No additional case files were monitored during the first quarter. |
| Findings and Analysis | See discussion above. |

| What is needed for full compliance?<br><br>What steps are required and/or recommended? | Good data must be kept on student goal achievement, and should reflect student progress for meeting IEP goals, and receiving academic benefit from instruction provided.  Student files reviewed indicated that reviews are completed every 10 weeks on students, and information on progress is sent to parents.  This practice, when done consistently, provides the youth and parents with good benchmarks for the year, but should also provide indicators for when IEPs may need to be modified.<br><br>Supervision of IEPs and data collection should provide indicators of whether such progress is being achieved with each student.  PRDE must have a system of providing oversight of special education teachers to monitor their development of IEPs, as well as progress and benchmarks achieved.<br><br>Full compliance with this provision is met when Paragraph 86 reaches full compliance. |
|---|---|