**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

**THE UNITED STATES OF AMERICA**

**Plaintiff,**

**v.**                                   **CIVIL ACTION NO. 94-2080 (GAG)**

**COMMONWEALTH OF PUERTO RICO**

**Defendant,**
_____

**INFORMATIVE MOTION TO APPROVE MONITOR'S
SECOND QUARTERLY REPORT FOR 2020**

The Monitor hereby submits her Second Quarterly Report for 2020 covering the period of

April 1 – June 30, 2020 regarding compliance on the remaining issues in this case.  This report is

submitted after review and comment by the Parties.

**Submitted  by:**

**/s/Kim Tandy**
Kim Tandy, Federal Monitor
United States v. Commonwealth of Puerto Rico
SPEHCE, VIG Tower
1225 Avidena Ponce de Leon, Penthouse Floor, Office #7
San Juan, Puerto Rico   00907
kimtandy@justicebydesign.net
317-840-9332

**Certificate of Service**

I HEREBY CERTIFY that this, I electronically filed the foregoing with the Clerk of the Court on September 3, 2020 using the CM/ECF system, which will simultaneously serve notice of such filing to counsel of record to their registered electronic mail addresses.

Respectfully Submitted,
/s Kim Tandy_____
**Kim Tandy**
Federal Monitor, United States v. Commonwealth of Puerto Rico
SPEHCE, VIG Tower
1225 Avidena Ponce de Leon, Penthouse Floor, Office #7
San Juan, Puerto Rico   00907
kimtandy@justicebydesign.net
317-840-9332

# Commonwealth of Puerto

Civil Action No:  3:94 –cv-02080 (GAG)

## Monitor's Second Quarterly Report

### April 1 – June 30, 2020

Kim Tandy, Federal Monitor
USACPR Monitoring, Inc.
kimtandy@justicebydesign.net
317-840-9332

Monitoring Team:
David Bogard, MPA, JD
Javier Burgos, JD
Robert Dugan
Miriam Martinez, PhD
Curtiss Pulitzer, AIA

# EXECUTIVE SUMMARY

The COVID-19 pandemic has altered operations within NIJ facilities in significant ways during the second quarter of 2020.  Similarly, because of stay at home orders impose by the Governor, monitoring of the facilities was necessarily adapted to meet the current set of circumstances.  This Court entered an Order on 4/20/2020 authorizing and directing the Monitor to "use all available technology to continue to perform all monitoring functions during the COVID-19 pandemic…… includ(ing) but not limited to, visits to NIJ facilities, meetings, interviews with youth and staff, as well as the electronic transfer of documents and/or photos." (Docket No. 1489)

The Monitoring team has had several briefings by the Department of Corrections and Rehabilitation, formally and informally, on measures taken in the facilities to educate staff and youth about COVID-19 symptoms, precautions, and protocols in place.  A daily count was provided to the Monitor and her team for much of the quarter regarding the number of youth and staff who were tested, those who tested positive, and those in quarantine or in medical isolation. DCR and the NIJ staff should be commended for their diligence in protecting youth and staff from the spread of the coronavirus in the NIJ facilities.

 The Monitoring team met separately to create a plan for monitoring each area of the Settlement Agreement, and submitted this plan to DCR and the United States Department of Justice on May 4, followed by a conference call the next day to discuss the particulars.  Monitoring has continued, although primarily from remote locations. The Governor's Orders limited many staff deemed nonessential from going to the facilities or to Central office.  Social workers, for example, were not in the facilities during this quarter.  Much of the Central Office was home furloughed, and unable to access information from the office.  This has had an impact on many of the routine reports received daily, weekly, or monthly.  OISC investigations have been delayed as a result of not being in the facilities during part of the first and second quarters.  Training has not occurred except in limited circumstances. School services have been improvised based upon guidance from the Department of Education, but without teachers and without using remote access. Special education services were not provided, and other provisions such as evaluations, IEP meetings, and extended school year services did not occur.

On the positive side, the Monitoring team and staff have held multiple videoconferences and conference calls with staff to administration of DCR to continue to collaborate on pending issues, move forward on various Orders from the Court, and discuss other compliance issues.  Video conferencing with youth was done through Dr. Miriam Martinez, Javier Burgos and the Monitor during the quarter.   A site visit was arranged through the Secretary of DCR by Deputy Monitor Javier Burgos, with precautionary steps taken to protect both Mr. Burgos as well as other in the facility.

Substantial changes in leadership within NIJ occurred soon after the escape of five sumariado youth from Ponce in the early morning of May 10th.  Subsequently, Gineima Ojeda Richardson was appointed as Director of the NIJ, and Sgt. Idelfonso Morales Santiago as the new Security Director.  Given long standing concerns regarding security and safety of youth, the Monitor asked new leadership for a special report within 30 days to address some of these issues and her plans moving forward.

The Monitor appreciates the efforts of her team, counsel for both parties, and the many NIJ staff and leadership with whom we work daily on compliance issues.

A summary of compliance ratings for the remaining sections is found below.

| Parag. No. | Compliance Provision | 3rd 2019 | 4th 2019 | 1st 2020 | 2nd 2020 |
|---|---|---|---|---|---|
| Physical Plant | | | | | |
| S.A. 31 | Facilities conforming to Building Codes | PC | PC | PC | PC |
| C.O. 43 | Sufficient funding for Implementation of C.O. | PC | PC | PC | PC |
| S.A. 45 | Agency Policy and Procedure Manual for all operations | PC | PC | PC | PC |
| S.A. 50 | Training for current and new direct care staff | PC | PC | PC | NC* |
| S.A. 48 | Sufficient Direct Care Staff | NC | NC | NC | NC |
| Jan 2009 Para. 1 | Reasonable Safety of Youth through Adequate Supervision | NC | NC | NC | NC |
| Parag 2 | Sufficient Staff to Implement Decree and adequate supervision | NC | NC | NC | NC |
| Parag 3 | Training for social workers if direct care staff | na | na | na | na |
| Parag 4 | Persons Hired to be Sufficiently Trained before deployed | na | na | na | SC |
| Parag 5 | Submission of monthly staffing report | PC | PC | NC | PC |
| S.A. 52 | Classification | NC | PC | PC | PC |
| S.A. 77 | Use of Force | PC | PC | PC | PC |
| S. A. 78 | Investigations into Alleged Abuse and Maltreatment of Youth | PC | PC | PC | PC |
| S.A. 79 | Restrictions on Isolation | PC | PC | PC | PC |
| S.A. 80 | Protective Custody | PC | PC | PC | PC |
| S.A. 59 | Treatment Plans for youth with Substance Abuse problems | PC | PC | PC | PC |
| C.O. 29 | Residential Mental Health Treatment Program | PC | PC | PC | PC |
| S.A. 36 | Continuous Psychiatric and Psychological services | PC | PC | PC | PC |
| S.A. 63 | Reducing Risk of Suicide | PC | PC | PC | PC |
| S.A. 72 | Emergency Psychotropic Medication | SC | SC | PC | PC |

| S.A. 73 | Behavior Modification/Treatment | SC | SC | PC | PC |
|---|---|---|---|---|---|
| S.A. 81 | Provision of Academic and Voc. Education to All Youth | PC | PC | PC | PC* |
| S.A. 86a. | Compliance with IDEA Requirements and Timeframes | PC | PC | PC | NC* |
| S.A. 86b. | Screening for youth with Disabilities (Child Find Provisions) | SC | SC | SC | NC* |
| S.A. 87 | Obtaining IEPs of Eligible Youth | PC | PC | PC | NC* |
| S.A. 90 | Delivery of Specially Designed Instruction and Related Services | PC | PC | PC | NC* |
| S. A. 91 | Qualified educational professionals and voc. Ed | PC | SC | SC | NC* |
| S.A. 93 | Year Round Services for youth with IEPS | SC | SC | SC | NC* |
| S.A. 94 | Services to youth in isolation or other disciplinary settings | PC | PC | PC | NC* |
| S.A. 95 | Modification of IEPs | PC | PC | PC | NC* |

## Compliance Ratings, Analysis and Recommendations

The Settlement Agreement requires that the Court retain jurisdiction of remaining claims "until such time as the Commonwealth has fully and faithfully implemented all requirements of the agreement and such full compliance has been maintained for one year." (S.A. 103). The Monitor and Consultants use a three-tiered system in this report defined as follows:

***Substantial Compliance*** shall mean a level of compliance that does not significantly deviate from the components of the provision, provided that any deviation poses no significant risk to detainee health or safety. Substantial Compliance indicates that there are approved relevant policies and procedures which, when implemented, are sufficient to achieve compliance; trained staff responsible for implementation; sufficient staff and resources to implement the required reform; and consistent implementation of the procedures during the majority of the monitoring period. Substantial compliance also requires that the procedures accomplish the outcome envisioned by the provision.

The substantial compliance rating is given only when the required reforms address all of the issues discussed in the provision and when solid implementation of the reforms has been consistently demonstrated, through reliable data, observations and reports from staff and youth, for a majority of the monitoring period.

***Partial Compliance*** indicates that compliance has been achieved on some of the components of this provision, but significant work remains. It indicates that there are approved relevant policies and procedures which, when implemented, are sufficient to achieve compliance; trained staff responsible

for implementation; and sufficient staff and resources to implement the requirements of the provision. Partial compliance indicates that while progress has been made toward implementing the procedures described by policy, performance has been inconsistent throughout the monitoring period and additional modifications are needed to ensure that procedures are sufficiently comprehensive to translate policy into practice, and to accomplish the outcome envisioned by the provision. Partial compliance is appropriate if policies may need minor revisions for compliance with the Settlement Agreement provided other requirements of this section are applicable.

**Non-compliance** indicates that most or all of the components of the provision have not yet been met. Examples include provisions where policies still need to be overhauled, the majority of staff may need to be trained, procedures may not have been developed, documentation may not be in place or consistently provided, and there has been no determination that the procedures accomplish the outcome envisioned by the provision.

*Because of the unique circumstances during this quarter as a result of the pandemic, the Monitor has noted that compliance in the areas of training and education were significantly hampered. The government lockdown for much of the quarter resulted in teachers being unavailable to conduct classes in person, and NIJ did not provide remote services. No special education services were provided during the quarter. NIJ provided minimal services to youth in the form of packets based upon grade and subject; completion of these packets allowed students to pass on to the next grade, but fell far short of compliance with the Settlement Agreement, particularly in the area of special education. Aggressive plans for the coming school year can reverse the non-compliance ratings for education in the Third Quarter.

## PHYSICAL PLANT - Curtiss Pulitzer

| S.A. 31 Existing facilities expected to be occupied by juveniles beyond Fiscal Year 1996-1997 shall conform to applicable federal, state, and/or local building codes. | |
|---|---|
| **Compliance  Rating** | **Partial Compliance** |
| Description of Monitoring process during this period of time | The Monitor's office has now received drafts of all the documents being developed by NIJ/DCR's consulting architect Javier Valentin relative to compliance with this provision. As stated in the last quarterly report, the last two reports on ADA compliance and the INTERNATIONAL BUILDING CODE 2009 and PUERTO RICO BUILDING CODE 2011, were received last quarter. The Monitor's Consultant reviewed and made edits to these reports, and has shared those comments with NIJ and Mr. Valentin.<br><br>Due to the earthquakes in Puerto Rico followed by the Covid-19 pandemic, the Monitor's Consultant has not been able to make any site visits. In lieu of site visits, the Monitor's Consultant initiated a self-reporting process for the last quarter wherein NIJ were using the spread sheet formats utilized by the Monitor's Consultant during his regular site visits. In addition, due to the need to maintain hygiene at all times due to Covid-19, NIJ agreed to use the plumbing matrix developed by the Monitor's Consultant |

| | |
|---|---|
| | several years ago when plumbing was still being monitored by this office. This was agreed to in a functional team conference call on April 6th.<br><br>In addition, the Monitor's Consultant reviewed the schedule for implementation of the CAPEX projects as well as the Paragraph 31 work with NIJ and Mr. Valentin. Funds were to become available in July when the fiscal year started. The Monitor's Consultant has since received a revised schedule for this work which is attached to this report.<br><br>A second functional team meeting was scheduled for late June but actually occurred on July 6th. We reviewed the edits made by the Monitor's Consultant to the most recent codes reports as well as the necessary modifications and reviewed the Paragraph 31 improvements. More information will be included in the Third Quarterly Report on this meeting. |
| Findings and Analysis | Facility assessment matrices were received for Ponce for the months of May and June and for Villalba for the months of April and June. In Ponce, there were two air conditioning units that were not functioning in Modules 4 and 6 in one wing of rooms, and two that were not functioning in Module 8, PUERTAS, in one wing of rooms and in the dayroom. Ponce continues to have persistent air conditioning problems. Not having sufficient cooling in Puertas is a health issue, especially in the summer months, as the juveniles housed there are on medication and need to be living in a cool environment. For Villalba the April report showed all air conditioning units functioning but the June report had two non-functioning units.<br><br>Plumbing assessment matrices were received for the months of April, May and June for Ponce and Villalba. For Ponce, there were no reported broken fixtures in April and June and there was hot water only reported for the month of June; it was left blank for April and May. Also, in May there was one broken toilet in living unit 6 which appears to have been fixed by the June report. For Villalba there was hot water reported in all the living units for all three months and in April there were 2 broken urinals in living unit B-2 as well as low water pressure but these issue were apparently fixed in the May report. There were no other issues reported in May or June.<br><br>The two latest codes reports were reviewed but contain many syntax, grammatical and spelling issues.  It was suggested by the Consultant, and agreed to by Mr. Valentin, that a professional editor was needed to recompile all the documents into a coherent document in proper English. In addition, the Monitor's Consultant noted that a few minor code violations described in the codes reports did not appear to have a corresponding budget allocation in the approved construction budget.  Mr. Valentin agreed and said he would address them in the development of the construction documents but felt there was still enough money in the overall appropriation, $373,707.09 for Ponce and $340,448.29 for Villalba, to cover these items. We discussed the procurement process and the concern that the projects would be bid out close to the election. In Puerto Rico there is a law that no new funding and/or contracts can be executed during the election season until the new Governor is inaugurated. NIJ assured the Monitor's Consultant that as these were existing appropriations there would not be an issue moving forward in the Fall. |

| | |
|---|---|
| | The Monitor's Consultant has also been monitoring the progress being made to comply with suicide prevention measures (See below and Para 79) in juvenile rooms, and continues to monitor fire safety conditions, plumbing and air conditioning through conversations, self-reporting documents and e-mails from NIJ to confirm that all housing units are functional and safe for juveniles to occupy.<br><br>As reported in the last quarterly report, there has been some positive movement in creating a solution in preventing suicides from occurring by a juvenile attaching a ligature to the hinges in juvenile room doors. All the rooms in the PUARTAS housing module in Ponce were retrofitted, as have three rooms in each of the seven remaining living modules in Ponce. Mr. Ortiz from FMO, reported that there has been no work performed yet in Villalba but that the metal flanges for the retrofit work were being fabricated and that work would commence shortly. Mr. Ortiz reported that the hinge covers at Ponce were about to be painted.<br><br>The replacement of air vent grilles with suicide resistant versions on the lower levels of the housing units at Ponce and Villalba have all been completed as reported in the last quarterly report . The Monitor's Consultant was told that the DCR brigades had applied security caulking at the edges of the vent grills to prevent the possibility of a ligature from being threaded through the edge of the grill in many of the juvenile rooms, but we have not been given an exact count yet. Application of the security caulking should prevent this from happening. In addition, this would prevent juveniles from sliding paper through these same gaps which impedes air conditioning air flow into the rooms. |
| What is needed for full compliance? What steps are required and/or recommended? | The Monitor's Consultant did have a follow up Go To Meeting call with Mr. Valentin regarding the comments and edits to the two latest reports.  As stated above, all three reports the IBC and Puerto Rico Building Codes, the Americans with Disability Act, and the NFPA Life Safety Code, must be compiled into one cohesive document and include all the edits and comments transmitted to Mr. Valentin to date. Mr. Valentin stated that he will hire a professional editor fluent in English to create the next round of reports for the Monitor's office to review.<br><br>The Monitor's Consultant will continue to monitor the projected schedule for completion of the documents to allow the bidding for the proposed construction work for Paragraph 31. In addition, the Monitor's Consultant will continue to monitor the progress for the CAPEX repairs budgeted for Ponce and Villalba.<br><br>The Monitor's Consultant would like to see a prioritization of for Paragraph 31 construction projects so that any mitigation of violations that affect Life Safety, and cannot be initially mitigated operationally, should have the highest priority for implementation.<br><br>While on-site visits to understand better the proposed capital projects as well as on-site inspections to review the progress of work once it commences is unlikely for several months, the Monitor's Consultant will be requesting progress photos and videos or perhaps live FaceTime tours of Ponce and Villalba. |

| Priority Next Steps | The Monitor's Consultant realizes and appreciate that the on-going earthquakes which have occurred in Puerto Rico coupled with the Covid -19 crisis have placed additional constraints on NIJ staff to ensure that facilities are safe.

NIJ is to hopefully continue retrofitting the door hinges in Villalba.  A schedule for work completion will be requested from Mr. Ortiz

NIJ must make the needed CAPEX repairs using the now available funds as the new fiscal year has commenced. Sufficient funding should be allocated to make additional repairs in the next 2021-2022 fiscal year.

The caulking of the air vent grills should be finished by the brigades hopefully this quarter.

Due to the Covid-19 crisis, the Monitor's Consultant will continue to meet virtually with NIJ and their consultant Mr. Valentin. The consultant will also rely on self-reporting by NIJ on existing physical plant issues that affect the health and safety of juveniles. It is unlikely that an on-site visit will be possible in the 3rd quarter. The Monitor's office is developing options to conduct facetime tours with Mr. Ortiz and including the Deputy Monitor Mr. Burgos, as well as receive video tours  of Ponce and Villalba. |
| Quality Assurance Measures | The quality assurance measures are for the monitor's office to keep reviewing the documents developed by Mr. Valentin and hopefully touring the facilities with Mr. Valentin at some point in the future to view first hand where code and ADA violations repairs are to be made. The Monitor's office will keep reviewing the documents being developed by NIJ to track facility repair issues including suicide mitigation efforts followed up hopefully by tours to determine compliance. |

| Sources of Information upon which Consultant report and compliance ratings are based. | The documentation being developed by Mr. Valentin will be the primary source to determine the levels of compliance with the codes and regulations. The financial resources to achieve full compliance may need to involve continued discussions with key personnel at NIJ and FOMB as well as senior officials within the Commonwealth hierarchy responsible for funding the agency.

The spread sheets, videos and photographs being submitted periodically by NIJ will help the Monitor's office to track facility repair issues. |

## POLICIES AND PROCEDURES, TRAINING AND RESOURCES – Kim Tandy

S.A. 43 Until this order is fully implemented, Defendants shall submit to the Legislature of the Commonwealth each fiscal year a report wherein the required sums of money will be established so as to implement this Consent Order.

| Compliance Rating | Partial Compliance |
|---|---|
| Description of Monitoring process during this period of time | On December 19, 2019 Judge Gelpi ordered the Parties to discuss a plan prior to the January 16th Status Conference for an adequately protected budget for this case, and "one in which funds are designated toward the present consent decree and not used toward any other purposes." (See Order, Doc. 1436) This was reinforced by the Court during the Status Conference on January 16[th,] 2020.

During the first quarter of the year, the Monitor worked with FOMB, Bluhaus and DCR finance staff as they prepared a budget which accurately reflected expenditures necessary for operation of the two remaining facilities and administration, including funds necessary for compliance. The Monitor met with Francisco Pares Alicia, Secretary of the Treasury and the Governor's personal representative assigned to the case, and Secretary Eduardo Juanatey on March 9 regarding the agency's plan for meeting staffing requirements, as well as how it will address other fiscal needs for compliance.

The Parties were given an extension of time until April 10th to file a Joint Motion agreeing to a budget which complied with the Court's orders.  The Monitor had several calls with DCR, Bluhaus, and FOMB to assist in working through questions and concerns. A further extension was granted to allow DCR time to work out remaining questions raised by FOMB.  On April 22, 2020 the budget was filed with a Joint Motion by the Parties, and with the agreement of the Monitor.  The budget was approved by this Court on April 23, with an Order that the budget shall be separate and earmarked within DCR's overall budget.

The FOMB must certify the Budget by June 30, 2020 pursuant to Section 202(e) of PROMESA. |
| Analysis and Findings | DCR is required by the Settlement Agreement to "submit to the Legislature of the Commonwealth each fiscal year a report wherein the required sums of money will be established so as to implement this Consent Order."  The Court has ordered DCR to have an adequately protected budget for this case, with designated funds which cannot otherwise be used toward other purposes. The current budget proposal has NIJ as a separate program within DCR so that funds will be assigned for exclusively use for juvenile facilities.

The budget total is $22,555,297 for the 2020-2021 fiscal year.  The Joint Motion filed by the Parties also notes that expenditures will be tracked and accounted for separate and apart from the total DCR budget throughout the fiscal year. (Doc. 1493, pg. 3)

The budget for NIJ includes 318 security personnel within the two remaining facilities, and 214 civil staff, including social workers, educators, special operations, central office staff, and those located in community offices.  The total security personnel includes 62 new positions for Juvenile Service Officers.  It also includes nearly 1.5 million in Capital Expenditures, including $714,155 for repairs needed to comply with Paragraph 31. |
| What is needed for full compliance? | DCR's separate budget for NIJ addresses some of the most serious compliance issues where financial resources have been an impediment, including staffing and capital |

| What steps are required and/or recommended? | expenditures for code violations.  Now that funding has been made available, it is imperative that funds are timely spent in the manner allocated to address these areas.<br><br>FOMB indicated in its letter to Governor Wanda Vazquez on June 1, 2020 that reporting for DCR's Juvenile Program "must include and clearly detail budget to actuals on a concept level basis, any reprogramming of funds within the program, and any reprogramming of funds to/from other programs or agencies."<br><br>If the population can be further downsized, with more youth remaining in their own communities, or being returned sooner, the budget projections will likely be different.  The Monitor strongly suggests a leadership group be discuss this now, and to utilize outside consultants to assist as needed. |
|---|---|
| Priority Next Steps | Monthly budget to actual reports must be generated which can ensure that appropriate spending is occurring, and which comply with FOMB's requirements.   These should also be provided to the Monitor. |
| Sources of Information upon which Consultant report and compliance ratings | Meeting and calls with FOMB staff<br>Meeting with DCR staff<br>Budget reports with backup documentation<br>FOMB letter to Governor Vazquez June 1, 2020 (downloaded 6/10/2020) at:<br>https://drive.google.com/file/d/1Myqu9ohXOqEZWQDEul_oT2FNZH7m_gVr/view |

| S.A. 45  Within one year of the approval of the agreement by the Court, Defendants agree to provide an agency policy and procedure manual governing all operational aspects of the institutions.  Within eighteen months of the approval of this agreement, Defendants shall further insure that the facilities are strictly operated within these policies and procedures and that all staff have been trained accordingly. |
|---|

| **Compliance  Rating** | **Partial Compliance** |
|---|---|
| Description of Monitoring process during this period of time | The Monitor has copies of existing policies and procedures in most of the remaining areas of the Settlement Agreement and Consent Order.  The four remaining policies which must still be approved are for S.A. 43, S.A. 52, and several provisions related to education covered in Policies 20.1 and 20.2.<br><br>During her meeting with Education staff in March, the Monitor again asked for a signed copy of Policy 20.1 through the Secretary's office.  The Monitor also requested and received a copy of the second round of revisions made to Policy 20.2 by the Department of Education and NIJ.<br><br>The Parties entered a Joint Motion to Address Continuing Facility Safety Issues filed on April 9, 2020, which was Ordered on April 10, and which contains an agreement to develop a policy on isolation based upon a definition developed by the Parties.  It was agreed that isolation policy and related policies would be submitted for review and approval  by the Monitor with 60 days. |
| Findings and Analysis | The following policies and procedures have not been finalized and approved through the Office of the Monitor: |

| | S.A. 52 Classification | Not complete | Changes to Policies 6.1 and 6.2 have been made and were reviewed by the Consultant in December. Those changes must be reviewed by DCR and approved. |
|---|---|---|---|
| | S. A. 79 Isolation | Not complete | NIJ is working with David Bogard to create policies regarding isolation, and to make the appropriate changes in policies for transitional measures, protective custody and modified group schedule. |
| | Further discussion about policies and procedures are noted in other sections of this report as relevant in the sections noted above. | | |
| What is needed for full compliance? What steps are required and/or recommended? | Approved policies and procedures should remain a priority in any area where the Monitor's office has not yet approved of changes, and where policies do not adequately reflect the requirements of the Settlement Agreement and/or Consent Order. On 12/21/2019, the Monitor's Consultant reviewed and commented on the draft Policies 6.1 and 6.2 drafts and asked for revised policies based on his review. Upon final draft policy reviews, the polices require a Secretary's authorization signature, an implementation date, and a training curriculum and training schedule to coincide with the implementation date in a manner that assures staff are trained prior to policy and procedure implementation. DCR has additional draft classification policies that are being revised based on the Monitor's Consultant prior reviews and comments. It is hoped that DCR will provide additional revised classification polices for review in the second quarter of 2020. A draft policy for isolation, as well as necessary correlating changes to the policies for transitional measures, protective custody and group schedule modification were completed by June 30th as required by Order. Suggested revisions were made by David Bogard, and changes should be made by mid-July for final approval. | | |
| Priority Next Steps | DCR must address the needed changes to policies as recommended by Bob Dugan relative to classification. Suggested changes to the newly drafted isolation policy, as well as related policies, should be completed by early July, and a 90 day implementation time table will then kick in as ordered. | | |
| Quality Assurance Measures | NIJ staff, under the leadership of Kelvin Merced, have been working on a set of policies regarding Quality Assurance which are under review by Bob Dugan. | | |

**S.A. 50.** Defendants shall ensure that current and new facility direct care staff are sufficiently well-trained to implement the terms of this agreement. Each direct care staff, whether current or new, shall receive at least forty (40) hours of training per year by qualified personnel to include, but not limited to, the following areas: CPR (cardiopulmonary resuscitation); recognition of and interaction with suicidal and/or self-mutilating juveniles; recognition of the symptoms of drug withdrawal; administering medicine; recognizing the side-effects of medications commonly administered at the facility; HIV related issues; use-of-force regulations; strategies to manage juveniles' inappropriate conduct; counseling techniques and communication skills; use of

positive reinforcement and praise; and fire prevention and emergency procedures, including the fire evacuation plan, the use of keys, and the use of fire extinguishers.

| Compliance  Rating | Non-compliance significantly hampered by the coronavirus |
|---|---|
| Methodology for Monitoring this Quarter | Training requirements were significantly hampered during this quarter as a result of COVID-19.  Central office staff were, for the most part, unable to work in the office, and many could not work from home to access necessary information to perform their jobs. Even after some restrictions were lifted and some were able to return to the office, new exposure to COVID-19 by an infected person again placed individuals on quarantine in June.  The Monitor recognizes that although there were definite setbacks in training regarding compliance, many tasks were unable to be performed during this time through no fault of NIJ staff.<br><br>The Monitor was able to hold a video conference with Kelvin Merced and Aida Burgos on May 6 to discuss the plan for training this quarter and in the future given COVID-19.<br><br>A training completion schedule for the year was provided, showing that training ceased on March 16, with all subsequently scheduled training for the quarter cancelled because of COVID.<br><br>Follow up emails were sent to determine whether the last 18 month report was completed for the period ending December of 2019.<br><br>Information was also received on training of new cadets which occurred this quarter. |
| Findings and Analysis regarding compliance. | No ongoing training for officers occurred during the second quarter, the result of the government shutdown and stay at home orders which impacted several people in Central Office, including IDECAHR staff.<br><br>The annual report covering July 1, 2018 – December, 2019 was not completed during this quarter and remains overdue. This was due during the first quarter, before COVID-19 affected operations.  Its completion should not be reliant solely on a staff member who has been required to remain at home; a backup system should be in place to cover these administrative tasks and meet deadlines in a timely manner.<br><br>The Monitor has not received an annual assessment of training needs, and documentation of necessary or recommended changes to the training curricula.<br><br>Verification of training records were not readily available during this quarter to OISC investigators, as noted in several investigative reports.<br><br>A new training class of 10 cadets, recruited from new DCR staff, was completed from June 8-19 on 13 topics, of which 9 cadets completed and were assigned to Ponce.  Three |

| | |
|---|---|
| | nursing staff received training on relevant topics, and both the new NIJ Director and Security Director completed one day of the training. While it is understood that this is a temporary measure to provide much needed staffing, it will nonetheless help until a new training academy for juvenile officers is completed.<br><br>Changes to the format of re-training occurred during fiscal year 2019-2020, including the redesign of the sequence of topics and number of hours offered to youth service officers.  Beginning in September of 20189, the annual retraining began with 4 full days on the subject of use of force, including use of force policies, gripping and control techniques, use and management of mechanical and chemical restraints, and report writing.  NIJ management noted that this change was welcomed by staff and there was noted improvement in employee execution.<br><br>A request was also made to allow NIJ to certify instructors in Intervention in Nonviolent Crisis (CPI), a model developed in the 1980's which provides strategies to avoid risks, ensure safety, and provide tools to work with people in high risks situations without exacerbating their emotional state.  This was presented as necessary to promote a change in institutional philosophy from one focused on security and punitive measures versus one focuses on security and treatment. Information on this model can be found at https://www.crisisprevention.com/Resources/Research<br><br>The rating of non-compliance is partially the result of the government shutdown and the inability of staff dedicated to the training function to operate from home. But training compliance has suffered for the last 3 quarters because of the lack of attention given to documentation, and staff being assigned to training functions within DCR. |
| What is needed to reach full and faithful compliance? | **Agreed upon metrics for reaching compliance are as follows:**<br>1)  Training sessions in all SA 50 categories must be planned and provided throughout the coming year with sufficient frequency to allow for ready access by participants in the remaining two facilities.  A training calendar must be prepared in advance.<br>2)  Training completion by active direct care staff must reach the targeted benchmarks by topic over an 18 month period, and corrective action plans for facilities not achieving those benchmarks must ensure that the remaining staff complete training within 180 days.  This includes:<br>   • Training on the use of chemical agents must be completed at the 100% rate, but only for those who are authorized and certified to use OC spray.<br>   • CPR training and certifications must be completed every 2 years at the 90% level for those direct care staff.<br>   • Training on suicide prevention must be completed at the 90% rate for all direct care staff.<br>   • Facility directors must ensure that all other required trainings for this provision meet at least 85% completion rate within the 18 months.<br>3)  Pre and post must be used to evaluate participants' increase in knowledge and skills achieved by the training. Staff must pass such tests with a 70% or higher grade |

| | |
|---|---|
| | 4)  Evaluation of training modules and delivery must be sought by participants and through QA to ensure trainers are knowledgeable and skilled both in content and delivery to adult learners, materials are understandable and adequately cover the topic, and that content is relevant, current and accurate.<br><br>5)  Ongoing training needs will be assessed at least on an annual basis or more frequently if needed to determine if modifications are necessary. Written documentation is required to show that such reviews have taken place and what changes if any have been made as a result.<br><br>6)   Necessary revisions to training based on changes in policies and procedures will be made within a targeted time, with full implementation within 12 months.  Written documentation is required to show that such changes have been made and implementation scheduled and completed. It is important that such changes be coordinated with UEMNI and OISC and include recommendations based upon investigation findings and results.<br><br>Appropriate staffing support must be in place to the Director of Human Resources and IDECAHR to facilitate report preparation and compliance evidence.  The new budget for the NIJ budget, which cannot be used for other purposes, includes the Director of Human Resources and IDECAHR.  Her responsibilities should be 100% within NIJ.<br><br>The Monitor encourages NIJ to continue to seek out resources for certifying trainers in the CPI model as a way of changing the culture within NIJ to a more therapeutic one. |
| Priority Next Steps | IDECARH must complete an annual report for the period of January of 2019 – June of 2020 during the third quarter.<br><br>IDECARH must provide backup documentation for 2019 and 2020 regarding training records, evaluations, and pre/post testing.<br><br>NIJ must comply with the April 9th (Doc. 1477) Order to provide a written plan to the Monitor and DOJ that describes the timing for recruitment and training of new officers, along with proposed dates for the training academy and estimated start dates.  The plan must describe the plan for officer recruitment, training and placement in facilities.<br><br>NIJ must evaluate staffing needed to comply with training provisions if it is not possible for the Director of Human Resources and IDECAHR to be physically present in Central office during the pandemic.<br><br>A plan for how training will be done, whether in person or remotely, for this fiscal year should be presented to the Monitor given the restrictions imposed by COVID-19. |
| Basis for findings and recommendations | The findings and recommendations are based upon the meetings with the Human Resource Specialist in May, as well as documentation received regarding the new cadet training in June. |

| | |
|---|---|
| | Information relative to the CPI program for training in crisis intervention can be found at https://www.crisisprevention.com/Resources/Research |

## PROTECTION FROM HARM – STAFFING  (Bob Dugan)

**S.A. 48.** Defendants shall ensure that the facilities have sufficient direct care staff to implement all terms of this agreement. Direct care staff supervise and participate in recreational, leisure and treatment activities with the juveniles. Compliance can be demonstrated in either of two ways.
<u>48.a Method one:</u> Defendants may provide documentation of consistent supervision by not less than one (1) direct care worker to eight (8) juveniles during day and evening shifts and not less than one (1) direct care worker to sixteen (16) juveniles during normal sleeping hours.
*<u>48.b Method Two:</u> Defendants may develop, and submit to the court for approval, an alternate staffing roster for any facility in this case. The roster shall be based on a study that shall specify fixed posts and the assignment necessary to implement the terms of this agreement, taking into consideration the physical configuration and function of spaces, the classification and risk profiles of youths involved, the incident patterns in the settings involved, the routine availability in the settings of other categories of staff, and the overall number of direct care positions necessary to consistently achieve the coverage proposed. Once a plan is approved for a facility, defendants shall document the employment of the necessary overall numbers of direct care staff, and the ongoing deployment of such staff in accordance with the plan."*

*The Commonwealth has the choice to demonstrate compliance according to method 48.a or 48.b. They have informed the Monitor that they do not intend to select method 48.b and that their legal position is that this language should be struck from the Settlement Agreement as superfluous.*

| Compliance Ratings | Non-Compliance |
|---|---|
| Description of Monitoring process during this period of time | S.A. 48 Staff Youth Ratio monitoring compliance is analyzed on a quarterly basis using DCR facility generated weekly staff youth ratio forms as well as the weekly Form DCR -DCR - 0144. These forms are submitted to the Monitor's Consultant throughout the reporting quarter. DCR facilities daily shift by shift staffing and youth population for each operational housing module is reported, as well as any 1:1 supervision events, and the volume of staff that are required to work a double shift. Commencing with the fourth quarter of 2019, DCR provided specific information of the names of staff who were working double shifts, the shift and location. The compliance report provides information from Staff Youth Ratio forms that were provided to the Monitor's Consultant for the period March 29, 2020 through June 27, 2020.

On March 11, 2020, the World Health Organization declared the coronavirus a world pandemic. On March 15, 2020, the Honorable  Wanda Vázquez Garced, Governor of Puerto Rico, issued through the Administrative Bulletin, Executive Order OE-2020-023, which ordered the necessary government and private closures to combat the effects of coronavirus (Covid-19) and to control the risk of contagion. As a result of the coronavirus pandemic, no site visits were conducted by the Consultant during the second quarter of 2020. |

|  | Monitoring of the various provisions of S.A. 48 were conducted through the production and delivery of the usual monitoring documentation. Communication with various members of the DCR staff was also conducted by multiple web video conferences throughout the second quarter. |
| --- | --- |

| | |
|---|---|
| Findings and Analysis | **Compliance Status:**  For the 2020 second quarter, S.A. 48a is found to be in non-compliance, with these findings:<br><br>• There are not sufficient staff and resources assigned to CDTS Ponce and CDTS Villalba to implement the requirements of the provision.<br>• DCR failed to submit a staffing plan to the Monitor and to the United States Department of Justice ("DOJ") by June 30, 2020 as required by the Joint Motion to Address Continuing Facility Safety Issues.<br>• 657 (16%) of staff youth ratio events were filled by staff working double shifts.<br>• The percentage of shifts (16%) covered by staff doing double shifts has reduced by 15% since the 2020 first quarter. This appears to be the direct result of implementation of 2, 12 hour shift staffing at both facilities, which eliminated double shifts at CDTS Villalba and greatly reduced double shifts at CDTS Ponce. Prior to implementation of the 2, 12 hour shift model, the volume of double shifts at both facilities was unsustainable.<br>• The closure of CD Humacao and transfer of youth to CDTS Ponce and CDTS Villalba had no positive impact in meeting the minimum required staff youth ratios, absent double shifting.<br>• An escape of five youth from CDTS Ponce, the volume of serious youth violence, assaults, cutting events reflects institutional environments that are intermittently chaotic and not safe for youth or staff.<br>• For the 2020 second quarter, the Monitor's Consultant continues to find non-compliance with meeting the minimum staff youth ratios and the shortage of officers, reliance on double shifts and twelve hour shifts, significantly jeopardizes youth safety and protection from harm.<br><br>**Analysis:**<br>DCR submitted a total of 26 facility staff youth ratio forms for the two facilities requiring staff youth ratios, allowing for 100% of the staff youth ratio forms being available for analysis. DCR has consistently provided all requested Staff Youth Ratio forms used for monitoring and reporting.<br><br>It should be noted that analysis of staffing for the second quarter is not as straight forward as in previous quarterly reports. The coronavirus quarantine protocols created exceptional challenges for DCR. As staff became exposed to positive coronavirus individuals, they were no longer available for assignment while proceeding through the Covid isolation protocols.<br><br>During the second quarter, DCR adjusted facility staffing from three, eight hour shifts per day to two, twelve hour shifts per day to address staffing shortages, quarantine of officers exposed to the coronavirus and the volume of double shifts that officer shortage generated.  The following table illustrates the staffing shift models that were being used by both facilities during the second quarter. |

| 2020 Second Quarter Shift Staffing Patterns: March 29- June 27, 2020 | | | |
|---|---|---|---|
| CDTS Ponce | 3, 8 Hour Shifts: 2, 12 Hour Shifts: | CDTS Villalba | 3, 8 Hour Shifts: 2, 12 Hour Shifts: |
| March 29 -April 4, 2020 | 3, 8 hour shifts | March 29 -April 4, 2020 | 3, 8 hour shifts |
| April 5 - 11, 2020 | 3, 8 hour shifts | April 5 - 11, 2020 | 3, 8 hour shifts |
| April 12 - 18, 2020 | 3, 8 hour shifts | April 12 - 18, 2020 | 3, 8 hour shifts |
| April 19 -20, 2020 | 3, 8 hour shifts | April 19 -25, 2020 | 3, 8 hour shifts |
| April 21 -25, 2020 | 2, 12 hour shifts | April 26 - May 2, 2020 | 3, 8 hour shifts |
| April 26 - May 2, 2020 | 2, 12 hour shifts | May 3 - 8, 2020 | 3, 8 hour shifts |
| May 3 - 9, 2020 | 2, 12 hour shifts | May 9, 2020 | 2, 12 hour shifts |
| May 10 -16, 2020 | 2, 12 hour shifts | May 10 -16, 2020 | 2, 12 hour shifts |
| May 17 - 23, 2020 | 2, 12 hour shifts | May 17 - 23, 2020 | 2, 12 hour shifts |
| May 24 - 30, 2020 | 2, 12 hour shifts | May 24 - 30, 2020 | 2, 12 hour shifts |
| May 31 - 6, 2020 | 2, 12 hour shifts | May 31 - June 4, 2020 | 2, 12 hour shifts |
| June 7- 9, 2020 | 2, 12 hour shifts | June 5-6, 2020 | 3, 8 hour shifts |
| June 10- 13, 2020 | 3, 8 hour shifts | June 7- 13, 2020 | 3, 8 hour shifts |
| June 14 -19, 2020 | 3, 8 hour shifts | June 14 -20, 2020 | 3, 8 hour shifts |
| June 20, 2019 | 2, 12 hour shifts | June 21 - 27, 2020 | 3, 8 hour shifts |
| June 21 - 27, 2020 | 2, 12 hour shifts | | |
| CDTS Ponce had thirty-three 3, 8 hour shift days, resulting in 99 shifts.. | | CDTS Villalba had sixty-four 3, 8 hour shift days, resulting in 192 shifts. | |
| CDTS Ponce had fifty-eight  2, 12 hour shift days, resulting in 116 shifts. | | CDTS Villalba had twnety -seven 2, 12 hour shift days, resulting in 54 shifts.. | |

As documented in the table, CDTS Ponce operated on 3, 8 hour shifts from March 29 through April 20, and started 2, 12 hour shifts on April 21, through June 9. On June 10 through June 19, CDTS Ponce operated on 3, 8 hour shifts. On June 20 through June 27, CDTS Ponce reverted back to 2, 12 hour shifts.

CDTS Villalba operated on 3, 8 hour shifts from March 29 through May 8, and started 2, 12 hour shifts on May 9, through June 4. On June 5 through June 27, CDTS Villalba operated on 3, 8 hour shifts.

The DCR 2, 12 hour shifts were 6:00 AM – 6:00 PM and 6:00 PM to 6:00 AM. For purpsoes of staff youth ratio compliance both the 6:00 AM – 6:00 PM and 6:00 PM to 6:00 AM have been assessed as requiring a 1:8 staff youth ratio. When DCR was operating with 3, 8 hour shifts, the 6:00 AM -2:00 PM amd 2:00 PM to 10:00 PM shift were assessed as requiring a 1:8 staff youth ratio and the 10:00 PM to 6:00 AM shifts were assessed as requiring a 1:16 staff youth ratio.

As part of the coronavirus protocols, youth were restricted to housing modules to reduce exposure to other staff and youth, with extremely limited off module programming opportunities.

The table below represent staff youth ratio performance by shifts for the period (March 29, 2020 through June 27, 2020).

| 2020 Second Quarter Shift Staffing | Weekly Staff Youth Ratio Events | Met Required Staff Youth Ratio | % of Compliant Staff Youth Ratio Events | Volume of Double Shifts | % of Staff Youth Ratio Requiring Double Shifts |
|---|---|---|---|---|---|
| CDTS Ponce Total :  3, 8 hour shifts | 873 | 873 | 100% | 311 | 36% |
| CDTS Ponce Total :  2, 12 hour shifts | 1124 | 1124 | 100% | 32 | 3% |
| CDTS Ponce Second Quarter Totals: | 1997 | 1997 | 100% | 343 | 17% |
| CDTS Villalba Total :  3, 8 hour shifts | 1633 | 1463 | 90% | 314 | 19% |
| CDTS Villalba Total :  2, 12 hour shifts | 487 | 456 | 94% | 0 | 0% |
| CDTS Villalba Second Quarter Totals: | 2120 | 1919 | 91% | 314 | 15% |
| DCR Second Quarter Totals | 4117 | 3916 | 95% | 657 | 16% |

For the second quarter of 2020, CDTS Ponce reported meeting the required staff youth ratio in 100% of the staff youth ratio events, regardless of operating either a 3, 8 hour shift or a 2. 12 hour shift.

For the second quarter of 2020, CDTS Villalba reported meeting the required staff youth ratio in 91% of the staff youth ratio events. While operating either a 3, 8 hour shift, CDTS Villalba met the staff youth ratio in 90% of the staff youth ratio events. While operating either a 2, 12 hour shift, CDTS Villalba met the staff youth ratio in 94% of the staff youth ratio events. When aggregating both shift models, CDTS Villalba met the staff youth ratio in 91% of the staff youth ratio events.

For the second quarter of 2020, DCR, regardless of shift models, met the staff youth ratio in 95% of the staff youth ratio events.

A more in depth view analysis of type of shift and volume of double shifts is displayed in the charts and tables below.

**CDTS Ponce Second Quarter Shift Staffing:**

| CDTS Ponce Second Quarter Shift Staffing: March 29- June 27, 2020 | 3, 8 Hour Shifts: 2, 12 Hour Shifts | Weekly Staff Youth Ratio Events | Met Required Staff Youth Ratio | % of Compliant Staff Youth Ratio Events | Volume of Double Shifts | % of Staff Youth Ratio Requiring Double Shifts |
|---|---|---|---|---|---|---|
| March 29 -April 4, 2020 | 3, 8 hour shifts | 179 | 179 | 100% | 19 | 11% |
| April 5 - 11, 2020 | 3, 8 hour shifts | 168 | 168 | 100% | 62 | 37% |
| April 12 - 18, 2020 | 3, 8 hour shifts | 189 | 189 | 100% | 74 | 39% |
| April 19 -20, 2020 | 3, 8 hour shifts | 54 | 54 | 100% | 22 | 41% |
| April 21 -25, 2020 | 2, 12 hour shifts | 99 | 99 | 100% | 0 | 0% |
| April 26 - May 2, 2020 | 2, 12 hour shifts | 140 | 140 | 100% | 0 | 0% |
| May 3 - 9, 2020 | 2, 12 hour shifts | 140 | 140 | 100% | 0 | 0% |
| May 10 -16, 2020 | 2, 12 hour shifts | 126 | 126 | 100% | 3 | 2% |
| May 17 - 23, 2020 | 2, 12 hour shifts | 135 | 135 | 100% | 0 | 0% |
| May 24 - 30, 2020 | 2, 12 hour shifts | 140 | 140 | 100% | 1 | 1% |
| May 31 - 6, 2020 | 2, 12 hour shifts | 132 | 132 | 100% | 9 | 7% |
| June 7- 9, 2020 | 2, 12 hour shifts | 60 | 60 | 100% | 4 | 7% |
| June 10- 13, 2020 | 3, 8 hour shifts | 116 | 116 | 100% | 32 | 28% |
| June 14 -19, 2020 | 3, 8 hour shifts | 167 | 167 | 100% | 102 | 61% |
| June 20, 2019 | 2, 12 hour shifts | 20 | 20 | 100% | 10 | 50% |
| June 21 - 27, 2020 | 2, 12 hour shifts | 132 | 132 | 100% | 5 | 4% |
| Total Second Quarter:  3, 8 hour shifts | | 873 | 873 | 100% | 311 | 36% |
| Total Second Quarter:  2, 12 hour shifts | | 1124 | 1124 | 100% | 32 | 3% |
| Total Second Quarter: | | 1997 | 1997 | 100% | 343 | 17% |

CDTS Ponce had thirty-three 3, 8 shift days, resulting in 99 shifts, **873** staff youth ratio events. The **873** staff youth ratio events, required **311** double shifts (36%) to meet a compliant staff youth ratio in 100% of the events .

CDTS Ponce had fifty-eight 2, 12 hour shift days, resulting in 116 shifts, **1124** staff youth ratio events.  The 1124 staff youth ratio events, required **32** double shifts (3%) to meet a compliant staff youth ratio in 100% of the events .

As illustrated in the CDTS Ponce table above, when CDTS Ponce operated a 3, 8 hour shift model, they required significant 311 double shifts, with a range of 11%-61% of staffing events requiring double shifts.

It also should be noted that CDTS Ponce reported using double shifts while employing a 2, 12 hour shifts, implying that staff working a double shift were on duty for 24 consecutive hours. When CDTS Ponce operated a 2, 12 hour shift model, they required 32 double shifts, with a range of 1% - 50% of staffing events requiring double shifts.

Although a CDTS Ponce 2, 12 hour shift was much more efficient with a reduction in double shifts, while still meeting the required staff youth ratios, expecting staff to be on duty for 24 consecutive hours precludes any expectation that staff can be awake and alert, engaged in active and effective behavior management.

PUERTAS, housed in one of the housing modules within CDTS Ponce, met the minimum required staff youth ratios for all shifts throughout of the 2020 second quarter reporting period. During the 2020 second quarter reporting period, CDTS Ponce had 159 staff to youth 1:1 events.

**CDTS Villalba Second Quarter Shift Staffing:**

| CDTS Villalba Second Quarter Shift Staffing: March 29- June 27, 2020 | 3, 8 Hour Shifts: 2, 12 Hour Shifts | Weekly Staff Youth Ratio Events | Met Required Staff Youth Ratio | % of Compliant Staff Youth Ratio Events | Volume of Double Shifts | % of Staff Youth Ratio Requiring Double Shifts |
|---|---|---|---|---|---|---|
| March 29 -April 4, 2020 | 3, 8 hour shifts | 173 | 165 | 95% | 24 | 14% |
| April 5 - 11, 2020 | 3, 8 hour shifts | 168 | 164 | 98% | 19 | 11% |
| April 12 - 18, 2020 | 3, 8 hour shifts | 168 | 168 | 100% | 14 | 8% |
| April 19 -25, 2020 | 3, 8 hour shifts | 182 | 179 | 98% | 15 | 8% |
| April 26 - May 2, 2020 | 3, 8 hour shifts | 189 | 182 | 96% | 9 | 5% |
| May 3 - 8, 2020 | 3, 8 hour shifts | 162 | 145 | 90% | 29 | 18% |
| 9-May-20 | 2, 12 hour shifts | 18 | 14 | 78% | 0 | 0% |
| May 10 -16, 2020 | 2, 12 hour shifts | 126 | 118 | 94% | 0 | 0% |
| May 17 - 23, 2020 | 2, 12 hour shifts | 126 | 121 | 96% | 0 | 0% |
| May 24 - 30, 2020 | 2, 12 hour shifts | 127 | 124 | 98% | 0 | 0% |
| May 31 - June 4, 2020 | 2, 12 hour shifts | 90 | 79 | 88% | 0 | 0% |
| June 5-6, 2020 | 3, 8 hour shifts | 54 | 40 | 74% | 25 | 46% |
| June 7- 13, 2020 | 3, 8 hour shifts | 189 | 152 | 80% | 68 | 36% |
| June 14 -20, 2020 | 3, 8 hour shifts | 180 | 145 | 81% | 55 | 31% |
| June 21 - 27, 2020 | 3, 8 hour shifts | 168 | 123 | 73% | 56 | 33% |
| Total Second Quarter: 3, 8 hour shifts | | 1633 | 1463 | 90% | 314 | 19% |
| Total Second Quarter: 2, 12 hour shifts | | 487 | 456 | 94% | 0 | 0% |
| Total Second Quarter: | | 2120 | 1919 | 91% | 314 | 15% |

CDTS Villalba had sixty-four 3, 8 shift days, resulting in 192 shifts, **1739** staff youth ratio events. The **1739** staff youth ratio events, required **314** double shifts (18%) to meet a compliant staff youth ratio in 84% of the events .

CDTS Villalba had twenty -seven 2, 12 hour shift days, resulting in 54 shifts, **487** staff youth ratio events, which required 0 double shifts. The **487** staff youth ratio events, required 0 double shifts to meet a compliant staff youth ratio in 93% of the events .

As illustrated in the CDTS Villalba table above, when CDTS Villalba operated a 3, 8 hour shift model, they required 314 double shifts, with a range of 5% - 46% of staffing events requiring double shifts, meeting the staff youth ratio is 90% of staffing events. It also should be noted that CDTS Villalba reported not using any double shifts while employing a 2, 12 hour shifts staffing model.

CDTS Villalba's  2, 12 hour shift appears to be a  much more efficient staffing option with an elimination of double shifts, while meeting the required staff youth ratios in 94% of staffing events.  During the 2020 second quarter reporting period, CDTS Villalba had 28 staff to youth 1:1 events.

**Staff Double Shifts:**
For the 2020 second quarter, 657 (18%) of the 4117 staff youth ratio events were covered by staff working a double shift**.** This is 15% decrease of shifts requiring staff to work a double shift compared to the first quarter 2020.

The table below displays the last six quarters of staffing events, double shift staffing events, percentage of double shift staffing events and total number of operational facilities for the quarter.

| Staff Double Shifts and Staffing Events | First Quarter 2019 | Second Quarter 2019 | Third Quarter 2019 | Fourth Quarter 2019 | First Quarter 2020 | Second Quarter 2020 |
|---|---|---|---|---|---|---|
| Volume of Double Shifts | 812 | 1188 | 1769 | 1813 | 1324 | 657 |
| Volume of Staffing Events | 4343 | 4396 | 4380 | 4390 | 4265 | 4117 |
| Percentage of Double Shift Staffing Events | 18.7% | 27.0% | 40.4% | 41.3% | 31.0% | 16.0% |
| Number of Facilities | 2 | 2 | 2 | 2 | 2 | 2 |

Implications of a large volume of double shifting are deterioration in staff productivity, reducing the ability for staff to be actively engaged in youth observation and supervision, as well as having a negative impact on staff morale and well-being. The outcome of double shifting can lead to fatigued direct care staff, a level of inattentiveness on the part of staff that may result in a failure to provide active behavior management. The failure to provide active behavior management can negatively impact youth safety and potentially contribute to staff negligence in providing effective, safe, and secure supervision of youth. Double shifting often leads to staff calling in sick to avoid being required to double shift after their regularly scheduled shift. All of the aforementioned are outcomes of a significant dependence on double shifts to provide minimum staff youth ratios.

There are no prohibitions nor restrictions in S. A. 48 on the use of double shifts to meet the requirements of minimum required direct care staff youth ratios. Although undesirable from an operational, staff morale, effective behavior management and budgetary perspective, it does not impact analysis of whether the minimum required staff youth ratios are being met. It should be noted that DCR's reliance on double shifting to meet minimum staff youth ratios reflects that DCR is significantly understaffed to meet the requirements of S. A. 48.

The second quarter reduction in double shifting must be balanced against the recognition of the Covid-19 quarantine requirements have created an aberrant institutional environment with segregation of youth populations, suspension of youth population facility movement and modification of shift schedules between eight and twelve hour shifts. Double shifting is a critical contributing factor that has jeopardized the agency's capacity to provide effective staffing for adequate supervision to assure youth safety and protection from harm.

On the weekly staff youth ratio reports completed by each facility, DCR requires documentation of the volume of double shifts used for each day for each shift. By Policy 9.20, Supervisors IV and III are required to assign officers to housing modules to meet the minimum required staff youth ratio based on the module youth population.

During the 2020 second quarter, at the request of the Monitor's Consultant, DCR continued to provide information about which staff were assigned to double shifts for each shift, each day, and the location of the double shift assignment.

| Volume of Staff and Volume of Double Shifts in Second Quarter 2020 | | | |
| CDTS Ponce | | CDTS Villalba | |
| Volume of Double Shifts | Number of Staff Double Shifting | Volume of Double Shifts | Number of Staff Double Shifting |
| --- | --- | --- | --- |
| 10 | 1 | 10 | 2 |
| 9 | 1 | 9 | 0 |
| 8 | 3 | 8 | 2 |
| 7 | 5 | 7 | 4 |
| 6 | 10 | 6 | 7 |
| 5 | 12 | 5 | 13 |
| 4 | 10 | 4 | 13 |
| 3 | 15 | 3 | 19 |
| 2 | 19 | 2 | 12 |
| 1 | 23 | 1 | 10 |

For the second quarter of 2020, CDTS Ponce had a total of 343 double shifts provided by 99 different named staff. The double shift profile range was as follows: one staff worked 10 double shifts; 1 staff worked 9 double shifts; 23 staff worked 1 double shift.

For the second quarter of 2020, CDTS Villalba had a total of 314 double shifts provided by 81 different named staff. The double shift profile range was as follows:  two staff worked 10 double shifts; 2 staff worked 8 double shifts; 4 staff worked 7 double shifts; 19 staff worked 3 double shifts.

As illustrated in the tables above, the volume of double shifting being used to provide the minimally required staff youth ratio, although reduced in the second quarter in light of facility Covid-19 quarantine restrictions continues at an unsustainable rate, jeopardizing youth safety, staff capacity to provide effective behavior management and staff well-being.

**DCR Quarterly Staff Youth Ratio Performance**



| | 6:00am- 2:00pm | 2:00pm- 10:00pm | 10:00pm- 6:00am |
|---|---|---|---|
| 2nd Quarter 2020 | 93% | 91% | 99% |
| 1st Quarter 2020 | 98% | 97% | 100% |
| 4th Quarter 2019 | 93% | 97% | 100% |
| 3rd Quarter 2019 | 96% | 97% | 100% |
| 2nd Quarter 2019 | 97% | 99% | 100% |
| 1st Quarter 2019 | 94% | 96% | 100% |

The DCR 2020 second quarter performance in meeting Staff Youth Ratios is as follows:

- 6:00 am – 2:00 pm shift:  93% of events, a 5% decrease from the first quarter of 2020 (98%)
- 2:00 pm – 10:00 pm shift:  91% of events, a 6% decrease from the first quarter of 2020 (97%)
- 10:00 pm – 6:00 am shift:  99% of events, a 0% change from the first quarter of 2020 (100%)

The 2020 second quarter waking hour staff youth ratio compliance decreases appear to be attributable to the following issues:

- The last day of education off of module for youth was in the first quarter on March 13, 2020.
- DCR protocols for Covid-19 quarantine were initiated on March 16, 2020 and continued throughout the second quarter.
  - DCR protocols for Covid-19 quarantine require that all youth be restricted to their assigned housing modules and suspension of all off module programming and events.
- The Covid-19 quarantine requirements caused for continual absence of officers as they were designated for Covid exposure quarantine.

- Although the Covid-19 quarantine requirements caused for a reduction in the need for officers providing supervision of youth while receiving programming off of their assigned modules, the absence of staff programming did not offset the volume of officers that were not available for assignment when on Covid exposure quarantine.

Compounding the level of double shifting is the volume of vacant positions during the second quarter at both facilities:
- At CDTS Ponce there are eight of ten filled Shift Supervisor positions, with two Supervisor IV vacancies.
- At CDTS Villalba there are eight of ten filled Shift Supervisor positions, with two Supervisor IV vacancies.

The volume of unfilled shift supervisor positions, aside from requiring excessive supervisor double shifts, creates a supervision void that is unacceptable for any expectation of successful operations, short of crisis management.

The volume of supervisor vacancies and corresponding requirement for supervisors to do multiple double shifts creates an unrealistic expectation for effective supervision, decision-making and coaching. This situation is compounded in that both facilities operate on a shift supervision model, which provides intermittent supervisory presence as shift supervisors make their required rounds in housing modules and throughout the facility, assuming that a more serious facility issue has not prevented timely rounds. Officers and supervisors are double shifting at an extraordinary rate, significantly decreasing their capacity to assure youth safety, security and well-being.

For the 2020 second quarter, DCR has not demonstrated sustainable performance compliance in meeting the minimum required staff youth ratios without a continual dependence of double shifting and implementing 2, 12 hour shifts.

| 2020 Second Quarter Shift Staffing | Weekly Staff Youth Ratio Events | Met Required Staff Youth Ratio | % of Compliant Staff Youth Ratio Events | Volume of Double Shifts | % of Staff Youth Ratio Requiring Double Shifts |
|---|---|---|---|---|---|
| DCR Total : 3, 8 hour shifts | 2506 | 2336 | 93% | 625 | 25% |
| DCR Total : 2, 12 hour shifts | 1611 | 1580 | 98% | 32 | 2% |
| DCR Second Quarter Totals | 4117 | 3916 | 95% | 657 | 16% |

For the second quarter of 2020, DCR has not been able to sustain meeting the minimum required staff youth ratio for 100% of the staffing events.

**Joint Motion to Address Continuing Facility Safety Issues:**
Although DCR did not submit a staffing plan to the Monitor and United States Department of Justice (DOJ) by June 30, 2020, as required by the Joint Motion, there was progress made on other issues specified in the Joint Motion:
- **CDTS Ponce Officer Assignment:**  Nine cadets from the DCR Academy participated in NIJ training on June 8 through 19, 2020. All nine officers were temporarily assigned to CDTS Ponce. Four officers were assigned to the 6:00-

| | |
|---|---|
| | 2:00 shift; four officers were assigned to the 2:00 – 10:00 shift; and one officer was assigned to the 10:00 – 6:00 shift. The assignment to CDTS Ponce was effective June 22, 2020. |
| | • DCR provided the Monitor's Consultant with electronic versions of the two cycles of Master Rosters that were used in the second quarter. No verification was provided that the Master Rosters are an accurate representation of S. A. 48 P5 reports. |
| | • During the second quarter there was considerable improvement by DCR in meeting incident reporting requirements. DCR provided the Monitor's Consultant with all of the incident report cover sheets for the first two quarters of 2020. For the second quarter, 201 incident report cover sheets were submitted: 86 incident events occurred at CDTS Ponce; and 115 incident events at CDTS Villalba. |
| What is needed for full compliance? What steps are required and/or recommended? | DCR needs to assign an adequate volume of officers to CDTS Ponce and CDTS Villalba to ensure the facilities have sufficient direct care staff to implement all terms of this agreement, and reduce unsustainable reliance on double shifting. DCR needs to meet procedural compliance not only with S.A. 48, but also their own Policy 9.20.<br><br>On April 9, 2020, a Joint Motion (Doc. 1477) was filed with the United States District Court for the District of Puerto Rico, and a subsequent Order issued, which identifies that compliance issues regarding staffing are not easily addressed within the current DCR budget. DCR was ordered to separate out a program budget for NIJ operations for the 2020-2021 fiscal year. The budget, certified by the Fiscal Oversight and Management Board (FOMB) and approved by the legislature, includes 318 officers and supervisory positions within the two NIJ facilities, 67 of which are new positions to be recruited and trained.<br><br>Additionally, the Joint Motion requires DCR to address its critical staffing issues and reduce its reliance on double shifting to meet the minimum staff/youth ratio. DCR failed to submit the required plan to the Monitor and United States Department of Justice (DOJ) by June 30, 2020. Procedural compliance with DCR Policy 9.20 requires meeting minimum required staff youth ratios as well as corrective action when ratios are not met for any given supervision event on any shift.<br><br>DCR did not meet the requirements of the Joint Motion to Address Continuing Facility Safety Issues, by failing to submit a staff plan by June 30, 2020. |
| Priority Next Steps | Priority next steps required to find compliance for S.A. 48a are the following:<br>• DCR needs to submit a plan to the to the Monitor and United States Department of Justice (DOJ) that meets the requirements of the Joint Motion to Address Continuing Facility Safety Issues.<br>• Address the requirement for procedural compliance with staffing Policy 9.20, as well as any required 1:1 staff or special population youth supervision events. |

| | |
|---|---|
| | • Address the inability to provide the necessary staff to maintain youth in the least restrictive placement possible, assuring protection from harm.<br>• DCR needs to implement independent quality assurance assessment of procedural compliance as required by Policy 9.20, generating reports for both internal use and submission to the Monitor's Office.<br>• At the close of the 2020 second quarter, the Monitor continued to work with DCR to identify the necessary steps to resolve the staffing crisis with the deployment of additional officers to both facilities. A detailed, executable plan is necessary that addresses the following issues:<br>    ○ The details regarding the request for approval of officers and supervisors for both facilities, responses to such request, and if approved, how such officers and supervisors will be secured, trained and deployed, and the time frame for doing so.<br>    ○ If it is necessary for new officers to be recruited and trained, the time frame for recruitment, training and placement must be provided.<br>    ○ The plan should also indicate how the Commonwealth will reduce its reliance upon double shifting to meet the minimum required staff/youth ratio, and indicate a recognition that staff youth ratios that exceed the minimum level will be required at times to keep assure youth safety. |
| Quality Assurance Measures | DCR Staffing Policy 9.20 identifies that retrievable staff youth ratio documentation be maintained at each facility. The documentation consists of the following:<br>• Daily youth population list identify which youth are in which modules, designation of any youth on Protective Custody, Transitional Measures, Therapeutic Observation of Constant Watch. Additionally, daily trips and youth assigned to those trips should also be maintained in the daily population list.<br>• The facility staff daily roster, displaying which staff has been assigned to which modules. It is critical that the form allows for clear documentation of officers assigned to each module as well as mini control.<br>• Review and assessment of DCR 0144 forms for each day are assessed for accuracy to the Daily Roster and compliance with DCR-DCR Policy 9.20 by the Supervisor IV the day after the events.<br>• At this time DCR has not initiated independent analysis of procedural compliance to Policy 9.20.<br>• During facility site visits, staff youth ratio quality assurance compliance analysis consists of a review of the Master Roster, facility Daily Roster, facility mini control logs, and DCR 0144 daily forms to assess procedural and performance compliance with -DCR Policy 9.20. The Monitor's Consultant did not conduct a site visit during the second quarter.<br>• Additional Reporting During the Second Quarter: A DCR Covid Report was provided starting on April 17 through May 31, 2020. The report identified youth in Covid health protocol; number of youth tested for Covid; number of youth who have tested positive for Covid; youth with symptoms associated with Covid; other personnel who have tested positive for Covid; Medical Services personnel who have tested positive for Covid; Security personnel out on quarantine for Covid; and Covid positive security personnel. |

| | |
|---|---|
| Sources of Information upon which Consultant report and compliance ratings are based | Weekly facility staff youth ratio workbooks and form DCR-1044 are provided to the Monitor's Consultant throughout the quarter. Facility staff youth ratio workbook data is analyzed to assess facility and agency compliance in meeting the minimum required staff youth ratio as described in S.A. 48a.  Form DCR-1044 is analyzed for procedural compliance with staffing policy, 9.20.<br><br>A component of facility site visits is review of facility staffing source documentation, Master Rosters, Daily Rosters, mini control logs analyzed against the weekly facility staff youth ratio workbooks that are provided to the Monitor's Consultant. Review and assessment of DCR-DCR-0144 forms for each facility for each day are assessed for accuracy to the Daily Roster and compliance with DCR Policy 9.20, by the Supervisor IV the day after the events. |

**January 2009 Stipulation Paragraph 1:** All necessary steps shall be taken immediately to ensure the reasonable safety of youth by providing adequate supervision of youth in all facilities operated by, or on behalf of, the Defendants.

| | |
|---|---|
| **Compliance Ratings** | **Non-Compliance** |
| Description of Monitoring process during this period of time | The Monitor's Consultant reviews and analyzes weekly Staff Youth Ratio forms and form DCR-0144. Additional documentation that is reviewed is as follows: Master Rosters, Daily Rosters, DCR-DCR 0144 Daily Staffing forms, as well as use of force events, monthly contraband reports, and incident report events. Observation, verification and documentation of housing module staff youth ratios is conducted on each site visit.<br><br>Additionally, 284 referrals to UENMI and OISC investigative reports have been reviewed to assess incidents and investigations that identify youth safety, youth supervision and contraband issues. |
| Findings and Analysis | For the second quarter of 2020, DCR is not providing adequate supervision of youth nor ensuring reasonable safety.<br><br>**Facility Closure of CD Humacao:** As of January 15, 2019, the CD Humacao facility was closed for youth populations. After the closure of Humacao, 127 staff were reassigned to other DCR facilities. The two remaining juvenile facilities, CDTS Ponce and CDTS Villalba, absorbed the CDTS Ponce youth and classifications without sufficient staff to ensure compliance with S.A. 48.  Double shifting is not a viable solution to provide adequate supervision and youth safety.<br><br>**Master Rosters and Required Staffing:**<br>The facility Master Roster is an agency generated staffing roster, identifying posts, fixed posts, fixed posts identified by need, movable posts and relief personnel. The Master Roster designates one fixed post for each housing module and additional fix posts identified by need, predicated on the housing module youth population and youth on special status (protective custody, transitional measure, constant supervision, etc.). |

DCR submitted to the Monitor's Consultant CDTS Ponce and CDTS Villalba Master Rosters on the following dates for each forty-two-day cycle:

| Period of 42 Day Master Roster Cycle | Date of Receipt |
|---|---|
| March 25 - May 5, 2020 | April 1, 2020 |
| May 6 - June 16, 2020 | May 6, 2020 |
| June 17 - July 28, 2020 | July 9, 2020 |

The most recent Master Rosters continue to use the DCR shift relief factors that have been used by the Agency for multiple years.  With the submitted Master Rosters, DCR continues to use a shift relief factors of 1.73 for seven day supervisor and officer posts and a 1.23 shift relief factor for five day posts.

The table below illustrates the June 17, 2020 through July 28, 2020 DCR Master Rosters staffing at CDTS Ponce and CDTS Villalba.

| DCR Master Roster CDTS Ponce SRF Calculations | Master Roster Required Personnel |
|---|---|
| 5 PUESTOS DE 7 DÍAS X 1.73 = 8.65 (9 SUPERVISORES) | 9 |
| 67 PUESTOS DE 7 DIAS X 1.73 = 115.91 = 116 O.S.J.I. & II | 116 |
| 1 PUESTOS DE 5 DÍAS X 1.23 = 1.23 (1 SUP) | 1 |
| 23 PUESTOS DE 5 DÍAS X 1.23 = 28.29 = 28 O.S.J.I. & II | 28 |
| 144  O.S.J.I. & II + 10 SUPERVISORES | **154** |
| **DCR Master Roster CDTS Villalba SRF Calculations** | **Master Roster Required Personnel** |
| 5 Puestos de 7 días x 1.73 = 8.65 = 9 Supervisores | 9 |
| 67 Puestos de 7 días x 1.73 = 115.91 -116  O.S.J.I. | 116 |
| 1 PUESTOS DE 5 DÍAS X 1.23 = 1.23 (1 SUPERVISOR) | 1 |
| 26 PUESTOS DE 5 DÍAS X 1.23 = 31.98  (32 O.S.J.I.) | 32 |
| 162 (152 O.S.J.I. & II + 10 SUPERVISORES) | **162** |
| *Master Roster Total Personnel* | **316** |

It should be noted that the CDTS Villalba Master Roster continues to  not include required posts to staff the facility video system that was certified as operational as of October 7, 2019. Staff required for this post, consistent with DCR policy, requires an additional five personnel.

The Sumariados population has historically been involved in the most violent and disruptive incidents within the juvenile facilities. The minimum required staff youth ratio for this population often has not provided adequate supervision to ensure youth safety. Dependent on the composition and milieu of  Sumariados population DCR needs to assess

| | |
|---|---|
| | the staff youth ratio based on the volume of staff needed to ensure a safe and secure environment, absent management of youth with applying long term restrictive room status.<br><br>On April 30, 2020 at CDTS Ponce, five youth classified as Sumariados escaped from the facility at approximately 2:01 AM. The youth assaulted staff and gained access to facility emergency keys to escape. At the time of the escape, there was no ranking officer supervisory staff present at the facility. This escape event will be described relative to staffing deficiencies in January 2009 Stipulation Paragraph 2 section of the report.<br><br>Staffing rosters are inadequate to provide sufficient number of staff on all shifts without an assignment of additional staff to CDTS Ponce and CDTS Villalba. Facilities and security management cannot adequately maintain their rosters and fill mandatory posts when insufficient staff are available to them, and consequently are forced to rely heavily on double shifting to attempt to meet the minimum required staff youth ratio. The availability and manner that staff are deployed to youth populations, based on housing module youth population volume or by need to assure youth safety, has not met the requirements of this provision.<br><br>Additional staff does not assure adequate supervision of youth nor youth safety if staff is not adequately trained, supervised, coached, mentored. Effective staffing requires a behavior management skill set that emphasizes communication, intervention, active listening skills and an understanding of adolescent and young adult development. Likewise, supervisory and management staff must be available to model and develop these skills in staff, not only available at times of module disruptions or required rounds. Programming opportunities must be significantly expanded to create an operational environment that keep youth actively engaged in meaningful social, recreational, educational and vocational activities.<br><br>The Monitor and Monitor's Consultant believe that quantitatively meeting the minimum staff youth ratios, in and of itself, is not sufficient to assure youth safety, especially when 657 shift events are covered with double shifting. There are not sufficient staff and resources assigned to CDTS Ponce and CDTS Villalba to implement the requirements of the provision. |
| What is needed for full compliance? What steps are required and/or recommended? | The April 9, 2020 Joint Motion to Address Continuing Facility Safety Issues stipulates 318 officers need to be assigned to CDTS Ponce and CDTS Villalba, 67 of which are new positions to be recruited and trained. The variance between DCR staff numbers in the facility Master Rosters and the Joint Motion required staff volume and assigned staff posts and revised shift relief factors must be resolved.<br><br>Meeting minimum staff youth ratios does not necessarily equate that staffing provides adequate supervision to keep youth safe. For full compliance, staff youth ratios need to consistently meet the minimum required staff youth ratio, as well as additional staffing that is required by special populations, youth assigned to Transitional Measures, |

| | |
|---|---|
| | Protective Custody, Sumariados and 1:1 staff youth supervision events. Reliance upon placement of youth in restrictive housing statuses in an effort to provide protection from harm does not provide "adequate supervision" to ensure youth safety.<br><br>To assure youth safety, procedural and operational practices need to require direct care staff to engage in active behavior management, youth need to be engaged in robust programming, as well as classification and programming to assure adequate staff supervision to effectively manage and control aggressive youth and youth "leaders". |
| Priority Next Steps | Although there are many priority next steps, the most critical priority next step, as agreed upon in the April 9, 2020 Joint Motion would be for DCR to provide a staffing plan to the Monitor and DOJ.<br><br>The Monitor's Consulting Team had made frequent requests for access to incident report information as one of the critical components to assess youth safety. During the second quarter, all CDTS Ponce and CDTS Villalba first and second quarter incident report cover sheets were provided to the Monitor's Consultant. Access to incident report cover sheets and notification of critical incidents was significantly improved in the second quarter, although timeliness of notification and documentation needs to become more consistent.<br><br>Digitizing incident reports has long been discussed so that the Monitoring team can have immediate access to this information, but more importantly, for efficiency, consistency, and accountability purposes for DCR.  The Joint Motion reached between the Parties and filed with the Court on April 9, 2020, requires a plan by the Commonwealth for digitalizing these reports.<br><br>The Monitor's Consultant has extensive experience in development of incident report applications. The Monitor's Consultant has provided DCR with prototypes for a revised electronic incident report cover sheet, as well as a model to digitize the complete incident report.<br><br>The Joint Motion requires that DCR report to DOJ and the Monitor by June 30, 2020 with completion of digitalization of incident reports; an explanation of the digitalized system for entering incident report cover sheets, including the design of application content, quality controls and security requirements. The incident report system implementation must include time frames and individuals responsible for field testing, workload requirements, necessary changes in policy, development and implementation of training and quality assurance measures. Additionally, DCR is to designate a Project Manager who will be responsible for implementation and integration of the changes into the DCR operations. The aforementioned milestones for the digitalization of incident reports was not met in the second quarter. Development of incident report cover sheets in the DCR electronic records has made some progress, in that there is a test application available for facility staff. Digitalization of incident reports requires policy and procedural development, training and quality assurance in order to operationalize the application. |

|  | The Monitor and Consultant continue working to establish measures of safety based upon those criteria contained within Paragraph 78 reporting, and other factors. |
|---|---|
| Quality Assurance Measures | Incident report analysis and quality assurance requires consensus on incident report characteristics, definitional compliance as well as comprehensive reporting. The installation of video systems at CDTS Villalba, while assisting in the assessment of investigations, should help in assessing youth safety, youth incident events dynamics and staffing. The CDTS Villalba video system continues to not be staffed locally at the facility. Failure to staff and establish procedures for identification and review of any event of violence and use of force, with preservation of relative video, jeopardizes accurate incident reporting and comprehensive investigations. Absent staffing, policy, procedure, training and quality assurance reviews, the confidence in the accuracy, reliability and comprehensive reporting of events that impact youth protection from harm is jeopardized. |

**January 2009 Stipulation Paragraph 2:** All necessary steps shall be taken to provide sufficient direct care staff to implement the Consent Decree and adequately supervise youth, pursuant to Paragraph 48.

The requirement that 50 YSOs be hired each month was terminated by the Court on September 13, 2011 (Docket 991). No new YSOs were hired during the Second Quarter of 2020.
Nine Cadets from the DCR Academy class were trained and temporarily assigned to CDTS Ponce on June 22, 2020.  DCR did not report the nine adult cadets as new hires.

| Compliance Ratings | Non-Compliance |
|---|---|
| Description of Monitoring process during this period of time | Monitoring of S.A. 48 January 2009 Stipulation Paragraph 2 occurs through review of the monthly staffing report required by the January 2009 Stipulation Paragraph 5 provided by the DCR Human Resources Development and Training Institute. Reports were provided for April, May and June 2020, although DCR has stated that no new officers were appointed during the quarter. Additional monitoring processes that occurred during this quarter were analysis of facility populations, classification levels, youth assigned to restrictive housing, minimum required staff youth ratios, incident report cover sheets, UEMNI referrals, OISC investigations and agency and facility staff volume and assignments. |
| Findings and Analysis | **Analysis of Sufficient Staffing:**  The closure of CD Humacao did not result in the transfer of staff to CDTS Ponce nor CDTS Villalba.  The failure to transfer staff has resulted in inability to consistently meet the minimum required staff youth ratio, nor to provide the adequate supervision to keep youth safe in the least restrictive placement possible, nor to relieve the disproportionate necessity on double shifting to provide the minimum required staff youth ratio. The availability and manner that staff are deployed to facilities and youth populations, based on housing module youth population volume or by need, has not consistently met the requirements of this provision.

**Second Quarter 2020 Contraband Report Review:** |

DCR submitted contraband workbooks for both active facilities for each month of the second quarter of 2020.

CDTS Ponce reported seven contraband events for the second quarter. CDTS Ponce reported two contraband events for April; one contraband event for May; and four contraband events for June 2020.

CDTS Villalba reported five contraband events for the second quarter. CDTS Villalba reported two contraband events for April; two contraband events for May; and one contraband event for June 2020. CDTS Villalba reported significant reduction in contraband discovered in the second quarter (5 events) from first quarter (17 events).

| 2nd Quarter 2020: Reported Contraband and Types of Contraband | | | | |
|---|---|---|---|---|
| Facility | 2nd Quarter 2020: Volume of Reported Contraband Events | Sharps: blades, knives, sharp metal) | Pills/ Drugs | Cell Phones/ Accessories |
| CTS Ponce | 7 | 8 | 4 | 1 |
| CTS Villalba | 5 | 3 | 0 | 0 |

The Monitor's Consultant had access to second quarter incident report cover sheets. The second quarter incident report cover sheets that identified contraband as an event characteristics was compared to the submitted facility contraband reports. The table below displays the variance of reported contraband between two separate source documents. There should be no variance between the reported events.

| Facility | 2nd Quarter 2020: Reported Contraband by Contraband Report | April 2020 Reported Contraband by Contraband Report | May 2020 Reported Contraband by Contraband Report | June 2020 Reported Contraband by Contraband Report |
|---|---|---|---|---|
| CTS Ponce | 7 | 2 | 1 | 4 |
| CTS Villalba | 5 | 2 | 2 | 1 |
| Facility | 2nd Quarter 2020: Reported Contraband in Incident Report Cover Sheets | April 2020 Reported Contraband in Incident Report Cover Sheets | May 2020 Reported Contraband in Incident Report Cover Sheets | June 2020 Reported Contraband in Incident Report Cover Sheets |
| CTS Ponce | 4 | 0 | 1 | 3 |
| CTS Villalba | 6 | 2 | 2 | 2 |

Staff are challenged to conduct effective searches because of noted staffing deficiencies, facilities do not have operational metal detection equipment nor search hardware technology, nor comprehensive practices of strategically searching youth who are known threats to the safety of other youth or themselves.

The contraband report did not document the volume of searches that were conducted at each facility, the type of searches that resulted in the discovery of contraband, nor the volume of searches that did not result in the discovery of contraband. The volume of sharps, drugs and medications contraband that were discovered is concerning in light of

the history and volume of cutting events at DCR facilities. Numerous OISC investigations have identified inconsistent search procedures.

**UEMNI Referrals and OISC Investigations:**
UEMNI referrals, which ultimately result in OISC investigations provide insight as to events where inadequate, inattentive or procedural non-compliant staffing contributes or is a characteristic of providing adequate youth supervision and youth safety. The following UEMNI referrals or OISC investigations are cited below.

**20-020 OISC Investigation:**  On April 1, 2020, youth alleges, while being held in the CDTS Ponce admission area, verbal, and physical assault by assigned officer. Although the OISC investigation could not substantiate the allegations, it did not that it appeared that the assigned officer had left the youth unsupervised in the admissions area.

**20-023 OISC Investigation:**  On April 14, 2020, at CDTS Villalba, the assigned officer left the housing module unsupervised and without being relieved by other staff. The officer did not notify the supervisor that he was off of the module. During the absence of the officer, a youth was assaulted. The on duty supervisor did not complete an incident report as required by policy.

The OISC investigation determined the assault on the youth could have been avoided if the officer was present on the housing module and had not abandoned his post.
There was no available video for the OISC investigator to review.

**20-027 OISC Investigation:**  On May 1, 2020 at CDTS Villalba, a youth attempted suicide by tying his sheets to the interior hinge of his sleeping room door. The OISC investigation did not find there to be negligence on the part of staff. The OISC investigator did note that the young man may have refrained from suicide attempt, if the intervention of the Psychologist he was requesting had been responded to with more diligence and/or priority.

**20-028 OISC Investigation:**  On April 30, 2020 at CDTS Ponce there was an escape of five youth at approximately 2:01 AM. All five youth who escaped were classified as Sumariados. The youth escaped by getting off the unsecured housing module, gaining access to an unlocked mini control, accessing the housing module emergency keys and escaping through the module emergency exit door.
The OISC investigation made the following findings:
- Two officers assigned to the housing module had abandoned the housing module for approximately 90 minutes prior to the escape.
- The officer assigned to provide supervision to a youth on protective custody status on the module had left the module, placing the youth at risk.
- The three officers did not request permission to leave their assigned posts, but did so.

- There was no ranking officer nor supervisor present at the facility at the time of the escape.
- The officers had allowed youth to be outside of their rooms, with doors unlocked. This practice had been authorized by agency administration in light of earthquake tremors.
- The exit doors to the hall from the housing module were left open.
- The officer assigned to the mini-control module, failed to secure the entrance door to the mini control, from which the youth obtained the emergency keys.
- Youth escaped with facility keys and radios.
- One of the youth who had escaped had previously escaped from CDTS Ponce.

**20-031 OISC Investigation**:  On May 19, 2020, at CDTS Ponce Module 4 at approximately 7:49 AM the officer assigned to the module, left the module without authorization of the supervisor, nor obtained relief prior to leaving module. While off the module, a youth attempted suicide. The youth was seen in the infirmary and transported to hospital, resulting in a psychiatric hospitalization.

**20-034 UEMNI Referral:**  On June 28, 2020 at CDTS Ponce, a youth (SYS# 5580), was assaulted by four youth with a broomstick. The youth was taken to the hospital for treatment. His injuries required surgery and removal of his spleen.

The older age of the youth population, many who no longer qualify for educational services, creates a sub-culture of youth whose only purpose is to see who can exert power and intimidation over the other populations. The continual challenge for "leadership" in facilities, with a relatively small population, must be addressed and remedied.

Based on the Monitor's Consultant operational experiences, multiple years of incident report analysis, and on-site observations, it is his opinion that the continual maneuvering for leadership amongst youth has led to a culture of power and revenge. In order to assure adequate supervision and youth safety, intervention and strategies must be developed to not only curtail the "leader" culture but to end it.  The direct by-product of the negative leadership culture is the volume of assault and cutting events occurring in both facilities.

Officers properly rested, assigned, supervised and engaged in active behavior management and awareness of behavioral indicators of potential disruptive behavior increase the probability of staff being able to keep youth safe. The DCR youth population, although smaller in volume, can certainly be characterized as a more sophisticated, violent adolescent population. Effective youth supervision requires competent staffing, predicated on a volume of staff that does not rely on shifts being covered by staff doing double shifts and alternating between eight and twelve hour shifts. The serious nature of incident events, reported and unreported, certainly indicates that the staffing issue within DCR continues at an unacceptable level that is not compliant with the provisions of S.A. 48.

The aforementioned incident events and corresponding staffing deficiencies and reliance on double shifting, demonstrates DCR has provided an insufficient number of staff to

| | |
|---|---|
| | adequately supervise youth and assure youth safety. Staffing rosters are inadequate to provide sufficient number of staff on all shifts without an increase in assigned staff.  Investigations and report analysis completed during the second quarter indicate incidents occurring while required staff are off unit, working double shifts, and/or not adequately providing supervision of youth. Facilities and security management cannot adequately maintain their rosters when insufficient staff are available to them, or they are forced to rely heavily on double shifting.<br><br>The Monitor and Monitor's Consultant believe that approaching quantitative compliance with minimum staff youth ratios, in and of itself, is not sufficient to assure youth safety, especially with reliance on extraordinary volume of double shifting.<br><br>There are not sufficient staff and resources to implement the requirements of the provision.  This Stipulation is found to be in non-compliance for the second quarter of 2020. |
| What is needed for full compliance? What steps are required and/or recommended? | DCR should take immediate steps to reduce the staffing crisis by identifying the strategies it will use to fill the staffing vacancies by faithfully and comprehensively complying with the staff plan reporting requirements of the April 9, 2020 Joint Motion.<br><br>For full compliance for this provision, DCR needs to consistently provide and assure the availability of direct care staff, absent an extraordinary reliance on double shifting, to be deployed to housing modules based on the minimum required staff youth ratio, as well as the specific staff supervision needs of special populations: Transitional Measures; Protective Custody; and 1:1 staff youth supervision events. Staffing volume should be provided to assure youth safety absent sole dependence on restrictive housing placements. |
| Priority Next Steps | The Monitor's Team is analyzing how to better assess characteristics of incident reports to accurately assess the volume of events that occur impacting youth safety and adequate staff supervision of youth.<br><br>A priority next step will be to fulfill the requirements of the April 9, 2020 Joint Motion to "Improve System of Incident Reporting".  The incident report module should not be mere replication of the hard copy incident report cover sheet, but a robust reporting application that not only provides for documentation of incident events, but supports incident event analysis for procedural compliance, development of targeted training efforts, as well as incident event reduction strategies to assure youth safety.<br><br>In the interim, the Monitor's Consultant is receiving all incident report cover sheets to assess youth incident report characteristics, UEMNI referrals and OISC investigations.<br><br>Future contraband reports should document the volume of searches that were conducted at each facility, the type of searches that resulted in the discovery of contraband, and the volume of searches that did not result in the discovery of contraband. Contraband events should be documented with incident reports. In incident |

| | events in which contraband has been discovered a formal analysis of the contraband source should be conducted and shared with officers.

The Monitor and Monitor's Consultant anticipate an executable staffing plan from DCR that fulfills the requirements of the April 9, 2020 Joint Motion.  As of the production of this report, that staffing plan has not been provided. |
|---|---|
| Quality Assurance Measures | The critical next steps for quality assurance measures is to develop consensus over critical terms of this stipulation. Agreement on the importance of the accuracy and reliability of data, consensus on definitional compliance of terminology, and comprehensive reporting of events and incident event characteristics are essential for effective quality assurance measures.

Recommendations have been made to DCR that all incident events of violence and use of force should require by policy that quality assurance video reviews be conducted, assuring that incident report characteristics and narratives are accurate representation of incident events. Additionally, all incident events of violence and use of force video documentation should be identified and saved to the video server to prevent critical video events from being deleted. |
| Sources of Information upon which Consultant report and compliance is based | Reports that were used for analysis of this compliance ratings were: Second quarter CDTS Ponce and CDTS Villalba Master Rosters; DCR submitted contraband reports April, May, and June 2020;  201 incident report cover sheets were submitted April, May, and June 2020. |

**January 2009 Stipulation Paragraph 3:** Defendants will include as direct care staff all social workers assigned to its institutions, once such staff receive forty (40) hours of pre- service training, ~~pursuant to Paragraph 49 of the Consent Decree.~~ The same shall also receive annual training as direct care staff, pursuant to Paragraph 50 of the Consent Decree.

| **Compliance Ratings** | **n/a** |
|---|---|

*In approximately 2011, the Commonwealth decided not to employ the categorization of Social Workers as direct care staff as allowed by this provision to enhance coverage. However, the provision remains as a future option. Unless and until the Commonwealth determines that they want to apply this provision, the Monitor's Office will not Monitor the provision. The choice to not implement this provision is not non-compliance but has been categorized as "NA" not applicable. The ~~struck~~ part of the provision references a provision that has been terminated.*

**January 2009 Stipulation Paragraph 4:** All persons hired to comply with Paragraph 48 shall be sufficiently trained~~, pursuant to Paragraph 49 of the Consent Decree,~~ before being deployed. Defendants shall deploy all duly trained direct care staff, ~~pursuant to Paragraph 49,~~ to juvenile facilities in a timely manner.
*The ~~struck~~ part of the provision references a provision that has been terminated.*

| Compliance Ratings | Substantial Compliance |
|---|---|
| Monitoring process during this period of time | DCR reported that there were no new appointments to the agency during the second quarter reporting period, nor has there been any new appointments in the last several years. Upon hiring of any new staff, DCR Policy Chapter 4.1 and 4.2 address the agency's policy and procedure for new employee pre-service training and annual training, as well as certification prior to facility assignment.<br><br>**Officer Temporary Assignment to CDTS Ponce:**  Although DCR reported no new staff were hired in the second quarter, nine cadets from the DCR Academy participated in NIJ training on June 8 through 19, 2020. All nine officers were temporarily assigned to CDTS Ponce. Four officers were assigned to the 6:00- 2:00 shift; four officers were assigned to the 2:00 – 10:00 shift; and one officer was assigned to the 10:00 – 6:00 shift. The assignment to CDTS Ponce was effective June 22, 2020. The assignment of the nine officers to CDTS Ponce is a temporary assignment until new officers are available from a new academy.<br><br>The cadets participated in training that addressed the following subjects: PREA; Handling Alleged Abuse and/or Institutional Negligence Prevention; Suicide Prevention; Fire Prevention / Key Control; Protective Custody / Transitional Measure; Rules and Procedures in the Use of Force; Behavior Modification; Physical Health / CPR; Grip and Control Techniques; Use and Management of Mechanical Restrictions; Use and Management of Chemical Restrictions; Drafting Incident Reports; and Civil Action 94-2080 Est. Fed. / Policies and Procedures in Youth Institutions.<br><br>In light of the training provided the nine officers assigned to CDTS Ponce on June 22, 2020, this stipulation is found to be Partial Compliance (PC) for this quarter. This stipulation will continue to be monitored during future quarters that DCR hires, or temporarily transfers officers to either of the juvenile facilities. |
|  |  |

**January 2009 Stipulation Paragraph 5:** On the fifth day of every thirty-day period commensurate with the Order approving this Stipulation, Defendants shall submit a report to the Monitor and the United States providing the following: a. the number of current direct care staff, by position classification, at each facility; b. the number of qualified direct care staff hired during the previous period; c. the number of hired direct care staff in the previous period who were hired ~~and have received pre-service training, pursuant to Paragraph 49;~~ and d. the juvenile facilities where the direct care staff who were hired in the previous quarter ~~and have received pre-service training, pursuant to Paragraph 49,~~ have been deployed or assigned.
*The ~~struck~~ part of the provision references a provision that has been terminated.*

| Compliance Ratings | Partial Compliance |
|---|---|
| Description of Monitoring process | Monitoring of S.A. 48 January 2009 Stipulation Paragraph 5 occurs through review of the monthly staffing report provided by the DCR Human Resources Development and Training Institute. |

| Findings and Analysis | **January 2009 Stipulation Paragraph 5:**<br>For the 2020 second quarter, January 2009 Stipulation Paragraph 5 is found to be in partial compliance. |
|---|---|

**January 2009 Stipulation Paragraph 5:** DCR provided April, May and June 2020 staffing report required by the stipulation. The stipulation language requires that the defendants shall submit a report by the fifth day of the following month. As seen in the receipt dates of the second quarter reports, no reports were not received by the fifth day of the month.

The table below summarizes the April, May, and June 2020, January 2009 Stipulation Paragraph 5 reports:

| Month/Year | OSJ I | OSJ II | OSJ III | OSJ IV | Total | Inactive | New Hires: 2020 | Voluntary Resignation Program | Date Received |
|---|---|---|---|---|---|---|---|---|---|
| April-20 | 332 | 22 | 15 | 5 | 374 | 71 | 0 | 0 | 5/19/2020 |
| May-20 | 328 | 21 | 15 | 5 | 369 | 72 | 0 | 0 | 6/22/2020 |
| June-20 | 325 | 21 | 15 | 5 | 366 | 46 | 0 | 0 | 7/13/2020 |

In prior quarterly reporting periods, the reported volume of staff would indicate that DCR has the volume of staff to meet the requirements of S.A. 48, but a closer review illustrates that staff have not been deployed in a manner to meet minimum required staff youth ratios, nor to effectively reduce the disproportionate reliance on double shifting, nor adequate staffing to assure youth safety. In June 2020, one hundred and six juvenile officers are deployed to other DCR facilities or programs.

The table below, illustrates the January 2009 Stipulation Paragraph 5 reporting data provided for the 2020 second quarter.

| Facilities | Month/Year | OSJ I | OSJ II | OSJ III | OSJ IV | Total | Inactive | New Hires: 2020 | Voluntary Resignation Program | Date Received |
|---|---|---|---|---|---|---|---|---|---|---|
| CD Humacao | April-20 | 2 | 0 | 0 | 0 | 2 | 1 | 0 | 0 | 5/19/2020 |
| CDTS Ponce | April-20 | 110 | 12 | 6 | 2 | 130 | 45 | 0 | 0 | |
| CDTS Villalba | April-20 | 111 | 7 | 5 | 3 | 126 | 20 | 0 | 0 | |
| Nivel Cental y Otras facilidades DCR | April-20 | 109 | 3 | 4 | 0 | 116 | 5 | 0 | 0 | |
| | April-20 | 332 | 22 | 15 | 5 | 374 | 71 | 0 | 0 | |
| CD Humacao | May-20 | 2 | 0 | 0 | 0 | 2 | 1 | 0 | 0 | 6/22/2020 |
| CDTS Ponce | May-20 | 109 | 11 | 6 | 2 | 128 | 28 | 0 | 0 | |
| CDTS Villalba | May-20 | 109 | 7 | 5 | 3 | 124 | 40 | 0 | 0 | |
| Nivel Cental y Otras facilidades DCR | May-20 | 108 | 3 | 4 | 0 | 115 | 3 | 0 | 0 | |
| | May-20 | 328 | 21 | 15 | 5 | 369 | 72 | 0 | 0 | |
| CD Humacao | June-20 | 2 | 0 | 0 | 0 | 2 | 1 | 0 | 0 | 7/13/2020 |
| CDTS Ponce | June-20 | 108 | 11 | 6 | 2 | 127 | 24 | 0 | 0 | |
| CDTS Villalba | June-20 | 109 | 7 | 5 | 2 | 123 | 18 | 0 | 0 | |
| Nivel Cental y Otras facilidades DCR | June-20 | 106 | 3 | 4 | 1 | 114 | 3 | 0 | 0 | |
| | June-20 | 325 | 21 | 15 | 5 | 366 | 46 | 0 | 0 | |

| | |
|---|---|
| | Through the course of the 2020 second quarter, DCR reported a reduction in 8 total officers, from 374 to 366. Additionally, the volume of inactive officers dropped from a quarterly high of 72 to 46 in June, a reduction of 26.<br><br>DCR did not report in the January 2009 Stipulation Paragraph 5 report, the temporary transfer of nine cadet officers from the DCR to CDTS Ponce on June 22, 2020. It is being noted by the Monitor's Consultant both in January 2009 Stipulation Paragraph 4: and here in January 2009 Stipulation Paragraph 5. |
| What is needed for full compliance? | DCR must fulfill their responsibility to provide monitoring data that is required to assess compliance. During environmental or other work stoppage events such as Covid-19 quarantine, DCR needs to assure that critical monitoring data is able to be produced. Additionally, the Monitor's Consultant believes the following actions, metrics and data elements are necessary for DCR compliance with S.A. 48 January 2009 Stipulation Paragraph 5:<br>• Assessment of staffing requirements and deployment of officers to the two operational facilities to meet the minimum required staff youth ratio without unreasonable reliance on double shifting.<br>• The capacity to provide adequate staffing to keep youth safe, in the least restrictive placement possible, without dependence on restrictive housing.<br>    ○ Significant improvement occurred in the 2020 second quarter with only one youth assigned to protective custody for two days in the second quarter. One youth was assigned to transitional measures 42 days in the second quarter.<br>    ○ No youth have been on transitional measures nor protective custody status from May 11 through June 30, 2020.<br>• For each month, submit a January 2009 Stipulation Paragraph 5 staffing report to the Monitor's Consultant and the United States on or about the fifth day of the month.<br>• In the January 2009 Stipulation Paragraph 5 staffing report, the inactive (inactivos) staff identified for each facility should be identified by personnel classification type.<br>• The report should contain the number of qualified direct care staff hired or transferred from other DCR status, during the previous period (month).<br>• Identify the juvenile facilities where the direct care staff who were hired in the previous quarter have been deployed or assigned.<br>• Provide the Monitor's Consultant with each facility's electronic version of the Master Rosters that is applicable to the monthly S.A. 48 January 2009 Stipulation Paragraph 5 reports.<br>    ○ The Monitor's Consultant received electronic versions of the facilities Master Rosters for the three forty-two day roster cycles of the second quarter.<br>• DCR needs to stipulate that the volume of staff documented in each facility's Master Roster corresponds with the data in the monthly S.A. 48 January 2009 Stipulation Paragraph 5 reports. |

| | |
|---|---|
| Priority Next Steps | DCR needs to provide this report on a consistent, timely basis. In order to assess the accuracy and reliability of the S.A. 48 January 2009 Stipulation Paragraph 5 report, DCR needs to provide to the Monitor's Consultant an electronic version of each facility's corresponding forty-two day cycle Master Rosters for CDTS Ponce and CDTS Villalba and stipulate that the volume of staff documented in each facility's Master Roster corresponds with the data in the monthly S.A. 48 January 2009 Stipulation Paragraph 5 reports.<br><br>As the Monitor's Consultant has explained to the Operations Functional Team in numerous occasions, the criteria to assess the accuracy of the S.A. 48 January 2009 Stipulation Paragraph 5 report would be that the monthly report documentation be the same volume of staff that is identified in each facility Master Roster.<br><br>DCR is currently under an Order by this Court (Doc. 1436) entered on 12/19/19 to work on a plan to adequately protect the budget for this case, and designate funds to be used only for the present consent decree and not used for other purposes. As such, they must separate out staff who have been reassigned within DCR and do not serve any function within NIJ when preparing their Master Rosters. |
| Quality Assurance Measures | Upon receipt of the monthly facility Master Roster, a comparative analysis occurs with the S.A. 48 January 2009 Stipulation Paragraph 5 report to assess the accuracy and reliability of the report matching the data from the facility Master Rosters.<br><br>Ultimately, the Monitor's Consultant expectation for an effective quality assurance measure is that upon production of the S.A. 48 January 2009 Stipulation Paragraph 5 report, DCR stipulates that the numbers presented in the report correspond to the volume of staff and corresponding classifications for each facility Master Roster. If the cycle Master Report and the S.A. 48 January 2009 Stipulation Paragraph 5 report staff numbers do not match, an explanation as to why there is variance in the numbers should be provided.<br><br>As of the production of the 2020 second quarter report, DCR has not stipulated that the volume of staff documented in each facility's Master Roster corresponds with the data in the monthly S.A. 48 January 2009 Stipulation Paragraph 5 reports. |

# PROTECTION FROM HARM – CLASSIFICATION (Bob Dugan)

| | |
|---|---|
| **S.A. 52:**  At both the detention phase and following commitment, Defendants shall establish objective methods to ensure that juveniles are classified and placed in the least restrictive placement possible, consistent with public safety. Defendants shall validate objective methods within one year of their initial use and once a year thereafter and revise, if necessary, according to the findings of the validation process. | |
| **Compliance Ratings** | **Partial-Compliance** |
| Description of Monitoring process during this period of time | On March 11, 2020, the World Health Organization declared the coronavirus a world pandemic. On March 15, 2020, the Honorable Wanda Vázquez Garced, Governor of Puerto Rico, issued through the Administrative Bulletin, Executive Order OE-2020-023,  which ordered the necessary government and private closures to combat the effects of coronavirus (Covid-19) and to control the risk of contagion. As a result of the coronavirus pandemic, no site visits were conducted by the Consultant during the second quarter of 2020.<br><br>Monitoring of the various provisions of S.A. 48 were conducted through the production and delivery of the usual monitoring documentation. Communication with various members of the DCR staff was also conducted by multiple web video conferences throughout the second quarter<br><br>Throughout the quarter, and in the previous thirty-two quarters, DCR has provided detention and committed classification documentation, with corresponding youth facility assignments and assessed levels of treatment. DCR facility and housing assignments have been found to consistently correspond to youth's assessed levels of classification and treatment. |
| Findings and Analysis | Throughout the DCR Classification development process the Monitor's Consultant has continually requested that the agency provide the following core elements to assure policy and procedural compliance with the S.A. 52:<br>• An approved, agency Secretary signed policy and procedure with implementation predicated upon a training curriculum and training schedule, that addresses the requirements of S. A. 52.<br>• The policy needs to specifically require an annual validation that assesses the objective methods and efficacy of the classification processes. Revisions to the classification processes should be made based on the findings of the annual validation.<br>• The policy needs to provide an administratively approved override process for both the detention and committed classification processes.<br><br>**Classification Policies:**<br>As of close of the fourth quarter 2019, the agency has produced the following revised draft classification policies:<br>• Policy 6.1:  This revised draft policy establishes the procedures for classification to levels of treatment of youth who are committed to NIJ-DCR. |

- o   The revised draft policy addresses that the committed classification instrument (I.C.C.) is administered by personnel trained by the DCR Institute of Development and Training of Human Resources (IDECARH).
  - o   The revised draft policy provides for a process of overriding  the I.C.C. based on specific criteria.
  - o   The revised draft policy includes processes to identify a "negative leader" and assessing an additional point in the ICD scoring process.
  - o   The revised draft policy stipulates that the classification instruments are validated within one year and then annually, with revisions to the classification process in accordance with the validation findings.
- Policy 6.2: This revised draft policy establishes procedures for a comprehensive multidisciplinary assessment, that in conjunction with the custody classification tool, (I.C.C.) allows for development the youths Individualized Family Service Plan (P.I.S.). The P. I. S. provides the structure for treatment services to be provided at the institutional level, that are designed to achieve changes in committed youth allowing for positive reintegration into the community. Draft Policy 6.2 is being reviewed by the Monitor's Mental Health Consultant. Upon her review, comments and recommendations will be provided to DCR.

On 12/21/2019, the Monitor's Consultant reviewed and commented on the draft Policies 6.1 and 6.2 drafts and asked for revised policies based on his review. Upon final draft policy reviews, the polices require a Secretary's authorization signature, an implementation date, and a training curriculum and training schedule to coincide with the implementation date in a manner that assures staff are trained prior to policy and procedure implementation.
DCR has additional draft classification policies that are being revised based on the Monitor's Consultant prior reviews and comments. It is hoped that DCR will provide additional revised classification polices for review in the third quarter of 2020.

**Annual Classification Validation Reports:**
DCR has produced draft annual classification reviews for 2016-2017 and 2017-2018.  The Monitor's Consultant had reviewed and made recommendations on both of the draft annual classification reviews. The Monitor's Consultant indicated that the draft annual reviews did not meet his expectation of what the provision requires, since the reviews were little more than a statistical representation of annual classification administration. The annual reports did not stipulate as to whether the annual reviews validated the custody and detention classification instruments, and if there were any findings that required necessary revisions to classification policies and procedures. Additionally, the Monitor's Consultant recommended that annual classification validation consist of an assessment of procedural compliance to applicable policies, identify training provided, annual youth classification population profiles, specific validation findings and statement relative to any necessary revisions.

On December 19, 2019 DCR provided the Monitor's Consultant with a 2018-2019 Annual Classification Review. The content of the 2018-2019 Annual Classification Review was a significant improvement from the prior annual reviews.

DCR has indicated that the 2019-2020 Internal Validation Report on Classification Instruments

Is in the process of analysis and drafting as of the end of the fiscal year. The annual report will have integration of information and statistical data, inclusive of modification of process required by the Puerto Rico Executive Orders. DCR has indicated that it hopes to have a draft of the 2019-2020 Internal Validation Report on Classification Instruments to the Monitor's Consultant by July 31, 2020.

**DCR Classification Report:**
On August 26, 2019, the Parties reached an agreement to address critical classification issues, in light of the limited facility housing options, volume of youth that had been in restrictive housing status of protective custody and transitional measures, as well as facility violence. The specific language of the filing stated:

> Pursuant to Paragraph XVII (j), the Office of the Monitor requested a report within 60 days, with assistance from Bob Dugan, detailing current concerns with the classification system, analyzing existing data from DEC from the prior 12 months, and making recommendations for how to address current limitations while ensuring that youth remain in the least restrictive placements, consistent with public safety.  It is strongly recommended that the process include the input of the facility directors, facility compliance officers, social work supervisors and others with direct working knowledge of the classification system. Recommendations which can bring paragraph 52 into compliance, both in policy and practice, should be concrete, with specific time frames, and address underlying problems occurring with current space limitations. Please identify who will be responsible to prepare such report, who will be involved in the process, and who will be responsible for its submission.

On August 15, 2019, the Monitor's Consultant provided a classification issues outline for DCR staff to assist with the task of generating a classification report. On August 16, 2019, the Monitor's Consultant had a conference call to review the submitted classification outline with Kelvin Merced, from the DCR Office of Federal Stipulations, who was designated as the lead staff member for the Classification Report. During site visits on September 17 and 18, the Monitor's Consultant met with DCR facility and Central Office staff to discuss issues that needed to be addressed in the classification report. Addressed during these meetings was the shortcomings in the classification process to allow for the instrument to effectively address the issue of "negative leaders" and those youth who threaten the safety of other youth and staff. This situation has obviously been compounded by staff shortages and the disturbingly high volume of double shifting. The Monitor's Consultant recommended to DCR staff that consideration should be given to blending specific levels of treatment housing module assignments to allow for more flexibility in creating safe, homogenous milieus that can cohabitate and still meet treatment goals.

On October 30, 2019, DCR provided the Office of the Monitor with the draft DCR Classification Process Review. On December 10, 2019, the Monitor's Consultant met with the DCR team that was responsible for the development of the draft Classification Process Review report.

There has been no further action or response from DCR in the 2020 second quarter on the draft classification report.

**Results of Classification Study Draft:**  The following summary is a review of the draft Classification Process Review report:

- The DCR team thought the exercise was worthwhile.
- The main issue is the absence of space.
- The volume of detention admissions and length of stay is limiting options to maneuver populations.
- There was a recognized delay in the administration of the detention classification instrument (ICD) to new detention intakes. This issue will be addressed by training more social work staff on how to administer the ICD.
- The committed classification instrument is doing what it is supposed to do and as described in the 2018-2019 annual validation report, no changes are necessary.
- Management of negative leaders is an institutional issue, a function of the two facilities and is not an issue to be addressed through the classification instruments.
- In speaking with the CDTS Villalba facility director on September 18, 2019, he indicated there were no problems with the classification instruments, but rather the facility issues that they were experiencing were a result of not having enough staff.

There has been no further action or response from DCR in the 2020 second quarter on the draft classification report.

**Second Quarter Classification Profiles:**
As of June 30, 2020, the DCR second quarter committed classification housing assignments are illustrated below:



The DCR 2019 and first and second quarter 2020 committed classification housing assignments are illustrated below:



DCR Classification of Committed Youth
2019 and 2020 Facility and Level Assignments

| | CTS Ponce: Level 2 | CTS Ponce: Level 3 | CTS Villalba: Level 4 | CTS Villalba: Level 5 | PUERTAS: | Classification in process, pending institutional assignment | Total Institutional Assignments |
|---|---|---|---|---|---|---|---|
| 2020 Second Quarter Totals | 0 | 2 | 3 | 1 | 0 | 12 | 6 |
| 2020 First Quarter Totals | 0 | 3 | 0 | 0 | 0 | 18 | 3 |
| 2019 Fourth Quarter Totals | 2 | 7 | 5 | 2 | 1 | 13 | 17 |
| 2019 Third Quarter Totals | 0 | 3 | 6 | 2 | 2 | 10 | 13 |
| 2019 Second Quarter Totals | 1 | 4 | 4 | 2 | 0 | 16 | 11 |
| 2019 First Quarter Totals | 0 | 2 | 10 | 3 | 0 | 14 | 15 |

As displayed in the tables above, there was no committed classification assignments in April or May, and limited classifications in June.  Since March 16, 2020, the Judicial Branch decreed closure of operations, which restricted access to legal documentation that was required for the processes of classification. Consequently, although some youth were classified in June, youth continued to be housed in the CDTS Villalba Evaluation Module to meet the covid protocols for isolation and segregation.

Second Quarter Facility Classification Changes:  Three of the five youth who escaped from CDTS Ponce on April 30 have been detained at CDTS Villalba. The three youth are classified as Sumariados. One Sumariados youth, who was at CDTS Ponce, was transferred to CDTS Villalba.  To maximize usage of the limited housing modules, on June 17, 2020, all four youth classified as Sumariados were assigned to a housing module at CDTS Villalba. Correspondingly, the detention youth classified as low were transferred to CDTS Ponce

As of June 30, 2020, the DCR detention classification housing assignments are illustrated below:



| | 1st Quarter 2019 Totals | 2nd Quarter 2019 Totals | 3rd Quarter 2019 Totals | 4th Quarter 2019 Totals | 1st Quarter 2020 Totals | 2nd Quarter 2020 Totals |
|---|---|---|---|---|---|---|
| Volume of Admissions | 62 | 66 | 62 | 47 | 54 | 20 |
| Leve/ Low | 51 | 32 | 47 | 28 | 26 | 10 |
| Moderado/ Moderate | 10 | 31 | 8 | 16 | 28 | 6 |
| Intensivo/ Intensive | 0 | 1 | 0 | 0 | 0 | 1 |
| Egreso/ Released | 0 | 0 | 3 | 0 | 0 | 0 |
| Custodia/ Custody | 1 | 0 | 0 | 0 | 0 | 0 |
| Sumariado | 0 | 0 | 0 | 0 | 0 | 0 |
| Court Releases | 0 | 0 | 4 | 0 | 0 | 0 |
| NA | 0 | 2 | 0 | 3 | 0 | 3 |

**Second Quarter Maximazations, Fleximazations and Overrides:**

Maximazations, Fleximazations and Overrides are the terms used to describe the processes for a facility to request that a youth's level of treatment be raised, a Maximazation, or lowered, a Fleximazation. The facility is required to formally request to the Division of Evaluation and Classification (DEC) for review, approval or denial of the change in level of treatment.

For the second quarter of 2020, there were three requests for Fleximazations and four requests for Maximazation:

- One youth was flexed from a Level 4 to PUERTAS.
- Two youth were flexed from a Level 3 to Level 2.

- Four youth were flexed from a Level 4 to Level 5.

Overrides are a change in detention level classification, either to a lower of higher classification. For the second quarter of 2020, there was ten Override requests, which were all approved:

- Three overrides from severe to moderate classification.
- Three override from moderate to severe classification.
- Two moderate to low classification.
- One from low to moderate classification.
- One from low to severe classification.

The Monitor's Consultant has identified to DCR federal as a population group that would appear to be candidates for automatic consideration of an override, in light of the sophisticated behavioral youth profile, the seriousness of alleged offenses and possible sentencing sanctions being faced. As of June 30, 2020, DCR was holding seven youth on federal charges

- 4 youth are classified as detention intensive
- 2 youth are classified as detention moderate
- 1 youth is classified as Level IV treatment; this youth was committed to DCR and classified as Level IV in June 2019, prior to the signing of federal charges. At this time, he remains categorized as Level IV.

The following table identifies the diverse classification populations within CDTS Ponce and CDTS Villalba.

| Detention Classification | Committed Classification | Special Populations |
|---|---|---|
| Detention Intake | Evaluation | Puertas (mental health youth) |
| Detention: Low | Level 2 | Mental Health 1:1 Supervision Events |
| Detention: Moderate | Level 3 | Protective Custody |
| Detention: Severe | Level 4 | Transitional Measures |
| Sumariados | Level 5 | Sumariados |
| Girls Detention Population | Girls Committed | Federal Holds |

Youth in Special Population categories, although not managed as such specifically by DCR, are youth populations that require specialized services, programming and staff supervision, to assure youth are placed in the least restrictive placement possible.

The table below displays the CDTS Ponce and CDTS Villalba bed capacity and youth populations as documented in each facility's  Staff Youth Ratio weekly report document.

| CDTS Ponce | Bed Capacity | Youth Population 6/30/2020 | CDTS Villalba | Bed Capacity | Youth Population 6/30/2020 |
|---|---|---|---|---|---|
| MODULO - 1 (Detention Low) | 15 | 11 | MODULO-A-1 (Det. Severe) | 15 | 4 |
| MODULO - 2 (Detention) | 15 | 2 | MODULO-A-2 (Nivel V) | 15 | 5 |
| MODULO - 3 (N-II) | 15 | 5 | MODULO-B-1 (Det. Mod) | 15 | 13 |
| MODULO - 4 (N-III) | 15 | 4 | MODULO-B-2 (Nivel IV) | 15 | 9 |
| MODULO - 5 (Det. Niñas) | 15 | 2 | MODULO-C-1 (Sumariados) | 15 | 4 |
| MODULO - 6 (Cust. Niñas) | 15 | 3 | MODULO-C-2 (Nivel IV) | 15 | 10 |
| MODULO - 7 (N-III ) | 15 | 7 | MODULO-D-1 (Evaluation: ME) | 15 | 11 |
| PUERTAS- 8 | 15 | 3 | MODULO-D-2 (Nivel V) | 15 | 4 |
| Admissions | 4 | 1 | Admissions: (Det. Low) | 4 | 0 |
| Observation Rooms | 4 | 2 | | | |
| Hospital | | 1 | | | |
| **Total** | | **40** | | | **60** |

As of March 16, 2020, with the initiation of DCR Covid-19 quarantine protocols, new admissions to the facilities were required to be on fourteen and twenty-one day quarantines. In order to meet the DCR quarantine requirements, new admissions to the facilities, either from the community, hospitals or from another facility required quarantine placements.

In light of the limited housing capacity of CDTS Ponce and CDTS Villalba, the facility admissions and the infirmary medical room are being used for quarantine of youth. As will be noted in the table above, as of June 30, 2020, CDTS Ponce is housing one youth in the admissions area and two youth in observation rooms.

The diverse categories and classification status of youth allows for no specific housing for special status youth, absent use of Admissions or Infirmary, nor any capacity to evacuate a module for emergency, nor normal physical plant maintenance.

Throughout the third and fourth quarter, DCR indicated the housing module limitations would be resolved with the transfer of the girl's detention and committed populations to a private facility. Various dates were presented for the transfers to occur. At this time, there is no finalized contract or specific date which has been identified for the movement of girls or other special populations. At this time there appears to be no relief nor strategies offered by DCR to resolve the limited housing module options.

| | |
|---|---|
| | In light of the pending submittal of the content of the 2019- 2020 Annual Classification Review, the status of the second quarter classification draft policies, and the Classification Study Draft, for the second quarter of 2020, the Monitor's Consultant has determined that DCR is in partial compliance with S.A. 52. |
| What is needed for full compliance? What steps are required and/or recommended? | The dynamic changes caused by the reduction of youth populations  and DCR facilities, ongoing shortages of staff resulting in an overreliance on double shifts, accompanied by the absence of comprehensive planning, has jeopardized the agency's capacity to provide for the safety and treatment needs of the youth in their care in the least restrictive placements possible. |
| | Although DCR has provided a draft of the Classification Process Review, it is the opinion of the Monitor's Consultant that the agency has not seized the opportunity to adjust classification requirements and practices in response to the present physical plant housing limitations. It was the hope of the Monitor and Monitor's Consultant that the 2019 Classification Process Review would provide a process to address needed revisions to classification policy and procedures to reflect the reality of the diverse youth population categories, youth who are at risk and existing housing limitations. |
| | In the third quarter of 2020, DCR needs to address the reality of the limited space, the staffing crisis and limited housing options, accentuated by the necessary Covid protocols. Relief to limited housing options by private placement of the female population has not materialized. |
| | A legitimate dialogue addressing classification, risk assessment issues and facility space limitations compromised has been negated by DCR contention that issues of youth safety is only a result of the staffing crisis and has no correlation to the classification processes. The classification instruments must not be exclusive to treatment levels, but also provide for a balanced risk assessment and be responsive to the reality of limited housing modules. DCR representatives contend that this is not a classification issue to be addressed by DEC, but an institutional behavior management issue. The Monitor's Consultant believes that DCR needs to undertake a holistic review of classification policies in conjunction with behavior management, programming and housing limitations. This effort should address whether classification level housing segregation may be modified and yet maintain the integrity of the treatment processes. In the absence of safety, treatment cannot occur. |
| | Problem solving dialogue should addresses creating youth milieus predicated on risk assessment for safety, as well as treatment needs. The volume of assault cutting events during the fourth quarter of 2019 and first quarter of 2020, as well as a serious assault resulting in youth surgery, creates a culture of revenge and fear that jeopardizes the safety of all youth and staff. |
| | Additionally, classification process should be considered for determination of the possibility of alternate programming placements, especially in light of ongoing youth population reductions. |
| | The metrics established for compliance of this provision are the following: |

|  | |
|---|---|
|  | <ul><li>Final agency approved classification policies and procedures, implementation dates predicated upon training curriculums and training schedules are necessary for full compliance.</li><li>Classification policies need to be inclusive of a process requirement for annual classification methodology validation, findings, and revisions that are necessary.</li><li>Production of the 2019-2020 annual classification validation review of objective methods, findings and revisions as required, predicated on a dynamic assessment of the existing and forecasted youth population, as well as the limitations of two or less facilities, and alternate placement options.</li><li>Continued production of monthly detention and committed classification data, with resolution of missing classification data as a result of the Covid-19 furloughs.</li><li>100% of detention youth are classified and assigned to appropriate housing modules unless prior release by the Court.</li><li>100% of committed youth are classified and assigned to appropriate facilities and housing modules, consistent with their assigned classification treatment levels and safety requirements.</li><li>Youth are placed in the least restrictive placement possible with staff assigned to assure their safety and protection from harm, in the least restrictive placement possible.</li></ul> |
| Priority Next Steps | Current policies require that DCR "validate objective methods within one year of their initial use and once a year thereafter and revise, if necessary, according to the findings of the validation process." The purpose of the classification system, as indicated in Paragraph 52, is to "ensure that juveniles are classified and placed in the least restrictive placement possible, consistent with public safety."<br><br>It is critical to continue a review of the classification system given the reality of housing youth in only two facilities.  This is particularly true with a decreasing youth population resulting in a higher concentration of youth with a history of violence and/or mental health concerns. The volume and diversity of classification along with special populations calls for an agency wide interdisciplinary review of classification level of treatment segregated housing practices. This effort should provide the opportunity to consider processes for facility management to have the capacity to create homogenous youth housing module milieus, not limited to assigned levels of treatment, but balanced with youth safety and managing "negative leaders". The sophisticated youth who is a negative leader, rarely is the youth directly involved with acts of violence and threatening behavior.<br><br>DCR has a history of blending youth with various levels of treatment that appears not to have jeopardized the integrity of treatment goals. DCR needs to continue to review and revise classification levels of treatment housing practices to assure compliance with all of the components of S. A. 52, as well as addressing the risk and treatment needs, and housing module limitations. Successfully managing the youth leader culture within each housing module and each facility is a priority to provide youth protection from harm and assure that youth are placed in the least restrictive placement possible. |

| Quality Assurance Measures | DCR effectively documents the results of both detention and committed classification processes and youth classification, levels of treatment and corresponding housing module assignments. Additionally, for the second quarter, DCR has produced documentation in regard to overrides, Maximazations and Fleximazations. Historically, monthly documentation of detention and committed classification is consistently provided to the Monitor's Consultant. |
|---|---|
| | DCR must continue incorporate annual reviews of the validation of the objective methods of the classification instruments, processes and findings, facilitating the opportunity to systematize quality assurance into the classification processes. |
| | The 2019-2020 Annual Classification Validation Report needs to address the effectiveness of existing classification practices in light of a reduction in housing modules and how these issues impact youth treatment and protection from harm requirements in the least restrictive placement possible. The classification levels of treatment assessment and requirements must be dynamic and responsive to effective institutional placement and treatment. |
| Sources of Information upon which Consultant report and compliance ratings are based | Monthly classification documentation for youth who have been classified for detention and committed youth is provided to the Monitor's Consultant. Monthly, DCR provides the Monitor's Consultant facility youth population and classification reports. During site visits, the Monitor's Consultant obtains facility youth population documentation that identifies youth housing module populations and classification levels of treatment. |
| | Detention classification documentation provided to the Monitor's Consultant monthly, indicates youth have been consistently classified and assigned to a housing module that corresponds to detention classification level. |
| | For the second quarter of 2020, all the reviewed committed institutional assignments are consistent with the level of treatment scores and level assignments as reported in the monthly committed classification reports. Modifications in classification and housing module assignments have been made based on the challenges presented by necessary Covid protocols. Youth committed classification levels and institutional housing assignments are reviewed for procedural accuracy during site visits. |

## PROTECTION FROM HARM – USE OF FORCE (David Bogard)

| **S.A. 77.** In no event is physical force justifiable as punishment on any juvenile. The use of physical force by staff, including the use of restraints, shall be limited to instances of justifiable self-defense, protection of self and others, to maintain or regain control of an area of the facility, including the justifiable protection of significant property from damage; and prevention of escapes; and then only when other less severe alternatives are insufficient. A written report is prepared following all uses of force and is submitted to administrative staff for review. When force, including restraint, is used to protect a youth from self, this must be immediately referred to the medical area for medical and mental health evaluation and any necessary treatment. |
|---|
| **Compliance Rating** | **Partial Compliance** |

| Description of Monitoring process during this period of time | Monitor's Use of Force Consultant was unable to visit the two facilities in the second Quarter of 2020 due to the Coronavirus.  This limitation effected the efficacy of our monitoring efforts inasmuch as it made it difficult to review videos of incidents and review associated incident reports in conjunction with DCR institutional management and compliance staff. Although the Monitor's Consultant was not able to review videos and incident reports on-site, the Deputy Monitor did travel to Ponce in July  to review the three Q2 use of force incidents for the quarter (all three of the quarter's incidents occurred at Ponce). He prepared an analysis of the quarter's three incidents referred to herein.

In light of the difficulties associated with on-site review of videos, DCR and Monitor's Consultants expended considerable energies aimed at allowing for remote viewing of incident videos from the facilities. Several "WebEx" calls were directed at establishing the actual requirements and protocols for remote viewing. Unfortunately, despite the efforts by DCR IT staff, this goal was not realized during the Second Quarter (or as of the date of this report) due to ongoing technical obstacles associated with remote access.  An additional consideration is that Villalba still does not have dedicated personnel to oversee its new CCTV, (video) system despite assurances by DCR that such staffing would be in place as long ago as October 2019.

An additional consideration was that DCR's video system was predicated on saving storage space by overwriting videos after 30 days of storage, unless otherwise saved. To avoid the loss of videos, a protocol was established this quarter whereby the Monitor identifies use of force and other videos based on reviews of Incident Report Cover Sheets and DCR takes necessary measures to preserve those videos prior to the thirty day overwrite so that DCR can insure that the video events are not lost.

The primary review tools were the incidents reported by DCR on its weekly ¶48 reports, Incident Report Cover Sheets, and Use of Force checklists. |
| Findings and Analysis | The three use of force incidents this quarter was the lowest reported figure in five previous quarters (averaged 6.2). Villalba reported no uses of force. |

| Facility | Q1-20 Events: Use of Force | Q1-20 Youth Involved | Q1-20 Physical Restraints | Q1-20 OC | Q2-20 Events: Use of Force | Q2-20 Youth Involved | Q2-20 Physical Restraints | Q2-20 OC |
|---|---|---|---|---|---|---|---|---|
| CTS Ponce | 6 | 19 | 22 | 0 | 3 | 4 | 12 | 1 |
| CTS Villalba Total | 4 | 7 | 16 | 0 | 0 | 0 | 0 | 0 |
| Total | 10 | 6 | 38 | 0 | 3 | 4 | 12 | 1 |

Notably, the one use of chemical agents continue the three quarter trend of zero or only one such use.  This very positive trend is reflective of DCR policy 9.18 that permits OC to be used only, "in extreme situations and as a last resort where an imminent and significant threat is

posed to staff or other youth by the subject." The OC figure is encouraging, as was the decrease in the use of physical restraints.

There were three use of force incidents this quarter, all of which were reviewed by OISC and the deputy monitor via on-site video at Ponce.  One involved a substantially out of control, seriously mentally ill youth housed in PUERTAS. Staff appeared to display great patience and attempts to de-escalate and calm the youth who was roaming around the module, throwing objects and complaining about not having a pillow.  It was only when the youth threatened several staff  with a PVC pipe that the supervisor ordered that force be used pursuant to a progression of force techniques (i.e., chemical restraints, physical restraints, and mechanical restraints) intended to control the youth so that a psychotropic medication could be injected on orders by the psychiatrist (and implemented by the nurse). Importantly, nursing staff documented that the youth incurred no injuries as a result of the force.

Monitor's staff who reviewed the video of the incident concluded that staff acted within the boundaries of current policy and training, and the OISC investigation determined that there was no excessive use of force employed. However, Monitoring staff raised questions about staff actions that *preceded* the uses of force, including why the psychiatrist ordered the youth- who was on constant supervision status- to be locked out of his room late in the evening, and why he was permitted to run around the dayroom unabated for more than an hour, (although that permissive approach was attributed in the OISC report to the supervisor's efforts to de-escalate and avoid the use of force.) There were also significant inadequacies related to some of the incident reports prepared by officers who were directly involved in the incident. And while it appears that staff used force consistent with policy, procedure and training, the incident raises questions about whether modified procedures or training should be considered for officers assigned to PUERTAS.

The other two use of force incidents involved (1) two officers simply separating two youth who were fighting over disputed leadership status, and (2) officers holding a youth who had self-lacerated while under therapeutic observation and was refusing to wear a paper gown; both incidents appeared to have been handled well by officers with minimal and appropriate uses of force.  In summary, each of the three use of force events this quarter were handled without any excessive force and officers continue to exhibit significant patience and de-escalation when there is opportunity to do so.

In the previous quarter we identified three incidents in which force was certainly used at Ponce, but appeared to go unreported as uses of force on incident cover sheets, incident reports, use of force checklists and, as a result, on ¶48 weekly reports. Our concern about misreporting was reiterated to DCR management clearly and repeatedly during this second quarter and there was no indication that there were any repeats this quarter.  However, despite our numerous expressions of concern about the possibility of future such reporting problems, we are not aware of any policy changes or protocols developed to put into place measures to insure no such problems in the future and lack of access to videos due to travel

| | |
|---|---|
| | restrictions may make it more difficult to fully assess the accuracy of incidents being categorized as uses of force. |
| What is needed for full compliance? | In order for the Monitor's Consultant to find substantial compliance with ¶77, DCR must be able to provide accurate and reliable evidence in incident reports, videos and OISC investigations of force routinely being used according to the procedures set forth in Policy 9.18 and DCR training.  Completion of the CCTV system at Villalba, including assignment of staff on the master roster for video monitoring and providing enhanced views of certain areas for which there is currently inadequate coverage (at both facilities), will enhance the utility of the CCTV system and potentially provide additional evidence of compliance. |
| What steps are recommended? | 1. DCR must establish a policy or protocol or further training to ensure all use of force events are consistently and accurately documented in incident reports, incident report cover sheets, use of force checklists, P48 weekly reports;<br>2. Complete implementation of  the video camera system at Villalba, including resolving technical problems and providing necessary master roster personnel to provide on-site capacity to save and view incidents;<br>3. DCR must establish its own internal mechanisms to identify and review videos of incidents  for preservation by establishing protocols for identifying significant use of force and other violent incidents and preserving them prior to their 30-day overwrites;<br>4. Expand camera coverage at Ponce and Villalba to view infirmary areas, mini-controls/sallyports and admissions and living unit dayroom glass walls;<br>5. OISC should more directly include in investigations specific assessments of compliance with ¶77 and Policies 9.10, 9.18 and use of force training with references facts obtained and assessed relative to language contained in those sources;<br>6. DCR should evaluate whether different use of force policies, procedures and training are necessary in the PUERTAS unit due to the mental health status and vulnerability of youth assigned to that module;<br>7. Both facilities should routinely conduct and document after-incident case reviews to evaluate use of force incidents;<br>8. Provide the Monitor with the most current versions of use of force training, Bi-annual chemical agents training and Policy 9.18;<br>9. DCR IDECARH needs to provide updated evidence to the Monitor's Office that all staff have recently received the required training in the revised Use of Force Policy 9.18 and reporting requirements included in 9.10. |
| Sources relied upon by Consultant for report and Compliance Ratings | DCR's ¶ 48 weekly spreadsheet reports of use of force incidents<br>Review of Ponce incident videos<br>IDECARH revised training materials reflecting the August 2018 revised policies 9.18 (use of force) and 9.10 (reporting).<br>DCR incident reports and cover sheets<br>Use of Force checklists prepare for each applicable incident |

| | OISC investigation reports |
|---|---|

## Protection from Harm:  Investigations of Abuse and Institutional Neglect – Kim Tandy

> **S.A. 78.**  Defendants shall take prompt administrative action in response to allegations of abuse and mistreatment.  An incident report shall be prepared for each allegation of physical or mental abuse, including juvenile on juvenile assaults, staff on juvenile abuse, and excessive use of force by staff, within 24 hours of the incident.  A copy of each incident report together with the preliminary investigation prepared by the Police Department and/or AIJ shall be forwarded to Defendant Department of Justice, where the allegations shall be investigated and a final report shall be made in 30 days.  In addition, a copy of each incident report alleging physical or mental abuse by staff or excessive use of force by staff together with the preliminary investigation prepared by the Police Department and/or the AIJ, shall be forwarded to the Defendant Department of Social Services.

| Compliance Rating | Partial Compliance |
|---|---|
| Description of Monitoring process during this period of time | The Joint Motion filed on April 12, 2020, and subsequently ordered by the Court, includes numerous requirements for digitalizing incident reports, and a process for the Monitor's office to receive timely incident reports manually until such digitalization is complete.  During this second quarter, NIJ worked with Bob Dugan from the Monitoring Team to develop an electronic incident report module for the electronic incident record system. This required revisions of the existing incident report cover sheet to a more robust reporting application. The Joint Motion and Order also requires NIJ to provide full access to incident report cover sheets manually until such digitalization is completed.  Bob Dugan established a tracking system in excel which documents all incident reports for the first six months of the year by facility, type, IR numbers, UEMNI referrals, and OISC investigations where warranted. Information regarding both processes is analyzed below in greater details.<br><br>The Monitor also tracks online alerts and other case information in the online system to ensure that events which should be listed as incidents are consistently reported. Where such events did not result in the creation of an incident report, where the incident was not properly referred to UEMNI, or where the UEMNI referral should have resulted in an OISC investigation as a Level 2 incident, this information was brought to the attention of compliance staff by the Monitor.<br><br>The Monitor met with Alexis Rodriguez Rivera, Sub-Manager of Investigations for O.I.S.C. by phone regarding Paragraph 78 on May 21, 2020. The meeting focused on the current status of OISC given COVID-19, earthquakes which caused damage to their offices early in the quarter, as well as delays caused in prior quarters by the assignment of other responsibilities. The meeting also covered information relative to recent investigations, as well as opportunities given new leadership.<br><br>Mr. Rodriguez provided the Monitor with a plan on May 22 for catching up on investigations which were overdue from 2019, and from the first quarter of the year.  As a result, the |

| | |
|---|---|
| | Monitor received twenty (20) investigative reports during the quarter, including the remaining five (5) which had been delayed from 2019.  Five cases targeted for completion by June 25, 2020 were not completed by the end of the quarter, and are overdue.<br>The Monitor reviewed and analyzed the twenty (20) OISC investigations, a substantial increase from nine (9) received in the First quarter, and fifteen (15) from the last quarter of 2019. |
| Findings and Analysis | The approved policies for this provision include  policies on Incident Reporting (Policy 9.10), the analysis of referrals of abuse and/or institutional neglect by UEMNI (Policy No 13.2.1); immediate prevention actions regarding serious allegations (Policy No. 13.2.2); and final determinations on referrals of abuse and/or institutional neglect (Policy 13.2.3). Investigations by UEMNI and OISC under this provision are reviewed against these policies as well as others based upon the implication of staff actions taken.<br><br>No retraining on these policies occurred during the second quarter, however, new cadets and newly appointed facility and security directors were trained on recognizing and reporting institutional abuse and neglect in the June training session.<br><br>**Incident Reporting**<br><br>Police 9.10 requires "appropriate communication mechanisms in order to take immediate action in case of incidents, routine or emergency, for ensuring that information on security, the well-being of the health of children and staff will be channeled timely and appropriately."<br><br>Development of the incident report application has several important goals, as described by Bob Dugan in the recommendations he provided to DCR.  The incident report module should:<br><br><ul><li>Allow for documentation of comprehensive incident event characteristics to accurately assess the volume of events occurring impacting youth safety and adequate staff supervision of youth.</li><li>Provide comprehensive documentation of incident events in data fields that allow for analysis;</li><li>Support analysis of incident events for procedural compliance;</li><li>Provide data for development of targeted training efforts; and</li><li>Provide data for incident event reduction strategies to assure youth safety and well-being.</li></ul><br>During the Second Quarter, DCR worked with Bob Dugan to make revisions in the Incident Report Cover sheet. Twenty two (22) cover sheets from Ponce were entered into the test application, and were reviewed by Bob Dugan electronically.  The analysis provided insights into improvement opportunities of the application, including more thorough quality assurance reviews at the facility level, assuring definitional compliance, and comprehensive reporting of all incident report characteristics to ensure the accuracy and reliability of the incident report application. |

The Joint Motion (Doc. 1477) and Order requires that DCR complete its digitalization of incident reports based upon the information contained in the manual format by June 30, 2020, and also report to the Monitor on that day:

- An explanation of the digitalized system for entering incident report cover sheets including the design of application content, quality controls, and security requirements; and
- Steps needed, time frames for implementation, and individuals responsible for field testing, workload requirements, necessary changes in policies, development and implementation of training, and quality assurance measures.
- A time table to DOJ and the Monitor for any necessary changes in policy, training, and implementation of the new forms, and a project manager responsible for implementing and integrating the changes in DCR operations.

While the Incident Report Cover sheet has been revised and significantly improved, and testing of the application has begun, the remaining information required by the Court's Order has not been received.

The second part of the Order pertains to the manual delivery of incident report cover sheets to the Monitor weekly, with many incidents require notification within 48 hours, and in some cases, 24 hours. DCR has produced PDF versions of all incident report cover sheets for the first six months of 2020.  This practice should continue until the digitalization is complete, and is compliance with the Court's Order of April 9, 2020.

The table below displays the volume of incident report cover sheets submitted by each facility for each month for the first six months of 2020.

| Facility | Jan-20 | Feb-20 | Mar-20 | Apr-20 | May-20 | Jun-20 | First Quarter Totals | Second Quarter Totals | Six Month Totals |
|---|---|---|---|---|---|---|---|---|---|
| CDTS Ponce | 35 | 26 | 53 | 27 | 28 | 31 | 114 | 86 | 200 |
| CDTS Villalba | 29 | 37 | 35 | 48 | 37 | 30 | 101 | 115 | 216 |
| Totals | 64 | 63 | 88 | 75 | 65 | 61 | **215** | **201** | **416** |

During the second quarter, of the 86 incident reports made at CDTS Ponce, 11 UEMNI referrals were made.   For the same time period at CDTS Villalba, of the 115 incident reports, 4 UEMNI reports were made.

**UEMNI Data regarding Harm to Youth**

Information below in the next several charts was received by UEMNI, and provides information on the number of youth on youth incidents, use of force incidents, and incidents involving suicidal or self-mutilating behavior, gestures or ideation.  This information has not yet been matched with the incident report tracking system in all areas. Where there are differences between the two systems, they are noted below.

Incident Tracking by Quarter involving Harm to Youth

| A. General Measures by quarter | 3rd 2019 | 4th 2019 | 1st 2020 | 2nd 2020 |
|---|---|---|---|---|
| A.1 Average Monday 1st Shift count of youth | 114 | 109 | 103 | 112 |
| A.2 Number of incident events | 34 | 26 | 36 | 35 |
| A.3 Number of youth-to-youth incident events | 12 | 8 | 11 | 5 |
| A.4 Incident events involving use of force by staff | 3 | 5 | 10 | 5* |
| A.5 Incident events with suicide act, ideation, or gesture | 14 | 11 | 5* | 8** |
| A.6 Incident events w/ self-mutilation act, ideation, or gesture | 8 | 5 | 6* | 19** |

* The Monitor's information, as verified by David Bogard, is that three separate use of force incidents occurred involving a total of 4 youth. Three separate types of force were used on one  youth, and it may be that this is included in the number reported above.
**The number of incident reports received involving suicidal gestures, acts, or ideation, as well as self-mutilation acts, ideation or gestures is low as compared to monthly data which is prepared for and received by the Mental Health Consultant.  For the second quarter, documentation received by the Mental Health Consultant indicates that there were 12 incidents involving suicidal acts, ideation or gestures, and 13 incidents involving self-mutilation acts, ideation or gestures.

Mental Health Incidents – Including 284 Reports
The subset of incidents involving suicidal acts, ideation, or gestures, or self-mutilation acts, ideation or gestures is found in Table B.  Most of these do not warrant abuse allegations.  If a 284 report is filed, implicating possible abuse by a staff member or other, the case also moves through the investigative stage.

For this chart, the Monitor has used the information provided in the monthly data sent by UEMNI, however this does not coincide with the numbers provided to the Mental Health Consultant, as noted above.

| B. Mental Health Record Information | 3rd 2019 | 4th 2019 | 1st 2020 | 2nd 2020 |
|---|---|---|---|---|
| B.1 Suicidal incidents, ideation or gestures | 14 | 11 | 11 | 8 |
| B.2 Number of individual youth referenced | 14 | 11 | 11 | 6 |
| B.3   Cases involving ideation only | 9 | 3 | 5 | 4 |
| B.4 Cases involving suicide gesture | 1 | 5 | 6 | 2 |
| B.5 Cases involving suicide intention | 4 | 3 | 1 | 2 |
| B.6 Cases w/ ambulatory treatment | 5 | 7 | 5 | 1 |
| B.7 Cases with hospitalization | 9 | 4 | 6 | 7 |
| B.8 Cases leading to death | 0 | 0 | 0 | 0 |
| B.9 Suicide Cases with 284 report filed | 0 | 4 | 1 | 2 |
| B.10 Self-mutilations incidents, ideation or gestures | 8 | 5 | 9 | 19 |
| B.11 Number of individual youth referenced | 8 | 5 | 9 | 11 |
| B.12 Cases requiring sutures | 3 | 2 | 1 | 0 |
| B.13 Cases requiring hospitalization | 0 | 3 | 3 | 5 |
| B.14 Cases leading to death | 0 | 0 | 0 | 0 |
| B. 16 Self-Mutilation Reports with 284 Referrals | 3 | 1 | 3 | 4 |

During the second quarter, only four (4) of the nineteen (19) incidents involving self-mutilation resulted in a 284 report being filed. Two (2) of the eight (8) cases involving suicidal gestures or ideation resulted in a 284 case being filed.  For a discussion of these incidents and how they were handled, see Dr. Martinez's analysis for Paragraph 63 in the Mental Health section.

### Responses to Abuse Referrals
The next table summarizes abuse referrals and the initial responses to such referrals.

| C. 284 Incidents by quarter (2019) | 3rd | 4th | 1st | 2nd |
|---|---|---|---|---|

| | | | | |
|---|---|---|---|---|
| C.1 284 Incident Events | 20 | 11 | 19 | 15 |
| C.2 Level One Incident Events | 1 | 1 | 3 | 3 |
| C.3 Level Two Incident Events | 19 | 10 | 16 | 12 |
| C.4 Referrals to OISC | 19 | 10 | 16 | 12 |
| C.5 Youth to Youth incidents | 12 | 8 | 9 | 5 |
| C.6 Youth to Youth Injuries | 6 | 2 | 3 | 1 |
| C.7 Youth to Youth with External Care | 5 | 4 | 3 | 3 |
| C.8 Youth to Youth Sexual | 0** | 0 | 2 | 1 |
| C.9 Youth to Youth Sexual  w/injury | 0 | 0 | 0 | 0 |
| C.10 Staff to Youth Incidents | 8 | 3 | 10 | 10 |
| C.11 Staff to Youth Injuries | 1 | 0 | 2 | 5 |
| C.12 Staff to Youth External Care | 3 | 0 | 3 | 1 |
| C.13  Staff to Youth Sexual | 1 | 0 | 0 | 1 |
| C.14 Staff to Youth Sexual w/injury | 0 | 0 | 0 | 0 |
| C.15 284 Incidents with Admin. Action | 20 | 11 | 19 | 15 |
| C.16 284 Incidents with report by shift end | 19 | 11 | 18 | 15 |
| C.17 Level 1 investigations completed 20 days | 1 | 0 | 3 | 3 |
| C.18 Special Operations interventions | 2 | 0 | 0 | 0 |
| C.19 SOU reports with 284 investigations | 1 | 0 | 0 | 0 |
| C.20  284 with Item 5 completed | 20 | 11 | 19 | 15 |
| C.21 284 with Staffing Compliance | 19 | 11 | 19 | 15 |
| C.22 Percent of 284 cases with staffing compliance | 95% | 100% | 100% | 100% |

** One sexual assault allegation was received and is noted although it was incorrectly identified in the data.

A determination is made at the institutional level as to whether incidents are Level One or Level Two based upon criteria in the Cernimiento de Incidentes de Alegado Maltrato Institucional form.  Level one incidents by definition include verbal abuse and some forms of

physical aggression.   Level Two incidents include material exploitation, incidents of a sexual nature, death, various instances of institutional neglect, including youth self-harm, undue restrictions with medication, misuse of mechanical restraint or pepper spray, and excessive use of force.  Level One incidents are investigated locally at the institution. Level Two incidents are investigated by OISC. Referrals to OISC as based on the screening protocol.

A review during the 2nd quarter shows four (3) Level 1 reports made.  Level I cases followed the same format/guidelines than Level II cases but the facilities' investigators only have 20 working days to finish the investigation.

Initial Case Management Measures Taken

| D. Initial Case Management Measures (2019-2020) | 3rd | 4th | 1st | 2nd |
|---|---|---|---|---|
| D.1 284 percent with admin actions | 100% | 100% | 100% | 100% |
| D.2 284 per cent completed by end of shift | 95% | 100% | 95% | 95% |
| D.3 284  Level 1 Investigation Complete Within 20 days | 100% | 0% | 100% | 100% |

.

**OISC Investigative Reports**

The Monitor reviewed and analyzed the twenty (20) OISC investigations, a substantial increase from nine (9) received in the First quarter, and fifteen (15) from the last quarter of 2019

| E. OISC (2019-2020) | 3rd | 4th | 1st | 2nd |
|---|---|---|---|---|
| E.1 Cases Referred from this quarter | 19 | 10 | 16 | 12 |
| E.2 Received by OISC Within 24 hours | 16 | 10 | 15 | 10 |
| E.3 Completed by OISC Within 30 workdays | 9 | 1 | 3 | 1 |
| E.4 Complete during the next quarter, but within 30 days | 0 | 2 | 3 | 12 |
| E.5 Cases Not Completed by OISC Within 30 days. | 10 | 9 | 10 | 11 |
| E.6 Percent of OISC cases completed within 30 days | 47% | 10% | 19% | 12% |
| E.7 Completed Cases Returned for Further investigation | 1 | 0 | 0 | 0 |

| | | | | |
|---|---|---|---|---|
| E.8 Percent of cases returned for further investigation | 10% | 0% | 0% | 0% |
| E.9 Further Investigation Completed | 0 | 0 | 0 | 0 |
| E.10 Cases this quarter incomplete, including further investigation | 10 | 9 | 6 | 5 |
| E.11 Percent of cases from this quarter not yet completed | 53% | 90% | 84% | 2% |

OISC staff made a concerted effort to address outstanding reports both from 2019 as well as the earlier part of 2020.  While a significant percentage of the reports noted above were not timely, the backlog of investigations was significantly reduced this quarter as a result of pulling in other investigators to assist with completion, under supervision of those trained in handling juvenile investigations.

NIJ's quarterly statistical report indicate that for the third quarter in a row, a majority of investigations were not completed within the 30 day completion time.  OISC staff were used to carry out investigations of candidates for the adult training academy during the last two quarters of 2019. In the first quarter of 2020, staff were hampered by damage to the Ponce offices, as well as stay at home orders during March from the COVID-19 pandemic, and with some restrictions in place during the second quarter.  This quarter shows significant progress in making up the backlog.  Of the

## Administrative Determinations

The following table summarizes the decisions and actions taken in cases that do not involve criminal charges.

| F. Administrative Determinations for 284 Cases (2019-2020) | 3rd | 4th | 1st | 2nd |
|---|---|---|---|---|
| F.1 Cases with youth discipline referrals | 38 | 16 | 25 | 23 |
| F.2 Cases with youth discipline actions | 31 | 10 | 22 | 11 |
| F.3 Cases with youth no discipline actions | 7 | 6 | 3 | 12* |
| F.4 Cases Staff/youth with determinations | 24 | 17 | 8** | 6 |
| F. 5 Cases recommending personnel actions | 12 | 9 | 6 | 2 |

*Of the youth who were not disciplined, 4 were as a result of USMIC recommendations, 1 was in COVID quarantine protocol, 5 were youth who escaped, and one youth was in hospitalization.

** Full information is not yet available for 12 employees from prior quarter.

A summary of actions taken by the legal department is provided at the end of the fiscal year as part of the annual report.  It would be helpful to indicate whether such decisions were overturned on appeal or through any other process.  The summary should also provide information on the nature and extent of disciplinary actions involving youth.

Prosecutorial Determinations for 284 Cases

| G. Prosecutorial Determinations for 284 Cases (2019-2020) | 3rd | 4th | 1st | 2nd |
|---|---|---|---|---|
| G.1 Cases received by PRDOJ | 1 | 0 | 0 | 1 |
| G.2 Cases with decision  not to prosecute | 1 | 0 | 0 | 0 |
| G.3 Cases with referral for prosecution | 0 | 0 | 0 | 1 |
| G.4 Cases pending determinations | 2 | 2 | 2 | 2 |

**Discussion Regarding UEMNI Reporting and Investigations**

Decision making as to whether a 284 referral is correctly classified as a Level I or Level II incident, and thus whether the investigation is done by UEMNI or by OISC, is the responsibility of UEMNI. NIJ uses the Cernimiento de Incidentes de Alegada Maltrato Institucional as a tool to determine which level of investigation should occur. That form is signed off on by UEMNI staff as well as the facility director.

Policy 13.2.1 requires that UEMNI be diligent about the appropriate classification of referrals of alleged abuse and reclassify within 48 hours as appropriate.  At times, Level I incidents have been reclassified as a Level II based incorrect or inaccurate completion of the Cernimiento form.  Incident 20-022 during the second quarter was improperly classified as Level I and reclassified as Level II.  Another incident, 20-034, was classified as a Level I incident involving a youth assault, in spite of the fact that the youth injured was hospitalized with serious injuries. This was changed after the Monitor received the referral and questioned the Level I classification as improperly made.

**Discussion Regarding OISC Investigations**

Many of the OISC investigations completed this quarter reflect delays in assigning cases to OISC after incidents occurred, or did not include the assignment date and required deadline. In some cases, they delays were substantial.  For example, OISC 19-064 involves an incident which occurred on October 16, 2019 where a youth made suicidal gestures by fastening a pair of trousers around his neck.  There is no case date assigned, and no chronology chart of actions taken by OISC. The report was not completed until June 8, 2020, nearly 7 months late. Findings are unclear in that they do not indicate what policies were implicated, if at all, and whether individual staff were in violation of those policies.  OISC report 19-072 involves a

report from December 1, 2019 involving three youth who tested positive to controlled substances, and lists an assignment date of June 12, 2020, and a completion date of June 22, 2020. There is no indication why the incident was not assigned for six months. Another report, OISC 19-066 involving a youth assault occurring on November 6, 2019 was assigned on November 7, 2019, but not completed until June 10, 2020. A fourth OISC report, 19-068 involves an incident of an alleged threat by a youth to cut the face of another, occurring on November 24, 2019. It was assigned on November 26, but not completed until June 8, 2020, roughly five and a half months late.

At least 3 other investigations from early late 2019 and early 2020 were overdue by several months. In one case, involving the attach on a youth who was in protective custody which occurred on January 16, 2020, the OISC report notes that the investigation was assigned on January 21, 2020, and "had been investigated by UEMNI in February 2020 as a Level I and was returned to OISC to investigate as a Level II, on May 22, 2020." The OISC report was completed on June 9, 2020, nearly five months after the incident.

The timeliness issues can be attributed in part to the unfortunate incidents in the first and second quarters involving earthquakes and COVID-19. But the backlog of case occurred before these incidents as a result of OISC staff being pulled to conduct investigations elsewhere within DCR with two new cadet classes.

A review of twenty (20) OISC reports received for the quarter for substance reflects some discrepancies in the quality and thoroughness of the reports, unlike in other quarters. This may be in part the result of OISC pulling other investigators in to decrease the backlog who may not be as familiar with NIJ operations and policies. In some cases, information was incomplete as a result of interviews which could not be conducted, training records which could not be provided, or other documentation which could not be viewed since may staff were not in central office when the March government shutdown occurred. Conclusions were not always as clear, and at times did not tie back to the initial allegations, or did not provide an analysis of the policies which were reviewed regarding the alleged misconduct. For example, in the January 16th incident, OISC found there was "documentary evidence and witnesses which attributed negligence to the official" involved, there are no corresponding policies noted which laid out the expectation, and when violated, led to this conclusion.

OISC reports have identified several important issues during this quarter as a result of their latest investigations of possible abuse and/or neglect within the institutions. Threats or actually assaults by youth of other youth are noted in several investigations. In one case, a youth was assaulted by five other youth and was hospitalized, requiring 14 stitches. OISC appropriately raised questions about the youth's transition from being in protective custody back on unit after there have been other problems with his integration. In other case, where a youth was threatened a knifepoint, OISC notes insufficient searches being done, with considerable time between them, in a unit with particularly aggressive youth. Another assault occurred against a youth recently out of protective custody, and involved multiple other youth who cut his face causing multiple wounds. The question was raised by OISC as to whether the youth from two separate modules should have been having recreation together, which is when the incident occurred.

| | |
|---|---|
| | Improper staffing and supervision is noted in some cases by OISC, such as an investigation of a youth in protective custody who was let out of his room without an escort, and was able to assault another youth.<br><br>The degree to which searches are done of units remains an issue, as noted by OISC in various cases, including one where two youth were found self-mutilating in the PUERTAS unit. Given the nature of this unit, it was recommended by OISC that searches should be done more regularly to avoid this danger.<br><br>Finally, OISC's report regarding the May 10, 2020 escape of five sumariado youth raises very serious concerns about security at Ponce, including youth being out of their rooms, improper supervisory personnel on the property, absenteeism of officers, and the lack of an effective search protocol of the area used by the youth to escape. This incident has resulted in changes to security supervisory staff.<br><br>OISC's critical investigative function has been hampered over the last several months because of being used for other purposes within DCR, and as a result of earthquakes and COVID-19 this quarter. While the latter of these could not be avoided, DCR must ensure that it is allocating appropriate resources to allow OISC to carry out its functions in relation to this case.<br><br>Historically, there has been little follow up within NIJ after these investigations are completed. The Monitor has requested examples of how OISC concerns are addressed by management, and the steps being taken to rectify trends identified through these reports. The Monitor remains concerned that information from OISC investigations which implicates problems with policy and practice is not shared with key managerial staff. The requested special report on safety issues includes an assessment of officer training in the area of security measures, and whether changes/improvements could increase safety for youth and officers. The report also requests a review of current practices regarding the use of information from OISC reports by management staff. That report was not received during the second quarter as required. |
| What is needed for full compliance? What steps are required and/or recommended? | Paragraph 78 is a critical aspect of protecting youth from harm while incarcerated in NIJ facilities. The process is designed to ensure that allegations of harm are immediately reported, investigated at both the facility level and through OISC, and that appropriate actions are taken for discipline against youth and/or employees involving such misconduct. Of equal importance, however, is that the process should identify policies which may need to be changed, additional training which may need to occur, and/or other measures which should be taken in response to incidents which have been investigated. In that sense, Policy 13.2.1 has as part of its purpose, "to prevent and minimize the occurrence of situations involving abuse or institutional neglect."<br><br>NIJ must ensure compliance with Policy 9.10 regarding consistent reporting of incidents as noted on the Incident Report Cover Sheet. As DCR moves toward digitization of its incident reports, a review of the policy and cover sheet format should be done to ensure it captures |

data necessary to generate effective management reporting.  NIJ has not complied with the Court order of April 10th regarding the digitization of incident report cover sheets.  NIJ provided copies of the incident report cover sheets manually for the first 6 months, and must continue to do so in the absence of the online system being functional.

Compliance measures require:

1) Timely reporting by NIJ of all incident reports (cover sheets) as detailed in other aspects of this report, to the Office of the Monitor. This ensures the Monitor that incidents are appropriately reported for investigation, or otherwise identified for review and possible 284 referrals. All incident reports are to be submitted weekly, but those of a more serious nature identified elsewhere must be submitted within 24 hours, or 48 hours, consistent with the Agreement between the Parties filed on August 26, 2019, and April 11, 2020.

2)  UEMNI must ensure that cernimiento forms and timely and complete, and properly identify incidents which are referred for investigation as a Level 1 or Level 2.

3) OISC investigations must comply with the 30 day time requirement for completion, and should be submitted to the Monitor on a timely basis once sent to the Secretary of DCR.

4)  OISC investigations should continue to evaluate compliance with procedural requirements regarding the handling of incidents, and equally important, contain sufficient detail with regard to violations of policy, credibility of facts and evidence supporting or disavowing allegations, and other relevant conclusions reached by the investigators.  Processes must be in place within facilities and NIJ leadership to then utilize these findings to make needed changes. Reports should be completed within 30 days of referral; while some reports may require additional time, the rate of timely completion during this quarter and last quarter was exceptionally low. This needs to be a priority.

4)  Consistent with the purpose of Paragraph 78, and Policy 13.2.1, measures must be in place to prevent and minimize the occurrence of situations involving abuse or institutional neglect. At a minimum, reporting on this should include:

  a)  Quarterly statistical reports of incidents involving allegations of abuse or institutional neglect, with analysis of possible patterns, trends, and other observations which can help prevent further incidents;

  b)  Evidence of meetings which document meetings with management and others to discuss cases of alleged abuse, status and outcomes of investigations, evaluation of patterns of recurrence, compliance with the terms, and discussions of alternatives for the prevention of incidents. Summaries of these meetings and decision regarding policies, training needs, and other appropriate action steps should be documented and submitted.

  c) Evidence of training for staff trainers and other direct service staff on the reporting of incident, and handling of referrals of alleged abuse and institutional neglect in coordination with IDECARH.

  d)  Maintenance of a log of actions taken against employees including the particulars of the actions by the employee, and actions taken against the employee, whether

|  | administrative or criminal.  Given that the purpose is to consider recidivism of actions constituting abuse or neglect, an analysis of such information should be done at least quarterly, or more often if warranted.  A copy of this log should be made available to the Monitor on a quarterly basis, along with any analysis done or actions taken as a result.<br><br>    e)  In the case of sexual abuse investigations, UEMN must review incidents to "recommend changes in policy or practices to prevent and detect sexual assault" as required by Policy 13.2.  Such reviews should ensure that adequate PREA protocols are in place and being used. |
|---|---|
| Priority Next Steps Toward Compliance | Staff must have a clear understanding of what should be reported as an incident, who must report, and the process for determining whether incidents should be reported as a Level 1 or Level 2 284 report requiring investigation at the facility level, or by OISC.<br><br>Incident cover sheets must be provided weekly, with those incidents of a serious nature provided to the Office of the Monitor within 24 hours.  The Office of the Monitor, through Bob Dugan, will continue to track these incidents relative to safety issues, and to determine appropriate referrals for investigations of Level 1 and Level 2 incidents.<br><br>Digitizing incident reports for efficiency, consistency and accountability purposes should be completed, in consultation with Bob Dugan, so that a systemized method of obtaining data regarding incidents, by facility, can be collected and analyzed.  The Order from April 11 must be followed and remaining work completed as a high priority.<br><br>Documentation of discussions held regarding the status and content of investigations, trends identified, and decisions made as a result should be submitted to the Monitor.<br><br>The Monitor should be provided with the last year years of data detailing employee conduct and actions taken by the agency, along with analysis of recidivism or other trends completed as required by policy.<br><br>Per policy, UEMNI must examine the sexual assault incidents which have been alleged, determine if PREA protections are in place, and if any changes in policy and practice should be made. Reference to prior correspondence from the Monitor as to forensic evaluations, training and other matters should be addressed.  UEMNI should provide information to the Monitor about the process and outcomes regarding PREA incidents over the last year.<br><br>OISC must sustain timeliness with conducting investigations within the 30 day period, unless warranted by the scope or complexity of a specific incident. |
| Quality Assurance | The Monitor has not reviewed proposed QA measures in this area. |

## Protection from Harm – Isolation and Protective Custody (David Bogard)

| | |
|---|---|
| | **S.A. 79.** Juveniles shall be placed in isolation only when the juvenile poses a serious and immediate physical danger to himself or others and only after less restrictive methods of restraint have failed. Isolation cells shall be suicide resistant. Isolation may be imposed only with the approval of the facility director or acting facility director. Any juvenile placed in isolation shall be afforded living conditions approximating those available to the general juvenile population. Except as provided in ¶ 91 of this agreement, juveniles in isolation shall be visually checked by staff at least every fifteen (15) minutes and the exact time of the check must be recorded each time. Juveniles in isolation shall be seen by a masters' level social worker within three (3) hours of being placed in isolation. Juveniles in isolation shall be seen by a psychologist within eight (8) hours of being placed in isolation and every twenty-four (24) hours thereafter to assess the further need of isolation. Juveniles in isolation shall be seen by his/her case manager as soon as possible and at least once every twenty-four (24) hours thereafter. A log shall be kept which contains daily entries on each juvenile in isolation, including the date and time of placement in isolation, who authorized the isolation, the name of the person(s) visiting the juvenile, the frequency of the checks by all staff, the juvenile's behavior at the time of the check, the person authorizing the release from isolation, and the time and date of the release. Juveniles shall be released from isolation as soon as the juvenile no longer poses a serious and immediate danger to himself or others. |
| **Compliance Rating** | **Partial Compliance** |
| | **S.A. 80.** The terms of this agreement relating to safety, crowding, health, hygiene, food, education, recreation and access to courts shall not be revoked or limited for any juvenile in protective custody. |
| **Compliance Rating** | **Partial Compliance** |
| Description of Monitoring process during this period of time | The process for Monitoring isolation under ¶ 79 has historically included a review of the placement of youth in either Protective Custody (PC under Policy 17.19), or Transitional Measures (TM Policy 17.20) for compliance with the protections and precautions enumerated in that paragraph and in the associated policies . While other forms of restricted room confinement, including self-confinement, group schedule modification, or "cool off" periods, might have been considered as isolation as well, in the absence of an agreed upon definition of "isolation" the focus of monitoring has been on the reality that the vast majority of youth placed on TM and PC have been separated from general population and largely restricted to their rooms for their safety or the safety of other youths.<br><br>The Parties have, during this second quarter, reached agreement as to a definition of 'isolation' which is to form the basis for developing new/revised policies, including: (1) Isolation,(2) Protective Custody, (3) Transitional Measures, and (4) Group Schedule Modification. The requirement for these policies was reflected in the Court's April 13 Order to Address Continuing Facility Safety needs and which afforded DCR until June 12 to generate modifications to its policies necessary to conform them to the new definition of isolation; DCR |

did meet that deadline and has generated additional drafts for review/edits by the Monitor's Consultants. The new/revised policies necessary for implementation of the isolation definition, will likely be implemented by the end of the third quarter.

The number of youth on TM or PC status was extremely low through this quarter with only one or two on either status at one time during the quarter. Of the two (2) events examined this quarter, one (1) was a function of Protective Custody, and one (1)  due to  Transitional Measures. Each of these cases is analyzed herein under ¶ 79 since both youth were confined in their rooms as a result of these statuses.

Once again, a significant component of our monitoring this quarter is the independent review of DCR's internal quality assurance activities for ¶ 79 and ¶ 80.  Compliance staff and social workers are tasked with using the Checklists and weekly audits to evaluate ¶ 79 and ¶ 80 initial placements of youth in restricted rooms and also applying the criteria included on the Weekly Audits that measure compliance with key aspects of ¶79/¶80 on an ongoing, weekly basis after placement. However, once employee furloughs due to the Covid-19 pandemic went into effect toward the latter part of the First Quarter, DCR social work staff who were working with compliance personnel in the process of evaluating and documenting compliance were no longer available for these tasks and the quality and thoroughness of these internal assessments diminished considerably.  Moreover, because of social work staff not being in the facilities, several criteria that required activities by social workers such as seeing youth within three (3) hours of being placed in isolation and every twenty-four (24) hours thereafter to assess the further need of isolation, were not consistently being documented as occurring.

We reviewed initial and final checklists and four weekly audits completed for the youth on protective custody status during this quarter, and the initial and final checklists and eight audits for the youth on Transitional Measures.

The weekly audits by DCR staff revealed very questionable and unreliable data relative to the paragraph 80 criteria for the two youths who were on Protective custody status at some point during the quarter. Because of the limited sample size and staff Covid-19 related access issues, there was not sufficient opportunity to verify the reliability of data that showed full compliance with the eight criteria some weeks, or complete non-compliance in other weeks. There will be a better opportunity to clarify the reliability of the paragraph 80 data in the next quarter.

| Findings and Analysis | The combined number of two PC and TM events throughout the quarter remains extremely low and is by far lower than the average of 10 per quarter experienced in the five previous quarters.  And as another reference point, it compares most favorably to the same quarter in 2019 when there were *11* such placements. |
|---|---|

| Facility | Q1 Events: Protective Custody | Q2 Events: Protective Custody | Q1 Events: Transitional Measures | Q2 Events: Transitional Measures |
|---|---|---|---|---|
| CTS Ponce | 3 | 1 | 1 | 1 |

| CTS Villalba | 1 | 1 | 0 | 0 |
|---|---|---|---|---|

The weekly Audit for each youth focuses on the five ¶79/80 post- placement criteria that are most critical and/or have proven most difficult for DCR to comply with, including: (1) the youth was seen by a psychologist every 24 hours after initial placement in the status, (2) the youth is seen by a case worker at least once every 24 hours, (3) if eligible, the youth receives 50 minutes of education class time per subject, five days a week, (4) the youth receives one hour of recreation daily and (5) youth are observed every 15 minutes when in their rooms.

The previously noted quality drop-offs in DCR staff's preparation of the checklists and weekly audits hampered the Monitor's Consultants' ability to accurately assess compliance relative to the majority of the numerous requirements of ¶79 and ¶80. This was solely a function of unavailability of experienced staff to perform this work since most were furloughed or not present in the facilities.

A persistent non-compliance area previously identified on each Checklist is the retrofit of suicide resistant rooms for youth in isolation. Although youth rooms are already suicide resistant, it was decided that the level of resistance could be *enhanced* by: (1) cleaning and caulking vents in all rooms and (2) retrofitting the room doors to minimize access to the interior door hinges that could be used as a ligature, and (3) caulking around the sprinkler heads. As of the end of this quarter the retrofitting of Ponce room door hinges with cover plates to prevent ligatures from being placed around the door hinges has been completed in 15 rooms in Ponce/PUERTAS along with three in each of the remaining modules.

As far as we know there were no Group Schedule Modification events this quarter. That said, the parties have agreed, by an April 10, 2020 Joint Motion, that group schedule modification will *not* be deemed to fall within the requirements of ¶79 should that status be defined as "a temporary status in response to a group event that is used to help deescalate a crisis." Group disturbances, mass searches, investigations, group violence, escapes and other critical incidents are the ones that this status was originally conceived to address.

| What is needed for full compliance? | While not each and every of the 20 criteria set forth in ¶79 as well as the eight criteria specifically required in ¶80 in the case of PC youth must necessarily be satisfied for substantial compliance to be rated, the majority must be rated positively consistently and with only occasional or intermittent or minor deviations, which do "not significantly deviate from the components of the provision, provided that any deviation poses no significant risk to detainee health or safety," as noted in the substantial compliance definition. Implementation of policies, practices and monitoring of the new isolation definition and associated policies must be achieved. |
|---|---|
| Priority Next Steps | 1- Determine a process for reinstating the high quality weekly audits and checklists ; <br> 2- Review and revise policies 17.19 (PC), 17.20 (TM) and 9.17 (Group Schedule Modification) as necessary to reflect and coincide with the new policy defining isolation; <br> 3- Train staff in changes to policies implementing the isolation definition; |

| | 4- Begin retrofits to door hinges on three rooms in each module to enhance suicide prevention features in rooms used for isolation;<br>5- Create a policy or protocol defining how the enhanced suicide resistant rooms will be assigned |
|---|---|
| Sources of Information | Checklists upon placement and removal from TM and PC<br>Weekly audits of ¶79/80 services and protections |

## MENTAL HEALTH – Dr. Miriam Martinez

**S.A. 59.** Defendants, specifically the Department of Health (ASSMCA), shall provide an individualized treatment and rehabilitation plan, including services provided by AIJ psychiatrists, psychologists, and social workers, for each juvenile with a substance abuse problem.

| Compliance Rating | Partial Compliance |
|---|---|
| Description of Monitoring process during this period of time | Several phone calls with the Monitor's office, DCR, NIJ staff and/or with DOJ occurred to review NIJ COVID 19 safety protocols to better understand procedures taken to ensure safety of staff and youth. Obtaining information this quarter was at times delayed due to NIJ staff managing crisis of COVID 19 positive cases. However, NIJ staff made themselves available for telephone conferences, were cooperative with responding to questions and followed up with clarifications regarding management of COVID 19 positive youth or staff. NIJ Information Technology staff were extremely helpful in facilitating access to video conferences. During this quarter, telephone conferences regarding concerning youth were also held with the mental health team, social work staff, and NIJ leadership.<br><br>During the second quarter of 2020 the Mental Health Consultant performed remote chart reviews and remote video interviews with 18 youth and with a few staff via a secure platform provided by DCR. All but the first interview was held so that the youth had privacy and could speak confidentially with the Mental Health Consultant. Precautions were taken after the first interview to ensure that nothing was left in offices that youth could take with them given that I was not in the room with them to monitor. Request was made by the Mental Health Consultant to double check all rooms, to instruct youth to have hands where the Mental Health Consultant could see them during the interview. When it wasn't possible to clear the office (i.e. COVID 19 positive cases) the staff watched youth through glass while interview took place. Eight youth from Villalba and nine youth from Ponce were interviewed via remote video including 2 youth that were COVID 19 positive and 3 from PUERTAS Program (one PUERTAS youth was interviewed twice, once in May and about another month later in June). Deputy Monitor Javier Burgos participated in 3 of the Ponce interviews. |

| | |
|---|---|
| | During the video conferences, the Mental Health Consultant was able to speak with the staff facilitating the conferences and with the Director of Villalba. These meetings were helpful to hear from their perspective how policies and procedures regarding COVID 19 was being adhered to and to hear if the staff had the medical supplies needed during this pandemic. Chart reviews were specifically completed for COVID 19 positive cases and for all youth who were reported to have suicidal ideation/gesture/intent and/or self-mutilated.<br><br>The Mental Health Consultant also spoke with PCPS leadership and with the Psychiatrist regarding concerning difficult to manage youth with multiple psychiatric hospitalizations.  The Mental Health Consultant discussed with PCPS leadership their concerns over 2020-2021 contract renewal.  PCPS is contracted by the Department of Correction and Rehabilitation to provide mental health staff to provide psychiatric, psychological and substance use services to youth within NIJ.  PCPS has informed the Mental Health Consultant that one of the psychologists has resigned and that there is fear of more resigning due to the uncertainty of employment past June 30th.<br><br>During this second quarter of 2020, the Mental Health Consultant also reviewed documentation regarding emergency psychotropic medication, suicidal ideation/intent/gesture and self-mutilation reports, documentation of administration of the MAYSI 2 and reports of youth in transitional measures or protective custody.  She sent multiple requests for clarification and responses to concerns following chart reviews.<br><br>The Mental Health Consultant requested and received data for all positive toxicology reports (for illicit drugs) from January through June 2020 and for Pearl insertions for the same time period. |
| Findings and Analysis | NIJ leadership and PCPS continue to be responsive and willing to work together for the benefit and well-being of youth.  The Mental Health Consultant found inconsistencies in reporting. For example, in May two incidents of suicidal ideation/intent/gesture were not reported but found during the chart reviews conducted by the Mental Health Consultant. In other instances there were inconsistencies between the notes and reports stating a youth was psychiatrically hospitalized, yet the "History of Movement" part of the medical record did not reflect this.<br><br>**Highlights  from the video interviews with youth are that:**<br><br>• Youth reported feeling generally well cared for with respect to COVID 19. All reported that security staff and all other staff keep masks on and take all safety precautions.<br>• They are more anxious about their families than they are about themselves especially due also to earthquakes that occurred during this time. |

- There was and still is a lot of anxiety related to the isolation and lock down. The youth expressed feeling anxious (the youth repeatedly used this word) about not seeing their families when some used to get weekly visits.
- Ponce youth stated it has been 3 months since they had been outside, yet the majority in Villalba stated that they go into the "mini gancha" every day or a few times a week.  In the "mini gancha" they got to stand and absorb/enjoy the sun, no games or balls were allowed due to COVID 19.
- With respect to education, the youth reported having the multi-subject assignments (Math, Science, Social Studies, English, Spanish, etc) but they either do it, or they don't, depending on how they feel.  Some were very anxious about whether they will get credit - especially those that were due to graduate this year.  The youth that stated they normally receive special education told the Mental Health Consultant that they were not receiving this extra help in the "notebooks" they are given with their assignments.
- All staff interviewed stated they have soap, sanitizers and PPE equipment as needed.
- I witnessed the COVID 19 youth being escorted by the staff who were in full ("hazmat" type) gowns, face shields, masks, etc.  They disinfected before and after the interviews spraying the chairs and the youth (on their bodies) as they left the interview and before returning to the cell.
- All reported that they knew how to ask for help if they needed it, even in the middle of the night.
- All reported seeing mental health and or substance abuse counselors and psychiatrist (if on medication). Mental health appointments are being kept, but some stated it was sporadic as if they didn't know the schedule. This may be due to the pandemic, needing to schedule the movement of staff and youth, and video conferencing capability.
- There was denial of any violence or fear of others (peers or staff).
- Most reported getting "candy" as incentive for behavior modification but some stated they hadn't gotten it because there wasn't any more (they ran out) and a staff person "bought some out of their own $."  Most could only state that the reason they receive a piece of candy is because they behave and don't get a "charge" ("un informe").
- Overall - boredom was the #1 complaint.  Same movies, not enough board games, no exercise, no other activities.  Their routines consist of sleeping in (some till 10 or 11a.m.), bathing, eating, napping, and watching television.
- There were no room complaints.

Charts reviewed remotely indicate that overall there are treatment plans in place for the youth.  The treatment plans however are not consistently fully completed nor implemented. When looking for completion and

| | |
|---|---|
| | implementation, the Mental Health Consultant is looking at all areas of a youth's plan, not just mental health.

With respect to Behavior Modification, the Mental Health Consultant was informed by the NIJ Health Liaison that moving forward, he will be responsible for Behavior Modification.  As mentioned in my last quarter report and as iterated in meetings that the NIJ Health Liaison has attended, behavior modification systems are best implemented when youth are engaged, understand the direct link between their behavior and rewards and when the youth understand how to advance in rewards within a consistently applied program.

Needless to say, the pandemic disrupted services being provided consistently and in some cases, in person. To PCPS's credit, most of the mental health staff continued to provide mental health services on site throughout the pandemic whenever possible.  The psychiatrist was available via secure video platform.

Data on all positive drug screens were reviewed for the period of time from January through June of 2020. A total of 49 toxicology screens were completed with 14 positive results.  Of those 14 positive results 12 were youth on "ingreso"  or intake and 2 were of the same youth (reported in last quarter) who has 2 positive fentanyl reports both of which are said to possibly be false-positives due to the medications the young person is on.  The seven negative results that were for youth who had community passes (all early in the year before pandemic was declared) are in stark contrast to last toxicology report reviewed by the Mental Health Consultant (August 2019 to Jan 4, 2020) when there were a reported 17 instances of positive toxicology reports following a return from a pass or return from a psychiatric hospitalization. This is a marked improvement over the last quarter, however, the data is received with caution over interpretation as the youth have (1) essentially been on lock down with less peer to peer interaction (2) have not been allowed visitors due to the coronavirus pandemic and (3) have been presumably under greater supervision due to the pandemic lock down measures.  The Monitor's office has advocated for NIJ to investigate and learn where the accessibility to drugs originated and to implement prevention and intervention efforts.

With respect to self-mutilations and general health, the Mental Health Consultant was able to confirm that during this quarter, there was one reported of insertion/attempted insertion of a "pearl" by a youth into his penis.  This seemingly lower rate of self-mutilations for this type of piercing/insertion could be due to the greater supervision of the youth and less accessibility to materials to use to insert due to the pandemic.  It could also be due to the positive impact of the education posted in the modules and provided by the nurse to the youth last quarter. |
| What is needed for full compliance? | For full compliance: |

| | |
|---|---|
| What steps are required and/or recommended? | NIJ must maintain a stable and consistent work force that delivers mental health services per the plan of care.  For several quarters, the Mental Health Consultant has advocated for a stable mental health work force. A term of at least 1.5 years with the current mental health team was a benchmark. This unfortunately has not occurred as at least two staff have left within a year or up to a year of being hired by PCPS.<br><br>The youth's treatment plans should reflect the individual needs of each youth. The youth's plans should be completed fully and implemented.  The Mental Health Consultant recognizes that security staffing issues may hinder the transport of youth to their mental health appointments, however, the youth need to consistently receive their services per the plan of care and the stipulations of this case.<br><br>Medical orders placed by psychiatric and medical staff should be executed as quickly as possible – especially for the high-risk youth and when these orders are needed to clarify diagnosis and treatment plan. |
| Priority Next Steps | Continue to monitor plan development and implementation.<br>As has been previously discussed with PCPS, the mental health staff should be on particular alert for youth with past psychiatric hospitalizations and serious mental health conditions, especially in light of COVID 19, the prevention/lock down measures and the inability to have family visits for the forseeable future. Increase in materials and supplies to augment "passive recreation" time.  For example, are there COVID 19 funds available that could cover tablets for the youth that can be loaded with educational games, documentaries, approved movies, puzzles and books.  Other juvenile detention facilities have found ways to have tablets loaded up in this way for the youth to share within modules.<br>Are there funds available to buy family friendly movies, such as at a large department store (i.e.Walmart) where some are available for about $5 so that the youth have more of a variety.<br>Could funds be used to purchase art therapy supplies to make collages, masks, paper mache, and sculpting.  These activities and expression through art can be especially therapeutic with youth who are depressed, withdrawn, anxious or who have experienced trauma.<br>If at all possible, non-contact sport activities in the small yards could be allowed when the youth are allowed to use the space.<br>Setting up friendly "contests" such as DJing a music set (each module picks their favorite songs and gets to play their set or send it to a group of peer judges to determine the "winner.") |
| Quality Assurance Measures | The Mental Health Consultant has initiated conversations with PCPS leadership so that PCPS could conduct the same types of reviews that the Mental Health Consultant performs and provide those results to the Mental Health Consultant for review and random checks. |

|  | As reported in the first quarter 2020 report, quality checks on whether or not assessments (MAYSI 2) was completed in a timely way or whether protocols were followed when use of emergency psychotropic medication were used are examples of self-monitoring and reporting that NIJ leadership can and should undertake.  NIJ leadership could also address the data of substance use and the insertion of pearls with a quality improvement plan that is developed with a multidisciplinary group and monitored with reporting going to the Mental Health Consultant.  The Mental Health Consultant stands ready to work with and encourages NIJ and PCPS leadership to move forward with a quality improvement plan. |
| Sources of Information upon which Consultant report and compliance ratings are based. | Sources of information that the Mental Health Consultant relied on were remote video interviews with youth in Ponce & Villalba, data/report reviews, remote chart reviews, as well as mental health staffing reports submitted by PCPS. |

**C.O. 29:** Defendants shall establish an adequate residential mental health treatment program which provides services in accordance with accepted professional standards for juveniles confined in the facilities in this case who are attempting to commit suicide and/or who are inflicting harm upon themselves and/or any other juvenile in need of such services as determined by the juvenile's interdisciplinary mental health team, which includes a qualified psychiatrist. This residential treatment program will house up to forty-eight (48) juveniles from Commonwealth facilities. The residential treatment program will be established in an area that meets professional standards regarding safe physical areas for suicidal and/or self-mutilating juveniles.

| Compliance  Rating | Partial Compliance |
|---|---|
| Description of Monitoring process during this period of time | The Mental Health Consultant interviewed youth within Ponce PUERTAS. She also had conversations with NIJ leadership and reviewed "programming for PUERTAS" that was submitted.<br><br>Chart reviews of youth in PUERTAS were also conducted questions and concerns were sent to NIJ and PCPS leadership to be addressed. |
| Findings and Analysis | Due to the pandemic, a full program for PUERTAS has been delayed. Groups were difficult to hold due to social distancing and youth lacked the motivation to engage fully with staff who were either remote or wearing masks.<br><br>According to the Mental Health Consultant's chart reviews, PCPS provided adequate psychiatric coverage for the limited number of youth (three) in PUERTAS during this pandemic.  The psychiatrist was noted to be available during mental health crisis, was able to be reached via phone and was able to utilize video conferencing to interview youth.<br><br>There was and continues to be great concern for PUERTAS youth who are repeatedly suicidal.  One particular youth has been suicidal more than 20 times, first coming to the attention of NIJ after his 12th birthday with already 17 psychiatric hospitalizations.  While PCPS has worked hard to stabilize him, one has to question whether this young man belonged in a prison system or |

| | |
|---|---|
| | whether he would be best served in an intensive residential therapeutic setting.  The Mental Health Consultant had multiple conversations about this particular youth and another PUERTAS youth who also had multiple psychiatric hospitalizations during the quarter.

This is not the first time the current Mental Health Consultant and the treatment team has questioned the placement of a youth in NIJ.  There have been a handful of other youth who presented with either severe psychosis or significant cognitive delays that were challenging youth to treat and whom we thought might best be served in a community therapeutic setting.  NIJ has in those instances advocated with the courts, have written letters and looked for appropriate placements for youth once discharged. |
| What is needed for full compliance?
What steps are required and/or recommended? | As per previous quarters, the priority is to provide a safe, distinct and consistent specialized program for those youth most at psychiatric risk and placed in the PUERTAS program. |
| Priority Next Steps | Monitor PUERTAS youth are receiving intensive mental health services and consistent psychiatric services.

PUERTAS Director to implement full programming as pandemic allows for more activities and on-site services from the full team.

Continue to consistently evaluate the youth for placement into PUERTAS. For those youth who are placed in PUERTAS and due to COVID 19 especially are at greater risk of psychiatric decompensation, working with the youth's legal counsel and with the public defender's office to find the best resolution for a sooner and safe discharge plan should be considered. |
| Quality Assurance Measures | See above and work with NIJ leadership and Director of PUERTAS to develop a QI plan in partnership with PCPS. |

**C.O. 36.** Within 120 days of the filing of this Consent Order, Defendant Juvenile Institutions Administration shall provide continuous psychiatric and psychology service to juveniles in need of such services in the facilities in this case either by employing or contracting with sufficient numbers of adequately trained psychologists or psychiatrists, or by contracting with private entities for provision of such services. The continuous psychiatric and psychological services to juveniles in need of such services shall include at a minimum, a thorough psychiatric evaluation, necessary diagnostic tests before the prescription of behavior-modifying medications, blood-level monitoring if behavior-modifying medications are prescribed, therapy, counselling, treatments plans and necessary follow-up care.

| | |
|---|---|
| **Compliance  Rating** | **Partial Compliance** |
| Description of Monitoring process during this period of time | During this quarter the Mental Health Consultant performed remote chart reviews and completed video interviews as described above.  The Mental Health Consultant completed an analysis of mental health staff hours contracted vs. mental health hours worked. |

| | |
|---|---|
| Findings and Analysis | An analysis of the PCPS hours contracted for mental health vs. the hours delivered indicates that for the second quarter, 2872 hours were contracted for mental health staff (which includes psychologist, psychiatrist and substance abuse counselors and occupational therapist) and 2682.50 hours were delivered, less than the contracted amount.   These hours are in contrast to 2952 hours contracted for in the first quarter and 3189.5 hours of mental health delivered in the first quarter.<br><br>The Mental Health Consultant is aware that PCPS lost a psychologist (L.V.) in May of 2020 and that the pandemic plans for on-site delivery were delayed by 3 weeks.  Nonetheless, and especially as another psychologist (V.L) has resigned as of June of 2020, the expectation is that PCPS will continuously recruit so as not to have a break in service.<br><br>The psychiatrist time was contracted for 360 hours for the second quarter and delivered 224.75 hours, 135.25 less hours of psychiatric care than contracted for.<br><br>In total this quarter there were six (unique) youth reported to have 21 incidents of suicidal ideation and self-mutilation.  In 6 of the 21 incidents youth were reported be have both suicidal ideation and self-mutilation on the same date.<br><br>There were 12 incidents of suicidal ideation/intent/gesture and 13 incidents of self-mutilation.  Of the 21 total incidents, 20 were seen by the psychiatrist within 24 hours. The one that was not seen within 24 hours was an incident of self-mutilation with a denial of suicidal ideation.<br><br>As reported previously, the psychiatrist provides a thorough evaluation prior to prescribing medications and provides the necessary follow-up care when prescribing new medications (i.e. within a week).  The psychiatrist must be supported in receiving lab work ordered in a timely manner as described in the first quarterly report of 2020.<br><br>The mental health team, even during the pandemic, worked hard to stabilize particular youth that were dysregulated, psychotic, and at times suicidal. Notes indicate communication between the treatment team providers. Documentation indicates that IM Haldol use this quarter was used as a last resort with a very psychotic and violent youth.<br><br>The mental health team now has video conference capability as well as the ability to go on site to deliver mental health services. |
| What is needed for full compliance?<br>What steps are required and/or recommended? | A stable mental health work force is needed to address the needs of this vulnerable population.  Building trust with a mental health provider takes time.  If the youth feel that the staff could abandon them at any time, this impedes the therapeutic process. PCPS has yet to be granted the contract for |

|  | this upcoming year.  As such, it is unclear whether recruitment is on-going to fill the two vacancies.  Current mental health staff are filling in for these two psychologists.<br><br>As reported last quarter, diagnostic tests ordered by the psychiatrist or the medical physician need to be completed expeditiously and the results returned as soon as they are completed.  COVID 19 has delayed a full review and plan for this, however, we will continue to monitor for compliance.<br><br>An additional psychiatrist splitting the hours would help relieve the current psychiatrist, provide a colleague to confer with, provide back up for emergencies and when the one psychiatrist has to call out sick or take vacation. |
|---|---|
| Priority Next Steps | Recruit and retain psychologist.<br>Recruit and retain additional psychiatrist. |
| Quality Assurance Measures | Will work with PCPS and DCR on Quality Assurance measures as these have not been advanced by the institution. |

**S.A. 63.** For each juvenile who expresses suicidal or self- mutilating ideation or intent while incarcerated, staff shall immediately inform a member of the health care staff. Health care staff shall immediately complete a mental health screening to include suicide or self-mutilation ideation for the juvenile. For each juvenile for whom the screening indicates active suicidal or self-mutilating intent, a psychiatrist shall immediately examine the juvenile. The juvenile, if ever isolated, shall be under constant watch. Defendants shall develop written policies and procedures to reduce the risk of suicidal behavior by providing screening for all juveniles at all points of entry or re-entry to AIJ's facilities and/or programs and by providing mechanisms for the assessment, monitoring, intervention and referral of juveniles who have been identified as representing a potential risk of severe harm to themselves. Treatment will be provided consistent with accepted professional standards.

| Compliance  Rating | Partial Compliance |
|---|---|
| Description of Monitoring process during this period of time | The Mental Health Consultant reviewed reports that were submitted by DCR of youth that were reported to have suicidal ideation, suicidal intent and/or self-mutilation for the entire quarter.  Also reviewed were MAYSI 2 assessments completed by the mental health team.  These reports are submitted regularly to the Mental Health Consultant. The Mental Health Consultant also reviewed the electronic medical records to find evidence of compliance with S.A. 63, including providing treatment consistent with professional standards.  She interviewed youth (via a secure electronic video platform provided by DCR )in PUERTAS and in detention that were high risk with multiple psychiatric hospitalizations.<br><br>The Mental Health Consultant held telephone and video conferences regarding high risk youth with NIJ leadership, PCPS leadership, staff from |

| | |
|---|---|
| | multifamily services, and the psychiatrist.  PCPS leadership has responded to all calls and emails requesting information about complex/high risk youth. |
| Findings and Analysis | In total this quarter there were six (unique) youth reported to have 21 incidents of suicidal ideation and self-mutilation.  In 6 of the 21 incidents youth were reported be have both suicidal ideation and self-mutilation on the same date.<br><br>There were 12 incidents of suicidal ideation/intent/gesture and 13 incidents of self-mutilation.  Of the 21 total incidents, 20 were seen by the psychiatrist within 24 hours. The one that was not seen within 24 hours was an incident of self-mutilation with a denial of suicidal ideation.<br><br>There were 11 psychiatric hospitalizations this quarter.  All 11 were seen within a 24-hour period by a mental health professional (psychologist or psychiatrist) post discharge per protocol.<br><br>As reported previously, several of the suicidal incidents have proceeded straight to psychiatric hospitalization and therefore not directly seen by the PCPS psychiatrist, but none the less, the youth was seen by a psychiatrist within 24 hours of the incident.<br><br>PCPS is found to continue to provide intensive psychiatric and psychological services to youth in detention (not in PUERTAS) who present with severe psychiatric symptoms.  Of the six youth reported above, only one was a PUERTAS resident. There were 3 youth who were in detention with a combined total of 14 incidents of suicidal ideation and self-mutilation this quarter.  The overwhelming majority of these incidents by youth in detention were by one particular youth that was difficult to manage.  We had several case conferences about this particular youth as the Mental Health Consultant was concerned about his multiple incidents and the inability to stabilize him.<br><br>The Mental Health Consultant continues to encourage NIJ and PCPS to move youth who qualify for PUERTAS into that program for more intensive programming. We have repeatedly been told that youth in detention cannot be moved into PUERTAS until the youth is adjudicated and sentenced.  The PCPS staff do provide intensive mental health services for youth in detention in need of such services, however, these are not the full complement of what a PUERTAS program could provide including the therapeutic group work.<br><br>Findings indicate that NIJ is failing to provide an immediate suicide evaluation by a health care (i.e. nurse) provider for any youth who self-mutilates or expresses suicidal ideation/intent/gesture. These were completed in only 15 of the 21 incidences.  On one or two occasions the nursing team may not have been able to complete the assessment as the youth was too agitated and psychotic. |

|  | The mental health team is continuing to manage youth into psychiatric hospitalization when needed and to consistently evaluate the youth once they return from the hospital. |
|---|---|
| What is needed for full compliance? What steps are required and/or recommended? | Suicide and self-mutilation assessments need to be consistently completed and the notes regarding suicidal ideation assessment should be more fully noted (not just check marks) with a clear plan in the bottom note section as to next steps.<br><br>As above, a stable mental health work force is needed to provide consistency in treatment. |
| Priority Next Steps | Medical staff (i.e. nurses) need to complete suicidal and self-mutilation screening for all youth who express suicidal ideation/gesture/intent or who self-mutilate. |
| Quality Assurance Measures | As reported in previous quarterly report, it is highly recommended that DCR have PCPS perform their own quality assurance measures to ensure compliance with S.A. 63. |

**S.A. 72**. All juveniles receiving emergency psychotropic medication shall be seen at least once during each of the next three shifts by a nurse and within twenty-four (24) hours by a physician to reassess their mental status and medication side effects. Nurses and doctors shall document their findings regarding adverse side effects in the juvenile's medical record. If the juvenile's condition is deteriorating, a psychiatrist shall be immediately notified.

| Compliance  Rating | Partial Compliance |
|---|---|
| Description of Monitoring process during this period of time | The Mental Health Consultant analyzed data provided by NIJ for the use of emergency psychotropic medication for the second quarter, 2020. There was one use reported for the 14th of May.<br><br>During the end of last quarter and following up on the Mental Health Consultant's recommendations, training was provided by the NIJ Health Coordinator to the nurses regarding the intramuscular use of emergency psychiatric medication and documentation of such.  In addition, the Mental Health Consultant provided a monitoring tool for use by the NIJ Health Liaison.   He used this tool to review the incident of May 14th and the documentation by staff.  The NIJ Health Liaison also used the tool for training and for evaluating compliance with S.A. 72 during the May 14th event. Also provided last quarter were the Standards for Mental Health Services in Correctional Facilities, with reference to the emergency use of psychotropic medications. |
| Findings and Analysis | There was only one use of intramuscular (IM) use of psychotropic medication. |

|  | Mental Health Consultant reviewed the documentation tool provided by the NIJ Health Liaison for compliance.  There has been improvement in documentation over last quarter.  Notes regarding the incident, nursing procedures and follow-up with physician were all noted. There is room for improvement as the chemical restraint and the physical restraints appear to have been used at the same time.  Chemical restraint should always be of last resort.  This was discussed with the NIJ Health Liaison for future training of nurses.<br><br>Further, the physician was not able to see the youth within 24 hours either because it was a weekend and the physician was not available and because the psychiatrist tried to evaluate the youth via video conference (due to COVID 19) but the youth refused to be evaluated.  This was also discussed with the NIJ Health Liaison for future planning and management. |
|---|---|
| What is needed for full compliance? What steps are required and/or recommended? | There are policies and procedures in place for the use of psychotropic medications which have been reviewed and approved by the Mental Health Consultant. These need to be consistently adhered to. |
| Priority Next Steps | The Mental Health Consultant will continue to monitor closely working with the NIJ Health Coordinator. |
| Quality Assurance Measures | See above. |

**S.A. 73.** Defendants, specifically AIJ, shall design a program that promotes behavior modification by emphasizing positive reinforcement techniques. Defendants, specifically AIJ, shall provide all juveniles with an individualized treatment plan identifying each juvenile's problems, including medical needs, and establishing individual therapeutic goals for the juvenile and providing for group and/or individual counseling addressing the problems identified. Defendants, specifically AIJ, shall implement all individualized treatment plans.

| Compliance  Rating | Partial Compliance |
|---|---|
| Description of Monitoring process during this period of time | The Mental Health Consultant interviewed 18 youth via secure video platform.  She used a 32-item questionnaire developed by her and designed to assess overall well-being and compliance with provisions of this case.  The interviews were open ended and youth were encouraged to also share any other things they wished to discuss.  The questionnaire included items related to Behavioral Modification. |
| Findings and Analysis | During this quarter, in both Ponce and Villalba, most youth interviewed could name a behavioral modification incentive that they were given.  These were mainly candy (chocolate) or cookies.  Group incentives seem to have been suspended due to COVID 19. |

|  | The youth further indicated that the incentive was not consistent and conjectured that this could be because of a lack of funds.  Some stated that they receive the incentive every Friday but that when it was not received, they did not know why.  The youth interviewed stated they receive the chocolate if they "behave" and do not get a "charge" put on them for disrespecting staff or not doing what they are supposed to do.<br><br>While incentives are meant to reward behaviors, the incentives are just part of an overall Behavior Modification Plan and certainly not the only positive reinforcement technique that should be used.  As discussed in the past, low cost/no cost  incentives such as two phone calls a week has been recommended.<br><br>The Mental Health Consultant has been verbally informed that there is a change in leadership of the Behavior Modification Program.  The person to work with, at least temporarily is the NIJ Health Liaison.<br><br>With respect to treatment plans, the full development and implementation of the individual treatment plans requires further attention and has not been found in compliance by the Mental Health Consultant.  See also above comments under S.A. 59. |
| --- | --- |
| What is needed for full compliance?<br>What steps are required and/or recommended? | NIJ leadership needs to develop and consistently apply a behavior modification program that is clear for the youth to understand and follow - with on-going self-monitoring to meet the needs of each youth. The plan should incorporate use of low or no cost incentives.  This includes time outside of room, art supplies and games for use in rooms and modules, special (healthy) snacks, and increasing the phone calls to families which is so important for reunification purposes. |
| Priority Next Steps | Further development of a consistently applied behavioral modification program with on-going self-monitoring, evaluation, and individualization to meet the needs of the youth. |
| Quality Assurance Measures | See above. |
| Sources of Information upon which Consultant report and compliance ratings are based | Interviews with youth. Chart reviews. Data analysis. |

## SPECIAL EDUCATION AND VOCATIONAL TRAINING –Kim Tandy

S.A. 81 Educational and Vocational Services – General Population
Defendants, specifically the Department of Education, shall provide academic and/or vocational education services to all juveniles confined in any facility for two weeks or more, equivalent to the number of hours the juvenile would have received within the public education system.  Specifically, this education shall be provided

| | |
|---|---|
| 5 (five) days per week, 6 (six) hours per day, 10 (ten) months per year.  AIJ shall provide adequate instructional materials and space for educational services.  Defendants shall employ an adequate number of qualified and experienced teachers to provide these services. | |
| **Compliance  Rating** | **Partial Compliance significantly hampered by coronavirus** |
| Methodology for Monitoring this Quarter | The Monitor was unable to meet in person or tour Villalba and Ponce during the second quarter as a result of the Coronavirus. As a result of the government shutdown in mid-March, teachers were also ordered to remain at home as well as other non-essential personnel.<br><br>A video conference with Kelvin Merced and Carlos Delgado on Wednesday, April 8 was held to clarify what was occurring, and to what services were able to be provided, and at what point during the shutdown.<br><br> A second video conference was held with Carlos Delgado, Kelvin Merced, and Daiber Carrion Munez (PRDE) on May 21, 2020 to review directives from the Department of Education regarding the continuation of educational services, and to discuss the capacity of NIJ/DE to continue to provide services, as well as comply with various aspects of IDEIA and the Settlement Agreement.<br><br>The Puerto Rico Department of Education has now taken over the funding and administration of all education services.  This issue was discussed, as well as the need for an updated Memorandum of Agreement regarding responsibilities and collaborative agreements between the two agencies.<br><br>Monthly documentation was provided for the months of April – June, and reflects for the most part the inability to provide services in the classroom, and difficulties in complying with various provisions such as education testing, IDEA evaluations, IEP meetings, and the summer program as a result of working without education staff throughout most of the quarter.<br><br>Information received and reviewed this includes:<br><br>1)   Monthly personnel attendance by support staff, teachers, and special education teachers, with documentation of teacher absences and "security situations" which disrupt school services for monitoring period for April and May, 2020.<br>2) List of all student receiving educational services, including vocational education, and special education students for April and May, 2020.<br>3)  Verification of the provision of educational services within 5 days of arrival for eligible youth for April and May, 2020.<br>4)  Tracking Form for Initial and Re-evaluation Process for April and May, 2020<br>5)  Modified school schedule during COVID-19 shutdown and sample work packets for detention in six subject areas, and packet for the Spanish curriculum |

| | |
|---|---|
| | The Monitor and Deputy Monitor were able to conduct a total of 9 youth interviews via Skype with youth regarding the educational services they received during the second quarter.  This information is incorporated in various sections as relevant. |
| Findings and Analysis | A Collaborative Agreement was signed in December of 2019 between the Department of Corrections and Rehabilitation and the Puerto Rico Department of Education regarding the operation of the school program for NIJ facilities.  This Agreement places the regular education programming under the jurisdiction of the Adult Program of the Department of Education, led by the Auxiliary Secretariat of Alternative Education. The agreement stipulates that matters related to educational aspects of institutions and correctional facilities go directly to the Department of Education, and that DCR will have "no inherent participation, or decision making power in the educational aspects of the Correctional Schools Program." Teaching staff will be Department of Education employees and have the same benefits as other teachers in the community.  Funds allocated by the DCR to cover these positions during the 2019-2020 academic year will be reimbursed by the Department of Education, and the Department of Education will cover the allocation of such funds in its budget for 2020-2021 and beyond.  The Agreement also specifies that DCR shall coordinate with the Department of Education regarding security issues.

DCR and PRDE have a Memorandum of Agreement which spells out the responsibilities of both.  Given the change in funding and oversight, this Memorandum must be revised to reflect the changes.

Policy 20.1 Educational and Recreational Services provides for regular and vocational services to youth in detention and in social treatment centers. This was provided to the Monitor in June, 2020.

On March 16th, the Governor's orders shut down all but essential government functions, including schools. Teachers were sent home throughout the island, including those working in the NIJ facilities. Teachers were reportedly unable to work from home at least part of the quarter per the Executive Order, but eventually were permitted to work remotely once some of the restrictions were lifted

Puerto Rico sought, and received, a waiver from the United States Department of Education regarding statewide assessments, accounting, and reporting requirements (report cards) based on the data from 2019-2020 due to the widespread school closures related to the Coronavirus.

The Puerto Rico Department of Education issued a directive on March 16, 2020 directing students to the Department of Education website where they could download remedial modules for Science, Spanish, Social Studies, English and Math for all grades, and |

suggested that if students cannot do the work alone, they should get help from a parent, sibling or family member. Answer sheets were also provided.[1]

According to the Department of Education, students in Puerto Rico will essentially be "passed" for this year and re-evaluated in August/September to see where their skills sets are.  Because many youth and families on the island do not have internet access, it was not feasible to require students to do work at home.

The U.S. Department of Education's has delayed distribution of emergency grant aid to Puerto Rico to assist with educational services on the island in light of Covid-19. On March 27, 2020, Congress passed the bipartisan Coronavirus, Aid, Relief, and Economic Security Act (CARES Act) for providing rapid federal financial relief to states, territories, and outlying areas.  Approximately $400 million in emergency aid was allocated for elementary and secondary education in Puerto Rico, but on June 16, 2020, the Department released only $7 million of the $400 million and indicated it would hold the remaining 98.4% while Puerto Rico obtained a third-party fiduciary to manage the funds.[2] The withholding of funds from Puerto Rico makes it more difficult for the PRDE to address educational needs generally for youth on the island, and in doing so, sets a low bar for youth on the island as a whole.  NIJ and PRDE can and should do more within NIJ to keep youth caught up, provide more structured educational programming, and provide access to teachers, even if remotely.

NIJ staff were able to provide modules with remedial materials for some students, and modules with new materials to others.  Students reported getting two packets of information to work on, which aligned with the "phases."  No one, however, reported receiving a third packet during Phase III, although it was reported that a second and third packet was given at the same time.

Monitored Provisions:
**1)  Provision of academic and/or vocational education for youth confined 2 weeks or more 5 days per week, 6 hours per day, 10 months per year.**

This provision ensures that all youth who are eligible for educational services receive such services within a two week period, and that full school days are provided over the 10 month school calendar.

Education staff provided a schedule for Ponce and Villalba in April which indicated Phases by week. For Ponce, Phase I was from April 1 – April 17, with Holy Week off.

---

[1] https://www.nbcnews.com/news/latino/students-rural-puerto-rico-remote-learning-amid-coronavirus-tough-challenge-n1189316

[2] See, Letter to Betsy DeVos, dated July 15, 2020 from Congressional representatives at https://edlabor.house.gov/imo/media/doc/2020-07-15%20Helping%20All%20Students%20Access%20Learning%20Opportunities%20During%20School%20Closures%20FINAL%5b1%5d.pdf

Phase II was April 20 – May 1st, and Phase III was May 4 – 15th.  The weeks of May 18 – 29th were listed as "administrative closing of school semester."  The schedule for Villalba began Phase I on April 15 – 24, Phase II from April 27th – May 8, and Phase III from May 11 – May 22.  The week of May 25th and June 1st were listed as "administrative closing of school semester."

Villalba youth interviewed generally reported that they were out of school for about a month; Ponce youth interviewed reported they were out of school for 1 – 2 weeks, although one youth indicated it was a month. These times are generally consistent with the schedule which was provided to the Monitor for the three phases.

Because there were no teachers in the facilities during this time, youth reported they were given two packets to complete, with materials in each subject.  The packets contained materials which included reading materials and exercises, with true/false questions, fill in the blank answers, crosswords, drawings, and other written assignments.  Youth described having the booklets for about 2 weeks, although some youth were able to finish all assignments within a day or two. There did not appear to be a set schedule for when youth would do their assigned work. One youth said he started around 7:00 a.m. and had the booklet all day until late afternoon.  He finished in a couple of days and then had nothing to do for 3 weeks.  Another youth said he spend about 2 hours a day and it took him 4-5 days to finish each booklet.  A review by the Monitor of some sample packets generally confirms the variety of exercises and materials.

One youth interviewed on June 29th at Ponce, and who arrived at there on May 22, said neither he nor others in detention there have done any school work since that time, and that no one has discussed it with him. It does not appear that there was any school in June.

While the pandemic has brought tremendous challenges to the NIJ facilities, minimal educational opportunities were provided to the youth, who otherwise have the daily structure and routine of school related activities.  Keeping youth busy with various structured learning activities, even with limited guidance from the PRDE, should be a priority.

**2)  AIJ shall provide adequate instructional materials and space for educational services**

Classrooms were not used during this quarter as a result of the pandemic. Materials were generally described by the youth interviewed as being able to be completed without assistance.  Some youth noted the work was mostly remedial so it was easy. Youth reported that they were told that if they completed the booklets, they would pass.  Most understood they could get their credits if they were in the adult education program. Of the youth interviewed who received school work, it appears that all of them completed the packets.  Not all youth in NIJ completed their work, however, and will need to do so at the beginning of the fall semester.

|  | **3)  Defendants shall employ an adequate number of qualified and experienced teachers to provide these services.**<br><br>Teaching staff were not available during this quarter to provide direct instruction to youth.  The packets of work based upon each youth's grade and classes were prepared by education staff, however, and taken to the facilities.<br><br>It was clear from the interviews that most youth missed having the assistance of their teachers.  Most said they could ask for help from officers or from other youth. While some youth said they could work faster on their own, most said they completed work better when teachers were there to help.  Some said the work was more difficult when teachers were not there to help explain and answer questions.  A few youth suggested that perhaps teachers could be on line to help them with work when school resumes, or at least have periodic contact.  Remarkably, youth seemed to understand the circumstances and while not ideal, accepted that this is how things will need to work for now. |
|---|---|
| What is needed for full compliance? What steps are required and/or recommended? | The Department of Education is responsible per the Settlement Agreement for the delivery of all educational services, as well as providing sufficient qualified teachers.<br><br>Well qualified staff should include verification not only of certifications, but also of training for new educational staff, and training required by the Department of Education and coordinated between the Division of Training and NIJ educational services.<br><br>Training records of education staff (including ancillary staff) should be documented and provided as evidence of training requirements.<br><br>Facilities for classrooms and administrative staff for the education programs must be functional, without leaking roofs, moldy ceilings or walls, and with air conditioning units that are working, once able to be safely used again.<br><br>Monthly attendance by essential educational staff should remain at 90% or higher in each facility. Ideally, classes should not be disrupted or cancelled as a result of teacher absence.<br><br>It remains to be seen what will happen with schools in the fall semester, however, it is likely that full school services may not resume.  The Monitor will be in contact during the third quarter before school begins to learn about what options the Commonwealth will be using to provide school services to the youth in Ponce and Villalba. With the Coronavirus situation remaining fluid, plans may necessarily change during the school year. |
| Priority Next Steps | A memorandum of agreement which more closely described the working relationship between DCR and PRDE should be created.<br><br>The Department of Education and NIJ education staff must determine how school services will be delivered for the 2020-21 school year, with contingency plans based |

| | upon the coronavirus and the limitations it has imposed.  That plan should, at a minimum:<br>• comport with whatever requirements for evaluating students at the beginning of the school year for placement required by the Puerto Rico Department of Education;<br>• determine where services will be provided and the schedule for classes in NIJ facilities so that the required daily classes can be delivered as best possible;<br>• determine how teaching staff will be utilized, and where, to maximize learning opportunities,  particularly for those students with special needs;<br>• determine how vocational programs will be provided;<br>• comply with other requirements impose by the PRDE and the Settlement Agreement as best possible while maintaining a safe environment during the pandemic.<br><br>Provide a list of qualified teachers for the school year, and administrative staff, who will be working in NIJ facilities, and the plan for providing and documenting training for these staff. |
|---|---|
| Quality Assurance Measures | The Department of Education should develop quality assurance measures relative to the delivery of education services in collaboration with the NIJ school administrative staff. |
| Sources of Information upon which Consultant report and compliance ratings are based. | Video conferences with education staff from NIJ and PRDE<br>Monthly statistical reports<br>Interviews with nine youth by video conferencing with written questionnaires<br>Documentation from PRDE regarding waiver and other changes during COVID-19<br>Collaborative Agreement between Department of Education and the Department of Corrections and Rehabilitation signed in December of 2019 |

| S.A. 86  Defendants, specifically the Department of Education, shall abide by all mandatory requirements and time frames set forth under the Individuals with Disabilities Education Act, 20 USC §§ 1401 et seq. Defendants shall screen juveniles for physical and learning disabilities. The screening shall include questions about whether the juvenile has been previously identified by the public school system as having an educational disability, previous educational history, and a sufficient medical review to determine whether certain educational disabilities are present, such as hearing impairments, including deafness, speech or language impairments, visual impairments, including blindness, mental retardation, or serious emotional disturbances adversely affecting educational performance. | |
|---|---|
| **Compliance  Rating** | **Non-Compliance significantly hampered by coronavirus** |
| Description of Monitoring process during this period of time | Because onsite monitoring visits were not possible this quarter, two video conferences were held with NIJ and PRDE education staff to review monitoring of special education provisions.<br><br>The Monitor reviewed a Supplemental Fact Sheet issued on March 21, 2020 by the United States Department of Education addressing the risk of covid-19 for school aged |

| | |
|---|---|
| | children with disabilities.[3]  The Department made clear that school districts must still provide a free and appropriate public education (FAPE) while balancing the need to protect the health and safety of students. While allowing for some flexibility, the Fact Sheet reiterated that the provision of FAPE may include special education and related services provided through distance learning, virtually, online or telephonically.<br><br>PRDE has not been granted a waiver of any type from complying with the requirements of the IDEIA.  PRDE has provided some guidance letters which the Monitor has reviewed such as how online professional development can occur, and how modified IEP meetings can be done remotely.<br><br>Additional records reviewed for the Second Quarter include:<br><br>1) List of all student enrolled (but not receiving) vocational education, including special education students<br>2) Verification of the provision of educational services within 5 days of arrival for eligible youth.<br>3)  Tracking Form for Initial and Re-evaluation Process<br>4)  Reports from MIPE regarding re-evaluations which are overdue<br>5)  Evaluations completed by PCPS<br><br>Information was also obtained by interviews with several youth qualified under the IDEIA to receive specially designed services, and documentation reviewed in the MIPE online system. |
| Findings and Analysis | This section provides a general requirement that compliance with the IDEIA is necessary in order to meet compliance requirements of this section. For purposes of complying with the IDEIA, this provision has been broken down into 4 sections as noted below:<br><br>**1) Mandatory requirements of the Individuals with Disabilities Education Act**<br>　　**a)  Child Find**<br>PRDE is responsible for ensuring that Child Find provisions to locate and identify youth who may be eligible for special education are met, but must work collaboratively with NIJ instructional staff to ensure that adequate mechanisms are in place to identify when youth are appropriate for referrals.<br><br>Youth are typically screened at detention using an education questionnaire to determine prior educational placements, previous involvement in special education, and academic achievement.  Diagnostic testing is completed within five school days and school records are requested and obtained. Physical disabilities are noted, including visual problems, speech problems, use of medication, hearing problems, and orthopedic problems. Recommendations for testing are made including for hearing impairment, psychological, |

---

[3] Supplemental Fact Sheet, Addressing the Risk of COVID-19 in Preschool, Elementary and Secondary Schools While Serving Children with Disabilities, United States Department of Education, March 21, 2020.

occupational therapy neurological examination, psychiatric, visual, health and/or a Woodcock Munoz.

Documentation received from NIJ education staff indicates that 0% of new youth admitted on detention status, and who were held for a minimum of 5 days, were evaluated based upon the process noted above, including basic testing across the five subject areas. This includes 3 new admissions in April, 4 new admissions in May, and admissions in June, although no data was provided for that month. Education staff have not been available in the facilities during this quarter to conduct these evaluations.

Although the Monitor has found this part of Paragraph 86 in substantial compliance in prior quarters, COVID-19 has significantly hampered the agency's ability this quarter to comply. This provision is in non-compliance.

### b) Evaluation of youth with suspected disabilities

PRDE has an obligation to ensure that youth with suspected disabilities, and those in need of re-evaluation, receive thorough multi-faceted evaluations which stretch across areas of concern as well as the identification of student strengths.  This include three year re-evaluation processes as well.

MIPE sends quarterly computer generated updates to the Monitor indicating which youth have  completed evaluations, which are about to be completed, and in which cases triennial evaluation dates have expired. The Monitor confirms these using the online MIPE system for more information about the timelines.  At the end of the quarter, MIPE's printout showed that five (5) triennial evaluations were overdue, some for significant periods of time during which the youth was in an NIJ facility.   A report by NIJ indicated that six youth were in the process of evaluation which were suspended during the lockdown. These youth are not the same youth identified by the MIPE system. Three evaluations were completed by PCPS which had been overdue.

Many of the youth who come into NIJ facilities have been out of school, or have had inconsistent educational experiences.  It is not uncommon for IEPs to be out of date, and evaluation times to have lapsed.  It is important that education staff identify when triennial evaluations are due, and work to obtain these in a timely fashion.  A question has arisen as to whether the youth remains enrolled in their local community school while the youth is detained, and whether NIJ's school program has authority and/or responsibility to ensure these evaluations are done. The Department of Education must determine ensure that the evaluations are conducted in a timely manner regardless, and must work through whatever barriers to achieving these that the youth's status in detention may pose.  That status does not obviate the requirement of a triennial evaluation, or initial evaluation, once the youth arrives in detention.

This section of Paragraph 86 in in non-compliance and needs significant work on the timeliness of evaluations and re-evaluations.  This section was significantly hampered by the coronavirus.

| | |
|---|---|
| | **c)  Provision of specially designed instruction and related services**<br><br>Case reviews completed during the 4th quarter of 2019 examined aspects of the youths' Individual Education Plan (IEP), including eligibility, levels of performance, IEP goals, progress notes and the provision of specially designed instruction, accommodations and related services. Case reviews were not done during the Second Quarter as they require the availability of special education teachers and other staff to verify information. Reliance upon the MIPE system to review the quality of IEPs has not been adequate since some information is not included in this system.<br><br>Educational services provided this quarter were severely hampered by the coronavirus and the Governor's orders sending teachers and other education personnel home. Special education services were not delivered remotely through online, telephone or virtual methods in order to comply with the requirements of the IDEIA and this Settlement Agreement.  While youth received packets of information, no specialized instruction, accommodations or other instructional aides were provided.<br><br>Guidance provided by the U.S. Department of Education recognized the challenges for schools shut down during the pandemic, and emphasized that federal disability laws allow for flexibility in determining how to meet the needs of individual students with disabilities.  This necessarily looks different during a national emergency, but it does not mean that services are discontinued.  In cases where services are missed or delayed, IEP teams must make decisions about whether and to what extent compensatory services may be required when schools resume normal operations.[4]<br><br>This provision is in non-compliance, and significantly frustrated by the coronavirus.<br><br>**d)  Procedural safeguards**<br>The annual IEP reviews which are required by the IDEIA were not conducted for most youth at the end of the school year.  Based upon information provided by NIJ for the month of May, 11 of the 22 youth with IEPs between Ponce and Villalba did not have a timely end of the year IEP review.  This function, while hampered by coronavirus, can be done remotely, and should be a high priority for completion before the coming school year.<br><br>NIJ and the PRDE are encouraged to examine guidance documents provided by the United States Department of Education relative to initial evaluation and assessment timelines and procedural safeguards during coronavirus. https://www.d.gov/coronavirus. |
| What is needed for compliance to be achieved? | Initial evaluations and re-evaluations must be completed in a timely manner, and in accordance with the provisions of IDEA. Under 34 CFR §300.305(a)(1), the IEP Team and other qualified professionals, as appropriate, as part of an initial evaluation and as part of any reevaluation under 34 CFR Part 300, must: "Review existing evaluation data on |

---

[44] Id. at pg. 2.

| | |
|---|---|
| | the child, including—(i) Evaluations and information provided by the parents of the child; (ii) Current classroom-based, local, or State assessments, and classroom-based observations; and (iii) Observations by teachers and related services providers." |
| | For youth who are in detention status, and who had a re-evaluation which is overdue or an initial evaluation which has not been completed,  this process must be worked out with the local district to ensure the evaluation gets completed. |
| | IEPs must include an individualized determination of disability, special considerations, including behavioral plans when appropriate, and a range of placement options, including the availability of resource rooms and a self-contained classroom if necessary. Staff should be trained on the use of Functional Behavioral Assessments and the Development of Behavioral Intervention Plans for those youth with significant behavioral and emotional problems which impede learning, and/or disrupt the classroom setting. |
| | IEPs meetings must be held at least on an annual basis, with new plans in place as needed. Compliance with this provision must be done remotely if necessary. |
| | The use of surrogates when necessary, must be examined.  While it may be possible that an NIJ social worker may stand in for a parent, this must be a parental designation and not one made by NIJ or PRDE. Policies and practices must also ensure other procedural safeguards for the participation of parents as well as youth. |
| | Compliance with IDEIA requirements during the pandemic is challenging, but NIJ and PRDE have not been exempted by the U.S. Department of Education nor this Settlement Agreement from compliance.  Finding ways to effectively serve youth remotely, as well as conducting the appropriate reviews, will be a high priority for the third quarter. |
| Priority Next Steps | Continue compliance on Child Find requirements, including initial screenings done on youth within 5 days of intake.  Provide information about the number of youth identified through this process. During the restrictions imposed by the Coronavirus, the initial testing should be done with identified staff in consultation with teachers. |
| | PRDE must ensure that COMPU meetings are conducted prior to the request for an evaluation or re-evaluation, and that such meetings comply with the requirements of the regulations under IDEA as to purpose, timing and outcomes.  The tracking form established by NIJ must be accurately completed, and should trigger the timeframes for completion of a new evaluation or re-evaluation accurately. This should be cross-checked with the MIPE system.  A system must be in place to conduct these meetings remotely if they are not possible in person.  A system must be in place for the coming school year which will ensure that evaluations can be done remotely if necessary. |
| | Evaluations and re-evaluations are the responsibility of the Department of Education and must be completed irrespective of whether the youth's status is in a community school or NIJ facility.  PRDE should provide greater oversight of deadlines for conducting these evaluations. |

|  | PRDE must ensure that there are proper procedures for identification of "parents" and that such individuals meet the definition within IDEA, or are designated by such person, and that surrogate parents are also available as needed. |
|  | PRDE must find ways to ensure that youth eligible to receive specially designed instruction are still served during the pandemic.  Because these youth were not given specially designed instruction during the months of March – June, determinations should be made as to whether they are entitled to compensatory education. |
|  | The Monitor encourages the use of PCPS to assist in the evaluation process, training and development of IEPs, particularly for those students with behavioral challenges. |
| Quality Assurance Measures | The monitor has not yet reviewed draft quality assurance. |
| Sources of Information relied upon | Interviews with NIJ and PRDE staff<br>Review of documentation regarding student schedules, attendance of staff and youth, disability categories and time spent in special education by facility<br>Interviews with youth by video conference<br>Phone calls and emails |

**S.A. 87**. If a juvenile has been previously identified as having an educational disability, Defendants shall immediately request that the appropriate school district provide a copy of the juvenile's individualized education plan ("IEP"). Defendants shall assess the adequacy of the juvenile's IEP and either implement it as written if it is an adequate plan or, if the IEP is inadequate, rewrite the plan to make it adequate, and then implement the revised IEP.

| Compliance Rating | **Non- Compliance significantly hampered by the coronavirus** |
|---|---|
| Description of Monitoring process during this period of time | The monitor previously reviewed the procedures and forms for requesting documentation on youth from prior school districts when admitted to detention.  This includes the youth's cumulative file through SIS and the special education file through MIPE.<br><br>Documentation of when IEPs were revised and when new IEP's were due was reviewed by the Monitor and compared against the MIPE system. |
| Findings and Analysis | Appropriate policies are in place to require that records of the youth's IEP are obtained immediately from the appropriate district. Records must be requested within 10 business days after the screening is done and the youth has indicated he or she has an IEP.  The youth is enrolled in school within 72 hours. Because of the coronavirus, during this quarter, few youth were admitted, and those who entered into detention status did not have teaching staff available to them.<br><br>It appears from the information provided to the Monitor for this quarter that only three IEP meetings were conducted during the shutdown to create a new IEP, and these were done remotely. Eleven reviews appear to be overdue and need to be conducted to |

|  | revise IEPs as necessary. Other reviews were conducted at different points during the school year and were not due during the last quarter. |
|---|---|
| What is needed for full compliance? What steps are required and/or recommended? | All special education files should contain a records of annual IEP reviews, and other reviews of the IEP done during the year as needed.  A system of reviewing IEPs must align with a 12 month calendar year, or more often if needed.<br><br>Youth with an outdated IEP upon arrival must have a COMPU meeting to develop a new IEP based upon the latest evaluation, and when that is out of date, a referral for a new evaluation must be promptly made.<br><br>During the pandemic, education staff will need to conduct remote COMPU meetings, and make best their best effort to involve parents in these remote meetings.  Given the unavailability of internet in some communities, this may prove challenging to get parental participation.  The Department of Education should examine ways to involve parents who have technology limitations in their homes. |
| Priority Next Steps | Ensure that the appropriate COMPU meetings are held to review the youth's IEP goals and progress, present levels of performance, and any needed changes to the IEP's goals, measurable objectives, accommodations and placement.  This includes the backlog of annual reviews that were not conducted during this quarter.<br><br>Ensure the appropriate technology is in place to conduct COMPU meetings, including the participation of parents and youth.<br><br>Clarify with Department of Education the responsibility and authority for re-evaluation when youth are detained and community schools still hold the youth's enrollment status. |
| Quality Assurance Measures | Education QA tools have not been reviewed by the Monitor but have been requested so they can be reviewed. |
| Sources of Information upon | Review of screening and evaluation materials completed while youth are detained<br>Review of documentation used to request and follow up on records<br>Discussions with PRDE and NIJ education staff<br>Review of monthly documentation tracking special education deadlines for evaluations and IEP reviews. |
| **S.A. 90**. Defendants shall provide appropriate services for juveniles eligible for special education and related services. Defendants shall provide each such juvenile with educational instruction specially designed to meet the unique needs of the juvenile, supported by such services as are necessary to permit the juvenile to benefit from the instruction. Defendants shall coordinate such individualized educational services with regular education programs and activities. | |
| **Compliance  Rating** | **Non- Compliance significantly hampered by coronavirus** |
| Description of Monitoring process | See above generally Paragraph 86 for a discussion of the provision of specially designed instruction |

| **S.A. 91.** Qualified professionals shall develop and implement an IEP reasonably calculated to provide educational benefits for every juvenile identified as having a disability. When appropriate, the IEP shall include a vocational component. | |
|---|---|
| **Compliance  Rating** | **Non- compliance significantly hampered by coronavirus** |
| Description of Monitoring process during this period of time | The Monitor reviewed the qualifications, including records of certifications, for special education staff at the beginning of the 2019-2020 school year.<br><br>A review of all youth schedules for regular and special education students was completed, including vocational education classes. |
| Findings and Analysis | Staff responsible for the development of IEPs are the special education instructors, who are training in working with students with disabilities and the creation of IEPs.  An adequate number of special education staff are employed in the two facilities, but none were available this quarter because of the coronavirus.<br><br>While all students were enrolled in vocational classes in the Second Quarter, no vocational education classes could be completed as a result of the coronavirus and no teachers being onsite for vocational education.<br><br>The extent to which IEPs are developed and implemented to allow youth to achieve academic benefit is monitored through Paragraph 86. |
| What is needed for full compliance? What steps are required and/or recommended? | The monitor believes that the policies and procedures, training, staff and resources are available to ensure that this provision is in compliance. A system of documentation has been created which is thorough and which appears to follow the requirements under IDEA for the creation and implementation of IEPs.<br><br>The provision of vocational education is incorporated into policy and, while not mandatory in all cases, has been an integral part of providing more robust educational services for youth in NIJ and is offered consistently.<br><br>IEPs must be designed based upon the individual needs of the youth.  Such determinations as made as part of the Paragraph 86 compliance ratings. It is important to note the relationship between well designed evaluations which include all areas of concerns, proper identification of youth disabilities and levels of performance, and the individualization of a plan which can meet the specific needs of those youth, including the level of service afforded, special aids and supports, accommodations, and related services.  Paragraph 86 ties those provisions together through file reviews, youth and teacher interviews, and observations.<br><br>For the coming school year, in the wake of the pandemic, NIJ and PRDE must determine a plan for how best to provide vocational education taking into account the requirements for social distancing, the availability of teachers remotely or in person, and other variables. |
| Priority Next Steps | Ongoing monitoring over the next year will ensure that all provisions in place are being implemented fully and faithfully as best possible given the pandemic. |

| Quality Assurance Measures | The Monitor has not reviewed proposed QA measures. |
|---|---|
| Sources of Information | All youth schedules regarding the provision of vocational instruction<br>Review of Policies and procedures |

**S.A. 93** Services provided pursuant to IEPs shall be provided year round.  Defendants shall ensure that juveniles with educational disabilities receive a full day of instruction five (5) days a week.

| Compliance  Rating | **Non-Compliance significantly hampered by coronavirus** |
|---|---|
| Description of Monitoring process during this period of time | The Monitor met with Carlos Delgado about the provision of extended school year services during her March monitoring visit.   The process of identifying, approving and providing services to youth who may require extended school year services (ESS) begins early in the calendar, and requires the approval by the Department of Education of youth who are deemed eligible.<br><br>Data concerning youth eligible for extended school year services in 2020 was received during the first quarter. |
| Findings and Analysis | Year round school services to special education students must be provided to students who "prior to the corresponding evaluations, require this service in order to avoid falling back in their academic skills and performance." (See policy 20.2 Section V)<br><br>Education staff provided information to the Monitor for the 2019 – 2020 school year which includes 8 youth in Villalba and 7 youth in Ponce who are eligible for extended school services.  Youth who are eligible will receive 5 hours per day of instruction during the summer schedule. Two special education teachers in each facility have been approved to work with this program over the summer.<br><br>Unfortunately, as a result of coronavirus, no teachers were available to conduct extended school year services, and none was provided during the month of June.  NIJ and PRDE should determine whether these students are entitled to compensatory services for ESS. |
| What is needed for full compliance? | Policies are already in place which address the need for Extended School Services.<br>An annual review of youth eligible for ESS should be made in the fall and submitted to the PRDE for consideration.  Qualified teachers must be retained each year to provide ESS to eligible students. |
| Priority Next Steps | NIJ and PRDE should consider implementing extended school year services for the youth who are eligible before the fall semester begins in order to provide this help to students who have difficulty with retention skills. |
| Quality Assurance Measures | Quality assurance measures should be established to ensure that such provisions are made in a timely manner, and that youth who are eligible received the service with a qualified teacher. |

| Sources of Information | Documentation as submitted to PRDE concerning students eligible for ESS, and teachers available and designated for this service.<br>Confirmation from Carlos Delgado regarding inability to provide ESS during June |
|---|---|

**S.A. 94.** Juveniles shall not be excluded from services to be provided pursuant to IEPs based on a propensity for violence or self-inflicted harm or based on vulnerability. Juveniles in isolation or other disciplinary settings have a right to special education. If required for institutional security, services provided pursuant to IEPs may be provided in settings other than a classroom.

| Compliance Rating | Non-Compliance significantly hampered by the coronavirus |
|---|---|
| Description of Monitoring process during this period of time | Because youth did not attend regular classes in the school this quarter, there were no reported incidents of youth being excluded from services as a result of administrative actions taken, incidents, or the unavailability of security staff. Similarly, the Monitor did not receive documentation regarding education for youth in transitional measures or protective custody. |
| Findings and Analysis | There are three sections to Paragraph 94 which must be monitored:<br>1)  Whether youth who have an IEP are excluded from services based upon a propensity for violence or self-inflected harm or based on vulnerability.<br>2)  Whether youth in "isolation or other disciplinary settings" are provided the right to special education services; and<br>3)  Whether educational services provided pursuant to an IEP occurring in settings outside of the classroom are required for institutional security.<br><br>**Services to Youth in TM or PC Status**:<br>NIJ Policy 20.1 to require full day educational services be provided to youth in Transitional Measures or Protective Custody who have not already graduated.  The requirement is for 6 fifty (50) minute classes, the same afforded other students. Compliance with this new policy positively impacts several provisions of the Consent Decree, including the educational requirements of Paragraphs 79 and 80, Paragraph 81, and Paragraph 86.  This policy must still be signed by the Secretary.<br><br>Verification of school services is made through examination of each youth's education schedule, and examination of daily attendance records, signed by each teacher, and by the student.  For those dates when the youth did not receive a full school day, accompanying explanatory notes are examined.<br><br>Placement in Transitional Measures and/or Protective Custody for the quarter was low, with only 2 youth eligible for school services. I did not receive verification of the services that these youth were provided.<br><br>Because of the coronavirus and the unavailability of teaching staff, no records were reviewed for these youth.<br><br>**School exclusion for other youth** |

| | A tracking form is used to document when school services are not available as a result of register, incidents such as fights, lack of available security or other reasons not the fault of youth.  Since there was no movement of youth to the school, and no teaching staff availability, there were not incidents of school services not be available for the reasons tracked in this provision.<br><br>**Classroom and Education Staff for TM**<br>In order to properly implement the new policy, NIJ must have sufficient educational staff to serve these youth, and the physical resources needed to conduct classes in a safe environment.  No classrooms were used, nor were teachers available during this quarter because of the pandemic. |
|---|---|
| What is needed for full compliance?  What steps are required and/or recommended? | Compliance with the new policy will require that NIJ consistently provide full school days of 6 fifty minute classes in accordance with individual schedules for youth who are in TM and PC and who have not graduated from high school.<br><br>Coordination with security staff is essential to limit the disruption to the school schedule as best possible, and to ensure that youth receive the required services.  Continued documentation and analysis of days where youth do not receive services due to other reason is critical.<br><br>The continued use of alternative classrooms is a positive move. NIJ should continue to ensure the necessary personnel and resources to approximate as best possible the regular school setting.<br><br>Time documentation of youth receiving education in TM and PC status, as well as any changes with implementation of Group Schedule Modification which interfere with educational programming. |
| Priority Next Steps | NIJ and PRDE must determine how youth in transitional measures or protective custody will be provided with educational services depending upon the model they use for delivering services to youth in the fall semester. |
| Quality Assurance Measures | No QA has been reviewed for this provision but the Monitor. |
| Sources of Information upon which Consultant relied | Review of policies and procedures relative to education<br>Discussion with education staff |

| **S.A. 95.** When an IEP is ineffective, Defendants shall timely modify the IEP. |
|---|
| **Compliance Rating** | **Non-Compliance significantly hampered as a result of coronavirus** |
| Description of Monitoring process | See above for discussion of this section.  . |
| Findings and Analysis | See discussion above. |

| What is needed for full compliance? What steps are required and/or recommended? | Good data must be kept on student goal achievement, and should reflect student progress for meeting IEP goals, and receiving academic benefit from instruction provided.  Student files reviewed indicated that reviews are completed every 10 weeks on students, and information on progress is sent to parents.  This practice, when done consistently, provides the youth and parents with good benchmarks for the year, but should also provide indicators for when IEPs may need to be modified.

Supervision of IEPs and data collection should provide indicators of whether such progress is being achieved with each student.  PRDE must have a system of providing oversight of special education teachers to monitor their development of IEPs, as well as progress and benchmarks achieved.

Special education services were not delivered for this quarter.  Many of the IEPs are overdue for review and revisions as noted in Paragraph 86.

Full compliance with this provision is met when Paragraph 86 reaches full compliance. |