IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO


THE UNITED STATES OF AMERICA

        Plaintiff,

        v.                      CIVIL ACTION NO. 94-2080 (GAG)


COMMONWEALTH OF PUERTO RICO

        Defendant,
_____


INFORMATIVE MOTION TO APPROVE MONITOR'S
THIRD QUARTERLY REPORT FOR 2020

        The Monitor hereby submits her Third Quarterly Report for 2020 covering the period of

July 1 – September 30, 2020 regarding compliance on the remaining issues in this case.  This

report is submitted after review and opportunity for comment by the Parties.


**Submitted  by:**

**/s/Kim Tandy**
Kim Tandy, Federal Monitor
United States v. Commonwealth of Puerto Rico
SPEHCE, VIG Tower
1225 Avidena Ponce de Leon, Penthouse Floor, Office #7
San Juan, Puerto Rico   00907
kimtandy@justicebydesign.net
317-840-9332

**Certificate of Service**

I HEREBY CERTIFY that this, I electronically filed the foregoing with the Clerk of the Court on December 10, 2020 using the CM/ECF system, which will simultaneously serve notice of such filing to counsel of record to their registered electronic mail addresses.

Respectfully Submitted,

/s Kim Tandy_____

**Kim Tandy**
Federal Monitor, United States v. Commonwealth of Puerto Rico
SPEHCE, VIG Tower
1225 Avidena Ponce de Leon, Penthouse Floor, Office #7
San Juan, Puerto Rico   00907
kimtandy@justicebydesign.net
317-840-9332

# Commonwealth of Puerto

Civil Action No:  3:94–cv-02080 (GAG)

Monitor's Third Quarterly Report

July 1 – September 30, 2020

Kim Tandy, Federal Monitor
USACPR Monitoring, Inc.
kimtandy@justicebydesign.net
317-840-9332

Monitoring Team:
David Bogard, MPA, JD
Javier Burgos, JD
Robert Dugan
Miriam Martinez, PhD
Curtiss Pulitzer, AIA

## EXECUTIVE SUMMARY

The continuing threat caused by the pandemic has necessitated modified monitoring protocols to remain in place during the third quarter, and continues to alter the way in which DCR must operate its juvenile facilities.  This Court entered an Order on 4/20/2020 authorizing and directing the Monitor to "use all available technology to continue to perform all monitoring functions during the COVID-19 pandemic…… includ(ing) but not limited to, visits to NIJ facilities, meetings, interviews with youth and staff, as well as the electronic transfer of documents and/or photos." (Docket No. 1489)  I commend the work done by DCR and its staff to follow COVID-19 protocols to keep youth and staff as safe as possible from the virus, and to work with the Monitoring team to ensure that we have the necessary information for our compliance work.  We continue to get weekly reports regarding those who have tested positive, which has been minimal, and those who are in quarantine as a precaution.

In spite of the good work being done to keep Covid-19 at bay and keep youth healthy, the psychological toll that the virus has taken cannot be underestimated. At one point, fourteen youth were in a 14 day quarantine status for safety reasons, including those who had been newly admitted to the facility from the community.  The American Academy of Pediatrics warns that the COVID-19 pandemic presents unique challenges to the health and well-being of youth involved with the justice system.[1] They note that juvenile justice systems must not only reduce the transmission of COVID-19, but must also mitigate the negative effect of practices necessary to reduce the transmission.  This requires access to physical and mental health care, frequent contact with family members or other supports through phone calls or video chats, access to distance learning education services, and information and education sessions about safety regarding COVID-19.

At a time when effective mental health services are most critical, there has been a significant disruption of these services during the third quarter for the youth in NIJ facilities. The contract held by PCPS for mental health and substance abuse services was rebid in May, and a new provider chosen in September, after month to month extensions for PCPS to continue services.  PSPC it now litigating the award of the contract to the other provider, resulting in the departure of several clinicians, and leaving youth without the continuity of services they desperately need, with clinicians they know and have a clinical relationship with. The losers in this controversy are the youth who need this service.

During the third quarter, thirty-two (32) separate incidents of attempted suicides, suicidal gestures or ideation, or self-mutilation occurred, the majority of which were at CTS Ponce.  Whether this escalation is the result of COVID-19 related factors, the disruption in mental health providers, or other reasons attributable to circumstances in local communities, it is extremely concerning and needs to be among the highest priorities for NIJ leadership.

This quarter saw marked improvement in educational services, even as adaptations were necessary, and a strong effort to address the backlog of overdue evaluations/re-evaluations and IEP meetings. Recruitment of new staff and plans for the new training academy were solidified for an October 16 start date.  Progress has been made on the new online reporting system, which is expected to be operationalized by November 15th.  OISC has made a significant improvement in timely investigations being completed and eliminating the backlog which accumulated over the last several quarters.  These efforts have been made in spite of numerous setbacks and challenged brought about because of the virus.

---

[1] https://services.aap.org/en/pages/2019-novel-coronavirus-covid-19-infections/clinical-guidance/responding-to-the-needs-of-youth-involved-with-the-justice-system--during-the-covid-19-pandemic/

With impending elections in November, the Court has issued transition plans in an effort provide continuity and stability to operations, and mitigate and prevent undue interruptions or sudden turnover of personnel which could set back the Commonwealth's efforts to implement key reforms. It is hoped that we can move ahead through these next few quarters, and not behind.

A summary of compliance ratings for the remaining sections is found below.

| Parag. No. | Compliance Provision | 4th 2019 | 1st 2020 | 2nd 2020 | 3rd 2020 |
|---|---|---|---|---|---|
| **Physical Plant** | | | | | |
| S.A. 31 | Facilities conforming to Building Codes | PC | PC | PC | PC |
| C.O. 43 | Sufficient funding for Implementation of C.O. | PC | PC | PC | PC |
| S.A. 45 | Agency Policy and Procedure Manual for all operations | PC | PC | PC | PC |
| S.A. 50 | Training for current and new direct care staff | PC | PC | NC* | PC* |
| S.A. 48 | Sufficient Direct Care Staff | NC | NC | NC | NC |
| Jan 2009 Para. 1 | Reasonable Safety of Youth through Adequate Supervision | NC | NC | NC | NC |
| Parag 2 | Sufficient Staff to Implement Decree and adequate supervision | NC | NC | NC | NC |
| Parag 3 | Training for social workers if direct care staff | na | na | na | na |
| Parag 4 | Persons Hired to be Sufficiently Trained before deployed | na | na | na | na |
| Parag 5 | Submission of monthly staffing report | PC | NC | PC | PC |
| S.A. 52 | Classification | PC | PC | PC | PC |
| S.A. 77 | Use of Force | PC | PC | PC | PC |
| S. A. 78 | Investigations into Alleged Abuse and Maltreatment of Youth | PC | PC | PC | PC |
| S.A. 79 | Restrictions on Isolation | PC | PC | PC | PC |
| S.A. 80 | Protective Custody | PC | PC | PC | PC |
| S.A. 59 | Treatment Plans for youth with Substance Abuse problems | PC | PC | PC | NC |
| C.O. 29 | Residential Mental Health Treatment Program | PC | PC | PC | NC |

| S.A. 36 | Continuous Psychiatric and Psychological services | PC | PC | PC | PC |
|---|---|---|---|---|---|
| S.A. 63 | Reducing Risk of Suicide | PC | PC | PC | PC |
| S.A. 72 | Emergency Psychotropic Medication | SC | PC | PC | PC |
| S.A. 73 | Behavior Modification/Treatment | SC | PC | PC | PC |
| S.A. 81 | Provision of Academic and Voc. Education to All Youth | PC | PC | PC* | PC |
| S.A. 86a. | Compliance with IDEA Requirements and Timeframes | PC | PC | NC* | PC |
| S.A. 86b. | Screening for youth with Disabilities (Child Find Provisions) | SC | SC | NC* | PC |
| S.A. 87 | Obtaining IEPs of Eligible Youth | PC | PC | NC* | PC |
| S.A. 90 | Delivery of Specially Designed Instruction and Related Services | PC | PC | NC* | PC |
| S. A. 91 | Qualified educational professionals and voc. Ed | SC | SC | NC* | PC |
| S.A. 93 | Year Round Services for youth with IEPS | SC | SC | NC* | PC |
| S.A. 94 | Services to youth in isolation or other disciplinary settings | PC | PC | NC* | PC |
| S.A. 95 | Modification of IEPs | PC | PC | NC* | PC |

*Compliance is significantly hampered by covid-19

## Compliance Ratings, Analysis and Recommendations

The Settlement Agreement requires that the Court retain jurisdiction of remaining claims "until such time as the Commonwealth has fully and faithfully implemented all requirements of the agreement and such full compliance has been maintained for one year." (S.A. 103). The Monitor and Consultants use a three-tiered system in this report defined as follows:

***Substantial Compliance*** shall mean a level of compliance that does not significantly deviate from the components of the provision, provided that any deviation poses no significant risk to detainee health or safety. Substantial Compliance indicates that there are approved relevant policies and procedures which, when implemented, are sufficient to achieve compliance; trained staff responsible for implementation; sufficient staff and resources to implement the required reform; and consistent implementation of the procedures during the majority of the monitoring period. Substantial compliance also requires that the procedures accomplish the outcome envisioned by the provision.

The substantial compliance rating is given only when the required reforms address all of the issues discussed in the provision and when solid implementation of the reforms has been consistently demonstrated, through reliable data, observations and reports from staff and youth, for a majority of the monitoring period.

*Partial Compliance* indicates that compliance has been achieved on some of the components of this provision, but significant work remains. It indicates that there are approved relevant policies and procedures which, when implemented, are sufficient to achieve compliance; trained staff responsible for implementation; and sufficient staff and resources to implement the requirements of the provision. Partial compliance indicates that while progress has been made toward implementing the procedures described by policy, performance has been inconsistent throughout the monitoring period and additional modifications are needed to ensure that procedures are sufficiently comprehensive to translate policy into practice, and to accomplish the outcome envisioned by the provision.  Partial compliance is appropriate if policies may need minor revisions for compliance with the Settlement Agreement provided other requirements of this section are applicable.

*Non-compliance* indicates that most or all of the components of the provision have not yet been met. Examples include provisions where policies still need to be overhauled, the majority of staff may need to be trained, procedures may not have been developed, documentation may not be in place or consistently provided, and there has been no determination that the procedures accomplish the outcome envisioned by the provision.

## PHYSICAL PLANT - Curtiss Pulitzer

| S.A. 31 Existing facilities expected to be occupied by juveniles beyond Fiscal Year 1996-1997 shall conform to applicable federal, state, and/or local building codes. | |
|---|---|
| Compliance  Rating | Partial Compliance |
| Description of Monitoring process during this period of time | The Monitor's office has reviewed the drafts of all the documents being developed by NIJ/DCR's consulting architect Javier Valentin relative to compliance with this provision. As stated in the last quarterly report, the Monitor's Consultant reviewed and made edits to these reports and has shared those comments with NIJ and Mr. Valentin.<br><br>Due to the earthquakes in Puerto Rico followed by the Covid-19 pandemic, the Monitor's Consultant has not been able to make any site visits. In lieu of site visits, the Monitor's Consultant initiated a self-reporting process in April, wherein NIJ are using the spread sheet formats utilized by the Monitor's Consultant during his regular site visits. In addition, due to the need to maintain hygiene at all times due to Covid-19, NIJ agreed to use the plumbing matrix developed by the Monitor's Consultant several years ago when plumbing was still being monitored by this office. The Monitor's Consultant has reviewed the self-reporting documents received for this quarter. |

| | |
|---|---|
| | In addition, the Monitor's Consultant reviewed the schedule for implementation of the CAPEX projects as well as the Paragraph 31 work with NIJ and Mr. Valentin. Funds became available in July when the fiscal year started, and the CAPEX work has commenced at the facilities in Ponce and Villalba. The Monitor's Consultant has since received a revised schedule for this work.<br><br>The Monitor's Consultant had a functional team Webex meeting on October 5th, rescheduled from September due to a quarantining situation at the FMO office within DCR. Kelvin Merced, Gineima Ojeda, Luis Ortiz and Pedro Santiago from DCR were on the webex as were David Bogard (for the suicide prevention discussion) and Curtiss Pulitzer. We  discussed:<br>• The status of the suicide prevention door hinge project<br>• The status of finalizing the remaining work on the new security vent grills on the lower floors of all housing units<br>• The status of the CAPEX work<br>• The status of finalizing the Para 31 reports by Javier Valentin<br>• The status of the documentation work being prepared by Javier Valentin to be bid out for the repair work related to Para 31<br>• General discussion of physical plant issues at Villalba and Ponce<br><br>While technically this meeting was held at the start of the fourth quarter, because it had been originally scheduled for September, the Monitor's Consultant has included the outcomes and discussions in the third quarterly report. |
| Findings and Analysis | Facility assessment matrices were received for Ponce for the months of July, August and September and only the month of September for Villalba during the third quarter. The number of broken air conditioning units increased from three in July to six in August and September. In both August and September at Ponce, there were four air conditioning units that were not functioning in Modules 1, 3, 4 and 6 in one wing of rooms and two that were not functioning in Module 8, PUERTAS, in one wing of rooms and in the dayroom. Ponce continues to have persistent air conditioning problems, and four of the six units that were not functioning were the same as at the end of the 2nd quarter. Not having sufficient cooling in PUERTAS, Module 8, is a health issue as the juveniles housed there are on medication and need to be living in a cool environment. It was reported during the functional team call that several of the classrooms at Ponce also had no air conditioning. For Villalba it was disappointing that the only facility assessment report received this quarter was for the month of September. The air conditioning systems are in better repair in Villalba and none were reported broken in September with the exception of one unit in the Admissions area, which is concerning as that is where juveniles in quarantine for Covid are housed. In addition, DCR continues to send the Monitor's office the monthly maintenance calendars for the brigades who perform most of the repair work at the two facilities.<br><br>Plumbing assessment matrices were received for the months of July, August and September for Ponce and only the month of September for Villalba. For Ponce, there were no reported broken fixtures in July and August one broken toilet reported in September and there was hot water and adequate drinking water reported for all three |

months. For Villalba it was disappointing that no plumbing assessment reports were received for July and August but in September, there was one broken urinal and shower reported and there was hot water and adequate drinking water reported in all living units.

On the October 5th conference call, Mr. Valentin reported to the Monitor's Consultant that his firm was behind in preparing the documents to be bid out for the Paragraph 31 construction work. A new schedule was received in mid-October showing the status of the construction documents for Paragraph 31 being completed at the end of November. The same schedule shows that the scopes of work for the CAPEX projects was completed in the third quarter. Significant progress has been made in getting the CAPEX projects under way. The repair work has begun in the gyms at both facilities and work on some of the fencing and gates and concertina wire was to commence at the start in early October. There is no fence repair work at Ponce. The sealing of the rooves and other roof repairs at Ponce was to commence in October as well. There is no roof repair work planned at Villalba.

A surprise appropriation was made to purchase and install a new 550 KW emergency generator at Ponce and a 600 KW generator at Villalba. In addition, 5000 gallon tanks to run the emergency generators at both facilities were funded. Presently there is a 600 gallon tank at Ponce and a 1000 gallon tank in Villalba, and both are woefully inadequate in emergency situations. The new emergency generators and tanks will vastly improve the facilities' abilities to maintain power during a hurricane, earthquake or other emergencies.

As stated in the last quarterly report, Mr. Valentin agreed that a professional editor was needed to recompile all the code documents into a coherent single document in proper English. Mr. Valentin stated that he was working with attorney Arlene Perez in this effort but no progress has been made during the third quarter.

The Monitor's Consultant is concerned that with the upcoming election, no progress will be made in bidding out the Paragraph 31 projects. NIJ has assured the Monitor's Consultant that as these were existing appropriations there would not be an issue moving forward. However, as contracts need to be approved and signed off by potentially outgoing appointed officials, this may cause the projects to be delayed.

The Monitor's Consultant has also been monitoring the progress being made to comply with suicide prevention measures (See below and Para 79) in juvenile rooms, and continues to monitor fire safety conditions, plumbing and air conditioning through conversations, self-reporting documents and e-mails from NIJ to confirm that all housing units are functional and safe for juveniles to occupy.

As reported in the last quarterly report, there has been some positive movement in creating a solution in preventing suicides from occurring by a juvenile attaching a ligature to the hinges in juvenile room doors. All the rooms in the PUERTAS housing module in Ponce were retrofitted as have three rooms in each of the seven remaining living modules in Ponce. At Villalba, Mr. Ortiz from FMO, reported that two rooms in

| | |
|---|---|
| | three housing modules had been completed. He reported that twenty more metal flanges for the retrofit work were being fabricated and that work would commence again shortly at Villalba once the individual doing the retrofit work, who came down with Covid-19 , is replaced with a properly trained replacement.  Mr. Ortiz reported that the hinge covers were about to be painted at Ponce. It is unclear why only two rooms at Villalba versus three at Ponce are being retrofitted. Mr. Ortiz explained that the configuration of the housing units at both facilities is somewhat different, but NIJ still needs to explain why this decision was made. In addition, the Monitor's Consultant requested the status from the NIJ fire safety coordinator regarding securing sprinkler heads with security caulking to prevent any ligatures from being threaded around gaps in the ceiling above the sprinkler heads, but no status report has been given yet. |
| | As was reported in earlier reports, all the replacement of air vent grilles with suicide resistant versions on the lower levels of the housing units at Ponce and Villalba have all been completed. The Monitor's Consultant was told that the DCR brigades had applied security caulking at the edges of the vent grills to prevent the possibility of a ligature from being threaded through the edge of the grills.  While the security caulking should prevent juveniles from sliding paper through these same gaps which impedes air conditioning air flow into the rooms,  there were some issues where this problem has resurfaced requiring that some of the vents to be replaced again. DCR is waiting for the new materials for these replacement vents to be fabricated. |
| | The Consultant received and reviewed the summary report prepared by DCR on the status of many of the projects described above, two tables describing the status of the air vents project and hinge retrofits and a revised project schedule from Mr. Valentin in making his determination regarding compliance. |
| What is needed for full compliance? What steps are required and/or recommended? | The Monitor's Consultant is waiting for a status report on when all three code reports (the IBC and Puerto Rico Building Codes, the Americans with Disability Act, and the NFPA Life Safety Code) will be compiled into one cohesive document and include all the edits and comments transmitted to Mr. Valentin to date. |
| | In discussions with Mr. Ortiz he agreed with the Monitor's Consultant that air conditioning repairs continue to be a problem, especially at Ponce, and that a maintenance contract for all the air conditioning units at both facilities is sorely needed. Due to budget cuts during the financial crisis those contracts were let to lapse. While the brigades can do many of the repairs, a properly crafted maintenance contract should allow for expedited repairs to occur. |
| | The Monitor's Consultant will continue to monitor the projected schedule for completion of the documents to allow the bidding for the proposed construction work for Paragraph 31. In addition, the Monitor's Consultant will continue to monitor the progress for the CAPEX repairs budgeted for Ponce and Villalba. |

| | The Monitor's Consultant would like to see a prioritization for Paragraph 31 construction projects so that any mitigation of violations that affect Life Safety, and cannot be initially mitigated operationally, should have the highest priority for implementation.<br><br>While on-site visits to understand better the proposed capital projects as well as on-site inspections to review the progress of work once it commences is unlikely until 2021, the Monitor's Consultant will be requesting progress photos and videos or perhaps live FaceTime tours of Ponce and Villalba in addition to monthly reports on facility inspections and the plumbing status reports. DCR needs to ensure that reports are sent to the Monitor's office in a timelier manner during the 4th and subsequent quarters. |
|---|---|
| Priority Next Steps | The Monitor's Consultant realizes and appreciate that the on-going earthquakes which have occurred in Puerto Rico coupled with the Covid -19 crisis have placed additional constraints on NIJ staff to ensure that facilities are safe.<br><br>Mr. Valentin should hopefully be completing the draft consolidated report. The Monitor's Consultant will continue to track his progress.<br><br>NIJ should be continuing retrofitting the door hinges in Villalba.  A schedule update for work completion will be requested from Mr. Ortiz<br><br>NIJ must continue with the needed CAPEX repairs at both facilities. Sufficient funding should be allocated to make additional repairs in the next 2021-2022 fiscal year.<br><br>The remaining air vent grills that need to be replaced should be finished by the brigades hopefully this quarter and all grills should be painted.<br><br>Due to the Covid-19 crisis, the Monitor's Consultant will continue to meet virtually with NIJ and their consultant Mr. Valentin. The consultant will also rely on self-reporting by NIJ on existing physical plant issues that affect the health and safety of juveniles. It is unlikely that an on-site visit will be possible until 2021. The monitor's office are developing options to try either conduct facetime tours with Mr. Ortiz and including the Deputy Monitor Mr. Burgos as well as receive video tours  of Ponce and Villalba. |
| Quality Assurance Measures | The quality assurance measures are for the monitor's office to keep reviewing the documents developed by Mr. Valentin and hopefully touring the facilities with Mr. Valentin at some point in the future to view first hand where code and ADA violations repairs are to be made. The Monitor's office will keep reviewing the documents being developed by NIJ to track facility repair issues including suicide mitigation efforts followed up hopefully by tours to determine compliance. Hopefully, a tour of the facilities in 2021 will confirm that the progress on the CAPEX work. |

| Sources of Information upon | The documentation being developed by Mr. Valentin will be the primary source to determine the levels of compliance with the codes and regulations. |
|---|---|

| | |
|---|---|
| which Consultant report and compliance ratings are based. | The financial resources to achieve full compliance may need to involve continued discussions with key personnel at NIJ and FOMB as well as senior officials within the Commonwealth hierarchy responsible for funding the agency.<br><br>The spread sheets, videos and photographs being submitted monthly by NIJ will help the Monitor's office to track facility repair issues. |

## POLICIES AND PROCEDURES, TRAINING AND RESOURCES – Kim Tandy

| S.A. 43 Until this order is fully implemented, Defendants shall submit to the Legislature of the Commonwealth each fiscal year a report wherein the required sums of money will be established so as to implement this Consent Order. | |
|---|---|
| **Compliance Rating** | **Partial Compliance** |
| Description of Monitoring process during this period of time | On December 19, 2019 Judge Gelpi ordered the Parties to discuss a plan prior to the January 16th Status Conference for an adequately protected budget for this case, and "one in which funds are designated toward the present consent decree and not used toward any other purposes." (See Order, Doc. 1436) This was reinforced by the Court during the Status Conference on January 16th, 2020.<br><br>On April 22, 2020 the budget was filed with a Joint Motion by the Parties, and with the agreement of the Monitor.  The budget was approved by this Court on April 23, with an Order that the budget shall be separate and earmarked within DCR's overall budget.<br><br>The budget was certified by FOMB pursuant to Section 202(e) of PROMESA.<br><br>DCR is required by the Settlement Agreement to "submit to the Legislature of the Commonwealth each fiscal year a report wherein the required sums of money will be established so as to implement this Consent Order."  The Court has ordered DCR to have an adequately protected budget for this case, with designated funds which cannot otherwise be used toward other purposes. The current budget proposal has NIJ as a separate program within DCR so that funds will be assigned for exclusively use for juvenile facilities.<br><br>The budget total is $22,555,297 for the 2020-2021 fiscal year.  The Joint Motion filed by the Parties also notes that expenditures will be tracked and accounted for separate and apart from the total DCR budget throughout the fiscal year. (ECF Doc. 1493, pg. 3)<br><br>The budget for NIJ includes 318 security personnel within the two remaining facilities, and 214 civil staff, including social workers, educators, special operations, central office staff, and those located in community offices.  The total security personnel includes 62 new positions for Juvenile Service Officers.  It also includes nearly 1.5 million in Capital Expenditures, including $714,155 for repairs needed to comply with Paragraph 31. |

| | |
|---|---|
| | The Monitor requested budget to actual numbers for the first quarter of the fiscal year to compare actual spending to what has been budgeted and approved for compliance issues. |
| Analysis and Findings | FOMB indicated in its letter to Governor Wanda Vazquez on June 1, 2020 that reporting for DCR's Juvenile Program "must include and clearly detail budget to actuals on a concept level basis, any reprogramming of funds within the program, and any reprogramming of funds to/from other programs or agencies."<br><br>DCR's separate budget for NIJ addresses some of the most serious compliance issues where financial resources have been an impediment, including staffing and capital expenditures for code violations.  Now that funding has been made available, it is imperative that funds are timely spent in the manner allocated to address these areas.<br><br>The Monitor requested and received budget to actual figures for July – September of 2020 reflecting the amounts being spent within the NIJ budget. Spending is under budget for staffing, as a result of new cadets not being brought on until later in the second quarter of the fiscal year. The agency has spent little on capital expenditures of the $1.38 million allocated, in part because covid-19 has made getting this work completed difficult. More information is included under paragraph 36 on this issue. |
| What is needed for full compliance? What steps are required and/or recommended? | DCR must not only request that adequate funding be sought from the legislature to comply with the Settlement Agreement terms, it must ensure that once received, this funding is used to remediate areas which have not yet come into compliance. As evidence of this, budget to actual amounts showing these expenditures were provided to the Monitor.<br><br>DCR must also ensure that those staff positions who have been included in the NIJ separate budget are filled and utilized only for purposes of NIJ. Currently, the Director of NIJ appointed in May after various incidents in the facilities, continues to split her time between NIJ leadership and other functions within DCR for the adult facilities.  DCR must ensure that this position and others paid for within the NIJ budget are dedicated only to NIJ functions as required by the Court's Order.<br><br>If the population can be further downsized, with more youth remaining in their own communities, or being returned sooner, the budget projections will likely be different. The Monitor strongly suggests a leadership group be discuss this now, and to utilize outside consultants to assist as needed. |
| Priority Next Steps | Quarterly budget to actual reports must be generated which can ensure that appropriate spending is occurring, and which comply with FOMB's requirements, and which are provided to the Monitor.<br><br>DCR must ensure that staff positions included in the NIJ budget are used only for the purposes of NIJ, including the Director of NIJ. |
| Sources of Information upon | Budget to actual report for July – September of 2020. |

| | |
|---|---|
| which Consultant report and compliance ratings | Information which has been obtained regarding the split function of various staff positions has come from top leadership positions within NIJ. |

| S.A. 45  Within one year of the approval of the agreement by the Court, Defendants agree to provide an agency policy and procedure manual governing all operational aspects of the institutions.  Within eighteen months of the approval of this agreement, Defendants shall further insure that the facilities are strictly operated within these policies and procedures and that all staff have been trained accordingly. |
|---|

| Compliance  Rating | Partial Compliance |
|---|---|
| Description of Monitoring process during this period of time | The Monitor has copies of existing policies and procedures in most of the remaining areas of the Settlement Agreement and Consent Order.  The remaining policies include final approval by the Secretary of several classification policies, and finalization of the new policy on Isolation (not yet numbered), as well as changes to policies 9.17 on Group Schedule Modification, 17.19 regarding Protective Custody, and 17.20 regarding Transitional Measures.<br><br>The Parties entered a Joint Motion to Address Continuing Facility Safety Issues filed on April 9, 2020, which was Ordered on April 10 (ECF Doc.1477), and which contains an agreement to develop a policy on isolation based upon a definition developed by the Parties.  It was agreed that isolation policy and related policies would be submitted for review and approval by the Monitor with 60 days.<br><br>When that did not occur, a subsequent Order was entered on 8/18/2020 requiring compliance with agreed upon timeframes for changes to be made to the four policies listed above by DCR no later than August 30, with comments by the Department of Justice to be made within 10 days thereafter, and any final resolution of language to be resolve within 10 days after that.  The policies were then to be translated by the Monitor's office, with a final 7 days given thereafter for the parties to address any substantive changes based upon the translation. |
| Findings and Analysis | As of close of the first quarter 2020, the agency has produced a revised draft of classification policies 6.1 and 6.2, with the changes noted in Bob Dugan's report for Paragraph 52 for this quarter.   The following policies for Classification, along with their revision dates,  are awaiting signature by the Secretary:<br><br>1.  6.1 - February 14, 2020<br>2.  6.2 - February 14, 2020<br>3.  6.3 - December 20, 2019<br>4.  6.4 - January 30, 2020<br>5.  6.5 - January 30, 2020<br>6.  6.6 - December 20, 2019<br><br>The revision of the new isolation policy, as well as final revisions in the policies on Group Schedule Modification, Transitional Measures, and Protective Custody have not been finalized in a Spanish format so that they can be translated into English for a final review.  At the end of the third quarter, this requirement is weeks beyond the deadline imposed by the Court's Order. |

| | |
|---|---|
| | Further discussion about policies and procedures are noted in other sections of this report as relevant in the sections noted above. |
| What is needed for full compliance? What steps are required and/or recommended? | Approved policies and procedures should remain a priority in any area where the Monitor's office has not yet approved of changes, and where policies do not adequately reflect the requirements of the Settlement Agreement and/or Consent Order.<br><br>The policies for Classification require the Secretary's authorization signature, an implementation date, and a training curriculum and training schedule to coincide with the implementation date in a manner that assures staff are trained prior to policy and procedure implementation.<br><br>A draft policy for isolation, as well as necessary correlating changes to the policies for transitional measures, protective custody and group schedule modification must be finalized to comply with the Court's 8/18/2020 Order.  DCR then has a 90 day period during which to implement the new policies, including a training curriculum and training schedule to ensure that all staff understand and have been trained on the new procedures. |
| Priority Next Steps | The Classification policies must be signed by the Secretary.<br><br>Final changes to the edits on the four policies related to isolation must be made to comply with the Court's order of 8/18/2020.  The Monitor will then have the policies translated, and the parties will have 7 days to ensure the translation is accurate. |
| Quality Assurance Measures | NIJ staff, under the leadership of Kelvin Merced, have been working on a set of policies regarding Quality Assurance which are under review by Bob Dugan. |

**S.A. 50.** Defendants shall ensure that current and new facility direct care staff are sufficiently well-trained to implement the terms of this agreement. Each direct care staff, whether current or new, shall receive at least forty (40) hours of training per year by qualified personnel to include, but not be limited to, the following areas: CPR (cardiopulmonary resuscitation); recognition of and interaction with suicidal and/or self-mutilating juveniles; recognition of the symptoms of drug withdrawal; administering medicine; recognizing the side-effects of medications commonly administered at the facility; HIV related issues; use-of-force regulations; strategies to manage juveniles' inappropriate conduct; counseling techniques and communication skills; use of positive reinforcement and praise; and fire prevention and emergency procedures, including the fire evacuation plan, the use of keys, and the use of fire extinguishers.

| Compliance  Rating | **Partial Compliance (significantly hampered by covid)** |
|---|---|
| Methodology for Monitoring this Quarter | Training requirements were significantly hampered during this quarter as a result of COVID-19.  Central office staff were, for the most part, unable to work in the office, and many could not work from home to access necessary information to perform their jobs.  The Monitor recognizes that although there have been definite setbacks in training regarding compliance, many tasks were unable to be performed during this time through no fault of NIJ staff. |

|  | A training completion schedule for the year was provided, showing that training ceased on March 16, with all subsequently scheduled training for the quarter cancelled because of COVID.<br><br>On 8/21/2020, the Monitor met by videoconference with Aida Burgos, Kelvin Merced and Gineima Ojeda Richardson about training issues.  Concern was expressed by the Monitor at that meeting about whether DCR was ensuring that these three staff were being used only for NIJ purposes as indicated in the approved budget.[2]<br><br>The Monitor requested that DCR provide her with a plan for third and fourth quarter detailing how this provision can be brought back into at least partial compliance. While no plan was submitted to address all of the areas of deficiency, a copy of the 18 month Annual Report was completed and sent for the period ending December of 2019. The Annual Report for the period ending June, 2020, has not yet been completed, however, no training of officers was completed during that time other than the training of 9 new cadets for relief in Ponce.<br><br>The focus this quarter has been on training of new cadets in the NIJ Training Academy in order to bring much needed staffing relief to both facilities. |
| Findings and Analysis regarding compliance. | No training for officers occurred during the third quarter other than that of 9 new cadets who already completed officer training at DCR.<br><br>The annual report covering July 1, 2018 – December, 2019, based upon the data collected by the Institute for Human Resources Development and Training (IDECARH), shows a total of 257 officers, of which 23 were inactive for training purposes (meaning they were away because of extended leave – 4 to 6 months – due to abandonment of post or reassignment to a facility that does not serve youth. A total of 234 officers (91%) were available for training purposes. IDECARH provided the Monitor backup documentation in the form of an Excel spreadsheet which lists all officers and the training they have received.<br><br>During the 18 month period covered by the report, IDECARH developed and coordinated a total of 1215 hours of training.  Officers are required to complete 40 hours of training during the 18 month period.  Of the available officers, 27% completed more than the required 40 hours, including 31 officers in Ponce, and 34 officers in Villalba.  It should be noted that the topics of Grip and Control Technique, Mechanical Restraints and Psychological First Aid were not offered until July 2019 and are not included in this report.  The chart below shows the topics covered, and the number and percentages of those attending by facility: |

| Topic Covered | Hours | Ponce | Villalba | Others | Total | Metric |
|---|---|---|---|---|---|---|

---

[2] Gineima Ojeda Richardson was appointed on May 12th as the Regional Manager over NIJ operations replacing Raul Cepeda.  Cepeda was included in the approved budget, and the Monitor has been told that Ms. Ojeda Richardson is his replacement.  As such, this position should have remained a full time position within NIJ.

| | | | | | | |
|---|---|---|---|---|---|---|
| Emergency key control and management | 3 | 90% | 100% | 95% | 95% | 85% |
| CPR/First Aid | 6 | 97% | 97% | 97% | 97% | 90% |
| Mgmt. of Alleged Maltreatment and Institutional Neglect | 4 | 88% | 92% | 97% | 90% | 85% |
| Suicide Prevention | 3 | 79% | 91% | 85% | 85% | 90% |
| Physical Health | 4 | 98% | 92% | | 95% | 85% |
| Behavior Modification Program | 4 | 76% | 80% | 78% | 78% | 85% |
| Life Security NIJ | 6 | 79% | 97% | 88% | 88% | 85% |
| Rules and procedures regarding Use of Force | 3 | 81% | 98% | 89% | 89% | 85% |
| Validation of youth rights | 4 | 84% | 54% | 69% | 69% | 85% |
| Use of Chemical Restrictions | 3 | 47% | 47% | | 47% | 100%* |

*The metric for this topic was set at 100% of those who are authorized to use OC spray. It is not clear as to whether the percentage of officers trained reflects only those authorized or is compared against the total available officers for training.

Of the ten topics listed, training did not hit the designated metric in 4 areas:  Behavior Modification, Validation of Youth Rights, Suicide Prevention, and the Use of Chemical Restrictions.  The other 6 areas met and in several cases, exceeded the established metric for compliance.  The facilities must have corrective actions plans to complete the additional training within 180 days. There is no evidence this was done in the first and second quarter of 2020, however, the restrictions because of covid-19 made this very challenging.

The Monitor has not received an annual assessment of training needs, and documentation of necessary or recommended changes to the training curricula.

Changes to the format of re-training occurred during fiscal year 2019-2020, including the redesign of the sequence of topics and number of hours offered to youth service officers.  Beginning in September of 2019, the annual retraining began with 4 full days on the subject of use of force, including use of force policies, gripping and control techniques, use and management of mechanical and chemical restraints, and report writing.  NIJ management noted that this change was welcomed by staff and there was noted improvement in employee execution.

A request was also made to allow NIJ to certify instructors in Intervention in Nonviolent Crisis (CPI), a model developed in the 1980's which provides strategies to avoid risks, ensure safety, and provide tools to work with people in high risks situations without

| | |
|---|---|
| | exacerbating their emotional state.  This was presented as necessary to promote a change in institutional philosophy from one focused on security and punitive measures versus one focuses on security and treatment. Information on this model can be found at https://www.crisisprevention.com/Resources/Research |
| What is needed to reach full and faithful compliance? | **Agreed upon metrics for reaching compliance are as follows:**<br>1)  Training sessions in all SA 50 categories must be planned and provided throughout the coming year with sufficient frequency to allow for ready access by participants in the remaining two facilities.  A training calendar must be prepared in advance.  Given the likelihood that the pandemic will extend through a portion of 2021, NIJ should determine how best to deliver ongoing training to its officers.<br><br>2)  Training completion by active direct care staff must reach the targeted benchmarks by topic over an 18 month period, and corrective action plans for facilities not achieving those benchmarks must ensure that the remaining staff complete training within 180 days.  This includes:<br>• Training on the use of chemical agents must be completed at the 100% rate, but only for those who are authorized and certified to use OC spray.<br>• CPR training and certifications must be completed every 2 years at the 90% level for those direct care staff.<br>• Training on suicide prevention must be completed at the 90% rate for all direct care staff.<br>• Facility directors must ensure that all other required trainings for this provision meet at least 85% completion rate within the 18 months.<br><br>3)  Pre and post must be used to evaluate participants' increase in knowledge and skills achieved by the training. Staff must pass such tests with a 70% or higher grade. Backup documentation must be provided to the Monitor to show such results.<br><br>4)  Evaluation of training modules and delivery must be sought by participants and through QA to ensure trainers are knowledgeable and skilled both in content and delivery to adult learners, materials are understandable and adequately cover the topic, and that content is relevant, current and accurate.<br><br>5)  Ongoing training needs will be assessed at least on an annual basis or more frequently if needed to determine if modifications are necessary. Written documentation is required to show that such reviews have taken place and what changes if any have been made as a result.<br><br>6)  Necessary revisions to training based on changes in policies and procedures will be made within a targeted time, with full implementation within 12 months.  Written documentation is required to show that such changes have been made and implementation scheduled and completed. It is important that such changes be coordinated with UEMNI and OISC and include recommendations based upon investigation findings and results. |

|  | Appropriate staffing support must be in place to the Director of Human Resources and IDECAHR to facilitate report preparation and compliance evidence.  The new budget for the NIJ budget, which cannot be used for other purposes, includes the Director of Human Resources and IDECAHR.  Her responsibilities should be 100% within NIJ.<br><br>The Monitor encourages NIJ to continue to seek out resources for certifying trainers in the CPI model as a way of changing the culture within NIJ to a more therapeutic one. |
|---|---|
| Priority Next Steps | IDECARH must complete an annual report for the period of January 1, 2019 – June 30, 2020 the fourth quarter.<br><br>IDECARH must provide backup documentation for 2019 and the first 5 months of 2020 regarding training records, evaluations, and pre/post testing.<br><br>NIJ must evaluate staffing needed to comply with training provisions if it is not possible for the Director of Human Resources and IDECAHR to be physically present in Central office during the pandemic.<br><br>A plan for how training will be done, whether in person or remotely, for this fiscal year should be presented to the Monitor given the restrictions imposed by COVID-19. |
| Basis for findings and recommendations | The findings and recommendations are based upon the meetings with the Human Resource Specialist in May, as well as the Annual Report ending December of 2019.<br><br>Information relative to the CPI program for training in crisis intervention can be found at https://www.crisisprevention.com/Resources/Research |

## PROTECTION FROM HARM – STAFFING  (Bob Dugan)

**S.A. 48.** Defendants shall ensure that the facilities have sufficient direct care staff to implement all terms of this agreement. Direct care staff supervise and participate in recreational, leisure and treatment activities with the juveniles. Compliance can be demonstrated in either of two ways.

<u>48.a Method one:</u> Defendants may provide documentation of consistent supervision by not less than one (1) direct care worker to eight (8) juveniles during day and evening shifts and not less than one (1) direct care worker to sixteen (16) juveniles during normal sleeping hours.

<u>*48.b Method Two:*</u> *Defendants may develop, and submit to the court for approval, an alternate staffing roster for any facility in this case. The roster shall be based on a study that shall specify fixed posts and the assignment necessary to implement the terms of this agreement, taking into consideration the physical configuration and function of spaces, the classification and risk profiles of youths involved, the incident patterns in the settings involved, the routine availability in the settings of other categories of staff, and the overall number of direct care positions necessary to consistently achieve the coverage proposed. Once a plan is approved for a facility, defendants shall document the employment of the necessary overall numbers of direct care staff, and the ongoing deployment of such staff in accordance with the plan."*

| | |
|---|---|
| *The Commonwealth has the choice to demonstrate compliance according to method 48.a or 48.b. They have informed the Monitor that they do not intend to select method 48.b and that their legal position is that this language should be struck from the Settlement Agreement as superfluous.* | |
| **Compliance Ratings** | **Non-Compliance** |
| Description of Monitoring process during this period of time | S.A. 48 Staff Youth Ratio monitoring compliance is analyzed on a quarterly basis using DCR facility generated weekly staff youth ratio forms, facility daily population reports, as well as the weekly Form DCR -DCR -0144. These forms are submitted to the Monitor's Consultant throughout the reporting quarter. DCR facilities daily shift by shift staffing and youth population for each operational housing module is reported, as well as any 1:1 supervision events, and the volume of staff that are required to work a double shift. Commencing with the fourth quarter of 2019, DCR provided specific information of the names of staff who were working double shifts, the shift and location. The compliance report provides information from Staff Youth Ratio forms that were provided to the Monitor's Consultant for the period June 28, 2020 through September 26, 2020.<br><br>As a result of the coronavirus pandemic, no site visits were conducted by the Consultant during the third quarter of 2020. Monitoring of the various provisions of S.A. 48 were conducted through the production and delivery of the usual monitoring documentation. In lieu on facility site visits, the Monitor's Consultant participated in five video web conferences during the third quarter. Communication with various members of the DCR staff was also conducted by multiple web video conferences throughout the third quarter. |
| Findings and Analysis | **Compliance Status:**  For the 2020 third quarter, S.A. 48a is found to be in non-compliance, with these findings:<br><br>• There are not sufficient staff and resources assigned to CDTS Ponce and CDTS Villalba to implement the requirements of the provision.<br>• DCR submitted a Staff Recruitment Process Timetable to the Monitor and to the United States Department of Justice ("DOJ") with an adjusted timeline dated August 27, 2020. A revised Staff Recruitment Process Timetable was submitted on October 9, 2020. The Staff Recruitment Process Timetable identifies the assignment of new officers who have successfully completed the training academy on November 16, 2020.<br>• DCR required 7496 double shift hours to meet the minimal required staff youth ratio in 94% of the 6:00 AM – 2:00 PM shifts and 90% of the 2:00 PM – 10:00 PM<br>• 796 (18%) of staff youth ratio events were filled by staff working double shifts.<br>    ○ CDTS Ponce used two, twelve-hour shift staffing for 78% of the staffing events (1527) in the third quarter. When using two, twelve-hour shift staffing, 45 double shifts were required to maintain minimum staff youth ratios.<br>    ○ CDTS Ponce used three, eight-hour shift staffing in 12% of the staffing events (436), which required 205 double shifts. |

- CDTS Ponce maintained minimum staff youth ratio in 99% of third quarter staffing events.
- CDTS Villalba used three, eight-hour shifts staffing for all 2428 third quarter staffing events, requiring 546 double shifts to maintain the minimum staff youth ratio in 92% of staffing events.
- The volume of serious youth violence, cutting events and assaults reflects institutional environments that are intermittently chaotic and not safe for youth or staff.
- For the 2020 third quarter, the Monitor's Consultant continues to find non-compliance with meeting the minimum staff youth ratios and the shortage of officers, reliance on double shifts and twelve hour shifts, significantly jeopardizes youth safety and protection from harm.

**Analysis:**

DCR submitted a total of twenty-six facility staff youth ratio forms for the two facilities requiring staff youth ratios, allowing for 100% of the staff youth ratio forms being available for analysis. DCR has consistently provided all requested Staff Youth Ratio forms used for monitoring and reporting.

It should be noted that as with the 2020 second quarter staffing data, analysis of staffing for the third quarter requires a more selective analysis, in light of CDTS Ponce use of two, twelve hour shifts for the majority of shifts. The coronavirus quarantine protocols created exceptional challenges for DCR. As staff became exposed to positive coronavirus individuals, they were no longer available for assignment while proceeding through the Covid quarantine protocols.

During the third quarter, DCR continued to adjust CDTS Ponce facility staffing from three, eight hour shifts per day to two, twelve hour shifts per day to address staffing shortages, quarantine of officers exposed to the coronavirus, and the volume of double shifts that the shortage of officers generated. The following table illustrates the staffing shift models that were being used by both facilities during the third quarter.

| 2020 Third Quarter Shift Staffin Patterns: June 28-September 26, 2020 | | | |
|---|---|---|---|
| CDTS Ponce                Third Quarter Shift Staffing:      June 28 - September 26, 2020 | 3, 8 Hour Shifts: 2, 12 Hour Shifts | CDTS Villalba              Third Quarter Shift Staffing:      June 28 - September 26, 2020 | 3, 8 Hour Shifts: |
| June 28 - July 4, 2020 | 3, 8 hour shifts | June 28 - July 4, 2020 | 3, 8 hour shifts |
| July 10-11 2020 | 3, 8 hour shifts | July 5 - 11, 2020 | 3, 8 hour shifts |
| July 5 - 9, 2021 | 2, 12 hour shifts | July 12 - 18, 2020 | 3, 8 hour shifts |
| July 12 - 18, 2020 | 2, 12 hour shifts | July 19 -25, 2020 | 3, 8 hour shifts |
| July 19 -25, 2020 | 2, 12 hour shifts | July 26 - August 1, 2020 | 3, 8 hour shifts |
| July 26 - August 1, 2020 | 2, 12 hour shifts | August 2 -8, 2020 | 3, 8 hour shifts |
| August 2 -8, 2020 | 2, 12 hour shifts | August 9 - 15, 2020 | 3, 8 hour shifts |
| August 9 - 15, 2020 | 2, 12 hour shifts | August 16 -22, 2020 | 3, 8 hour shifts |
| August 16 -22, 2020 | 2, 12 hour shifts | August 23 - 29, 2020 | 3, 8 hour shifts |
| August 23 - 29, 2020 | 2, 12 hour shifts | August 30 - September 5, 2020 | 3, 8 hour shifts |
| August 30 - September 5, 2020 | 2, 12 hour shifts | September 6 -12, 2020 | 3, 8 hour shifts |
| September 6 -12, 2020 | 2, 12 hour shifts | September 13 -19, 2020 | 3, 8 hour shifts |
| September 13 -19, 2020 | 2, 12 hour shifts | September 20 - 26, 2020 | 3, 8 hour shifts |
| September 20 - 22, 2020 | 2, 12 hour shifts | | |
| September 23 - 26, 2020 | 3, 8 hour shifts | | |
| CDTS Ponce had 14, 3, 8 hour shifts days, resulting in 52 shifts. | | CDTS Villalba had 91 3, 8 hour shifts days, resulting in 273 shifts. | |
| CDTS Ponce had 77, 2, 12 hour shift days , resulting in 154 shifts. | | | |

As displayed in the table above, CDTS Ponce operated on three, eight hour shifts from July 28 through July 11, and started two, twelve hour shifts on July 5, through September 22. On September 23 through 26, CDTS Ponce operated on three, eight hour shifts.

CDTS Villalba operated on three, eight hour shifts from June 28 through September 26.,

The DCR two, twelve-hour shifts were 6:00 AM – 6:00 PM and 6:00 PM to 6:00 AM. For purposes of staff youth ratio compliance both the 6:00 AM – 6:00 PM and 6:00 PM to 6:00 AM have been assessed as requiring a 1:8 staff youth ratio. When DCR was operating with three, eight hour shifts, the 6:00 AM -2:00 PM amd 2:00 PM to 10:00 PM shift were assessed as requiring a 1:8 staff youth ratio and the 10:00 PM to 6:00 AM shifts were assessed as requiring a 1:16 staff youth ratio.

As part of the coronavirus protocols, youth were restricted to housing modules to reduce exposure to other staff and youth, with no or extremely limited off module programming opportunities.

For the third quarter of 2020, CDTS Ponce reported meeting the required staff youth ratio in 99% of the staff youth ratio events operating a three, eight-hour shift and 1005 of the staffing events when using a two, twelve -hour shifts.

For the third quarter of 2020, CDTS Villalba using a three, eight-hour shift model reported meeting the required staff youth ratio in 92% of the staff youth ratio events.

For the third quarter of 2020, DCR, regardless of shift models, met the staff youth ratio in 95% of the staff youth ratio events.

A more in-depth view analysis of type of shift and volume of double shifts is displayed in the charts and tables below.

**CDTS Ponce Third Quarter Shift Staffing:**

| CDTS Ponce Third Quarter Shift Staffing: June 28 - September 26, 2020 | 3, 8 Hour Shifts: 2, 12 Hour Shifts | Weekly Staff Youth Ratio Events | Met Required Staff Youth Ratio | % of Compliant Staff Youth Ratio Events | Volume of Double Shifts | % of Staff Youth Ratio Requiring Double Shifts |
|---|---|---|---|---|---|---|
| June 28 - July 4, 2020 | 3, 8 hour shifts | 197 | 194 | 98% | 96 | 49% |
| July 10-11 2020 | 3, 8 hour shifts | 143 | 142 | 99% | 66 | 46% |
| July 5 - 9, 2021 | 2, 12 hour shifts | 44 | 44 | 100% | 0 | 0% |
| July 12 - 18, 2020 | 2, 12 hour shifts | 154 | 154 | 100% | 0 | 0% |
| July 19 -25, 2020 | 2, 12 hour shifts | 147 | 147 | 100% | 0 | 0% |
| July 26 - August 1, 2020 | 2, 12 hour shifts | 149 | 149 | 100% | 8 | 5% |
| August 2 - 8, 2020 | 2, 12 hour shifts | 136 | 136 | 100% | 0 | 0% |
| August 9 - 15, 2020 | 2, 12 hour shifts | 140 | 140 | 100% | 2 | 1% |
| August 16 -22, 2020 | 2, 12 hour shifts | 139 | 139 | 100% | 14 | 10% |
| August 23 - 29, 2020 | 2, 12 hour shifts | 138 | 138 | 100% | 4 | 3% |
| August 30 - September 5, 2020 | 2, 12 hour shifts | 140 | 139 | 99% | 4 | 3% |
| September 6 -12, 2020 | 2, 12 hour shifts | 140 | 140 | 100% | 2 | 1% |
| September 13 -19, 2020 | 2, 12 hour shifts | 140 | 140 | 100% | 7 | 5% |
| September 20 - 22, 2020 | 2, 12 hour shifts | 60 | 60 | 100% | 4 | 7% |
| September 23 - 26, 2020 | 3, 8 hour shifts | 113 | 113 | 100% | 43 | 38% |
| Total Third Quarter: 3, 8 hour shifts | | 453 | 449 | 99% | 205 | 45% |
| Total Third Quarter: 2, 12 hour shifts | | 1527 | 1526 | 100% | 45 | 3% |
| Total Third Quarter: | | 1980 | 1975 | 100% | 250 | 13% |

For the 2020 third quarter, CDTS Ponce had fourteen 3, 8 hour shift days, resulting in 52 shifts, and **453** staff youth ratio events. The 453 staff youth ratio events, required **205** double shifts (**45%**) to meet a compliant staff youth ratio in **99%** of the events .

For the 2020 third quarter, CDTS Ponce had seventy-seven 2, 12 hour shift days, resulting in **154** shifts, and **1527** staff youth ratio events. The 1527 staff youth ratio events, required **45** double shifts (**3%**) to meet a compliant staff youth ratio in **100%** of the events .

As illustrated in the CDTS Ponce table above, when CDTS Ponce operated a three, eight-hour shift model, requiring 205 double shifts, with a range of 45% - 49% of staffing double shifts events.

CDTS Ponce reported using double shifts while employing two, twelve-hour shifts, implying that staff working a double shift were on duty for 24 consecutive hours. When CDTS Ponce operated a two, twelve-hour shift model, they required 45 double shifts, with a range of 1% - 10% of staffing events requiring double shifts.

Although a CDTS Ponce two, twelve hour shift was much more efficient with a reduction in double shifts, while still meeting the required staff youth ratios, expecting staff to be on duty for 24 consecutive hours precludes any realistic expectation that staff can be awake and alert, nor engaged in active and effective behavior management. Requiring staff to double shift while using a twelve -hour shift staffing model is physically impossible for staff to remain active and alert in assuring youth are safe, secure, and protected from harm.

PUERTAS, housed in one of the housing modules within CDTS Ponce, met the minimum required staff youth ratios for all shifts throughout of the 2020 third quarter reporting period. During the 2020 third quarter reporting period, CDTS Ponce had 206 staff to

youth 1:1 events and reported meeting the 1:1 staff youth ratio requirement in 100% of the events.

**CDTS Villalba Third Quarter Shift Staffing:**

| CDTS Villalba Third Quarter Shift Staffing: June 28 - September 26, 2020 | 3, 8 Hour Shifts: 2, 12 Hour Shifts | Weekly Staff Youth Ratio Events | Met Required Staff Youth Ratio | % of Compliant Staff Youth Ratio Events | Volume of Double Shifts | % of Staff Youth Ratio Requiring Double Shifts |
|---|---|---|---|---|---|---|
| June 28 - July 4, 2020 | 3, 8 hour shifts | 177 | 147 | 83% | 32 | 18% |
| July 5 - 11, 2020 | 3, 8 hour shifts | 189 | 156 | 83% | 76 | 40% |
| July 12 - 18, 2020 | 3, 8 hour shifts | 189 | 171 | 90% | 58 | 31% |
| July 19 -25, 2020 | 3, 8 hour shifts | 189 | 172 | 91% | 53 | 28% |
| July 26 - August 1, 2020 | 3, 8 hour shifts | 189 | 175 | 93% | 69 | 37% |
| August 2 -8, 2020 | 3, 8 hour shifts | 189 | 181 | 96% | 30 | 16% |
| August 9 - 15, 2020 | 3, 8 hour shifts | 189 | 183 | 97% | 45 | 24% |
| August 16 -22, 2020 | 3, 8 hour shifts | 180 | 175 | 97% | 37 | 21% |
| August 23 - 29, 2020 | 3, 8 hour shifts | 189 | 184 | 97% | 30 | 16% |
| August 30 - September 5, 2020 | 3, 8 hour shifts | 189 | 177 | 94% | 29 | 15% |
| September 6 -12, 2020 | 3, 8 hour shifts | 184 | 168 | 91% | 37 | 20% |
| September 13 -19, 2020 | 3, 8 hour shifts | 186 | 164 | 88% | 17 | 9% |
| September 20 - 26, 2020 | 3, 8 hour shifts | 189 | 174 | 92% | 33 | 17% |
| Total Third Quarter: 3, 8 hour shifts | | 2428 | 2227 | 92% | 546 | 22% |
| Total Third Quarter: 2, 12 hour shifts | | 0 | 0 | NA | 0 | NA |
| Total Third Quarter: | | 2428 | 2227 | 92% | 546 | 22% |

For the 2020 third quarter, CDTS Villalba had ninety-one 3, 8 hour shift days, resulting in 273 shifts, and 2428 staff youth ratio events. The 2428 cstaff youth ratio events, required **546** double shifts **(22%)** to meet a compliant staff youth ratio in **92%** of the events .

For the 2020 third quarter, CDTS Villalba had zero 2, 12 hour shift days.

As illustrated in the CDTS Villalba table above, when CDTS Villalba operated a three, eight-hour shift model, they required 546 double shifts, with a range of 9% - 40% of staffing events requiring double shifts, meeting the staff youth ratio in 92% of staffing events.

During the 2020 third quarter reporting period, CDTS Villalba had 16 staff to youth 1:1 events reported meeting the 1:1 staff youth ratio requirement in 100% of the events.

**Staff Double Shifts:**

For the 2020 third quarter, 796 (18%) of the 4408 staff youth ratio events were covered by staff working a double shift**.** This is 2% increase of shifts requiring staff to work a double shift compared to the second quarter 2020 (657 of 4117, 16%).

The table below displays the last seven quarters of staffing events, double shift staffing events, percentage of double shift staffing events and total number of operational facilities for the quarter.

| Staff Double Shifts and Staffing Events | First Quarter 2019 | Second Quarter 2019 | Third Quarter 2019 | Fourth Quarter 2019 | First Quarter 2020 | Second Quarter 2020 | Third Quarter 2020 |
|---|---|---|---|---|---|---|---|
| Volume of Double Shifts | 812 | 1188 | 1769 | 1813 | 1324 | 657 | 796 |
| Volume of Staffing Events | 4343 | 4396 | 4380 | 4390 | 4265 | 4117 | 4408 |
| Percentage of Double Shift Staffing Events | 18.7% | 27.0% | 40.4% | 41.3% | 31.0% | 16.0% | 18.1% |
| Number of Facilities | 2 | 2 | 2 | 2 | 2 | 2 | 2 |

Implications of a large volume of double shifting are deterioration in staff productivity, reducing the ability for staff to be actively engaged in youth observation and supervision, as well as having a negative impact on staff morale and well-being. The outcome of double shifting can lead to fatigued direct care staff, a level of inattentiveness on the

part of staff that may result in a failure to provide active behavior management. The failure to provide active behavior management negatively impacts youth safety contributes to staff failure in providing effective, safe, and secure supervision of youth. Double shifting often leads to staff calling in sick to avoid being required to double shift after their regularly scheduled shift. All of the aforementioned are outcomes of inadequate staffing and a significant dependence on double shifts to attempt provide minimum staff youth ratios.

During the third quarter, the Monitor's expert had the opportunity to review video of six CDTS Ponce incident events. In all six reviewed video events, staff present in housing models, were sitting down, and not actively engaged with youth, until the disturbance event in the module. The observed inactivity of staff, certainly impacted by the staffing challenges generated by double shifts and staff reductions from covid, would also be attributable to simple physical exhaustion from the required work schedules.

There are no prohibitions nor restrictions in S. A. 48 on the use of double shifts to meet the requirements of minimum required direct care staff youth ratios. Although undesirable from an operational, staff morale, effective behavior management and budgetary perspective, it does not impact analysis of whether the minimum required staff youth ratios are being met. It should be noted that DCR's reliance on double shifting to meet minimum staff youth ratios reflects that in the third quarter of 2020, DCR is significantly understaffed to meet the requirements of S. A. 48.

The third quarter 2% increase in double shifting must be balanced against the recognition of the Covid-19 quarantine requirements have created an aberrant institutional environment with segregation of youth populations, suspension of youth population facility movement and programming and modification of shift schedules between eight- and twelve-hour shifts. Double shifting is a critical contributing factor that has jeopardized the agency's capacity to provide effective staffing for adequate supervision to assure youth safety and protection from harm.

**Double Shifts:**  On the weekly staff youth ratio reports completed by each facility, DCR requires documentation of the volume of double shifts used for each day for each shift. By Policy 9.20, Supervisors IV and III are required to assign officers to housing modules to meet the minimum required staff youth ratio based on the module youth population.

During the 2020 third quarter, at the request of the Monitor's Consultant, DCR continued to provide information about which staff were assigned to double shifts for each shift, each day, and the location of the double shift assignment.

**CDTS Ponce Double Shifts:**

For the third quarter of 2020, CDTS Ponce staff worked both eight- and twelve-hour shifts. CDTS Ponce staff had a total of 205 eight-hour double shifts and 45 twelve-hour shifts provided by 108 different named staff working a total of 3128 double shift hours. The double shift profile range was as follows:

- 1 staff worked 5 eight-hour shifts and 2 twelve-hour shifts, for a total of 64 hours of double shifts.
- 47 staff worked 43 eight-hour double shifts and 11 twelve-hour shifts, for an average of 20 double shift hours for each of the 47 staff, for a total of 940 hours of double shifts.

| CDTS Ponce Third Quarter Double Shifts | | | | | |
|---|---|---|---|---|---|
| CDTS Ponce Volume of Staff | Volume of 8 Hour Double Shifts | Volume of 12 Hour Double Shifts | 8 and 12 Hour Double Shift Total Hours | Total Volume of Double Shift Hours | Double Shift Hours Per Staff |
| 1 | 5 | 2 | 64 | 64 | 64 |
| 3 | 9 | 8 | 56 | 168 | 56 |
| 12 | 45 | 6 | 44 | 528 | 44 |
| 1 | 2 | 2 | 40 | 40 | 40 |
| 18 | 54 | 3 | 36 | 648 | 36 |
| 3 | 1 | 6 | 32 | 96 | 32 |
| 23 | 46 | 7 | 28 | 644 | 28 |
| 47 | 43 | 11 | 20 | 940 | 20 |
| 108 | 205 | 45 | 320 | 3128 | 29 |



CDTS Ponce Third Quarter 2020 Double Shifts

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
|---|---|---|---|---|---|---|---|---|
| CDTS Ponce Third Quarter Double Shifts CDTS Ponce Volume of Staff | 1 | 3 | 12 | 1 | 18 | 3 | 23 | 47 |
| CDTS Ponce Third Quarter Double Shifts Volume of 8 Hour Double Shifts | 5 | 9 | 45 | 2 | 54 | 1 | 46 | 43 |
| CDTS Ponce Third Quarter Double Shifts Volume of 12 Hour Double Shifts | 2 | 8 | 6 | 2 | 3 | 6 | 7 | 11 |
| CDTS Ponce Third Quarter Double Shifts Double Shift Hours Per Staff | 64 | 56 | 44 | 40 | 36 | 32 | 28 | 20 |

### CDTS Villalba Double Shifts:

For the third quarter of 2020, CDTS Villalba staff worked both eight -hour shifts.  CDTS Villalba had a total of 546 double shifts provided by 98 different named staff working a total of 4368 double shift hours. The double shift profile range was as follows:

- 2 staff worked 18 double shifts, for 144 double shift hours for each staff.
- 14 staff worked 4 double shifts, for an average of 32 double shift hours for each staff.
- 11 staff worked 1 double shifts; for an average of 8 double shift hours for each staff.

| CDTS Villalba Third Quarter Double Shifts | | | |
|---|---|---|---|
| CDTS Villalba Volume of Staff | Volume of 8 Hour Double Shifts | Total Volume of Double Shift Hours | Double Shift Hours Per Staff |
| 2 | 18 | 288 | 144 |
| 1 | 16 | 128 | 128 |
| 2 | 13 | 208 | 104 |
| 2 | 12 | 192 | 96 |
| 1 | 11 | 88 | 88 |
| 4 | 10 | 320 | 80 |
| 5 | 9 | 360 | 72 |
| 8 | 8 | 512 | 64 |
| 9 | 7 | 504 | 56 |
| 11 | 6 | 528 | 48 |
| 7 | 5 | 280 | 40 |
| 14 | 4 | 448 | 32 |
| 11 | 3 | 264 | 24 |
| 10 | 2 | 160 | 16 |
| 11 | 1 | 88 | 8 |
| 98 | 546 | 4368 | 45 |



As illustrated in the tables above, DCR required 7496 double shift hours to meet the minimal required staff youth ratio in 94% of the 6:00 AM – 2:00 PM shifts and 90% of the 2:00 PM – 10:00 PM shifts for CDDT Ponce and CDTS Villalba.

**DCR Quarterly Staff Youth Ratio Performance:**



| | 6:00am- 2:00pm | 2:00pm- 10:00pm | 10:00pm- 6:00am |
|---|---|---|---|
| 3rd Quarter 2020 | 94% | 90% | 100% |
| 2nd Quarter 2020 | 93% | 91% | 99% |
| 1st Quarter 2020 | 98% | 97% | 100% |
| 4th Quarter 2019 | 93% | 97% | 100% |
| 3rd Quarter 2019 | 96% | 97% | 100% |
| 2nd Quarter 2019 | 97% | 99% | 100% |
| 1st Quarter 2019 | 94% | 96% | 100% |

The DCR 2020 third quarter performance in meeting Staff Youth Ratios is as follows:

- 6:00 am – 2:00 pm shift:  94% of events, a 1% increase from the second quarter of 2020 (93%)

- 2:00 pm – 10:00 pm shift:  90% of events, a 1% decrease from the second quarter of 2020 (91%)

- 10:00 pm – 6:00 am shift:  110% of events, a 1% increase from the second quarter of 2020 (99%)

The 2020 third quarter waking hour staff youth ratio compliance rate variance appear to be attributable to the following issues:

- School start up:  The first day of education off of module for youth was in the third quarter on August 24, 2020.
- DCR protocols for Covid-19 quarantine were initiated on March 16, 2020 and continued throughout the third quarter.
  - DCR protocols for Covid-19 quarantine require that all youth be restricted to their assigned housing modules and suspension of all off module programming and events.
- The Covid-19 quarantine requirements caused for continual absence of officers as they were designated for Covid exposure quarantine.

- Although the Covid-19 quarantine requirements caused for a reduction in the need for officers providing supervision of youth while receiving programming off of their assigned modules, the absence of staff programming did not offset the volume of officers that were not available for assignment when on Covid exposure quarantine.

Compounding the level of double shifting is the volume of vacant Shift Supervisor positions during the third quarter at both facilities:

- At CDTS Ponce there are four of nine Shift Supervisor vacant.
- At CDTS Villalba there are three of eight Shift Supervisor positions vacant.

The volume of unfilled shift supervisor positions, aside from requiring excessive supervisor double shifts, creates a supervision void that is unacceptable for any expectation of successful operations, short of crisis management. The unavailability of Supervisors IV and Supervisors III has resulted in assignment of Officers I and Officers II to provide shift supervision.

The volume of supervisor vacancies and corresponding requirement for supervisors to do multiple double shifts creates an unrealistic expectation for effective supervision, decision-making and coaching. This situation is compounded in that both facilities operate on a shift supervision model, which provides intermittent supervisory presence as shift supervisors make their required rounds in housing modules and throughout the facility, assuming that a more serious facility issue has not prevented timely rounds. Officers and supervisors are double shifting at an extraordinary rate, significantly decreasing their capacity to provide dynamic assessment of procedural compliance, assure youth safety, security, and well-being.

For the 2020 third quarter, DCR has not demonstrated sustainable performance compliance in meeting the minimum required staff youth ratios without a continual dependence of double shifting. CDTS Ponce implementing two, twelve-hour shifts, for 77% of the third quarter shift events, required 3128 double shift hours. CDTS Villalba implementing three, eight-hour shifts, required in 4386 double shift hours

For the third quarter of 2020, DCR has not been able to sustain meeting the minimum required staff youth ratio for 100% of the staffing events.

**Joint Motion to Address Continuing Facility Safety Issues:**

DCR submitted a Recruitment Process OSJ I Timetable to the Monitor and United States Department of Justice (DOJ) dated August 27, 2020, as required by the Joint Motion. A revised Recruitment Process OSJ I Timetable dated October 9, 2020, was submitted to the Monitor's Office on October 13, 2020.  The Recruitment Process OSJ I Timetable identifies that staff candidates will be assigned as officers in the youth institutions on November 16, 2020.

|  | • **CDTS Ponce Officer Assignment:**  Nine cadets from the DCR Academy participated in NIJ training on June 8 through 19, 2020. All nine officers were temporarily assigned to CDTS Ponce. Four officers were assigned to the 6:00-2:00 shift; four officers were assigned to the 2:00 – 10:00 shift; and one officer was assigned to the 10:00 – 6:00 shift. The assignment to CDTS Ponce was effective June 22, 2020. The nine cadets continue in the temporary assignment at CDTS Ponce during the third quarter.<br>• DCR provided the Monitor's Consultant with electronic versions of the three cycles of Master Rosters that were used in the third quarter. No verification was provided that the Master Rosters are an accurate representation of S. A. 48 P5 reports.<br>• During the third quarter DCR provided the Monitor's Office with incident report cover sheets but were unable to consistently provide them within the required timeframes of the Joint Motion.<br>    o  For the third quarter, 114 incident report cover sheets were submitted by CDTS Ponce with 37% of the incident report cover sheets submitted within the required timeframe.<br>    o  For the third quarter, 57 incident report cover sheets were submitted by CDTS Villalba with only 2 (4%) of the incident report cover sheets submitted within the required timeframe. |
|---|---|
| What is needed for full compliance?<br><br>What steps are required and/or recommended? | DCR needs to assign an adequate volume of officers to CDTS Ponce and CDTS Villalba to ensure the facilities have sufficient direct care staff to implement all terms of this agreement, and reduce an inordinate reliance on double shifting.  DCR needs to meet procedural compliance not only with S.A. 48, but also their own Policy 9.20.<br><br>On April 9, 2020, a Joint Motion (Doc. 1477) was filed with the United States District Court for the District of Puerto Rico, and a subsequent Order issued, which identifies that compliance issues regarding staffing are not easily addressed within the current DCR budget. DCR was ordered to separate out a program budget for NIJ operations for the 2020-2021 fiscal year. The budget, certified by the Fiscal Oversight and Management Board (FOMB) and approved by the legislature, includes 318 officers and supervisory positions within the two NIJ facilities, 67 of which are new positions to be recruited and trained.<br><br>Additionally, the Joint Motion requires DCR to address its critical staffing issues and reduce its reliance on double shifting to meet the minimum staff/youth ratio. Procedural compliance with DCR Policy 9.20 requires meeting minimum required staff youth ratios as well as corrective action when ratios are not met for any given supervision event on any shift.<br><br>The DCR Recruitment Process OSJ I Timetable identifies that staff candidates will be in the youth institutions officially as Officers on November 16, 2020. |
| Priority Next Steps | Priority next steps required to find compliance for S.A. 48a are the following: |

| | |
|---|---|
| | <ul><li>DCR needs to submit a plan to the to the Monitor and United States Department of Justice (DOJ) that meets the requirements of the Joint Motion to Address Continuing Facility Safety Issues.  An adjusted staffing plan needs to address a revised schedule for training additional recruits, the assignment of cadets to the two juvenile institutions, and revisions to Master Rosters for both facilities that reflect the assignment of new officers.</li><li>Address the requirement for procedural compliance with staffing Policy 9.20, as well as any required 1:1 staff or special population youth supervision events.</li><li>Address the inability to provide the necessary staff to maintain youth in the least restrictive placement possible, assuring protection from harm.</li><li>DCR needs to implement independent quality assurance assessment of procedural compliance as required by Policy 9.20, generating reports for both internal use and submission to the Monitor's Office.</li><li>At the close of the 2020 third quarter, the Monitor continued to work with DCR to identify the necessary steps to resolve the staffing crisis with the deployment of additional officers to both facilities. A detailed, executable plan is necessary that addresses the following issues:<ul><li>The details regarding the new officers and supervisors for both facilities, how such officers and supervisors will be deployed, and the time frame for doing so.  As of the most recent Staff Recruitment Timetable, new officers are identified as being in the youth institutions on November 16, 2020. The volume of officers to be assigned at either facility has not been provided to the Monitor's Office at the time of production of this report.</li><li>Any limitations in the assignment or supervision requirements for new officers should be clearly explained and documented to the Monitor and DOJ.</li><li>The addition of new officers and assignment of staff to vacant Supervisor positions need to be reflected in the facility Master Rosters effective November 16, 2020 as well as the future Master Rosters.</li><li>The staff plan should also indicate how the Commonwealth will reduce its reliance upon double shifting to meet the minimum required staff/youth ratio and indicate a recognition that staff youth ratios that exceed the minimum level will be required at times to keep assure youth safety.</li></ul></li></ul> |
| Quality Assurance Measures | DCR Staffing Policy 9.20 identifies that retrievable staff youth ratio documentation be maintained at each facility. The documentation consists of the following:<br><br><ul><li>Daily youth population list identify which youth are in which modules, designation of any youth on Protective Custody, Transitional Measures, Therapeutic Observation of Constant Watch. Additionally, daily trips and youth assigned to those trips should also be maintained in the daily population list.</li></ul> |

|  | • The facility staff daily roster, displaying which staff has been assigned to which modules. It is critical that the form allows for clear documentation of officers assigned to each module as well as mini control.<br><br>• Review and assessment of DCR 0144 forms for each day are assessed for accuracy to the Daily Roster and compliance with DCR-DCR Policy 9.20 by the Supervisor IV the day after the events.<br><br>• At this time DCR has not initiated independent analysis of procedural compliance to Policy 9.20.<br><br>• During facility site visits, staff youth ratio quality assurance compliance analysis consists of a review of the Master Roster, facility Daily Roster, facility mini control logs, and DCR 0144 daily forms to assess procedural and performance compliance with -DCR Policy 9.20. The Monitor's Consultant did not conduct a site visit during the third quarter.<br><br>• Additional Reporting During the Third Quarter: A DCR Covid Report was provided throughout the third quarter. The report identified youth in Covid health protocol; number of youth tested for Covid; number of youth who have tested positive for Covid; youth with symptoms associated with Covid; other personnel who have tested positive for Covid; Security personnel out on quarantine for Covid; and Covid positive security personnel. |
|---|---|
| Sources of Information upon which Consultant report and compliance ratings are based | Weekly facility staff youth ratio workbooks and form DCR-1044 are provided to the Monitor's Consultant throughout the quarter. Facility staff youth ratio workbook data is analyzed to assess facility and agency compliance in meeting the minimum required staff youth ratio as described in S.A. 48a.  Form DCR-1044 is analyzed for procedural compliance with staffing policy, 9.20.<br><br>A component of facility site visits is review of facility staffing source documentation, Master Rosters, Daily Rosters, mini control logs analyzed against the weekly facility staff youth ratio workbooks that are provided to the Monitor's Consultant. Review and assessment of DCR-DCR-0144 forms for each facility for each day are assessed for accuracy to the Daily Roster and compliance with DCR Policy 9.20, by the Supervisor IV the day after the events. During the third quarter, modified documentation reviews were conducted remotely. |
| **January 2009 Stipulation Paragraph 1:** All necessary steps shall be taken immediately to ensure the reasonable safety of youth by providing adequate supervision of youth in all facilities operated by, or on behalf of, the Defendants. | |
| **Compliance Ratings** | **Non-Compliance** |
| Description of Monitoring process | The Monitor's Consultant reviews and analyzes weekly Staff Youth Ratio forms and form DCR-0144. Additional documentation reviewed is as follows: Master Rosters, Daily |

| | |
|---|---|
| during this period of time | Rosters, DCR-DCR 0144 Daily Staffing forms, as well as use of force events, monthly contraband reports, and incident report cover sheet events. Observation, verification and documentation of housing module staff youth ratios is conducted on each site visit.<br><br>Additionally, UENMI referrals and OISC investigative reports have been reviewed to assess incidents and investigations that identify youth safety, youth supervision and contraband issues. |
| Findings and Analysis | For the third quarter of 2020, DCR is not providing adequate supervision of youth nor ensuring reasonable youth safety.<br><br>**Master Rosters and Required Staffing:**<br><br>The facility Master Roster is an agency generated staffing roster, identifying posts, fixed posts, fixed posts identified by need, movable posts and relief personnel. The Master Roster designates one fixed post for each housing module and additional fix posts identified by need, predicated on the housing module youth population and youth on special status (protective custody, transitional measure, constant supervision, etc.).<br><br>DCR submitted to the Monitor's Consultant CDTS Ponce and CDTS Villalba Master Rosters on the following dates for each forty-two-day cycle: |

| 42 Day Master Roster Cycle | Date of Receipt |
|---|---|
| June 17 - July 28, 2020 | July 9, 2020 |
| July 29 - September 8, 2020 | October 13, 2020 |
| September 9 - October 20, 2020 | October 13, 2020 |

| | |
|---|---|
| | The most recent Master Rosters continue to use the DCR shift relief factors that have been used by the Agency for multiple years.  With the submitted Master Rosters, DCR continues to use a shift relief factors of 1.73 for seven-day supervisor and officer posts and a 1.23 shift relief factor for five-day posts.<br><br>The table below illustrates the most recent DCR Master Rosters staffing at CDTS Ponce and CDTS Villalba for September 9, 2020 through October 20, 2020. |

| DCR Master Roster CDTS Ponce SRF Calculations | Master Roster Required Personnel |
|---|---|
| 5 PUESTOS DE 7 DÍAS X 1.73 = 8.65 (9 SUPERVISORES) | 9 |
| 67 PUESTOS DE 7 DIAS X 1.73 = 115.91 = 116 O.S.J.I. & II | 116 |
| 1 PUESTOS DE 5 DÍAS X 1.23 = 1.23 (1 SUP) | 1 |
| 23 PUESTOS DE 5 DÍAS X 1.23 = 28.29 = 28  O.S.J.I. & II | 28 |
| 144  O.S.J.I. & II + 10 SUPERVISORES | **154** |

| DCR Master Roster CDTS Villalba SRF Calculations | Master Roster Required Personnel |
|---|---|
| 5 Puestos de 7 días x 1.73 = 8.65 = 9 Supervisores | 9 |
| 67 Puestos de 7 días x 1.73 = 115.91 -116  O.S.J.I. | 116 |
| 1 PUESTOS DE 5 DÍAS X 1.23 = 1.23  (1 SUPERVISOR) | 1 |
| 26 PUESTOS DE 5 DÍAS X 1.23 = 31.98  (32 O.S.J.I.) | 32 |
| 162 (152 O.S.J.I. & II + 10 SUPERVISORES) | **162** |
| *Master Roster Total Personnel* | **316** |

CDTS Villalba Master Roster continues to not include required posts to staff the facility video system that was certified as operational as of October 7, 2019. Staff required for this post, consistent with DCR policy, requires an additional five personnel.

The absence of assigned staff to the Villalba video system, continues to prevent preservation of video for Monitor's staff review.

Staffing rosters are inadequate to provide sufficient number of staff on all shifts without an assignment of additional staff to CDTS Ponce and CDTS Villalba. Facilities and security management cannot adequately maintain their rosters and fill mandatory posts  when insufficient staff are available to them, and consequently are forced to revert to mandated double shifting to attempt to meet the minimum required staff youth ratio. The availability and manner that staff are deployed to youth populations, based on housing module youth population volume or by need to assure youth safety, has not met the requirements of this provision.

Additional staff does not assure adequate supervision of youth nor youth safety if staff is not adequately trained, supervised, coached, and mentored. Effective staffing requires a behavior management skill set that emphasizes communication, intervention, active listening skills and an understanding of adolescent and young adult development. Likewise, supervisory and management staff must be available to model and develop these skills in staff, not only available at times of module disruptions or required rounds. Programming opportunities must be significantly expanded to create an operational environment that keep youth actively engaged in meaningful social, recreational, educational and vocational activities.

The Monitor and Monitor's Consultant believe that quantitatively meeting the minimum staff youth ratios, in and of itself, is not sufficient to assure youth safety, especially when

| | |
|---|---|
| | 796 shift events, entailing 7496 coverage hours, are covered with double shifting. There are not sufficient staff and resources assigned to CDTS Ponce and CDTS Villalba to implement the requirements of the provision. |
| What is needed for full compliance?<br><br>What steps are required and/or recommended? | The April 9, 2020 Joint Motion to Address Continuing Facility Safety Issues stipulates 318 officers need to be assigned to CDTS Ponce and CDTS Villalba, 67 of which are new positions to be recruited and trained. The variance between DCR staff numbers in the facility Master Rosters and the Joint Motion required staff volume, assigned staff posts and revised shift relief factors must be resolved. The revised Master Rosters and staffing plan, reflecting facility and post assignments of new officers, should also address filling vacant Supervisor positions.<br><br>Meeting minimum staff youth ratios does not necessarily equate that staffing provides adequate supervision to keep youth safe.  For full compliance, staff youth ratios need to consistently meet the minimum required staff youth ratio, as well as additional staffing that is required by special populations, youth assigned to Transitional Measures, Protective Custody, Sumariados and 1:1 staff youth supervision events. Reliance upon placement of youth in restrictive housing statuses in an effort to provide protection from harm does not provide "adequate supervision" to ensure youth safety nor for youth to be placed in the least restrictive placement possible.<br><br>To assure youth safety, procedural and operational practices need to require direct care staff to engage in active behavior management, youth need to be engaged in robust programming, as well as classification and programming to assure adequate staff supervision to effectively manage and control aggressive youth and youth "leaders". |
| Priority Next Steps | Although there are many priority next steps, the most critical priority next step, as agreed upon in the April 9, 2020 Joint Motion was for DCR to provide a staffing plan to the Monitor and DOJ. During the third quarter, DCR submitted a Recruitment Process OSJ I Timetable dated August 27, 2020, with a revised plan timeframe dated October 9, 2020. The Recruitment Process OSJ I Timetable identifies new staff assignment to youth institutions as officers on November 16, 2020.<br><br>Although the Recruitment Process OSJ I Timetable provides various tasks and dates for the recruitment, interviewing, testing and training processes, the timetable does not constitute a staffing plan per se. The volume of officers to be deployed to each facility, the strategy for reduction of double shifts and meeting minimal staff youth ratios has not been provided. It is critical that DCR develop a more detailed plan that addresses the volume of staff to be assigned to each facility, filling Supervisor vacancies, revised Master Rosters reflecting officer assignments and documented strategies for reduction of double shifts and compliance with minimal staff youth ratios. Additionally, to support new officer retention, strategies need to be implemented and documented to the Monitor as to what the facility on boarding process will be for new officers. Will there be restrictions or limitations to their post assignments, who they work with, what populations they work with, etc. |

The Monitor's Consulting Team had made frequent requests for access to incident report information as one of the critical components to assess youth safety. During the third quarter, all CDTS Ponce and CDTS Villalba third quarter incident report cover sheets were provided to the Monitor's Consultant, but were not provided within the reporting timeframes required by the Joint Motion. The timeliness of notification and documentation needs to meet the Joint Motion reporting requirement time frames.

For the third quarter, 37% (42 of 113) incident report cover sheets from CDTS Ponce were received within the expected time as required in the Joint Motion. Two incident report cover sheets of 57 (4%) from CDTS Villalba was received within the expected time frame as required in the Joint Motion. The inability for both CDTS Ponce and CDTS Villalba to provide incident report cover sheets within the timeframe required by the Joint Motion prevents the Monitor's Office from identifying and requesting video preservation of use of force events, as well as events that involve youth protection from harm.

Digitizing incident reports has long been discussed so that the Monitoring team can have immediate access to this information, but more importantly, for efficiency, consistency, and accountability purposes for DCR.  The Joint Motion reached between the Parties and filed with the Court on April 9, 2020, requires a plan by the Commonwealth for digitalizing these reports. The implementation of the digitized incident report is required by Court Order by November 15, 2020.

The Monitor's Consultant has extensive experience in development of incident report applications. The Monitor's Consultant has provided DCR with prototypes for a revised electronic incident report cover sheet, as well as a model to digitize the complete incident report. On September 14, 2020 the Monitor's Consultant provided DCR with a review of the test incident report application. The Monitor's Consultant identified a number of critical issues that he believed needed to be addressed. One of the most significant issues that was identified was the extremely limited volume of test incident reports that appeared to be entered into the test application. On the October 7, 2020 web conference between the Monitor's Consultant and DCR, the implications of such limited testing was again emphasized with DCR, as well as the challenges that can be anticipated for user adoption.

During the third quarter, DCR submitted Programming of Cover Sheet and Incident Report Timetable dated August 28, 2020.  The timetable was revised and resubmitted to the Monitor's Office on October 13, 2020, with Live Application Monitoring identified on November 15, 2020. Digitalization of incident reports requires policy and procedural development, training, and quality assurance in order to operationalize the application.

Training of personnel in the use of the Final Incident Report is identified in the timeframe as occurring between October 26 and November 13, 2020.

The Monitor and Consultant continue working to establish measures of safety based upon those criteria contained within Paragraph 78 reporting, and other factors.

| Quality Assurance Measures | Incident report analysis and quality assurance requires consensus on incident report characteristics, definitional compliance as well as comprehensive reporting and effective application training. |
|---|---|
| | The installation of video systems at CDTS Villalba, while assisting in the assessment of investigations, should help in assessing youth safety, youth incident events dynamics and staffing. The CDTS Villalba video system continues to not be staffed locally at the facility. Failure to staff and establish procedures for identification and review of any event of violence and use of force, with preservation of relative video, jeopardizes accurate incident reporting and accurate, comprehensive OISC investigations. |
| | During the third quarter, the CDTS Villalba video system was unable to provide any of the video preservation requests submitted by the Monitor's Consultants. The Villalba video system, in addition not being staffed, has not been consistently operational for over two years. DCR has indicated that they have asked a video vendor providing recommendations as to what is required to allow for stable operation of the video system, specifically the ability to reliably retrieve video events within the system retention/overwrite time frames. |
| | The inability for CDTS Villalba to produce incident report cover sheets within the Joint Motion required time frame and the unstable nature of the facility video system, precludes the Monitor and her staff, as well as OISC and law enforcement from access to video. Video access for the Monitor and her team is critical in assessment of compliance with use of force policy and procedure, review of acts of violence, assessment of on module staffing practices, and assessment of youth safety and protection from harm. |
| | As of the production of the quarterly report, the CDTS Villalba video system is not able to produce videos that have been requested within the stipulated timelines. |
| | Absent staffing, policy, procedure, training and quality assurance reviews, the confidence in the accuracy, reliability and comprehensive reporting of events that impact youth protection from harm is jeopardized. |

**January 2009 Stipulation Paragraph 2:** All necessary steps shall be taken to provide sufficient direct care staff to implement the Consent Decree and adequately supervise youth, pursuant to Paragraph 48.

The requirement that 50 YSOs be hired each month was terminated by the Court on September 13, 2011 (Docket 991). No new YSOs were hired during the Second Quarter of 2020.

Nine Cadets from the DCR Academy class were trained and temporarily assigned to CDTS Ponce on June 22, 2020.  DCR did not report the nine adult cadets as new hires.

| Compliance Ratings | Non-Compliance |
|---|---|
| Description of Monitoring process | Monitoring of S.A. 48 January 2009 Stipulation Paragraph 2 occurs through review of the monthly staffing report required by the January 2009 Stipulation Paragraph 5 provided by the DCR Human Resources Development and Training Institute. Reports were |

| during this period of time | provided for July, August, and September of 2020, although DCR has stated that no new officers were appointed during the quarter. Additional monitoring processes that occurred during this quarter were analysis of facility populations, classification levels, youth assigned to restrictive housing, minimum required staff youth ratios, incident report cover sheets, UEMNI referrals, OISC investigations and agency and facility staff volume and assignments. |
|---|---|
| Findings and Analysis | **Analysis of Sufficient Staffing:**  During the third quarter, DCR has not consistently met the minimum required staff youth ratio, and when the minimum staff youth ratio has been met, it is inordinately dependent upon extensive use of double shifts. This has resulted in a failure to provide the adequate supervision necessary to keep youth safe in the least restrictive placement possible. The availability and manner that staff are deployed to facilities and youth populations, based on housing module youth population volume or by need, has not consistently met the requirements of this provision. |

**Third Quarter 2020 Contraband Report Review:**

DCR submitted contraband workbooks for both active facilities for each month of the third quarter of 2020.

CDTS Ponce reported fourteen contraband searches for the third quarter. CDTS Ponce reported six searches and eleven contraband events for July; two searches and two contraband event for August; and six searches and nineteen contraband events for September 2020.

CDTS Villalba reported seven contraband searches for the third quarter. CDTS Villalba reported two searches and zero contraband events for July; three searches and zero contraband event for August; and two searches and zero contraband events for September 2020.

| Facility | 3rd Quarter 2020 Total Searches | 3rd Quarter 2020: Reported Contraband by Contraband Report | July 2020 Seaches | July 2020 Reported Contraband by Contraband Report | August 2020 Seaches | August 2020 Reported Contraband by Contraband Report | September 2020 Seaches | September 2020 Reported Contraband by Contraband Report |
|---|---|---|---|---|---|---|---|---|
| CTS Ponce | 14 | 32 | 6 | 11 | 2 | 2 | 6 | 19 |
| CTS Villalba | 7 | 0 | 2 | 0 | 3 | 0 | 2 | 0 |

The Monitor's Consultant analyzed third quarter incident report cover sheets. The third quarter incident report cover sheets that identified contraband as an event characteristic was compared to the submitted facility contraband reports. The table below displays the variance of reported contraband between the separate source documents. There should uniformity in reported events, minimally requiring production of incident reports for the discovery of contraband.

38

| Facility | 3rd Quarter 2020: Reported Contraband in Incident Report Cover Sheets | July 2020 Reported Contraband in Incident Report Cover Sheets | August 2020 Reported Contraband in Incident Report Cover Sheets | September 2020 Reported Contraband in Incident Report Cover Sheets |
|---|---|---|---|---|
| CTS Ponce | 8 | 3 | 1 | 4 |
| CTS Villalba | 2 | 1 | 1 | 0 |

Staff are challenged to conduct effective searches because of noted staffing deficiencies, facilities do not have operational metal detection equipment, nor search hardware technology, nor comprehensive practices, of strategically searching youth who are known threats to the safety of other youth or themselves.

The contraband report did not appear to document the total volume of searches that were conducted at each facility, the type of searches that resulted in the discovery of contraband, nor the volume of searches that did not result in the discovery of contraband. The volume of sharps, drugs and medications contraband that were discovered is concerning in light of the history and volume of cutting events at DCR facilities. Numerous OISC investigations have identified inconsistent search procedures as a contributing factor to events that placed youth at risk, assaults, injuries, and hospitalizations.

**OISC Investigations:**

The following OISC completed investigations are cited for the third quarter. The OISC investigations are illustrative of events where inadequate, inattentive, or procedural non-compliant staffing contributes or is a characteristic of providing inadequate youth supervision, jeopardizing youth safety and protection from harm.

> **20-026 OISC Investigation:**  On April 22, 2020, at CDTS Ponce, a youth was involved in a self-destructive behavior, lacerating his left arm. The youth had been on preventative supervision, which requires an officer to be assigned to assure youth safety. The Officer that had been assigned to provide preventative supervision was also assigned to the mini-control post for modules 7 and 8. An officer assigned to two posts simultaneously, while not only a violation of DCR Standard 12.2.39, jeopardized youth safety. The youth self-destructive behavior occurred while the officer assigned to preventative supervision was positioned in the mini-control.
>
> On the date and shift of this event, there were more than 23 officers were on Covid protocols or other absences. The supervisor for the shift was an Officer I.
>
> **20-031 OISC Investigation:**  On May 19, 2020**,** at CDTS Ponce, a youth attempted suicide by tying his sweatshirt do the door hinge. He was taken to the hospital for physical evaluation and subsequently psychiatric hospitalization. The officer assigned to provide youth supervision in the housing module, left the housing module without notification nor approval of the shift supervisor. The officer

stated that there was no availability of a working radio to notify the supervisor of his departure from the module. When the officer was out of the housing module, the youth made the suicide attempt.

**20-034 OISC Investigation:**  On June 28, 2020, at CDTS Ponce Module 4, a youth was attacked by two other youth, beating him with a broomstick handle and a bar of soap placed inside a sock. The victim was taken to the hospital. During the youths stay in the hospital, he required surgical removal of his spleen as the result of the assault.

**20-035 OISC Investigation:**  On July 1, 2020, at CDTS Villalba, nine youth seriously assaulted and cut another youth, resulting in open wounds on the right side, and chest lacerations. The youth was taken to the hospital. His wounds required three stitches near his right nipple, sixteen stitches in the right rib area and seven stitches in the area of his right shoulder blade.

At the time of the assault, one staff member was assigned to the module with a module youth population of twelve youth. The officer assigned to the module did not have a radio to communicate with his supervisor, mini-control, or master control. The officer left the module without benefit of being relieved.

On the date and shift of this event, the module was not being staffed by the required minimal staff youth ratio and the officer abandoned his post without being relieved, failing to provide the youth protection from harm.

The absence of the officer from the module afforded the nine youth the opportunity to commit the assault,

The OISC investigation states that searches had been conducted in the module on June 30, July 1, and July 2. The CDTS Villalba July Contraband Report does not document any search occurring on July 2.

**20-045 OISC Investigation:**  On September 14, 2020, an event occurred in the school area when four youth from Module 4 attempted to attack three youth from Module 7. Officers used physical force to prevent one group of youth from engaging with the other group of youth. On the day of the incident, only two of the six officers engaged in the event completed incident reports. The youth with whom physical force was used were not evaluated by medical personnel on the day of use of force.

**Suicidal Behavior and Third Quarter Clinical Services:** There were seventeen incidents of suicide attempts/gestures/ideation and at least four incidents of self-mutilation in September compared to six incidents of suicidal attempts/gestures/ideation (no self-mutilation) in August.  Lack of mental health staffing and services, mental health staff that disappeared and or left without proper clinically appropriate terminations with their patients undoubtedly contribute to the destabilization and decompensation of youth.

The older age of the youth population, many who no longer qualify for educational services, creates a sub-culture of youth whose only purpose is to see who can exert power

and intimidation over the other populations. The continual challenge for "leadership" in facilities, with a relatively small population, must be addressed and remedied.

Based on the Monitor's Consultant operational experiences, decades of incident report analysis, and on-site observations, it is his opinion that the continual maneuvering for leadership amongst youth has led to a culture of power and revenge. In order to assure adequate supervision and youth safety, intervention and strategies must be developed to not only curtail the "leader" culture but to end it.  The direct by-product of the negative leadership culture is the volume of assault and cutting events occurring in both facilities.

Officers properly rested, assigned, supervised and engaged in active behavior management and awareness of behavioral indicators of potential disruptive behavior increase the probability of staff being able to keep youth safe. The DCR youth population, although smaller in volume, can certainly be characterized as a more sophisticated, violent adolescent population. Effective youth supervision requires competent staffing, predicated on a volume of staff that does not rely on shifts being covered by staff doing double shifts and alternating between eight and twelve hour shifts. The serious nature of incident events, reported and unreported, certainly indicates that the staffing issue within DCR continues at an unacceptable level that is not compliant with the provisions of S.A. 48.

The aforementioned incident events and corresponding staffing deficiencies and reliance on double shifting, demonstrates DCR has provided an insufficient number of staff to adequately supervise youth and assure youth safety. Staffing rosters are inadequate to provide sufficient number of staff on all shifts without an increase in assigned staff.  Investigations and report analysis completed during the third quarter indicate incidents occurring while assigned staff are off unit, working double shifts, and/or not adequately providing supervision of youth. Facilities and security management cannot adequately maintain their rosters when insufficient staff are available to them, or they are forced to revert to mandated double shifting.

The Monitor and Monitor's Consultant believe that approaching quantitative compliance with minimum staff youth ratios, in and of itself, is not sufficient to assure youth safety, especially with reliance on extraordinary volume of double shifting.

There are not sufficient staff and resources to implement the requirements of the provision.  This Stipulation is found to be in non-compliance for the third quarter of 2020.

| | |
|---|---|
| What is needed for full compliance?<br><br>What steps are required and/or recommended? | DCR should take immediate steps to reduce the staffing crisis by identifying the strategies it will use to fill the staffing vacancies by faithfully and comprehensively complying with the staff plan reporting requirements of the April 9, 2020 Joint Motion and meeting the timetable milestones documented in the Recruitment Process OSJ I Timetable dated October 9, 2020.<br><br>For full compliance for this provision, DCR needs to consistently provide and assure the availability of direct care staff, absent an extraordinary reliance on double shifting, to be deployed to housing modules based on the minimum required staff youth ratio, as well |

| | as the specific staff supervision needs of special populations: Transitional Measures; Protective Custody; and 1:1 staff youth supervision events. Staffing volume should be provided to assure youth safety absent sole dependence on restrictive housing placements. |
|---|---|
| Priority Next Steps | The Monitor's Team is analyzing how to better assess characteristics of incident reports to accurately assess the volume of events that occur impacting youth safety and adequate staff supervision of youth.<br><br>A priority next step will be to fulfill the requirements of the April 9, 2020 Joint Motion to "Improve System of Incident Reporting".  The incident report module should not be mere replication of the hard copy incident report cover sheet, but a robust reporting application that not only provides for documentation of incident events, but supports incident event analysis for procedural compliance, development of targeted training efforts, as well as incident event reduction strategies to assure youth safety.<br><br>In the interim, the Monitor's Consultant is receiving all incident report cover sheets to assess youth incident report characteristics, UEMNI referrals and OISC investigation. DCR has not provided the third quarter incident report cover sheets in the timeframe required by the Joint Motion.<br><br>Future contraband reports should document the volume of searches that were conducted at each facility, the type of searches that resulted in the discovery of contraband, and the volume of searches that did not result in the discovery of contraband. Contraband events should be documented with incident reports. In incident events in which contraband has been discovered a formal analysis of the contraband source should be conducted and shared with officers.<br><br>The Monitor and Monitor's Consultant anticipate an executable staffing plan from DCR that fulfills the requirements of the April 9, 2020 Joint Motion.  As of the production of this report, that staffing plan has not been provided although various versions of a Recruitment Process OSJ's has been provided.<br><br>Identification of new officer date of assignment to the two DCR youth institutions does not meet critical elements of a staffing plan. Master Roster modification adjustments, guidelines for considerations for post assignments, and strategies for facility onboarding to maximize new officer retention are critical components to having the new cadets evolve to effective officers. |
| Quality Assurance Measures | Agreement on the importance of the accuracy and reliability of data, consensus on definitional compliance of terminology, and comprehensive reporting of events and incident event characteristics are essential for effective quality assurance measures.<br><br>Recommendations have been made to DCR that all incident events of violence and use of force should require by policy that quality assurance video reviews be conducted, assuring that incident report characteristics and narratives are accurate representation of incident events. Additionally, all incident events of violence and use of force video |

| | documentation should be identified and saved to the video server to prevent critical video events from being deleted. |
|---|---|
| Sources of Information upon which Consultant report and compliance is based | Reports that were used for analysis of this compliance ratings were: third quarter CDTS Ponce and CDTS Villalba Master Rosters; DCR submitted contraband reports July, August, and September 2020; incident report cover sheets were submitted for July, August, and September 2020; UEMNI and OISC Report submitted for the third quarter. Additionally, six CDTS Ponce video use of force events were reviewed, of which five occurred in the third quarter. |

**January 2009 Stipulation Paragraph 3:** Defendants will include as direct care staff all social workers assigned to its institutions, once such staff receive forty (40) hours of pre- service training, ~~pursuant to Paragraph 49 of the Consent Decree.~~ The same shall also receive annual training as direct care staff, pursuant to Paragraph 50 of the Consent Decree.

| Compliance Ratings | **NA** |
|---|---|

*In approximately 2011, the Commonwealth decided not to employ the categorization of Social Workers as direct care staff as allowed by this provision to enhance coverage. However, the provision remains as a future option. Unless and until the Commonwealth determines that they want to apply this provision, the Monitor's Office will not Monitor the provision. The choice to not implement this provision is not non-compliance but has been categorized as "NA" not applicable. The ~~struck~~ part of the provision references a provision that has been terminated.*

**January 2009 Stipulation Paragraph 4:** All persons hired to comply with Paragraph 48 shall be sufficiently trained~~, pursuant to Paragraph 49 of the Consent Decree,~~ before being deployed. Defendants shall deploy all duly trained direct care staff, ~~pursuant to Paragraph 49,~~ to juvenile facilities in a timely manner.

*The ~~struck~~ part of the provision references a provision that has been terminated.*

| Compliance Ratings | **NA** |
|---|---|

| Monitoring process during this period of time | DCR reported that there were no new appointments to the agency during the third quarter reporting period, nor has there been any new appointments in the last several years. |
|---|---|
| | Upon hiring of any new staff, DCR Policy Chapter 4.1 and 4.2 address the agency's policy and procedure for new employee pre-service training and annual training, as well as certification prior to facility assignment. |
| | **Officer Temporary Assignment to CDTS Ponce:** Although DCR reported no new staff were hired in the third quarter, nine cadets from the DCR Academy participated in NIJ training on June 8 through 19, 2020. All nine officers were temporarily assigned to CDTS Ponce and remained assigned to CDTS Ponce for the third quarter. Four officers were assigned to the 6:00- 2:00 shift; four officers were assigned to the 2:00 – 10:00 shift; and one officer was |

| | |
|---|---|
| | assigned to the 10:00 – 6:00 shift. The assignment to CDTS Ponce was effective June 22, 2020. The assignment of the nine officers to CDTS Ponce is a temporary assignment until new officers are available from a new academy. The Recruitment Process OSJ I Timetable identifies that officers will be assigned to youth institutions on November 16, 2020.<br><br>No training was provided to any new officers nor cadets during the third quarter, consequently this stipulation is found to be in a NA status. This stipulation will continue to be monitored during future quarters that DCR hires, trains, or temporarily transfers officers to either of the juvenile facilities. |
| | |

**January 2009 Stipulation Paragraph 5:** On the fifth day of every thirty-day period commensurate with the Order approving this Stipulation, Defendants shall submit a report to the Monitor and the United States providing the following: a. the number of current direct care staff, by position classification, at each facility; b. the number of qualified direct care staff hired during the previous period; c. the number of hired direct care staff in the previous period who were hired ~~and have received pre-service training, pursuant to Paragraph 49;~~ and d. the juvenile facilities where the direct care staff who were hired in the previous quarter ~~and have received pre-service training, pursuant to Paragraph 49,~~ have been deployed or assigned.

*The ~~struck~~ part of the provision references a provision that has been terminated.*

| Compliance Ratings | Partial Compliance |
|---|---|
| Description of Monitoring process | Monitoring of S.A. 48 January 2009 Stipulation Paragraph 5 occurs through review of the monthly staffing report provided by the DCR Human Resources Development and Training Institute. |
| Findings and Analysis | **January 2009 Stipulation Paragraph 5:**<br><br>For the 2020 third quarter, January 2009 Stipulation Paragraph 5 is found to be in partial compliance.<br><br>DCR provided the July, August, and September 2020 staffing report required by the stipulation. The stipulation language requires that the defendants shall submit a report to the Monitor and to the United States by the fifth day of the following month. As seen in the receipt dates of the third quarter reports, reports were not received by the fifth day of the month.<br><br>The table below summarizes the July, August, and September 2020, January 2009 Stipulation Paragraph 5 reports: |

| Month/Year | OSJ I | OSJ II | OSJ III | OSJ IV | Total | Inactive | New Hires: 2020 | Voluntary Resignation Program | Date Received |
|---|---|---|---|---|---|---|---|---|---|
| July-20 | 225 | 18 | 11 | 4 | 258 | 40 | 0 | 0 | 8/14/20 |
| August-20 | 224 | 18 | 11 | 4 | 257 | 40 | 0 | 0 | 9/16/20 |
| September-20 | 222 | 18 | 11 | 4 | 255 | 34 | 0 | 0 | 10/13/20 |

The table below, illustrates the January 2009 Stipulation Paragraph 5 reporting data provided for the 2020 third quarter.

| Facilities | Month/Year | OSJ I | OSJ II | OSJ III | OSJ IV | Total | Inactive | New Hires: 2020 | Voluntary Resignation Program | Date Received |
|---|---|---|---|---|---|---|---|---|---|---|
| CDTS Ponce | July-20 | 116 | 11 | 6 | 2 | 135 | 20 | | 0 | |
| CDTS Villalba | July-20 | 109 | 7 | 5 | 2 | 123 | 20 | | 0 | |
| | July-20 | 225 | 18 | 11 | 4 | 258 | 40 | 0 | 0 | 8/14/20 |
| CDTS Ponce | August-20 | 116 | 11 | 6 | 2 | 135 | 24 | 0 | 0 | |
| CDTS Villalba | August-20 | 108 | 7 | 5 | 2 | 122 | 16 | 0 | 0 | |
| | August-20 | 224 | 18 | 11 | 4 | 257 | 40 | 0 | 0 | 9/16/20 |
| CDTS Ponce | September-20 | 114 | 11 | 6 | 1 | 132 | 19 | 0 | 0 | |
| CDTS Villalba | September-20 | 108 | 7 | 5 | 3 | 123 | 15 | 0 | 0 | |
| | September-20 | 222 | 18 | 11 | 4 | 255 | 34 | 0 | 0 | 10/13/20 |

Commencing with the July 2020 January 2009 Stipulation Paragraph 5 report, DCR no longer reported on any assigned staff to CD Humacao nor any staff assigned to Central Office or other facilities.

DCR did not report in the third quarter January 2009 Stipulation Paragraph 5 reports the temporary transfer of nine cadet officers from the DCR to CDTS Ponce on June 22, 2020. It is being noted by the Monitor's Consultant both in January 2009 Stipulation Paragraph 4: and here in January 2009 Stipulation Paragraph 5.

| What is needed for full compliance? | DCR must fulfill their responsibility to provide monitoring data that is required to assess compliance. During environmental or other work stoppage events such as Covid-19 quarantine, DCR needs to assure that critical monitoring data is able to be produced within the required timeframes. |
|---|---|

The Monitor's Consultant believes the following actions, metrics and data elements are necessary for DCR compliance with S.A. 48 January 2009 Stipulation Paragraph 5:

- Assessment of staffing requirements and deployment of officers to the two operational facilities to meet the minimum required staff youth ratio without unreasonable reliance on double shifting.
- The capacity to provide adequate staffing to keep youth safe, in the least restrictive placement possible, without dependence on restrictive housing. Significant improvement occurred in the 2020 third quarter:
  - One youth assigned to protective custody for forty days in the third quarter.
  - One youth was assigned to transitional measures 21 days in the third quarter.
  - No youth have been on transitional measures nor protective custody status August 25 through September 30, 2020.
- For each month, submit a January 2009 Stipulation Paragraph 5 staffing report to the Monitor's Consultant and the United States on the fifth day of the month.

|  | |
|---|---|
|  | <ul><li>In the January 2009 Stipulation Paragraph 5 staffing report, the inactive (inactivos) staff identified for each facility should be identified by personnel classification type.</li><li>The report should contain the number of qualified direct care staff hired or transferred from other DCR status, during the previous period (month).</li><li>Identify the juvenile facilities where the direct care staff who were hired in the previous quarter have been deployed or assigned.</li><li>Provide the Monitor's Consultant with each facility's electronic version of the Master Rosters that is applicable to the corresponding monthly S.A. 48 January 2009 Stipulation Paragraph 5 reports.<ul><li>The Monitor's Consultant received electronic versions of the facilities Master Rosters for the three, forty-two day roster cycles of the third quarter.</li></ul></li><li>DCR needs to stipulate that the volume of staff documented in each facility's Master Roster corresponds with the data in the monthly S.A. 48 January 2009 Stipulation Paragraph 5 reports.</li></ul> |
| Priority Next Steps | DCR needs to provide this report on a consistent, timely basis. In order to assess the accuracy and reliability of the S.A. 48 January 2009 Stipulation Paragraph 5 report, DCR needs to provide to the Monitor's Consultant an electronic version of each facility's corresponding forty-two day cycle Master Rosters for CDTS Ponce and CDTS Villalba and stipulate that the volume of staff documented in each facility's Master Roster corresponds with the data in the monthly S.A. 48 January 2009 Stipulation Paragraph 5 reports.<br><br>As the Monitor's Consultant has explained to the Operations Functional Team on numerous occasions and quarterly reports, the criteria to assess the accuracy of the S.A. 48 January 2009 Stipulation Paragraph 5 report would be that the monthly report documentation be the same volume of staff that is identified in each facility Master Roster.<br><br>DCR is currently under an Order by this Court (Doc. 1436) entered on 12/19/19 to work on a plan to adequately protect the budget for this case, and designate funds to be used only for the present consent decree and not used for other purposes. As a result of this Court Order, DCR has separated out staff who have been reassigned within DCR and do not serve any function within NIJ. This is reflected in the third quarter S.A. 48 January 2009 Stipulation Paragraph 5 reports. |
| Quality Assurance Measures | Upon receipt of the monthly facility Master Roster, a comparative analysis occurs with the S.A. 48 January 2009 Stipulation Paragraph 5 report to assess the accuracy and reliability of the report matching the data from the facility Master Rosters.<br><br>Ultimately, the Monitor's Consultant expectation for an effective quality assurance measure is that upon production of the S.A. 48 January 2009 Stipulation Paragraph 5 report, DCR stipulates that the numbers presented in the report correspond to the volume of staff and corresponding classifications for each facility Master Roster. If the cycle Master Report and the S.A. 48 January 2009 Stipulation Paragraph 5 report staff numbers do not match, an explanation as to why there is variance in the numbers should be provided. |

| | |
|---|---|
| | As of the production of the 2020 third quarter report, DCR has not stipulated that the volume of staff documented in each facility's Master Roster corresponds with the data in the monthly S.A. 48 January 2009 Stipulation Paragraph 5 reports. |

## PROTECTION FROM HARM – CLASSIFICATION (Bob Dugan)

| | S.A. 52: At both the detention phase and following commitment, Defendants shall establish objective methods to ensure that juveniles are classified and placed in the least restrictive placement possible, consistent with public safety. Defendants shall validate objective methods within one year of their initial use and once a year thereafter and revise, if necessary, according to the findings of the validation process. |
|---|---|
| **Compliance Ratings** | **Partial-Compliance** |
| Description of Monitoring process during this period of time | As a result of the coronavirus pandemic, no site visits were conducted by the Consultant during the third quarter of 2020. Monitoring of the various provisions of S.A. 48 were conducted through the production and delivery of the usual monitoring documentation. Communication with various members of the DCR staff was also conducted by multiple web video conferences throughout the third quarter<br><br>Throughout the quarter, and in the previous thirty-three quarters, DCR has provided detention and committed classification documentation, with corresponding youth facility assignments and assessed levels of treatment. DCR facility and housing assignments have been found to consistently correspond to youth's assessed levels of classification and treatment. |
| Findings and Analysis | Throughout the DCR Classification development process the Monitor's Consultant has continually requested that the agency provide the following core elements to assure policy and procedural compliance with the S.A. 52:<br><br>• An approved, agency Secretary signed policy and procedure with implementation predicated upon a training curriculum and training schedule, that addresses the requirements of S. A. 52.<br>    o As of the production of the third quarter report, final Secretary signed Classification policies have not been presented to the Monitor's Consultant.<br>• The policy needs to specifically require an annual validation that assesses the objective methods and efficacy of the classification processes. The policy needs to state that based on the findings of the annual validation any revisions to the classification policies and processes should be made if necessary. |

- The policy needs to provide an administratively approved override process for both the detention and explanations of the fleximazation and maximazation committed classification processes.

**Classification Policies:**

As of close of the first quarter 2020, the agency has produced the following revised draft classification policies:

- Policy 6.1:  This revised draft policy establishes the procedures for classification to levels of treatment of youth who are committed to NIJ-DCR.
    - The revised draft policy addresses that the committed classification instrument (I.C.C.) is administered by personnel trained by the DCR Institute of Development and Training of Human Resources (IDECARH).
    - The revised draft policy provides for a process of overriding the I.C.C. based on specific criteria.
    - The revised draft policy includes processes to identify a "negative leader" and assessing an additional point in the ICD scoring process.
    - The revised draft policy stipulates that the classification instruments are validated within one year and then annually, with revisions to the classification process in accordance with the validation findings.
- Policy 6.2: This revised draft policy establishes procedures for a comprehensive multidisciplinary assessment, that in conjunction with the custody classification tool, (I.C.C.) allows for development the youths Individualized Family Service Plan (P.I.S.). The P. I. S. provides the structure for treatment services at the institutional level that are designed to achieve changes in committed youth allowing for positive reintegration into the community.
- Upon final draft policy reviews, the policies require a Secretary's authorization signature, an implementation date, and a training curriculum and training schedule to coincide with the implementation date in a manner that assures staff are trained prior to policy and procedure implementation.

DCR has additional draft classification policies that are being revised based on the Monitor's Consultant prior reviews and comments. DCR did not produce any final and approved signed Secretary classification policies for the third quarter. It is hoped that DCR will provide additional Secretary approved and signed classification polices for the fourth quarter of 2020.

**Annual Classification Validation Reports:**

On December 19, 2019 DCR provided the Monitor's Consultant with a 2018-2019 Annual Classification Review. The content of the 2018-2019 Annual Classification Review was a significant improvement from the prior annual reviews. The annual report had integration of information and statistical data, inclusive of modification of process required by the Puerto Rico Executive Orders

On September 1, 2020, DCR provided the Monitor's Consultant with a 2019-2020 Report on Internal Validation Instruments for the Classification of Youth (ICC-ICD). The annual report was reviewed and returned by the Monitor's Consultant to DCR on September 3, 2020. The Monitor's Consultant review raised a number questions and issues as to statements or conclusions that were stated in the report. As of the time of the production of the quarterly report, there has not been a response from DCR to the Monitor's Consultant review of the annual report.

**Third Quarter Classification Profiles:**

As of September 30, 2020, the DCR third quarter committed classification housing assignments are illustrated below:



| | CTS Ponce: Level 2 | CTS Ponce: Level 3 | CTS Villalba: Level 4 | CTS Villalba: Level 5 | PUERTAS: | Classification in process, pending institutional assignment | Total Institutional Assignments |
|---|---|---|---|---|---|---|---|
| 2020 Third Quarter Totals | 1 | 7 | 7 | 3 | 0 | 10 | 18 |
| September-20 | 0 | 0 | 1 | 1 | 0 | 3 | 2 |
| August-20 | 1 | 2 | 2 | 0 | 0 | 3 | 5 |
| July-20 | 0 | 5 | 4 | 2 | 0 | 4 | 11 |

The DCR 2019 and first, second and third quarter 2020 committed classification housing assignments are illustrated below:



DCR Classification of Committed Youth
2019 and 2020 Facility and Level Assignments

|  | CTS Ponce: Level 2 | CTS Ponce: Level 3 | CTS Villalba: Level 4 | CTS Villalba: Level 5 | PUERTAS: | Classification in process, pending institutional assignment | Total Institutional Assignments |
|---|---|---|---|---|---|---|---|
| 2020 Third Quarter Totals | 1 | 7 | 7 | 3 | 0 | 10 | 18 |
| 2020 Second Quarter Totals | 0 | 2 | 3 | 1 | 0 | 12 | 6 |
| 2020 First Quarter Totals | 0 | 3 | 0 | 0 | 0 | 18 | 3 |
| 2019 Fourth Quarter Totals | 2 | 7 | 5 | 2 | 1 | 13 | 17 |
| 2019 Third Quarter Totals | 0 | 3 | 6 | 2 | 2 | 10 | 13 |
| 2019 Second Quarter Totals | 1 | 4 | 4 | 2 | 0 | 16 | 11 |
| 2019 First Quarter Totals | 0 | 2 | 10 | 3 | 0 | 14 | 15 |

As of September 30, 2020, the DCR detention classification housing assignments are illustrated below:



| | 1st Quarter 2019 Totals | 2nd Quarter 2019 Totals | 3rd Quarter 2019 Totals | 4th Quarter 2019 Totals | 1st Quarter 2020 Totals | 2nd Quarter 2020 Totals | 3rd Quarter 2020 Totals |
|---|---|---|---|---|---|---|---|
| ■ Volume of Admissions | 62 | 66 | 62 | 47 | 54 | 20 | 29 |
| ■ Leve/ Low | 51 | 32 | 47 | 28 | 26 | 10 | 13 |
| ■ Moderado/ Moderate | 10 | 31 | 8 | 16 | 28 | 6 | 13 |
| ■ Intensivo/ Intensive | 0 | 1 | 0 | 0 | 0 | 1 | 1 |
| ■ Egreso/ Released | 0 | 0 | 3 | 0 | 0 | 0 | 0 |
| ■ Custodia/ Custody | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| ■ Sumariado | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| ■ Court Releases | 0 | 0 | 4 | 0 | 0 | 0 | 0 |
| ■ NA | 0 | 2 | 0 | 3 | 0 | 3 | 2 |

**Third Quarter Maximazations, Fleximazations and Overrides:**

Maximazations, Fleximazations and Overrides are the terms used to describe the processes for a facility to request that a youth's level of treatment be raised, a Maximazation, or lowered, a Fleximazation. The facility is required to formally request to the Division of Evaluation and Classification (DEC) for review, approval or denial of the change in level of treatment.

For the third quarter of 2020, there were three requests for Fleximazations, two requests for Maximazation and one transfer from PUERTAS to Level 3:

- In July 2020, one youth was maxed to a Level 4.
- In August of 2020:
    - One youth was maxed from a Level 3 to a Level 4.
    - One youth was flexed from a Level 5 to a Level 3.
    - One youth was flexed from a Level 4 to a Level 3.
    - One youth was changed from a PUERTAS placement to a Level 3.
- In September 2020, one youth was flexed from a Level 4 to the community.

Overrides are a change in detention level classification, either to a lower or higher classification. For the third quarter of 2020, there were four Override requests, which were all approved:

- Two overrides from moderate to severe classification.
- One override from moderate to low classification.
- One override from low to moderate classification.

As of September 30, 2020, DCR was holding seven youth on federal charges

- six youth are classified as detention intensive
- one youth is classified as Level IV treatment; this youth was committed to DCR and classified as Level IV in June 2019, prior to the signing of federal charges. At this time, he remains categorized as Level IV.

The following table identifies the diverse classification populations within CDTS Ponce and CDTS Villalba.

| Detention Classification | Committed Classification | Special Populations |
|---|---|---|
| Detention Intake | Evaluation | PUERTAS (mental health youth) |
| Detention: Low | Level 2 | Mental Health 1:1 Supervision Events |
| Detention: Moderate | Level 3 | Protective Custody |
| Detention: Severe | Level 4 | Transitional Measures |
| Sumariados | Level 5 | Sumariados |
| Girls Detention Population | Girls Committed | Federal Holds |

Youth in Special Population categories, although not managed as such specifically by DCR, are youth populations that require specialized services, programming, and staff supervision, to assure youth are placed in the least restrictive placement possible.

The table below displays the CDTS Ponce and CDTS Villalba bed capacity and youth populations as documented in each facility's Staff Youth Ratio weekly report document.

| CDTS Ponce | Bed Capacity | Youth Population 9/30/2020 | CDTS Villalba | Bed Capacity | Youth Population 9/30/2020 |
|---|---|---|---|---|---|
| MODULO - 1 (Detention Low) | 15 | 5 | MODULO-A-1 (Det. Severe) | 15 | 4 |
| MODULO - 2 (Covid Protocol 19) | 15 | 6 | MODULO-A-2 (Evaluation: ME) | 15 | 3 |
| MODULO - 3 (Level II) | 15 | 5 | MODULO-B-1 (Level V) | 15 | 8 |
| MODULO - 4 (Level III) | 15 | 10 | MODULO-B-2 (Level IV) | 15 | 11 |
| MODULO - 5 (Detention: Girls) | 15 | 2 | MODULO-C-1 (Sumarido) | 15 | 3 |
| MODULO - 6 (Custody: Girls) | 15 | 2 | MODULO-C-2 (Detention Moderate) | 15 | 7 |
| MODULO - 7 (Level 3 ) | 15 | 6 | MODULO-D-1 (Level IV) | 15 | 12 |
| PUERTAS- 8 | 15 | 1 | MODULO-D-2 (Level V) | 15 | 3 |
| Admissions | 4 | 1 | Admissions: (Multiple Detention Levels) | 4 | 3 |
| Observatin Rooms | 8 | 3 | | | |
| **Total** | | 41 | | | 54 |

As of March 16, 2020, with the initiation of DCR Covid-19 quarantine protocols, new admissions to the facilities were required to be on fourteen and twenty-one day quarantines. In order to meet the DCR quarantine requirements, new admissions to the facilities, either from the community, hospitals or from another facility required quarantine placements.

In light of the limited housing capacity of CDTS Ponce and CDTS Villalba, the facility admissions, module external observation rooms and Module 2 are being used for quarantine of youth. As is noted in the table above, as of September 30, 2020, CDTS Ponce is housing six youth in Module 2, one youth in the admissions area and three youth in observation rooms.

The diverse categories and classification status of youth allows for no specific housing for special status youth, absent use of Admissions, observation rooms or special designation of a housing module, nor any capacity to evacuate a module for emergency, nor normal physical plant maintenance.

In light of the pending submittal of a final 2019- 2020 Annual Classification Review, final, Secretary approved classification policies, for the third quarter of 2020, the Monitor's Consultant has determined that DCR is in partial compliance with S.A. 52.

| | |
|---|---|
| What is needed for full compliance?<br><br>What steps are required and/or recommended? | The dynamic changes caused by the reduction of youth populations and DCR facilities, ongoing shortages of staff resulting in an over-dependence on double shifts, accompanied by the absence of comprehensive planning, has jeopardized the agency's capacity to provide for the safety and treatment needs of the youth in their care in the least restrictive placements possible.<br><br>It is the opinion of the Monitor's Consultant that the agency has not seized the opportunity to adjust classification requirements and practices in response to the present physical plant housing limitations. It is recognized that opportunity to revise classification has been suspended and prevented by the management of Covid 19 protocols.<br><br>In the fourth quarter of 2020, DCR needs to address the reality of the limited space, the staffing crisis and limited housing options, accentuated by the necessary Covid protocols. Obtaining relief to limited housing options by private placement of the female population has not materialized.<br><br>A legitimate dialogue addressing classification, risk assessment issues, facility space limitations and behavior management has been negated by DCR contention that issues of youth safety is only a result of the staffing crisis and has no correlation to the classification processes. The classification instruments must not be exclusive to treatment levels, but also provide for a balanced risk assessment and be responsive to the reality of limited housing modules. DCR representatives contend that this is not a classification issue to be addressed by DEC, but an institutional behavior management issue. The Monitor's Consultant believes that DCR needs to undertake a holistic review of classification policies in conjunction with behavior management, programming and housing limitations. This effort should address whether classification level housing segregation may be modified and yet maintain the integrity of the treatment processes. In the absence of safety, treatment cannot occur.<br><br>Problem solving dialogue should address creating youth milieus predicated on risk assessment for safety, as well as treatment needs. The volume of assault, cutting events during the first, second and third quarter of 2020, as well as a serious assault resulting in youth surgery, is the result of a  culture of revenge and fear that jeopardizes the safety of all youth and staff.<br><br>Additionally, classification process should be considered for determination of the possibility of alternate programming placements, especially in light of ongoing youth population reductions.<br><br>The metrics established for compliance of this provision are the following:<br><br>• Final agency approved classification policies and procedures, implementation dates predicated upon training curriculums and training schedules are necessary for full compliance.<br>• Classification policies need to be inclusive of a process requirement for annual classification methodology validation, findings, and revisions that are necessary.<br>• Production of the final 2019-2020 annual classification validation review, reflective of the Monitor's Consultant's review and comments of objective methods, findings and revisions as required, predicated on a dynamic assessment of the existing and |

|  | forecasted youth population, as well as the limitations of two or less facilities, and alternate placement options.<br>• Continued production of monthly detention and committed classification data.<br>• 100% of detention youth are classified and assigned to appropriate housing modules unless prior release by the Court.<br>• 100% of committed youth are classified and assigned to appropriate facilities and housing modules, consistent with their assigned classification treatment levels and safety requirements.<br>• Youth are placed in the least restrictive placement possible with staff assigned to assure their safety and protection from harm, in the least restrictive placement possible. |
|---|---|
| Priority Next Steps | Current policies require that DCR "validate objective methods within one year of their initial use and once a year thereafter and revise, if necessary, according to the findings of the validation process." The purpose of the classification system, as indicated in Paragraph 52, is to "ensure that juveniles are classified and placed in the least restrictive placement possible, consistent with public safety."<br><br>It is critical to continue a review of the classification system given the reality of housing youth in only two facilities.  This is particularly true with a decreasing youth population resulting in a higher concentration of youth with a history of violence and/or mental health concerns. The volume and diversity of classification along with special populations calls for an agency wide interdisciplinary review of classification level of treatment segregated housing practices. This effort should provide the opportunity to consider processes for facility management to have the capacity to create homogenous youth housing module milieus, not limited to assigned levels of treatment, but balanced with youth safety and managing "negative leaders". The sophisticated youth who is a negative leader, rarely is the youth directly involved with acts of violence and threatening behavior.<br><br>DCR has a history of blending youth with various levels of treatment that appears not to have jeopardized the integrity of treatment goals. DCR needs to continue to review and revise classification levels of treatment housing practices to assure compliance with all of the components of S. A. 52, as well as addressing the risk and treatment needs, and housing module limitations. Successfully managing the youth leader culture within each housing module and each facility is a priority to provide youth protection from harm and assure that youth are placed in the least restrictive placement possible. |
| Quality Assurance Measures | DCR effectively documents the results of both detention and committed classification processes and youth classification, levels of treatment and corresponding housing module assignments. Additionally, for the third quarter, DCR produced documentation in regard to overrides, Maximazations and Fleximazations. Historically, monthly documentation of detention and committed classification is consistently provided to the Monitor's Consultant. |

| | |
|---|---|
| | DCR must continue incorporate annual reviews of the validation of the objective methods of the classification instruments, processes, and findings, facilitating the opportunity to systematize quality assurance into the classification processes.<br><br>The 2019-2020 Annual Classification Validation Report needs to address the effectiveness of existing classification practices in light of a reduction in housing modules and how these issues impact youth treatment and protection from harm requirements in the least restrictive placement possible. The classification levels of treatment assessment and requirements must be dynamic and responsive to effective institutional placement and treatment. |
| Sources of Information upon which Consultant report and compliance ratings are based | Monthly classification documentation for youth who have been classified for detention and committed youth is provided to the Monitor's Consultant. Monthly, DCR provides the Monitor's Consultant facility youth population and classification reports. During site visits, and in monthly reports, the Monitor's Consultant obtains facility youth population documentation that identifies youth housing module populations and classification levels of treatment.<br><br>Detention classification documentation provided to the Monitor's Consultant monthly, indicates youth have been consistently classified and assigned to a housing module that corresponds to detention classification level.<br><br>For the third quarter of 2020, all the reviewed committed institutional assignments are consistent with the level of treatment scores and level assignments as reported in the monthly committed classification reports. Modifications in classification and housing module assignments have been made based on the challenges presented by necessary Covid protocols. Youth committed classification levels and institutional housing assignments are reviewed for procedural accuracy during site visits. |

## PROTECTION FROM HARM – USE OF FORCE (David Bogard)

| | |
|---|---|
| **S.A. 77.** In no event is physical force justifiable as punishment on any juvenile. The use of physical force by staff, including the use of restraints, shall be limited to instances of justifiable self-defense, protection of self and others, to maintain or regain control of an area of the facility, including the justifiable protection of significant property from damage; and prevention of escapes; and then only when other less severe alternatives are insufficient. A written report is prepared following all uses of force and is submitted to administrative staff for review. When force, including restraint, is used to protect a youth from self, this must be immediately referred to the medical area for medical and mental health evaluation and any necessary treatment. | |
| **Compliance Rating** | **Partial Compliance** |
| Description of Monitoring process during this period of time | The Monitor's Use of Force Consultant was unable to visit the two facilities in the third Quarter of 2020 due to the Coronavirus.  In order to accomplish a key benefit of on-site review of incident reports and videos, DCR and Monitor's Consultants once again expended considerable energies aimed at allowing for remote viewing of incident videos from the facilities. Several "WebEx" calls were directed at establishing a feasible technological |

| | |
|---|---|
| | approach and protocols for remote viewing. On a very positive note, the efforts of Monitor's staff and DCR resulted in a work-around for Ponce whereby pre-selected videos can now be viewed remotely via Web-Ex calls, according to agreed upon protocols.  The Monitor's staff is now reviewing incident report cover sheets and identifying for DCR which incidents should be preserved before they are overwritten within the 30-day storage limit.  Once notification is received from DCR that the particular incident video has been preserved, the Monitor and DCR schedule the Web-Ex call. This approach has now be effectively implemented on two occasions during which a total of six use of force incidents were viewed (one Q2 incident and five for Q3).<br><br>While there is now a creative and effective approach to review videos of Ponce incidents, this has not been realized at CTS Villalba.  Despite multiple assurances, going back for longer than a year that technical difficulties would be resolved and video staff would be assigned at Villalba, neither of these issues has been resolved and, as such, it is still not feasible to remotely view videos of incidents at that facility.<br><br>In addition to the recently initiated video review process at Ponce, the primary review tools were the incidents reported by DCR on its weekly ¶48 reports, Incident Report and Cover Sheets. The long-awaited automated incident report system is not fully implemented. |
| Findings and Analysis | For the second consecutive quarter, there were no reported use of force events at CTS Villalba.  That said, the number of such incidents increased from three to five at Ponce, including one seriously violent event, which included multiple applications of OC as well as troublesome instances of physical restraints and seemingly excessive force. |

| Facility | Q3-20 Events: Use of Force | Q3-20 Youth Involved | Q3-20 Physical Restraints | Q3-20 OC | Q2-20 Events: Use of Force | Q2-20 Youth Involved | Q2-20 Physical Restraints | Q2-20 OC |
|---|---|---|---|---|---|---|---|---|
| CTS Ponce | 5 | 14 | 14 | 4 | 3 | 4 | 8 | 1 |
| CTS Villalba | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total | 5 | 14[3] | 14 | 4 | 3 | 4 | 8 | 1 |

With one notable exception, whereby staff used OC on four youth in a volatile incident at Ponce, OC was not used there and there were no such incidents at Villalba.

There were five use of force incidents this quarter, all of which occurred at Ponce.  Four of the incidents involved staff intervening to break up fights between two or more youth. In three of those cases, the video review revealed that officers acted appropriately and primarily attempted to stand between or pull youth who were fighting away from each other with the force appearing to be very reasonable and minimal.  In a fourth such incident involving efforts to impede some youth from attacking others in the school area and library,

---

[3] There is a small variance (2) in number of youth involved due to what is reported in DCR Incident Report Cover Sheets and what is reported in the Weekly Staff Youth Ratio Use of Force forms.

| | |
|---|---|
| | the camera view was not adequate to provide a clear view of staff actions. Policy violations occurred as a result of some involved officers not submitting reports or obtaining medical care for involved youth on the same day after the incident. Youths made no allegations concerning force and when five youths were seen by the nurse the following day, and notes indicated "no trauma and no injuries" for each. Reports indicate that some force was used, although, based on the incident reports and the OISC investigation, it appeared to entail only holding and moving the youths by their shoulders.<br><br>A fifth incident at Ponce involved facility officers and UOE officers who initially responded to the mini-recreation area for Ponce Module 7 when youth were refusing to follow directions and were overturning trash cans. UOE officers responded to assist control the incident and to escort the youths back to their housing module. Once the youths were in the module dayroom, a series of assaults and fights broke out between youth and officers, with multiple physical restraints and four youths being subjected to OC. One UOE officer was viewed throwing multiple (very dangerous) punches at a youth's upper body and head and then pursuing the youth into his cell, and then inappropriately followed him into his room out of camera view. While several youths were clearly seen actively resisting staff directives and physically resisting escort attempts, there were multiple instances of excessive force displayed during this incident. And too much time elapsed before all youths were ordered to and escorted to their rooms to avoid subsequent incidents (which did occur). This incident was referred to UEMNI and, as of the preparation of this report, remains under investigation by OISC.<br><br>There have been a couple of instances in recent months when officers intervened in fights between youths by physically inserting themselves between the youth, or placing their hands between them or pulling a youth away when being assaulted by others. While such actions are necessary and may not amount to 'force' if no action is being used to control or move a youth against their will, the actions taken must at least be described and documented in the incident reports. |
| What is needed for full compliance? | In order for the Monitor's Consultant to find substantial compliance with ¶77, DCR must be able to provide accurate and reliable evidence in incident reports, videos and OISC investigations of force routinely being used according to the procedures set forth in Policy 9.18 and DCR training.<br><br>Completion of the CCTV system at Villalba, including assignment of staff on the master roster for video monitoring and providing enhanced views of certain areas for which there is currently inadequate coverage (at both facilities), will enhance the utility of the CCTV system and potentially provide additional evidence of compliance. |
| What steps are recommended? | 1. DCR must show that serious disciplinary measures and corrective actions are taken (e.g., supplemental training) for officers, including UOE, who violate use of force policies and use excessive or unnecessary force;<br>2. DCR must establish a policy or protocol or further training to ensure all use of force events are consistently and accurately documented in incident reports, incident report cover sheets, use of force checklists, P48 weekly reports; |

|  | 3. DCR must complete implementation of the video camera system at Villalba, including resolving technical problems and providing necessary master roster personnel to provide on-site capacity to save and view incidents;<br><br>4. DCR must complete development and implementation of the long-delayed automated incident report process;<br><br>5. Expand camera coverage at Ponce and Villalba to view infirmary areas, mini-controls/sallyports and admissions and living unit dayroom glass walls;<br><br>6. OISC should more directly include in investigations specific assessments of compliance with ¶77 and Policies 9.10, 9.18 and use of force training with references facts obtained and assessed relative to language contained in those sources;<br><br>7. DCR should identify and research potential implementation of different use of force policies, procedures and training in the PUERTAS unit due to the mental health status and vulnerability of youth assigned to that module;<br><br>8. Both facilities should routinely conduct and document after-incident case reviews to evaluate compliant and non-compliant use of force incidents;<br><br>9. Provide the Monitor with the most current versions of use of force training, Bi-annual chemical agents training and Policy 9.18;<br><br>10. DCR IDECARH needs to provide updated evidence to the Monitor's Office that all staff have recently received the required training in the revised Use of Force Policy 9.18 and reporting requirements included in 9.10. |
|---|---|
| Sources relied upon by Consultant for report and Compliance Ratings | DCR's ¶ 48 weekly spreadsheet reports of use of force incidents<br>Review of Ponce incident videos<br>IDECARH revised training materials reflecting the August 2018 revised policies 9.18 (use of force) and 9.10 (reporting).<br>DCR incident reports and cover sheets<br>OISC investigation reports |

## Protection from Harm:  Investigations of Abuse and Institutional Neglect – Kim Tandy

| S.A. 78.  Defendants shall take prompt administrative action in response to allegations of abuse and mistreatment.  An incident report shall be prepared for each allegation of physical or mental abuse, including juvenile on juvenile assaults, staff on juvenile abuse, and excessive use of force by staff, within 24 hours of the incident.  A copy of each incident report together with the preliminary investigation prepared by the Police Department and/or AIJ shall be forwarded to Defendant Department of Justice, where the allegations shall be investigated and a final report shall be made in 30 days.  In addition, a copy of each incident report alleging physical or mental abuse by staff or excessive use of force by staff together with the preliminary investigation prepared by the Police Department and/or the AIJ, shall be forwarded to the Defendant Department of Social Services. |
|---|
| **Compliance Rating** | **Partial Compliance** |

| Description of Monitoring process during this period of time | The Monitor met by videoconference with Kelvin Merced, Gineima Ojeda, and Alexis Rodriguez (OISC) on July 14 to discuss matters related to Monitor's Special Report on Safety issues, outstanding issues to address continued facility safety issues, staffing leadership issues in Ponce, and a review of UEMNI and OISC issues. |
|---|---|
| | Additional information was sought in areas not fully covered by DCR's response to the Monitor's request regarding a report on safety issues, and subsequent information was requested. |
| | The Monitor convened the parties on 7/20/2020 to discuss compliance with the April Order regarding safety issues, and to revise a plan with updated information and requirements for DCR to address issues of incident reporting, isolation and staffing compliance. |
| | The Court held a status conference on 8/5/2020 to address missed deadlines on some of the Orders from the agreement between the parties relative to safety issues identified by the Monitor.  A subsequent Joint Motion agreeing to new terms and deadlines to address these three areas was filed on 8/18/2020 (Document 1525), and an Order followed that same day warning that further non-compliance on the same issues without an adequate explanation would because for the Court to take other actions.  The Court also required DCR to ensure that adequate staffing be devoted to the timely completion of these tasks. |
| | The Monitor met with NIJ leadership on 9/9/2020 by videoconference regarding the update on the online reporting system for incident reports, and reviewed the updated coversheet and online application based upon recommendations from Bob Dugan. |
| | The Monitor received information from Bob Dugan who compiles information received on incident reports.  She also tracks UEMNI reports, both level 1 and level 2, and receives completed investigation reports from Level 1 UEMNI investigations, and Level 2 OISC investigations. During this quarter, a total of 8 completed OISC reports were received and reviewed, and 4 Level 1 UEMNI reports were received and reviewed. |
| Findings and Analysis | The approved policies for this provision include  policies on Incident Reporting (Policy 9.10), the analysis of referrals of abuse and/or institutional neglect by UEMNI (Policy No 13.2.1); immediate prevention actions regarding serious allegations (Policy No. 13.2.2); and final determinations on referrals of abuse and/or institutional neglect (Policy 13.2.3). Investigations by UEMNI and OISC under this provision are reviewed against these policies as well as others based upon the implication of staff actions taken. |
| | No retraining on these policies occurred during the third quarter.  The Annual Report for the period ending on December 31, 2019 indicates that 90% of officers completed training in this area during that 18 month period. |
| | **Incident Reporting** |
| | Police 9.10 requires "appropriate communication mechanisms in order to take immediate action in case of incidents, routine or emergency, for ensuring that information on security, the well-being of the health of children and staff will be channeled timely and appropriately." |

Development of the incident report application has several important goals, as described by Bob Dugan in the recommendations he provided to DCR.  The incident report module should:

- Allow for documentation of comprehensive incident event characteristics to accurately assess the volume of events occurring impacting youth safety and adequate staff supervision of youth.
- Provide comprehensive documentation of incident events in data fields that allow for analysis;
- Support analysis of incident events for procedural compliance;
- Provide data for development of targeted training efforts; and
- Provide data for incident event reduction strategies to assure youth safety and well-being.

The Third Joint Motion to Address Continuing Facility Safety Issues (Document 1525) and Order following requires that DCR complete its digitalization of incident reports based upon the information contained in the manual format by November 15, 2020, and a plan submitted to the Monitor by August 30, 2020 which provides:

- An explanation of the digitalized system for entering incident report cover sheets including the design of application content, quality controls, and security requirements; and
- Steps needed, time frames for implementation, and individuals responsible for field testing, workload requirements, necessary changes in policies, development and implementation of training, and quality assurance measures.
- A time table to DOJ and the Monitor for any necessary changes in policy, training, and implementation of the new forms, and a project manager responsible for implementing and integrating the changes in DCR operations.

While the Incident Report Cover sheet has been revised and significantly improved, and testing of the application has begun, the remaining information required by the Court's Order has not been received.

The second part of the Order pertains to the manual delivery of incident report cover sheets to the Monitor weekly, with many incidents require notification within 48 hours, and in some cases, 24 hours. As noted in detail by Bob Dugan earlier in this report, there are significant delays in the timely receipt of these reports. Villalba submitted their reports in a timely manner only 4% of the time during this quarter, and Ponce submitted incident report cover sheets only 38% of the time.

The table below displays the volume of incident report cover sheets submitted by each facility for the Third Quarter:

| Facility | July 2020 | August 2020 | September 2020 | Third quarter totals |
|----------|-----------|-------------|----------------|----------------------|
| Ponce | 26 | 28 | 60 | 114 |
| Villalba | 20 | 20 | 17 | 57 |
| Totals | 46 | 48 | 77 | 171 |

During the second quarter, of the 86 incident reports made at CDTS Ponce, 11 UEMNI referrals were made.   For the same time period at CDTS Villalba, of the 115 incident reports, 4 UEMNI reports were made.

**UEMNI Data regarding Harm to Youth**

Information below in the next several charts was received by UEMNI, and provides information on the number of youth on youth incidents, use of force incidents, and incidents involving suicidal or self-mutilating behavior, gestures or ideation.  This information has not yet been matched with the incident report tracking system in all areas. Where there are differences between the two systems, they are noted below.

Incident Tracking by Quarter involving Harm to Youth

| A. General Measures by quarter | 4th 2019 | 1st 2020 | 2nd 2020 | 3rd 2020 |
|---|---|---|---|---|
| A.1 Average Monday 1st Shift count of youth | 109 | 103 | 112 | 93 |
| A.2 Number of incident events | 26 | 36 | 35 | 46 |
| A.3 Number of youth-to-youth incident events | 8 | 11 | 5 | 8 |
| A.4 Incident events involving use of force by staff | 5 | 10 | 5 | 5 |
| A.5 Incident events with suicide act, ideation, or gesture | 11 | 5 | 8 | 25* |
| A.6 Incident events w/ self-mutilation act, ideation, or gesture | 5 | 6 | 19 | 8* |

**The number of incident reports received involving suicidal gestures, acts, or ideation, as well as self-mutilation acts, ideation or gestures is somewhat different as compared to monthly data which is prepared for and received by the Mental Health Consultant, who reported 32 incidents, with four of those being both a suicide attempt and self-mutilation. One difference may be in whether cases where youth insert "pearls" and whether that is classified as a self-mutilation event.  The number is more consistent than last quarter. Both numbers are inconsistent with the incident reporting system numbers, which classify events differently. Further work to reconcile these will continue.

Mental Health Incidents – Including 284 Reports

The subset of incidents involving suicidal acts, ideation, or gestures, or self-mutilation acts, ideation or gestures is found in Table B.  Most of these do not warrant abuse allegations.  If a 284 report is filed, implicating possible abuse by a staff member or other, the case also moves through the investigative stage.

For this chart, the Monitor has used the information provided in the monthly data sent by UEMNI, however this does not coincide with the numbers provided to the Mental Health Consultant, as noted above.

| B. Mental Health Record Information | 4th 2019 | 1st 2020 | 2nd 2020 | 3rd 2020 |
|---|---|---|---|---|
| B.1 Suicidal incidents, ideation or gestures | 11 | 11 | 8 | 25 |
| B.2 Number of individual youth referenced | 11 | 11 | 6 | 16 |
| | | | | |
| B.3   Cases involving ideation only | 3 | 5 | 4 | 8 |
| B.4 Cases involving suicide gesture | 5 | 6 | 2 | 9 |
| B.5 Cases involving suicide intention | 3 | 1 | 2 | 8 |
| B.6 Cases w/ ambulatory treatment | 7 | 5 | 1 | 3 |
| B.7 Cases with hospitalization | 4 | 6 | 7 | 22 |
| B.8 Cases leading to death | 0 | 0 | 0 | 0 |
| B.9 Suicide Cases with 284 report filed | 4 | 1 | 2 | 5 |
| B.10 Self-mutilations incidents, ideation or gestures | 5 | 9 | 19 | 8 |
| B.11 Number of individual youth referenced | 5 | 9 | 11 | 8 |
| B.12 Cases requiring sutures | 2 | 1 | 0 | 0 |
| B.13 Cases requiring hospitalization | 3 | 3 | 5 | 4 |
| B.14 Cases leading to death | 0 | 0 | 0 | 0 |
| B. 16 Self-Mutilation Reports with 284 Referrals | 1 | 3 | 4 | 1 |

During this quarter, more than a 300% increase in the number of hospitalizations occurred among youth with suicidal behavior or ideation, although only five (5) 284 reports being made.  Of the 8 self-mutilation incidents, none required sutures, and only one 284 referrals was made.  For a more in depth discussion of these incidents and how they were handled, see Dr. Martinez's analysis for Paragraph 63 in the Mental Health section.

Responses to Abuse Referrals

The next table summarizes abuse referrals and the initial responses to such referrals.

| C. 284 Incidents by quarter (2019-2020) | 4th | 1st | 2nd | 3rd |
|---|---|---|---|---|
| C.1 284 Incident Events | 11 | 19 | 15 | 16 |

| | | | | |
|---|---|---|---|---|
| C.2 Level One Incident Events | 1 | 3 | 3 | 4 |
| C.3 Level Two Incident Events | 10 | 16 | 12 | 12 |
| C.4 Referrals to OISC | 10 | 16 | 12 | 12 |
| C.5 Youth to Youth incidents | 8 | 9 | 5 | 8 |
| C.6 Youth to Youth Injuries | 2 | 3 | 1 | 3 |
| C.7 Youth to Youth with External Care | 4 | 3 | 3 | 3 |
| C.8 Youth to Youth Sexual | 0 | 2 | 1 | 0 |
| C.9 Youth to Youth Sexual  w/injury | 0 | 0 | 0 | 0 |
| C.10 Staff to Youth Incidents | 3 | 10 | 10 | 8 |
| C.11 Staff to Youth Injuries | 0 | 2 | 5 | 4 |
| C.12 Staff to Youth External Care | 0 | 3 | 1 | 1 |
| C.13  Staff to Youth Sexual | 0 | 0 | 1 | 1 |
| C.14 Staff to Youth Sexual w/injury | 0 | 0 | 0 | 0 |
| C.15 284 Incidents with Admin. Action | 11 | 19 | 15 | 11 |
| C.16 284 Incidents with report by shift end | 11 | 18 | 15 | 16 |
| C.17 Level 1 investigations completed 20 days | 0 | 3 | 3 | 2 |
| C.18 Special Operations interventions | 0 | 0 | 0 | 1 |
| C.19 SOU reports with 284 investigations | 0 | 0 | 0 | 1 |
| C.20  284 with Item 5 completed | 11 | 19 | 15 | 16 |
| C.21 284 with Staffing Compliance | 11 | 19 | 15 | 15 |
| C.22 Percent of 284 cases with staffing compliance | 100% | 100% | 100% | 94% |

A determination is made at the institutional level as to whether incidents are Level One or Level Two based upon criteria in the Cernimiento de Incidentes de Alegado Maltrato Institutional form.  Level one incidents by definition include verbal abuse and some forms of physical aggression.   Level Two incidents include material exploitation, incidents of a sexual nature, death, various instances of institutional neglect, including youth self-harm, undue restrictions with medication, misuse of mechanical restraint or pepper spray, and excessive use of force.  Level One incidents are investigated locally at the institution. Level Two incidents are investigated by OISC. Referrals to OISC as based on the screening protocol.

A review during the third quarter shows four (4) Level 1 reports made.  Level I cases followed the same format/guidelines than Level II cases but the facilities' investigators only have 20 working days to finish the investigation.  Twelve Level 2 events occurred and were referred to OISC for investigation. These numbers were very close to the Second quarter.

Initial Case Management Measures Taken

| D. Initial Case Management Measures (2019-2020) | 4th | 1st | 2nd | 3rd |
|---|---|---|---|---|
| D.1 284 percent with admin actions | 100% | 100% | 100% | 100% |
| D.2 284 per cent completed by end of shift | 100% | 95% | 95% | 100% |
| D.3 284  Level 1 Investigation Complete Within 20 days | 0% | 100% | 100% | 100% |

.

**OISC Investigative Reports**

The Monitor reviewed and analyzed the twenty (20) OISC investigations, a substantial increase from nine (9) received in the First quarter, and fifteen (15) from the last quarter of 2019

| E. OISC (2019-2020) | 4th | 1st | 2nd | 3rd |
|---|---|---|---|---|
| E.1 Cases Referred from this quarter | 10 | 16 | 12 | 12 |
| E.2 Received by OISC Within 24 hours | 10 | 15 | 10 | 12 |
| E.3 Completed by OISC Within 30 workdays | 1 | 3 | 1 | 6 |
| E.4 Complete during the next quarter, but within 30 days | 2 | 3 | 12 | 0 |
| E.5 Cases Not Completed by OISC Within 30 days. | 9 | 10 | 11 | 1 |
| E.6 Percent of OISC cases completed within 30 days | 10% | 19% | 12% | 50% |
| E.7 Completed Cases Returned for Further investigation | 0 | 0 | 0 | 0 |
| E.8 Percent of cases returned for further investigation | 0% | 0% | 0% | 0% |
| E.9 Further Investigation Completed | 0 | 0 | 0 | 0 |

| | 4th | 1st | 2nd | 3rd |
|---|---|---|---|---|
| E.10 Cases this quarter incomplete, including further investigation | 9 | 6 | 5 | 5 |
| E.11 Percent of cases from this quarter not yet completed | 90% | 84% | 2% | 50% |

OISC staff made a concerted effort to address outstanding reports both from 2019 as well as the earlier part of 2020. While a significant percentage of the reports noted above were not timely, the backlog of investigations was significantly reduced this quarter as a result of pulling in other investigators to assist with completion, under supervision of those trained in handling juvenile investigations.

NIJ's quarterly statistical report indicate that for the third quarter in a row, a majority of investigations were not completed within the 30 day completion time. OISC staff were used to carry out investigations of candidates for the adult training academy during the last two quarters of 2019. In the first quarter of 2020, staff were hampered by damage to the Ponce offices, as well as stay at home orders during March from the COVID-19 pandemic, and with some restrictions in place during the second quarter. This quarter shows significant progress in making up the backlog. Of the

### Administrative Determinations
The following table summarizes the decisions and actions taken in cases that do not involve criminal charges.

| F. Administrative Determinations for 284 Cases (2019-2020) | 4th | 1st | 2nd | 3rd |
|---|---|---|---|---|
| F.1 Cases with youth discipline referrals | 16 | 25 | 23 | 32 |
| F.2 Cases with youth discipline actions | 10 | 22 | 11 | 15 |
| F.3 Cases with youth no discipline actions | 6 | 3 | 12* | 1 |
| F.4 Cases Staff/youth with determinations | 17 | 8** | 6 | 16 |
| F. 5 Cases recommending personnel actions | 9 | 6 | 2 | 8 |

*Of the youth who were not disciplined, 4 were as a result of USMIC recommendations, 1 was in COVID quarantine protocol, 5 were youth who escaped, and one youth was in hospitalization.

** Full information is not yet available for 12 employees from prior quarter.

A summary of actions taken by the legal department is provided at the end of the fiscal year as part of the annual report. It would be helpful to indicate whether such decisions were

overturned on appeal or through any other process.  The summary should also provide information on the nature and extent of disciplinary actions involving youth.

Prosecutorial Determinations for 284 Cases

| G. Prosecutorial Determinations for 284 Cases (2019-2020) | 4th | 1st | 2nd | 3rd |
|---|---|---|---|---|
| G.1 Cases received by PRDOJ | 0 | 0 | 1 | 0 |
| G.2 Cases with decision  not to prosecute | 0 | 0 | 0 | 0 |
| G.3 Cases with referral for prosecution | 0 | 0 | 1 | 0 |
| G.4 Cases pending determinations | 2 | 2 | 2 | 2 |

**Discussion Regarding UEMNI Reporting and Investigations**

Decision making as to whether a 284 referral is correctly classified as a Level I or Level II incident, and thus whether the investigation is done by UEMNI or by OISC, is the responsibility of UEMNI. NIJ uses the Cernimiento de Incidentes de Alegada Maltrato Institucional as a tool to determine which level of investigation should occur. That form is signed off on by UEMNI staff as well as the facility director.

Policy 13.2.1 requires that UEMNI be diligent about the appropriate classification of referrals of alleged abuse and reclassify within 48 hours as appropriate.  At times, Level I incidents have been reclassified as a Level II based incorrect or inaccurate completion of the Cernimiento form.  No incidents this quarter were reclassified.

**Discussion Regarding OISC Investigations**

Of the 8 OISC investigations received, only four were timely, and two were more than one month late in their completion.  In spite of that, OISC has made improvements in their completion of investigations, and the backlog which has existed for the last three quarters has largely been eliminated moving into the last quarter of the year.  On occasion, reports which require additional investigation are noted, and such extra time is warranted and reasonable.

Investigations overall follow the protocol for interviews of youth, staff or others, video reviews where available, review of relevant documents, and findings relevant to the allegations alleged in the referral.  In some cases, the findings are not clearly delineated and tied to specific policies for various staff involved in the case.

One section of the report format includes information about what preceded the incident. These sections should be stronger, as this is key to understanding why the incidents occurred, and more importantly, how such incidents can be prevented in the future.  This is particularly important given the high incidents of suicidal behaviors, and the conflicts present

<table>
<tr><td></td><td>among youth in some units. The culture within the units, and within the facilities in general, can be a contributing factor, including the "leadership" structure among youth, frustration and depression over lack of contract with family members, and the restrictions generally which are in place because of the coronavirus.

One particularly disturbing incident involved a youth at PUERTAS where OC spray, mechanical restraints, physical restraints, and the use of emergency psychotropic drugs were all used against a youth who was emotionally unstable and agitated.  The incident calls into question the policies regarding use of force on youth with serious mental illness, particularly the use of OC spray.

The Council of Juvenile Administrators (CJCA) reported in 2011 that many states and jurisdictions have moved away from allowing OC spray in juvenile facilities, and for those who have not, related policies and practices often show a more punitive and adult corrections approach to managing youth in facilities.[4] CJCA reports that in its collective experience, "overreliance upon restraints, whether they be chemical, physical, mechanical or other, compromises(s) relationships between staff and youth, one of the critical features of safe facilities."[5]  The Monitor acknowledges that the use of force in the instance involving this youth were viewed by OISC as being within policy.   The agency policy allowing youth with serious mental health issues should be re-examined as contrary to the type of therapeutic environment which should exist within PUERTAS, if not in the rest of the facility, and detrimental to the relationship building between youth and staff which should be at the forefront of the rehabilitative process.

Director Ojeda Richardson identified several process that she has put into place to increase safety, and to follow up on the information provided through OISC investigations. She indicated she was establishing monthly meetings for the discussion and evaluation of incidents with the participation of OISC, UEMNI, the Security Coordinator, Kelvin Merced and Aida Burgos to discuss findings and take corrective actions relative to training and implementation. She provided the example of addressing youth getting access to and taking psychotropic drugs as a need to re-evaluate the procedure and management of medicine to identify possible implementation deficiencies. She has identified, as has the OISC, a disconnect between the heads of the institutions and the security officers at these facilities. In response she has re-established a hierarchical system by giving institutional directors the authority to operate their institutions, and increasing communication between them and the Security Coordinator on a daily basis.

These are two positive changes which have been identified by OISC, and others.  This type of continued collaboration between OISC and NIJ management is encouraging and should continue.</td></tr>
<tr><td>What is needed for full compliance?</td><td>Paragraph 78 is a critical aspect of protecting youth from harm while incarcerated in NIJ facilities**.**   The process is designed to ensure that allegations of harm are immediately reported, investigated at both the facility level and through OISC, and that appropriate actions are taken for discipline against youth and/or employees involving such misconduct.</td></tr>
</table>

---

[4] Council of Juvenile Correctional Administrators, Issue Brief, Pepper Spray in Juvenile Facilities, May 2011.
[5] Id.

| | |
|---|---|
| What steps are required and/or recommended? | Of equal importance, however, is that the process should identify policies which may need to be changed, additional training which may need to occur, and/or other measures which should be taken in response to incidents which have been investigated.  In that sense, Policy 13.2.1 has as part of its purpose, "to prevent and minimize the occurrence of situations involving abuse or institutional neglect." |
| | NIJ must ensure compliance with Policy 9.10 regarding consistent reporting of incidents as noted on the Incident Report Cover Sheet. |
| | Compliance measures require: <br> 1) Timely reporting by NIJ of all incident reports (cover sheets) as detailed in other aspects of this report, to the Office of the Monitor. This ensures the Monitor that incidents are appropriately reported for investigation, or otherwise identified for review and possible 284 referrals. All incident reports are to be submitted weekly, but those of a more serious nature identified elsewhere must be submitted within 24 hours, or 48 hours, consistent with the Agreement between the Parties filed on August 26, 2019, and April 11, 2020. Consistency in reporting must be improved as required by the Court. The online system is required to be completed by November 15, with policies and training established so that it provides consistent, accurate and timely reporting of incidents. |
| | 2)  UEMNI must ensure that cernimiento forms and timely and complete, and properly identify incidents which are referred for investigation as a Level 1 or Level 2. |
| | 3) OISC investigations must comply with the 30 day time requirement for completion, and should be submitted to the Monitor on a timely basis once sent to the Secretary of DCR. |
| | 4)  OISC investigations should continue to evaluate compliance with procedural requirements regarding the handling of incidents, and equally important, contain sufficient detail with regard to violations of policy, credibility of facts and evidence supporting or disavowing allegations, and other relevant conclusions reached by the investigators.  Processes must be in place within facilities and NIJ leadership to then utilize these findings to make needed changes. Reports should be completed within 30 days of referral, unless there are exceptional circumstances which warrant a longer period of time due to the complexity of the case, or other extenuating circumstance.  OISC should continue to notify the Monitor when this occurs along with the reasons for the delay. |
| | 5)  Consistent with the purpose of Paragraph 78, and Policy 13.2.1, measures must be in place to prevent and minimize the occurrence of situations involving abuse or institutional neglect. At a minimum, reporting on this should include: <br>      a)  Quarterly statistical reports of incidents involving allegations of abuse or institutional neglect, with analysis of possible patterns, trends, and other observations which can help prevent further incidents; |
| |      b)  Evidence of meetings which document meetings with management and others to discuss cases of alleged abuse, status and outcomes of investigations, evaluation of patterns of recurrence, compliance with the terms, and discussions of alternatives for the prevention |

| | |
|---|---|
| | of incidents. Summaries of these meetings and decision regarding policies, training needs, and other appropriate action steps should be documented and submitted.<br><br>c) Evidence of training for staff trainers and other direct service staff on the reporting of incident, and handling of referrals of alleged abuse and institutional neglect in coordination with IDECARH.<br><br>d)  Maintenance of a log of actions taken against employees including the particulars of the actions by the employee, and actions taken against the employee, whether administrative or criminal.  Given that the purpose is to consider recidivism of actions constituting abuse or neglect, an analysis of such information should be done at least quarterly, or more often if warranted.  A copy of this log should be made available to the Monitor on a quarterly basis, along with any analysis done or actions taken as a result.<br><br>e)  In the case of sexual abuse investigations, UEMN must review incidents to "recommend changes in policy or practices to prevent and detect sexual assault" as required by Policy 13.2.  Such reviews should ensure that adequate PREA protocols are in place and being used. |
| Priority Next Steps Toward Compliance | Staff must have a clear understanding of what should be reported as an incident, who must report, and the process for determining whether incidents should be reported as a Level 1 or Level 2 284 report requiring investigation at the facility level, or by OISC.  This should be a priority for new cadets, as well as an ongoing training issue for officers and supervisors.<br><br>Incident cover sheets must be provided weekly, with those incidents of a serious nature provided to the Office of the Monitor within 24 hours.  The Office of the Monitor, through Bob Dugan, will continue to track these incidents relative to safety issues, and to determine appropriate referrals for investigations of Level 1 and Level 2 incidents.<br><br>Digitizing incident reports for efficiency, consistency and accountability purposes should be completed, in consultation with Bob Dugan, so that a systemized method of obtaining data regarding incidents, by facility, can be collected and analyzed.  This is a high priority and DCR has been ordered to complete this system by November 15.<br><br>Documentation of discussions held regarding the status and content of investigations, trends identified, and decisions made as a result should be submitted to the Monitor.<br><br>The Monitor should be provided with the last year years of data detailing employee conduct and actions taken by the agency, along with analysis of recidivism or other trends completed as required by policy.<br><br>Per policy, UEMNI must examine the sexual assault incidents which have been alleged, determine if PREA protections are in place, and if any changes in policy and practice should be made. Reference to prior correspondence from the Monitor as to forensic evaluations, training and other matters should be addressed.  UEMNI should provide information to the Monitor about the process and outcomes regarding PREA incidents over the last year. |

| | |
|---|---|
| | OISC must sustain timeliness with conducting investigations within the 30 day period, unless warranted by the scope or complexity of a specific incident. |
| Quality Assurance | The Monitor has not reviewed proposed QA measures in this area. |

## Protection from Harm – Isolation and Protective Custody (David Bogard)

| | |
|---|---|
| | **S.A. 79.** Juveniles shall be placed in isolation only when the juvenile poses a serious and immediate physical danger to himself or others and only after less restrictive methods of restraint have failed. Isolation cells shall be suicide resistant. Isolation may be imposed only with the approval of the facility director or acting facility director. Any juvenile placed in isolation shall be afforded living conditions approximating those available to the general juvenile population. Except as provided in ¶ 91 of this agreement, juveniles in isolation shall be visually checked by staff at least every fifteen (15) minutes and the exact time of the check must be recorded each time. Juveniles in isolation shall be seen by a masters' level social worker within three (3) hours of being placed in isolation. Juveniles in isolation shall be seen by a psychologist within eight (8) hours of being placed in isolation and every twenty-four (24) hours thereafter to assess the further need of isolation. Juveniles in isolation shall be seen by his/her case manager as soon as possible and at least once every twenty-four (24) hours thereafter. A log shall be kept which contains daily entries on each juvenile in isolation, including the date and time of placement in isolation, who authorized the isolation, the name of the person(s) visiting the juvenile, the frequency of the checks by all staff, the juvenile's behavior at the time of the check, the person authorizing the release from isolation, and the time and date of the release. Juveniles shall be released from isolation as soon as the juvenile no longer poses a serious and immediate danger to himself or others. |
| **Compliance Rating** | **Partial Compliance** |
| Description of Monitoring process during this period of time | Previous quarterly reports have addressed ¶79 and ¶80 jointly due to the fact that youth on protective custody and transitional measures statuses are, practically speaking, isolated in order to protect them or others.  USDOJ has, however, repeatedly requested that ¶79 and ¶80 be addressed as separate provisions because while isolation is almost always used as the primary measure to protect youth who are significantly vulnerable to attack by others, it is not and should not be the *exclusive* means available to protect youth on protective custody and transitional measures.  As such, to the degree that isolation continues to be employed to achieve the ¶80 youth safety objectives of protective custody, this discussion of ¶79 will continue to also address protective custody (PC) and transitional measures (TM) for which isolation is primarily employed as a safety measure.  At the same time, however ¶80 will also be discussed and rated as a separate provision.<br><br>During the second quarter, the parties reached agreement defining isolation, necessitating a new policy addressing isolation, and revisions to policies regarding Protective Custody, Transitional Measures, and Group Schedule Modification.  The requirement for these policies was reflected in the Court's April 13, 2020 Order to Address Continuing Facility Safety needs |

and which afforded DCR until June 12 to generate modifications to its policies necessary to conform them to the new definition of isolation. A subsequent deadline was given in an Order dated 8/18/20 and gave DCR until August 30, 2020 to modify the draft/modify the four sets of policies, with subsequent reviews and timeframes for an official translation to be done.  While DCR did meet that initial deadline, final versions have still not been completed at the end of the third quarter. The new/revised policies will require professional translation and will likely be implemented during the fourth quarter after DCR staff can be trained in the new policies.

As a result of the policy development process, significant attention was paid to the issue of Group Schedule Modification, including what it actually means in practice, why it has not consistently been reported to the Monitor, whether it is, in fact, a form of group isolation. Because of concerns regarding how it has been utilized, It has been perhaps the most challenging of the four policies to draft.

The number of youth in isolation due to TM or PC status remained extremely low throughout this quarter with only one transitional measures placement (Ponce: July 15-August 5) and one protective custody placement (Villalba: July 16-August 25).  Both were housed separately from other youths in general population and, as a result each of these cases is analyzed herein under ¶ 79. The two isolation events this quarter present a continuation of a trend going back to the first quarter of 2020 when the number of isolation placements began to drop precipitously: Q4-2019 (45); Q1-2020(5); and Q2-2020 (2).

An interview focusing on services and criteria within ¶79 was conducted by Dr. Martinez. Deputy Monitor Javier Burgos interviewed Villalba director Malave concerning the background of the Villalba protective custody placement, i.e., the leadership struggle resulting in a youth being attacked by nine youths in the module, necessitating medical care and 26 stitches.

A significant component of our monitoring this quarter is the independent review of DCR's internal quality assurance activities for ¶ 79 and ¶ 80.  Compliance staff and social workers are tasked with using the Checklists and weekly audits to evaluate ¶ 79 and ¶ 80 initial placements of youth in restricted rooms and also applying the criteria included on the Weekly Audits that measure compliance with key aspects of ¶79/¶80 on an ongoing, weekly basis after placement.

In the previous quarterly report we discussed concerns about the recent quality of checklists and audits of isolation incidents.  Although there have been very few isolation incidents this quarter, there have nevertheless been reoccurring problems with the thoroughness and accuracy of findings made by staff assigned to this important quality assurance activity. In most instances, staff completing the forms do not include comments to provide details or context for the ratings that simply state yes or no as to the criteria, although comments as to missed or shortened recreation or education periods are generally provided with explanations.

And no details or explanations were provided on the checklist where the audit shows compliance with important ¶79 criteria such as the requirement that the youth be seen by a psychologist within 8 hours; seen by a social worker within 3 hours; that less restrictive measures were considered; the youth was in danger or was considered a threat to others, etc.

|  | Perhaps the most critical aspect of protection from harm for youth in isolation is that juveniles in isolation be visually checked by staff at least every 15 minutes, and that the exact time of these checks be recorded.  Accurate documentation is absolutely necessary and an essential component of the weekly audits/checklists.  But despite the critical nature of this safety component, documentation is significantly lacking in multiple aspects.  For one, the majority of audits show that staff are not consistently meeting this requirement, with no details provided as to how or how often the requirement is or is not met.  Second, when the auditor reports that the rounds requirement *was* met, there also is no documentation of quantitative compliance.<br><br>With 32 rounds being required per shift (i.e., a minimum of four per hour and eight hours per shift) there is ample opportunity to use sampling or examples to show the number of compliant or non-compliant rounds as a percentage of the number required.  But in lieu of providing quantitative evidence of compliance, the audits most often report simply that the requirement was or, in most cases, was not met, with the comment being "Excess in irregular intervals every 15 minutes."[6]  On a positive note, audits regularly include brief descriptions of corrective actions taken by facility directors or high level supervisors in response to negative findings as to the conduct and documentation of rounds. For example, the Institutional Chief at Villalba noted recently that he would continue to orient officers on all three shifts regarding meeting the standard of irregular intervals at least every 15 minutes. |
|---|---|
| Findings and Analysis | |

| Facility | Q3 Events: Protective Custody | Q3 Events: Transitional Measures | Q2 Events: Protective Custody | Q2 Events: Transitional Measures |
|---|---|---|---|---|
| CTS Ponce | 0 | 1 | 1 | 1 |
| CTS Villalba | 1 | 0 | 0 | 0 |

The weekly Audit for each youth focuses on the five ¶79/80 post- placement criteria that are most critical and/or have proven most difficult for DCR to comply with, including: (1) the youth was seen by a psychologist every 24 hours after initial placement in the status, (2) the youth is seen by a case worker at least once every 24 hours, (3) if eligible, the youth receives 50 minutes of education class time per subject, five days a week, (4) the youth receives one hour of recreation daily and (5) youth are observed every 15 minutes when in their rooms.

An interview of one of two youths who was in isolation was conducted by Dr. Martinez and confirmed that: (1) youths in isolation are receiving education when school is in session and they are still academically eligible, (2) they routinely receive an hour a day of recreation inside or outside, (3) they see a nurse and psychologist every day, including on weekends, (4) see a social worker on each weekday and she calls them on weekends to check in.

---

[6] *See*, for example, Weekly Audit 8/23-29 for youth A.V.R.

| | |
|---|---|
| | The weekly audits by DCR staff reported full compliance with the ¶79 requirements, including seeing the psychologist every 24 hours, being seen by a social worker every 24 hours, termination of isolation as soon as the youth was no longer a danger to self or others, and sometimes visual monitoring every 15 minutes.  That said, additional documentation of such compliance would be helpful to explain or verify reported data relative to the ¶ 80 criteria for the two youths who were an isolation status at some point during the quarter. One youth interview was completed to supplement the weekly audits and checklists.<br><br>A persistent non-compliance area that continues to be identified on each Checklist is the retrofit of suicide resistant rooms for youth in isolation. Although youth rooms are already suicide resistant, it was decided that the level of resistance could be *enhanced* by: (1) cleaning and caulking vents in all rooms and (2) retrofitting the room doors to minimize access to the interior door hinges that could be used as a ligature, and (3) caulking around the sprinkler heads. As of the end of the second quarter the retrofitting of Ponce room door hinges with cover plates to prevent ligatures from being placed around the door hinges was completed in each of the 15 rooms in Ponce/PUERTAS along with three in each of the remaining modules; some of the doors still require painting. Four rooms were completed in three modules at Villalba, although completion of the safety caulking was delayed because youths clogged the vents with paper. Completion of the project at Villalba has been significantly delayed due to personnel becoming sick with COVID-19.  The essential next step is to address the use of these enhanced suicide resistant cells in isolation policy and/or mental health policy.<br><br>The parties have agreed, by an April 10, 2020 Joint Motion, that group schedule modification will *not* be deemed to fall within the requirements of ¶79 and the new isolation definition and policy if that status be defined as "a temporary status in response to a group event that is used to help deescalate a crisis." This status was originally conceived to address critical incidents such as group disturbances, mass searches, investigations, group violence, and/or escapes...<br><br>There were two Group Schedule Modification events this quarter—one from September 22-30 at Ponce Module 7 and a second one in Villalba B-1 from August 16-21.  The Ponce event was documented but only addresses the circumstances leading up to the GSM decision, and not the amount and parameters of time the youth were confined to their rooms.  We were provided the available documentation in response to our request.  In the case of the Villalba incident, we only became aware of the incident through an interview of a youth by Dr. Martinez.  We have requested an OISC investigation regarding this incident, which has not yet been completed. We have no reports or forms or any documentation to describe the incident and whether it was consistent with policy. |
| What is needed for full compliance? | While not each and every of the 20 criteria set forth in ¶79 as well as the eight criteria specifically required in ¶80 in the case of PC youth must necessarily be satisfied for substantial compliance to be rated, the majority must be rated positively consistently and with only occasional or minor deviations, which do "not significantly deviate from the components of the provision, provided that any deviation poses no significant risk to detainee health or safety," as noted in the substantial compliance definition.<br><br>Implementation of policies, practices and monitoring of the new isolation definition and associated policies must be achieved. |

| Priority Next Steps | 1- Determine a process for enhancing detail in weekly audits and checklists ;<br>2- Absent any quantitative assessment on DCR's part, the Monitor will propose an approach for DCR to use when auditing rounds;<br>3- Complete drafting and implementation of a new Isolation Policy;<br>4- Review and revise policies 17.19 (PC), 17.20 (TM) and 9.17 (Group Schedule Modification) as necessary to reflect and coincide with the new policy defining Isolation;<br>5- Train staff in changes to policies implementing the isolation and related policies;<br>6- Complete retrofits to door hinges and vents in each module to enhance suicide prevention  features in rooms used for isolation;<br>7- Create a policy or protocol defining how the enhanced suicide resistant rooms will be assigned;<br>8- Promptly document and report any Group Schedule Modification events to the Monitor |
|---|---|
| Sources of Information | Checklists upon placement and removal from TM and PC<br>Four Weekly audits of a youth in Transitional measures and five weekly audits of a youth on Protective Custody<br>Group Schedule Modification report for Ponce September 21-30<br>Interview with one youth on PC status |

**S.A. 80.** The terms of this agreement relating to safety, crowding, health, hygiene, food, education, recreation and access to courts shall not be revoked or limited for any juvenile in protective custody.

| Compliance  Rating | Partial Compliance |
|---|---|
| Description of Monitoring process during this period of time | USDOJ requested that compliance findings under ¶79 and ¶80 be addressed separately since all protective custody events do not necessarily invoke isolation requirements (although the vast majority do).  As such, we have addressed these two provisions separately.<br><br>The number of youth on PC status, once again, remained extremely low throughout this quarter with only one protective custody placement for a young man (AVR) who was seriously attacked by a group of nine other youths in a struggle over leadership.<br><br>One of the primary monitoring activities for this provision this quarter was an interview of the one youth on protective custody, which focused on the services the youth was receiving (which was conducted by Dr. Martinez).<br><br> A second interview of facility director Malave was conducted by deputy monitor Burgos and focused on the efforts being made to administratively and/or judicially have the youth removed from the facility and placed in the community. |

| | |
|---|---|
| | And the third major activity was the DCR's internal quality assurance review of the youth's activities in support of ¶ 80.  Compliance staff and social workers are tasked with using the Checklists and weekly audits to evaluate ¶ 80 initial placements of youth in restricted rooms and also applying the criteria included on the Weekly Audits that measure compliance with key aspects of ¶80 on an ongoing, weekly basis after placement. |
| Findings and Analysis | The young man was on protective custody as a result of a vicious attack by a group of nine other youths as a result of a "leadership dispute." He was interviewed by Dr. Martinez and expressed that he wished to remain on protective custody and in isolation to "avoid problems and keep out of trouble."  The interview revealed that the youth, consistent with the requirements of ¶80, generally received the same services as youths in general population, including safety, a non-crowded private room, healthcare, hygiene, food, access to courts and recreation for an hour a day.  Although school was on recess during the entire time this youth was on protective custody he reported that he was in 12th grade and received a workbook for assignments over the summer. Just as youth in general population, he routinely received an hour a day of recreation inside or outside (although due to Covid-19, there is no active recreation with other youths). As it relates to his access to the courts, the youth was represented by the public defender in the successful effort to allow him to complete his studies and to expedite his release to the community. He stated that he sees a nurse and psychologist every day, including on weekends, and a social worker on each weekday (who also calls him on weekends to check in). |
| | The weekly audits by DCR staff reported full compliance with the eight ¶80 requirements.  That said, additional documentation of such compliance would be helpful to validate the data relative to the ¶ 80 criteria for the one youth who was on protective custody status during the quarter. DCR staff did document a couple of instances in which storms caused recreation to be canceled and four others where recreation was abbreviated because the youth did not wish to remain in recreation for the full time period (the Supervisor IV documented that corrective action was taken for staff who failed to properly explain why the youth wished to terminate the recreation period early.) |
| | As a function of the limitations imposed to provide protection to the youth, he was isolated and reported that he was spending most daytime hours sleeping, eating, bathing and watching television. While time out of room is not necessarily a criterion of ¶80, it is nevertheless a factor that is not healthful for the youth on protective custody, and the hours confined do exceed those experienced by youth in general population. |

| What is needed for full compliance? What steps are required and/or recommended? | Full compliance will require documentation that academically eligible youths on protective custody receive the full complement of education services (50 minutes times 5 subjects times 5 days).<br><br>DCR needs to fully document the review and consideration of alternative approaches to youth who need protection but can safely be managed without isolation. |
|---|---|
| Quality Assurance Measures | The primary quality assurance measures, as reflected in the weekly audit checklists are whether youth on PC receive the same access to services as youth in general population. |
| Sources of Information upon which Consultant report and compliance ratings are based. | One PC youth interview<br>One interview of the facility director<br>Five weekly audits |

## MENTAL HEALTH – Dr. Miriam Martinez

| **S.A. 59.** Defendants, specifically the Department of Health (ASSMCA), shall provide an individualized treatment and rehabilitation plan, including services provided by AIJ psychiatrists, psychologists, and social workers, for each juvenile with a substance abuse problem. | |
|---|---|
| **Compliance  Rating** | **Non-Compliance** |
| Description of Monitoring process during this period of time | During the third quarter of 2020 the Mental Health Consultant performed remote chart reviews and remote video interviews via secure platform provided by DCR with 10 youth from Ponce in detention and 10 youth from Villalba in detention, for a total of 20 youth.  Of the 20 youth interviewed, one was in the status of protective custody. The Mental Health Consultant decided to focus on youth in detention for the interviews noticing an increase in mental health crisis events with youth in detention. The interviews were held privately with just the youth and the Mental Health Consultant present.<br><br>Chart reviews were for all youth who were reported to have suicidal ideation/gesture/intent and/or self-mutilated.  Multiple requests for clarification and responses to concerns following chart reviews were sent to PCPS and NIJ for attention and response.<br><br>In addition to the above, the Mental Health Consultant had multiple conversations with NIJ and PCPS leadership throughout the quarter and participated in the virtual interviews held in late September and early October of 2020.  These were coordinated by the Department of Justice, and were held with PCPS mental health and other NIJ staff. They covering a range of topics from Behavior Modification, Substance Abuse Treatment, Isolation, PUERTAS and mental health services. |

| | |
|---|---|
| | The Mental Health Consultant learned that the contract for mental health services for fiscal year 2020-20201 was awarded to another contractor. However, PCPS, who held the contract with the Department of Correction and Rehabilitation to provide mental health staff to provide psychiatric, psychological and substance use services to youth within NIJ has appealed this decision.  Currently, PCPS is on a month to month extension until a final decision is made. <br><br> The Mental Health Consultant requested and reviewed various documents related to the hours, contracts and credentials of mental health staff newly hired by PCPS. <br><br> The Mental Health Consultant requested and has yet to receive data for all positive toxicology reports (for illicit drugs) for this quarter. |
| Findings and Analysis | PCPS has experienced a resignation of all psychologists contracted to deliver direct care as well as the PCPS Mental Health Services Coordinator psychologist (as of September) and the psychiatrist who was providing 120 hours a month of service has also resigned (as of October).  For a period of about one month this quarter there was only one psychologist at 40 hours a month compared to previous services of 120 hours per month. Prior to September of 2020, at least four psychologists also left PCPS. **At the same time, there were 17 incidents of suicide attempts/gestures/ideation and at least 4 incidents of self-mutilation in September compared to 6 incidents of suicidal attempts/gestures/ideation (no self-mutilation) in August**. <br><br> Lack of mental health staffing and services, mental health staff that disappeared/left without proper clinically appropriate terminations with their patients undoubtedly contributed to, and likely exacerbated, the destabilization and decompensation of youth.  The rapid turnover of psychologists has been a consistent problem with PCPS, especially when the psychologists are less experienced.  One psychologist hired just received her license to practice a few weeks prior to PCPS hiring.  Another psychologist hired by PCPS was trained and then decided not to continue.  And yet a third, hired in October resigned (in October), reportedly after one day of work. <br><br> The Mental Health Consultant found no planned transitioning between providers of mental health care, an expected professional standard for continuity of care.  Instead, psychologists left without informing their patients and without the benefit of transitioning care to providers that would take their place.  Although requested, no transition plan was provided for (1) transitioning of the contract for mental health services to NIJ youth; (2) transitioning of psychologists; or (3) the lack of psychiatric coverage given the psychiatrist's resignation. |

The Mental Health Consultant found inconsistencies in reporting serious incidents of suicidal gestures/intents.  Last quarter there were 2 incidents that the Mental Health Consultant found during the normal course of chart reviews that were not reported to her.  This quarter, there were three incidents found by the Mental Health Consultant that were not included in the written report requested and submitted to her. The receipt of timely and accurate information from NIJ for monitoring purposes is crucial.

With respect to substance use treatment per this provision, the "treatment" has consisted of educational "talks" or didactics, and does not include therapy. The PCPS Coordinator, who has also resigned, agreed to work on the delivery of substance use therapy, with less of a focus on psychoeducation regarding the dangers or potential consequences of drug use.  She cited a "culture" of substance use care that would be difficult to change but that she was on board with what the Mental Health Consultant advised. The PCPS Director was present during these conversations.  The Mental Health Consultant saw no evidence of such changes while doing chart reviews, nor did information taken from the interviews with 20 youth suggest that this had occurred.  While most of the 20 youth found the time with the substance use counselor helpful, there continues to be a need for actual therapeutic intervention and not just psychoeducation.  In some cases when the Mental Health Consultant asked – "What did your time with the substance use counselor consist of?" the response was – "A urine test."

Charts reviewed remotely indicate that overall there are treatment plans in place for the youth, however, the treatment plans are not consistently completed in full, nor implemented.  They also are not individualized in that services are often written in vague, generic terms for each youth. For example: Of 10 charts reviewed specifically regarding the plan for substance use, 7 had the same generic intervention of "1X per month individual or group or more frequent as needed (one of these did not specify whether individual or group). One of the 10 charts had no intervention for substance use despite the initial evaluation indicating the youth had used THC since age 12, experimental use of benzodiazepines, use of marijuana and alcohol. One of the ten had an intervention of "educational talks or group didactics" 1 – 2x per month or more as necessary. One had the intervention of individual or group, weekly or more as necessary.

Family interventions with youth are part of standard psychiatric practice. Minors are typically returned to their parents or other family members once released into the community.  Many times, conflict with family physical abuse, abandonment combined with poor judgement and coping skills have led the youth to behaviors that find them within NIJ. Family therapy, including use of evidence-based practices that are successful with this population are highly recommended for juvenile offenders.  The plans of care tend to be left blank in

|  | this area "Aspecto Familiar."   The Mental Health Consultant has discussed this with NIJ and PCPS emphasizing the need for family work.  Of the 10 charts reviewed, 8 were blank in this area and of the two that had something in this area , one stated something about orientating the youth to making a phone call to the family once authorized, home visits and the other chart stated in this area a comment about implementing "monthly visits" with the family.  In other words, all 10 charts failed to have a family intervention goal.  While there may be community social workers responsible for connecting the family with the young person, it is also important for the treating team (psychologist and psychiatrist) to have regular contact (i.e. monthly) with the family to discuss symptoms, medications, progress, goals an plans for future. |
|---|---|
|  | Of note, the youth interviewed named stress over not seeing their family as a major reason for their depression and anxiety.  Some of the youth that had suicidal ideation or who had attempted suicide named "desperation" at not seeing family or worrying about family as a major stress. |
|  | Overall health and well-being is the goal of having a complete plan of care. Yet during interviews conducted in August with youth, four youth from Viilalba reported that they were locked down in their rooms over a period of about 5 days, permitted only to leave to use the bathroom or to bathe. Meals were provided in their room.  Leadership at Villalba confirmed this to the Mental Health Consultant.  This practice is isolation (whether it is called group modification or not) and can be seriously detrimental the mental health of a young person.  The Mental Health Consultant discussed this with NIJ leadership as recently as last year after a similar event, and has previously sent articles about the dangers and suicide risk involved in placing youth in isolation. |
|  | The Mental Health Consultant finds noncompliance with S.A. 59 due to: |
|  | (1) a severe shortage of mental health staff who clinically assess and administer direct therapeutic interventions, administer and interpret standardized assessment tool (MAYSI 2),manage mental health crisis, attend the DEC meetings, write/revise plans of care and provide psychiatric coverage; |
|  | (2) a lack of completed and individualized treatment plans; and |
|  | (3) a lack of consistent substance use therapy. |
| What is needed for full compliance?<br><br>What steps are required and/or recommended? | To achieve substantial compliance, NIJ must do the following:<br><br>1) Maintain a stable and consistent work force that delivers the full spectrum of mental health services. This includes having psychiatrists that share 1.5 FTE for the NIJ population.  This level of coverage of psychiatric time allows for the full spectrum of psychiatric services needed including assessment, |

| | |
|---|---|
| | observation, treatment, ordering of labs, interpretation of labs, review of medical records, coordination with outside providers, time to speak with parents/family members, attendance at DEC or other important multidisciplinary team meetings, consultation and crisis work.  Of note, the mental health staff hired by PCPS do not have health benefits, sick or vacation time.  Some reported working for over a year, 24/7 without a day off reporting working hours on some days from 7 a.m. to 9 p.m.  A term of at least 1.5 years of a stable work force was given by the Mental Health Consultant in prior reports. |
| | 2) Ensure that youth treatment plans reflect the individual needs of each youth.  Even when youth are deemed "stable" by the mental health staff, these youth require on-going mental health services to address underlying issues that lead to conduct disorder and anger management problems, substance use and work that can help build positive social skills and development of empathy.  These issues should be addressed in twice monthly individual sessions in addition to monthly or twice monthly group work. Coordination with the Behavior Modification team is necessary to fully address the mental health and behavioral needs of the youth.  The youth's plans should be completed fully developed and implemented. |
| | Medical orders placed by psychiatric and medical staff should be executed as quickly as possible – especially for the high-risk youth and when these orders are needed to clarify diagnosis and treatment plan. |
| | 3) Provide individual substance use treatment and rely less on group didactics. |
| Priority Next Steps | A decision should be made as soon as possible regarding the contract for mental health services. |
| | Provisions within the mental health contract which include a "non-complete" clause should be eliminated to the extent they conflict with C.O. 36 and frustrate the need for continuous psychiatric and psychological services. |
| | Should the contract change, a smooth transition of the providers of care can be made to the new contractor.  The Mental Health contract should make clear the contractor's obligation to cooperate with the Office of the Monitor, including all provisions in the Court's Order of 1/27/2020 (ECF Doc. 1451) relative to communication and provision of documentation, and the consequences of failing to do so. |
| | Hire psychiatrists to fill hours needed given the resignation of Dr. Soto-Raices. |
| | Continue to hire psychologists to fill hours needed given the resignation of all other psychologists. These psychologists should ideally be experienced in working with this population and/or at minimum one-year post licensure experienced working with adolescents who have experienced abuse, trauma, |

| | severe psychiatric conditions, and substance use.  PCPS recently hired a psychologist with less than a few weeks of obtaining her license to practice. In the past, inexperienced clinicians have not lasted at NIJ and have left or may have been asked to leave; as such, it is critical that those with limited experience receive intensive supervision and oversight. It is questionable as to whether this currently exists. |
| | As the pandemic continues, youth in detention especially are at continued risk of decompensation.  Mental health staff must be proactive instead of reactive in providing mental health services. |
| | A full implementation of a plan of care includes programing during non-school hours.  Examples of what could be provided were given last quarter.  Tablets acquired by the school can be used for reading, educational or fun games and safe and appropriate movies.  A priority should be to get the tablets up and running as soon as possible. |
| | Use of materials for expression through art can help alleviate stress for youth, can be therapeutic for depressed, withdrawn and anxious youth. |
| | Increase physical activity which has also been proven to help with depression. |
| Quality Assurance Measures | Given disruption in mental health services, including the coordination, it is unclear whether any quality assurance activities are being implemented. |
| Sources of Information upon which Consultant report and compliance ratings are based. | Sources of information that the Mental Health Consultant relied on were remote video interviews with youth in Ponce & Villalba, data/report reviews, remote chart reviews, as well as mental health staffing reports submitted by NIJ and PCPS, staff video interviews and phone calls. |

**C.O. 29:** Defendants shall establish an adequate residential mental health treatment program which provides services in accordance with accepted professional standards for juveniles confined in the facilities in this case who are attempting to commit suicide and/or who are inflicting harm upon themselves and/or any other juvenile in need of such services as determined by the juvenile's interdisciplinary mental health team, which includes a qualified psychiatrist. This residential treatment program will house up to forty-eight (48) juveniles from Commonwealth facilities. The residential treatment program will be established in an area that meets professional standards regarding safe physical areas for suicidal and/or self-mutilating juveniles.

| Compliance  Rating | Non-Compliance |
| --- | --- |
| Description of Monitoring process during this period of time | This quarter the Mental Health Consultant reviewed programming for PUERTAS that was submitted. |
| | Chart reviews of youth in PUERTAS were also conducted, and questions and concerns were sent to NIJ and PCPS leadership to be addressed. |

| | |
|---|---|
| Findings and Analysis | For the last several months there has only been one youth in the PUERTAS program. Two youth were released to the community on 7/21/20.  One youth was transferred to another unit in Ponce on 8/27/20 despite having had a self-mutilation incident on 7/25/20, a serious suicide attempt (by attempted hanging) on 7/31/20, and being on constant watch for suicide (in a paper gown) on 8/2/20.

The one youth remaining in PUERTAS entered the program on 6/17/20.  In that time he experienced a change in psychologists three times, each of whom has left, and is now being treated by a fourth psychologist who was just hired.   In addition, he is now losing his psychiatrist.

For all of 2020, there has only been one referral to PUERTAS, that being the youth currently in PUERTAS.   In 2019 there were six referrals to PUERTAS.

This quarter, the Mental Health Consultant received a program description for PUERTAS from PCPS, however, the program included groups which cannot be held with just one person in PUERTAS.  The Mental Health Consultant provided feedback with no response from the Director of PUERTAS.  While PCPS is the contractor providing the Mental Health Services, the responsibility for having a viable and vibrant program rests with NIJ and the Director of PUERTAS.  Providing an individual plan for one youth is not in line with compliance for this provision.

All staff assigned to work in PUERTAS, including security staff should be specially trained in de-escalation techniques in addition to suicide prevention.  Warm handoffs (i.e. brief meetings regarding clinical concerns during shift changes) that include security, nursing and mental health staff could avoid crisis leading to the use of force techniques such as pepper spray and emergency use of medication. Understanding, preparation, articulation of a plan in case things escalate help a team feel in control, safe and armed with the information necessary to safely care for the youth.  Use of force can be particularly disorienting and emotionally traumatizing to an already psychotic person and should only be used in a very extreme situation after exhaustion of all other methods to de-escalate.  In addition, it is recommended that the staff involved in the use of force debrief, not only with the clinical staff to see what could have avoided this use of force, but also with the youth involved.  Debriefing with the youth can help the youth to understand the steps taken to de-escalate, it can help the security staff articulate what exactly was done and it can give the opportunity for the youth to state what it felt like for him and what could have been done differently.  This can help build trust and relationship among the youth and team that is charged to care for them.  DCR would benefit from looking at other mental health programs which do not resort to use of OC spray, and further examine their policies in this regard. |

| | |
|---|---|
| | The Mental Health Consultant finds a need for youth, including those in detention, to have intensive mental health and other services. While PCPS mental health has been reactive and providing mental health services to youth in mental health crisis, more needs to be done to address the need of youth in crisis, suicidal, psychotic and self-mutilating.<br><br>There is a lack of leadership for a residential mental health treatment program as exemplified by the lack of referrals in 2020.  In 2020 there were more than 10 incidents of suicidal ideation/gesture/intent of youth that were not in detention and not in PUERTAS (detention status is an exclusionary criteria for PUERTAS). These youth could have been served with intensive mental health services. |
| What is needed for full compliance?<br><br>What steps are required and/or recommended? | The priority is to provide a safe, distinct and consistent residential mental health program with strong leadership for those youth most at psychiatric risk.<br><br>Youth who meet the criteria for PUERTAS should be referred and considered for the program on a consistent basis.<br><br>Consistent, experienced mental health staff are needed for the program as detailed above. |
| Priority Next Steps | Ensure the provision of a stable, experienced, consistent mental health work force.<br><br>Consider developing an intensive mental health program for youth in detention as has been suggested by the Mental Health Consultant in the past. This would require a physical location with suicide resistant rooms and a full complement of programing – detailed ideas for which have also been provided by the Mental Health Consultant.<br><br>Examine concerns regarding use of force with OC spray and consider changing the policies to prohibit this in lieu of more therapeutic interventions. |
| Quality Assurance Measures | There has not been advancement in quality assurance measures. |

**C.O. 36.** Within 120 days of the filing of this Consent Order, Defendant Juvenile Institutions Administration shall provide continuous psychiatric and psychology service to juveniles in need of such services in the facilities in this case either by employing or contracting with sufficient numbers of adequately trained psychologists or psychiatrists, or by contracting with private entities for provision of such services. The continuous psychiatric and psychological services to juveniles in need of such services shall include at a minimum, a thorough psychiatric evaluation, necessary diagnostic tests before the prescription of behavior-modifying medications, blood-level monitoring if behavior-modifying medications are prescribed, therapy, counselling, treatments plans and necessary follow-up care.

| Compliance  Rating | Partial Compliance |
|---|---|
| Description of Monitoring process during this period of time | During this quarter the Mental Health Consultant performed remote chart reviews and completed video interviews as described above.<br><br>The Mental Health Consultant also completed an analysis of mental health staff hours contracted vs. mental health hours worked. |
| Findings and Analysis | An analysis of the PCPS hours contracted for mental health vs. the hours delivered indicates that for the third quarter mental health staff (which includes the psychologists, psychiatrist, substance abuse counselors and the occupational therapist) were contracted for 2952 hours. These providers reportedly delivered 2567 hours of service; 385 less than contracted for.<br><br>As mentioned above, all of the psychologists resigned as of September (one new was added in September).  The PCPS Psychologist Coordinator who worked closely with the Mental Health Consultant also resigned. (At the time of writing for this report at the end of October, the psychiatrist who provided 120 hours a month has also resigned.) PCPS has added a psychiatrist for 8 – 20 hours a week, however, this does not come close to filling the need at NIJ. If anything the Mental Health Consultant has consistently advocated for supporting the lone psychiatrist by adding additional hours and warned of burn out or the loss of this psychiatrist which has now occurred. The psychiatrist delivered 35.5 more hours than he was contracted for undoubtedly covering for the lack of psychologists and due to the high acuity of cases. He was contracted for 360 hours for the third quarter and delivered 395.50 hours of service.<br><br>A total of 32 incidents of suicidal ideation/gestures/intent (SI) and self-mutilation (SM) occurred this quarter.  Of the 32 incidents, 29 were suicide attempts with 13 serious attempts by hanging by tying a sheets, a sweater or other item around the neck. In other incident, the young man tied something around his neck, but then called out to a security officer for help.  Of the 29 incidents of suicide attempts, 4 of those youth also self-mutilated.  Of the 29 youth who were suicidal, 23 were hospitalized and 22 were seen immediately upon return.<br><br>Of the 32 incidents, 17 were from detention in either Ponce or Villalba and 29 were seen by a medical provider who administered a suicide assessment screen. Of the 32 incidents, 31 were seen by a psychiatrist within a 24-hour period – although this was mainly through psychiatric hospitalization.<br><br>It is noteworthy that of the 32 incidents of SI/SM, 26 were from Ponce (only 2 of these 26 were PUERTAS youth).  In addition, the number of SI youth this quarter more than doubled from last quarter, from a reported 12  SI youth compared to |

| | |
|---|---|
| | this quarter's 29. There was a significant increase (more than doubling) of SI/SM incidents from August to September, again as a likely result of the mental health staff leaving abruptly, without clinically appropriate terminations with youth – many of whom have abandonment issues and histories of trauma.  An example is one youth from CTS Ponce, who was treated by psychologist Dr. S, then after she left by Dr. L, then when she left by Dr. M who last saw him on 8/5 before leaving and the new psychologist saw him next on 9/15 (over a month between psychologist appointments) in crisis and he was psychiatrically hospitalized.<br><br>The mental health team continues to have video conference capability as well as the ability to go on site to deliver mental health services. |
| What is needed for full compliance?<br><br>What steps are required and/or recommended? | A stable mental health work force is needed to address the needs of this vulnerable population.  Building trust with a mental health provider takes time.  If youth feel that staff could abandon them at any time, this impedes the therapeutic process.<br><br>An analysis by NIJ leadership is needed to understand the vast differences in the numbers presented above between Ponce and Villalba.  There appears to be more cooperation with and from the non-mental health staff at Villalba to facilitate youth being seen.  There appears to be more activities provided and one to one engagement from the administrative leadership at Villalba.  Youth at Villalba mention the leadership at Villalba, namely Mr. Malave, as being firm, but fair and caring. The staff at Villalba, unsolicited also speak of Mr. Malave's leadership with fondness and respect. |
| Priority Next Steps | Recruit and retain mental health staff – psychologists and psychiatrists to fully meet the needs of youth.<br><br>Analyze what is driving the differences between Ponce and Villalba. |
| Quality Assurance Measures | Quality Assurance measures have not been advanced by NIJ or PCPS. |

**S.A. 63.** For each juvenile who expresses suicidal or self- mutilating ideation or intent while incarcerated, staff shall immediately inform a member of the health care staff. Health care staff shall immediately complete a mental health screening to include suicide or self-mutilation ideation for the juvenile. For each juvenile for whom the screening indicates active suicidal or self-mutilating intent, a psychiatrist shall immediately examine the juvenile. The juvenile, if ever isolated, shall be under constant watch. Defendants shall develop written policies and procedures to reduce the risk of suicidal behavior by providing screening for all juveniles at all points of entry or re-entry to AIJ's facilities and/or programs and by providing mechanisms for the assessment, monitoring, intervention and referral of juveniles who have been identified as representing a potential risk of severe harm to themselves. Treatment will be provided consistent with accepted professional standards.

| Compliance Rating | Partial Compliance |
|---|---|
| Description of Monitoring process during this period of time | The Mental Health Consultant reviewed reports that were submitted by DCR of youth that were reported to have suicidal ideation, suicidal intent and/or self-mutilation for the entire quarter.  The Mental Health Consultant also reviewed the electronic medical records to find evidence of compliance with S.A. 63, including providing treatment consistent with professional standards.  Upon reviewing these reports and completing chart reviews, 3 additional cases of suicidal ideation or intent were found which were not reported.<br><br>The Mental Health Consultant also interviewed 20 youth via a secure electronic video platform provided by DCR.<br><br>The Mental Health Consultant communicated via telephone, video conference, and emails regarding her concerns, requests for more information, clarification, and to advocate for youth.  Both the psychiatrist and the PCPS Psychologist Coordinator who has now resigned were responsive and able to provide information about youth. |
| Findings and Analysis | As mentioned above, this third quarter there were a total of 32 incidents of suicidal ideation/intent/gestures (SI) and self-mutilation (SM).  Of the 32 incidents, 29 were suicide attempts with 13 serious attempts by hanging by tying a sheets, a sweater or other item around neck. In other incident, a young man tied something around his neck, but then called out to a security officer for help.  Of the 29 incidents of suicide attempts, 4 of those youth also self-mutilated.  Of the 29 youth who were suicidal, 23 were psychiatrically hospitalized and 22 were seen immediately upon return.  The number of psychiatric hospitalizations more than doubled from last quarter, where there were 11 psychiatric hospitalizations.<br><br>Of the 32 incidents, 17 were from detention in either Ponce or Villalba and 29 were seen by a medical provider who administered a suicide assessment screen.  Three of the youth were not administered a suicide screen.   Of the 32 incidents, 31 were seen by a psychiatrist within a 24-hour period – this was mainly through psychiatric hospitalization.  The majority of the incidents, the psychologist would call the psychiatrist who would advise on psychiatric hospitalization.<br><br>In total this quarter there were 22 unique youth reported to have 32 incidents as compared to 6 unique youth reported to have 21 incidents last quarter.  This represents a three-fold increase in the number of youth with suicidal ideation, intent, gestures and self-mutilation. |

| | |
|---|---|
| | In several of the suicide attempts, it was the security officer who found the youth and called for help. |
| | Findings indicate that there is a failure to provide treatment according to accepted professional standards with adequate staffing to provide needed mental health services in order to stabilize youth who have been exhibiting increasing anxiety and depression due to (1) the pandemic; (2) being placed in quarantine; and (3) not seeing family members, and/or (4) anxiety of their court cases. |
| | With strong communication with all on the team, mental health staff can work together with security and other administrative staff to know where their services are needed to avert a crisis vs. responding to one. |
| | The mental health team did manage youth into psychiatric hospitalization when needed and did consistently evaluate the youth except on one occasion upon return from the hospital. |
| What is needed for full compliance?<br><br>What steps are required and/or recommended? | Medical staff need to consistently complete the suicide assessments in all instances of self-mutilation or suicidal ideation/intent/gesture. |
| | As above, a stable mental health work force is needed to provide consistency in treatment. |
| | Proactive intervention with the youth in detention with a focus on their psychiatric history and risk. |
| | More team work and communication to understand which youth are having a particularly difficult time due to staff turnover, lack of family contact, the pandemic, and/or anxiety about their court case (youth in detention). |
| | Family therapy and family communication for the youth is needed as they have not been able to have visits since the pandemic began, now going on about 7 months.  DCR is encouraged to use video conferencing with families and, when safe to do so, safe distancing visits with family. |
| Priority Next Steps | Ensuring a full and stable mental health work force should be the first priority. Overall staffing shortages can impact the ability of the mental health staff to see youth consistently.  Addressing these staffing shortages as is reported elsewhere in this Monitor's report will assist the mental health staff (once on-boarded) to meet the mental health needs of youth. |
| Quality Assurance Measures | It is highly recommended that DCR have PCPS, or other provider if chosen to perform quality assurance measures to ensure compliance with S.A. 63. |

**S.A. 72**. All juveniles receiving emergency psychotropic medication shall be seen at least once during each of the next three shifts by a nurse and within twenty-four (24) hours by a physician to reassess their mental status and medication side effects. Nurses and doctors shall document their findings regarding adverse side effects in the juvenile's medical record. If the juvenile's condition is deteriorating, a psychiatrist shall be immediately notified.

| Compliance Rating | Partial Compliance |
|---|---|
| Description of Monitoring process during this period of time | The Mental Health Consultant received and reviewed data on emergency use of psychotropic medication for Ponce and Villalba. |
| Findings and Analysis | There were no uses of intramuscular (IM) use of psychotropic medication this quarter. |
| What is needed for full compliance?<br><br>What steps are required and/or recommended? | There are policies and procedures in place for the use of psychotropic medications which have been reviewed and approved by the Mental Health Consultant. These need to be consistently adhered to.<br><br>Orientation and training should be provided immediately for the new psychiatrist(s) coming on board so they are familiar with policies, procedures, de-escalation techniques within NIJ, when use of force is utilized, how to work closely with the psychologists, social workers, nursing and security staff. |
| Priority Next Steps | The Mental Health Consultant will continue to monitor closely working with the NIJ Health Coordinator. |
| Quality Assurance Measures | See above. |

**S.A. 73.** Defendants, specifically AIJ, shall design a program that promotes behavior modification by emphasizing positive reinforcement techniques. Defendants, specifically AIJ, shall provide all juveniles with an individualized treatment plan identifying each juvenile's problems, including medical needs, and establishing individual therapeutic goals for the juvenile and providing for group and/or individual counseling addressing the problems identified. Defendants, specifically AIJ, shall implement all individualized treatment plans.

| Compliance Rating | Partial Compliance |
|---|---|
| Description of Monitoring process during this period of time | The Mental Health Consultant interviewed 20 youth via secure video platform. She used a 32-item questionnaire she developed to assess overall well-being and compliance with provisions of this case. The interviews were open ended and youth were encouraged to also share |

| | |
|---|---|
| | any other things they wished to discuss. The questionnaire included items related to Behavioral Modification. |
| | The Mental Health Consultant reviewed medical records for compliance with S.A. 73. Please also reference above for reference to plans of care that were not completed. |
| | The Mental Health Consultant reviewed NIJ Policies and Procedures relevant to Behavior Modification: 15.2, 15.3 and 15.4. |
| | The Mental Health Consultant also sat in on interviews the representatives from the Department of Justice held in late September with PCPS and NIJ staff. During some of these interviews, questions related to Behavior Modification were asked. |
| Findings and Analysis | Behavior Modification Policy and Procedure 15.2 is a general policy with respect to the implementation of a behavior modification program. This 15.2 states youth in detention are excluded (i.e. do not get a behavior modification plan). It describes a system based on Level of security (1-5), Four stages (Orientation, Adjustment, Transition and Honor) and level of progress (1 – 17). The Behavior Modification Policy and Procedure 15.3 for Group Incentives refers to points a unit/module of youth can earn and trade in for rewards for their behavior. This policy/procedure describes consequences (i.e. loss of points) due to the group not following rules. It also describes the incentives that could be possible to be traded in for (movie = 100 points, materials for cards = 250 points and BBQ = 350 points). Lastly the Behavior Modification Policy and Procedure 15.4 for Individual Incentives refers to levels and individualized incentives for advancement in levels. It refers to use of social reinforcements as tools for behavior modification, such as compliments, certificates, recognition and psychoeducational talks. |
| | Youth interviewed could not name a system whereby they could move up levels and gain more rewards if they achieved certain goals. |
| | Overwhelmingly, they reported getting candy, normally on Fridays, if they "behave good" and do not get a "charge." Some youth recognized that if the module "behaved" or "didn't get into problems" then maybe they would have access to a play station or a movie, however, this was not described as tied to a point or level system. |
| | Staff interviewed could not name a system whereby the youth could move up levels if they met their goals. |
| | General chart reviews indicate a lack of completed individualized treatment plans. Interventions are often stated in vague terms such as |

| | |
|---|---|
| | "once a month or more as needed." See also comments above regarding the need for completion of individualized plans of care. |
| | In addition to the charts reviewed and mentioned above, the Mental Health Consultant also reviewed behavior modification in the plans of care for the youth in NIJ that have federal charges. These are arguably the most youth with the most serious and egregious of offenses that are waiting to go before the court. There are 7 youth in this status. Of those, 3 have been detained almost 3 years and the others between 9 months and 1 year and 6 months. Of the 7 youth, 5 did not have behavior modification plans filled out. Of the two that did, one had "Respect for authority." |
| | Recognize consequences for "not challenging authority" as goals but no indication as to how (just two times a week was listed as for modality and intervention). The other youth had Decision Making as a goal, and as for modality and frequency "none." Presumably he had met these goals, but it is unclear. When the Mental Health Consultant has inquired about the lack of behavior modification goals for youth in detention, she has been informed that the policies and procedures preclude NIJ from having these goals for youth in detention. |
| | A loss of mental health staff means re-orientation and training but moreover and more importantly, a behavior modification program has to be clearly defined and implemented. |
| | In the past, the Mental Health Consultant recognized efforts by staff to follow policies and procedures established, evidence of individual incentives were provided, staff training on behavior modification policies and procedures were provided and chart reviews indicated that for the most part, interventions were being implemented. It is entirely possible for NIJ to move into a level of compliance or near compliance if efforts by leadership are consistently applied and the policies and procedures are clear to youth and staff and are adhered to. |
| What is needed for full compliance? What steps are required and/or recommended? | Ensure that youth treatment plans reflect the individual needs of each youth. The youth's plans should be completed fully and implemented. |
| | Given the length of time youth are actually spending in detention, the Mental Health Consultant recommends a review and revision of NIJ Policies and Procedures 15.2, 15.3 and 15.4 so that youth in detention, can also participate in a full rehabilitation plan. |
| | NIJ leadership should develop and consistently apply a behavior modification program that is clear for the youth and staff to understand |

| | |
|---|---|
| | and follow - with on-going self-monitoring to meet the needs of each youth. |
| Priority Next Steps | Review of Policies and Procedures relevant to Behavior Modification. |
| Quality Assurance Measures | Have not been developed. |
| Sources of Information upon which Consultant report and compliance ratings are based | Interviews with youth and staff. Review of Behavior Modification Policies and Procedures.  Chart reviews. Data analysis. |

## SPECIAL EDUCATION AND VOCATIONAL TRAINING –Kim Tandy

| S.A. 81 Educational and Vocational Services – General Population Defendants, specifically the Department of Education, shall provide academic and/or vocational education services to all juveniles confined in any facility for two weeks or more, equivalent to the number of hours the juvenile would have received within the public education system.  Specifically, this education shall be provided 5 (five) days per week, 6 (six) hours per day, 10 (ten) months per year.  AIJ shall provide adequate instructional materials and space for educational services.  Defendants shall employ an adequate number of qualified and experienced teachers to provide these services. | |
|---|---|
| **Compliance  Rating** | **Partial Compliance significantly hampered by coronavirus** |
| Methodology for Monitoring this Quarter | The Monitor was unable to meet in person with educational personnel, or to tour the facilities, but conducted several video conferences during the quarter, as well as various email exchanges. On 8/10/2020, a videoconference was held with Kelvin Merced, Guillermo Somoza and Carlos Delgado to review second quarter non-compliance ratings, and to discuss preparation for the upcoming school year. A subsequent videoconference was held 8/11/2020 with Daiber Carrion from the Department of Education to review the challenges to meeting the requirements for special education students in light of covid-19, and how services would be structured for the coming year. School began on August 24th, and a site visit in person was conducted September 3 at Villalba, and August 28th at Ponce by Deputy Monitor Javier Burgos. On September 18th, another videoconference was held to determine whether all education had been hired, and to see how the modified school program was working. |

| | |
|---|---|
| | Finally, on September 30 and October 1, DOJ conducted a "virtual tour" with interviews of teachers and others, including its expert Kelly Dedel. The Monitor took part in several of those interviews.<br><br>Information received and reviewed this includes:<br><br>1)  A list of all education personnel for Ponce and Villalba, including any vacancies<br>2) A list of students who graduated from the 6th, 8th and 12th grades for the 2019-2020 school year.<br>3) A list of eligible students for extended school year services (ESS) for 2019-2020 to be made up during the 2020-2021 school year<br>4) A list of all students participating in educational services, by grade, gender, classification, special education status, and type of vocational services being provided for the months of August and September<br>5)  A list of students who have been evaluated upon intake within a five day period to determine educational status for the months of August and September<br>6)  Tracking form for students receiving special education regarding initial and re-evaluations processes, and IEP dates<br>7) Monthly personnel attendance by support staff, teachers, and special education teachers, with documentation of teacher absences and "security situations" which disrupt school services for monitoring period for August and September<br>8)  A copy of the school calendar for 2020-2021<br>9)  Class schedules for all populations eligible to receive school services (those who have not yet graduated) |
| Findings and Analysis | A Collaborative Agreement was signed in December of 2019 between the Department of Corrections and Rehabilitation and the Puerto Rico Department of Education regarding the operation of the school program for NIJ facilities.  This Agreement places the regular education programming under the jurisdiction of the Adult Program of the Department of Education, led by the Auxiliary Secretariat of Alternative Education. The agreement stipulates that matters related to educational aspects of institutions and correctional facilities go directly to the Department of Education, and that DCR will have "no inherent participation, or decision making power in the educational aspects of the Correctional Schools Program." Teaching staff will be Department of Education employees and have the same benefits as other teachers in the community. The Agreement also specifies that DCR shall coordinate with the Department of Education regarding security issues.  The prior Memorandum of Agreement between the two agencies must be revised to further to reflect this agreement in greater detail. DCR and PRDE have indicated to the Monitor that this is being worked on.<br><br>Puerto Rico sought, and received, a waiver from the United States Department of Education regarding statewide assessments, accounting, and reporting requirements (report cards) based on the data from 2019-2020 due to the widespread school closures related to the Coronavirus.  According to information received by DCR, after assessments done in August and September of this new school, 1 youth was able to graduate from the 6th grade, 7 youth graduated from the 8th grade, and 8 youth |

graduated from the 12th grade.  It is a good sign that these youth are still able to meet the requirements for graduation even during the pandemic.

School began on August 24th with a plan to provide virtual learning. In order to maintain social distancing and other covid-19 protocols in the facility, NIJ brought teachers back in to the facility but not in the classrooms.  Classes were offered virtually with students located in selected classrooms and teachers in other classrooms connected by the Microsoft Teams platform.  The youth in the classroom can see the teacher on an electric white board, while the teacher can view the classroom through the computer's camera eye.  Academic courses were scheduled in the morning from 7:30 – 12:00 for regular classes, and 1:00 up to 3:00 for vocational, Title I and Special Education services.

At least sixty (60) new computers/laptops were received to assist students both with educational work, and also to provide another outlet for activity on the modules for those youth who are not in school.  By the end of this quarter, these had not been set up yet with the necessary security codes, software and antivirus software, although they were received in August.  It is expected that at Ponce the internet (broad band) is not sufficient to cover the needs of the facility in using these computers for internet purposes given the demand for internet by social workers and others for court hearings. The internet is better at Villalba since improvements were made as a result of the video camera installation.

While the school schedule began on time, it was necessary to use the first week to conduct evaluation and diagnostic tests on youth to see whether they could be successfully passed on to the next grade per requirements of the Department of Education.

**Monitored Provisions:**
**1)  Provision of academic and/or vocational education for youth confined 2 weeks or more 5 days per week, 6 hours per day, 10 months per year.**

This provision ensures that all youth who are eligible for educational services receive such services within a two week period, and that full school days are provided over the 10 month school calendar.

Verification was made that all youth were scheduled full school day services, and all youth were assigned to vocational services.

The attendance rates for September as reported, the first full month, showed high attendance rates among teachers, ranging from 88 – 100% at Villalba, and 88 – 100% at Ponce.  It is not clear whether youth were attending all day during this quarter, as there were numerous youth in quarantine, teachers in quarantine, and staffing challenges because of quarantines and other shortages.

It is unclear as to whether the schedule provided was adhered to as noted, especially for youth in detention, where accompanying staff has been an ongoing challenge, especially at Villalba. Youth interviews this quarter were not focused solely on education, but do

| | |
|---|---|
| | indicate some inconsistencies with daily full-school days.  Nonetheless, this is still an improvement over the last quarter.<br><br>**2)  AIJ shall provide adequate instructional materials and space for educational services**<br>Classrooms were used this quarter, with remote access into the classroom by the teachers, who were in another area.  The first week was designed to test youth on the prior year's work to ensure they advanced properly for promotion, as required by the Department of Education.<br><br>Forty-three computers and tablets were brought in for Villalba and at least 30 for Ponce for use by students in the classrooms and back on the module. There have been several delays in getting these into operation.  DCR must develop a protocol for their use, and ensure they are password protected and other do not allow youth to freely use the internet or other programs which are not permitted.  At the end of the quarter these have not yet been able to be used.<br><br>According to the site visit by Javier Burgos, there are whiteboards in the classroom which connect with the teachers.  They are working remotely from elsewhere in the facility.  This minimizes contact between teachers and youth, but allows for access to the teachers for instruction, questions, and discussion.   Youth were socially distanced in the classroom.<br><br>**3)   Defendants shall employ an adequate number of qualified and experienced teachers to provide these services.**<br><br>During the visit to Ponce on August 28th, there were still several pending staff assignments to be made by the Department of Education, even though the staff were identified.<br><br>During the visit to Villalba on September 3, five vocational teachers were on site with materials to provide the service.  Youth with high school diplomas were also scheduled to participate in vocational classes. The classes are being done remotely with materials. Vocational teachers are planning to videotape demonstrations to accompany the written materials for some lessons.  There were only two regular teachers on site, and two special education teachers. Others had been identified but not yet approved to start.<br><br>By the end of the quarter, only the director position at Villalba, only the director and 2 Title I teachers were left to be employed, and at Ponce, only the director and one Title 1 teachers were pending. |
| What is needed for full compliance? What steps are required and/or recommended? | The Department of Education is responsible per the Settlement Agreement for the delivery of all educational services, as well as providing sufficient qualified teachers.<br><br>Well qualified staff should include verification not only of certifications, but also of training for new educational staff, and training required by the Department of Education and coordinated between the Division of Training and NIJ educational services. |

| | |
|---|---|
| | Training records of education staff (including ancillary staff) should be documented and provided as evidence of training requirements. |
| | Facilities for classrooms and administrative staff for the education programs must be functional, without leaking roofs, moldy ceilings or walls, and with air conditioning units that are working, once able to be safely used again. |
| | Monthly attendance by essential educational staff should remain at 90% or higher in each facility. Ideally, classes should not be disrupted or cancelled as a result of teacher absence. |
| | Given the reality of covid-19 being prevalent for the next several months, DCR and PRDE must make its best efforts to ensure that services are afforded for a full day of school, even if done remotely.  Computers should be operational, and should aid students in completing assignments. The remote classroom can offer promise for how services can be provided, as is being done by many community schools. |
| | DCR and PRDE must ensure that all students are receiving a full school day, including those youth who are in detention status, in transitional measures, protective custody, group schedule modification or any other form of isolation, including quarantine. |
| | With the Coronavirus situation remaining fluid, plans may necessarily change during the school year. |
| Priority Next Steps | A memorandum of agreement which more closely described the working relationship between DCR and PRDE should be created. |
| | The Department of Education and NIJ education staff must continue to make all efforts to adapt classes as best possible during the coronavirus so that youth can attain maximum benefit from instruction. |
| | Given the reality of teacher exposure to covid-19 requiring quarantine, DCR and PRDE must have contingency plans for how youth will continue to receive services. |
| | Ensure that vocational services are provided, even if remotely, through demonstrations which are videotaped or live, and written materials that students can complete. This is a creative solution offered by DCR which should be followed up. |
| | Ensure that the new computers are operational and being used to their maximum benefit for students both in the classroom, or when possible, during evening hours, for instructional purposes. |
| | Comply with other requirements impose by the PRDE and the Settlement Agreement as best possible while maintaining a safe environment during the pandemic. |

| Quality Assurance Measures | The Department of Education should develop quality assurance measures relative to the delivery of education services in collaboration with the NIJ school administrative staff. |
|---|---|
| Sources of Information upon which Consultant report and compliance ratings are based. | Video conferences with education staff from NIJ and PRDE<br>Monthly statistical reports<br>List of teachers and other school personnel including vacancies<br>List of students who have graduated 6th, 8th and 12th grades<br>Documentation from PRDE regarding waiver and other changes during COVID-19<br>Collaborative Agreement between Department of Education and the Department of Corrections and Rehabilitation signed in December of 2019 |

| S.A. 86  Defendants, specifically the Department of Education, shall abide by all mandatory requirements and time frames set forth under the Individuals with Disabilities Education Act, 20 USC §§ 1401 et seq. Defendants shall screen juveniles for physical and learning disabilities. The screening shall include questions about whether the juvenile has been previously identified by the public school system as having an educational disability, previous educational history, and a sufficient medical review to determine whether certain educational disabilities are present, such as hearing impairments, including deafness, speech or language impairments, visual impairments, including blindness, mental retardation, or serious emotional disturbances adversely affecting educational performance. |
|---|
| **Compliance  Rating** | **Partial Compliance** |

| Description of Monitoring process during this period of time | The Monitor continued to check with postings from the U.S. Department of Education regarding any waivers relative to special education compliance due to covid-19.<br>The United States Department of Education specifically declined to seek a congressional waiver for school districts related to their responsibilities under the Individuals with Disabilities Improvement Education Act (IDEIA).[7] The Department made clear that school districts must still provide a free and appropriate public education (FAPE) while balancing the need to protect the health and safety of students. The Department of Education has reiterated that the provision of FAPE may include special education and related services provided through in person, distance learning, virtually, online or telephonically.<br><br>As such, PRDE has not been granted a waiver of any type from complying with the requirements of the IDEIA.  PRDE has provided some guidance letters which the Monitor has reviewed such as how online professional development can occur, and how modified IEP meetings can be done remotely.<br><br>The Monitor also learned this quarter that Puerto Rico has special conditions for the release of CARES funds, IDEIA, Title 1 and funds for vocational education. Funding for the 2019-2020 and 2020-2021 years have been retained until the island can negotiate a third party to manage its funds. PRDE has been negotiating a contract now for about a year with such a provider.  They have, however, received a waiver to release 2017-2018 |
|---|---|

---

[7] See, https://sites.ed.gov/idea/secretary-devos-declines-to-seek-congressional-fape-lre-waivers-to-idea-requirements.

| | |
|---|---|
| | funds, and may be able to use those to hire two school psychologists which were previously sought.  This proposal has been submitted and waiting approval.

Additional records reviewed for the Second Quarter include:

1) List of all student enrolled vocational education, including special education students
2) Verification of the provision of educational services within 5 days of arrival for eligible youth.
3)  Tracking Form for Initial and Re-evaluation Process
4)  Reports from MIPE regarding re-evaluations which are overdue
5)  Evaluations completed by PCPS
6)   A list of eligible students who were entitled to extended school year services from this past summer.
7)  List of youth who have been evaluated by PCPS and copies of evaluations

In total, three video conferences were held with the Carlos Delgado (DCR) and Daiber Carrion (PRDE) to discuss the provision of special education services. These were held on August 10th, August 11th, and September 18th.  As noted above, one site visit was also made to each of the two facilities by Javier Burgos this quarter.

At the end of September, the Monitor participated in a "virtual tour" by the U.S. Department of Justice from September 30 – October 2.  This included meetings with teachers and facility directors, as well as with Carlos Delgado and Daiber Carrion.  The DOJ education expert Kelly Dedel also participated. |
| Findings and Analysis | This section provides a general requirement that compliance with the IDEIA is necessary in order to meet compliance requirements of this section. For purposes of complying with the IDEIA, this provision has been broken down into 4 sections as noted below:

**1) Mandatory requirements of the Individuals with Disabilities Education Act**
   **a)  Child Find**
PRDE is responsible for ensuring that Child Find provisions to locate and identify youth who may be eligible for special education are met, but must work collaboratively with NIJ instructional staff to ensure that adequate mechanisms are in place to identify when youth are appropriate for referrals.

Youth are typically screened at detention using an education questionnaire to determine prior educational placements, previous involvement in special education, and academic achievement.  Diagnostic testing is completed within five school days and school records are requested and obtained. Physical disabilities are noted, including visual problems, speech problems, use of medication, hearing problems, and orthopedic problems. Recommendations for testing are made including for hearing impairment, psychological, occupational therapy neurological examination, psychiatric, visual, health and/or a Woodcock Munoz.

Documentation received from NIJ education staff indicates that there were 19 new youth admitted on detention status, of which 17 held for a minimum of 5 days. Of the seventeen youth 17 held, five (5) already graduated and thus were not tested. Of the |

remaining twelve (12), one was hospitalized, and the other eleven (11) were evaluated based upon the process noted above, including basic testing across the five subject areas. This includes 4 new admissions in August, and 7 new admissions in September. This is a substantial improvement from the second quarter where no youth were being tested because of covid-19.  Of the eleven youth evaluated, they were completed in a timely manner.

This section has returned to compliant status as it had been with the exception of the second quarter.

### b) Evaluation of youth with suspected disabilities

PRDE has an obligation to ensure that youth with suspected disabilities, and those in need of re-evaluation, receive thorough multi-faceted evaluations which stretch across areas of concern as well as the identification of student strengths.  This include three year re-evaluation processes as well.

MIPE sends quarterly computer generated updates to the Monitor indicating which youth have  completed evaluations, which are about to be completed, and in which cases triennial evaluation dates have expired. The Monitor confirms these using the online MIPE system for more information about the timelines.  At the end of the quarter, MIPE's printout showed that six (6) triennial evaluations were overdue, some for significant periods of time.   A report by NIJ indicated of the six youth listed, one left in May. A second youth left in March, but returned in July.  The evaluations for the five youth still in the facility were referred for completion to PCPS since they were overdue. It is not unusual that information is not completed in the MIPE system.

DCR referred a total of 11 youth for re-evaluations to PCPS for completion which were overdue, and all 11 were completed during this third quarter.   It appears there are 3 additional evaluations which are pending, two for youth in treatment and one for a youth in detention status, which were more recently initiated.

This is very significant progress.  PCPS has been contracting with an outside clinical psychologist to complete these evaluations. If the mental health provider changes, it would be helpful to continue this services so that this area can move toward greater compliance.

### c) Provision of specially designed instruction and related services

DCR and PRDE took several measures to ensure that youth were receiving specially designed instruction and related services this quarter.  DCR opted to design services with youth in their classrooms (or on module for small numbers), with teachers working remotely from within the facility.

Guidance provided by the U.S. Department of Education recognized the challenges for schools shut down during the pandemic, and emphasized that federal disability laws allow for flexibility in determining how to meet the needs of individual students with

| | |
|---|---|
| | disabilities.  This necessarily looks different during a national emergency, but it does not mean that services are discontinued.  In cases where services are missed or delayed, IEP teams must make decisions about whether and to what extent compensatory services may be required when schools resume normal operations.[8]

DCR and PRDE did a commendable job this quarter in scheduling and completing IEPs which were overdue for revisions, and doing COMPU meetings remotely.  PRDE compliance staff began meeting weekly to do planning on how to help the youth with the most significant disabilities to bet better services.

 Remote services, while likely necessary at this point, may not be appropriate for some students who need more one on one time.  DCR and PRDE should continue to find ways to effectively delivery the services to those youth who struggle to learn remotely.

   **d)  Procedural safeguards**

DCR and PRDE made a significant effort this quarter, starting in August, to reschedule COMPU meetings remotely, and to revise IEPs accordingly.  On September 3, for example, at the time of Mr. Burgos' visit, three COMPU meetings were already completed, and three additional ones were scheduled.

NIJ and the PRDE are encouraged to examine guidance documents provided by the United States Department of Education relative to initial evaluation and assessment timelines and procedural safeguards during coronavirus. https://www.d.gov/coronavirus. |
| What is needed for compliance to be achieved? | Initial evaluations and re-evaluations must be completed in a timely manner, and in accordance with the provisions of IDEA. Under 34 CFR §300.305(a)(1), the IEP Team and other qualified professionals, as appropriate, as part of an initial evaluation and as part of any reevaluation under 34 CFR Part 300, must: "Review existing evaluation data on the child, including—(i) Evaluations and information provided by the parents of the child; (ii) Current classroom-based, local, or State assessments, and classroom-based observations; and (iii) Observations by teachers and related services providers."

For youth who are in detention status with overdue re-evaluations, a process must be worked out with the local district to ensure the evaluation gets completed.

IEPs must include an individualized determination of disability, special considerations, including behavioral plans when appropriate, and a range of placement options, including the availability of resource rooms and a self-contained classroom if necessary. Staff should be trained on the use of Functional Behavioral Assessments and the Development of Behavioral Intervention Plans for those youth with significant behavioral and emotional problems which impede learning, and/or disrupt the classroom setting. |

---

[88] Id. at pg. 2.

| | IEPs meetings must be held at least on an annual basis, with new plans in place as needed. Compliance with this provision must be done remotely if necessary.<br><br>The use of surrogates when necessary, must be examined.  While it may be possible that an NIJ social worker may stand in for a parent, this must be a parental designation and not one made by NIJ or PRDE. Policies and practices must also ensure other procedural safeguards for the participation of parents as well as youth.<br><br>Compliance with IDEIA requirements during the pandemic is challenging, but NIJ and PRDE have not been exempted by the U.S. Department of Education nor this Settlement Agreement from compliance.  Finding ways to effectively serve youth remotely, as well as conducting the appropriate reviews, will continue to be a high priority. |
|---|---|
| Priority Next Steps | Continue compliance on Child Find requirements, including initial screenings done on youth within 5 days of intake.<br><br>Continue the good progress with timely evaluations and revised IEPs. The Monitor encourages the use of PCPS to assist in the evaluation process, training and development of IEPs, particularly for those students with behavioral challenges.<br><br>PRDE must ensure that there are proper procedures for identification of "parents" and that such individuals meet the definition within IDEA, or are designated by such person, and that surrogate parents are also available as needed.<br><br>PRDE must find ways to ensure that youth eligible to receive specially designed instruction are still served during the pandemic.  Because these youth were not given specially designed instruction during the months of March – June, compensatory education should be considered.<br><br>The use of computers to assist students, including special education students, is strongly encourages since the computers are now readily available.<br><br>The Monitor has consulted with PRDE about conducting selected file reviews during the fourth quarter using compliance staff to conduct these reviews, with reports provided to the Monitor.  It is hoped that PRDE will eventually move into this self-monitoring function.  The process has been established to be completed in the next quarter. |
| Quality Assurance Measures | The monitor has not yet reviewed draft quality assurance. |
| Sources of Information relied upon | Interviews with NIJ and PRDE staff<br>Review of documentation regarding student schedules, attendance of staff and youth, disability categories and time spent in special education by facility<br>Copies of evaluations completed<br>Review of Department of Education guidance documents<br>Phone calls and emails |

**S.A. 87**. If a juvenile has been previously identified as having an educational disability, Defendants shall immediately request that the appropriate school district provide a copy of the juvenile's individualized education plan ("IEP"). Defendants shall assess the adequacy of the juvenile's IEP and either implement it as written if it is an adequate plan or, if the IEP is inadequate, rewrite the plan to make it adequate, and then implement the revised IEP.

| Compliance Rating | Partial Compliance |
|---|---|
| Description of Monitoring process during this period of time | The monitor previously reviewed the procedures and forms for requesting documentation on youth from prior school districts when admitted to detention.  This includes the youth's cumulative file through SIS and the special education file through MIPE.<br><br>Documentation of when IEPs were revised and when new IEP's were due was reviewed by the Monitor and compared against the MIPE system. |
| Findings and Analysis | Appropriate policies are in place to require that records of the youth's IEP are obtained immediately from the appropriate district. Records must be requested within 10 business days after the screening is done and the youth has indicated he or she has an IEP.  The youth is enrolled in school within 72 hours. Because of the coronavirus, during this quarter, few youth were admitted, and those who entered into detention status did not have teaching staff available to them.<br><br>It appears that IEP reviews and modifications that were past the one year deadline during the second quarter have been revised during this quarter.  DCR and PRDE have made a concerted effort to schedule COMPU meetings early in the school year to make these changes. |
| What is needed for full compliance? What steps are required and/or recommended? | All special education files should contain a records of annual IEP reviews, and other reviews of the IEP done during the year as needed.  A system of reviewing IEPs must align with a 12 month calendar year, or more often if needed.<br><br>Youth with an outdated IEP upon arrival must have a COMPU meeting to develop a new IEP based upon the latest evaluation, and when that is out of date, a referral for a new evaluation must be promptly made.<br><br>During the pandemic, education staff will need to continue to conduct remote COMPU meetings, and make best their best effort to involve parents in these remote meetings. Given the unavailability of internet in some communities, this may prove challenging to get parental participation.  The Department of Education should examine ways to involve parents who have technology limitations in their homes. |
| Priority Next Steps | Ensure that the appropriate COMPU meetings are held to review the youth's IEP goals and progress, present levels of performance, and any needed changes to the IEP's goals, measurable objectives, accommodations and placement. This is particularly important for youth entering into detention status.<br><br>Ensure the appropriate technology is in place to conduct COMPU meetings, including the participation of parents and youth. |

| Quality Assurance Measures | Education QA tools have not been reviewed by the Monitor but have been requested so they can be reviewed. |
|---|---|
| Sources of Information upon | Review of screening and evaluation materials completed while youth are detained<br>Review of documentation used to request and follow up on records<br>Discussions with PRDE and NIJ education staff<br>Review of monthly documentation tracking special education deadlines for evaluations and IEP reviews. |

**S.A. 90**. Defendants shall provide appropriate services for juveniles eligible for special education and related services. Defendants shall provide each such juvenile with educational instruction specially designed to meet the unique needs of the juvenile, supported by such services as are necessary to permit the juvenile to benefit from the instruction. Defendants shall coordinate such individualized educational services with regular education programs and activities.

| Compliance Rating | Partial Compliance |
|---|---|
| Description of Monitoring process | See above generally Paragraph 86 for a discussion of the provision of specially designed instruction |

**S.A. 91.** Qualified professionals shall develop and implement an IEP reasonably calculated to provide educational benefits for every juvenile identified as having a disability. When appropriate, the IEP shall include a vocational component.

| Compliance Rating | Partial Compliance |
|---|---|
| Description of Monitoring process during this period of time | The Monitor reviewed the qualifications, including records of certifications, for special education staff at the beginning of the 2019-2020 school year.  She has not received credentials on new teachers assigned to NIJ facilities for this year.<br><br>A review of all youth schedules for regular and special education students was completed, including vocational education classes. |
| Findings and Analysis | Staff responsible for the development of IEPs are the special education instructors, who are training in working with students with disabilities and the creation of IEPs.  An adequate number of special education staff are employed in the two facilities, and were available this quarter.<br><br>All students receiving special education and related services are enrolled in vocational education classes. These are held in the afternoon with remote access.<br><br>The extent to which IEPs are developed and implemented to allow youth to achieve academic benefit is monitored through Paragraph 86. |
| What is needed for full compliance? What steps are required and/or recommended? | The monitor believes that the policies and procedures, training, staff and resources are available to ensure that this provision is in compliance. A system of documentation has been created which is thorough and which appears to follow the requirements under IDEA for the creation and implementation of IEPs. |

|  | The provision of vocational education is incorporated into policy and, while not mandatory in all cases, has been an integral part of providing more robust educational services for youth in NIJ and is offered consistently.<br><br>IEPs must be designed based upon the individual needs of the youth.  Such determinations as made as part of the Paragraph 86 compliance ratings. It is important to note the relationship between well designed evaluations which include all areas of concerns, proper identification of youth disabilities and levels of performance, and the individualization of a plan which can meet the specific needs of those youth, including the level of service afforded, special aids and supports, accommodations, and related services.  Paragraph 86 ties those provisions together through file reviews, youth and teacher interviews, and observations.<br><br>For the coming school year, in the wake of the pandemic, NIJ and PRDE must continue to provide vocational education taking into account the requirements for social distancing, the availability of teachers remotely or in person, and other variables. |
|---|---|
| Priority Next Steps | Ongoing monitoring over the next year will ensure that all provisions in place are being implemented fully and faithfully as best possible given the pandemic. |
| Quality Assurance Measures | The Monitor has not reviewed proposed QA measures. |
| Sources of Information | All youth schedules regarding the provision of vocational instruction<br>Review of Policies and procedures |

**S.A. 93** Services provided pursuant to IEPs shall be provided year round.  Defendants shall ensure that juveniles with educational disabilities receive a full day of instruction five (5) days a week.

| Compliance  Rating | **Partial Compliance** |
|---|---|
| Description of Monitoring process during this period of time | The Monitor met with Carlos Delgado and Daiber Carrion during this third quarter to discuss a method for making up extended school year services (ESS) since no service was provided to eligible students this summer because of covid-19.<br><br>A list of students who remain in DCR custody and who qualified for ESS was provided. Plans were discussed about how "compensatory services" could be provided. The Monitor asked to receive a plan for how these services will be delivered this during this quarter and/or next. |
| Findings and Analysis | Year round school services to special education students must be provided to students who "prior to the corresponding evaluations, require this service in order to avoid falling back in their academic skills and performance." (See policy 20.2 Section V)<br><br>Education staff provided information to the Monitor for the 2019 – 2020 school year which includes 8 youth in Villalba and 7 youth in Ponce who are eligible for extended school services.  Eligible youth were to have received 5 hours per day of instruction during the summer schedule. Two special education teachers in each facility were approved to work with this program over the summer. |

| | |
|---|---|
| | Unfortunately, as a result of coronavirus, no teachers were available to conduct extended school year services, and none was provided during the month of June.

An appropriate level of compensatory services should be provided to these youth, who are at risk for regression.  There are 6 youth in Villalba and one in Ponce entitled to these services. DCR has informed the Monitor that there will be a weekly class with these youth through December 23rd to make up for the instruction during the summer. I have encouraged creative uses for this time which would include high interest activities that can reinforce fundamentals, but not feel like "more school." |
| What is needed for full compliance? | Policies are already in place which address the need for Extended School Services. An annual review of youth eligible for ESS should be made in the fall and submitted to the PRDE for consideration.  Qualified teachers must be retained each year to provide ESS to eligible students.

Compensatory services must be provided to make up for the time lost this summer for eligible students. |
| Priority Next Steps | Design and document all hours spent per eligible use between now and the end of the school year on December 23.  Ensure that all youth who were eligible receive this services. |
| Quality Assurance Measures | Quality assurance measures should be established to ensure that such provisions are made in a timely manner, and that youth who are eligible received the service with a qualified teacher. |
| Sources of Information |  Documentation as submitted to PRDE concerning students eligible for ESS, and teachers available and designated for this service. |

**S.A. 94.** Juveniles shall not be excluded from services to be provided pursuant to IEPs based on a propensity for violence or self-inflicted harm or based on vulnerability. Juveniles in isolation or other disciplinary settings have a right to special education. If required for institutional security, services provided pursuant to IEPs may be provided in settings other than a classroom.

| Compliance Rating | Partial Compliance |
|---|---|
| Description of Monitoring process during this period of time | The Monitor cross referenced youth in TM, PC or on group schedule modification to see what educational services were provided under this section.  Of the two youth in transitional measures or protective custody, one was eligible for school services while in that status at least for a couple of days.  There were also 8 youth in Ponce on Group Schedule Modification for 6 days (four of which were school days) from September 22 – September 28, and who were entitled to educational services.

Timely reports were not provided of youth for youth in disciplinary settings or isolation, or measures such as PC or TM, or group schedule modification which results in isolation. |
| Findings and Analysis | There are three sections to Paragraph 94 which must be monitored: 1)  Whether youth who have an IEP are excluded from services based upon a propensity for violence or self-inflected harm or based on vulnerability. |

| | |
|---|---|
| | 2) Whether youth in "isolation or other disciplinary settings" are provided the right to special education services; and<br>3) Whether educational services provided pursuant to an IEP occurring in settings outside of the classroom are required for institutional security.<br><br>**Services to Youth in TM or PC Status**:<br>NIJ Policy 20.1 to require full day educational services be provided to youth in Transitional Measures or Protective Custody who have not already graduated. The requirement is for 6 fifty (50) minute classes, the same afforded other students. Compliance with this new policy positively impacts several provisions of the Consent Decree, including the educational requirements of Paragraphs 79 and 80, Paragraph 81, and Paragraph 86. This policy must still be signed by the Secretary.<br><br>Verification of school services is made through examination of each youth's education schedule, and examination of daily attendance records, signed by each teacher, and by the student. For those dates when the youth did not receive a full school day, accompanying explanatory notes are examined.<br><br>Placement in Transitional Measures and/or Protective Custody for the quarter was low, with only 2 youth in this status for the third quarter, with only one of those youth in that status for 2 days of the school quarter. Eight youth, however, were placed in group schedule modification status at Ponce; educational services should be documented for these youth during the duration of that status.<br><br>**School exclusion for other youth**<br>A tracking form is used to document when school services are not available as a result of register, incidents such as fights, lack of available security or other reasons not the fault of youth.<br><br>**Classroom and Education Staff for TM**<br>In order to properly implement the new policy, NIJ must have sufficient educational staff to serve these youth, and the physical resources needed to conduct classes in a safe environment. |
| What is needed for full compliance? What steps are required and/or recommended? | Compliance with the new policy will require that NIJ consistently provide full school days of 6 fifty minute classes in accordance with individual schedules for youth who are in TM and PC, and who have not graduated from high school. This will also be true for other youth who are in group schedule modification status, or otherwise in any form of isolation. For youth who are in quarantine, educational services must still be provided in modified form.<br><br>Coordination with security staff is essential to limit the disruption to the school schedule as best possible, and to ensure that youth receive the required services. Continued documentation and analysis of days where youth do not receive services due to other reason is critical. |

| | Time documentation of youth receiving education in TM and PC status, as well as any changes with implementation of Group Schedule Modification which interfere with educational programming. |
|---|---|
| Priority Next Steps | NIJ and PRDE must determine how youth in transitional measures or protective custody will be provided with educational services depending upon the model they use for delivering services to youth in the fall semester.<br><br>NIJ and PRDE will also need to ensure that educational services are provided to youth in group schedule modification or other forms of isolation when applicable. Quarantined youth should still be receiving access to education services even if a teacher cannot be physically present. |
| Quality Assurance Measures | No QA has been reviewed for this provision but the Monitor. |
| Sources of Information upon which Consultant relied | Review of policies and procedures relative to education<br>Discussion with education staff |

**S.A. 95.** When an IEP is ineffective, Defendants shall timely modify the IEP.

| Compliance Rating | Partial Compliance |
|---|---|
| Description of Monitoring process | See above for discussion of this section.  . |
| Findings and Analysis | See discussion above. |
| What is needed for full compliance? What steps are required and/or recommended? | Good data must be kept on student goal achievement, and should reflect student progress for meeting IEP goals, and receiving academic benefit from instruction provided.  Student files reviewed indicated that reviews are completed every 10 weeks on students, and information on progress is sent to parents.  This practice, when done consistently, provides the youth and parents with good benchmarks for the year, but should also provide indicators for when IEPs may need to be modified.<br><br>Supervision of IEPs and data collection should provide indicators of whether such progress is being achieved with each student.  PRDE must have a system of providing oversight of special education teachers to monitor their development of IEPs, as well as progress and benchmarks achieved.<br><br>Special education services did resume this quarter, and the IEPs which were overdue have been revised as noted in Paragraph 86.<br><br>Full compliance with this provision is met when Paragraph 86 reaches full compliance. |